UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA
LAS VEGAS DIVISION


| | | |
|---|---|---|
| IN RE: | ) | CASE NO:  06-10725 |
| | ) | CHAPTER 11 |
| | ) | |
| USA COMMERCIAL MORTGAGE COMPANY, | ) | Las Vegas, Nevada |
| | ) | |
| | ) | Monday, November 13, 2006 |
| Debtor. | ) | ( 9:54 a.m. to 11:03 a.m.) |
| | ) | (11:22 a.m. to 11:37 a.m.) |
| | | (11:46 a.m. to 12:06 p.m.) |


MOTIONS HEARING

BEFORE THE HONORABLE LINDA B. RIEGLE,
UNITED STATES BANKRUPTCY JUDGE


Calendared Motions:      See page 2

Appearances:      See page 3

Court Recorder:      Helen Smith

Transcribed by:      Exceptional Reporting Services, Inc
14493 South Padre Island Drive, #A-400
Corpus Christi, TX 78418-5940
361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**CALENDARED MOTIONS:**

**#1   MOTION TO AUTHORIZE A SHORT-TERM FORBEARANCE FOR THE MARLTON SQUARE 1ST LOAN, AND TO GENERALLY AUTHORIZE SHORT-TERM LOAN FORBEARANCES AND FULL RELEASES AND RECONVEYANCES FOR LOANS PAID OFF IN FULL (AFFECTS DEBTORS USA COMMERCIAL MORTGAGE COMPANY AND USA CAPITAL FIRST TRUST DEED FUND, LLC), DE #1448;**

**#2   MOTION FOR RELIEF FROM STAY PROPERTY:  LOAN SERVICING AGREEMENT FOR DIRECT LOAN TO BOISE/GOWAN, LLC., DE #1273;**

**#3   DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT PLAN OF REORGANIZATION DATED NOVEMBER 6, 2006, DE #1755;**

**#4   MOTION TO ENFORCE ORDER GRANTING DEBTORS' MOTION TO DISTRIBUTE FUNDS, DE #1389;**

**#5   MOTION TO WITHDRAW AS ATTORNEY OF RECORD FOR FRANK LEE RAYMOND, DE #1703;**

**#6   FIRST APPLICATION FOR COMPENSATION FOR REIMBURSEMENT OF EXPENSES OF COMMITTEE MEMBERS FOR OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS OF USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, FEES:  $0.00, EXPENSES: $1,447.08, DE #1508**

3

**APPEARANCES FOR:**

Debtors:                        ANNETTE JARVIS, ESQ.
                                P.O. Box 45385
                                Salt Lake City, UT 84145

                                JEANETTE McPHERSON, ESQ.
                                Schwartzer & McPherson Law Firm
                                2850 S. Jones Boulevard
                                Suite 1
                                Las Vegas, NV 89146

Official Committee of           CANDACE CARLYON, ESQ.
Equity Security Holders         Shea & Carlyon, Ltd.
of USA Capital First            701 Bridger Avenue
Trust Deed Fund, LLC:           Suite 850
                                Las Vegas, NV 89101

Official Committee of           GERALD GORDON, ESQ.
Executory Contract              GREG GARMAN, ESQ.
Holders of USA                  Gordon Silver
Commercial Mortgage             3960 Howard Hughes Parkway
Company:                        9th Floor
                                Las Vegas, NV 89169

SPCP Group:                     AMY N. TIRRE, ESQ.
                                Kummer Kaempfer Bonner
                                5585 Kietzke Lane
                                Reno, NV 89511

                                JAMES C. McCARROLL
                                Reed Smith, LLP
                                599 Lexington Avenue
                                NEW YORK, NY 10022

Frank Raymond Lee:              DAMON DIAS, ESQ.

Official Committee of           MARC LEVINSON, ESQ.
Equity Security Holders         Orrick Herrington & Sutcliffe, LLP
of USA Capital                  400 Capitol Mall
Diversified Trust Deed          Suite 3000
Fund, LLC:                      Sacramento, CA 95814

                                ANNE M. LORADITCH, ESQ.
                                Rox Rothschild
                                3800 Howard Hughes Pkwy., Suite 500
                                Las Vegas, NV 89169

4

**APPEARANCES FOR:**      (CONTINUED)


Stanley Alexander Trust,  ROBERT LePOME, ESQ.
et al.:                   10120 S. Eastern Ave., #200
                          Henderson, NV 89052


Official Committee of     ROB CHARLES, ESQ.
Unsecured Creditors for   Lewis & Roca, LLP
USA Commercial Mortgage   3993 Howard Hughes Parkway
Company:                  Suite 600
                          Las Vegas, NV 89169


Official Committee of     EVE KARASIK, ESQ.
USA Capital First Trust   CHRISTINE PAJAK, ESQ.
Deed Fund, LLC, et al.:   Stutman Treister & Glatt, P.C.
                          1901 Avenue of the Stars
                          12th Floor
                          Los Angeles, CA 90067


U.S. Trustee:             AUGIE LANDIS, ESQ.
                          Assistant United States Trustee
                          (No address provided)

1    **Las Vegas, Nevada; Monday, November 13, 2006; 9:54 a.m.**

2    **(Call to Order)**

3        **THE CLERK:**  All rise.  Bankruptcy Court is now in

4    session.

5        **THE COURT:**  Be seated.

6        Okay, USA Commercial Mortgage appearances, please.

7        **MS. JARVIS:**  Annette Jarvis for the debtors.

8        **MS. McPHERSON:**  Good morning, your Honor; Jeanette

9    McPherson of Schwartzer and McPherson law firm on behalf of the

10   debtors and debtors-in-possession.

11       **MS. KARASIK:**  Good morning, your Honor; Eve Karasik

12   and Christine Pajak of Stutman Treister and Glatt, Special

13   Corporation, on behalf of the First Trust Deed Fund.

14       **MS. CARYLON:**  Good morning, your Honor; Candace

15   Carlyon of Shea and Carlyon on behalf of the First Trust Deed

16   Fund Committee.

17       **MR. LEVINSON:**  Good morning; Marc Levinson of Orrick

18   on behalf of the Diversified Committee.

19       **MS. LORADITCH:**  Good morning; Anne Loraditch of

20   Beckley Singleton Chartered, Nevada counsel for Diversified

21   Trust Deed Fund Committee.

22       **MR. GARMAN:**  Your Honor, Greg Garman and Gerald

23   Gordon of Gordon and Silver for the Direct Lender Committee.

24       **MS. TIRRE:**  Good morning, your Honor; Any Tirre of

25   Kummer Kaempfer Bonner on behalf of SPCP Group, LLC, local

6

1    counsel.

2         **MR. McCARROLL:**  Good morning, your Honor; James

3    McCarroll of Reed Smith, LLP, on behalf of SPCP Group, LLC, the

4    stalking horse bidder.

5         **MR. LePOME:**  Good morning, your Honor; Bob LePome on

6    behalf of Dr. Stanley and others.

7         **MR. CHARLES:**  Rob Charles from Lewis and Roca on

8    behalf of the Official Unsecured Creditors Committee of USA

9    Commercial Mortgage Company.

10        **MR. LANDIS:**  Good morning, your Honor; Augie Landis,

11   Assistant United States Trustee.

12        **MR. DIAS:**  Good morning, your Honor; Damon Dias on

13   behalf of creditor Frank Raymond Lee.

14        **THE COURT:**  Okay.

15        All right, Ms. Jarvis, do you want to go ahead and

16   give us a status report update before we start, to the extent

17   there is any more beyond the disclosure statement?

18        **MS. JARVIS:**  There's not a lot more beyond the

19   disclosure statement.  The parties have been working very hard

20   to put together the disclosure statement, make the necessary

21   amendments, to add additional information to respond to your

22   Honor's concerns, and also to the two filed objections which

23   were by the SEC and the PBGC, and I think those have been

24   resolved.

25        We do have -- we filed last week amended plan and

7

1   disclosure statement to incorporate the compromises that have

2   been reached as well as to add information respecting those

3   changes and the response to the objections.  We do have a few

4   more today which I will, in the course of the hearing, walk

5   through.  They're mostly in the nature of technical amendments.

6          So with that, we've been continuing to collect loans.

7   I don't know that in the last week we've collected any, but we

8   do have some; I think one that we expected to be collected this

9   week that should have been funded I think today, and continued

10  those efforts.

11          **THE COURT:**  Oh, while I have you here; have you seen

12  the motion Ms. Scann filed on behalf of Binford (phonetic)?

13          **MS. JARVIS:**  Yes.

14          **THE COURT:**  The question is what date do you want to

15  have that heard?  Do you have any objection to having that

16  heard on November 28th?

17          **MS. JARVIS:**  We would prefer not to have it on an

18  expedited basis.  There are some -- it's an ongoing discussion.

19  This is something that has been discussed between the parties

20  for quite some time.  We do want to make sure that we have

21  adequate ability to be able to respond to this because there is

22  a --

23          **THE COURT:**  Okay.  That was my concern.

24          **MS. JARVIS:**  -- disagreement.

25          **THE COURT:**  My inclination, I know Ms. Scann isn't

8

1    here, but it was my inclination if you didn't agree not to

2    shorten time because of the pressures we've got.

3            MS. JARVIS:  Right; we would prefer not to shorten

4    time, your Honor.

5            THE COURT:  Okay.

6            And this is something just to chew about during the

7    breaks and before we finish today.  You know, I'm very

8    concerned about the 15th being a little short in light of the

9    fact that we've got to mail these out and it's going to cost --

10   and the package is going to be heavy.  I'd be willing to give

11   you a date, 18th, 19th, or 21st.  So if during the break you-

12   all want to think about doing that, then we can certainly do

13   that.  I think that probably makes more sense.

14           MS. JARVIS:  We appreciate that, your Honor.  You're

15   correct, that it is an extremely short time table to get

16   everything mailed out.

17           THE COURT:  Okay.

18           Okay, so let's go first to the Marlton; that's

19   probably the easiest.

20           MS. JARVIS:  I think, your Honor, where it was left

21   last time, we had not filed the loan servicing agreement.  We

22   have since filed a declaration of Mr. Alison with the loan

23   servicing agreement.  This is a short-term forbearance; that

24   actually is only through I think it's November 19th, the end of

25   this week.  We anticipate that it will be paid off during that

1   period of time.

2           The right to give a forbearance is something that is

3   granted to the loan servicer without requiring consent of the

4   investors in the loan.  This is a very short-term one, and the

5   whole purpose of it is so that the loan can be in a position

6   where it can get refinanced, and that's what the issue is.

7           **THE COURT:**  And more importantly, no lender has given

8   you an objection?

9           **MS. JARVIS:**  No, that's correct.

10          **THE COURT:**  No direct lender on that loan?

11          **MS. JARVIS:**  That is correct.

12          **THE COURT:**  Okay.

13          **MS. JARVIS:**  And we did notice it to them as -- we

14  didn't send out the three-day notice because we don't need

15  their consent, but we did mail copies of the motion to every

16  lender that is in that loan.

17          **THE COURT:**  Okay.

18          **MS. JARVIS:**  So they were all notified that way, and

19  there were no objections.

20          **THE COURT:**  Okay.  Any additional comments from the

21  direct lenders committee?

22          **MR. GARMAN:**  No, your Honor; I think we've more or

23  less worked this out by the end of the last hearing, which was

24  they have these rights under the loan servicing agreements.

25  They need to comply with them, but I don't want to give them

1   blanket authority on that uncomfortable line between a

2   forbearance, which is authorized --

3           **THE COURT:**  Right.

4           **MR. GARMAN:**  -- and an extension, which is not.

5           **THE COURT:**  Right.  I think better practice in the

6   future is to send the notice -- you can even send the notice

7   saying: 'Whether or not we need to send this notice, we're

8   sending it to you'.  You have accomplished that by the notice

9   of the motion, so therefore whether it's on the forbearance

10  side or the modification side, you've complied and you have the

11  -- the servicer has got the right to do that, so I'll approve

12  that.

13          **MS. JARVIS:**  Thank you, your Honor.

14          **THE COURT:**  Okay.  And the Canepa motion is off.

15  That's been resolved, correct?

16          **MS. JARVIS:**  That's correct.

17          **THE COURT:**  And on number five, the motion to

18  withdraw, I assume there's -- there's obviously no objection to

19  that, so that's granted.

20          And let's just go to item number --

21          **THE CLERK:**  Judge, I'm sorry; Mark Diamond (phonetic)

22  called, the attorney from their law firm is here.

23          **THE COURT:**  Well, there's no opposition, so --

24          **THE CLERK:**  Just so he understands.

25          **THE COURT:**  Okay.

1    **MR. DIAS:**  Good morning, your Honor.  This was our

2  motion and I understood that that was granted.  There was no

3  opposition received in this matter.  Damon Dias on behalf of

4  creditor Frank Raymond Lee.

5    **THE COURT:**  Okay.

6    Okay, now let's just skip ahead to number six, the

7  compensation for the committee members.

8    **MS. LORADITCH:**  Good morning, your Honor; Anne

9  Loraditch of Beckley Singleton Chartered.

10    Your Honor, this application requests approval of

11  reimbursement of expenses for two of the committee members:

12  Sara Katz, requesting the amount of $928.97, and committee

13  chairman Robert Worthen (phonetic) requesting $518.11.  The

14  application was served on regular notice and there's been no

15  opposition.

16    **THE COURT:**  And this was in connection with their

17  duties in meeting, et cetera?

18    **MS. LORADITCH:**  That's correct; through the period of

19  August 31st, 2006.

20    **THE COURT:**  Okay, so that's granted.

21    **MS. LORADITCH:**  Thank you.

22    **THE COURT:**  Okay.  Now let's go to the disclosure

23  statement.  And this is much better.  I mean I think it's

24  fairly readable, to the extent anything like this can be

25  readable.  But I think what might be helpful, you know, for the

1  record and for the purpose of those here and on the phone to go

2  through how the plan works, and I think in particular the

3  direct lenders compromise.

4          **MS. JARVIS:**  Okay.

5          **MS. CARYLON:**  Your Honor, do you have the summary

6  that was separately filed?

7          **MS. JARVIS:**  You did; I think it's a --

8          **MS. CARYLON:**  Three-page.

9          **MS. JARVIS:**  -- three-page summary that we had filed

10  separately last week.

11          **MS. CARYLON:**  Because that might be the easiest thing

12  to track through.

13          **THE COURT:**  Is it in chart form or --

14          **MS. JARVIS:**  No, it's narrative.

15          **THE COURT:**  No, I don't have it.

16          **MS. CARYLON:**  I don't know that it was linked to the

17  disclosure statement, unfortunately.

