1

```
1            UNITED STATES BANKRUPTCY COURT
                  DISTRICT OF NEVADA
2                  LAS VEGAS, NEVADA
   In re:  USA COMMERCIAL MORTGAGE  )  E-Filed:  08/17/10
3  COMPANY,                         )
                                    )
4          Debtor.                  )  Case No.
                                    )  BK-S-06-10725-LBR
5  _____)  Chapter 11

6            PARTIAL TRANSCRIPT OF PROCEEDINGS
                           OF
7  MOTION TO AUTHORIZE DEBTOR, USA COMMERCIAL MORTGAGE COMPANY,
        AS LOAN SERVICER TO APPROVE LOAN MODIFICATION
8                 FOR PALM HARBOR ONE LOAN,
    TO PROVIDE THE PREVIOUSLY-AUTHORIZED SUBORDINATION
9       OF THE MARLTON SQUARE 2ND LOAN IN CONNECTION
        WITH THE PAYOFF OF THE MARLTON SQUARE 1ST LOAN,
10           TO AUTHORIZE A SHORT-TERM FORBEARANCE
                FOR THE MARLTON SQUARE 1ST LOAN,
11    AND TO GENERALLY AUTHORIZE SHORT-TERM LOAN FORBEARANCES
             AND FULL RELEASES AND RECONVEYANCES
12           FOR LANS PAID OFF IN FULL, NO. 1448
                          AND
13     MOTION FOR ORDER APPROVING CONTINUED USE OF CASH
                THROUGH JANUARY 31, 2007,
14       PURSUANT TO FOURTH REVISED BUDGET, NO. 1452
                          AND
15    ORDER SHORTENING TIME RE: MOTION TO EXCLUDE DEBTORS
          FROM HAVING TO FILE INTERCOMPANY CLAIMS
16            AGAINST EACH OTHER BY THE BAR DATE,
                   OR, ALTERNATIVELY,
17     FOR THE APPROVAL OF THE IMMEDIATE APPOINTMENT
                  OF SPECIAL COUNSEL
18   TO FILE AND PURSUE THE INTERCOMPANY DEBTOR CLAIMS, NO. 1519
                          AND
19     MOTION TO CONVERT CASE TO CHAPTER 7, NO. 1661
                       VOLUME 2
20         BEFORE THE HONORABLE LINDA B. RIEGLE
              UNITED STATES BANKRUPTCY JUDGE
21
                Monday, October 30, 2006
22
                    10:30 a.m.
23
   Court Recorder:        Cathy Shim
24
   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.
```

2

```
 1    APPEARANCES:

 2    For the Debtor and        LENARD E. SCHWARTZER, ESQ.
      Debtor in Possession:     Schwartzer & McPherson Law Firm
 3                              2850 South Jones Boulevard
                                Suite 1
 4                              Las Vegas, Nevada 89146

 5                              ANNETTE W. JARVIS, ESQ.
                                Ray, Quinney & Nebeker, P.C.
 6                              36 South State Street
                                Suite 1400
 7                              Salt Lake City, Utah 84145

 8    For the First Trust       EVE H. KARASIK, ESQ.
      Deed Fund Committee:      Stutman, Treister & Glatt, P.C.
 9                              1901 Avenue of the Stars
                                Twelfth Floor
10                              Los Angeles, California 90067

11                              CANDACE C. CARLYON, ESQ.
                                Shea & Carlyon, Ltd.
12                              233 South Fourth Street
                                Suite 200
13                              Las Vegas, Nevada 89101

14    For the Canepa Group:     LAUREL E. DAVIS, ESQ.
                                Lionel, Sawyer & Collins
15                              300 South Fourth Street
                                Suite 1700
16                              Las Vegas, Nevada 89101

17    For the Direct            GREGORY E. GARMAN, ESQ.
      Lenders Committee:        Gordon & Silver, Ltd.
18                              3960 Howard Hughes Parkway
                                Ninth Floor
19                              Las Vegas, Nevada 89109

20    For Diversified Trust     ANNE M. LORADITCH, ESQ.
      Deed Fund Committee:      Beckley Singleton, Chtd.
21                              530 Las Vegas Boulevard South
                                Las Vegas, Nevada 89101
22
      For Drs. Alexander        ROBERT C. LePOME, ESQ.
23    and Others:               Law Offices of Robert C. LePome
                                330 South Third Street
24                              Suite 1100-B
                                Las Vegas, Nevada 89101
25
```