18          **MR. LEVINSON:**  It was linked to the notice.

19          **MS. CARYLON:**  It was linked to the notice,

20  Mr. Levinson.

21          **THE COURT:**  I should have it; let me double check.  I

22  certainly read the disclosure statement, and I read the

23  ballots.

24      **(Pause)**

25          **MS. JARVIS:**  It was attached to the notice of filing

1    cover sheet summary of disclosure statement for debtors' second

2    joint amended plan, and it was e-filed on November 7th.

3          **THE COURT:**  All I got in connection with the notice

4    of filing --

5          **MS. KARASIK:**  I have an extra copy, your Honor.

6          **THE COURT:**  Okay.  I didn't get an -- was the notice

7    of hearing, solicitation procedures, and the ballot.

8          **MS. JARVIS:**  We'll check.  Do you have a copy?

9       **(Pause - the Court reviews documents)**

10         **THE COURT:**  Notice of filing cover summary.  Oh,

11   that's interesting; no, I did not get that.

12         **MS. JARVIS:**  We had filed this, your Honor, as kind

13   of a more simplified summary of the plan, because we understand

14   even though we've simplified the language in the disclosure

15   statement, it is long, it is complex, and therefore the

16   committees and the debtors worked together to put together this

17   short summary.

18         **THE COURT:**  You know, it is possible that I received

19   it in the sense that I had like three copies of this, one that

20   was delivered, one I had downloaded because I wasn't sure if

21   I'd have a chance to get a copy before I had to go to that

22   seminar.  So after I read one copy, if it was attached to

23   another copy, it's possible I didn't get it, but -- I mean I

24   didn't see it but it's possible that it was given to me, but

25   it's not attached to the notice of filing the proposed notice

 1    of confirmation.

 2            Okay, go ahead then.

 3            **MS. JARVIS:**  It was separately filed from that; it

 4    was filed with the notice --

 5            **THE COURT:**  Oh, okay.

 6            **MS. JARVIS:**  -- of filing cover sheets.

 7            **THE COURT:**  Okay.

 8            **MS. JARVIS:**  We'll check the docket to make sure it

 9    shows up on the docket, but it was separately filed from the

10    notice of the confirmation hearing.

11            **THE COURT:**  Okay.

12            **MS. JARVIS:**  This kind of goes through a very short

13    summary of the plan, and it's intended to kind of be an

14    introduction so that parties understand.

15            The basic premise of the plan is that the five

16    debtors remain separate, and so each group of creditors are

17    distributed from or are paid from the assets of their own

18    debtor.  However, there also are certain compromises that are

19    reached where there are certain, in some cases, waivers of

20    claims, in some cases transfers of money back and forth to

21    resolve inter-company claims and to make sure that the whole

22    plan works as far as funding for litigation that will go on

23    post-petition, et cetera.

24            And kind of to -- this summary also explains each

25    different type of claim.  Let me first just go through the USA

1  Commercial Mortgage, a general discussion of that.  We don't

2  believe -- we have classes for secured claims.  I think we're

3  not aware of any secured claims, but in every instance, every

4  class we have secured claims, just in case there are some that

5  we don't know about, but we don't anticipate that there are

6  any.

7          Then in the USA Commercial Mortgage we have a class

8  of unsecured claims.  That would include the claims of direct

9  lenders that would be filed if there is something that

10  Commercial Mortgage has not for the payment of their loans,

11  because they have their interest in their loans, but if they

12  have some claim beyond that for some harm that Commercial

13  Mortgage did to them, then those claims would be included in

14  that pot.

15          **THE COURT:**  Now, I've forgotten; have we extended the

16  bar date for -- We did, did we not?

17          **MS. JARVIS:**  To January 15th.

18          **THE COURT:**  Okay.

19          **MS. JARVIS:**  That is correct.  But because it is a

20  pot plan, your Honor --

21          **THE COURT:**  It doesn't matter, right.

22          **MS. JARVIS:**  -- it doesn't matter.  And, you know, we

23  have set forth in the disclosure statement projections on what

24  we estimate the returns to be, but we also set forth the

25  estimation of claims that we've used to determine that so that

16

1   you can tell that if the claims are a lot more than that, then

2   obviously the percentage return --

3           **THE COURT:**  Because I suppose, for example, you know,

4   if it turns out that -- somebody could arguably file a claim

5   for the deficiency between what they put in and what they got

6   out, and there are two theories.  One theory would be the

7   negligence of USA Commercial in making the loan, but on the

8   other -- And so the worst case basis is it could be all those

9   claims.

10          Now, of course, a number of those claims may not have

11  any relationship because it may well have been that it's just

12  like any other risk of loss in a real estate transaction.

13          **MS. JARVIS:**  Exactly.

14          **THE COURT:**  So the largest universe will know, the

15  largest universe would be -- well we won't know because we

16  don't have a lot of the loans, collected, right?  But it

17  doesn't make any difference; it's a pot plan.

18          **MS. JARVIS:**  Yes.  And there also has been, as part

19  of the compromise between the unsecured creditors committee and

20  the direct lenders committee, we have proposed an alternative

21  dispute resolution procedure for dealing with those claims.

22          **THE COURT:**  Okay.

23          **MS. JARVIS:**  So hopefully there will be a way to deal

24  with them expeditiously and inexpensively, because a lot of

25  them may be claims that probably aren't really claims.

17

1          **THE COURT:**  Uh-huh.

2          **MS. JARVIS:**  Other ones are probably categorized in

3    several different classes.  I mean you can identify what kinds

4    of claims would -- should be allowable and which shouldn't.

5          **THE COURT:**  Okay.

6          **MS. JARVIS:**  So that will be worked out and will be

7    filed within ten days before the confirmation hearing, the

8    alternative dispute resolution --

9          **THE COURT:**  Okay.

10         **MS. JARVIS:**  -- procedures.

11         Then in the USA Commercial Mortgage class, we also

12   have a class, and this has been added originally in the plan as

13   we filed it a week ago.  We had put penalty claims, meaning

14   those usually filed by governmental agencies for non-pecuniary

15   losses, would be subordinated to the claims of other creditors

16   in that class.  We've now put them in a separate class.  I

17   think that's probably more appropriate.

18         And then we also have -- there is a class of

19   subordinated claims which are the claims of the non-debtor

20   insiders that will be subordinated to the payment of all other

21   claims in Commercial Mortgage.

22         With the First Trust Deed Fund and Diversified --

23   Well, let me go first to First Trust Deed Fund.  Primarily

24   their assets are going to be liquidated through the sale to

25   Silver Point.  And as you know, the USA Commercial Mortgage is

18

1    funded partially through the sale to Silver Point because the

2    sale of the servicing business goes into that estate and

3    partially through litigation, which will be pursued

4    particularly against all litigation, all parties out there, but

5    particularly against the non-debtor insiders.  So --

6         THE COURT:  And that's being pursued on behalf of

7    everyone or just --

8         MS. JARVIS:  On behalf of everyone in Commercial

9    Mortgage.  But the claims in Commercial Mortgage will include

10   the direct lender claims that we just discussed.  It will also

11   include claims of Diversified as well.  I believe under the

12   compromises First Trust Deed will not --

13        MS. KARASIK:  No, they will.

14        MS. JARVIS:  Oh, they will?  They will.  Okay, First

15   Trust Deed will also have a claim.  So in other words, kind of

16   the residual claims all end up in this USA Commercial Mortgage

17   trust.

18        THE COURT:  Okay.

19        MS. JARVIS:  So those claims will be dealt with

20   together and, you know, distributed prorate, so the insider

21   litigation will be pursued.

22        It's funded not only by the money that comes in from

23   the sale to Silver Point, but it's also funded as well by

24   monies that have been collected for servicing fees and also

25   what we call the prepaid interest which, as part of the

1  compromise with the direct lenders, will be kept in the estate

2  and used both to distribute to creditors as well as to fund the

3  litigation against the non-debtor insiders.  So that is part of

4  the claim as well.

5          I'll let Mr. Garman and Mr. Charles explain in a

6  minute a little bit more about the USACM direct lenders

7  compromise --

8          **THE COURT:**  Okay.

9          **MS. JARVIS:**  -- because there are compromises of

10 claims back and forth and I think they probably will be best at

11 describing that.  So that's basically USA Commercial Mortgage.

12         First Trust Deed and Diversified are each liquidated

13 in their own way.  First Trust Deed is liquidated through the

14 sale of its assets to Silver Point.  Those funds will come in;

15 they will be distributed first to creditors.  We don't

16 anticipate many creditors at all, but then to the equity

17 holders prorate.

18         They have reached -- I think First Trust Deed has

19 compromised with virtually everyone, all the other inter-

20 company debtors in the case.  And in fact, maybe Ms. Karasik

21 could kind of give a little bit more of a summary of that since

22 these were -- the inter-company compromises were negotiated as

23 we discussed between the committees.

24         Diversified Trust Deed Fund will also be liquidated,

25 but it will be wound down -- It'll remain in existence until it

20

1    is wound down and its assets are distributed.  Most of the

2    loans -- there are a few of the loans in the Diversified Trust

3    that will be serviced by Silver Point as part of the

4    transaction, the closing to Silver Point or whoever the winning

5    bidder would be.  The remainder of the loans remain with the

6    Diversified estate and will be liquidated over time.

7            In addition, they have claims that they will pursue

8    as well against non-debtor insiders, and that will be part of

9    winding down their estate.

10           There are some issues between Diversified and

11   Commercial Mortgage, which, again, maybe I can have the

12   committees to address a little bit more that remain to be

13   resolved because Commercial Mortgage has a receivable against

14   IP.  Diversified has a receivable under the 1090 loan against

15   IP, and there are some issues with respect to where the

16   proceeds of those belong, and that's an issue that is

17   continuing to be either worked out or will be, as part of

18   confirmation, determined by the Court.  So once the assets are

19   completely liquidated in Diversified, then it will dissolve.

20           And again, we don't anticipate a lot of claims in

21   Diversified, but the claims will be paid in full and then the

22   remainders of the money will be distributed pro-rata to the

23   interest holders.

24           Realty and Securities will both be liquidated and

25   dissolved under state law.  There is a compromise which has

21

1    been added in between Realty and the funds.  Realty, as you'll

2    recall, managed the funds, and there are certain new

3    compromises in the plan with respect to either a waiver or a

4    subordination of claims.  Then Realty waives certain management

5    fees that were due Realty as of the date of the bankruptcy

6    filing.  And this was felt to be an appropriate compromise

7    since there are significant claims that the funds have against

8    the manager, and this resolved those claims in a way that

9    facilitates the rest of the inter-company compromises as well.

10           So that's basically kind of an overall view of how it

11   works, and maybe the committees could come up and talk a little

12   bit about the compromises.

13           **THE COURT:**  Just -- I think it's the chart; I didn't

14   have the chart that showed the direct loans attached to my copy

15   of the disclosure statement, and that's understandable because

16   I know you're going to attach it.

17           Do you happen to have one prepared now?  It's the

18   chart -- is it chart three, schedule three?

19           **MS. JARVIS:**  It's the loan summary, after the loan

20   summary.

21           **THE COURT:**  Or maybe you haven't established one yet.

22     **(Attorneys confer with each other)**

23           **THE COURT:**  Exhibit -- Oh, no, that's the

24   relationship; not that one.

25           **MS. JARVIS:**  There should -- I think the one we filed

22

1    on I think it was the 7th may have had one, but can I hand this

2    up to you?

3             THE COURT:  Yes.

4        (Ms. Jarvis provides the document to the Court)

5             MR. LEVINSON:  Is that Exhibit B to what?

6             MS. JARVIS:  It's filed with the disclosure

7    statement, right?

8             MS. KARASIK:  Yes, it was filed with the disclosure

9    statement.

10            MS. CARYLON:  Docket number 1755, Exhibit 3 I

11   believe.

12            THE COURT:  There are no exhibits attached to my

13   copy.

14            MS. CARYLON:  Exhibit 2.

15            MR. LEVINSON:  It's Exhibit 2; Exhibit 3 is the

16   ordered chart, or the disordered chart.

17        (Attorneys confer with each other)

18            THE COURT:  Okay.  There were none attached to the

19   red line.  Is it in the original; maybe that's where I'd find

20   it?

21            MS. JARVIS:  I think it was filed with the -- it

22   should have been filed with the original.

23            THE COURT:  Okay.

24            MS. JARVIS:  I think all the exhibits should have

25   been attached to the original as filed.

23

1      **THE COURT:**  Okay.  I'll look there then, because I

2  had read the red line, so it just didn't have the exhibits.

3          Okay, fine; that's good.

4      **MS. JARVIS:**  Yes.

5      **THE COURT:**  Got it.  You can have yours.

6          Eileen, you can pass that one back.

7    **(The Clerk complies)**

8      **MS. JARVIS:**  We have also in that vein, in adding in

9  additional information, there is a chart now in the disclosure

10 statement as well that talks about the loans that have been

11 collected --

12     **THE COURT:**  Okay.

13     **MS. JARVIS:**  -- post-petition as well, so there is,

14 as your Honor suggested, a lot more information for direct

15 lenders as far as what has gone on and the status of the loans

16 in the case.

17     **THE COURT:**  Okay.

18     **MR. GARMAN:**  Your Honor, I've been nominated to

19 discuss the direct lender USACM compromise, because there are a

20 lot of parts to this.

21         First, we've negotiated a --

22     **THE COURT:**  I don't think your mike is close enough

23 to your face.  You can raise it -- it's counterintuitive, yes.

24     **MR. GARMAN:**  They fixed it, I think.

25     **THE COURT:**  You press down to make it go up.

24

1          **MR. GARMAN:**  Now it's up.

2          It's a comprehensive resolution that takes care of

3   all aspects of direct lenders.  First, it identifies whose

4   loans they are; they'll be the direct lenders' loans.  It deals

5   with servicing of those loans on a going forward basis.  It

6   deals with how the loan servicing agreements will be dealt

7   with, and finally it deals with treatment.

8          Specifically, the plan contemplates that direct

9   lenders' loans do not constitute property of the estate.  They

10  belong to each individual direct lender, and upon the effective

11  date of this plan and transfer out of the servicing rights,

12  those loan servicing agreements, the notes and the underlying

13  deeds of trust are not modified by these bankruptcy

14  proceedings.

15         If on the effective date of the plan the servicing

16  goes to Silver Point, direct lenders have the right at that

17  point to replace Silver Point with some other servicer provided

18  they comply with the terms of the underlying contracts and

19  applicable Nevada law.