3

```
 1    APPEARANCES (Cont.):

 2    For the MacDonald        JEFFREY L. HARTMAN, ESQ.
      Center for Arts and      Hartman & Hartman
 3    Humanities:              510 West Plumb Lane
                               Suite B
 4                             Reno, Nevada 89509

 5    For the Official         ROB CHARLES, JR., ESQ.
      Unsecured Creditors      Lewis and Roca, LLP
 6    Committee:               3993 Howard Hughes Parkway
                               Suite 600
 7                             Las Vegas, Nevada 89109

 8    For the United States    AUGUST B. LANDIS, ESQ.
      Trustee:                 Office of the United States Trustee
 9                             300 Las Vegas Boulevard South
                               Suite 4300
10                             Las Vegas, Nevada 89101

11    Also Present:            DON WALKER
                               Committee Chair
12                             Official Unsecured Creditors Committee

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1          (Court convened at 10:44:36 a.m.)

2          (Partial transcript.)

3          THE CLERK:  Bankruptcy court is now in session.

4     (Colloquy not on the record.)

5          THE COURT:  Be seated.  Okay.

6     (Colloquy not on the record.)

7          THE COURT:  USA Commercial.

8     Appearances, please.

9     (Colloquy not on the record.)

10          MR. SCHWARTZER:  Lenard Schwartzer and Annette Jarvis

11     for the debtors and debtors in possession.

12          MS. KARASIK:  Good morning, your Honor.  Eve Karasik,

13     Stutman, Treister & Glatt, Professional Corporation, on behalf

14     of the First Trust Deed Fund Committee.

15          MS. CARLYON:  Good morning, your Honor.

16     Candace Carlyon of Shea & Carlyon for the First Trust Deed Fund

17     Committee.

18          MS. DAVIS:  Good morning, your Honor.  Laurel Davis

19     of Lionel, Sawyer & Collins on behalf of the Canepa Group.

20          MR. GARMAN:  Your Honor, Greg Garman on behalf of the

21     Executory Contract Committee or the Direct Lender Committee.

22          MS. LORADITCH:  Good morning, your Honor.

23     Anne Loraditch of Beckley Singleton, Chartered, on behalf of

24     the Diversified Trust Deed Fund Committee.

25          MR. LePOME:  Robert LePome, Drs. Alexander and

1  others.

2          MR. HARTMAN:  Good morning, your Honor.  Jeff Hartman

3  for the MacDonald Center for the Arts and Humanities.

4          MR. CHARLES:  Your Honor, Rob Charles from

5  Lewis and Roca.  We represent the Official Unsecured Creditors

6  Committee of the USA Commercial Mortgage Company, and

7  Don Walker, our Committee Chair, is present in the courtroom.

8          MR. LANDIS:  Augie Landis, Assistant United States

9  Trustee, for the Department of Justice through the

10  United States Trustee's Office.

11          THE COURT:  Okay.  All right.  Let's get rid of the

12  first matter, the omnibus objection.  That had already been

13  taken care of, correct?  I think all we had left was Highland

14  which has then been withdrawn?

15          MS. CARLYON:  Yes, your Honor.  That is correct, so

16  both of those matters were previously resolved.

17          THE COURT:  Okay.  So No. 1 is completed, and, No. 2,

18  Highland withdrew their claim, so that's granted.  Okay.  All

19  right.

20      Let's skip to the motion to convert because that obviously

21  affects how other things proceed in the case.  First, let me

22  just for the record indicate the timing on this motion just so

23  the record's clear.

24      The U.S. Trustee filed this motion last week and noticed

25  it on the calendar for the November hearing.  When the parties

6

1    made me aware of that last week, I thought it best that that

2    matter be heard sooner, rather than later, because of the

3    uncertainty it creates and because of my schedule.

4        I understand the day's a very short time.  But because of

5    my schedule, the earliest I could have heard it was the 7th

6    which again creates uncertainty.

7        The U.S. Trustee's Office consented to having it earlier.

8    They refused to consent to go beyond the 30 days and then the

9    15 days.  And, of course, that would have put us right in the

10   middle of the sale process, so that's why I shortened the time.

11       Obviously, there's no harm to the movant because the

12   movant is the one that made the motion.  The only potential

13   harm would be to those opposing.

14       However, I believe that the debtors and all the

15   constituencies consented to having it heard on shortened time

16   and, indeed, have filed oppositions to resolve the uncertainty

17   issue, so just a note about that timing.  Okay.

18       Go ahead, Mr. Landis, with that in mind.

19          MR. LANDIS:  Thank you, your Honor.  And may it

20   please the Court, Counsel, the motion that brings us here

21   today, Judge, is the United States Trustee's motion to convert

22   these cases to Chapter 7.

23       I understand that the scope of evidence that will be

24   allowed in support of our motion is limited to matters of

25   record at the time that the motion was filed.

7

1       It's a huge docket.  Rather than to simply ask the Court

2   to take judicial notice of all aspects, I have narrowed it down

3   to a series of categories of documents.

4       If the Court will indulge me, I'll identify those matters

5   that we would ask the Court to take judicial notice of in

6   support of our motion.

7           THE COURT:  Okay.  Is there any reason you didn't do

8   that in your motion?

9           MR. LANDIS:  Your Honor, in connection with the

10  hearing, we believed that we would be able to present evidence

11  through testimony if necessary.  We believe that given the

12  short time we didn't even have an opportunity to amend the

13  motion further.

14      The bottom line is we want to simply make the Court aware

15  of the facts as we knew them at the time that the motion was

16  filed.

17          THE COURT:  Well, but it seems to me -- and you've

18  heard me also, you know, castigate the debtors.  When you file

19  motions in this case, you've got to support -- you should file

20  it with the appropriate evidence be it judicial notice or

21  declaration, and that's fine.

22      I understand.  I can take judicial notice at any time, but

23  it certainly would have made everybody's life easier if you had

24  identified those things in the motion since you're the one that

25  chose the motion.  You're the one that chose to file it when

1    you did.

2              MR. LANDIS:  Your --

3              THE COURT:  Nobody --

4              MR. LANDIS:  Your --

5              THE COURT:  -- was pressuring --

6              MR. LANDIS:  That --

7              THE COURT:  -- you to file it a certain time.  You

8    made that decision.

9              MR. LANDIS:  We'll come back to that because I will

10   address the timing-of-the-motion question because I think

11   that's a concern to the Court.

12        But you will hear from the items that we're identifying

13   that this is not an effort to sandbag anyone, Judge.  The

14   motions or the actions, items, that we're asking to have

15   judicial notice taken of are all matters that were filed either

16   by the debtors or related parties in connection with this

17   matter.

18        So there is no surprise.  They're aware of what the

19   facts are as based on the judicial-notice requests that will

20   follow.

21        The first series of judicial-notice requests we're asking

22   the Court to take judicial notice of are the monthly-operating

23   reports for USA Commercial Mortgage.  Those docket entries are

24   327, 791, 926, 927, 928, 1176, 1338, and 1671.

25        The second category of reports is the monthly-operating

1    reports for USA Capital Realty Advisors, Docket Entries 328,

2    792, 917, 918, 919, 920, 921, 1175, 1339, and 1615.

3         The third category is the monthly-operating reports for

4    the Diversified Trust Deed Fund, Docket Entries 329, 793, 923,

5    924, 925, 1173, 1340, and 1616.

6         The fourth category are the monthly-operating reports for

7    the First Trust Deed Fund, Docket Entries 330, 794, 929, 930,

8    931, 1174, 1341, and 1618.

9         The last in the series of monthly-operating reports are

10   those filed on behalf of USA Securities, LLC, Docket Entries

11   331, 795, 922, 1177, 1342, and 1617.

12        The next category of items we're asking the Court to take

13   judicial notice of are the declarations filed with the court by

14   Thomas J. Allison on behalf of the debtors, Docket Entries 9,

15   130, 267, 347, 449, 648, 702, 750, 955, 957, 1090, 1430, 1435,

16   1578, 1633, and 1671.

17        The next category of documents, Judge, are simply the loan

18   summaries filed by the debtors in the case to date,

19   Docket Entries 418, 967, 1329, and 1621.

20        We would also ask the Court to take judicial notice of the

21   motion for the order authorizing reimbursement of due-diligence

22   expenses of the potential postpetition lender.  Docket Entries

23   171 is the motion, and 702 is the order denying.

24        The next category is the denial of the motion for

25   emergency interim and permanent orders authorizing the debtors

1    to obtain postpetition financing.  Docket Entries 588 is the

2    motion.  835 is the order denying.

3         With respect to the Fertitta Enterprises motion to provide

4    financing for the Rio Rancho loan I believe it was, we'd ask

5    the Court to take judicial notice of Docket Entries 1085, 1103,

6    1125, and 1128 which was the order granting.

7         The good news is, Judge, the rest of these are very short.

8    We'd ask the Court to take judicial notice of the motion to

9    exclude the debtors from having to file intercompany claims,

10   Docket 1454, the motion for order approving retention plan of

11   debtor's remaining employees, Docket 1429, the debtor's joint

12   disclosure statement, Docket 1309, the debtor's plan of

13   reorganization as amended to date, Docket Entries 1310 and

14   1576, the auction-sale notice, Docket No. 1352, the asset

15   purchase agreement Docket No. 1603, and, finally, Judge, the

16   petitions and schedules filed in these five cases as amended to

17   date.

18        That would conclude our offer of proof with respect to

19   request being judicial notice of those matters, your Honor.  We

20   would appreciate a ruling as to whether or not the Court will

21   take judicial notice of those facts in connection with our

22   motion.

23             THE COURT:  All right.  Any comments, objections?

24             MS. CARLYON:  Your Honor, I feel somewhat

25   blind-sided.  Are copies of those documents available for the

1      Court and all counsel to review?

2              MR. LANDIS:  Your Honor, they were filed of record

3      months and months ago.

4              THE COURT:  I understand, but it's still troublesome

5      why you chose not to refer to any specifics in your motion as

6      opposed to making generalities.  I mean, motions are made and

7      supported.  It's your burden of proof.

8              MS. CARLYON:  This --

9              THE COURT:  I --

10             MS. CARLYON:  This is a suggestion, your Honor.  The

11     last thing I want to do is to have an issue on appeal or an

12     appeal created to further divert our attention.

13         I certainly have no objection to taking judicial notice of

14     the specific pleadings referenced in the motion to convert, and

15     there were several.

16         Further, I have no objection to Mr. Landis arguing

17     any matters that are within the record before this

18     Court.

19         At the end of the day if such matters which were not

20     referenced in the motion may form a basis of granting the

21     motion, I would like a short amount of time for us to review

22     and respond because that's what we haven't had.

23             THE COURT:  Okay.  All right.  So for purpose of

24     argument, I'll take judicial notice of those items with

25     depending upon I need to give the opponents time to review any

1    of those matters.

2        MR. LANDIS:  So the Court is taking judicial

3    notice --

4        THE COURT:  I will.

5        MR. LANDIS:  -- of those matters?

6    Thank you, your Honor.

7        THE COURT:  Although, again, that does not excuse

8    your failure to having identified those at the beginning.

9        MR. LANDIS:  Your Honor, I think in fairness there

10    were a number of those that I ran through that are, in fact, in

11    the motion; however, it's not complete, and I understand the

12    Court's guidance, and we'll follow it.

13        Getting to the heart of the matter, the first issue that's

14    presented here is as I read the objections that were filed is

15    whether or not the United States Trustee has statutory standing

16    to file its motion to convert or dismiss these

17    jointly-administered cases.

18        Right out of the blocks, Judge, one of the concerns that

19    the Court expressed at the prior hearing was why now,

20    Mr. Landis.  Well, what are you doing?  What are you thinking?

21        And the answer is is that there is a congressional mandate

22    directed to the Office of the United States Trustee that

23    requires us to file motions to convert under Section 1112(b),

24    specifically, 28, USC, Section 586(a)(8).

25        And I'll see if I can substitute it for those pretty

1    flowers up there, and I don't know if there's any good way to

2    lessen that.

3           (Colloquy not on the record.)

4                  MR. LANDIS:  You can't see that, can you?

5                  THE COURT:  I have my copy.

6                  MR. LANDIS:  Okay.  Section 586(a)(8) provides,

7    generally, duties, supervision by Attorney General,

8    Subsection A, "Each United States Trustee within the region for

9    which such United States Trustee is appointed shall."

10          Subsection 8, "In any case in which the United States

11   Trustee finds material grounds for any relief under

12   Section 1112 of Title 11, the United States Trustee shall apply

13   promptly after making that finding to the Court for relief."

14   We didn't have any choice, Judge.  We had to file the motion.

15          Based upon the facts as we knew them, based upon the

16   record before the Court, and the information filed by the

17   debtors in connection with their plan, and then their efforts

18   to liquidate their operating entity and their solvent fund, we

19   had no option.

20          With respect to our unwillingness to extend the

21   30-day deadline, the reason for that is statutory.

22   Section 1112(b)(3) --

23                  THE COURT:  No.  You can clearly consent to that.

24                  MR. LANDIS:  1112(b)(3) requires that, "The Court

25   commence the hearing under this subsection not later than

1    30 days after the filing of the motion unless the movant

2    expressly consents to a continuance for a specific period of

3    time or compelling circumstances prevent the Court from meeting

4    the time limits."

5         Let me tell you the reason why.  You hit on it at the last

6    hearing, Judge.  We filed our motion at the last date where

7    giving full notice would allow that matter to be heard before

8    the sale was set.  That's the reason that we chose the omnibus

9    hearing date that we chose.

10        You also know that we had no problem coming into this

11   court in a hurry in order to get this issue resolved because

12   it's in the best interests of the parties here, and it's

13   important to the Court to have the opportunity to consider this

14   giving us the congressional mandate that we have.

15        With respect to statutory standing, also, of course,

16   11, USC, Section 307 provides that, "The United States Trustee

17   may raise and appear and be heard on any issue in any case or

18   proceeding under this title."  We certainly didn't file a plan,

19   so we didn't run afoul of Section 307.

20        We have the right to be here, Judge, and we have to be

21   here, and that's the reason for the filing of the motion and

22   the reason for the timing of it.

23        When we became confident that the motion had a factual

24   basis and a legal basis well, we filed it at a point in time

25   that would allow the Court to hear it before the parties

1    incurred the cost of sale.

2         The real issue here, Judge, begins with a question of

3    cause.  The question of cause, in this case, the United States

4    Trustee hangs its hat on the provisions on the

5    11, USC, Section 1112(b)(4).

6         There's a two-pronged analysis under that section, Judge,

7    and I know the Court's familiar with it.  For purposes of this

8    subsection, "The term 'cause' includes substantial or

9    continuing loss to or diminution of the estate in the absence

10   of a reasonable likelihood of rehabilitation," not

11   reorganization.  It is not the United States Trustee's position

12   that there could never be a liquidating Chapter 11 case.

13        The question here is simply whether the standards exist

14   for conversion of these five interrelated Chapter 11s at this

15   time, and we believe that they do for the following reasons:

16        In determining whether conversion is appropriate under

17   1112(b) under the interpretation that the Courts give that

18   provision, "A negative cash-flow situation alone is sufficient

19   to establish continuing loss or diminution of the estate."

20   We've cited you the cases in our motion.  There's no surprise

21   there.

22        Whereas in this case, a debtor has ceased business

23   operations.  Now, they haven't, yet, but they will as soon as

24   they sell USA Commercial Mortgage's loan-servicing assets and

25   significantly all of the assets of the First Trust Deed Fund,

1    including that resulting only for administrative expenses, and

2    we'll leave that aside for now.

3        Effectively, it comes straight from the pockets of the

4    creditors.  This is enough to satisfy the first element of

5    Section 1112(b).

6        I've cited you the Loop case which is an

7    Eighth Circuit case not binding on this Court, but it is

8    certiorari denied for purposes of analysis of the first prong

9    of Section 1112(b)(4).

10        Proof with respect to the question of substantial loss,

11    there was a $3,643,179 operating loss for USA Commercial

12    Mortgage in the month of July alone, and the fact of that is

13    established by the monthly-operating report for July.  That's

14    Docket Entry 1176, page 2, line 4.

15        Continuing loss, losses in excess of $300,000 in July and

16    August.  In particular, July obviously was 3,000,000, but

17    you're looking at an additional approximately $300,000 in

18    August.

19        And I heard the Court's warning to me in a prior hearing

20    don't talk about September, but there is a September operating

21    report, Judge.

22        With respect to the total operating loss from continued

23    operations postpetition, you'll find that there was $1,416,110

24    loss at the end of August.  That's Docket Entry 1338.

25        The bottom line, Judge, faced with those issues and the

1    postpetition operating losses of the operating entity among the

2    debtors, there is, in fact, in this case facing the Court both

3    a substantial and a continuing loss or diminution of the

4    various estates in this case.

5        The second question then becomes whether there is an

6    absence of a reasonable likelihood of rehabilitation, not

7    reorganization.

8        Rehabilitation is specifically used in Section 1112(b)(4).

9    It chose not to use reorganization.  The question is this.

10   Courts have consistently understood rehabilitation to refer to

11   the debtor's ability to restore the viability of its business.

12       Again, I gave you the Loop case.  You can look at

13   Cannock Realty Trust (phonetic) and the other matters that we

14   have cited for you, Judge.

15       A reasonable likelihood of rehabilitation is lacking, for

16   example, in cases where the debtor lacks income, operating

17   funds, employees, capital, or continuing revenue-generating

18   activity.

19       We did find a Ninth Circuit case with respect to the lack

20   income.  We cited you the Johnston case,

21   149 Bankruptcy Reporter 158, 160.  It's a BAP decision from