20         So we've dealt with the loans, we've dealt with

21  servicing, we've dealt with substantive consolidation.  There

22  will be done under this proceeding.  There will be no re-

23  characterization claims brought by anyone expect for the

24  Diversified Fund maintains their right to bring a substantive

25  consolidation or re-characterization argument against direct

25

1    lenders.  But given that there's no compromise with

2    Diversified, that was just a natural fallout of where we stand.

3           The claims of direct lenders have been broken down

4    into two aspects: There's the A-4 class and there's the A-5

5    class.  The A-4 class deals with all of the monetary claims of

6    direct lenders, and by that I mean it deals with the prepaid

7    interest, it deals with unsecured claims from whatever source,

8    whether it be tort, contract or the like; and by that, the

9    claims we've talked about.

10          Simply because you have a non-performing loan doesn't

11   mean you have a claim against USA simply in their capacity as a

12   loan servicer.  But if they fail to exercise remedies that have

13   damaged direct lenders, if they fail to comply in any other

14   material way with the terms of the loan servicing agreements,

15   direct lenders have the right to file claims.  Those claims are

16   dealt with in the A-4 category, and they share pro-rata with

17   all other similar creditors in this plan, which would be the

18   unsecured class.

19          **THE COURT:**  Now, you said prepaid interest was in A-

20   4; that's not correct, is it?

21          **MR. GARMAN:**  I'm sorry, no, no.

22          **THE COURT:**  Okay.

23          **MR. GARMAN:**  Prepaid interest is not; I apologize for

24   that.  All classes --

25          **THE COURT:**  Because prepaid interest is a claim going

26

1    the other way?

2          **MR. GARMAN:**  That's A-5; prepaid interest comes in A-

3    5.  All monetary claims that a direct lender may have though

4    are dealt with in the A-4 category.

5          **THE COURT:**  And they now have to January 15th to file

6    that claim?

7          **MR. GARMAN:**  They have until January 13th --

8          **THE COURT:**  Thirteenth.

9          **MR. GARMAN:**  -- to file that claim, but as drafted,

10   you must -- direct lenders must file a claim prior to that date

11   if they seek to submit a ballot and vote as an A-4 creditor.

12         **THE COURT:**  Okay.

13         **MR. GARMAN:**  So the deadline has been extended simply

14   because there are circumstances out there that need further

15   explanation to certain direct lenders, and so we've given them

16   that time.

17         **THE COURT:**  Sure.  But if they want to -- so you've

18   made it clear in here that they've got till January 13th to

19   share?

20         **MR. GARMAN:**  Right.

21         **THE COURT:**  But if they want to vote, they have to

22   file it before the ballot deadline?

23         **MR. GARMAN:**  Right.

24         **THE COURT:**  Okay.

25         **MR. GARMAN:**  Yes, your Honor.

1          The A-5 category is the category that deals with the

2   prepaid interest and is what we've called the compromise class.

3   The compromise class contemplates that direct lenders will be

4   relieved and there will be waivers and releases for a variety

5   of claims.   Among those are all accrued, prepaid servicing fees

6   that were arguably owed by direct lenders to the company.

7          Now, one point of clarification I have to make: We've

8   negotiated a structure, and that structure has been in place,

9   and I think that we all still agree with that structure.   But

10  facts and circumstances continue to change as we apply our

11  structure to this plan.   So, over the last thirty-six hours, on

12  Saturday and Sunday, we've uncovered that certain facts weren't

13  as we expected them to be.   So committees, I think all the

14  committees are going to be looking at the disclosure statement

15  that comes out of this hearing today to make sure that this is

16  still the deal they signed on to.

17          **THE COURT:**  You know what I think would be helpful

18  regardless is to do a couple of hypotheticals in your

19  disclosure statement.   I'm suggesting this -- And you know what

20  I would do?   I think I'd take real people; you've disguised

21  their names, perhaps, sometimes it's hard to come up with a

22  hypothetical just using real facts, so that people could see,

23  okay, what happens to me if my loan never paid a dime but I was

24  paid Y dollars?   And then other people whose loans performed

25  for a while and now they may perform, so maybe a couple of

28

1    hypotheticals might help.

2           **MR. GARMAN:**  Okay; we can try and incorporate that.

3    The reality is that there are so many different fact patterns

4    here --

5           **THE COURT:**  Oh, I know, permutations.

6           **MR. GARMAN:**  -- that it's difficult to --

7           **THE COURT:**  Exactly.

8           **MR. GARMAN:**  -- to come up with that.

9           **THE COURT:**  Exactly.  And it's just a suggestion

10   because, you know, disclosure statements provide adequate

11   information, I think it's provided adequate information, I'm

12   getting ahead of myself, but it's making this easy and

13   understandable to read.

14          **MR. GARMAN:**  And truthfully, that's the learning

15   curve we're all still on.

16          **THE COURT:**  Right.

17          **MR. GARMAN:**  But as we negotiated the structure, as

18   pieces came together, the accounting hadn't been done exactly

19   as any of the committees had anticipated that it would be for a

20   variety of reasons.

21          **THE COURT:**  Okay.

22          **MR. GARMAN:**  So we're still putting together the

23   mechanics of it, but I think that the structure is generally in

24   place.

25          So, releases for all accrued prepaid -- accrued but

1   unpaid pre-petition loan service fees.  For example, in years

2   past USACM was paying direct lenders on a pre-petition basis

3   for performing loans, but former management wasn't taking loan

4   service fees.  USACM has said they have a claim for that.

5   Direct lenders have asserted that they have defenses to that.

6          Then there are pre-petition accrued and unpaid loan

7   service fees on non-performing loans that they simply never

8   took out.  Those are all being waived.

9          On a post-petition basis, the contractual service fee

10  as set forth in the loan servicing agreement, whether it be one

11  percent or three percent, is the amount that direct lenders

12  will pay from the petition date through the effective date, and

13  those are -- that is an interest of USACM that will be applied

14  to the trust.

15         The compromise also deals with the prepaid interest

16  in the larger netting term that we've determined.  As a global

17  resolution to this, we've looked at it, and the A-5 class

18  contemplates that that is property of the estate under 541.  So

19  that will remain an asset of the USACM estate to pay claims, to

20  the extent necessary administratives, and then obviously the

21  remainder of it will flow down to the USACM trust that

22  Mr. Charles has set up to pay the claims of all unsecured

23  creditors, including those of direct lenders.

24         **THE COURT:**  Okay.  So we know what's happened so far.

25  So we know what happened so far; let me make up a hypothetical.

30

1    Ms. Smith was paid five thousand dollars pre-petition on her

2    loans, of which only three thousand was performing.

3            **MR. GARMAN:** Right.

4            **THE COURT:** Okay?  Post-petition, another thousand

5    has been received, but that was offset.

6            **MR. GARMAN:** Right.

7            **THE COURT:** So she didn't receive any new monies but

8    she now only owes one thousand dollars for prepaid.  As of

9    confirmation, will the claim against her for the additional one

10   thousand be waived?

11           **MR. GARMAN:** No.

12           **THE COURT:** Not for servicing fees, but I mean

13   prepaid interest.

14           **MR. GARMAN:** No.

15           **THE COURT:** No.

16           **MR. GARMAN:** That will continue to be netted on a

17   going forward basis by whatever the replacement servicer is --

18           **THE COURT:** Servicer is.

19           **MR. GARMAN:** -- until that balance is out.

20           **THE COURT:** Okay.  And then one that balance is paid,

21   then it's paid?

22           **MR. GARMAN:** Then it's paid.

23           **THE COURT:** And so when the balance is paid, that

24   person gets the money going forward?

25           **MR. GARMAN:** Right.  And we determined that that was

31

1    the only way to make sure that it was --

2            THE COURT:  Everybody was treated fairly.

3            MR. GARMAN:  -- could be dealt with, right.

4            MS. JARVIS:  And let me just add one other component

5    to that because if you take your example, so a thousand was

6    collected from the borrowers post-petition and it's held there,

7    but you also could have five hundred dollars or five hundred

8    that was netted against some other loans that were performing

9    that is held back in, you know, the bankruptcy estate.  That

10   would all then come into the USACM estate, and she would only

11   have five hundred dollars then that would be left outstanding

12   that would be either collected from borrowers or netted after

13   the effective date.

14           THE COURT:  Yeah, I think we're saying the same

15   thing.

16           MR. GARMAN:  I think so, yeah.

17           THE COURT:  Yeah.

18           MR. GARMAN:  It gets tough in application on

19   individual facts, but I think, your Honor, we're saying the

20   same thing, which is that process will continue and the plan

21   contemplates that to the extent necessary, recovery extension

22   will be given to the statute of limitations to make sure that

23   this process is fully fulfilled, direct lenders aren't overpaid

24   on loans for which payoff post-confirmation --

25           THE COURT:  But if somebody's loan was performing the

32

1   whole time, then all that gets withheld is -- Well, nothing

2   gets withheld vis-à-vis the estate; just the new servicer gets

3   their --

4           **MR. GARMAN:**  Right, right.

5           **THE COURT:**  Okay.  I think it might be helpful to do

6   a chart so that people see, so they know what to anticipate.

7   This will save you time at the end.  If you've got -- Do we

8   have a chart that shows how much yet needs to be repaid on some

9   of these loans?

10          **MR. GARMAN:**  That's a work in progress on a daily

11  basis.

12          **THE COURT:**  Okay.

13          **MR. GARMAN:**  But I don't --

14          **THE COURT:**  And of course the point is once these

15  loans get collected, then the principal will come in, and

16  that'll take care of it and they'll get their principal, and

17  that'll take care of the interest, because all that was prepaid

18  was interest, right?

19          **MR. GARMAN:**  There are two loans, I believe, in which

20  there was prepaid principal, and the same process --

21          **THE COURT:**  Oh, even though the loan didn't pay?

22          **MR. GARMAN:**  Yeah, yes.

23          **THE COURT:**  Oh.

24          **MR. GARMAN:**  I think it's limited to two.

25          **MS. JARVIS:**  Two.

33

1            **MR. GARMAN:**  Two loans that there was prepaid

2    principal on?

3            **MS. JARVIS:**  Yes, there were two.

4            **MR. GARMAN:**  But the process works in an identical

5    fashion for those two loans.  As the principal comes in, the

6    netting process is entirely the same on a going forward basis.

7            **THE COURT:**  Okay.

8            **MR. GARMAN:**  So, with that there's another component,

9    which is the loan service fees that have been held on a post-

10   petition basis, and we've tried to come up with a global

11   resolution.

12           Pursuant to this Court's order, three percent has

13   been held back from all direct lenders regardless of what your

14   contractual loan servicing agreement said.  We've agreed that

15   whatever the loan servicing agreement says is your loan service

16   fee will be held by the debtor, and the remainder will be

17   returned to individual direct lenders but for one further

18   component, which is $605,000.00 of that money which is being

19   held back, the spread between one percent and three percent,

20   will be used to reimburse the USACM estate for the allowed and

21   paid attorney's fees of the direct lenders' committee.  That

22   doesn't constitute the entire fee that will be incurred through

23   the effective date, but it was part of the negotiations, and

24   that's what we came to.

25           So the way that works, your Honor, is that if you

34

1  have a -- And that's calculated as of principal balances owed

2  as of the petition date.  So that $605,000 is then spread

3  across those principal balances, and if you have a one percent

4  loan service fee, that amount will be on top of the one percent

5  you're paying to USA.  But if you're a three-percenter, it

6  comes out of the spread between one and three.

7          And then finally, as the debtor indicated, we're

8  working with the unsecured creditors committee to come up with

9  an alternative dispute resolution process to make sure that we

10 don't have an unruly claims proceeding that unnecessarily

11 requires disaster before your Honor.

12         So, your Honor, we think this is a global compromise

13 that puts direct lenders in the position they need to be in and

14 saves us from having affirmative litigation commenced, either

15 by or against thousands of direct lenders, that could take

16 years.

17         **THE COURT:**  Okay.  Mr. Charles?

18         **MR. CHARLES:**  Do you know John Dawson?

19         **THE COURT:**  Yes.

20         **MR. CHARLES:**  He wants to say the settlement on the

21 record that was totally different than we had talked about, and

22 I was terribly hurt, but that's not what happened here.

23         But there are two things I want to clarify with

24 Mr. Garman.  One is the notion of waiving pre-petition, unpaid

25 annual loan servicing fees.  The company has been paying the

35

1    bills out of servicing fees.  At the beginning of the case,

2    essentially all of the interest that was collected was pre-

3    petition interest, and no one has said that the company needs

4    to write checks back to direct lenders for servicing fees

5    charged on that pre-petition interest.

6            So there is language to be worked out with

7    Mr. Garman's committee and an understanding to be reached, but

8    that's --

9            **THE COURT:**  So in other words, as I understood his

10   compromise, the estate will be waiving claims against people

11   where the servicing fees really weren't paid, is that correct?

12           **MR. CHARLES:**  There are really two components.  That

13   is one component.

14           **THE COURT:**  That's one component.

15           **MR. CHARLES:**  Another component is if you looked at

16   the schedule of assets on Commercial Mortgage, you saw a line

17   item for $5.8 million dollars rounded of accrued and unpaid

18   servicing fees, which we have understood to be servicing fees

19   charged on interest that hasn't yet been collected.

20           Since the petition date, something I believe

21   Ms. Smith has told us, north of a million three of that has

22   been collected and used.  So that servicing fee has been used,

23   and we're not talking about writing checks back to direct

24   lenders for that.

25           Another big chunk of it was servicing fees on

36

1    Diversified loans.  The Diversified committee, bless their

2    hearts, are not going to pay a servicing fee on things like the

3    1090 loan.  And so the amount of potentially uncollected

4    accrued servicing fees is a relatively -- is not a huge number

5    but it is a material number, and that's the language that we're

6    working out with Mr. Garman's committee.

7         The other point about the servicing fees, some of

8    these agreements were ambiguous you could say when the

9    servicing fee in the agreement said 'up to X percent; for

10   example, up to three percent'.  And in fact, there are more

11   variations than you've heard about before.  Those are not

12   material but it's just frightening how many variations there

13   are.

14        The compromises, if it said 'up to three percent',

15   that means three percent.  But again, Mr. Garman's point is

16   that to the extent there is an allocation of the direct

17   lenders' committees allowed fees, it's coming across pro-rata

18   among all of them.  And on the 'up to three percents', it's

19   essentially coming out of what would have been their servicing

20   fee otherwise.  There is also a compromise there -- very

21   parsimonious billers at Gordon and Silver, but nevertheless,

22   the Commercial Mortgage creditors are paying the significant

23   portion of what we estimate to be the allowed fees of the

24   direct lenders committee's counsel.

25             **THE COURT:**  Okay.