22   Nevada in 1992.  You're probably well familiar with it.

23       Debtors have generated income in this case only from the

24   collection of loans that existed prior to the filing of this

25   bankruptcy case, and the reason is evident from matters of

1    record.

2        If you look at the motion where the debtors sought to have

3    Fertitta fund existing loans, Docket Entry 1085 at

4    paragraph 15, Debtor USA Commercial Mortgage's license to

5    broker additional loan advances on the loans that it has

6    originated by locating funds from private investors has been

7    suspended by the Nevada Mortgage Lending Division in the

8    absence of further authorization from the Division.  There's

9    matters in the record that show why USA Commercial Mortgage

10   isn't able to continue to do business.

11       It's evident that the debtors haven't generated any income

12   from postpetition operations especially when you look at

13   USA Commercial Mortgage's performance.  It has incurred

14   operating losses totally $1,416,110 as of the end of August,

15   Docket Entry 1338.

16       The debtors knew they were in trouble.  They knew they

17   needed postpetition financing, and they came to this Court not

18   once, but two different times trying to get it.  They failed to

19   obtain that financing both times they were here.

20       They sought to have the Court approve a $150,000

21   due-diligence fee in order to obtain financing through Fortress

22   and were unsuccessful, Docket Entries 171 and 702, the motion

23   and the order denying.

24       They then came back promptly with a motion for emergency

25   interim and permanent orders authorizing the debtors to obtain

1    postpetition financing and again were denied, Docket Entries

2    588 and 835.

3         The significance of that is evident from the fifth

4    supplemental declaration Mr. Allison filed in support of the

5    debtor's motions on June 20th, 2006, Docket No. 750.

6         There has got to be a better way.

7              THE CLERK:  I think there's the (indiscernible).

8              MR. LANDIS:  Well, that's a little better.

9              THE CLERK:  Yeah.

10             MR. LANDIS:  I don't know if it's great or not.

11             THE CLERK:  That's perfect.

12             MR. LANDIS:  "Debtors need liquidity to fund the

13    administrative and operational expenses that are set forth in

14    the revised budget because of the irregularity of payments on

15    the loans from which the debtor's servicing fees and other

16    contractual costs and fees are paid.

17         While I, Mr. Allison, have initiated and accelerated

18    measures to collect unpaid interest on the nonperforming loans

19    and implemented improved loan-servicing procedures for all of

20    the loans being serviced by USACM, even with these operational

21    enhancement, the regular payment streams to USACM as servicer

22    of the loans has been disrupted because of the filing of the

23    debtor's bankruptcy petitions.

24         I further believe based on my experience, extensive

25    interaction with borrowers, the lack of immediate

1    debtor-in-possession financing to ensure adequate collection

2    efforts will only work to accelerate this disruption of regular

3    payment streams further.

4        Additionally, the regular payment stream has been

5    diminished due to the large number of nonperforming loans.

6    Accordingly, the cash collections that are set forth in the

7    revised budgets are only projections.

8        As a result, it is entirely possible the debtors will not

9    realize the full cash collections currently contemplated in the

10   budget and are needed to fund the debtor's operational budget."

11   They didn't get it.  They didn't receive that financing.

12       The debtor's plan provides for the liquidation of the

13   loan-servicing operations.  That the only operating entity

14   among the debtor is USA Commercial Mortgage and the most

15   solvent investment fund.

16       You can look at the plan, your Honor, at Docket 1310

17   and 1575 -- and I know you have -- and find that to be the

18   case.

19       There isn't any doubt that the employee base has shrunk by

20   approximately 80 percent postpetition, either.  In fact, the

21   debtors are seeking to retain the last 11 employees there by

22   paying $300,000 plus and incentives to keep them.  That's the

23   basis of the retention motion, Docket 1429.

24       And the decline is established by the Allison declaration,

25   Docket No. 1430 at paragraphs 1 through 12, so where does that

1    leave us?

2         From the United States Trustee's perspective, it leaves us

3    with a statutory mandate, shall file a motion to convert under

4    1112(b), and that's what we did.

5         The question then becomes, Judge, if, in fact, cause

6    exists -- and we believe that it does based upon the evidence

7    before you that's in the docket -- what now?

8         The Court pointed out that there is also the possibility

9    in some circumstances that under Section (b)(1),

10   11, USC, Section 1112(b)(1), "Absent unusual circumstances

11   specifically identified by the Court that establish the

12   requested conversion or a dismissal is not in the best interest

13   of creditors and the estate, the Court shall convert the case."

14        So the Court has an opportunity in appropriate cases to

15   determine whether or not there is an exception to the

16   requirement of conversion.

17        In order to establish whether or not that exception

18   applies, you have to turn to Subsection (b)(2).  That

19   establishes the parameters under which an exception to

20   conversion is appropriate.

21        That section provides, "The relief provided in paragraph 1

22   shall not be granted absent unusual circumstances specifically

23   identified by the Court that establish that such relief is not

24   in the best interest of creditors and the estate.

25        If the debtor or another party in interest objects and

1   establishes that, A, there is a reasonable likelihood that a

2   plan will be confirmed within the time frames established under

3   the code," no real argument there, Judge.

4       They got a plan on file, and you've got a series of dates

5   set that would allow them to have confirmation within the

6   period of time that's been set, but it doesn't stop there.

7       And Subsection B, "The grounds for granting such relief

8   include an act or omission of the debtor other than under

9   paragraph 4-A for which there exists a reasonable justification

10  for the act or omission, and that will be cured within a

11  reasonable period of time fixed by the Court."

12      There isn't any allegation in our motion of any act or

13  omission of the debtor other than under paragraph 4-A.  Our

14  motion is specific to the continuing loss or diminution of the

15  estate in the absence of a likelihood of rehabilitation of

16  these debtors given the facts before you.

17      As a result, there is no available exception, and the

18  Court at this point as a result of the changes under the

19  Bankruptcy Abuse Prevention and Consumer Protection Act of 2005

20  must -- and, in fact, the code says shall -- convert these

21  cases to Chapter 7.

22      Your Honor, our position is as stated in the motion.

23  You've been kind enough to hear me.  You've been kind enough to

24  allow me to provide you with the factual basis in an otherwise

25  hefty docket that underpins the basis of our motion.

1      This is not a great way to make friends and influence

2  people necessarily in this case, Judge, but we have a job to do

3  and a statutory mandate to follow.

4      There is no reasonable likelihood of rehabilitation of the

5  debtor's business operations.  Cause exists for a conversion.

6  Conversion must enter at this time, your Honor.

7              THE COURT:  Okay.

8              MR. LANDIS:  Thank you.

9              THE COURT:  All right.  Opposition.

10  (Colloquy not on the record.)

11              MS. JARVIS:  Your Honor, let me first give a little

12  more background to what has been accomplished since these

13  bankruptcies were filed.

14      When you talk about the -- this is an ongoing business.  I

15  mean, whether this business has been generating new loans or

16  not, it has been collecting loans.  It has been servicing

17  loans.

18      And that in and of itself is a business operation, a

19  business operation that is important not only in generating

20  revenues postpetition, but important in order to accomplish a

21  sale because the sale is predicated on the buying of an ongoing

22  business, not just assets, an ongoing servicing business.

23      That's evident when you look through not only what is

24  being bought by Silver Point, but the many covenants that are

25  contained in that asset purchase agreement with respect to the

1   ongoing operations of the debtor, so it is a business that is

2   ongoing.

3       Since the bankruptcy was filed, 19 loans have been

4   collected with a total principal amount of approximately

5   $145,000,000.

6       The total interest collected has been approximately

7   $38,000,000.  The total service fees which is income to this

8   estate collected have been in excess of 2.7 million dollars.

9       Other fees collected have been approximately 1.2 million

10  dollars.  Prepaid interest that has been collected since the

11  bankruptcy was filed is approximately 14.5 million dollars.

12      As of September 30th, there were 791 (sic) loans still

13  outstanding on the books of Commercial Mortgage for servicing,

14  many of those loans having a participation interest by both

15  Diversified and --

16      (Colloquy not on the record.)

17      MS. JARVIS:  -- sorry -- many of those also having a

18  participation interest of the two funds which are also

19  debtors.  Let me correct myself.  It's not 791 loans.  It's

20  $791,000,000 in loans that are still outstanding.

21      As your Honor has repeatedly heard in hearings before

22  your Honor, Mr. Allison and the employees of the debtors have

23  worked hard in collecting loans.  Many of those are now coming

24  to fruition.

25      I would also add some additional information that I could

1    proffer or have Mr. Allison testify to that it is expected that

2    as between now and January 31st which is the day that we

3    project a closing for the sale that the bid procedures were

4    approved for last week that he expects to receive a payoff of

5    38 more loans with a total amount to be collected of

6    $322,000,000.  That would leave a balance of 55 loans, a

7    balance of $469,000,000 outstanding.

8        These loans in collecting these, if the $322,000,000 is

9    collected, that would include 2.8 million dollars in servicing

10   fees collected between now and January 31st, other fees of

11   5.1 million dollars as well as continued amounts on the prepaid

12   interest.

13       And, your Honor, whether these are collected now or

14   between now and the closing date with Silver Point because of

15   the way the asset purchase agreement was negotiated on behalf

16   of these estates by the debtors and the committees, the fees

17   remain, the accrued fees, and in some case even fees that

18   accrue after the closing date stay with the estate.

19       So whether this is actually collected between now and

20   January 31st, keeping this estate going continues to pay money

21   into this estate because the accrued fees if collected by

22   Silver Point after the closing will come back into the estate.

23       And those would include 5.8 million dollars more of

24   service fees projected through January 31st of '07,

25   23.8 million dollars more in prepaid interest, and other fees

1    of approximately 26.9 million dollars.

2        (Interruption via telephone at 11:17:15 a.m.)

3            THE OPERATOR:  This is the operator.  I'm sorry for

4    the interruption.

5            MS. JARVIS:  So there is --

6            THE OPERATOR:  I'm one of the operators here --

7            MS. JARVIS:  -- dramatically more --

8            THE OPERATOR:  -- at the conference center.

9            THE COURT:  Excuse me.

10            THE OPERATOR:  And the caller --

11            THE COURT:  Is someone talking --

12            THE OPERATOR:  -- is saying --

13            THE COURT:  -- on the phone?

14            THE OPERATOR:  -- that they're not hearing anything.

15            THE COURT:  Please stop talking on the phone.

16            THE OPERATOR:  This is the operator.  Are you there?

17            THE COURT:  Yes.

18            THE OPERATOR:  I see that you're the host on today's

19    call?

20            THE COURT:  What?

21            THE OPERATOR:  This is the conference operator.  I'm

22    speaking only to you.  I picked you up out of the call.  Can

23    you hear me?

24            THE COURT:  This is the Court.

25            THE OPERATOR:  Hello?

1          THE CLERK:  She said she was the operator.

2          THE COURT:  Right.  But --

3          THE OPERATOR:  The callers in this call cannot hear

4     anything because there's nothing coming from the host line.

5       (Colloquy not on the record.)

6          THE COURT:  Oh, do they --

7          THE OPERATOR:  Okay.  I'll release you back to the

8     call if you would like to open up the line, so everyone can

9     have a conference.  Please press star 5.

10      Thank you.

11      (Colloquy not on the record.)

12          THE CLERK:  I don't think I can do it from this end.

13    I think we have to do it through our (indiscernible), so we'll

14    hang up.

15      And we'll redo it the (indiscernible) redo it

16    (indiscernible) the call because, evidently, we lost the patch,

17    so should I redial?

18          THE COURT:  I guess.

19      (Redialing at 11:18:23 a.m.)

20      (Colloquy not on the record.)

21      (Pause concluded at 11:20:58 a.m.)

22          THE COURT:  Okay.  Sorry.

23      Go ahead.

24          MS. JARVIS:  Oh, no problem.

25      As I was saying, your Honor, other fees projected to

1    accrue through the 31st of January '07 is 26.9 million.

2        Now, to be clear, some of those fees may not be

3    collectable.  But if you look at the whole amount, this is a

4    huge amount of fees and that can come into this estate if it

5    continues operations, if it continues to be able to sell its

6    business as a going concern under the asset purchase agreement.

7        And I raise this in the context, too, because against that

8    is set the U.S. Trustee's assertion that based on the operating

9    reports, the cash budgets that have been submitted, that he

10    argues there is some continuing loss.

11        However, the Court in the Legacy Estate Group case which

12    is a very new case out of the Northern District of California

13    does comment on just briefly that blindly -- and it seems to

14    say that blindly considering evidence of continuing loss or

15    diminution from the operating reports is simply, you know, not

16    appropriate.

17        These are cash reports.  They are cash collections.  They

18    are, you know, cash disbursements.  The budget is a cash

19    budget, and that is different than looking at the entire

20    picture of all the assets of this estate.

21        When you add to all these fees that are being generated by

22    the continuing operations of this business, you also have a

23    couple other components that need to be considered.  That is

24    the claims against IP.

25        Your Honor earlier approved an agreement with respect to

1   taking a security interest in IP, and there is also existing a

2   claim of the 10-90 loan in Diversified against IP.

3       Those two loans alone are around $120,000,000 of claims

4   against IP that have yet to be monetized and completely

5   pursued.  Those are tied with the loans.

6       The importance of the servicing component ties into these

7   insider claims that are important assets of this estate as well

8   because as we've previously told the Court approximately

9   15 percent of the loans that will be outstanding as of the end

10  of January will be loans in which insiders have claims.

11      So protecting the interests of these loans protects not

12  only the interest of the direct lenders, but, also, the

13  interests of these estates in the underlying claims that they

14  have against insiders.

15      I would state, your Honor, that with looking at this

16  entire picture of all the assets of this estate, of the

17  importance of the ongoing operations of this estate, and the

18  collection of these fees I would assert that there is no proof

19  of a continuing loss or diminution of the estate.

20      In fact, the evidence is just the opposite when you

21  consider the affidavit or the declaration of Mr. Allison with

22  respect to the value that has come into this estate since

23  filing, the books and records being corrected and put in a

24  state where there can actually be a sale of assets in this

25  estate which would not have been possible before this time, the

1  collections of the loans and fees which previously had not been

2  collected.

3      And in many cases, the fees actually owed to this estate

4  had just been allowed to either linger or not collected.  That

5  has been corrected.  There has been, in fact, an increase in

6  the estate since the bankruptcy was filed.

7      Mr. Landis talks about the Loop case.  But in the Loop

8  case, they actually had ceased business operations and

9  continued.

10      In this case, there are business operations continuing.

11  There are fees continuing to accrue.  There are fees continuing

12  to be collected, and that is an important difference.

13      Further, he talks about in referring to the standard in

14  1112 there is also the issue of the absence of a reasonable

15  likelihood of rehabilitation.

16      You know, in addition to the fact that there is a

17  continuing business that needs to keep going, there are

18  different ways of looking at it.

19      Even if you accept his argument that rehabilitation can't

20  mean a pure liquidation, there are different kinds of

21  liquidation.

22      This is not a liquidation like in the Loop case.  That the

23  business operations have ceased.  That we're just continuing on

24  at this point in time with no source of income, with no

25  operations.

1          This is a business where we are keeping it in business in

2     order to sell.  That is a type of rehabilitation,

3     rehabilitating this business by keeping it as an ongoing

4     concern and selling it as an ongoing concern.

5          And, therefore, I would submit that neither of those parts

6     of cause, either continuing loss or the absence of a reasonable

7     likelihood of rehabilitation, have been met in this case.

8          Even when these assets are sold, your Honor, there will be

9     continuing fees coming in because of the way that the asset

10    purchase agreement was negotiated with the buyer.

11         So they will become, in essence, a collection agent for

12    returning and collecting and returning fees to this estate as

13    well as the litigation that needs to be pursued.

14         Finally, I would also point out, your Honor, that this is

15    a situation under 1112 where you can find unusual

16    circumstances.

17         And, again, if you look at the Legacy case that we cited

18    from the Northern District of California, that Court found

19    exceptional circumstances, so that even if you found that the

20    standard found in 1112(b)(4)(A) was met you still don't have to

21    convert the case if you find these unusual circumstances.

22         And as the Court did in that case, there are some

23    similarities between this.  They found that there had been a

24    substantial enhancement of the estate, including in a sale that

25    took place in that case.

1    They noted the fact that the creditors committee and the

2    debtor as in this case had in short order brought a plan before

3    the Court that would expected to be confirmed over a reasonable

4    period of time.

5    They again differentiated between the cash issues of an

6    estate and the overall assets of the estate in finding that

7    there was no substantial or continuing loss or diminution of

8    the estate.

9    And, finally, they found that the professional fees