37

1        **MS. KARASIK:**  Good morning, your Honor; Eve Karasik

2   on behalf of the FTDF committee.  And I will work through the

3   two compromises that the First Trust Deed Fund made.  In this

4   case, we've pretty much settled with everybody at this point.

5   I mean, of course, we have the money, so we want to make sure

6   we're settled with everybody.

7        And it might be easy if you track along; I think this

8   is much simpler than Mr. Garman's and the unsecureds' deal.

9   And I'm not sure what draft you're working on, but if you go to

10  the inter-company claims section.

11       **THE COURT:**  I've got the red line disclosure

12  statement hearing.

13       **MS. KARASIK:**  And I'm looking at a clean one.  But

14  the inter-company claims are after the classification.

15     **(Ms. Karasik confers with Ms. Jarvis)**

16       **THE COURT:**  Oh, you know, I think you should probably

17  add an index to this as I'm thinking about it.

18       **MS. JARVIS:**  Your Honor, if I could maybe hand up

19  some documents?  We have made a bunch of technical changes, as

20  I explained.

21       **THE COURT:**  Okay.

22       **MS. JARVIS:**  I have actually clean copies of

23  everything that's been changed today and red lined from what

24  was last filed.

25       **THE COURT:**  Okay.

38

1          **MS. JARVIS:**  So I might hand these up because I think

2    Ms. Karasik is going to go through the newest version.

3          **THE COURT:**  Okay.

4      **(Ms. Karasik confers with Ms. Jarvis)**

5          **MS. CARYLON:**  And in these, your Honor, you'll see an

6    index but it's at the end.

7          **THE COURT:**  Oh, okay.

8          **THE CLERK:**  The one on the top.

9          **THE COURT:**  All right, good.

10          **MS. KARASIK:**  On the top, your Honor, is the clean

11   plan.

12          **THE COURT:**  Okay.  Oh, so you're referring to the

13   plan, okay.

14          **MS. KARASIK:**  Yes, the clean plan on the top.

15          **THE COURT:**  Uh-huh.

16          **MS. KARASIK:**  I mean it's pretty much the same in

17   both the disclosure statement and the plan.

18          **THE COURT:**  Okay.

19          **MS. KARASIK:**  And it's page fifty-three.

20          **THE COURT:**  Okay.

21          **MS. KARASIK:**  This is the settlement between

22   Commercial Mortgage and the First Trust Deed Fund, and the

23   first one in the settlement is we fix our unremitted principal

24   claim, $347,775.00 plus pre-petition interest.

25          The next part of the compromise is that First Trust

1    Deed Fund will retain an unsecured claim against Commercial

2    Mortgage.  Now, this claim, just like all the other direct

3    lenders, is not going to be a claim for a deficiency; it's

4    going to be a claim for actual harm or breach.  And right now

5    we're working on fixing the amount of that claim, and what

6    we've set up here is that that amount will either be agreed to

7    by the confirmation hearing or there will be an evidentiary

8    hearing.

9         Because there is going to be no post-effective date,

10    the First Trust Deed Fund, we're going to get this done by the

11    confirmation hearing and we're going to get it done by

12    agreement.  I'm pretty sure about that.

13         Prepaid interest --

14         **THE COURT:**  Now, just as an aside.

15         **MS. KARASIK:**  Sure.

16         **THE COURT:**  Procedurally, you know, since compromises

17    must be noticed and heard, make sure as soon as you reach that

18    compromise that you send notice I think of that compromise to

19    everyone.  I think that's more prudent.

20         **MS. KARASIK:**  Okay.  We will --

21         **THE COURT:**  Mr. Landis is our expert on procedure

22    here.  Do you think -- or do you think that the notice of

23    confirmation hearing is sufficient as what's on the website?

24    What are your -- what's your preference?

25         **MR. LANDIS:**  My preference would be if individual

1    compromises are reached that notice and the opportunity for a

2    hearing to object be given so that parties have the opportunity

3    to consider that separate from confirmation, Judge.

4            **THE COURT:**  Okay.

5            **MS. KARASIK:**  Your Honor, we do have the concept

6    here.

7            **THE COURT:**  Right.

8            **MS. KARASIK:**  And we will do our best to get this

9    done as soon as possible.  I'm actually going to have a call

10   with our financial advisors tomorrow so that we're sure what

11   universe we're talking about.

12           **THE COURT:**  And I hate to have you send notices to

13   everybody, but certainly as to the fund members.

14           **MS. KARASIK:**  Right.  And we can also --

15           **THE COURT:**  But then to the universe of everyone.

16           **MS. KARASIK:**  -- post it on the website?

17           **THE COURT:**  Yeah.  You know, maybe notice, let's do

18   that.  I think that would satisfy it; that the compromise will

19   be placed on the website.  And I think it's probably

20   appropriate to notice the fund members.

21           **MS. KARASIK:**  Uh-huh.

22           **THE COURT:**  But you don't have to notice the whole

23   other universe of lenders, investors, et cetera, because it's

24   too hard to sort out who are merely lenders and who are

25   investors on their loans, right?  You have your list of

1    investors in your fund, right?

2         **MS. KARASIK:**  Correct, your Honor.

3         **THE COURT:**  Okay.

4         **MS. KARASIK:**  And your Honor, we do have some other,

5    in the plan, subsequent, you know, documents that we've served

6    on other parties, and we certainly can provide in there; we can

7    give them notice that this will be on the website and that the

8    members will be served with just a notice that a compromise has

9    been reached.

10        **THE COURT:**  I think that's appropriate.  I think we

11   can give notice on the website.  You put in the disclosure

12   statement that compromises that are done will be posted on the

13   website and that shall constitute notice.

14        **MS. KARASIK:**  Okay.

15        **THE COURT:**  But if it's a compromise involving any

16   particular fund, those fund members will be noticed.  If it's a

17   compromise involving any particular set of lenders, I don't

18   think that we envision that.  There are no particular loans

19   being compromised in here.

20        **MS. KARASIK:**  No.

21        **THE COURT:**  Okay.

22        **MS. CARYLON:**  Since the disclosure statement and

23   summary says what the compromise will be and just not the

24   dollar amount, I don't know that it's really necessary to give

25   an additional notice of the dollar amount if we say, you know,

42

1    'We are trying to compromise this number.  If we do, we will

2    place it on the website'.  I would hope that would be

3    sufficient because --

4         THE COURT:  I got the sense that you were talking

5    more about the dollar number.  Is it just the dollar number

6    you're trying to compromise?

7         MS. CARYLON:  A number of the compromises are just

8    dollar numbers --

9         THE COURT:  You know, the only thing is --

10         MS. CARYLON:  -- and some of the ones involving DTDF

11    are allocations, but they're basically a numerical compromise

12    between two amounts.

13         THE COURT:  I still think -- That's good expect that,

14    you know, these numbers could be --

15         MS. KARASIK:  Although, your Honor, could I say one

16    thing about this?  This piece of the deal is really we call in

17    a term of art our 'schmuck insurance'.

18         THE COURT:  Uh-huh.

19         MS. KARASIK:  I mean we're pretty much taking our

20    sale, and that's going to be the predominant, the sale

21    proceeds.  This is just -- there is a whole run out there, and

22    you'll see later; we give a piece of this to Diversified

23    actually.  This is schmuck insurance.  If somehow there's gold

24    that falls from the sky, we didn't want to, you know, negotiate

25    away --

43

1          **THE COURT:**  Lose it; okay.

2          **MS. KARASIK:**  -- everything.  So it's really not a

3    significant piece.  We don't expect it.

4          **THE COURT:**  But it's going to be shared pro-rata

5    though, right?

6          **MS. KARASIK:**  Yeah.

7          **THE COURT:**  See, and that's the problem.  I mean if

8    you compromise -- you know, you can have a compromise if the

9    compromise is one dollar less than what you claimed, and that's

10   the whole point of A and C (phonetic) properties.

11         **MS. KARASIK:**  Right.

12         **THE COURT:**  You've got to see whether or not it's a

13   fair compromise.  So I think it would be appropriate -- I won't

14   make you do extra notice.

15         **MS. KARASIK:**  Okay.

16         **THE COURT:**  But do put in here that the amount that

17   will be compromised will be compromised from confirmation.

18   Please --

19         **MS. KARASIK:**  Okay.  We'll be clear about that.

20         **THE COURT:**  -- look at the website; that'll be on

21   there.

22         **MS. KARASIK:**  And we can also say, your Honor, the

23   deficiency claim will be something in the range of X.

24         THE COURT:  Yeah.

25         **MS. KARASIK:**  It's not going to be the full

44

1  deficiency claim; it'll be some amount that is less than that.

2          **THE COURT:**  Okay.

3          **MR. LANDIS:**  Rule 9019 governs, Judge, and basically

4  all it says is that on motion by the trustee and after notice

5  and a hearing, the Court may approve a compromise or

6  settlement.  It's not specific to the dollar figures, but as

7  much information as can be provided, especially to the members

8  of the First Trust Deed Fund, should be.  This seems like a

9  reasonable resolution.

10         **THE COURT:**  Great, thank you.  Okay, let's do it that

11 way.

12         **MS. KARASIK:**  Okay; thank you, your Honor.

13         The next item of our compromise has to do with the

14 prepaid interest.  That's approximately $2.5 million.  The

15 exact amount is in the disclosure statement and the plan.  It's

16 already been netted, and there's no more to be paid.  It's been

17 netted from collections, and USACM will keep it.

18         There is a management fee.

19     **(A cell phone rings)**

20         **THE COURT:**  Turn all phones off.

21         **THE COURT RECORDER:**  All cell phones must be turned

22 off in the courtroom at all times.  Please; thank you.

23         **MS. KARASIK:**  There is a management fee that we all

24 originally thought was paid to Realty and then shuttled over to

25 Commercial Mortgage.  It actually turns out historically it was

45

1    only paid to Realty, which was part of the reason why we had to

2    then have a compromise this weekend with Realty.  However,

3    post-petition, this amount has been -- I mean the services have

4    been provided by the mortgaging entity.  The deal here is to

5    waive that fee altogether.  It's $78,000.00 per month.  It's

6    tied to the principal balance of the loans.

7              To the extent we actually have paid, and there is

8    some dispute about whether we have, that will be repaid to the

9    fund or offset against other amounts we owe Commercial

10   Mortgage.

11             The servicing fee; the deal we cut on the servicing

12   fee is that the First Trust Deed Fund will be charged a one

13   percentage fee.  We are one of those servicing agreements that

14   say 'up to three percent'.  However, we have defenses because

15   it never was charged and this is how we compromised that

16   dispute.  The fund would be charged a one percent annual

17   servicing fee from the petition date through June 30.

18             Commencing on July 1st, there will be a 2.5 percent

19   fee charged through the earlier of the effective date or

20   January 31st, 2007, and I'll explain why we have that date

21   limit in there in a second.  And then to the extent there were

22   any pre-petition servicing fees outstanding, they'll be waived.

23             Now, the reason why we have this date is our concern

24   was if the plan doesn't get confirmed, we may need to recut

25   some of these deals.  Now, I think what we've agreed is that

46

1    they will stay through January 31st.  So we're not going to go

2    back on January 31st and say, 'No, we're not going to pay you

3    X, Y and Z anymore, but going forward we may not want to pay

4    you.'  You may not want us to waive the management fee, or we

5    may recut these later.  So we needed some time horizon on that.

6            Servicer advances.  Servicer advances are the

7    foreclosure-related type costs provided for in paragraph four

8    of most of the servicing agreements.  The deal we cut on the

9    servicer advances was that the First Trust Deed Fund, through

10   the effective date, would pay its proportionate share of these.

11   However, it would pay these only for what you would call the

12   ordinary course professional type.

13           So to the extent Ray Quinney or Mesirow or Schwartzer

14   and McPherson were performing these types of services, we

15   wouldn't pay those, and that's because of the next compromise,

16   which is the fee allocation that we have agreed to.  And the

17   fee allocation is $125,000.00 per month for all the debtors'

18   professionals coming out of the fund, and we just didn't want

19   to pay it twice, in effect, so that's why we cut that deal.

20           Now, the date, the January 31st date I think I just

21   explained.  We've reached an agreement on allocation of the

22   overbid and expense reimbursement and break-up fee, and that is

23   an 85/15 deal.  It's not -- it's generally an 85/15 percent

24   deal, and that's not exactly -- if you look at the values of

25   the assets, that would be more like three percent and ninety-

1   seven percent, but this was part of our negotiation.

2          Now, there is a caveat there.  There is a provision

3   for another split, but we wanted to file that under seal just

4   because it's very sensitive and we didn't want any bid

5   inclusion to occur.  So we will be filing that with the Court.

6   I don't remember the exact date we decided to file it, but we

7   will be filing that well in advance of the confirmation

8   hearing.  So that is the compromise with Commercial Mortgage.

9          And Mr. Charles, do you have any clarifications?

10          **MR. CHARLES:**  An excellent summary, and that pretty

11   much tracks the words which also are very clear.

12          **THE COURT:**  Okay.

13          **MS. JARVIS:**  Let me just add that on Realty, the

14   waiver of the management fees is also tied to the subordination

15   or waiver --

16          **MS. KARASIK:**  Yeah, I'm going to waive that one.

17          **MS. JARVIS:**  -- of their claim as well.

18          **MS. KARASIK:**  And then there are mutual releases

19   between the First Trust Deed Fund and Commercial Mortgage and

20   Securities and Realty.

21          **THE COURT:**  Now, what about assignment of claims?  In

22   other words, are any claims against insiders?  And I read this

23   but I wasn't -- didn't quite understand it entirely.

24          **MS. KARASIK:**  Well essentially, we do have a claim --

25   we have assignment of some assets to Diversified, which is the

1   next compromise I'm going to get to.  First Trust Deed has a

2   claim in Commercial Mortgage, and will share in the non-debtor

3   insider litigation recoveries based on the pro-rata amount of

4   its claim rather than going out and prosecuting it itself.  And

5   it will be a beneficiary of that trust.  Distributions will be

6   made out of that trust to First Trust Deed holders, and --

7          THE COURT:  But is there an assignment of any claims

8   you may have to Trust Deed Fund -- or whoever is prosecuting

9   the action against the insiders, or whomever?

10          MS. KARASIK:  I guess our view was they're all sort

11   of the same claim, and we're just going to sit and take that

12   claim in the trust.  That's basically how we envisioned it.  It

13   really is --

14          THE COURT:  But what if the argument was -- I'm

15   trying to think of some example besides an insider.