10    allowed to date were reasonable and necessary considering the

11    case.  It was also a complicated case which this case is,

12    your Honor.

13    I might also note that as we go forward and budget out

14    fees we expect that those fees will diminish as the case goes

15    on particularly with respect to the activities of Mesirow.

16    The accounting is substantially concluded.  There will be

17    a lot of things that need to be done going forward, but it's

18    been carefully looked at with respect to those persons.  And,

19    again, as we get this plan in shape and go forward towards

20    confirmation, those costs should diminish.

21    Finally, your Honor, I would just briefly state that with

22    respect to the U.S. Trustee's standing, you know, it is simply

23    a reading of the statute that they did.  It was taken out in

24    these amendments.

25    And so there is a question or a reason to question

1    whether, in fact, someone, the U.S. Trustee, without an

2    economic stake in the outcome is a proper party to bring this

3    motion.

4        We would submit, your Honor, that under all of the

5    circumstances of this case that cause has not been shown to

6    convert this case.

7        And that even if cause was shown the unusual circumstances

8    are present in this case.  That the Court should deny a motion

9    to convert.

10        Thank you --

11            THE COURT:  Okay.

12            MS. JARVIS:  -- your Honor.

13            THE COURT:  All right.  Other opposition.

14        (Colloquy not on the record.)

15            MS. KARASIK:  Good morning, your Honor.  Eve Karasik

16    on behalf of the First Trust Deed Fund.  The First Trust Deed

17    Fund supports the debtor's opposition.

18        I just wanted to emphasize that 1112(b)(4) has been in the

19    code for a while.  And even with that provision in the code,

20    there's been a huge body of law that's created that's permitted

21    liquidating Chapter 11 plans.

22        There's also provisions in the code itself that permits

23    liquidating Chapter 11 plans.  This is the case for a

24    liquidating Chapter 11 plan.

25        We have a sale not only of the First Trust Deed Fund

1    assets, but of the servicing rights that's going to provide a

2    qualified servicer to the direct lenders who need a servicer.

3         We have a joint term sheet, and, actually, I'm the initial

4    draftsperson of that term sheet, and I can tell you it is

5    moving rapidly.  We are very close.

6         We have a handful of issues.  We're actually going to meet

7    today and try to resolve them because our goal is to get a

8    modified plan that encompasses this term sheet finalized and,

9    hopefully, drafted this week.

10        I'd like to point out what does Chapter 7 really give this

11   group of cases.  What happens under a Chapter 7?  You end up,

12   probably, with five trustees, five trustees with five sets of

13   professionals all trying to figure out what happened in this

14   case.  You have an enormous amount of costs that's going to be

15   layered on already an enormous amount of costs.

16        In addition, let's just look at the direct lenders for a

17   second.  Now, who's going to service their loan?  The

18   Chapter 7 Trustee isn't going to service their loans.

19        Is the Chapter 7 Trustee going to find somebody to sell

20   all the loans to or is what's going to happen is that the

21   direct lenders are going to each break off?

22        You know, let's say there's a loan with 300 different

23   direct lenders on which there are a lot of them.  You're going

24   to have 60 different loan servicers for that one loan?

25        I just don't think the actual solution of a motion to

1    convert -- there's no solution.  It doesn't help this case.  It

2    just dramatically hurts it.

3        And not only does it damage the sale process -- and I

4    think there's enough declarations before this Court to show

5    that -- I think we need to think about what does Chapter 7

6    really do here.

7        Now, maybe you read the code.  Technically, it says shall.

8    You must convert, but this court is not a court of

9    technicalities.  It's a court of equity.

10       And the statute itself permits the Court to look beyond

11   the actual cause standard where there are circumstances that

12   justify it.  I think if we look at what Chapter 7 would do in

13   this case it would be an absolute disaster.

14              THE COURT:  Okay.

15              MS. KARASIK:  Thank you, your Honor.

16              THE COURT:  Thank you.

17       Anyone else?

18              MR. CHARLES:  Your Honor, Rob Charles on behalf of

19   the Unsecured Creditors Committee.  Our focus is a little

20   different because there are not -- at least not yet valued by

21   the market -- this materially-valuable assets of

22   Commercial Mortgage that are being sold in this sale.

23       But there are materially-valuable assets in

24   Commercial Mortgage that would be adversely affected by a

25   conversion and really, conversely, have a higher value in a

1    reorganization which I think demonstrates that there is not a

2    substantial or continuing loss, and let me give you the buckets

3    of assets quickly and also for the benefit of folks who are

4    listening.

5         The major asset in Commercial Mortgage is the $58,000,000

6    receivable against IP, and, presumably, a Chapter 7 Trustee

7    could find that and prosecute it, but it exists today only

8    because of the Chapter 11.

9         In other words, if Mesirow had not gone back and

10   reconstructed out of the ledgers the sums that had been

11   withdrawn by USAIP, that asset would not exist.

12        And so when the debtors talk about how Chapter 11 has

13   increased the assets, they're not looking at it on a narrow

14   income-statement basis the way Mr. Landis is.

15        They're looking at in the aggregate is there more value

16   been created for the creditors in the Chapter 11, and the IP

17   asset is one such example.

18        The second and biggest, the second-biggest asset, which is

19   dramatically adversely affected by a conversion is the notion

20   of prepaid interest.

21        You know that the former managers prepaid interest to

22   lenders when the interest had not been received from the

23   borrowers.

24        And that now as those payments, those interest payments,

25   are being made by borrowers through Commercial Mortgage as a

1    servicing agent they're being captured.  And, in addition, the

2    lenders have been recouped for the prepaid interest they

3    received.

4         In a Chapter 7 to make Ms. Karasik's point a little more

5    bleak and a little more blunt, you have to reject the servicing

6    agreements.

7         You cannot assume the servicing agreements.  Why not?

8    Because the servicer stole people's money, at least $46,000,000

9    of diverted principal.

10        You know you can't assume those servicing agreements

11   because you can't cure or provide an adequate assurance of

12   cure, and so what happens in a 7?

13        The Chapter 7 Trustee has 60 days, probably rejects the

14   servicing agreements immediately because the trustee has no

15   ability to service.  How does that affect prepaid interest?

16        However payments are made, however borrowers make

17   payments, it will no longer be through

18   Commercial Mortgage.

19        Let's say that the Lord intervenes.  And by a miracle, a

20   new servicing agent is brought in for all of the lenders, and

21   the new servicing agent deals directly with the lenders.

22        None of them are going to agree, gosh, it makes sense to

23   send money back to Commercial Mortgage for the prepaid

24   interest.

25        And Mr. LePome and Ms. Chubb have eloquently explained

1    why if you use equitable theories you can't get at those

2    moneys.

3        So the only way the Chapter 7 Trustee could deal with the

4    prepaid-interest issue is to bring fraudulent-transfer or

5    avoidance actions against the lenders whose money is out there.

6        And the prepaid interest then turns from whatever the

7    number is -- and you heard today they've collected at least

8    25,000,000 of it -- into some much smaller number only after

9    you net out dramatic litigation expenses, including suing

10   thousands of people across this country.

11       The third biggest asset in Commercial Mortgage is the

12   variety of interests that it has either as a lender and loans

13   that are serviced or in fees.

14       And in both of those instances, but, particularly, in the

15   fees, extension fees, exit fees, uncollected origination fees,

16   those fees disappear in a conversion and liquidation.  What's

17   the amount of those?

18       As best we can tell off of the most recent loan-summary

19   report, the accumulated origination fees not yet collected are

20   about 4,000,000, servicing fees as Mr. Jarvis indicated over 6,

21   extension fees as Ms. Jarvis indicated over 6, and exit fees of

22   a rounded 20,000,000.

23       If you reject the servicing agreements, any obligation of

24   a lender to allow those fees to be collected from a borrower

25   and paid to Commercial Mortgage as the servicing agent

1    disappears.

2        At best, what you'd have is Commercial Mortgage saying,

3    well, yes, we rejected your servicing agreements, but we'd like

4    the money, anyway, to which you get the inevitable

5    counterclaims, and there's a new servicing agent.

6        And by the way, the new servicing agent isn't coming in at

7    one percent or up to three percent, and we hope to be able to

8    recover advances.

9        The servicing agent is going to come in at market rates to

10   service distressed loans.  The loans that are left are not the

11   happy that-we'll-be-writing-you-a-check-when-the-loan-matures

12   loans.

13       They are the Tracy Suttles go hire Vinson & Elkins in

14   Houston and the problems at Amesbury/Hatters Point and other

15   problems in Massachusetts.

16       They are the ugly, coyote ugly, loans that the lenders are

17   going to have to pay significantly more to have serviced, and

18   all of those will be damages asserted against

19   Commercial Mortgage.

20       So in our view, Chapter 11 created value by Mesirow

21   identifying these fees and collecting them, including the fees

22   Ms. Jarvis identified.

23       Chapter 7 conversion costs you substantially that value,

24   and, consequently, there is either no continuing loss because

25   these values are here and being collected or the notion of

1    rehabilitation is here we maximize the collections through the

2    Chapter 7 or the liquidation.

3        The last point I made is a declaration that we filed

4    for Mr. Russell which has not been touched upon by the

5    parties.

6        Bob Russell, Robert Russell, is a member of our committee.

7    You'll also remember him as wearing a borrower hat in

8    connection with the loan that Fertitta funded the completion

9    on.  He has other loans where he is a borrower dealing with

10   Commercial Mortgage.

11       And his declaration essentially says if you send out the

12   message about a possible conversion you have dramatically

13   adversely affected the borrowers because they're not sure now

14   who to deal with or who they're going to be negotiating with.

15       But if you convert, if you shut down the business, get rid

16   of the employees, bring in new trustees who have to be

17   disinterested -- how will you find them in Nevada -- and new

18   sets of professionals who have to be disinterested -- how will

19   you find them in Nevada or Arizona or California -- you are

20   going to have to restart the process with borrowers.

21       And so every borrower that's now working with Mr. Allison

22   on a sale or a refinance or releasing of collateral or whatever

23   before the end of the year, in the next couple of months, all

24   of that process stops while you bring someone else in up to

25   speed.

1          Forget the difficulty of collecting difficult loans.  If

2     you have a difficult loan, and Mr. Allison is saying we may sue

3     you, we're getting ready to hire lawyers, and you see the

4     Chapter 7 Trustee is coming in, you'll say, friend, I'll talk

5     to the trustee if and when he or she can figure out who I am

6     and how much I owe, and all of that dramatically decreases the

7     recovery for creditors in these Chapter 11 cases.

8          Therefore, we believe that as a factual predicate there is

9     neither a substantial or continuing loss nor is there an

10    absence of rehabilitation.

11              THE COURT:  Okay.  Thank you.

12              MR. GARMAN:  Your Honor, Greg Garman for the

13    Direct Lenders Committee.  Your Honor, you've heard

14    enough.

15         Congress has taken away Mr. Landis' discretion in many

16    ways, but the Direct Lenders Committee joins in the compelling

17    arguments of the debtor, the First Trust Deed Fund, and the

18    Unsecured Creditors.

19              THE COURT:  Okay.  Now, you're involved in the

20    21st Century's case, right?

21              MR. GARMAN:  My office is, your Honor.

22              THE COURT:  You're not personally.

23              MR. GARMAN:  I am not.

24              THE COURT:  Okay.

25              MS. LORADITCH:  Your Honor, Anne Loraditch on behalf

1    of the Diversified Trust Deed Fund Committee.  The

2    Diversified Fund Committee would echo the compelling arguments

3    of counsel here today in opposition to the motion to convert.

4              THE COURT:  All right.  Thank you.  All right.

5        Reply.

6        (Colloquy not on the record.)

7              MR. LANDIS:  Thank you, Judge.  A lot of things got

8    said, and a lot of things didn't.  Some things that you didn't

9    hear, that USA Commercial Mortgage can originate the very first

10   loan postpetition.  It can't.  Nobody said that it could.  It's

11   not going to be an ongoing business.

12        And, in fact, Mr. Allison has told you in connection with

13   his affidavits that the nature of the business of

14   USA Commercial Mortgage is, in fact, to originate and service

15   loans, not going to do that.  It's going to service them for a

16   while, and then they're going to be sold.

17        What's going to happen is that they're going to collect a

18   finite set of loans.  They're going to reduce the outstanding

19   loan pool down to the coyote uglies.

20        The good assets are going to be gone out of the estate,

21   and what you're going to be left with is a nonoperating

22   litigation estate.  That's a problem in the context of

23   11, USC, Section 1112(b).

24        (Colloquy not on the record.)

25              MR. LANDIS:  Second, that USA Commercial Mortgage is

1    operating at a profit postpetition.  Nobody said that.  They

2    can't.  It's not, and so they don't.

3         Really, what it boils down to, though, is that all the

4    fees that they're supposedly going to be collecting are the

5    same fees they've been collecting all the time postpetition.

6         And what has that yielded for the benefit of debtors -- or

7    excuse me -- of creditors?  Bupkis.  As a matter of fact,

8    negative to the tune of over $1,000,000.

9         Third, the Legacy Estate Group case, I've read it.  It's

10    distinguishable on its facts.  A couple of things the Court

11    needs to know about that.

12         First, the creditor in that case filed the motion to

13    convert, and it was heard after the sale happened.  That's why

14    we're here now.  We wanted to avoid exactly that problem.

15         Second, the unusual circumstances that warranted a denial

16    of conversion wasn't the contents of the monthly-operating

17    reports.

18         What the Court seized on is this.  "The parties have

19    turned a case which could have resulted in major losses to

20    local growers" -- this is winery country, and these are

21    vineyards -- "to local growers and complete disaster to

22    unsecured creditors into a case where growers have been paid,

23    three major wineries have been preserved as going concerns

24    along with the jobs that they generate, and the creditors

25    committee anticipates a 100-percent dividend to unsecured

1    creditors under a plan which could be confirmed within a month

2    or two."  Nobody has told you that there's going to be a

3    100-percent dividend to creditors in this case.

4         Fees will diminish.  If they diminish, and they're already

5    losing money, what's going to happen to the estate?  Diminution

6    in value.  It's a fixed loan pool.

7         This is not an objection to confirmation of a plan.  We

8    are not objecting to liquidation plans, in general.  We are

9    objecting to -- we are asking the Court to determine that, in

10   fact, in this particular set of circumstances under the facts

11   of these five cases that conversion is warranted.

12        With respect to the question about liquidation via

13   Chapter 7, the trustees can market and sell assets.  They do it

14   all the time.  They can service the remaining loans, and they

15   can make arrangements to do it if it makes sense.

16        If it doesn't, it limits the cost, and the upside cost is

17   limited to the cap at least as far as the trustee's fees are

18   concerned.

19        Joint administration or substantive consolidation of

20   Chapter 7 cases could eliminate some of the concerns that have

21   been expressed.

22        Judge, you've heard now I think what you need to hear in

23   order to address and resolve this motion.  This is a court of

24   equity.  That much is true.

25        But in the Ninth Circuit, equity follows the law.  That's

1    what we're asking the Court to do now.  The law requires that

2    these cases be converted to Chapter 7.  We're asking you now to

3    enter an order accordingly.

4         Thank you, Judge.

5              THE COURT:  Okay.

6         (Thereupon, the portion requested to be transcribed

7         was concluded at 11:44:25.)

8         (Recess at 12:13:44 p.m.)

9         (Court reconvened at 12:36:23 p.m.)

10             THE COURT:  Be seated.

11        (Colloquy not on the record.)

12             THE COURT:  Okay.  I guess the next motion we have,

13   then, is --

14        (Colloquy not on the record.)

15             THE COURT:  -- the loan modification.

16        (Colloquy not on the record.)

17             MS. JARVIS:  Hopefully, your Honor, in our reply

18   brief, we did clarify a lot of issues that were brought up, you

19   know, in the objections, and I think that we should have most

20   of those resolved, and let me just kind of, you know, summarize

21   what the issues are.

22        The Palm Harbor One loan, what we're asking for is

23   permission to reduce the release price by 20 percent, and this

24   is based on, you know, Mr. Allison's review of the situation

25   (indiscernible) the situation in order to get this done meaning

1    getting the units sold that what is now market price we believe

2    and also in order to get this paid by the maturity date.

3        There are certain requirements in the loan documents with

4    respect to making sure the ratio of loan to value is a certain

5    percent.  Those requirements will be complied with.

6        We also have sent out the three-day notice under the

7    loan-servicing agreements to all the direct lenders.  No one

8    has objected.

9        And we did answer questions on some of those and, you

10   know, made sure -- for instance, one of the issues raised was

11   we didn't put in appraisal information in our motion.

12       Well, we did send out information to the lenders.

13   Obviously, this is as we've previously said sensitive

14   information, appraisal information, for both the borrowers and

15   the lenders.

16       So the information that was given to the lenders both in

17   responding to questions as well as in the letter was broader

18   than what's given to the Court, so that was done, and no one

19   has objected to that.

20            THE COURT:  Let me ask first if there's now any

21   objections to the Palm Harbor modification.

22            MR. GARMAN:  There are, your Honor.

23            THE COURT:  All right.

24            MR. GARMAN:  We've narrowed it --

25            THE COURT:  Well, let's do them one by one, then.