16          MS. KARASIK:  Uh-huh.  Well, we have claims against

17   Realty, for example, for mismanagement, and that one we're

18   subordinating in that --

19          THE COURT:  Right.

20          MS. KARASIK:  -- in that class.  And our view is

21   we'll probably never get anything out of Realty ever, and I

22   need to talk to Mr. Charles about a technical issue there

23   because there will be no post-effective date First Trust Deed

24   Fund entity to settle it, so I may have to just delegate that

25   to the trust to do because the chances of ever getting anything

49

1    meaningful out of that, it just doesn't make sense to set up a

2    trust and have administrative costs.

3              THE COURT:  Well how about let's try this, and maybe

4    it's covered by the servicer.  Are there -- well, no, Silver

5    Point acquires all your rights to all those claims.  So for

6    example, if somebody didn't perform on the loan and there are

7    guarantees out there, Silver Point gets that.

8              MS. KARASIK:  Right.

9              THE COURT:  That's right; okay.

10             MS. KARASIK:  Okay, I'll move on to the Diversified

11   compromise.

12             THE COURT:  Right.

13             MS. KARASIK:  We are going to make what is called the

14   FTDF --

15             THE COURT:  And let me just back up.

16             MS. KARASIK:  Sure.

17             THE COURT:  Let me suggest -- I don't mean to suggest

18   that there may be a need for assignment --

19             MS. KARASIK:  Right.

20             THE COURT:  -- of any causes of action or rights; I'm

21   just inquiring whether or not it was done.  I'm not suggesting

22   that there need to be.

23             MS. KARASIK:  Okay; thank you.

24             The first part of this compromise is that the First

25   Trust Deed Fund will pay -- will make what is called the FTDF

1  payment, and this is in two pieces.  The first is $500,000.00

2  to be paid on the effective date from the First Trust Deed Fund

3  to the Diversified Fund.

4         There's a second piece of it, a second $500,000.00

5  that will come out of the overbid to the extent we have an

6  overbid, and that is the First Trust Deed payment.

7         Diversified has agreed to repay that payment upon

8  receiving what is called the First Trust Deed Fund base

9  recovery percentage, which is layman's terms really means our

10 sale proceeds less costs of -- you know, cost of the sale, cost

11 of the cases, all the claims that need to be paid before

12 interest; really our net recovery.

13        **THE COURT:**  And the reason for this compromise if I

14 recall is because First Trust Deed Fund, I guess, and others

15 received the proceeds of principal of loans -- arguably

16 received principal of loans?

17        **MS. KARASIK:**  It's really the re-characterization

18 Lemons argument --

19        **THE COURT:**  Okay.

20        **MS. KARASIK:**  -- and the potential, you know,

21 consolidation argument which we think is even more of a reach,

22 but just to put that away and be able to take the cash and move

23 on.

24        **THE COURT:**  Okay.

25        **MS. KARASIK:**  So there is a provision here for

51

1   repayment.  The first $500,000.00 is paid once essentially

2   Diversified reaches the same recovery that First Trust did, and

3   then the second is paid back with an adjustment for the time

4   value of money, and that second $500,000.00 is paid back

5   according to that adjustment.

6          There are some assets and claims transferred to

7   Diversified.  We're transferring our unremitted principal claim

8   to Diversified; that approximately $350,000.00 claim, I

9   believe.  We're transferring something that everybody refers to

10  as the Bice Energy (phonetic) loan, which is not a loan; it

11  actually has to do with some sort of a refinancing fee that I

12  don't know if they ever were able to secure or not, but we're

13  transferring that asset to Diversified.

14         And then something called the non-assignable

15  litigation claims, and for these types of claims we're thinking

16  of potential securities actions since we were a securities-

17  related entity, and those will go to Diversified.  To the

18  extent First Trust Deed Fund needs to exist to -- or needs to

19  prosecute them for Diversified, Diversified will reimburse or

20  pay for that litigation.

21         And lastly, your Honor, --

22         **THE COURT:**  So it will be prosecuting in Trust Deed

23  Fund's name is what you're saying?

24         **MS. KARASIK:**  Right, right.

25         **THE COURT:**  Okay.

52

1        **MS. KARASIK:**  To the extent that entity needs to

2   exist in order to preserve those claims it will exist, but the

3   costs won't come out of the First Trust Deed Fund.

4        **THE COURT:**  Okay.

5        **MS. KARASIK:**  Lastly, your Honor, before we talked

6   about the claim that the First Trust Deed Fund will retain in

7   Commercial Mortgage, the unsecured claim.  What First Trust

8   Deed has agreed to do is to assign to Diversified all its

9   recoveries under that claim until Diversified reaches its

10  eighty-five percent recovery, which means it has to receive an

11  eighty-five percent recovery on its original investment, net of

12  costs.  And there are mutual releases between the two funds in

13  the plan.

14       And lastly, there's the Realty compromise which we've

15  touched on.  Because of the confusion as to who actually was

16  owed or paid the management fees, again, management fees are

17  waived.  In exchange, the First Trust Deed claim is

18  subordinated in Realty, and there will be releases between

19  those two entities.

20       **THE COURT:**  Okay.

21       **MS. KARASIK:**  Thank you.

22       **THE COURT:**  Anybody want to add anything to the

23  terms?

24       **MS. KARASIK:**  Mr. Levinson, do you have any comments?

25       **THE COURT:**  You don't need to if you don't -- I mean

53

1   --

2           **MR. LEVINSON:**  No, I was going to talk next anyway.

3           **THE COURT:**  Okay.

4           **MR. LEVINSON:**  Ms. Karasik's summary was accurate as

5   to the compromises with us.  Our committee's goal is to repay

6   the $500,000.00.  We'd like nothing more than that.

7           Our compromise with Realty is similar expect we're

8   subordinating only the first $50 million dollars of our claim.

9   We think in the end that's not going to matter much, but that's

10  the deal.

11          We have tried hard to negotiate an agreement with the

12  mortgage company, and we've been unable to do so.  The sad part

13  is we have very good communication between the two of us; we

14  just haven't been able to reach a deal on any number of fronts.

15  So, in order to get the plan going and confirmed, which is

16  everyone's goal, we just agreed to disagree.  And we will

17  continue to communicate and talk and beat one another's brains

18  in, and hopefully we will reach a compromise, but there's no

19  guarantee of that.  If we can't reach a compromise, we'll be

20  back before you to fight out a number of different issues.

21          **THE COURT:**  Well, I guess I'm concerned in the sense

22  that if, for example, you don't reach a compromise in a

23  substantive consolidation issue, how does anybody vote on

24  whether or not this is a good plan?

25          **MR. LEVINSON:**  We understand that that would have to

54

1    be the subject of an objection to the plan which is filed by

2    the debtor --

3            **THE COURT:**  Okay.

4            **MR. LEVINSON:**  -- and not by the committee but which

5    we support.  So we understand the time is growing short on

6    that.

7            **THE COURT:**  Okay.  So the point would be, if you

8    don't agree to it, you would just argue it can't be confirmed

9    because it could be substantively consolidated and then I guess

10   I'd have to have a hearing on that?

11           **MR. LEVINSON:**  Yes.

12           **THE COURT:**  An evidentiary hearing.

13           **MR. LEVINSON:**  Well, it would just be an objection to

14   the plan; that's right.

15           **THE COURT:**  Okay.

16           **MR. LEVINSON:**  But, again, we're hoping we're not

17   going to get there.  The kinds of issues we've been talking

18   about with the unsecured creditors committee have to do with

19   the size of our claim, and, this was said earlier, the

20   allocation, how it would be paid out, how we would share in the

21   compromise that you approved on this $58 million dollar note

22   from investment partners.  Remember, you said that it could be

23   shared according to whoever had the rights to it.  You didn't

24   decide that because it wasn't before you.  We've been talking

25   about that and we just haven't agreed, but we're continuing to

1    talk.

2              THE COURT:  Okay.

3              MR. LEVINSON:  One thing I did want to do in a

4    Landis-like fashion was --

5              THE COURT:  And we have a new ELMO, so apparently you

6    can do it the other way now.

7              MR. LEVINSON:  Well, I just wanted to -- Something

8    that Ms. Jarvis said before that wasn't quite right, and I want

9    to make sure we've got it right.

10             Number sixty-three is the definition of my fund's

11   unsecured claim, and what it does is it provides that we don't

12   have an agreement now, and if we have an agreement prior to

13   confirmation, we'll bring it to the Court's attention under the

14   noticing procedure, and we'll put it on the website and the

15   like.

16             But if we haven't reached agreement by that date, we

17   did not intend to litigate it that day.  The idea was we would

18   litigate it in the future, and we don't say 'on the

19   confirmation date'.

20             THE COURT:  Right.

21             MR. LEVINSON:  The further idea is that if we could

22   make an agreement after confirmation but prior to the effective

23   date, then we'll come back to you of course because we're still

24   within your clutches.  But after the effective date, we can

25   agree at any time that we don't have to come back to court.

56

 1   And again, the goal being if we can avoid litigation, we'd like

 2   to, and we've talked to one another but we just don't know.

 3   But that's the time table for that.

 4           THE COURT:  Okay.

 5           MS. JARVIS:  Your Honor, in that vein, if you look at

 6   the clean copy of the disclosure statement I just handed you a

 7   copy of, and if you turn to page sixty-nine of that.

 8           THE COURT:  Okay.

 9           MS. JARVIS:  There is a section in the disclosure

10   statement entitled 'Remaining disputes between USACM and DTDF',

11   so those are defined and set forth in the disclosure statement.

12           THE COURT:  Right.  Well, the only thing was when I

13   read this the first time, I see they're there, I see you've

14   resolved how to disagree.  What happens if you don't agree?

15   And I guess you're right; it comes down to you object to

16   confirmation, and I either say that should or shouldn't prevent

17   confirmation, and/or to the extent it's an amount, that clearly

18   can be determined separately.  But to the extent it's an

19   integral part of the plan/qua-plan, then it's an objection

20   which I either grant or overrule.

21           MR. LEVINSON:  That's correct, your Honor.  The

22   substantive consolidation re-characterization are the show

23   stoppers that we have to decide.  Other than that, we can fight

24   about it later.

25           THE COURT:  Okay.

57

1          **MR. LEVINSON:**  Thank you.

2          **THE COURT:**  All right.  Now, just to be clear before

3    I take comments.  All I'm here today is to ascertain whether or

4    not there is adequate information in this disclosure statement.

5    I'm not making any judgments about whether or not any of these

6    plan provisions are good, are bad, should be or not be

7    confirmed.

8          So, with that, any further questions or comments

9    about the accuracy of the information in the disclosure

10   statement?

11         **MS. JARVIS:**  Your Honor, if I could.  We talked about

12   the summary of the disclosure statement.  I think it's docket

13   number 1754.

14         **THE COURT:**  Okay, thank you.

15         **MS. JARVIS:**  So just to give that to you.

16         **MR. LePOME:**  Attorney Robert LePome for Doctors

17   Alexander and other direct lenders.

18         I'm -- We're unclear from the disclosure statement

19   with regard to Diversified's position where they say there's

20   going to be no characterization except that Diversified may

21   bring an action against the direct lenders.  The direct lenders

22   have very patiently been told 'Watch for the plan and see if

23   you can digest it and accept it, and don't file your adversary

24   proceeding.'  Is there -- This really says that they can bring

25   an adversary proceeding just like we can, and I don't know

58

1   whether there's any time limit in the plan that says do that.

2   If there isn't and if it's coming, well, I need to tell my

3   people that we might as well file it tomorrow.  Diversified may

4   want to speak on that.

5           THE COURT:  Okay.  And what do you mean by -- well,

6   let me hear your response on that.

7           MR. LEVINSON:  I guess my response is: Huh?  We

8   reserve the right -- we did not enter into an agreement -- a

9   settlement agreement with the direct lenders for a number of

10  reasons, but primarily because there isn't really that much of

11  an intersection between the Diversified committee and the

12  direct lenders unless we were to bring an action or adversary

13  or many actions to determine that their claims ought to be re-

14  characterized.

15          We understand the burden that we face on that, and

16  they have the right to bring whatever action --

17          THE COURT:  And you mean re-characterized not as

18  prepaid interest?

19          MR. LEVINSON:  Correct.  The re-characterization is

20  'Hey, we're all in this together.  We're all unsecured

21  creditors.'

22          THE COURT:  I think you need to make that clear.

23  Mr. LePome is talking about something else I think.  He's

24  talking about -- aren't you?  Are you talking about the

25  distinction between 'Is this property of the estate or not

59

1    property of the estate'?

2         **MR. LePOME:**  That's exactly right.  He says -- In

3    other words, either you have a one-pot theory that's presented

4    to the Court or we have the direct lenders really own the loans

5    that they say they own.  If they own the loans that they say

6    they own, we need -- the Court's never --

7         **THE COURT:**  Well --

8         **MR. LePOME:**  The Court's never ruled on that because

9    there's never been an adversary proceeding.

10        **THE COURT:**  But by virtue of this confirmation, the

11   point is, and they should make it clear, if I confirm this

12   plan, it seems to me that as much as you want to reserve your

13   rights to re-characterize, it's not going to happen.

14        **MR. LEVINSON:**  We understand, and that's why we're

15   going to have to object if we're going to object.

16        **THE COURT:**  Okay.  So --

17        **MR. LePOME:**  That's what my question was really.

18   When is the time limit that they're going to file this re-

19   characterization or whatever they want to call their adversary

20   proceeding?

21        **THE COURT:**  What I think what we should do is make it

22   clear that all these objections will have to be ruled on as a

23   part of -- In other words, you can reserve all your rights, but

24   I'm not going to confirm a plan that -- probably not.  You'd

25   have to convince me somehow that there are rights that can be

60

1    reserved without a plan being confirmed.

2          **MR. LEVINSON:**  Well, and also, your Honor, we

3    understand that if a plan is confirmed and it goes effective,

4    we ain't going anywhere.

5          **THE COURT:**  That's right, because a plan does

6    specifically provide now, doesn't it -- Well, you know, that is

7    a good point because on one hand you reserve your rights, but

8    the plan doesn't say by virtue of confirmation, there is no re-

9    characterization, and you probably should add that in.

10         **MS. CARYLON:**  Well, it does; it says --

11         **THE COURT:**  That's --

12         **MS. CARYLON:**  It says 'No substantive consolidation'.

13         **MS. JARVIS:**  Yeah, it does.

14         **MS. CARYLON:**  It's clear on that point.  But we'll --

15         **THE COURT:**  Well, but that's --

16         **MS. CARYLON:**  We'll clarify that that's the sense.

17         **THE COURT:**  That's different because substantive

18   consolidation only deals with property of the estate.  The

19   argument is: Is the direct lenders' claims property of the

20   estate or not?