```
1              MR. GARMAN:  Yeah.

2              MS. JARVIS:  We will also get as we said written

3    approval of any subordinated debt.  We have made it a practice

4    as soon as we signed up the offer letter with Silver Point to

5    run these issues by Silver Point.

6              THE COURT:  But I'm --

7              MS. JARVIS:  And --

8              THE COURT:  I just want to talk about Palm Harbor

9    first.

10             MS. JARVIS:  Yeah.  This is Palm Harbor --

11             THE COURT:  Oh.

12             MS. JARVIS:  -- as well --

13             THE COURT:  Oh, okay.  Okay.

14             MS. JARVIS:  -- because it's a modification.  And in

15   order not to run afoul --

16             THE COURT:  Okay.

17             MS. JARVIS:  -- of some of the covenants, we do run

18   this by Silver Point and do get confirmation from them that

19   there is not an issue before we go ahead.

20        We do think, you know, your Honor, the three-day rule we

21   think clearly applies.  We are abiding by the terms of the

22   loan-servicing agreement.

23        That is the way this has been done in the past, the way it

24   has been agreed to, to be done under the loan-servicing

25   agreement, and the way that we did get permission to do this
```

1    from the lenders in this instance as well.

2              THE COURT:  Okay.  All right.  Mr. Garman.

3              MR. GARMAN:  Your Honor, we've gotten a lot closer.

4    I just want to make sure that we're all on the record with what

5    we've done.

6         Your Honor, I have one primary job in this case, and

7    that's to protect the direct lenders and the loan-service

8    agreements.

9         And I get really nervous when we bring forward motions

10   under 105 and 363 arguing that in the ordinary course of the

11   debtor's business judgment they can use property of the estate

12   both in the ordinary course or outside of the ordinary course.

13        And as it comes to --

14             THE COURT:  Well, I --

15             MR. GARMAN:  It comes --

16             THE COURT:  I can't believe --

17             MR. GARMAN:  As it comes --

18             THE COURT:  -- that you're saying this is property of

19   the estate.

20             MR. GARMAN:  And that --

21             THE COURT:  Your direct lenders will have heart

22   attacks if you're saying that this is property --

23             MR. GARMAN:  That's clearly --

24             THE COURT:  -- of the estate.

25             MR. GARMAN:  -- my opposition.  And if you read the

1   motion, it says that the authority sought by the motion is

2   under 105 and 363.

3        And that, clearly, I can't accept an order that says under

4   363 the debtor is authorized to do certain things outside of

5   the ordinary course as it constitutes property of the estate.

6   That is my primary objection.

7        THE COURT:  Okay.  But there's language that would

8   satisfy that, wouldn't it?

9        MR. GARMAN:  I think so.

10        THE COURT:  Okay.

11        MR. GARMAN:  And I just want to make sure we're all

12   on the same page.

13        When it comes to Palm Harbor, when the motion was filed, I

14   did not have an understanding that the terms of the

15   loan-service agreement had been complied with, and that

16   individual letters had been sent to direct lenders indicating

17   what was happening.

18        Consistent with our past pleadings, the Direct Lenders

19   Committee is uncomfortable that the terms of the loan-service

20   agreement have been complied with simply because notices of

21   hearings have gone out.

22        It appears as if the debtor has sent -- and I think

23   they'll acknowledge this -- to individual direct lenders

24   explaining the business judgment as to why it is that the

25   debtor supports this.

1     But I want to be very clear that any order entered as it

2   relates to Palm Harbor should not reflect that in the exercise

3   of the debtor's business judgment the following things have

4   happened.

5     I think that that business judgment belongs to the direct

6   lenders.  And if the direct lenders have not objected, and the

7   terms of the loan-service agreement have been complied with,

8   then it is fully appropriate for USA in their capacity as loan

9   servicer to take certain steps.

10     It's just the language of the order that I'm very

11   concerned about and the language of the request as it comes to

12   Palm Harbor.  We'll deal with the next two, but I just want to

13   be very clear that those are my concerns with Palm Harbor.

14     But if the terms of the loan-service agreement have been

15   complied with and are not being modified in any way with

16   respect to this request, I'm not here to argue that this is not

17   an appropriate action to take.

18             THE COURT:  Okay.

19             MS. JARVIS:  And, your Honor, if I could just

20   explain?  When we talk about property of the estate, exercise

21   of business judgment, we're talking about the contracts which

22   are property of the estate, and that's really, you know, the

23   premise of what we're asking for.

24     We have lived by, you know, the terms of the contract.

25             THE COURT:  Um-h'm.

1           MS. JARVIS:  Like I said, we, you know, carefully

2    make sure that when a three-day notice is required we send out

3    a three-day notice which was done in this case without

4    objection by the direct lenders.

5           THE COURT:  Okay.  So if we get in a fight, if we

6    spend lots of hours on an order, then I'm really going to be

7    disappointed in everybody.

8        It seems to me the ordinary course of business is

9    servicing contracts.  And in compliance with the loan

10   agreements, it's done, right?  Does that solve --

11          MR. GARMAN:  I believe it is, your Honor.  I --

12          THE COURT:  Okay.

13          MR. GARMAN:  I don't know that we need an order for

14   that.

15          MS. JARVIS:  And, you know, you, well -- and, you

16   know, your Honor, too, we would like an order.  We need it

17   submitted immediately because these are kind of things that

18   back up, and we need --

19          THE COURT:  Well, I know.

20          MS. JARVIS:  -- them done, and --

21          THE COURT:  But that all depends upon you getting

22   them submitted.

23          MS. JARVIS:  Correct.  And we've asked --

24          THE COURT:  And like I said, I'm tired of like told

25   I've got to do them right away, and they don't get submitted

1    for a week.

2              MS. JARVIS:  Understood.

3              THE COURT:  I still don't have the order on the --

4              MS. JARVIS:  It's been uploaded.  The bid-procedures

5    order is signed off, and it has been uploaded while we've been

6    in hearings this morning.

7              THE COURT:  Okay.  Now, the Marlton loan.

8              MS. JARVIS:  The Marlton, let me go to the

9    Marlton Square 2nd loan.  This is a situation where there is

10   already a subordination agreement in place and meaning that the

11   lenders agreed to it in their original loan documents.

12       It's just a confirmation, and Mr. Garman asked, well, why

13   do you need orders.  Part of it is because of the uncertainty

14   of the situation.

15       A lot of times, we simply can't get borrowers to pay off

16   loans unless we have, you know, clear permission from the Court

17   to do this.

18       And this is really kind of one of those situations where

19   they want assurance that we can actually, you know, give them

20   the agreement to subordinate even though it's been previously

21   agreed to in the documents, so the motion was filed.

22       We did not give a three-day notice because this is it was

23   already agreed to in the agreement, so we don't want to confuse

24   them and think they're agreeing to something new.

25       We did make sure that this motion was served on every one

1    of the direct lenders in this loan, and there were not any

2    objections to this.

3        We also have made it a requirement in order to confirm

4    that the subordination agreement is in place.  We will require

5    the borrower to bring current the past-due interest, so that is

6    being sought.  And like I said, notice has been given of this

7    motion to all the direct lenders without objection.

8            THE COURT:  Okay.  All right.  Is there still

9    opposition to this one, then?

10           MR. GARMAN:  Well --

11       (Colloquy not on the record.)

12           MR. GARMAN:  Your Honor, I just want to be clear

13   again.  We have concerns not again through the exercise of the

14   business judgment, but making sure that the debtor is complying

15   with the terms of the loan-service agreement.

16       There's a provision that provides for the direct lenders

17   have consented to a subordination under certain circumstances.

18   Those circumstances are really not before the Court.

19       We don't know what the terms of the new loan are.  We

20   didn't know when the motion was filed whether subordinate

21   positions had consented to this such that the second wouldn't

22   be pushed down to fourth or a fifth and their requests for

23   forbearances on notes that have already matured.

24       Again, I'm comfortable that if the contracts authorize the

25   debtor to take these actions they authorize the debtor to take

1    these actions.

2        I'm uncomfortable if we're getting orders that allow them

3    to, arguably, violate the terms of the loan-service agreement

4    simply because we don't have enough information.

5        I again don't think that an order -- if truly this is an

6    ordinary-course transaction for the debtor, I don't think --

7            THE COURT:  Well --

8            MR. GARMAN:  -- that --

9            THE COURT:  -- what would you rather have, somebody

10   not pay because they claim you don't have an order?

11           MR. GARMAN:  No, your Honor.  What I want to make

12   sure is that if they breach the terms of the loan-service

13   agreements on a postpetition basis we're not getting a comfort

14   order that says direct lenders don't have a claim for a breach

15   if that is what the circumstances are.  That's my concern.  I

16   don't want to give them --

17           THE COURT:  Have you ever suggested --

18           MR. GARMAN:  -- an umbrella to breach.

19           THE COURT:  -- any language in an order to them?

20           MR. GARMAN:  Well, your Honor, I don't think an order

21   is necessary, and I didn't know.  I didn't until today.  There

22   were issues that weren't dealt with in the motion, your Honor,

23   and I think that we've resolved them by way of the reply once

24   again.

25       But if there is an order of this Court that's necessary to

1    say that the debtor is authorized to perform under the terms of

2    the loan-service agreement, no one would have any concern about

3    that.

4         But if there is an order that's necessary to say that

5    direct lenders have consented to this or that direct lenders

6    have previously consented to that, I don't know that it would

7    be appropriate nor have I heard that that specific language was

8    requested by any potential borrower.  We haven't even heard the

9    name of a borrower.

10         THE COURT:  Okay.  Have any direct lenders on this

11    loan contacted you?

12         MR. GARMAN:  Well, they weren't noticed, your Honor.

13         MS. JARVIS:  No.  They were, the notice, and we --

14         THE COURT:  So they were.

15         MS. JARVIS:  We made sure that the motion and the

16    notice went out to all of the direct lenders on each of the

17    loans affected.

18         MR. GARMAN:  And, your Honor, if the notices go out

19    in compliance with the loan-service agreements, it's the

20    direct-lenders' business judgment that needs to take precedent.

21    If they've complied with it, then it should go forward.

22         THE COURT:  Okay.  So does that solve your problem?

23    I mean --

24         MS. JARVIS:  And this is not a new subordination.

25    We're not asking --

```
 1              THE COURT:  Okay.