21         **MR. GARMAN:**  And your Honor, let me speak for the

22   direct lenders first.  I can --

23         **THE COURT:**  And I recognize that this plan's intent

24   is that it be each lender has its own right to the property and

25   it's not property of the estate.  I understand you can't agree

61

1   to that now, but I think if the plan's -- The plan needs to

2   take a position one way or the other.  I think the position of

3   the plan is: Each direct lender's claim is a claim of that

4   lender to that loan.

5         **MR. GARMAN:**  And your Honor, I think we need to be

6   careful here because there is no contractual privity between

7   the direct lenders and the Diversified Fund.  There was no deal

8   to be struck, there was nothing for us to give them in exchange

9   for a release.

10         What we have here is there are going to be factual

11  findings made by this Court not only to approve this deal but

12  to transfer the servicing rights to someone else.  And, most

13  importantly, Silver Point has factual findings that are going

14  to be necessary for it to buy these loans out of these estates.

15        I think that the parties are comfortable that

16  Diversified has its ability to object to this plan if they

17  think it's in their best interest to object.  But come the

18  effective -- come confirmation, these issues are dealt with,

19  and I don't know that it's appropriate to start adding things

20  to the disclosure statement saying that third parties with whom

21  direct lenders have no contractual privity have either waived

22  or won't take any action.  Frankly, I'm more --

23        **THE COURT:**  Well, that's what the disclosure

24  statement says.

25        **MR. GARMAN:**  It is, but there is no relationship here

1  to be resolved between the direct lenders and Diversified.  If

2  we were outside of bankruptcy, Diversified would have whatever

3  rights they have outside of bankruptcy.  They could always --

4  Diversified is not being resolved by way of this plan in its

5  entirety.

6          THE COURT:  Okay.

7          MR. GARMAN:  And to -- I think we're treading on some

8  dangerous --

9          THE COURT:  I guess my point is this: Whatever the

10 plan purports to do, then that should be in the plan --

11         MR. GARMAN:  Right.

12         THE COURT:  -- such that if I -- we know when I deal

13 with the objections whether or not direct lenders are free of a

14 claim that somehow their loans constituted property of the

15 estate.  I mean I think that's clear.

16         MR. GARMAN:  Right.  I would love a plan --

17         THE COURT:  But I'm not sure it's in the plan.

18         MR. GARMAN:  I would love a plan that says it's free

19 of all third parties, including Diversified, but I know I can't

20 get that either.

21         THE COURT:  No, no, no.  What I meant was -- because

22 the issue was is it property of the estate or not.

23 Confirmation of the plan will resolve whether or not the loans

24 held by direct lenders, including Trust Fund for that matter,

25 are property of the estate or not.  And the current plan is

1  that they're not property of the estate; that each direct

2  lender holds their fractional interest in the loans, including

3  Diversified.

4          **MR. LEVINSON:**  We understand.

5          **THE COURT:**  Okay.

6          Okay, any other comments on the adequacy of the

7  information?

8          **MR. McCARROLL:**  Your Honor, James McCarroll of Reed

9  Smith on behalf of Silver Point.

10          Silver Point has reviewed the various drafts of the

11  disclosure statement as they've gone back and forth, including

12  two serial drafts that went out over the weekend.  We are find

13  in substance with most of the information in the disclosure

14  statement, but there are a few statements that we believe need

15  a bit of clarification.  Subject to some descriptive and

16  wording changes, I don't foresee any problem getting there, but

17  we're not quite there yet.

18          **THE COURT:**  Okay.

19          **MR. McCARROLL:**  My partner is back at my office and

20  Silver Point's business people are working right now to get the

21  final few comments incorporated and to get them over to the

22  debtors.  We've communicated with the debtors and counsel for

23  the committees, and we hope and expect to get comments over to

24  all parties this afternoon with, again, the hope that we'll

25  reach resolution either today or early tomorrow morning.

64

1          **THE COURT:**  Okay.

2          Okay, with that, I'm prepared to approve the

3    disclosure statement once it's signed off by all the committee

4    members.

5          Now, let's take a recess and talk among yourselves

6    about timing because I'm very concerned about that December

7    15th date, especially since you're going to send it out by

8    first-class mail; it'll cost a fortune to otherwise.  Well,

9    first-class mail, I think this big a package would take a week

10   to get there.  You might check with the Post Office, but that's

11   my experience.

12         **MS. JARVIS:**  Your Honor, we have been working with

13   BMC, you know, and we've can't get it out.  I think their

14   feeling is the fastest we can get it done is five days.

15         **THE COURT:**  Okay.  And I've --

16         **MS. JARVIS:**  And that is copying, mailing --

17         **THE COURT:**  I've forgotten our schedules, but I could

18   also give you -- you know, you've got this January 3rd already.

19   I don't think anybody wants the week between December 25th and

20   January 1st.  So I'll give you whatever days you need.  I'll

21   just move off calendar what you need, so look at the calendar

22   and tell me what day.  And like I said, I've forgotten your

23   Silver Point parameters, but I think it's better that way for

24   your own sanity.

25         One other timing issue; that's on the settlement

1  conference we had with the Stanfords.

2           **MS. KARASIK:**  Standard?

3           **MS. JARVIS:**  Standard Development?

4           **THE COURT:**  Standard.  Judge Glover is not going to

5  be here December 13th.  I've got to assume that wouldn't work

6  for a good day anyway because Mr. Alison is going to be just a

7  little bit busy that week.  But we can reset it for the 11th or

8  12th, or we can move it to January.  So that's something to

9  think about and let me know your preferences.

10          Okay, we'll take a short recess and then we'll talk

11  about timing, and then we'll take the Hantgens' (phonetic)

12  motion.

13          **MR. UNIDENTIFIED:**  Thank you, your Honor.

14          **THE CLERK:**  All rise.

15      **(A recess was taken from 11:03 a.m. to 11:22 a.m.)**

16          **THE CLERK:**  Bankruptcy court is now in session.

17          **THE COURT:**  Be seated.  Okay.  What are your thoughts

18  about the date?

19          **MS. JARVIS:**  Your Honor, we talked about it further

20  and we agree that it would be best to do it on December 19th.

21          **THE COURT:**  Okay.

22          **MS. JARVIS:**  We would also ask that the Court give us

23  some time on the 21st in case there are some issues.  That

24  would give us an intervening day to try to --

25          **THE COURT:**  Okay.

66

1          MS. JARVIS:  -- deal with those.

2          THE COURT:  That works out good.  That way I can have

3    my motion calendar and still bring you back.  Okay.  So, let's

4    do it.  Confirmation will be the 19th, then, and is it a

5    problem that ballots aren't due 'til the 14th?

6          MS. CARLYON:  Well, we're -- well, the problem we've

7    got is -- let me try to walk through what we think the schedule

8    would work out as.

9          THE COURT:  Okay.  That'd be fine.

10          MS. JARVIS:  And, you know, because we've talked to

11   our balloting agent, too.  We know how long it will take.  What

12   we would ask for is as we propose the voting record date be

13   November 6th.

14          MS. CARLYON:  I'm going to hand this up, okay?

15          MS. JARVIS:  Okay, great.

16          MS. CARLYON:  I'm going to hand up a proposed

17   (indiscernible).

18          THE COURT:  Yeah, sure.

19          MS. JARVIS:  So, that's just for purposes of

20   determining, you know, who the ballots are sent to.  Voting

21   record date would be November 6.

22          THE COURT:  But -- oh.  I see what you're saying.

23   Why don't you send ballots to everybody?

24          MS. JARVIS:  Well, we will.  I mean, we're sending

25   them to all the direct lenders, but like we have, for instance,

67

1   we have ballots that are set for certain classes and in some

2   instances they have amounts in them and that determination is

3   made as the 6th.

4           **COURT RECORDER:**  I'm sorry.  Someone must have on his

5   cell phone.

6           **THE COURT:**  No, it's -- she's -- somehow it's that

7   microphone.  Somehow you're touching the --

8           **MS. JARVIS:**  Maybe if I move over this way.

9           **THE COURT:**  Yeah.

10          **MS. JARVIS:**  Okay.

11          **THE COURT:**  There you go.

12          **MS. JARVIS:**  All right.  I'll try this one instead.

13  It's an order to -- because there are certain kind of moving

14  parts and the type of ballots that are sent out, some of them

15  are tailored to, you know, claims to make them easier to count

16  and tabulate.

17          **THE COURT:**  All right.

18          **MS. JARVIS:**  We just need to -- it doesn't mean that

19  other people can't get ballots and if they request them, they

20  will.  And ballots will be sent to all direct lenders.

21          **THE COURT:**  All right.

22          **MS. JARVIS:**  So --

23          **THE COURT:**  Well, ballots will be sent to everybody

24  who's got a proof of claim in or a schedule right now, right?

25          **MS. JARVIS:**  Exactly.

68

1          **THE COURT:** Okay.

2          **MS. JARVIS:** Exactly.

3          **THE COURT:** Okay, that's fine.

4          **MS. JARVIS:** Then, the distribution of the

5    solicitation packages would be on November 20th.

6          **THE COURT:** All right.

7          **MS. JARVIS:** The objections to the plan and providing

8    evidence in support of those would be December 7th.

9          **THE COURT:** Now, the only problem I have with that is

10   -- and I'm not quite sure how we deal with this --

11         **MS. JARVIS:** Uh-huh.

12         **THE COURT:** Under the plan that I read -- maybe it's

13   been altered -- any direct lender that doesn't want to be

14   treated in that class five has to file an objection to plan.

15         **MS. JARVIS:** Yes.

16         **THE COURT:** So, does that make a difference on our

17   timing?  And then, also, the problem of courtesy copies -- I

18   mean, as much as I don't want to waive courtesy copies -- we've

19   got the problem of them filing and they're not going to be

20   regular filers.  So, is it possible to make the -- a few days

21   later for any direct lenders and indicate that all they have to

22   do is file their objection?

23         **MS. JARVIS:** In looking at this, part of it depends

24   on how soon before the confirmation hearing your Honor wants us

25   to present our evidence, because we will need some time.  Right

1   now this is proposed that they -- the objectors -- present

2   objections and evidence on the 7th, so we have one week to then

3   file our evidence in response and our briefs in support of the

4   plan.

5           If we move that back, we would ask -- because it's --

6           **THE COURT:**  I would be all right if you had it in by

7   the 14th.  Your direct evidence and your --

8           **MS. JARVIS:**  But could we move it back any further if

9   we're going to move back the objection deadline?  That's why

10  I'm saying the time between the objections and our responses

11  and putting the evidence together, if it's too tight, then it's

12  just problematic for us to get everything --

13          **THE COURT:**  Okay.

14          **MS. JARVIS:**  -- done.

15          **THE COURT:**  So --

16          **MS. JARVIS:**  So, right now we have the seven days.

17  If we move back the objection deadline but we don't --

18          **THE COURT:**  Well, most everything you need to do

19  could be done now for that matter, because you know what you

20  need to support confirmation.  So, that could be done now.

21  It's just responding to any objections and, quite frankly, you

22  would -- I have no problem -- I mean, we're going to have to

23  have witnesses available anyway for cross examination.  So, I'd

24  let you supplement the record with live testimony.

25          **MS. JARVIS:**  Okay.  I think that would work, your

70

1    Honor.

2            THE COURT:  That probably would be better.

3            MS. JARVIS:  Yeah.

4            THE COURT:  I mean, it's going to make that

5    confirmation hearing longer, but it will save -- okay.  So,

6    let's --

7            MS. JARVIS:  Okay.  So, let's move the deadline,

8    then, back for oppositions to the plan and direct evidence to

9    what would your Honor prefer?  Like the 11th?

10            THE COURT:  Yeah, let's do the 11th.

11            MS. JARVIS:  Which I think is a Monday.

12            THE COURT:  Uh-huh.  By five?  And it's probably

13    appropriate to say by five, since people can file

14    electronically now.  And then, your briefs will be due the

15    15th.  Let's do it this way.  Your briefs in support of and

16    testimony in support of is due the 15th --

17            MS. JARVIS:  Okay.

18            THE COURT:  -- but you don't need to do testimony and

19    response.  I'll let you do that at confirmation.

20            MS. JARVIS:  Okay.  And then, we have proposed that -

21    -

22            THE COURT:  And we'll also have objections would be

23    due the 11th at 5:00 o'clock, too.  Oh, that's what you said.

24            MS. JARVIS:  Yeah.  And the voting deadline we would

25    also propose be on the 11th.

71

1          **THE COURT:**  That's fine.

2          **MS. JARVIS:**  And we had proposed that their ballot

3     summary -- it's actually a Sunday, December 17th --

4          **THE COURT:**  Well, you could make it the 18th, then.

5          **MS. JARVIS:**  The 18th?  Okay.

6          **MS. CARLYON:**  All of the committees, I think, wish to

7     see it filed by Sunday night, so that we would have a day to

8     analyze this.

9          **THE COURT:**  Okay.  Well, that's fine.  I mean, since

10    you can electronically file it, it's not a problem.  Wait.

11    Sometimes the system is down on weekends.

12         Could we find out if the system is down on Sundays?

13     **(Court confers with clerk)**

14         **MS. JARVIS:**  And your Honor, we tried to reach our

15    balloting agent to make sure that the 17th would work.  I

16    think, given our past discussions, if the ballots are filed on

17    the 11th, the 17th would work, but we just want to make it

18    subject to making sure they're okay with that and can get that

19    done.

20         **MS. CARLYON:**  And obviously, if this system's down,

21    they can distribute it to the committees and file it when the

22    system comes up.

23         **THE COURT:**  Well, there you go.  Sure.

24         **MS. JARVIS:**  Yeah.  I mean, we can distribute it to

25    the committees by the 17th and file it by the 18th.

72

1          **THE COURT:**  That works.

2          **MS. JARVIS:**  Okay.  Let's do that.

3       **(Court confers with clerk)**

4          **MS. CARLYON:**  So, it'll be filed by the 18th, I

5   assume at noon.

6          **THE COURT:**  That's fine.  And then, why don't we

7   start -- let's start a little later on the 19th.  Let's start

8   at 10:00, to give you an extra hour to, you know, work things

9   out, talk, et cetera.  And then, obviously, if you need more

10  time, I mean, but we'll start later, but if we say we're going

11  to start at 10:00 that'll give you a chance to go forward.

12         **MS. JARVIS:**  A couple of other changes in the notice

13  that was sent out, because this goes with this, as well.  We

14  did -- when we filed the notice, because it was a holiday

15  weekend, which we didn't realize it was a holiday weekend, we

16  accidentally omitted the injunction language that Rule 3016

17  says has to be put in the notice, so that has been included.