 2              MS. JARVIS:  -- can you now give us permission.  This

 3      is just affecting --

 4              THE COURT:  So it is on order --

 5              MS. JARVIS:  -- what's already in there.

 6              THE COURT:  -- that merely says you're authorized to

 7      enter into the subordination --

 8              MS. JARVIS:  Well, we offered --

 9              THE COURT:  -- in accordance with the terms of the

10      agreements?

11              MS. JARVIS:  Right.

12              THE COURT:  That's sufficient?

13              MS. JARVIS:  The term of the existing agreements,

14      right, because these lenders already agreed to subordination.

15              THE COURT:  Okay.

16              MS. JARVIS:  So --

17              THE COURT:  So as long as they say in accordance with

18      the existing agreements --

19              MS. JARVIS:  Yes.

20              THE COURT:  -- you're all right.

21              MS. JARVIS:  Yes.

22              THE COURT:  Are you all right there --

23              MR. GARMAN:  I'm comfortable --

24              THE COURT:  -- Mr. --

25              MR. GARMAN:  -- with that --
```

1          MS. JARVIS:  Yes.

2          MR. GARMAN:  -- your Honor.

3          THE COURT:  Okay.  Okay.  And the next one.

4          MS. JARVIS:  The Marlton Square 1st loan, in this

5     case, it matured on September 19th.  We're asking for

6     permission to forbear on this until November 19th.

7          Again, forbearance is something that under the

8     loan-servicing agreements that the USA Commercial Mortgage is

9     allowed to do without giving out a three-day notice, so we did

10    not give out that three-day notice.

11         We did, however, make sure that all of the lenders on

12    this loan were noticed with the motion and the notice of

13    hearing.

14         This is a situation where the forbearance was agreed to --

15    and, again, we're talking now for only a couple more weeks --

16    in order to allow them to refinance this.

17         Mr. Allison has had numerous discussions with this lender,

18    believes that it can be refinanced, and that this makes the

19    most sense.

20         This is not an extension of maturity because we are not

21    showing it as anything other than a matured loan on the books.

22    We're treating it as a matured loan.  It is simply a temporary

23    forbearance, and, again, none of the direct lenders have

24    objected to this.

25         THE COURT:  Okay.  Is there any opposition to this

1    one still?

2           MR. GARMAN:  No, your Honor.  I think we've resolved

3    it other than under the loan-service agreements they're

4    authorized to enter into forbearances, but they're specifically

5    not authorized to enter into loan extensions.

6        That's a fine line, and I want to make sure that we're not

7    determining what that line's going to be --

8           THE COURT:  Okay.

9           MR. GARMAN:  -- by way of this proceeding.

10          MS. JARVIS:  Understood, your Honor.

11          THE COURT:  All right.  And Mr. Hartman, does he

12   still have an objection?

13          MR. HARTMAN:  Yes, your Honor.  My objection was very

14   small and conditional.  I've only been in the case for about a

15   week, so I'm a little behind the curve.

16       I just wanted to understand in the conditional opposition

17   what happens to the loan proceeds once they're confirmed, and

18   what I got instead of an answer was, well, it's already been

19   dealt with in some other order.  Go figure it out.  Can --

20          MS. JARVIS:  The --

21          MR. HARTMAN:  You know, that's what I'm asking for --

22          MS. JARVIS:  The --

23          MR. HARTMAN:  -- the answer --

24          MS. JARVIS:  Yeah.  Then --

25          MR. HARTMAN:  -- to that question.

1          MS. JARVIS:  Then maybe I can respond more clearly.

2     We do have in place a motion or an order to distribute funds,

3     and all funds that are collected kind of funnel through this

4     motion or this order to distribute funds, so they will be

5     distributed to the direct lenders.

6          There are certain holdbacks that are allowed under the

7     orders.  Those will be implemented.  But other than that, the

8     funds will be paid out on a monthly basis to the direct

9     lenders.

10          MR. HARTMAN:  Okay.

11          THE COURT:  On a monthly or isn't it just -- when you

12     get it, don't you pay it all at once other than the holdbacks?

13          MS. JARVIS:  I think we actually pay it on a monthly.

14          (Colloquy not on the record.)

15          MS. JARVIS:  Right.  Yeah.  The distribution's made

16     monthly.  That's in accordance with the distribution motion

17     where we take all the collections that have happened in the

18     past month.

19          We send it out to the financial advisers of various

20     committees what we're going to distribute to the lenders.  If

21     they have any problem, they let us know.  And if not or if we

22     resolve them, then everything's distributed.

23          THE COURT:  Well, I guess -- oh, okay.  But the point

24     is it's not like you're going to get paid -- if his share was

25     300,000, it's not like he's going to get 300,000 divided by a

```
1    year each month.  It's going to be --

2              MS. JARVIS:  No.

3              THE COURT:  -- 300,000 --

4              MS. JARVIS:  The whole thing.

5              THE COURT:  -- at the end of the next month after

6    the --

7              MS. JARVIS:  That's right.

8              THE COURT:  Okay.

9              MS. JARVIS:  Yeah.  When a loan is collected in full,

10   that whole part goes into being distributed --

11             THE COURT:  Right.

12             MS. JARVIS:  -- in the next month.

13             THE COURT:  Right.

14             MS. JARVIS:  That is correct, your Honor.

15             THE COURT:  Okay.

16             MR. HARTMAN:  So with respect to the holdbacks as I

17   understand them, there is a procedural mechanism whereby they

18   have to provide that information to the lenders, so that there

19   can be an opportunity to agree or disagree.

20             THE COURT:  I forget how we did that.  Part of it's

21   the holdbacks because --

22             MS. JARVIS:  There is --

23             THE COURT:  -- of the netting.

24             MS. JARVIS:  I think the hold -- yeah.  There is both

25   the netting holdbacks where if there is a lender in several
```

1    loans there's netting across loans.

2         And then the second is just a three-percent holdback

3    pending a determination as to whether this is actually a

4    three-percent loan-servicing agreement --

5              THE COURT:  Oh, one percent.  That's right.

6              MS. JARVIS:  -- or that there are some other possible

7    charges that could be made.

8              THE COURT:  You know what you should do --

9              MR. HARTMAN:  So is --

10             THE COURT:  -- is --

11             MR. HARTMAN:  May I --

12             THE COURT:  Sure.

13             MR. HARTMAN:  I'm sorry.

14             THE COURT:  Um-h'm.

15             MR. HARTMAN:  Is the three percent part of the

16   servicing agreement or is that a new percentage that the --

17             THE COURT:  Part of the servicing.

18             MR. HARTMAN:  Okay.

19             THE COURT:  Some cases, the servicing agreement

20   purported to say three, but they were only doing one, yeah, and

21   that's why I said you should hold back the three because

22   notwithstanding the fact that you were only getting one they

23   were entitled to the three, and that could be determined later.

24             MS. JARVIS:  And some of that is why.  Some of that

25   is temporary.  The one percent is immediately collectible.

1      The two percent is pending further determination by the

2   Court as to which ones are subject to the three percent and

3   which ones may be subject to other costs that can be held back

4   under the loan-servicing agreements.

5           THE COURT:  You know what I should do is probably get

6   that order and have BNC put that as a separate or else have a

7   separate link.

8           MS. JARVIS:  Okay.  We'll do that.

9           MR. HARTMAN:  All right.  Thank you, your Honor.

10          THE COURT:  Um-h'm.

11      (Colloquy not on the record.)

12          THE COURT:  And any other objections to that one,

13   then?

14      Canepa's satisfied now or not?

15          MS. DAVIS:  Your Honor, I had an objection to the

16   more general language which has been clarified by the reply and

17   the representations made on the record.

18      I share the same concern that Mr. Garman has that when

19   you're talking about a short-term forbearance versus a loan

20   extension it is a fine line.

21      But with the clarification that they will give the notices

22   that are required by the loan-servicing agreements, and that

23   they're just looking for, really, comfort orders when they need

24   them, my concerns are satisfied.

25          THE COURT:  Okay.  Okay.  And the forbearances, I

1    guess there's an agreement that 90 days is permissible?

2         MS. JARVIS:  Well, I think we've asked for 90 days,

3    and I'm not sure whether the First Trust Deed -- they've

4    asked --

5         THE COURT:  60.

6         MS. JARVIS:  -- for 60.

7         THE COURT:  Okay.

8         MS. JARVIS:  Yeah.  So --

9         MS. KARASIK:  Your Honor, 90 days is fine.  We just

10   threw 60 days out.  We just didn't want an unlimited --

11        THE COURT:  Yes.

12        MS. JARVIS:  And --

13        THE COURT:  Okay.

14        MS. KARASIK:  -- forbearance period.

15        MS. JARVIS:  Yeah.

16        THE COURT:  Mr. Garman.

17      (Colloquy not on the record.)

18        MR. GARMAN:  Your Honor, I actually strenuously

19   object to this one.  They're asking for an order that says

20   notwithstanding what the contract says if they enter into a

21   forbearance for up to 90 days regardless of what the underlying

22   circumstances are that's not a breach of the loan-servicing

23   agreement, and that's inappropriate.

24      Some of these loans have been in default for potentially a

25   year.  And to simply give them comfort to say they can extend

1    it for another 90 days and wouldn't be subject to an

2    affirmative claim by a direct lender, I think it is just

3    entirely inappropriate under the circumstances.

4         They have the right to enter into forbearances under the

5    terms of the contract.  And if they wish to exercise that

6    right, they're free to do so, but don't give them an umbrella.

7              THE COURT:  Okay.

8              MS. JARVIS:  Your Honor, the contract does give the

9    right, you know, for the loan servicer to enter into

10   forbearance without getting permission from the lenders.

11        As we've gone through these cases, you know, we've been

12   very careful in making sure that, you know, we've proceeded by,

13   you know, notice even on issues that we think, you know, we

14   could do from an ordinary-course standpoint both because we

15   wanted to make sure that people had notice, have what we were

16   doing, so that if there were any problems with that they could

17   be dealt with, but, also, because, again, it's difficult for us

18   to negotiate with these borrowers and get things done with the

19   uncertainties of this case.  And so in many cases, we do need

20   orders simply to get agreements done.

21        I think the practice has been in this case at the very

22   beginning we asked for kind of more ordinary-course

23   approval.

24        And I think, you know, the Court being sensitive to, you

25   know, the issues in this case and the concerns of the direct

1    lenders has really -- basically, I took the message from the

2    Court in our initial motion on this that we needed to come to

3    the Court and get permission to do things in a more open

4    fashion.  That that was also the preference of the Court.

5         And this is in that spirit where we're recognizing we have

6    the right under the loan-servicing agreements to enter into

7    forbearance agreements.

8         We're simply saying we don't want to come back every time

9    to the Court.  We'd like to just get permission to go ahead as

10   long as they're not more than 90 days to do this without having

11   to seek --

12              THE COURT:  Okay.  The --

13              MS. JARVIS:  -- further Court permission.

14              THE COURT:  Why you guys keep bringing motions or

15   like the servicing agreements, and nobody ever files one, I

16   don't know.

17        Nobody attached a servicing agreement to any of their

18   pleadings.  I got every other pleading in the world.  I got

19   subordination agreements, and I've got construction-loan

20   agreements.

21              MS. DAVIS:  Your Honor, I referred back to the ones

22   that I had filed in conjunction with my relief-from-stay motion

23   by docket entry.  I don't know whether your Honor has that --

24              THE COURT:  I --

25              MS. DAVIS:  -- immediately --