18         In addition, our balloting procedures propose that,

19  in essence, with the direct lender class, that in order to

20  avoid having to have all the direct lenders file something in

21  order to vote because the deadline's been extended to the 15th

22  and the debtor's having to go through and try to file

23  objections to deal with it, what we proposed as a balloting

24  procedure is that in that direct lender class, that each direct

25  lender, in essence, be given a dollar vote, so it's, in

73

1   essence, one vote per one direct lender.

2          So, that is part of the balloting and solicitation

3   procedures that we've suggested, as well.

4          **THE COURT:**  Okay.  I think we can do that, because

5   they're not creditors, so --

6          **MS. JARVIS:**  And it prevents, you know, a lot of

7   unnecessary, you know, filings of --

8          **THE COURT:**  Accounting.

9          **MS. JARVIS:**  Yes.

10         **THE COURT:**  And if they're -- what if they're in

11  different loans, does that make a difference?  So, if one

12  lender is in five loans, they still get one vote?

13         **MS. JARVIS:**  Yes, that is correct, your Honor.

14  That's what's proposed.

15         **THE COURT:**  And the committee had no objection to

16  that?

17         **MR. GARMAN:**  No, your Honor, that's consistent with

18  the loan service agreements.  One document governs a variety of

19  loans.

20         **THE COURT:**  All right.  Then, again, since they're

21  not creditors, then we don't have -- I mean, in the traditional

22  sense.  All right.  That will work.

23         Okay.  Good.  What did you decide about that

24  settlement conference?  Do you want to have that in January

25  instead?

74

1          **(Court confers with clerk)**

2              I mean, on one hand, you've got the standard issue up

3    in the air.  It's on appeal, but --

4              **MS. JARVIS:**  Yeah, I think January will be fine.

5              **THE COURT:**  Okay.  I mean, we could do it in

6    December, but, you know, we have to have a principal there, so

7    like I said, I think Mr. Allison might be just a little bit

8    busy.

9              **MS. JARVIS:**  Yeah.  I appreciate that, your Honor.

10             **THE COURT:**  Okay.  All right.  Anything else, then,

11   on the disclosure statement?

12             **MS. JARVIS:**  Just we have submitted an order to prove

13   the disclosure statement.  In your packet that I gave you

14   today, we submitted that and we also have black lined against,

15   you know, like the procedures that you've previously seen so

16   you can see any changes.  The only change we would need to make

17   with this now is putting in these new dates.  We will do that

18   and then upload the order.

19             The order does have -- when we filed the notice, we

20   had put in a sample ballot.  The order I was given a copy of

21   for your Honor this morning actually has ballots for each class

22   attached to it -- so, it's more complete -- as well as the

23   solicitation procedures and the notice.  So, we would ask that

24   this be -- we can upload this probably later today --

25             **THE COURT:**  Okay.

75

1      **MS. JARVIS:** -- and ask that this be entered right

2  away the notice approved.

3      **THE COURT:** Does the U.S. Trustee have any comments

4  or questions or concerns about the summary or the ballot?

5      **MR. LANDIS:** Not at this juncture, your Honor, we do

6  not.

7      **THE COURT:** Okay. Thank you.

8      **MS. CARLYON:** Just for the record, we had asked the

9  Court to approve the use of the alternate direct testimony

10  procedures from the local rules and I assume that's acceptable?

11      **THE COURT:** Yes. That is. My thought being that's

12  certainly acceptable -- my point was if you don't want to do

13  that, if it's faster just to put -- easier to put the witness

14  on, as well.

15      **MS. CARLYON:** Yeah, I mean, for the prima facie case

16  for confirmation --

17      **THE COURT:** That'll be alternate direct testimony.

18      **MS. CARLYON:** -- and the prima facie case for

19  objections, I think it's important that that be submitted in

20  advance through that procedure.

21      **THE COURT:** So, yes. Do we have -- all right. So, I

22  guess anybody that wishes to submit -- my concern is with the

23  direct lender, Mr. Smith, files an objection, I'll consider it,

24  whether or not there's -- you know, without making him file the

25  alternate direct testimony. But anybody who wishes to submit

1   evidence in opposition must submit the prima facie objection by

2   an affidavit with the opposition.

3          **MS. CARLYON:**  Okay.  Thank you, your Honor.

4          **MS. JARVIS:**  Your Honor, just in clarification, the

5   order -- it would actually make sense if we actually upload it

6   tomorrow --

7          **THE COURT:**  That's fine.

8          **MS. JARVIS:**  -- because we have to do it with the

9   disclosure statement and, as you heard, there are a few issues

10  you raised that we'll correct in the disclosure statement.

11  Silver Point has a few issues that we need corrected, so we

12  will make those corrections, file the final with the order

13  tomorrow, if that works.

14         **THE COURT:**  Okay.

15         **MS. KARASIK:**  Your Honor, just one item in the order.

16  We are -- I believe all the committees and certainly the first

17  trustee committee are going to provide a letter in support of

18  the plan and those will be attached for them.  I have ours if

19  the Court wants it before to take a look at it, or we can just

20  attach all of them together, whichever you --

21         **THE COURT:**  Just make sure U.S. Trustee's office has

22  a copy so they get a chance to review it.  If they have any

23  objections --

24         **MS. KARASIK:**  They'll just be attached to the

25  disclosure statement order.

77

1           THE COURT:  All right.

2           MS. KARASIK:  Thank you, your Honor.

3           THE COURT:  Uh-huh.

4        (Court confers with clerk)

5           Yeah, the 15th we will not use now.

6           MS. JARVIS:  Your Honor, we would ask --

7           THE COURT:  Or do you want to just keep it in case we

8    have --

9           MS. JARVIS:  We would ask that -- sometimes they set

10   aside, so for instance, if there are some, you know,

11   evidentiary issues --

12           THE COURT:  Okay.

13           MS. JARVIS:  -- that we could, you know, use it for

14   preliminarily to start on the confirmation hearing.

15           THE COURT:  All right.  Let's do this, then.  Let's

16   use the 15th at 9:30 for a status and I would allow the

17   attorneys to participate by telephone.  You'll probably all be

18   here anyway.

19           Well, let's use the first status.  Those people --

20   I'll allow telephonic participation by the attorneys, assuming

21   it's just a status hearing.  I'd want somebody here locally to

22   come in and let me know what's going on.  And then we could --

23   by then, you'll know what kind of oppositions you have.

24           MS. JARVIS:  If there are any evidentiary issues like

25   the motions in limine or whatever --

78

1          THE COURT:  Exactly.

2          MS. JARVIS:  -- we can file those in advance and have

3    them heard at that point in time.

4          MS. CARLYON:  Your Honor, given the problems we've

5    had with the dial-in, perhaps we'll set a different -- dial-in

6    with a different server for that date.

7          THE COURT:  A different -- yes.  I'm only going to

8    make it -- the only telephonic available is for those attorneys

9    who wish to participate in the proceeding.

10          MS. CARLYON:  Is Ms. McPherson volunteering to do

11   that or shall I?

12          MS. McPHERSON:  We can do it, your Honor.

13          THE COURT:  Okay.

14          MS. CARLYON:  Thank you.

15          THE COURT:  So, let's have a pre-confirmation

16   scheduling conference on the 15th.

17          MS. JARVIS:  And would that be at 9:30?

18          THE COURT:  You pick a time.  If you'd rather do it a

19   little later -- 9:30's good?

20          MS. JARVIS:  9:30's fine.

21          THE COURT:  Okay.  Now, obviously, if you're already

22   in town and you're here -- it's easier if everybody's here --

23   but I don't want to make people travel for that.

24      (Court confers with clerk)

25          THE COURT:  Okay.  Good.  All right.  So, the last

79

1  thing we have is the motion by Mr. Sylvester?

2          Just so I know, these pink, rose-colored back ones

3  are the last version, right?  Okay.

4          Okay.  Go ahead.

5          **MR. SYLVESTER**:  Good morning, your Honor, Jeffrey

6  Sylvester --

7          **THE COURT**:  And anybody else who wishes to leave,

8  certainly may.  Do you want to take a short recess so everybody

9  can -- or you can stay, whatever?

10          Let's take two minutes, so anybody that wants to

11  leave they certainly may.

12          **THE CLERK**:  All rise.

13     **(A recess was taken from 11:37 a.m. to 11:46 a.m.)**

14          **THE CLERK**:  Bankruptcy court is now in session.

15          **THE COURT**:  Be seated.  You know, I was thinking to

16  another compromise in the DFK.  Did Ms. -- they all left,

17  didn't they?

18     **(No audible response)**

19          **THE COURT**:  Well, you can find out for me.  Mr. --

20          **MS. UNIDENTIFIED**:  Mr. Charles is here.

21          **MS. CARLYON**:  And Mr. Levinson just -- yes, I'll go

22  grab him.  Marc?

23          **THE COURT**:  After I told him he could then he did

24  leave like I told him he could.

25          You know, Judge Glover could probably do a settlement

80

1    conference to try and resolve these final differences.  He

2    could do it December 11th or 12th.  The thing is in order to do

3    it I have to kick off other settlement conferences.  So if

4    you're at all interested let us know by oh, Thursday.

5            **MR. LEVINSON:**  Thursday, this week?

6            **THE COURT:**  If you're interested.  It would be

7    December 11th or 12th.  So just let us know by Thursday if one

8    of those days would work.

9            And how long -- if we did it, how long do you think

10   it would take?  Do you think it would take a whole day?

11           **MR. LEVINSON:**  Every settlement conference I've ever

12   been to nothing gets done until close to the end.

13           **MR. CHARLES:**  Your Honor, so if it's scheduled for

14   four hours it will get done in the fourth hour.  If it's

15   scheduled for six it will get done in the sixth.

16           **THE COURT:**  Okay.  He's very -- you haven't been

17   before him but he's pretty good at striking the whip so I think

18   four hours is probably --

19           **MR. LEVINSON:**  I think I have been in front of him.

20           **THE COURT:**  Okay.

21           **MR. LEVINSON:**  I think he may have tried to settle

22   some EVT issues.

23           **THE COURT:**  Okay.

24           **MR. LEVINSON:**  I could be wrong.

25           **MS. CARLYON:**  He did a lot of the preference.

81

1          **THE COURT:**  Right.

2          **MR. LEVINSON:**  Yes.

3          **THE COURT:**  Right.  So that way we wouldn't have to

4    change as many things if we gave you either the morning.  Well,

5    you just -- you've got to let us know by Thursday --

6          **MR. CHARLES:**  Who should we tell?

7          **THE COURT:**  -- because we have to kick other people

8    off.

9          **MR. CHARLES:**  I'm sorry, your Honor.  Who should we

10   tell?

11         **THE COURT:**  Ms. Workheiser.

12         **MR. CHARLES:**  We can do this.

13         **THE COURT:**  Okay.

14         **MR. LEVINSON:**  We will discuss.

15         **THE COURT:**  Okay.  And what he requires and I require

16   is that the person with settlement authority be there as well.

17   This person with settlement authority can't be on the

18   telephone.  It has to be in person because the whole point and

19   I agree when you do settlement conferences you -- the person in

20   charge has got to see the reality.

21         **MR. CHARLES:**  Here's our problem.  We have two

22   committees and we have wildly differing views of issues which

23   interrelate.  So unless you said we have to bring the whole

24   committee together which has not ever happened in my experience

25   for just my committee, it is not possible for us to bring

82

1    decision makers.  We can get parameters from our clients but

2    it's -- unless I don't --

3              **THE COURT:**  Isn't there a committee chair?

4              **MR. CHARLES:**  Sure.  But the problem is you have to

5    know within some relevant parameters kind of where you're

6    likely to end up and then get authority to do that on literally

7    probably four to six moving pieces which move each other.

8              **THE COURT:**  I think he's alright with that but he

9    wants somebody who's in charge.

10             **MS. CARLYON:**  Typically, when we have a committee

11   just as if you have a board or a government agency, we send

12   someone who is charged with having authority to settle --

13             **THE COURT:**  Subject to --

14             **MS. CARLYON:**  -- subject to the yes vote of the group

15   and have the group standing by to give that yes vote during the

16   conference.

17             **THE COURT:**  Right.

18             **MR. CHARLES:**  I cannot get my nine -- Mr. Landis

19   blessed me with nine really busy talented people who I couldn't

20   say to you are available anytime on the phone for --

21             **THE COURT:**  Well, I think he'd be flexible to say,

22   "All right.  This is the deal but get back to us in 48 hours."

23             **MR. LEVINSON:**  Fine.

24             **MR. CHARLES:**  We can live with that and I apologize

25   for interrupting.

83

1          **MR. LEVINSON:**  No, no, my situation is the same,
2    that's fine, except my committee is smaller.
3          **THE COURT:**  Okay.  So let's do that.  If you agree to
4    it and -- I mean, I would just order it but there's no sense
5    ordering settlement conferences that just waste everybody's
6    time and you've done very well yourselves but if you agree to
7    it, it will be either the 11th or the 12th.  You've got to let
8    us know by Thursday at 5:00.  What is Friday?
9          **MR. CHARLES:**  And a.m. or p.m. at this point on
10   either day?
11         **THE COURT:**  You tell us what you prefer.
12         **MR. CHARLES:**  Okay.
13         **THE COURT:**  It's probably easier to kick off -- I've
14   got two set for the morning I'd have to move and three in the
15   afternoon each day.  The 11th is probably better because those
16   are my cases which I'd feel a little better about moving rather
17   than Judge Mark Bell's.
18         **MR. CHARLES:**  I won't tell him.
19         **THE COURT:**  Okay.
20         **MR. CHARLES:**  We will get back to your courtroom
21   deputy by Thursday --
22         **THE COURT:**  Right.
23         **MR. CHARLES:**  -- if not sooner.
24         **THE COURT:**  Thanks.
25         **MR. LEVINSON:**  Thank you, your Honor.

84

1          **THE COURT:**  Okay.  All right.  Fine.  Mr. Sylvester?

2          **MR. SYLVESTER:**  Good morning, your Honor.  Jeffrey

3    Sylvester on behalf of USA Commercial Real Estate Group.

4          Your Honor, this is the Real Estate Group's motion to

5    enforce the order allowing the debtors to distribute funds

6    received by the debtors from the various borrowers for

7    distribution to the Direct Lenders.  The Court will recall, of

8    course, that the debtors requested that this Court authorize

9    the release of those funds directly to the Direct Lenders net

10   of whatever servicing fee was due and owing pursuant to the

11   terms and provisions of the loan servicing agreement.

12         The motion that was filed by the debtors further

13   provided that the debtors would supplement the record and

14   provide to the Direct Lenders sort of a statement as of June

15   30th as to the amount of the Direct Lenders loan and the

16   amounts received by the borrowers for distribution to the

17   Direct Lenders.

18         Obviously, Real Estate Group didn't oppose that

19   motion and pursuant to the terms and conditions of the debtors

20   motion in fact received the anticipated distribution from the

21   debtors and we've attached that anticipated distribution to the

22   reply memorandum.