```
 1              THE COURT:  That was --
 2              MS. DAVIS:  -- in front of you.
 3              THE COURT:  -- the only one --
 4              MS. JARVIS:  We --
 5              THE COURT:  -- I've ever seen --
 6              MS. JARVIS:  Yeah.
 7              THE COURT:  -- that I've been able --
 8              MS. JARVIS:  We'll --
 9              THE COURT:  I dug that out --
10              MS. JARVIS:  Yeah.
11              THE COURT:  -- for the last hearing.
12              MS. JARVIS:  We will make sure that when we reference
13      loan-servicing agreements they're always attached.
14              THE COURT:  Because, again, I don't know.
15              MS. JARVIS:  We'll --
16              THE COURT:  You know, there were obviously
17      differences because when I refer to the one they were obviously
18      different than what you were doing.  Well, I'll take the matter
19      under submission.  I don't have a servicing agreement.
20              MS. JARVIS:  Okay.  Your Honor, we'll go ahead and
21      file one.  If we could do a redacted one because we -- or I
22      guess we could use one that's already been filed by a party --
23              THE COURT:  Okay.
24              MS. JARVIS:  -- if the Court would prefer.
25              THE COURT:  And in the meantime, if you've got --
```

1    whatever authority you have under the contract, you have under

2    the contract.

3        But if you're asking for a ruling, then I can't do it

4    because nobody's given me the contract.  Nobody has even talked

5    about the contract, so --

6            MS. JARVIS:  So just so I understand what your Honor

7    is saying, then, is we either have the option to go ahead and

8    do a forbearance if we feel like it's appropriate or you would

9    ask for a supplemental submission on that, so that the Court

10   can rule on that.

11           THE COURT:  Right.

12           MS. JARVIS:  Okay.  We will do one of those of the

13   others.  I think because of the issue we have with respect to

14   negotiating with these borrowers it will probably be the

15   latter, filing the motion just because they need to understand

16   that we have the ability to do that in order for us to

17   negotiate with them to get these loans repaid.

18           THE COURT:  Okay.  And if Mr. Garman's loans aren't

19   collected, that's his client's problems.

20           MS. KARASIK:  Your Honor, just we're a little bit

21   concerned about the intersection between this motion and the

22   Silver Point deal, and I'm just curious.

23       I know on the -- I mean, you stated on the record that

24   they don't have a problem with us, and, you know, obviously --

25           MS. JARVIS:  If --

1          MS. KARASIK:  -- I trust you, but I'd like something.

2     I don't know if I should sign off on the order.

3          I believe there's some provision, potentially, in the APA,

4     and I have been sort distanced from that.  We've tried to split

5     that apart, so we don't double, you know, bill in this case --

6          MS. JARVIS:  I --

7          MS. KARASIK:  -- (indiscernible).

8          MS. JARVIS:  I think the easiest thing would be in

9     any order simply put that we would run this by Silver Point in

10    accordance with the APA and --

11         MS. KARASIK:  And then we'd --

12         MS. JARVIS:  -- would not proceed --

13         MS. KARASIK:  -- sign off on it?

14         THE COURT:  Why don't you put --

15         MS. JARVIS:  Yeah.

16         THE COURT:  -- in your certification --

17         MS. JARVIS:  Okay.

18         THE COURT:  -- that you've contacted I think we

19    decided it was qualified buyers --

20         MS. JARVIS:  Yeah.

21         THE COURT:  -- who had deposited --

22         MS. JARVIS:  It's --

23         THE COURT:  -- their funds.

24         MS. JARVIS:  Right.  And signed an asset purchase

25    agreement.  Right.

```
 1              THE COURT:  Right.

 2              MS. JARVIS:  Right.

 3              THE COURT:  So you could just do a 9021 certificate

 4    that indicates that you've contacted and then save for your

 5    files your E-mail to them --

 6              MS. JARVIS:  Okay.

 7              THE COURT:  -- et cetera.

 8              MS. JARVIS:  Okay.  We will do that.  That's a good

 9    idea --

10              MS. KARASIK:  Would you --

11              MS. JARVIS:  -- your Honor.

12              MS. KARASIK:  -- just make sure that we're copied on

13    that and everything?

14              MS. JARVIS:  Okay.

15              MS. KARASIK:  Great.

16         Thank you.

17              THE COURT:  Okay.  So I guess we'll continue this

18    part 3 of this motion until the November 13th date.

19              MS. JARVIS:  Okay.  The other clarification we'd ask

20    -- and, again, this comes from borrowers -- but, you know, just

21    the uncertainties to get them to pay.

22         We have an order already from the Court that when a loan's

23    paid off in full, you know, we can give a release and collect

24    that loan, but it was dealing with sales, originally, with

25    sales of property.
```

1          We would just like a clarification that we can also deal

2     with it with respect to refinancings as well because that has

3     come up, particularly --

4                    THE COURT:  Don't you have --

5                    MS. JARVIS:  -- in connection --

6                    THE COURT:  -- any authority --

7                    MS. JARVIS:  -- with the Marlton Square.

8                    THE COURT:  -- under your agreement to give

9     reconveyances?

10                   MS. JARVIS:  We do.  But, again, because of the

11    uncertainties that we -- we have gone in and gotten orders from

12    the Court to allow us to give us permission to go ahead and

13    give a full release upon payment in full.

14         Some of the borrowers balk because they're just concerned

15    about it, so we --

16                   THE COURT:  Okay.

17                   MS. JARVIS:  -- just want a clarification that it

18    extends to refinancing as well.

19         So, in other words, any way that it's repaid through a

20    sale or refinancing, we clearly can give releases and collect

21    those loans in full.

22                   THE COURT:  All right.  Is there any objection to

23    that aspect of it?

24                   MR. GARMAN:  No.  Your Honor, if it would make it

25    easier, instead of taking these piecemeal, I would consent to

1    entry of an order that they are authorized to take all actions

2    under the loan-service agreement.

3              THE COURT:  Okay.  Does that satisfy your needs?

4              MS. JARVIS:  That would satisfy our needs,

5    your Honor.

6              THE COURT:  Okay.

7              MS. JARVIS:  Yes.

8              THE COURT:  So why don't you do that instead --

9              MS. JARVIS:  Okay.

10             THE COURT:  -- then.

11             MS. JARVIS:  We will do that.

12             THE COURT:  All right.  So the next thing we have --

13             MS. JARVIS:  If I could just raise one --

14             THE COURT:  Sure.

15             MS. JARVIS:  -- one issue?

16             THE COURT:  Um-h'm.

17             MS. JARVIS:  With respect to the three loans, we did

18    ask for a Rule 6004(g) provision in the order that would be

19    okay, so they could be effective immediately, and we did.  You

20    know, like I said, this was noticed out --

21             THE COURT:  All right.

22             MS. JARVIS:  -- to everyone.

23             THE COURT:  All right.  So that's granted.

24             MS. JARVIS:  Okay.

25             THE COURT:  Okay.  Next, we have the cash, the cash

1      motion.

2              MR. SCHWARTZER:  Lenard Schwartzer appearing for the

3      debtors and debtors in possession, your Honor.  This is no

4      longer a contested matter, your Honor.

5          We have filed a motion to extend the time period for the

6      debtor to be allowed to use the cash that's coming into

7      USA Commercial to pay the normal expenses pursuant to the

8      fourth revised budget filed on October 20th.

9          This motion seeks that the continuing use of cash go

10     through the week ending January 31st, 2007, which, hopefully,

11     will be through the week of the completion of the sale of the

12     servicing business.

13         We did receive a reply, an opposition, from the

14     First Trust Deed Fund Committee.  And after discussions with

15     them, there is an agreement that going forward the fee being

16     paid by the First Trust Deed Fund to USA Realty Advisors on a

17     monthly basis, a management fee, which is different than the

18     collection fee that's collected by USA Commercial, the

19     management fee, will be held in USA Realty Advisors and not

20     spent because there is a potential claim by the First Trust

21     Deed Fund to recoup that fee.

22         Now, that will be going forward from today because in the

23     past and as reported in the last monthly-operating report these

24     funds have been taken.  This management fee has been taken from

25     the First Trust Deed Fund and used by USA Commercial Mortgage.

1        But going forward I guess beginning with the fee for the

2    month of November, it will be held in USA Capital Realty and

3    not used for expenses at this time.  Possibly, this issue will

4    be handled by the plan of reorganization and eliminated that

5    way.  That's my understanding.

6            THE COURT:  Okay.

7            MR. SCHWARTZER:  Other than the brief filed by the

8    First Trust Deed Fund Committee, there has been no other

9    objections or responses to the motion.

10           THE COURT:  Okay.

11           MS. KARASIK:  Your Honor, we did object based on the

12   management fee.  It was our understanding that we had an

13   agreement where it was going to be held in escrow, and,

14   apparently, there was some confusion there.  So going forward,

15   they will hold it separately.  It's okay that it's in

16   USA Realty.

17       I'm told by Ms. Carlyon who reviews the operating reports

18   in this case that it was not paid over in the last set of

19   operating report.

20       So we would like to have this start from my guess it would

21   be September going forward, rather than from the October going

22   forward.

23       Ms. Carlyon, do you want to look at this?

24           MS. CARLYON:  The monthly-operating reports filed to

25   date correctly state that no such management fee has been

1    postpetition.

2        And, informally, we have discussed that numerous times

3    with debtor's professionals and management, and it has always

4    been --

5            MS. KARASIK:  That's from USA Capital.

6            MS. CARLYON:  -- our agreement and understanding.

7        (Colloquy not on the record.)

8            MS. CARLYON:  And I have verified when the

9    monthly-operating reports were filed that we are not

10   postpetition paying that management fee.

11       (Colloquy not on the record.)

12           MS. CARLYON:  We would never agree to do so.  It

13   would create horrendous conflicts between these estates.

14           THE COURT:  Okay.

15           MS. KARASIK:  Okay.

16       (Colloquy not on the record.)

17           THE COURT:  So is it held back for September or no?

18           MR. SCHWARTZER:  No.

19       (Colloquy not on the record.)

20           MR. SCHWARTZER:  Unless my client chooses

21   (indiscernible).

22       (Colloquy not on the record.)

23           MS. KARASIK:  Your Honor, they've collected the fees

24   through June.

25       (Colloquy not on the record.)

1          MS. KARASIK:  So I would ask that from July going

2     forward because that was our understanding it would be

3     escrowed.

4          THE COURT:  Okay.

5          MS. KARASIK:  And they can sit on USA Realty.  I

6     don't care --

7          MR. SCHWARTZER:  September --

8          MS. KARASIK:  -- what --

9          MR. SCHWARTZER:  -- going forward would be acceptable

10    to my client (indiscernible).

11         MS. KARASIK:  My understanding was that we were going

12    to do this from the time period that they had -- you know, the

13    communication ended, so, basically, I mean, there's a

14    miscommunication.

15       We thought that they were holding them the entire time in

16    an escrow account.

17       (Colloquy not on the record.)

18         MS. KARASIK:  We understand that was a

19    miscommunication.  They've took them through June.  Okay.

20       It's a mistake.  We understand it.  We'll deal with that.

21    We're dealing with that issue among many others --

22         THE COURT:  In the Fund.

23         MS. KARASIK:  -- in the joint term sheet.

24       So from July going forward, we should do it based on what

25    the understanding was which was that they should sit in an

1   escrow account.

2            THE COURT:  Well, it's just fungible dollars, so

3   let's hold it from July.

4            MS. KARASIK:  And then they --

5            THE COURT:  You're going --

6            MS. KARASIK:  And --

7            THE COURT:  -- to have --

8            MS. KARASIK:  And they --

9            THE COURT:  -- to readjust some things.

10           MS. KARASIK:  -- won't use it.  That's just --

11           THE COURT:  Yeah.

12           MS. KARASIK:  -- going to set aside.

13       And at the end of the day, we either will have an

14   agreement where it's dealt with or we'll fight about it.  Our

15   concern is we feel like we're paying twice.

16       We're paying, you know, Mesirow fees.  For August, we're

17   over -- together all the debtor's professional fees exceeded

18   $200,000, and then on top of it we've got to pay a management

19   fee, and there's other issues.

20       So our view is let's not fight about it today.  Let's just

21   it set aside.  Hopefully, within the next two weeks, it's going

22   to be resolved.  It won't be an issue, anymore.

23           MR. SCHWARTZER:  Whatever the Court orders.

24           THE COURT:  Okay.  So I'll order to set it aside from

25   July.  I mean, it's just fungible dollars, so it will have to

```
 1    be put back in, I mean, not used I guess.

 2              MS. KARASIK:  Right.  It's just going --

 3              MR. SCHWARTZER:  It will just --

 4              MS. KARASIK:  -- to sit there --

 5              MR. SCHWARTZER:  -- be held in USA Realty Advisors --

 6              MS. KARASIK:  -- and not used.

 7              MR. SCHWARTZER:  -- and not used.

 8              THE COURT:  All right.  That's fine.

 9              MS. KARASIK:  That's fine.

10              THE COURT:  Yeah.

11              MS. KARASIK:  Right.

12              MS. CARLYON:  And I just was to make sure that we're

13    not authorizing the debtor to go back and pay management fees

14    that haven't been paid.

15        I understand there's a discrepancy between what people are

16    saying the monthly-operating reports show, and we'll work that

17    out, but saying that this is from July forward does not mean

18    it's okay to go backwards --

19              THE COURT:  No.  This is just --

20              MS. CARLYON:  -- and pay something --

21              THE COURT:  -- an interim measure.

22              MS. CARLYON:  -- that hasn't been paid.

23              THE COURT:  Okay.

24              MS. KARASIK:  And, your Honor, also, the budget has

25    professional fees.  It has allocations.  It's fine to be in the
```

1    budget.

2        It's just everybody needs to understand these are

3    estimates.  Everybody's rights are reserved with respect to the

4    allocations.  I'd like the order to say that just so that's no

5    confusion at the end of the day when we're going back and --

6            THE COURT:  Right.

7            MS. KARASIK:  -- you know, if we have to go back and

8    argue about it.  Of course, hopefully, that will all be

9    resolved also in our joint term sheet.

10           THE COURT:  Okay.

11           MS. KARASIK:  Thank you, your Honor.

12           THE COURT:  All right.  So that will be the order.

13       Now, on the intercompany claims, I think that's been

14   resolved by the suggestion that we just extend the bar date?

15           MS. JARVIS:  Yes.  Yeah.  The committees and the

16   debtors agree if the Judge --

17           THE COURT:  Okay.

18           MS. JARVIS:  If your Honor, would just extend the bar

19   date, you know --

20           THE COURT:  To when?

21           MS. JARVIS:  -- indefinitely --

22           THE COURT:  Or indefinitely.

23           MS. JARVIS:  -- it would be okay.

24           THE COURT:  I think that probably --

25           MS. JARVIS:  Yeah.