23         The Court, of course, approved the debtors' motion to

24   distribute funds and allowed the debtors to make those

25   distributions to those Direct Lenders as set forth in those

85

1    proposed statements.

2              Unfortunately, Real Estate Group didn't receive its

3    distribution although it was advised by debtors that they would

4    be receiving the monies as the funds had actually been put in a

5    check form.  When Real Estate Group didn't receive its

6    distribution I contacted counsel then for the Creditors

7    Committee and inquired as to why it hadn't yet received its

8    monies and ultimately after several conversations the response

9    was, "Well, there may be claims against the principals of Real

10   Estate Group and, therefore, out of an abundance of caution and

11   without further order of the Court, we're not going to release

12   those funds."

13             As a result, your Honor, we filed the motion.

14             **THE COURT:**  Well, USA Commercial Real Estate Group

15   isn't an entity is it?

16             **MR. SYLVESTER:**  It is.

17             **THE COURT:**  It's an incorporated entity?

18             **MR. SYLVESTER:**  It is and I think, as an aside, this

19   Court granted the Unsecured Creditors Committee's application

20   for a 2004 examination of which went forward on Thursday of

21   last week.  And in connection with that, a subpoena was issued

22   with respect and requested and received the corporate documents

23   including the Articles of Incorporation, the bylaws, and the

24   minutes of shareholders and directors.

25             It is a duly formed Nevada corporation and I will

1    concede to you it is owned by Mr. Milanowski and Mr. Hantges.

2          The motion was filed and the opposition that we

3    received, in essence, echoed the comments of the confidential

4    Creditors Committee indicating that there may be claims against

5    the principals of USA Commercial Real Estate Group and that out

6    of an abundance of caution and without further order of the

7    Court no funds will be released.

8          There was a joinder filed by the Unsecured Creditors

9    Committee indicating that there should be some further

10   investigation as to the business transactions, if any, by and

11   between Real Estate Group and the debtors.

12         Again, the 2004 examination was commenced and

13   concluded and the documents were produced.

14         Real Estate Group has direct loans that advocate

15   $750,000 and while the proposed distribution is nominal in

16   respect to, of course, the case as a whole and its direct

17   loans, it is still an amount that the direct lender, USA

18   Commercial Real Estate Group, believes it is entitled to

19   receive.

20         **THE COURT:**  Well, how do we know that money didn't

21   come from USA Commercial Mortgage?

22         **MR. SYLVESTER:**  There was some, again, investigation,

23   your Honor, at the time of the 2004 examination.

24         **THE COURT:**  But you've offered no evidence of that?

25         **MR. SYLVESTER:**  I haven't.  I haven't offered any

87

1    evidence of that, your Honor, and I don't think that the

2    Creditors Committee and counsel are suggesting that those funds

3    belonged to any one of these debtors, at least that's not what

4    the opposition is that I have seen and I haven't seen any

5    communication in that regard.  There was testimony in 2004 that

6    it came from commissions from real estate transactions and

7    that's the evidence that we have.

8            The point that I'm making, your Honor, is that we

9    don't think it's property of the estate and having heard the

10   comments of Mr. Garman and the agreement reached with the

11   debtors subject to confirmation, these funds will not be deemed

12   property of the bankruptcy estate and I'm not going to stand

13   before this Court and suggest that she issue an order as to

14   whether it is or isn't.  I'm assuming that will be a matter for

15   confirmation.  But there is no right of setoff because the

16   funds that are now held, the debtors and the Unsecured

17   Creditors Committee have not taken the position that those --

18   at least in opposition to this motion -- that those funds are,

19   in fact, property of the estate.  What they are suggesting is

20   they may have claims against the principals and that may or may

21   not be true but they haven't asserted a claim against USA

22   Commercial Real Estate Group; they haven't intimated that a

23   claim exists, and there is no evidence to suggest that there is

24   a claim by the debtor's against Real Estate Group.

25            **THE COURT:**  But you're not objecting to the netting

88

1    aspect of this?

2         **MR. SYLVESTER:**  No, your Honor, we didn't and, as a

3    matter of fact, the amount in the reply or the statement that

4    was forwarded I'm assuming was net of the loan servicing fee.

5    These direct loans were pursuant to a loan servicing agreement

6    and we haven't taken the position today that they're not

7    entitled to those fees or that those sums should be netted out

8    of the amounts received from the borrowers.

9         Again, there's no evidence to suggest that set off is

10   appropriate.  They haven't alleged claims.  It is a duly formed

11   Nevada corporation.  There's no claims of an alter ego such

12   that they can reach the assets of Mr. Milanowski and

13   Mr. Hantges and, frankly, to hold those funds is, I think,

14   tantamount to writ attachment.

15        And as a result, we're simply asking the Court to

16   compel the debtors to release the funds that it has previously

17   indicated it would be released pursuant to the Court's order

18   permitting distribution.

19        **THE COURT:**  Okay.  Opposition?

20        **MS. McPHERSON:**  Your Honor, as you recall, the

21   debtors did file the motion for permission for the proposed

22   distributions to be made and, as set forth in the motion, the

23   debtors do say that they are not waiving any rights or

24   arguments that they have.  And so, the statements did go out to

25   everybody and actually right now Mesirow is holding

89

1    appropriately 137,000 for USA Real Estate Group and we are in

2    the process of learning more about USA Commercial Real Estate

3    Group.

4         We do know that it's owned solely by Mr. Milanowski

5    and Tom Hantges and we believe that they are insiders and we

6    are trying to determine whether there are additional claims

7    against them.  I think it's -- would certainly be appropriate

8    to find that their claims could be equitably subordinated

9    because of the prepetition irregularities that went on and the

10   effect that those prepetition irregularities had on other

11   claimants.

12        And so as a result of the fact that USA Commercial

13   Real Estate Group is comprised of insiders and the prepetition

14   conduct that went on, those monies were just not distributed

15   and we would need a --

16        **THE COURT:**  Does the plan -- I know the plan provides

17   for equitable subordination.  Does it include -- does the

18   definition of "insider" go so far as to include this claim?  So

19   when the plan is written that claim will be subordinated?

20        **MS. McPHERSON:**  I believe the plan refers to

21   nondebtor entities as potential claims that could be

22   subordinated.

23        **THE COURT:**  Okay.  All right.

24        **MS. McPHERSON:**  Thank you.

25        **THE COURT:**  Any other opposition?

1          **MR. CHARLES:**  Your Honor, Rob Charles on behalf of

2     the Unsecured Creditors Committee.

3          Counsel has accurately represented that we did

4     conduct a 2004 examination last week.  We have not yet had it

5     transcribed and I did not want to incur the expense of an

6     expedited transcript.

7          But to more directly answer one of the questions you

8     asked counsel which was "Has Commercial Real Estate Group

9     demonstrated the source of the funds used to identify as

10    loans?"  Because all that you to identify them as a lender is

11    what any lender has, a name on a loan document.  But for some

12    reason there is an understandable curiosity as to how an entity

13    owned by Hantges and Milanowski where Hantges is the broker and

14    is the president, Milanowski is the vice president, it has no

15    employees and Milanowski is running the deal, how that -- how

16    it came to have money.

17         Essentially, Mr. Milanowski told me, "Trust me, we

18    wrote checks through the trust -- or the trust account that was

19    used for investors, investor trust account, not the collection

20    account," and we have not have documented or confirmed by

21    Mesirow or by the debtors that, in fact, Commercial Real Estate

22    Group money went through that account, nor do we know the

23    source of those funds.  Mr. Milanowski didn't know.  He thought

24    perhaps they were commissions; he wasn't sure.  And, you know,

25    like any human being, I'm sure his memory was difficult and

1    infallible.  He essentially wouldn't tell us anything other

2    than what was on pieces of paper in front of him and there was

3    no documentation either as to demonstrating that there were, in

4    fact, funds loaned or what the source of those funds were.

5         So I can't tell you that I know the converse.  I

6    can't tell you that they didn't put money in or that they stole

7    the money for these loans.  I don't know that.  I just don't

8    know as we stand here today.

9         **THE COURT:**  Okay.  All right.  Reply?

10        **MR. SYLVESTER:**  Very briefly, your Honor.

11        The opposition that were filed by the committee and

12   by the debtors said that there may be claims against the

13   principals of the Real Estate Group but they have not

14   articulated what those claims are and they have not suggested,

15   at least in the pleadings filed before the Court, that the

16   funds used to fund these direct loans were property of the

17   debtor.

18        Obviously, the debtor is in possession of these

19   business records, including but not limited to the trust fund

20   account, and could have, if it was so inclined, determine

21   whether or not funds were actually advanced and then loaned to

22   the borrowers.

23        On the record before the Court today is simply an

24   undisputed fact that my client is a Direct Lender, that the

25   debtors now holding proceeds received from the borrowers

92

1    pursuant to the servicing agreement, and that the Court has

2    authorized those funds to be released.

3            And I appreciate the concern that the Court has about

4    the claims of the estates against the principals but as this

5    corporation duly formed presently stands before this Court

6    there are no claims against it and there has been no evidence

7    to suggest that there's a right of offset or that there is some

8    mutuality that would permit a setoff of the funds now held by

9    the debtors against the funds due and owing USA Real Estate

10   Group.

11           **THE COURT:**  Well, I think it's -- I'm going to defer

12   this until after confirmation.  There are some concerns I have

13   that this is nothing more than an attachment brought without a

14   lawsuit.  But by the same token, it seems to me the plan will

15   take care of this through Class A-7 and/or through that

16   process.  So I think it would premature for me to decide this

17   prior to confirmation and, of course, in the meantime another

18   lawsuit's brought and attachments sought.  That ends that issue

19   there and/or if it's resolved that this is a subordinated claim

20   that resolves that.

21           So we'll set it down for our first hearing after

22   confirmation which is -- would be January 3rd.

23           **MR. UNIDENTIFIED:**  Nine thirty?

24           **THE COURT:**  Yes.

25           **MR. UNIDENTIFIED:**  Thank you, your Honor.

93

1          **THE COURT:**  Although, obviously, you know, we'd go in

2     our order so it may get moved.  All right.  Thank you.

3          So that's all we have for today?  Okay.  I'm sorry.

4          **MS. JARVIS:**  One cleanup matter.  The orders, the few

5     orders for Mesirow, and Ray, Quinney, and Schwartzer and

6     McPherson --

7          **THE COURT:**  They were held because of the problems

8     that somebody raised.

9          Have they been resolved?

10         **MS. JARVIS:**  Well, I think all of the issues are

11    resolved except there -- with respect to Mesirow and Ray,

12    Quinney.  I think there was one issue that was briefed with

13    respect to Schwartzer and McPherson although I think given the

14    agreements that have been reached under the plan I'm not sure

15    that that really is even an issue.  But in any case, that has

16    been fully briefed and is ready for your Honor to enter.

17         **THE COURT:**  You know, I'm not going to have to decide

18    that brief issue.

19         Can you just reach some kind of resolution in the

20    meantime so at least they can get paid and defer the

21    allocation?

22         **MS. CARLYON:**  Absolutely.  It's been suggested by a

23    number of parties that the agreement that was reached with the

24    debtors' professionals, which is basically an interim, nine and

25    one-half percent being paid out of the funds, be applied across

1   the board to all of debtors' professionals.  That is the order

2   that's requested by Ray, Quinney.  Everyone is in agreement.

3   That is the order being requested by Mesirow.  Everyone is in

4   agreement.

5           For some reason, Schwartzer, McPherson has an odd

6   amount for the interim and just -- let's just do the same nine

7   and a half percent on an interim basis.  It's without prejudice

8   and confirmation will resolve all of this anyway.

9           **THE COURT:**  Okay.

10          **MS. CARLYON:**  And that way everybody can get paid

11  something now and we can worry about, you know, the $5,000

12  difference or whatever at a later date.

13          **THE COURT:**  Okay.

14          **MS. McPHERSON:**  Your Honor, we are talking about a

15  small amount and that's why we find it curious that this has

16  become such an issue.

17          **THE COURT:**  Well, can you just upload the -- I mean,

18  if you want to wait until I resolve this that's fine.  But if

19  you want to re-upload the order with that, without prejudice,

20  it's your choice.  I am not going to get to it because I've got

21  other hearings and things before now.  I mean, I'm not going to

22  -- I don't know how to resolve it without spending an hour

23  listening to the transcripts.  So you decide what you want to

24  do.

25          **MS. McPHERSON:**  Okay, your Honor.  We'll discuss it.

1    Thank you.

2              **THE COURT:**  Okay.

3              **MS. JARVIS:**  And, your Honor, we just --

4              **THE COURT:**  So, I'll tell you what.  I'm going to

5    trash all those orders and you can re-upload the three.

6              **MS. JARVIS:**  No, actually the orders for Ray, Quinney

7    and Mesirow, as Ms. Carlyon said, are -- they're agreed to.

8              **THE COURT:**  All right.

9              **MS. JARVIS:**  There's no issue.  It's just --

10             **MS. CARLYON:**  They were completely approved.

11             **MS. JARVIS:**  Yes, those are done.

12             **THE COURT:**  Okay.

13             **MS. JARVIS:**  They don't need to be uploaded.  They're

14   approved.

15             **THE COURT:**  Okay.

16             **MR. GARMAN:**  Your Honor, we didn't have an objection

17   to it but Mesirow has not paid the remainder of the

18   professionals any -- none of the Knudson (phonetic) order or

19   the allowed fee applications because they've decided that they

20   wanted to wait until their order was approved and that we find

21   is inappropriate.  So we'd like this resolved and we'd like the

22   fees that have already been authorized by this Court to be paid

23   to the rest of the professionals to go out as soon as

24   possible.

25             **MS. JARVIS:**  I think, your Honor, it's an issue of

96

1    with respect to the money coming out of USA Commercial

2    Mortgage.  There has -- there's not going to be a complete

3    payment; it's going to be a pro rata payment so everything

4    needs to be determined so that can be done.  So it is important

5    that these orders get entered so we can get this paid.

6              **THE COURT:**  Okay.

7              **MS. JARVIS:**  Thank you, your Honor.

8              **THE COURT:**  Okay.  All right.  Thank you then.

9              **MS. CARLYON:**  Thank you, your Honor.

10             **THE CLERK:**  All rise.

11          **(Proceeding was adjourned at 12:06 p.m.)**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    July 12, 2010
            Signed                                      Dated


                    *TONI HUDSON, TRANSCRIBER*