```
1           THE COURT:  -- does make more sense.
2           MS. JARVIS:  Yeah.  We planned on describing all
3   these and working on these to put in the disclosure statement.
4   There will be a resolution of those claims.  We think that
5   makes the most sense.  It doesn't make any sense to spend
6   time --
7           THE COURT:  Right.
8           MS. JARVIS:  -- on filing claims.
9           THE COURT:  And, also, how in the world do you
10  estimate?  How in the world do you decide what they are?
11          MS. JARVIS:  Exactly.
12          MS. CARLYON:  Can we --
13          MS. JARVIS:  It's just --
14          MS. CARLYON:  I'm sorry.  This is Candace Carlyon.
15  Could we set this for a status at the conclusion of
16  confirmation, rather than just say indefinitely --
17          THE COURT:  Oh, okay.
18          MS. CARLYON:  -- and then have to file a new motion
19  and reserve it?
20          THE COURT:  Sure.  That's good, yeah.  So we'll
21  continue this 'til -- when do you think?
22          THE CLERK:  (Indiscernible) the 15th.
23          THE COURT:  Confirmation's December 5th?
24          THE CLERK:  The 15th of December, Judge --
25          THE COURT:  Okay.
```

1          THE CLERK:  -- is when we --

2          THE COURT:  So we'll continue this one to

3    December 15th.  Okay.  All right.  I think that's everything.

4       How are you coming on your disclosure statement?  Are you

5    getting that revised?

6          MS. JARVIS:  Yes.  We're working on it.  We actually

7    have originally submitted a stipulated order saying we would

8    file it on October 31st.

9       We've had further conversations with the committees

10   because of these intercompany issues, and we plan on filing a

11   second stipulation to have it filed November 6th.

12          THE COURT:  Okay.

13          MS. JARVIS:  That will give us time to get these

14   intercompany issues resolved and disclosed more fully --

15          THE COURT:  And you're taking --

16          MS. JARVIS:  -- in the disclosure statement.

17          THE COURT:  -- the suggestions that I made,

18   previously --

19          MS. JARVIS:  Yes.  Those --

20          THE COURT:  -- such as --

21          MS. JARVIS:  We're also including those.  We've

22   gotten comments from the SEC, and we're taking --

23          THE COURT:  Okay.

24          MS. JARVIS:  -- all of those into account.  We made a

25   detailed list and are working on those as well, your Honor.

1          THE COURT:  Okay.

2          MS. JARVIS:  Let me also just mention.  As I said,

3     the bid-procedures order was uploaded while we've been in

4     hearing.

5          The amended asset purchase agreement with the comments

6     that your Honor gave us last week will be filed today as well.

7     It's been signed, and it will be filed today.

8          THE COURT:  Okay.  I probably won't be able to sign

9     that order 'til at least Thursday, so is --

10         MS. JARVIS:  I think the amended asset purchase

11    agreement now gives us until -- it gives us some additional

12    time, so I think that's sufficient.

13         (Colloquy not on the record.)

14         THE COURT:  Okay.  It would be helpful -- does

15    anybody have a paper copy with them because --

16         MS. CARLYON:  Yeah.

17         MS. JARVIS:  Let me --

18         MS. CARLYON:  Let me --

19         MS. JARVIS:  Let me --

20         MS. CARLYON:  -- find out.

21         MS. JARVIS:  Let me just check a copy real quickly.

22         THE COURT:  Because --

23         (Colloquy not on the record.)

24         MS. JARVIS:  Yes.  Now, what we negotiated is the

25    breakup-fee order.  It has to be entered by the Court no later

1  than November 8th, and no appeal shall be filed, thereafter,

2  although it's —

3           THE COURT:  Okay.

4           MS. JARVIS:  Yeah.  So it's November 8th.

5           THE COURT:  Okay.  All right.  Mr. Garman.

6           MR. GARMAN:  Your Honor, I have one housekeeping

7  matter I'd like a little input from the Court on.  I think

8  there's unanimous agreement from all of us on this side from

9  the U.S. Trustee, the four committees, and the debtor that we

10  got ahead of ourselves on their proof-of-claim bar date

11  particularly as it comes to direct lenders.

12      Mesirow has done an incredible job of gathering

13  information and putting it into their database, and they've

14  begun sending out the individual statements to direct lenders.

15      Unfortunately, they're not easy to read to say the least,

16  and there are some errors on those statements, and they've been

17  a work in progress meaning that they've changed from one month

18  to the next, and it took me hours to understand how to

19  interpret one of the easier direct-lender statements.

20      I think there's agreement, and we've talked to the

21  debtor about this and spent a great deal of time with them last

22  week.

23      The debtor has agreed to have another informational

24  session much like they did at the 341 meeting at Cashman Center

25  or some similar place and to provide additional information by

1    way of loan recaps and some other information that will make it

2    much more possible to have a meaningful bar date.

3        What you're going to get now are thousands of unknown

4    unliquidated claims that are going to kick off a huge

5    claims-objection process at great cost.

6        I have a motion that I can file today to do this.  But in

7    looking at Rule 3003 and 9006, I don't think it's necessary.  I

8    certainly think under 9006 you have the ability.

9        Under 9006(b)(1), I think you have the ability without a

10   motion to enlarge the time period for filing a proof of claim

11   under 3003(c)(3).  But to the extent you want me to file a

12   motion, I'd be happy --

13           THE COURT:  Now, we don't want --

14           MR. GARMAN:  -- to do that.

15           THE COURT:  -- to do it for anybody except direct

16   lenders, right?

17           MR. GARMAN:  That's the only constituency I think

18   that has difficulty reading their statements or determining --

19           THE COURT:  Because the problem --

20           MR. GARMAN:  -- their claims.

21           THE COURT:  -- is we need claims --

22           MR. GARMAN:  I agree.

23           THE COURT:  -- to understand what else is out there.

24           MR. GARMAN:  Certainly, we need claims, and I think

25   the unsecureds are in a position -- well, let me clarify.  The

1    direct lenders need the ability to file claims.

2        Many of their claims are going to be unsecured claims for

3    diverted principal or other things, so I want to make sure that

4    we cover the totality of direct lenders.

5        But this is going to be a liquidating plan in which there

6    is a finite pot of assets to distribute to the various classes

7    of creditors however big they are.

8        I think that if we extend it 60 days we get some time to

9    start this process that, hopefully, we can deal with it in that

10   time.  And if we can't, we can deal with the bar date again.

11       So I would ask that you enter an order or authorize us to

12   upload an order extending the bar date from I believe it's

13   November 13 now for another 60 days.

14           THE COURT:  Is everybody in agreement, and how does

15   that impact understanding what you've got and the confusion?

16           MS. JARVIS:  Your Honor, we are in agreement, and I

17   think the point is that we think by kind of extending this,

18   having an informational meeting, getting more information to

19   the direct lenders we're going to save money on the back end by

20   not having to object to a lot of claims that probably shouldn't

21   be filed.

22       This is a pot plan, so it's merely a situation of what

23   percentage distribution would you get from a potential pot.  We

24   do know who the diverted principal lenders are, so we've

25   already identified that.  We know the amount of that.

1    This would be more, you know, in the nature of are there
2    some shortfalls, you know, claimed by lenders that, you know,
3    would actually have some claim.
4        We can probably do some kind of general estimation on that
5    as well for purposes --
6            THE COURT:  I mean, you clearly --
7            MS. JARVIS:  -- of --
8            THE COURT:  -- want to limit --
9            MS. JARVIS:  -- a disclosure statement.
10           THE COURT:  -- the Highland Capital situation.
11           MS. JARVIS:  Yes.
12           THE COURT:  So how do you tailor an order?  I guess
13   you would just limit it to those people who don't have a claim
14   because they're not really -- they really don't have a claim.
15       Well, they do to the extent there's a breach of the
16   servicing agreement.  They don't have a claim because they're
17   direct lenders.
18           MS. JARVIS:  There's got to be some proximate cause
19   and in many cases with respect to something that USA Commercial
20   Mortgage did.  And in many cases, there isn't going to be that
21   link.
22       And it's an order to prevent and explain that to the
23   direct lenders, so that, hopefully, we won't get a lot of
24   claims --
25           THE COURT:  But what do you do --

1          MS. JARVIS:  -- that just say --

2          THE COURT:  -- about voting if you don't have it done

3   before the bar date?  Now, the direct lenders won't vote,

4   anyway, I guess because -- I don't know what you're going to do

5   in that regard.

6          MS. JARVIS:  How about if we submit --

7          THE COURT:  I think --

8          MS. JARVIS:  -- a stipulated order, you know, with

9   respect to that?  I tell you we've thought about this,

10  your Honor, with respect to potentially filing a motion for

11  estimation of claims for voting purposes because, you know, the

12  -- for instance, if you did get a direct lender, one of them,

13  that said, well, I think I was harmed, and you owe me

14  $50,000,000, you know, based on whatever, and another direct

15  lender, you know, files something and says, well, I don't know.

16  It's $5.

17      So, you know, there is that issue as well, and our thought

18  was to go forward and file like, probably, a motion for

19  estimation --

20          THE COURT:  I mean --

21          MS. JARVIS:  -- of claims --

22          THE COURT:  -- you're absolutely right.  It's not an

23  issue, and, perhaps --

24          MS. JARVIS:  -- for voting.

25          THE COURT:  -- you know, I shouldn't have said the

1    bar date, but, well, you know, the problem we first had was

2    Highland Capital, and --

3         MS. JARVIS:  No.  I do think we needed a bar date, I

4    mean, there because the direct lenders are kind of -- they're a

5    more amorphous group, but, you know, there are other claims

6    that we need to know because we can estimate those.

7         THE COURT:  Sure.  And the Funds --

8         MS. JARVIS:  We can't estimate --

9         THE COURT:  -- you need to know --

10        MS. JARVIS:  -- other claims.

11        THE COURT:  -- who was claiming what proof of

12   interest and how much their proof of interest is.

13        MR. GARMAN:  The direct-lender claims are coming into

14   focus, and here's what's happening.  We acknowledge and we

15   agree that most direct lenders probably don't have claims

16   against USA Capital simply as the servicer.

17        And as we proceed in the coming months with another

18   300,000,000 in principal being paid off and direct lenders

19   being paid off, that's just an entire pool that we don't have

20   to deal with.

21        But there are finite loans that in which there was fairly

22   clearly misrepresentations or actual fraud committed upon

23   direct lenders to induce them to enter into loans, for example.

24        To clarify what I'm asking for, I'd like to extend the bar

25   date for anyone whose claim arose out of their capacity as a

1    direct lender.

2        There's maybe unsecured claims from diverted

3    principal.  There may be fraud claims that arise out of these

4    loans.

5        But as we're making progress, we really are seeing that

6    this pool of claims is coming into focus, and we're going to

7    have a much better grasp of what it is even in dealing with our

8    plan.

9        I think that we can circulate a stipulated order amongst

10   this group that will deal both with the plan-context issues and

11   deal with the bar date and get that before the Court --

12               THE COURT:  Okay.

13               MR. GARMAN:  -- by the end of the week.

14               THE COURT:  Well, I'd certainly be willing to

15   consider a stipulated order.

16               MS. JARVIS:  Yes.

17               THE COURT:  I mean, you know, I'll have to --

18               MS. CARLYON:  See it?

19               THE COURT:  Yeah.  And, certainly, you could just

20   service notice on a limited -- if you wanted to file a motion,

21   you'd just do a limited notice.

22       But I'd want a proposal about what you want as opposed to

23   in general because we've got all these -- and, again, this is

24   such a unique case.  I mean, it's just --

25               MS. JARVIS:  We --

```
1          THE COURT:  -- different.

2          MS. JARVIS:  We can --

3          THE COURT:  I mean, it's --

4          MS. JARVIS:  We can do that, your Honor.

5          THE COURT:  So --

6          MR. GARMAN:  We will do that today and tomorrow

7   because the bar date is coming up of I think it's the 13th or

8   14th.

9          MS. JARVIS:  Yes.

10         MR. GARMAN:  And we want --

11         MS. JARVIS:  It's the 13th.

12         MR. GARMAN:  -- to get this information out there

13  before the Court gets another 500 --

14         THE COURT:  Okay.

15         MR. GARMAN:  -- unknown proofs of claim filed.

16         THE COURT:  Okay.  Okay.  All right.  Well, we'll see

17  you back on the 13th, then.

18         MS. CARLYON:  Thank you, your Honor.

19         THE COURT:  All right.

20         MS. KARASIK:  Thank you --

21         MS. JARVIS:  Thank you --

22         MS. KARASIK:  -- your Honor.

23         THE COURT:  Thank you.

24         MS. JARVIS:  -- your Honor.

25      (Colloquy not on the record.)
```

1              THE CLERK:  All rise.

2          (Court concluded at 01:15:54 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      I certify that the foregoing is a correct transcript

2    from the electronic sound recording of the proceedings in

3    the above-entitled matter.

4

5

6    /s/ Lisa L. Cline                        08/17/10

7    Lisa L. Cline, Transcriptionist          Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25