1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF NEVADA

3    LAS VEGAS, NEVADA

4    In re:  USA COMMERCIAL MORTGAGE      )  JUNE 21, 2006
        COMPANY,                          )  E-Filed:  10/21/10
5                                         )
                Debtor.                   )  Case No.
6                                         )  BK-S-06-10725-LBR
        _____)  Chapter 11
7

8                    TRANSCRIPT OF PROCEEDINGS
                              OF
9                       STATUS HEARING
                    RE: MOTION FOR ORDER
10         UNDER 11, USC, SECTIONS 105(A), 345, AND 363
        APPROVING DEBTOR'S PROPOSED CASH MANAGEMENT PROCEDURES
11           AND INTERIM USE OF CASH IN ACCORDANCE
              WITH PROPOSED CASH BUDGET, NO. 8
12                            AND
        MOTION DIRECTING PAYMENTS TO DIRECT LENDERS, NO. 336
13                            AND
                    ORDER SHORTENING TIME
14     RE: MOTION TO USE CASH COLLATERAL THROUGH JULY 29, 2006,
            PURSUANT TO SECOND REVISED BUDGET, NO. 407
15                            AND
                MOTION TO RECONSIDER, NO. 609
16                            AND
                    ORDER SHORTENING TIME
17                 RE: MOTION FOR AUTHORITY
        TO FORBEAR AND TO PROVIDE FURTHER FUNDING
18        FOR CERTAIN OUTSTANDING LOANS, NO. 592
                              AND
19                  ORDER SHORTENING TIME
        RE: MOTION FOR EMERGENCY INTERIM AND PERMANENT ORDERS
20     AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING,
                            NO. 588
21                            AND
                    ORDER SHORTENING TIME
22         RE: MOTION FOR ORDER APPROVING AGREEMENT
                WITH INVESTMENT PARTNERS, NO. 575
23                            AND

24

25     Proceedings recorded by electronic sound recording;

Cline Transcription Services, Inc.  (702)644-1123

```
 1                    ORDER SHORTENING TIME
          RE: APPLICATION FOR ADMINISTRATIVE ORDER
 2       ESTABLISHING PROCEDURES FOR INTERIM COMPENSATION
     AND REIMBURSEMENT OF EXPENSES OF PROFESSIONALS, NO. 570
 3                            AND
                     ORDER SHORTENING TIME
 4       RE: MOTION TO REMOVE FERTITTA ENTERPRISES, INC.,
          AS A MEMBER OF OFFICIAL COMMITTEE OF HOLDERS
 5           OF EXECUTORY CONTRACT RIGHTS, NO. 562
                            AND
 6                   ORDER SHORTENING TIME
                    RE: APPLICATION TO EMPLOY
 7          ORRICK, HERRINGTON & SUTCLIFFE, LLP,
            AS COUNSEL TO THE OFFICIAL COMMITTEE
 8                OF EQUITY SECURITY HOLDERS
     OF USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, NO. 619
 9                            AND
                     ORDER SHORTENING TIME
10      RE: APPLICATION TO EMPLOY BECKLEY SINGLETON, CHTD.,
                AS SPECIAL NEVADA BANKRUPTCY COUNSEL
11    TO THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS
     OF USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, NO. 622
12                            AND
            JOINT MOTION FOR NUNC PRO TUNC ORDER
13    CLARIFYING REQUIREMENT TO PROVIDE ACCESS TO INFORMATION,
                           NO. 521
14                            AND
                     ORDER SHORTENING TIME
15         RE: APPLICATION TO EMPLOY FTI CONSULTING, INC.,
      AS FINANCIAL ADVISORS NUNC PRO TUNC AS OF JUNE 9, 2006,
16                          NO. 659
                            AND
17                   ORDER SHORTENING TIME
          RE: APPLICATION TO EMPLOY ALVAREZ & MARSAL, LLC,
18           AS FINANCIAL AND REAL ESTATE ADVISOR
           NUNC PRO TUNC TO JUNE 1, 2006, NO. 633
19                        VOLUME 2
                       A.M. SESSION
20          BEFORE THE HONORABLE LINDA B. RIEGLE
              UNITED STATES BANKRUPTCY JUDGE
21             Wednesday, June 21, 2006

22                      9:00 a.m.

23

24    Court Recorder:        Helen C. Smith

25    Proceedings recorded by electronic sound recording;
```

3

```
 1    APPEARANCES:

 2    For Diversified Trust      MARC A. LEVINSON, ESQ.
      Deed Fund Committee:       Orrick, Herrington & Sutcliffe
 3                               400 Capitol Mall
                                 Suite 300
 4                               Sacramento, California 95814

 5                               ANNE M. LORADITCH, ESQ.
                                 BRETT A. AXELROD, ESQ.
 6                               Beckley Singleton, Chtd.
                                 530 Las Vegas Boulevard South
 7                               Las Vegas, Nevada 89101

 8                               JEFFERY D. HERMANN, ESQ.
                                 Orrick, Herrington & Sutcliffe
 9                               777 South Figueroa Street
                                 Suite 3200
10                               Los Angeles, California 90017

11    For the Official           CANDACE C. CARLYON, ESQ.
      Committee of Equity        Shea & Carlyon, Ltd.
12    Security Holders           233 South Fourth Street
      of USA Capital             Suite 200
13    First Trust Deed Fund,     Las Vegas, Nevada 89101
      LLC:
14
      For Boise/Gowen, LLC,      SUSAN WILLIAMS SCANN, ESQ.
15    and Franklin Stratford,    Deaner, Deaner, Scann, Malan
      Investment, LLC:             & Larsen
16                               720 South Fourth Street
                                 Suite 300
17                               Las Vegas, Nevada 89101

18    For the First Trust        EVE H. KARASIK, ESQ.
      Deed Committee:            Stutman, Treister & Glatt, P.C.
19                               1901 Avenue of the Stars
                                 Twelfth Floor
20                               Los Angeles, California 90067

21    For the Jones Vargas       JANET L. CHUBB, ESQ.
      Direct Lenders:            Jones Vargas
22                               100 West Liberty
                                 Twelfth Floor
23                               Reno, Nevada 89501

24

25
```

4

```
1    APPEARANCES (Cont.):

2    For the Unsecured          ROB CHARLES, JR., ESQ.
     Creditors Committee        Lewis and Roca, LLP
3    of USA Commercial          3993 Howard Hughes Parkway
     Mortgage Company:          Suite 600
4                               Las Vegas, Nevada 89109

5    For the Canepa             LAUREL E. DAVIS, ESQ.
     Group:                     Lionel, Sawyer & Collins
6                               300 South Fourth Street
                                 Suite 1700
7                               Las Vegas, Nevada 89101

8    For the Official           GERALD M. GORDON, ESQ.
     Committee of Executory     GREGORY E. GARMAN, ESQ.
9    Contract Holders of        Gordon & Silver, Ltd.
     USA Commercial             3960 Howard Hughes Parkway
10   Mortgage Company:          Ninth Floor
                                Las Vegas, Nevada 89109
11
     For Liberty Bank:          WADE B. GOCHNOUR, ESQ.
12                              Haney, Woloson & Mullins
                                1117 South Rancho Drive
13                              Las Vegas, Nevada 89102

14   For CapitalSource          DAVID A. COLVIN, ESQ.
     Finance, LLC:              Marquis & Aurbach
15                              10001 Park Run Drive
                                Las Vegas, Nevada 89145
16
                                KENNETH J. OTTAVIANO, ESQ.
17                              Katten Muchin Rosenman, LLP
                                525 West Monroe Street
18                              Suite 1600
                                Chicago, Illinois 60661
19
     For the United States      AUGUST B. LANDIS, ESQ.
20   Trustee:                   Office of the United States Trustee
                                300 Las Vegas Boulevard South
21                              Suite 4300
                                Las Vegas, Nevada 89101
22
     For the Debtor:            ANNETTE W. JARVIS, ESQ.
23                              Ray, Quinney & Nebeker, P.C.
                                36 South State 1400
24                              Salt Lake City, Utah 84145

25
```

5

1    APPEARANCES (Cont.):

2    For the Debtors:          LENARD E. SCHWARTZER, ESQ.
                               Schwartzer & McPherson Law Firm
3                              2850 South Jones Boulevard
                               Suite 1
4                              Las Vegas, Nevada 89146

5    For Richard McKnight,     THOMAS J. GILLOON, ESQ.
     Esq.:                     Law Office of Richard McKnight, P.C.
6                              330 South Third Street
                               Suite 900
7                              Las Vegas, Nevada 89101

8    Also Present:             ROBERT A. RUSSELL
                               Manager
9                              Boise/Gowen, LLC
                               Franklin Stratford Investment, LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1                          I   N   D   E   X

                                                              Voir
2      Witness          Direct      Cross      Red.      Rec.    Dire

3      THOMAS J. ALLISON
       (By Ms. Jarvis)    28                   120
4      (By Mr. Gordon)                68                 129
       (By Mr. Landis)               89
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         E X H I B I T S

2      Number              Description                    Page

3      Trustee's A    List of Top Creditors              103

4      Trustee's B    Beastar Loan Origination           114

5      Trustee's C    Beau Rivage Loan Origination       115

6      Trustee's D    Re: Freeway 101                    116

7      Trustee's E    Re: Universal Hawaii               117

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

8

1          (Court convened at 09:20:20 a.m.)

2              THE COURT:  Okay.  All right.  On USA Commercial.

3          Appearances, please.

4              MR. LEVINSON:  Good morning, your Honor.

5      Marc Levinson of Orrick, proposed counsel for the

6      Diversified Trust Committee.

7              MS. LORADITCH:  Good morning, your Honor.

8      Anne Loraditch of Beckley Singleton, proposed Nevada counsel

9      for the Diversified Trust Committee.

10         And I would note for your Honor that Brett Axelrod of my

11     office and Jeffery Hermann of Orrick are also in the

12     courtroom.

13             THE COURT:  Okay.

14             MS. CARLYON:  Good morning, your Honor.

15     Candace Carlyon of the law firm of Shea & Carlyon on behalf of

16     the First Trust Deed Committee.

17             MS. SCANN:  Good morning, your Honor.  Susan Scann of

18     Deaner, Deaner, Scann, Malan & Larsen on behalf of Boise/Gowen,

19     LLC, and Franklin Stratford, LLC.  Robert A. Russell, the

20     manager of those two LLCs, is also present.

21             MS. KARASIK:  Good morning, your Honor.  Eve Karasik,

22     Stutman, Treister & Glatt, Professional Corporation, on behalf

23     of the First Trust Deed Fund Committee.

24             MS. CHUBB:  Good morning, your Honor.  Janet Chubb of

25     Jones Vargas for what have become to be called the

1    JV Direct Lenders.

2         (Colloquy not on the record.)

3         MR. CHARLES:  Rob Charles from Lewis and Roca.  We

4    represent the Unsecured Creditors Committee of USA Commercial

5    Mortgage Company.

6         MS. DAVIS:  Good morning, your Honor.  Laurel Davis

7    appearing on behalf of the Canepa Group.

8         MR. GORDON:  Gerald Gordon and Greg Garman of

9    Gordon & Silver on behalf of the Official Committee of

10    Direct Lenders.

11         MR. GOCHNOUR:  Good morning, your Honor.

12    Wade Gochnour of Haney, Woloson & Mullins on behalf of

13    Liberty Bank.

14         MR. COLVIN:  Good morning, your Honor.  David Colvin,

15    local counsel for CapitalSource Finance, LLC.  With me is

16    Mr. Kenneth Ottaviano who is Chicago counsel.

17         And we'd ask the Court -- we are in the process of

18    preparing and submitting pro hac vice papers, but we would ask

19    that he be permitted to speak this morning.

20         THE COURT:  All right.

21         THE CLERK:  Could you spell the other attorney's last

22    name?

23         MR. OTTAVIANO:  Yes, ma'am.  It's Ottaviano,

24    O-t-t-a-v-, as in Victor, i-a-n-o.

25         THE CLERK:  Thank you.

1          MR. OTTAVIANO:  Thank you.

2          MR. LANDIS:  Augie Landis for the United States

3    Trustee, your Honor.

4          THE COURT:  Okay.

5          MS. JARVIS:  Annette Jarvis on behalf of the debtors.

6          THE COURT:  All right.

7          MR. SCHWARTZER:  Lenard Schwartzer, local counsel for

8    the debtors.

9          THE COURT:  All right.  I've got to make myself room

10   to work here.

11         MR. SCHWARTZER:  We've noticed we can't see over the

12   pile, either, your Honor.  Your Honor, we would have some

13   suggestions with regard to the order of hearing these things.

14      (Colloquy not on the record.)

15         MR. SCHWARTZER:  First of all, there is some

16   uncontested applications for employment of counsel and experts

17   for the committee.

18      We would suggest that those things go forward right off

19   the bat, so the committee counsel know they're employed, and

20   then they're officially counsel for the committee.

21      Then we know we have a long calendar and some time

22   limitations, and we --

23         THE COURT:  Well, I probably shouldn't tell you this,

24   but my time-limitation problem has gone away.

25         MR. SCHWARTZER:  Well, that's actually terrible

Cline Transcription Services, Inc.  (702)644-1123

1   because I had planned this wonderful afternoon, your Honor, but

2   I'm sure it will be wonderful here, too, but I was suggesting

3   that there are some --

4           THE COURT:  No.  I don't --

5           MR. SCHWARTZER:  To get --

6           THE COURT:  I agree.

7           MR. SCHWARTZER:  -- some order to the motions that

8   are more substantive, we were thinking that it would probably

9   be important to consider the motion for emergency interim and

10  permanent DIP financing to begin with followed by the motion

11  for authority to forbear and provide further funding and then

12  following that with the motion to extend the budget from

13  July 16th to some later date when the Court can consider the

14  budget again because we have that deadline in the middle of the

15  Court's vacation, and that would be our suggestion, your Honor.

16      So we would be talking about going to page 4.  So after

17  the applications, we would be talking about going to the motion

18  on page 4, the first motion on page 4, then the second motion

19  on page 3, and then the --

20          THE COURT:  Well, 4 is the controversial one.

21          MR. SCHWARTZER:  It sure -- yes.

22          THE COURT:  I thought we were going to do the

23  uncontested first.

24          MR. SCHWARTZER:  Yeah.  I would say do the

25  applications first --

1          THE COURT:  Okay.

2          MR. SCHWARTZER:  -- then do the contested ones in the

3    order that makes -- and we think the order that makes sense is

4    the DIP financing first, then the motion to forbear --

5          THE COURT:  Okay.

6          MR. SCHWARTZER:  -- because part of that sort of --

7    that solves some of the problems.

8       And the motion to forbear will solve if there is DIP

9    financing and then, finally, the motion to extend the budget

10   which makes more sense after we know whether there is --

11         THE COURT:  Exactly.

12         MR. SCHWARTZER:  -- DIP financing --

13         THE COURT:  Exactly.

14         MR. SCHWARTZER:  -- as well, and then --

15         THE COURT:  And I'm going to take the Fertitta motion

16   after the, quote, "uncontested" -- the employment applications

17   because then we know who is the committee --

18         MR. SCHWARTZER:  That --

19         THE COURT:  -- chair.

20         MR. SCHWARTZER:  I understand that.  And if we don't

21   have a time, we thought -- if we were going to run out of

22   time --

23         THE COURT:  Um-h'm.

24         MR. SCHWARTZER:  -- we thought that one could be put

25   off a month.

1       But if you're going to do that -- if we're not going to

2   run out of time, that is an important motion to be

3   heard --

4           THE COURT:  Okay.

5           MR. SCHWARTZER:  -- your Honor.

6           THE COURT:  Before we start even with the

7   applications, let me just have a brief update on where we are,

8   schedules, the truing up, anticipated payments, and I recognize

9   this will all fit in later, but just kind of a brief summary

10  and a status.

11          MS. JARVIS:  These schedules were filed timely last

12  week on the 15th.  There are some amendments because they are

13  very complicated, and we're working through those, too, because

14  there were a few mistakes or holes that we realized after they

15  were filed that's just, you know, been a monumental process, so

16  we're working through those.

17      The investors, (indiscernible) investors' statements,

18  should be sent out next week.  Those are the original ones that

19  go only to the petition date.

20      They will then be updated through as close to the end of

21  June as possible to be sent out in early July.  We sent out in

22  early July, so that is proceeding forward.

23      In addition to restating all of the investor accounts in

24  going back and reconstructing their records, part of that

25  process also requires restating the borrower accounts which the

1   company is in the process of doing because it went back and

2   reconstructed, you know, the application of payments.  Let me

3   explain it this way.

4        Just as with the investors where the documents in what was

5   to be done with respect to the lenders in, for instance, the

6   collection of servicing fees and et cetera, the documents say

7   one thing, but the practice in, for instance, paying the

8   interest whether or not it was collected was something

9   different.

10       There also is that same issue with respect to borrowers as

11  far as the documents as to where, you know, payments are to be

12  applied and the way it was done in the books, you know, and

13  records.

14       So that also is being completely reconstructed to make

15  sure that there is an accurate accounting for the payments that

16  were made on the loans.

17       And we come out with, you know, an accurate picture of

18  what has been paid in accordance with the loan documents, so

19  the practice in accounting for it was different than the loan

20  documents.

21       And Mesirow has gone back to reconstruct all of that as

22  well, so that is also in process.  I think that's close to be

23  being completed.

24       So that we in addition to being able to give the investors

25  an accurate account of their loans we also will have an

1    accurate account for the borrowers of the current status of

2    their loans as well, so it's been a monumental process.

3        We do have also set for next week meetings with the four

4    committees to start discussing plan options and also the motion

5    that we intend to file by the 7th to distribute the funds in

6    the Collection Account to the investors or to the lenders which

7    we will have set in accordance with our discussion last week on

8    August 4th, so we will begin those discussions in earnest.

9        We should have enough information to be able to sort out

10   and deal with some of the more difficult problems in figuring

11   out what to do with certain types of issues among the investors

12   with respect to the distributions that should be made, and we

13   will get to this later in dealing with the DIP motion and the

14   cash management.

15       But with respect to the --

16       (Interruption over the telephone line at 09:28:53 a.m.)

17       THE COURT:  Whatever service we're using, the call

18   got dropped.  This is one of the best we know.

19           (Colloquy not on the record.)

20       THE COURT:  Again, this is our test results on what

21   company we can and can't use I guess.

22       (Colloquy not on the record.)

23       (Telephone dialing.)

24       (Colloquy not on the record.)

25           911 OPERATOR:  911 Emergency.  Robert --

1           THE COURT:  Oh.

2           911 OPERATOR:  -- 70672.

3       (Colloquy not on the record.)

4           911 OPERATOR:  Hello, 911.

5           THE COURT:  Tell her we're --

6           THE CLERK:  I'm sorry.  We're --

7           THE COURT:  -- (indiscernible).

8           THE CLERK:  We probably dialed the wrong number.

9           911 OPERATOR:  Okay.

10          THE CLERK:  Jeez.

11       (Colloquy not on the record.)

12          THE COURT:  How did it do that?

13          UNIDENTIFIED SPEAKER:  I don't know.

14       (Colloquy not on the record.)

15          UNIDENTIFIED SPEAKER:  I don't know.  There's no 911

16   on there.

17          THE CLERK:  No.

18       (Colloquy not on the record.)

19          THE COURT:  It should be just that 91 I would think.

20          UNIDENTIFIED SPEAKER:  It is 91-888-311-9051.

21   There's no 911 string in there.

22          THE COURT:  Oh, so we just did it that way.

23          UNIDENTIFIED SPEAKER:  It just does it

24   (indiscernible).  There's no 911 string in there.

25       (Colloquy not on the record.)

```
 1          (Telephone dialing.)

 2              ELECTRONIC VOICE:  We're sorry.  The number you have

 3      reached is not in service.  Please --

 4          (Colloquy not on the record.)

 5              UNIDENTIFIED SPEAKER:  One more try.

 6              MR. SCHWARTZER:  It was in service before --

 7           (Colloquy not on the record.)

 8              UNIDENTIFIED SPEAKER:  Give it one more try.

 9              MR. SCHWARTZER:  -- your Honor.

10              THE COURT:  Fine.

11              MR. SCHWARTZER:  That number was in service before --

12          (Colloquy not on the record.)

13              MR. SCHWARTZER:  -- earlier this morning.

14              THE COURT:  Yeah.

15              UNIDENTIFIED SPEAKER:  It was?  It was working?

16              THE COURT:  Well, I guess that company goes out of

17       our list.

18           (Colloquy not on the record.)

19           (Telephone dialing.)

20              THE COURT:  Do you know what company it was?

21              MR. SCHWARTZER:  Oh, you know, maybe because we

22      didn't pay them for the last phone call --

23              THE COURT:  Oh.

24              MR. SCHWARTZER:  -- they went out of business.

25          (Colloquy not on the record.)
```

1       ELECTRONIC VOICE:  We're sorry.  The number you have

2   reached is not in service.

3       (Colloquy not on the record.)

4       UNIDENTIFIED SPEAKER:  They only have one line.

5       THE COURT:  Yeah.  I guess that's it, yeah.

6       (Colloquy not on the record.)

7       MR. SCHWARTZER:  Actually, your Honor, I'm hoping to

8   get them as a client.

9       THE COURT:  Yeah.

10      (Colloquy not on the record.)

11      THE COURT:  Well, I think this Court had LDDS to

12  start with which turned into WorldCom, so --

13      (Colloquy not on the record.)

14      THE COURT:  Just for those of you who are sitting in

15  the courtroom, we have established a phone line where people

16   can listen in, and that's apparently what's happened is that

17   connection's been lost.

18      MS. CHUBB:  Well, I'm certainly glad I got to the

19  airport at 5:00 o'clock --

20      THE COURT:  Yeah.

21      MS. CHUBB:  -- as opposed to trying to call in.

22      THE COURT:  Ms. Chubb, what would you have done if

23   you weren't able to talk, though?

24      MS. CHUBB:  Oh.

25      THE COURT:  See, this is a listen-in-only line.

1        MS. CHUBB:  You know, it's a real quandary,

2    your Honor.  (Indiscernible) if I'm sitting here, and I

3    (indiscernible).

4        (Colloquy not on the record.)

5        THE CLERK:  Are all the parties on the line?

6        MS. CHUBB:  (Indiscernible) stand by the door.

7        THE CLERK:  Okay.  Let me try and transfer you over

8    to our PA system.  Hold on.

9        (Colloquy not on the record.)

10        THE COURT:  Okay.  All right.  So I guess we're back

11    on-line.

12        (Colloquy not on the record.)

13        THE COURT:  And if they can't talk, they won't be

14    able to tell us that they're --

15        THE CLERK:  It's busy.

16        UNIDENTIFIED SPEAKER:  It's busy?

17        THE CLERK:  I think they hung up.

18        UNIDENTIFIED SPEAKER:  Try again, please.

19        THE CLERK:  No.  I got them, again.

20        (Colloquy not on the record.)

21        THE CLERK:  It's busy, but you know what?  I got

22    ahold of them on this line.

23        UNIDENTIFIED SPEAKER:  Can I dial in for

24    (indiscernible)?

25        (Colloquy not on the record.)

1          THE COURT:  How do we know we lost the call?

2      (Colloquy not on the record.)

3          THE COURT:  Somebody called us?

4          UNIDENTIFIED SPEAKER:  Just dial the 6647.  Do a

5   transfer.

6          THE CLERK:  Um-h'm.

7      (Colloquy not on the record.)

8      (Telephone dialing.)

9          ELECTRONIC VOICE:  We're sorry.  Your call cannot be

10  completed as dialed.  Please check --

11         THE COURT:  Mr. Schwartzer, is there a number that my

12  staff can tell your office to call the company to call?

13         MR. SCHWARTZER:  The only thing I could do is have

14  the --

15     (Colloquy not on the record.)

16         MR. SCHWARTZER:  Your Honor, the only thing I could

17   do is have your staff call my office.

18         THE COURT:  Okay.  So we should call your office to

19  get that number.

20     (Colloquy not on the record.)

21         THE COURT:  Okay.  Thanks.  All right.

22     Ms. Jarvis, I'm sorry.  I interrupted you right in

23  mid-sentence.

24     (Colloquy not on the record.)

25         THE COURT:  So if you didn't like what you said, you

1    could just start over.

2        MS. JARVIS:  Let's see if I can remember where I was.

3        (Colloquy not on the record.)

4        MS. JARVIS:  About the distributing of the collection

5    accounts, and we do currently have about $80,000,000 in that

6    account.

7        There is an issue with respect to the amounts that we

8    collected that was what we call the prepaid interest meaning

9    the interest that already has been paid out to investors that

10   we now have collected back from the borrowers.

11       That amount is not going to be distributed as part of that

12   distribution because, you know, we believe it actually is

13   general property of the estate.  There are other issues to work

14   out.

15       And, actually, with respect to the cash-management motion,

16   we have agreed to go forward with the DIP financing and to

17   simply hold that money, you know, currently while we sort out

18   these issues with respect to where it ought to go.  Frankly, I

19   think this is probably an issue that we hopefully can negotiate

20   out in a plan of reorganization.

21       THE COURT:  Okay.

22       MS. JARVIS:  So, currently, that will be held.

23       THE COURT:  All right.  Thank you.  And then remind

24    me at the end for housekeeping issues as well as our usual

25    practice.  All right.

1            Let's then go to the application for employment of Orrick
2       and Beckley Singleton.
3            MS. LORADITCH:  Good morning, your Honor.  As
4       debtor's counsel indicated, the three employment applications
5       that we filed, Orrick, Herrington & Sutcliffe as counsel to the
6       Official Committee of Equity Security Holders of USA Capital
7       Diversified Trust Deed Fund, LLC, an application by the
8       committee to employ Beckley Singleton as Nevada bankruptcy
9       counsel, and, also, to employ FTI Consulting, Inc., as
10      financial advisers to the committee, all three applications
11      were unopposed.  And, in fact, we have all signatures on the
12      proposed orders as well.
13           THE COURT:  Okay.  I don't have any problem employing
14      the two law firms.  Let me just caution as I've cautioned
15      everybody else to not duplicate services.  There is like five
16      attorneys here today.
17           Perhaps, you know, it's your business judgment, and that's
18      necessary to get a sense of what's happening in the case.  But
19      in all these fee applications, I'm going to take a look at how
20      many attorneys were doing things, and I'm going to expect
21      justifications for why these things happen.
22           Oftentimes, there is very good justifications for having
23      two sets of counsel at a particular hearing because, you know,
24      there's a need to understand the context.
25           And, for example, I have my clerks and externs sit in, so

1   that there's context.  And when I say I need something, they'll

2   know what I'm talking about and not just stare blankly at me.

3          MS. LORADITCH:  No.  I appreciate your comments,

4   your Honor.  And, in fact, all the professionals in light of

5   the Court's previous comments on those subjects are very keenly

6   aware of duplication, and we're being very careful about how

7   we're assigning tasks and billing, and so forth.

8       But I do appreciate the comment with regard to context

9   because as the Court is obviously aware that is important as

10  well.

11         THE COURT:  And one kind of point -- and this kind of

12  came out in the budget, and we can discuss it later.  Now, it's

13  quite clear that you're going to be paid not from

14  USA Commercial.  You're going to be paid from the particular

15  fund that you're representing, correct?

16         MS. LORADITCH:  Correct.

17         THE COURT:  Okay.  And, again, we'll get to it in the

18  budget because the budget mentions, well, we now have four

19  attorneys to pay, but the point is that's going to be coming

20  from USA Commercial directly, I mean.

21         MS. LORADITCH:  My recollection of the budget -- and

22   I don't have it immediately at my fingerprints, but, perhaps --

23         THE COURT:  I think that's been deferred.

24         MS. LORADITCH:  -- debtor's counsel --

25         THE COURT:  That was one of the initial things,

1    reasons for the financing, was we have four attorneys now,

2    instead of one.

3              MS. LORADITCH:  Well, I don't know about that.  But

4     on the budget, it does break out by debtor --

5              THE COURT:  Okay.

6              MS. LORADITCH:  -- and provides for professionals by

7    estate.

8              THE COURT:  Okay.

9              MS. LORADITCH:  Your Honor, I just have a question,

10   and I'm sorry.  Go ahead.

11             THE COURT:  And I was going to say as to FTI, you

12   know, I'm a little hesitant about what's the need for your own

13   real estate adviser, your own adviser in the context of this

14   case, but it seems to me this is the Fund.

15        The Fund's represented by a committee.  They're in the

16   position to know what they believe is best, and I'm not going

17   to second-guess.  I presume that you have talked this through

18   and felt that it's necessary.

19             MS. LORADITCH:  We have.

20             THE COURT:  Okay.  So with that, I'll -- and,

21   certainly, I have no opposition to that particular company, and

22   it is certainly qualified.

23             MS. LORADITCH:  Thank you, your Honor.  One

24    question --

25             THE COURT:  Oh, I'm sorry.  FTI, they're being paid

1    an hourly, correct, not -- this is not a 327 retainer basis?

2              MS. LORADITCH:  That's correct.

3              THE COURT:  Okay.  And all the fees will be subject

4     to review --

5              MS. LORADITCH:  Correct, your Honor.

6              THE COURT:  -- at the end.  Okay.

7              MS. LORADITCH:  That's right.  With respect to the --

8    I'm sorry.  Go ahead.

9              MR. LEVINSON:  I wanted to make one additional

10    disclosure, your Honor, not to --

11             THE CLERK:  Could you make your appearance, please.

12             MR. LEVINSON:  Oh, I'm sorry.  Marc Levinson for

13    Orrick.

14             THE CLERK:  Thank you.

15             MR. LEVINSON:  I learned the other day that the

16     debtor has sued Wells Fargo Bank on account of a postpetition

17     transfer I believe for $100,000.  My firm also represents

18     Wells Fargo Bank.  If it's a bank, we generally represent it.

19       We do not represent Wells Fargo Bank and have not in

20     connection with anything related to these cases, but I wanted

21     to make sure the Court was aware of that.

22             THE COURT:  Okay.  All right.  Thank you.

23             MS. LORADITCH:  With respect to the orders,

24    your Honor, given your schedule, is it possible that we could

25    upload those this morning?

1              THE COURT:  Everybody upload --

2              MS. LORADITCH:  And then we'll --

3              THE COURT:  Everybody should upload things as soon as

4      possible.

5              MS. LORADITCH:  Okay.

6              THE COURT:  And on the other housekeeping matter, if

7      you don't get them -- as long as you've got the certification

8      that everybody signed off, even if you don't get them uploaded

9      by Friday, they'll be signed.

10          But then it will be very important that you have

11     everybody sign off on all the orders, so that we know they're

12     correct.

13             MS. LORADITCH:  Okay.

14             THE COURT:  You do, anyway, but, you know.

15             MS. LORADITCH:  Right.  And we've actually collected

16     signatures --

17             THE COURT:  Okay.  So upload those --

18             MS. LORADITCH:  -- as of this morning, so --

19             THE COURT:  -- today.

20             MS. LORADITCH:  Okay.

21             THE COURT:  Okay.

22             MS. LORADITCH:  Thank you.

23             THE COURT:  Okay.  All right.  So those three are

24     approved, so that's the applications on page 6 and page 6-B,

25     and then we have the application to employ Alvarez & Marsal.

1          MS. KARASIK:  Good morning, your Honor.  Eve Karasik,

2     Stutman, Treister & Glatt, on behalf of the First Trust Deed

3     Committee.

4          The First Trust Deed Committee seeks to employ

5     Alvarez & Marsal as our financial adviser.  We have received

6     one comment I believe from the Unsecured Creditors Committee

7     just admonishing us not to duplicate services among the funds

8     between FTI and Alvarez.

9          We're very sensitive to that, and they are doing their

10    best not to duplicate and understand their fees will be at risk

11    in the event they do.

12         THE COURT:  Okay.  And, of course, the point is their

13    fees are only paid from your particular fund's assets.

14         MS. KARASIK:  Correct, your Honor.

15         THE COURT:  Okay.  All right.  So that's approved as

16    well.

17         MS. KARASIK:  Thank you very much.

18         THE COURT:  All right.  Let's go to the motion to

19    remove Fertitta from the creditors committee, and that's on

20    page --

21         THE CLERK:  5.

22         THE COURT:  -- 5.

23         MS. JARVIS:  Your Honor, if I could, I would like to

24    call Mr. Allison to the stand to provide testimony.

25         THE COURT:  All right.

1          (Colloquy not on the record.)

2               THE CLERK:  (Indiscernible) up here (indiscernible).

3          (Colloquy not on the record.)

4               THE CLERK:  (Indiscernible).

5               MR. ALLISON:  Thank you.

6               THE CLERK:  Would you raise your right hand.

7     Thereupon --

8                         THOMAS J. ALLISON

9     was called as a witness by the Debtor, and having been first

10    duly sworn, testified as follows:

11              THE WITNESS:  I do.

12              THE CLERK:  Would you state your name and spell your

13    last name for the record.

14              THE WITNESS:  Thomas J. Allison, A-l-l-i-s-o-n.

15              THE CLERK:  Thank you.

16                        DIRECT EXAMINATION

17     BY MS. JARVIS:

18    Q.   Mr. Allison, what your position with the debtors?

19    A.   I'm the president and chief restructuring officer of

20    USA Commercial Mortgage and the manager of the two funds.

21    Q.   And in that capacity, have you had the opportunity to

22    become familiar with the business records kept in the ordinary

23    course of business of this debtor?

24    A.   Painstakingly so, Ms. Jarvis.

25    Q.   And either you or your staff under your direction has

1    thoroughly gone through the records of this debtor?

2    A.   Yes, we have.

3    Q.   Okay.  Let me show you what I will have marked as

4    Exhibit A.

5        (Colloquy not on the record.)

6            THE COURT:  Have those been marked, already, you're

7    giving to the witness?

8            MS. CARLYON:  Did you make copies for everyone?

9            MS. JARVIS:  I only have the copies that we got to

10   show, you know, up on the (indiscernible).  I apologize for

11   that.

12           THE COURT:  We need a copy for the witness, though --

13           MS. JARVIS:  Okay.

14           THE COURT:  -- and to be marked.

15           MS. JARVIS:  Well --

16           THE COURT:  I know.

17           MS. JARVIS:  Yeah.  Can he --

18           THE COURT:  But the clerk has to mark it, and --

19           MS. JARVIS:  Okay.  But let me have it marked, and

20   then can I have it back again to show?

21           THE COURT:  Okay.

22           MS. JARVIS:  I apologize.

23           THE CLERK:  Do you want me to go make copies, Judge?

24           THE COURT:  No.  That will take time.

25           THE CLERK:  Okay.

1          MS. JARVIS:  Thank you.

2          THE CLERK:  It will be Exhibit 1.

3      (Debtor's Exhibit No. 1 was marked

4      for identification.)

5          MS. JARVIS:  Thank you.  Okay.  Exhibit 1.

6      (Colloquy not on the record.)

7          THE CLERK:  There you go.

8          MS. JARVIS:  Thank you.

9    BY MS. JARVIS:

10   Q.   Let me show you what's been marked as Exhibit 1.  Do you

11   recognize this document?

12   A.   Yes, I do.

13   Q.   And does --

14          THE COURT:  A or 1?

15          MS. JARVIS:  Just a minute.  It's --

16          THE COURT:  You said A.

17          THE CLERK:  No.  She said --

18          THE COURT:  You mean 1?

19          THE CLERK:  She said 1.

20          MS. JARVIS:  She said 1 because this --

21          THE COURT:  Okay.

22          MS. JARVIS:  Your clerk told me I was to mark it --

23          THE COURT:  Right.

24          MS. JARVIS:  -- with 1.

25          THE COURT:  Okay.

```
1               MS. JARVIS:  So I --

2               THE COURT:  Um-h'm.

3               MS. JARVIS:  -- was obeying instructions.

4               THE COURT:  Okay.

5       BY MS. JARVIS:

6       Q.   And does this come from the business records of the debtor?

7       A.   Yes, it does.

8       Q.   And was this business record kept in the ordinary course of

9       the debtor?

10      A.   Yes.  This record reflects the loan participants in the

11      interest rate in the Hasley Canyon loan.

12      Q.   And I noticed on the far right hand there is a notation of

13      the interest rate that is paid for each investor; is that

14      correct?

15      A.   That's correct.

16      Q.   This is a document that is kept internally at the debtor's?

17      A.   Yes.  The exhibit up until the interest rate is part of the

18      Exhibit A.  The calculate -- the interest rate is the interest

19      rate calculated to be paid each month to the investors on the

20      transaction.

21      Q.   So this would have been kept internally, but it would not

22      have been the Exhibit A that was publicly filed with the deed

23      of trust; is that correct?

24      A.   The -- it would be filed up until the interest rate --

25      Q.   Yeah.  Okay.
```

1    A.    -- the -- the last column.

2    Q.    So in other words, the way it would be filed -- let me just

3    put my hand over it.  It would be filed as if

4    (indiscernible) --

5    A.    That's correct.  The interest-rate column --

6    Q.    -- without that --

7    A.    -- is hidden.

8    Q.    -- without that last column.

9    A.    Yes.

10   Q.    So no one would have publicly seen that interest rate.

11   A.    That's correct.

12   Q.    Can you identify on there Fertitta Enterprises as an

13   investor?

14   A.    Yes.

15   Q.    And can you identify the interest rate that they were paid

16   on this loan.

17   A.    18 percent.

18   Q.    And from your review of this, was there any other investor

19   in this loan that was paid 18 percent?

20   A.    No.

21         THE CLERK:  Is this (indiscernible) 2?

22         MS. JARVIS:  This is the exhibit it came off.  This

23   is Exhibit 2.

24         (Colloquy not on the record.)

25         (Debtor's Exhibit No. 2 was marked

1           for identification.)

2      BY MS. JARVIS:

3      Q.   Let me show you what's been marked as Exhibit 2.  Do you

4      recognize this document?

5      A.   Yes, I do.

6           (Colloquy not on the record.)

7      BY MS. JARVIS:

8      Q.   And was it kept in the -- or is it from the business

9      records of the debtor?

10     A.   Yes, it is.

11     Q.   And it's kept in the ordinary course of those records.

12     A.   That's correct.

13     Q.   Okay.  And what is this document?

14     A.   This is the participants -- the list of investors in the

15     Tapia Ranch investment.  The last column is the interest rate

16     paid to the investors.

17     Q.   And, again, this column when it was publicly filed with the

18     deed of trust, that last column of the interest rate would not

19     have been on the list; is that correct?

20     A.   That's correct.

21     Q.   Okay.  Can you identify Fertitta Enterprises as an investor

22     in this loan?

23     A.   Yes, I can.  They have a $5,000,000 investment.

24     Q.   It's about a third of the way down the page?

25     A.   That's correct.

1    Q.    And can you identify the interest rate that they were paid

2    on this.

3    A.    13 percent.  The remaining investors are all paid

4    12-and-a-half percent.

5    Q.    Now, have you gone through the payment records that exist

6    at the debtor with respect to these loans?

7    A.    Yes, I have.

8          (Dialing interruption at 09:47:50 a.m.)

9    BY MS. JARVIS:

10   Q.    And in reviewing those payments records, was

11   Fertitta Enterprises actually paid the higher interest rate in

12   both of these loans?

13   A.    Yes, they were.

14   Q.    And was any other investor paid or was any other investor

15   paid that higher interest rate --

16   A.    No.  The --

17   Q.    -- in these loans?

18   A.    The interest that was paid by the borrower to the debtors

19   was the either 13 percent or 18 percent depending upon the

20   loans, so that what you -- what you saw in the other two

21   transactions were the service fees being deducted.

22         They were no service fees deducted on the Fertitta loan.

23   They were paid.  They were paid what we -- what USA Commercial

24   Mortgage received as an interest payment.

25   Q.    Let me show you.  Let me have marked --

1          THE COURT:  I'm sorry.  Say that over again.  What

2     about the service rate?

3          THE WITNESS:  The -- on -- on the -- on -- on each of

4     the loans, there was a -- on the loan that Fertitta was

5     18 percent, USA Commercial Mortgage received 18 percent from

6     the borrower as an interest rate.

7          It paid off -- it paid to the balance of the individuals

8     17 percent keeping a one-percent service fee on the

9     transaction.

10          The -- on -- on the second transaction where the interest

11     rate was at 13 percent, Commercial Mortgage kept a

12     50-basis-point service fee on -- on the transaction.

13          In both transactions, what was collected by -- by

14     USA Commercial Mortgage was a pass-through to

15     Fertitta.

16      BY MS. JARVIS:

17     Q.   So on both of these loans, no servicing fee was paid by

18     Fertitta.

19     A.   That's correct.

20     Q.   Okay.  And, in fact, have you reviewed the other loans that

21     are outstanding with Fertitta?

22     A.   Yes.

23     Q.   In any of those cases, did Fertitta pay a servicing fee?

24     A.   No.

25     Q.   So in all of those cases, it was never charged a servicing

1    a fee.

2    A.   That's correct.

3         MS. JARVIS:  Let me just for an example just have

4    marked as Exhibit 3 --

5         (Colloquy not on the record.)

6         MS. JARVIS:  -- so that we can see how this is kept

7    with respect to the payments made, so I'm going to have these

8    marked as Exhibit 3.

9         (Colloquy not on the record.)

10        (Debtor's Exhibit No. 3 was marked

11        for identification.)

12        MS. JARVIS:  Okay.

13    BY MS. JARVIS:

14    Q.   Do you recognize this document?

15    A.   Yes.  This is a payment summary of -- that would go to

16    Fertitta each month.  This is prepared internally by the

17    company to lay out the investment, the original investment, the

18    net ending balance, and the interest you paid year-to-date.

19    Q.   And these are kept in the ordinary course of business of

20    the debtor?

21    A.   Yes.

22    Q.   And they are generated in the ordinary course?

23    A.   That's correct.

24    Q.   And this is the investment statement for Fertitta?

25    A.   That's correct.

1    Q.   Okay.  Can you identify the two loans that we were just

2    talking about on this statement.

3    A.   Sure.  Hasley Canyon is the original investment of

4    $3,000,000 with an interest rate of 18 percent, and you'd have

5    to move up in the -- and you have to move to the $5,000,000

6    transaction which is Tapia Ranch.

7    Q.   Okay.  And these payment summaries show that with respect

8    to Tapia Ranch 13 percent is actually paid to Fertitta on this

9    loan; is that correct?

10   A.   That's correct.

11   Q.   And with respect to Hasley Canyon, 18 percent was actually

12   paid?

13   A.   That's correct.

14   Q.   I've combined these as Exhibit 3.  There are several

15   together.  Let me just pull out for an example, then.

16        (Interruption over the telephone line at 09:52:01 a.m.)

17   BY MS. JARVIS:

18   Q.   Is this --

19             MS. CARLYON:  I'm sorry.

20    BY MS. JARVIS:

21   Q.   Can you identify this document?

22   A.   Yes.  This --

23             THE COURT:  Hang on a second.

24             MS. CARLYON:  I'm sorry to interrupt.  Just for the

25   benefit of everyone who's trying to follow along, it seems

1    like --

2            THE COURT RECORDER:  Could you speak right directly

3    into the microphone, Counsel, please?

4            MS. CARLYON:  I'm sorry.

5            THE COURT RECORDER:  Thank you.

6            MS. CARLYON:  Candace Carlyon for the First Trust

7    Deed Fund.  It appears that the exhibits that we have marked so

8    far, part of this one, were actually exhibits to the debtor's

9    original motion.

10           MS. JARVIS:  That is correct.  Either to the original

11   motion or the supplemental declaration.

12           MS. CARLYON:  It appears that the document that we're

13   looking at now may be Exhibit B to Mr. Allison's supplemental

14   declaration that was filed yesterday.

15           MS. JARVIS:  But --

16           MS. CARLYON:  Could we have counsel just identify the

17   documents by where we have them, so we can follow along?

18           MS. JARVIS:  Yes.  I can do that.

19           THE COURT:  And on the phone, what -- are we having

20   problems again or all those noises are --

21           THE CLERK:  As soon as we mute it, then we lose

22   contact with (indiscernible).  I don't (indiscernible).

23           THE COURT:  Okay.

24           MS. JARVIS:  Okay.

25    BY MS. JARVIS:

1   Q.   Can you identify this document.

2   A.   Sure.  This is the account statement of Donna Cangelosi --

3   Q.   And --

4   A.   -- on --

5   Q.   Oh, go ahead.

6   A.   And it reflects her investments, for example, the -- her

7   investment -- her return on -- on the transaction, well --

8   Q.   And --

9   A.   On the Hasley Canyon transaction, her return was

10  17 percent.

11  Q.   Okay.  And so this demonstrates that while she was paid

12  17 percent Fertitta was paid 18 percent on this same loan; is

13  that correct?

14  A.   Correct.

15  Q.   I'm going to show you just another.  This is also -- is

16  this also a loan summary --

17  A.   Yes --

18  Q.   -- of another --

19  A.   -- it is.

20  Q.   -- investor?

21  A.   That's correct.

22  Q.   And this investor is also in Hasley Canyon; is that

23  correct?

24  A.   That's correct, and his interest, his interest rate, is

25  17 percent.

1    Q.   If I pulled out other such loan summaries on these two

2    loans, from your review of these loans, would those loan

3    summaries show that with respect to the actual payments that

4    Fertitta was paid the higher interest rate in both the

5    Hasley Canyon loan and the Tapia Ranch loan, and that no other

6    investors were paid that higher rate?

7    A.   That's correct.

8         (Colloquy not on the record.)

9         (Debtor's Exhibit No. 4 was marked

10        for identification.)

11   BY MS. JARVIS:

12   Q.   Can I show you what has been marked as Exhibit 4.  Can you

13   identify this document.

14   A.   Yes, I can.  This is the offering summary that would have

15   been made -- that an investor in each -- in this transaction

16   would have received.

17        This is a Hasley Canyon Loan Company, LLC.  It describes

18   the investment.  It -- it describes the loan amount, the

19   interest rate, the maturity, and it further -- further down, it

20   will describe the collateral and the appraisal of the property.

21   Q.   And so from your review -- this is the solicitation

22   document for Hasley Canyon -- is this the only solicitation

23   document that you have found in the files of the debtors?

24   A.   This is the only solicitation document I found in the file

25   of -- of the debtor.

1    Q.   And what rate does it identify for investors?

2    A.   17 percent.

3    Q.   Okay.  Let me show you what's been marked as Exhibit 5.

4    Can you identify this document.

5    A.   Sure.  This is the loan-offering document for USA Capital

6    used to raise $22,000,000 at an interest rate of 12.5 percent

7    on the Castaic Partners property.

8              MS. CARLYON:  I'm sorry.  What exhibit is that --

9              MS. JARVIS:  These --

10             MS. CARLYON:  -- in the various documents --

11             MS. JARVIS:  These --

12             MS. CARLYON:  -- on file?

13             MS. JARVIS:  These were not attached.  These are new

14   exhibits, so these were not previously attached.

15   BY MS. JARVIS:

16   Q.   Go ahead.  Sorry.

17   A.   And this is the -- the borrowers, Castaic Ranch.  This is

18   also known as Tapia Ranch and which is mentioned under the name

19   of the project.

20        It was a loan amount of $22,000,000, and the investors

21   that -- we solicited the -- the company solicited the investors

22   at a net rate of 12.5 percent.

23   Q.   And is this the only solicitation document that you have

24   found with respect to -- and this is actually the Tapia Ranch;

25   is that correct?

1    A.    That's correct.

2    Q.    It's Tapia Ranch is the name it's known by, but the

3    borrower actually is identified --

4    A.    It doesn't --

5    Q.    -- as --

6    A.    Can --

7    Q.    -- Castaic Partners?

8    A.    That's correct.

9    Q.    But it's the same loan.

10    A.    Yes.

11    Q.    And is this the only solicitation document that you've

12    found in your review of the records with respect to

13    Tapia Ranch?

14    A.    Yes.

15          (Colloquy not on the record.)

16          (Debtor's Exhibit No. 6 was marked

17          for identification.)

18     BY MS. JARVIS:

19    Q.    Let me show you what has been marked as Exhibit 6, and this

20    was marked as Exhibit E to the declaration of Mr. Bullard.  Do

21    you recognize this document as the exhibit that you reviewed

22    attached to Mr. Bullard's declaration?

23    A.    Yes.

24    Q.    Have you conducted or have you asked your staff to conduct

25    a search of the debtor's records with respect to this document?

1    A.    Yes.  We were not able to find it.

2    Q.    Okay.  So prior to having seen this attached to

3    Mr. Bullard's declaration, you had never seen this document.

4    A.    No.

5    Q.    And it doesn't exist from your search in the records of the

6    debtor.

7    A.    No.  I actually had my staff complete a -- pull a complete

8    -- complete file of loan offerings, and we were not able to

9    retain -- we were not able to find this particular transaction.

10    Q.    Okay.  Now, does this look like the solicitation document

11    that I just showed you with respect to Hasley Canyon?

12    A.    Yes.  But there's a different -- there's a couple

13    differences on it.  Besides the interest rate being different,

14    the amount of principal is different.  And if you read on, the

15    loan to value is slightly different as well.

16          (Colloquy not on the record.)

17          (Debtor's Exhibit No. 7 was marked

18          for identification.)

19    BY MS. JARVIS:

20    Q.    Let me show you what I've had marked as Exhibit 7, and this

21    actually was marked as Exhibit A to the declaration of

22    Mr. Bullard.

23    A.    This shows a list of individual investors in -- in the

24    transaction which shows Fertitta at $1,000,000 as you can see.

25    There are other investors listed as well such as the --

1          THE COURT:  Which transaction?  I'm sorry.  Did you
2     ask that question, yet?
3              MS. JARVIS:  No.
4              THE COURT:  Oh.
5     BY MS. JARVIS:
6     Q.    Can you identify which transaction is this?  Is this the
7     Tapia Ranch --
8     A.    I believe this is --
9     Q.    -- transaction?
10    A.    -- Tapia Ranch.  That's correct.
11    Q.    And this actually is the way that the Exhibit A or that
12    this document would be attached to a deed of trust; is that
13    correct?
14    A.    That's correct without the interest-rate line visible.
15    Q.    So this is the way it would be recorded and available for
16    public viewing.
17    A.    That's correct.
18    Q.    Now, have you reviewed the declaration of Mr. Bullard and
19    the response filed by Fertitta in this case?
20    A.    Yes, I have.
21    Q.    And did you recognize the argument that was made that there
22    were a higher interest rate paid because of the large amounts
23    that was invested by Fertitta?
24    A.    Yes.  I recognize the argument.
25    Q.    When you look at this -- and did you review, then, this

1  document with respect to the loan-document files as they are

2  kept in the ordinary course of business of the debtor?

3  A.  Yes, I did.  And, actually, when I -- when I read the issue

4  with respect to having a premium pricing for putting a large

5  block of money in, it's fairly obvious that Mr. Scott Canpana

6  (sic) who is the next person on the list has $700,000

7  individually invested into the Tapia Ranch transaction.

8  Q.  And did you review what interest rate Mr. Canepa was paid

9  with respect to this transaction?

10  A.  He was paid at the -- he was paid the lower interest rate.

11       MS. DAVIS:  Excuse me, your Honor.  Laurel Davis on

12  behalf of Scott Canepa.

13       THE COURT RECORDER:  I'm sorry.  You need to be a

14  little bit closer to the microphone, please.

15       MS. DAVIS:  Laurel Davis on behalf of Scott Canepa.

16  I'm very sorry to interrupt, but I believe there's a mistake.

17  Mr. Canepa does not have an investment in Tapia.  He has an

18  investment in Hasley Canyon.

19       MS. JARVIS:  Oh, and this --

20       THE WITNESS:  Ms. Davis --

21       MS. JARVIS:  Yeah.

22       THE WITNESS:  -- he does have an investment in --

23  I've verified it.

24   BY MS. JARVIS:

25  Q.  But she --

1          MS. DAVIS:  In Tapia.

2    BY MS. JARVIS:

3    Q.   I think she's clarifying that we're talking about Hasley --

4    I got confused.  We're talking about Hasley Canyon --

5    A.   Yes.

6    Q.   -- not about Tapia.

7    A.   Hasley Canyon.

8          THE COURT:  So this is Hasley Canyon.

9          THE WITNESS:  Yes.

10         MS. DAVIS:  Yes.

11         MS. JARVIS:  Yeah.  Hasley Canyon.  Right.  So

12   let's --

13         MS. DAVIS:  And the --

14         MS. JARVIS:  -- correct that.

15         MS. DAVIS:  The exhibit was misidentified as Tapia.

16         MS. JARVIS:  Yes.

17         THE COURT:  Thank you.

18         MS. JARVIS:  Yes.  Let me correct that

19   identification.

20    BY MS. JARVIS:

21   Q.   This is Hasley Canyon; is that correct?

22   A.   Yes.

23   Q.   So with respect to -- so have you looked at the payments

24   that would have been made or the interest rate that would have

25   been paid to Mr. Canepa in this loan?

1    A.    Yes.

2    Q.    And was it paid at the same rate or a lower rate than the

3    Fertitta Enterprises?

4    A.    Lower rate.

5         (Colloquy not on the record.)

6         (Debtor's Exhibit No. 8 was marked

7         for identification.)

8     BY MS. JARVIS:

9    Q.    Let me show you what's been marked as Exhibit 8, and this

10   was Exhibit E to your original declaration.  Do you recognize

11   this document?

12   A.    Yes.

13   Q.    And --

14   A.    Yes.

15   Q.    And did this document come from the business records kept

16   by the debtor in the ordinary course of business?

17   A.    Yes.

18   Q.    And what is this document?

19   A.    This document is -- is the agreement between USA Commercial

20   Mortgage and the Los Valles Land Development Company.  This is

21   the -- the exit fee that was negotiated by the -- with the

22   borrower and Fertitta Enterprises sharing in that -- in that

23   exit fee.

24   Q.    And Los Valles Land & Gold, LLC, what is that also known

25   as?  Is that also the Hasley Canyon?

1    A.    Yes, I believe so.

2    Q.    Yeah.  So this would be related to the Hasley Canyon loan

3    that we just discussed.

4    A.    That's correct.

5    Q.    Okay.  Were there any other investors in that transaction

6    that received part of the exit fee?

7    A.    No.

8    Q.    And, in fact, in reviewing the books and records of the

9    debtor, are you aware of any other investors or lenders who

10   received agreements sharing the exit fee with the debtor?

11   A.    No.  The exit fees were an important part, component of the

12   revenue, to USA Commercial Mortgage, and there -- there is only

13   two instances where we saw a sharing of the exit fee with an

14   individual investor, the -- the two transactions we're going to

15   talk about.

16   Q.    In fact, the second transaction -- let me show you what's

17   been marked as Exhibit 9, and this was I believe Exhibit F to

18   your original declaration.  Do you recognize this document?

19   A.    Yes.

20   Q.    And was it also kept in the ordinary course of business in

21   the debtor's business files?

22   A.    Yes, it was.

23   Q.    And can you identify this document and explain what it is.

24   A.    Yes.  This is again an agreement to share the exit fee on

25   this transaction.

1    Q.   And --

2    A.   And it's sharing 22.7 percent of the exit fee of

3    one percent with Fertitta Enterprises.

4    Q.   Okay.  And let me just clarify the highlighting on these is

5    actually not the way they were in the ordinary course.  That

6    was actually my markings on that to make it easier to read; is

7    that correct?

8    A.   That's correct.

9    Q.   Okay.  Was there any other investor in this loan or do you

10   have any evidence that any other investor in this loan was

11   allowed to share in the exit fee?

12   A.   No.  No other investor was.

13   Q.   Okay.  Last week, you were here in the courtroom; is that

14   correct?

15   A.   Yes.

16   Q.   And did you hear counsel for Fertitta with respect to the

17   arguments made on the motion for relief from stay that was

18   filed on behalf of Fertitta?

19   A.   Yes, I did.

20   Q.   Okay.  And is it consistent -- is it your understanding

21   that the position taken by Fertitta is that with respect to --

22   well, let me first ask a foundational question.  Have you

23   reviewed the various loans that Fertitta is in?

24   A.   Yes, I have.

25   Q.   And on some of those loans, were they paid interest that

1    was not yet collected from the borrowers?

2    A.    In every loan.

3    Q.    Okay.  And that's what we would have referred to as the

4    overpayments, the interest --

5    A.    That's correct.

6    Q.    -- overpayments.

7    A.    The -- the net overpayment position for Fertitta is

8    approximately 1.5 million dollars.

9    Q.    Among the various loans.

10   A.    Yes.

11   Q.    Okay.  And, in fact, in your -- let's just go back and

12   explain this.  In your declaration, you explained that with

13   respect to the books and records of the company before Mesirow

14   reviewed those books and records the amount that was shown to

15   be owing was 2.1 million --

16   A.    That's correct.

17   Q.    Is that correct?

18   A.    That's correct.

19   Q.    And that as of last week is what you thought was owing back

20   on this overpaid interest.

21   A.    That's correct.  That was due to the statements.  As we've

22   -- as we've continued to work within the company, one of the

23   things that we've done is gone back and -- and have gone to the

24   four walls of each note.

25        And -- and as -- as payments have come in under the notes,

1    sometimes, they've been styled as principal payments while --

2    while there is interest owing.

3         Under the -- under the -- under the note -- under the

4    notes the way they're structured, the payments should be first

5    applied to interest and then to principal.

6         So what that did was create a -- by -- by applying

7    payments that were styled as being applied to principal to --

8    it reduced the amount of outstanding interest by -- by paying

9    down the -- by making a proper accounting of what should have

10   been paid down under each of the notes.

11   Q.   And so because the borrowers' statements are being

12   restated, that then reflects back on restatement of the

13   investors' statement; is that what --

14   A.   That's correct.

15   Q.   -- you're saying?

16        So the difference between the 1.5 million that you're

17   testifying today and the 2.1 is as a result of these redoing of

18   the borrowers' statements which then impacts the investors'

19   statements.

20   A.   That's correct.

21   Q.   And, in fact, in your declaration that was filed yesterday,

22   at that point, I think it states that it's around

23   500-and-something thousand.

24   A.   Right.

25   Q.   Can you explain --

1    A.    And we --

2    Q.    -- that number.

3    A.    We're continuing to work -- we were continuing to work and

4    on -- on this account up until the time of filing, and we found

5    another payment that -- that was -- was improperly recorded.

6          And that changed it from 500 -- the $500,000 level,

7    approximately, to the million-five, so it's about a

8    million-five that was over -- that was an overpayment.

9    Q.    Does that million-five also include servicing fees that

10   were never collected from Fertitta?

11   A.    Well, there were no servicing fees collected from Fertitta,

12   period.

13   Q.    So would that be included in that 1.5 or could that be in

14   addition to the 1.5?

15   A.    The -- the interest rate was a pass-through.  What we

16   collected from the borrower was 18 percent, and what we paid to

17   Fertitta was -- or what we -- what we accrued on our books is

18   18 percent more precisely so because in most instances we

19   hadn't collected that money, and that was a pass-through to

20   Fertitta.

21          MS. JARVIS:  Okay.  Let me --

22          (Interruption over the telephone line at 10:10:39 a.m.)

23          (Colloquy not on the record.)

24          (Debtor's Exhibit No. 10 was marked

25          for identification.)

1    BY MS. JARVIS:

2    Q.   Did you go through the -- or did you personally or did you

3    direct your staff to go through the business records of the

4    debtor to look for a loan-servicing agreement with Fertitta?

5    A.   I directed my staff to do that.

6    Q.   Okay.  And let me show you what's been marked as

7    Exhibit 10.  I'll show you, and this has not previously been

8    marked as an exhibit.

9         This is the front page of it, and I just show that, so you

10   can see how it's held in the ordinary course.  The second page

11   is this.  It was stapled together.  Do you recognize this

12   document?

13   A.   Yes.  This would be a loan-servicing agreement.

14   Q.   With --

15   A.   And this is one that was entered into between

16   USA Commercial Mortgage and Mr. -- Mr. Fertitta and

17   Mr. Fertitta's Family Trust.

18   Q.   Okay.  And there are several of these relating to the

19   Fertitta entities, right, related entities?

20   A.   That's correct.

21   Q.   So this is an example of one of them, but there are other

22   loan-servicing agreements as well?

23   A.   Yes.

24   Q.   Okay.  And this document by the way was found and kept in

25   the ordinary course of business of the debtors?

1    A.    That's correct.

2          (Interruption over the phone line at 10:12:20 a.m.)

3          (Colloquy not on the record.)

4     BY MS. JARVIS:

5    Q.    Let me show you or refer you -- this is in the same

6    document -- to paragraph No. 4.  Can you identify that

7    paragraph.

8    A.    That's the compensation for -- to USA Commercial Mortgage

9    for its loan-servicing fee which is one quarter of one percent.

10   Q.    And none of this was ever -- from the review you've done to

11   the records -- and I think you've gone back to 2003 by now; is

12   that correct?

13   A.    That's correct.

14   Q.    There have been no servicing fees that have been paid --

15   A.    That's correct.

16   Q.    -- by Fertitta or any of the Fertitta entities.

17   A.    That's correct.

18   Q.    Let me go back, then, to where we started before I laid

19   this foundation reminding you of being in court last week and

20   listening to the counsel for Fertitta who was arguing a motion

21   for relief from stay on behalf of Fertitta.

22          Is it your understanding from not only what was -- well,

23   is it your understanding that it is Fertitta's position that

24   with respect to the 1.5 million that he has been overpaid that

25   when those amounts are collected from the borrowers that

1    Fertitta is also entitled to that second collection of that

2    interest?

3    A.    Yes.

4    Q.    So in other words, it's your understanding that Fertitta is

5    taking the position that it is entitled to be paid for that

6    interest twice.

7    A.    That's correct.

8    Q.    And you've had no conversations with Mr. Bullard that would

9    lead you to believe differently.

10    A.    No.

11    Q.    Okay.  If in this instance -- so is it your understanding

12    that Fertitta's position is that with respect to the

13    1.5 million -- and you're saying on every single loan they have

14    an overpaid amount -- that it's their position that the only

15    way this could be collected is by suing them?

16              MR. GORDON:  Your Honor, I'm going to object.

17    There's no evidence of that is that --

18              THE COURT RECORDER:  I'm sorry, Counsel.

19              MR. GORDON:  -- to sue.

20              THE COURT RECORDER:  Could you speak --

21              THE COURT:  Well --

22              THE COURT RECORDER:  -- into the microphone?

23              THE COURT:  -- you need to be speaking at a

24    microphone.

25         And if the question is what statements he made, that would

1    be an admission.  So if that's the question -- so yeah.  You

2    can only ask him about the statements that were made to him.

3     BY MS. JARVIS:

4    Q.   Was the statement made to you by Mr. Bullard that would

5    confirm your understanding that with respect to the overpayment

6    of the interest that the only way to collect that in Fertitta's

7    view would be to sue them?

8    A.   Not to me directly, but I've heard that through --

9              MR. GORDON:  I'm going to object, your Honor, as

10   hearsay.

11             MS. JARVIS:  Yeah.

12             THE COURT:  Sustained.

13             MS. JARVIS:  Yeah.

14    BY MS. JARVIS:

15   Q.   Let me just ask you.  If the loans were pulled, if relief

16   from stay had been granted on the Fertitta loans, do you

17   believe it would increase the difficulty of recovering back the

18   overpaid interest --

19   A.   Yes.

20   Q.   -- and, also, getting paid any unpaid servicing fees --

21   A.   Yes.

22   Q.   -- that relate to years past?

23        Based on your analysis of the records that you and your

24   staff has done to date, how many direct investors are there?

25   A.   Approximately, 3600 direct investors.

1    Q.    And how many of those -- based on what you know to date,

2    can you estimate how many of those direct investors may have

3    had diverted principal, the group that we consider to be

4    underpaid?

5    A.    A substantial number of them.

6    Q.    Would it be in the hundreds?

7    A.    No.  In the thousands.

8    Q.    Yeah.  And is it a greater number than you had originally

9    anticipated?

10   A.    Yes.

11   Q.    And what did you find that revised your estimate of that?

12   A.    As -- as we've gone through transaction by transaction, we

13   originally saw three deals, three transactions, that had

14   diverted principal.

15         As we've delved -- you've delved into the books and

16   records, we've uncovered a substantial number of other

17   transactions that, you know, either were misrepresented on the

18   books and records and should have been written off and over a

19   period of time that weren't collected or where the principal

20   had been diverted partially.

21   Q.    And do you have any estimate today -- I think the original

22   estimate you gave was around $50,000,000 in this category.  Is

23   the amount higher than that --

24   A.    Oh.

25   Q.    -- based on your current knowledge?

1    A.    Our current estimate is it continues to be around

2    50,000,000.  But as we continue to work on the amounts of

3    shortfall, that -- the number -- the amount of shortfall is

4    growing in -- in -- in excess of $50,000,000.

5              THE COURT:  50, did you say?

6              THE WITNESS:  5-0 million.

7     BY MS. JARVIS:

8    Q.    Let me then just lastly go back to the servicing-fee issue.

9    Have you or your staff reviewed as part of going through the

10   investor reconciliations reviewed issues with respect to

11   servicing fees that are paid by each investor --

12   A.    Yes.

13   Q.    -- including direct investors?

14   A.    Yes.

15   Q.    Based on your review, are you aware of any other investor,

16   direct investor, who did not pay a servicing fee or a servicing

17   fee was not collected from in the course of business of this

18   debtor?

19   A.    No.

20              MS. JARVIS:  Thank you.

21        That's all I have, your Honor.

22              THE COURT:  Before I have cross, would you explain

23   the exit fees and how that works in any particular transaction.

24   Obviously, the documents speak for themselves, but I don't have

25   the advantage of having --

1            THE WITNESS:  Sure.

2            THE COURT:  -- the whole contract.

3            THE WITNESS:  Your Honor, the exit fees are part of

4    the -- the way that USA Commercial Mortgage operates its

5    business, it -- it basically generated its revenue from fees.

6        Origination fees on the fund end of a transaction, those

7    origination fees could be up to -- up to ten basis points of

8    the transaction.

9        And exit fees on the back end of the transaction and the

10   exit fees on the back end of the transaction were a principal

11   source of revenue for the company.

12           THE COURT:  Now, do you mean when the loan was paid

13   off?

14           THE WITNESS:  When the loan --

15           THE COURT:  Is that when they're due?

16           THE WITNESS:  -- was paid off.  Essentially, what

17   they were charging was a success fee --

18       (Interruption over the telephone line at 10:18:47 a.m.)

19           THE WITNESS:  -- at the end of the transaction.

20           THE COURT:  Okay.  And to whom are those fees paid --

21           THE WITNESS:  In -- in all --

22           THE COURT:  -- as between the borrower and USA.

23           THE WITNESS:  The --

24           THE COURT:  And then we'll go into USA and this other

25   side or how did this all work?

1          THE WITNESS:  The -- the borrower at the -- at -- at

2     the closing -- at the paying off of a loan, the borrower would

3     pay to USA Commercial Mortgage a success fee.

4          The success fees in several -- in some transactions are --

5     are a percentage point.  Some are profit sharing.  Some are --

6     some are a fixed dollar amount.

7          But those fees were part of the revenue base of USA -- a

8     significant part of the revenue base of USA Commercial

9     Mortgage.

10          So that at -- at -- at the closing of a transaction and

11     the net payoff, it would pay off the principal balance plus any

12     -- the accrued interest, any -- any other types of fees which

13     may have been an extension fee as well as the exit fee which

14     would have been another fee that would have been -- been

15     payable at -- at the consummation of a transaction.

16          THE COURT:  And what you're saying is the documents

17     -- under these documents, Fertitta gets a portion of those

18     fees, but not all the fees.

19          THE WITNESS:  No.  There was a -- it was a

20     fee-sharing arrangement between Fertitta and -- and

21     USA Commercial Mortgage.

22          THE COURT:  Okay.  Okay.  Thanks.

23          You can see why I said that it's a good thing I have my

24     clerks here, so they don't stare blankly because I can't ask

25     questions, and I can't explain things well, so they need to

1    hear for themselves, so --

2        MS. JARVIS:  Well, I should have done a better job of

3    having him explain it --

4        THE COURT:  No, no.

5        MS. JARVIS:  -- to you --

6        THE COURT:  That's fine.

7        MS. JARVIS:  -- your Honor.

8        THE COURT:  All right.  Let's take a short recess,

9    and then we'll do cross.  I'm not clear where we're -- I assume

10   the U.S. Trustee's Office is doing cross --

11       MR. LANDIS:  Oh, yes.

12       THE COURT:  -- and Mr. Gordon.

13       And, you know, I would think that the lenders' committees

14   would have the right to since their constituency, in essence,

15   is -- since the lenders are the direct -- the funds are

16   participants in some of those mortgages.

17       They may have an interest in it whether or not you do or

18   not, but I would certainly understand if you did.  All right.

19   So let's take about a five-minute break and let you get your

20   questions together --

21       (Colloquy not on the record.)

22       THE COURT:  -- and then proceed.

23       THE CLERK:  All rise.

24       (Recess at 10:21:05 a.m.)

25       (Court reconvened at 10:44:15 a.m.)

1           THE CLERK:  Bankruptcy court is now in session.

2       (Colloquy not on the record.)

3           THE COURT:  Okay.  Be seated.

4       (Colloquy not on the record.)

5           THE COURT:  All right.  Additional appearances.

6           MR. GILLOON:  Thomas Gilloon, your Honor, on behalf

7   of the McKnight 2000 Family Trust.

8           THE COURT:  Okay.

9           MR. GILLOON:  I spoke with Ms. Jarvis concerning our

10  motion that's on calendar for today, also.  We have agreed to

11  continue that until August 4th --

12          THE COURT:  Okay.

13          MR. GILLOON:  -- when the hearing will be held on the

14  other.

15      She indicated to me that the interest that's being

16  earned in the Collection Account is going to be held until that

17  time.

18          THE COURT:  Yes.  Is that correct, Ms. Jarvis?

19          MS. JARVIS:  That is correct.

20          THE COURT:  All right.  So that motion --

21          MR. GILLOON:  Thank you --

22          THE COURT:  -- is --

23          MR. GILLOON:  -- your Honor.

24          THE COURT:  -- the motion --

25          THE CLERK:  Could --

1           THE COURT:  -- on --

2           THE CLERK:  Could you tell me which motion that that

3   is?

4           MS. JARVIS:  It's the first.  I think it's the first.

5   It was the first -- it was the first matter on the calendar

6   today.  I think it's the motion of Richard McKnight.

7           MR. GILLOON:  Yes.

8           THE COURT:  The second page --

9           MR. GILLOON:  Or --

10          THE COURT:  -- or at page 2.

11          THE CLERK:  Page 2?

12          THE COURT:  Yes.

13          THE CLERK:  Directing the --

14          THE COURT:  The motion directing.

15          THE CLERK:  Okay.

16          THE COURT:  Okay?

17          MR. GILLOON:  And that's August 4th at 9:30 or

18  9:00 o'clock?

19          THE COURT:  9:30, I guess.

20          MR. GILLOON:  Thank you --

21          THE COURT:  Thank you.

22          MR. GILLOON:  -- your Honor.

23          MR. BENINCASA:  Jasper Benincasa --

24          THE COURT:  Okay.

25          MR. BENINCASA:  -- representing myself.

```
1              THE COURT:  All right.

2              THE CLERK:  You --

3              THE COURT:  Thank you.

4              THE CLERK:  You have the matter --

5              MR. BENINCASA:  Thank you, your Honor.

6              THE CLERK:  -- on page 3.

7              THE COURT:  Yes.  I understand.  Okay.

8         Before we start on this phone problem, let me task the

9    Holders of Executory Contract Interest Committee -- I must

10   admit if you did that in an acronym it sort of sounds like --

11        (Colloquy not on the record.)

12             THE COURT:  The acronym sounds like Antonio Banderas

13   in Shrek II playing Puss in Boots.

14        (Colloquy not on the record.)

15             THE COURT:  Anyway, let me task that committee with

16   solving this phone problem.  A review of the bidding -- and I

17   don't think Mr. Gordon was here --

18             THE CLERK:  (Indiscernible).

19             THE COURT:  -- the government has finally --

20             THE CLERK:  Mr. Gordon is here.

21             THE COURT:  No.  He wasn't here when we had --

22             THE CLERK:  Oh, I'm sorry.

23             THE COURT:  -- this discussion.

24             THE CLERK:  I'm sorry.

25             THE COURT:  Wasn't here.
```

1          He wishes he wasn't here now, but --

2          (Colloquy not on the record.)

3          THE COURT:  The government has allowed us to use one

4    of four phone systems to do conference calls.  Now, we

5    presently have a system we can use, Sprint.

6          But what happens with our Sprint system is it gets billed

7    to the government, and I'm a little reticent to impose the

8    costs, the costs of phone calls, on all the taxpayers.

9          And, also, it impacts our budgets directly because

10   there's less money in the sky for us to do the things we need

11   to do, so I think it's more appropriate to use the system in

12   which the people who use the phone system pay.

13         So the government has authorized four separate companies

14   which can be used and purportedly have the technical expertise

15   to do this.

16         However, before we can sign up any of those companies, we

17   have to go through this process by which we say that they're

18   the best because either they're the cheapest or there's -- it

19   meets the -- they don't have technical problems.

20         (Interruption over the telephone line at 10:47:05 a.m.)

21         THE COURT:  Well, we can't do that, and they refuse

22   to let us just do Court Call because we can't say that the

23   other phone companies don't work.  And, of course, you can't do

24   that until you've had the system, and the system failed.

25         So I'll task Mr. Gordon.  I've given you a list.  I don't

1    care which company, but then, again, if the committee picks a

2    phone system that takes out of the government's procurement

3    problem.

4         And the only reason I'm tasking Mr. Gordon is it's mainly

5    your constituents that would like to be on the phone.  It's not

6    cheap, but then, again, the way we're doing it now it's being

7    borne by all the debtors which may be all right, too.  But the

8    other way, these various Court Call systems charge back, and

9    they take care of everything.

10        And we're apparently having problems with the company

11   Mr. Schwartzer's office has selected, so, you know, any

12   particular -- and I'm not saying there's any problem with what

13   he selected.  You never know until you get on these phone calls

14   what's going to work or not.

15        But let me just task that back to you for the next

16   hearing.  You get a whole month to figure that out if you don't

17   mind.

18             MR. GORDON:  We'll take on that task.  Obviously,

19   we'll work with the debtor in terms of the cost and that type

20   of thing.  As I understand, it's 100 portals.  Is that what the

21   Court is --

22             THE COURT:  We never --

23             MR. GORDON:  It's what's --

24             THE COURT:  -- know.

25             MR. GORDON:  We never know, but we've set up up to

1    100 portals.  Obviously, that gets very expensive because we've

2    dealt --

3              THE COURT:  Especially --

4              MR. GORDON:  -- with that before.

5              THE COURT:  -- with all these hours, so that's

6    something to discuss and hope -- you know, you --

7              MR. GORDON:  We'll work it out.

8              THE COURT:  You may decide that, you know, that --

9    well, again, if everybody pays their own way, then, certainly,

10   they can be on.

11       You may decide you want to go to that system, so that the

12   estate is not bearing that cost.  And, again, with these

13   five-hour hearings, it gets very expensive.  But by the same

14   token, people -- you know, it's good for them to be able to

15   listen, so --

16             MR. GORDON:  I appreciate that, your Honor.

17             THE COURT:  All right.  So cross-examination of

18   Mr. Allison.

19       And I don't know if anybody's on the phone now.  We've

20   been losing the calls.  We attempted to switch phone companies.

21   We can't do that this late minute.

22       And so they're just going to -- unfortunately, we're just

23   in a position where they may or may not be able to listen to

24   what's going on today.

25             MR. GORDON:  Good morning, Mr. Allison.

```
1              THE WITNESS:  Good morning, Mr. Gordon.  How are you?

2              MR. GORDON:  Fine.  How are you?

3              THE WITNESS:  Good.

4         (Colloquy not on the record.)

5                        CROSS-EXAMINATION

6    BY MR. GORDON:

7    Q.  Mr. Allison, let's take a look at what's been --

8              THE COURT RECORDER:  Mr. Gordon, I'm sorry.  Could

9    you move the microphone --

10             MR. GORDON:  No.

11             THE COURT RECORDER:  -- directly towards you?

12             THE COURT:  Ooh --

13             MR. GORDON:  Sorry.

14             THE COURT:  -- and I'm sorry.  I didn't necessarily

15   mean for you or Mr. Landis to go first.  It doesn't make a

16   difference I assume?

17             MR. LANDIS:  If Mr. Gordon's ready, your Honor --

18             THE COURT:  Okay.

19             MR. LANDIS:  -- let's just keep --

20             THE COURT:  That's fine.

21             MR. LANDIS:  -- the ball rolling.

22        (Colloquy not on the record.)

23   BY MR. GORDON:

24   Q.  Let's take a look at what's been marked as Exhibit 10, and

25   this is a loan-servicing agreement, an LSA, and I believe it's
```

1   dated June 29, 1996?

2   A.   That's what it says.

3   Q.   And where did you obtain this?

4   A.   From our -- from the files of USA Commercial Mortgage.

5   Q.   And were there other loan-servicing agreements in the

6   files?

7   A.   Yes.

8   Q.   Were there later ones?

9   A.   For various -- I'm not sure what you mean --

10  Q.   Well --

11  A.   -- by later ones.

12  Q.   -- later-dated ones, ones that were dated later on.

13           THE COURT:  For whom?

14   BY MR. GORDON:

15  Q.   For Mr. Fertitta or signed by Mr. Bullard,

16  Fertitta Enterprises.

17  A.   I don't recall, but I -- I believe this is what we had, and

18  we pulled -- when we pulled the file out, this is what we

19  found.

20  Q.   And this is dated 1996.  Do you know if this complies with

21  the statutory changes to NRS 645 that were done in 1999?

22  A.   I don't have a factual basis on that.

23  Q.   Okay.  And this is signed by Frank J. Fertitta, Trustee.

24       (Interruption over the telephone line at 10:50:28 a.m.)

25  BY MR. GORDON:

1    Q.   Do you know if of the -- if we look at the second page, you

2    see Frank J. Fertitta and Victoria K. Fertitta Family Trust by

3    Frank J. Fertitta, Trustee.  Do you know if this is applicable

4    to Fertitta Enterprises?

5    A.   It was in the Fertitta Enterprises file, Mr. Gordon.

6    Q.   Okay.  And were there other -- I just want to make it

7    clear.  Were there other loan-servicing agreements in the

8    Fertitta Enterprises file?

9    A.   You know, on a loan-by-loan basis, there would have been

10   one for other -- for other transactions as well.

11   Q.   Were there ones for the Tapia loan?

12   A.   There would have been a loan-servicing agreement for each

13   of the loans.

14   Q.   Do you have the loan-servicing agreement for Tapia with you

15   today?

16   A.   I don't believe that I do.

17   Q.   Do you have the loan-servicing agreement for Hasley with

18   you today?

19   A.   I don't believe that I do.

20   Q.   Do you know if those two loan-servicing agreements are the

21   same as this Exhibit 10?

22   A.   They would have been very similar.

23   Q.   Do you know if they're the same?

24   A.   I can't say for certainty today that they're the same.  But

25   in reviewing loan-servicing agreements for, virtually, all the

1    companies -- for all the loans, they're very similar.

2    Q.    Your counsel directed you to paragraph 4 of this

3    document --

4    A.    That's correct.

5    Q.    -- which says that the annual servicing fee is in the sum

6    of one quarter of one percent.

7    A.    That's correct.

8    Q.    Is that the same loan-servicing fee that was applicable to

9    Tapia?

10    A.    No.  There -- there -- in each of the loans, there were

11    various loan-servicing fees, Mr. Gordon.

12    Q.    Okay.  Now, the Court asked you a couple of questions with

13    regard to the exit fee.  Is it my understanding with regard to

14    the exit fee that it is earned by USA Capital Mortgage when all

15    the principal and interest has been paid to the direct lenders?

16    A.    Yes.

17    Q.    And until they have received all their principal and

18    interest, and servicing fees are taken out by USA Capital, then

19    that's when the exit fee applies.

20    A.    Yes, sir.

21    Q.    And it's also my understanding that the percentage set

22    forth in the two loan-servicing fees that were identified,

23    Exhibits 8 and 9 -- this is Exhibit 8 -- that the percentage

24    being paid to Fertitta Enterprises, Inc., is its percentage of

25    the actual loan.  It's equivalent to the percentage of the

1    loan.

2    A.    That's correct.

3    Q.    Okay.  And it has no rights to receive a portion of the

4    loan-servicing fee until USA Capital is entitled to receive a

5    percentage of the loan-servicing fee (sic).

6    A.    You mean the exit loan --

7    Q.    Yeah.  I'm sorry.

8    A.    -- exit fee.

9    Q.    The exit.  I apologize.

10    A.    It's a loan exit fee, Mr. Gordon, and --

11    Q.    Yes.

12    A.    And it has the same rights as USA Commercial Mortgage as --

13    as a co-lender would.

14    Q.    And the same applies with regard to Exhibit 9 loan

15    transaction --

16    A.    Yes.

17    Q.    -- the same --

18    A.    The same exit fee.

19    Q.    -- the same exit.  Mr. Allison, you were in court last

20    week, were you not?

21    A.    Yes.

22    Q.    And you've also had occasion to review both the motion

23    filed by your counsel on your behalf to remove

24    Fertitta Enterprises from the committee as well as the reply

25    filed a couple days ago?

1    A.    Yes.

2        (Interruption over the telephone line at 10:54:47 a.m.)

3    BY MR. GORDON:

4    Q.    And you agreed with the statements contained in the reply.

5    You read it.  You agree with it, correct?

6    A.    Yes.

7    Q.    If you had had a disagreement, you would have requested

8    that the statement be changed.

9    A.    That's correct.  When I -- when I read the reply and when

10    -- and you -- actually, that's when I noticed the difference

11    between the -- the loan-solicitation agreement because we don't

12    have one of those.  We don't have that particular

13    loan-solicitation document in our file.

14    Q.    Okay.  On page 4, let me read to you what's quoted in

15    paragraph 2 of the reply starting at line 10.  "Although USA

16    has not completed its investigation of Fertitta's connections

17    with USA's former management, it is apparent that the

18    willingness of USA's former management to pay elevated interest

19    rates to Fertitta was not based solely on the amount of funds

20    direct lenders invested in the loans?"

21        (Interruption over the telephone line at 10:55:55 a.m.)

22            THE COURT:  I'm sorry.  Please, we're on a -- this is

23    a listen only, so please put yourself on mute.

24            MR. GORDON:  One of the things that can be done with

25    the phone system is make it listen only.

```
 1              THE COURT:  Well, unfortunately, we tried that, but
 2    the problem was it cut everybody off.
 3              MR. GORDON:  Okay.
 4              THE COURT:  You know, your government dollars at
 5    work, you know.
 6              MR. GORDON:  We'll try to do it in the private sector
 7    at half the price.  How's that?
 8          (Colloquy not on the record.)
 9              THE COURT:  Just don't use --
10    BY MR. GORDON:
11    Q.    Let me again --
12              THE COURT:  -- the USA Commercial model.
13    BY MR. GORDON:
14    Q.    Let me read that to you again.  "Although USA has not
15    completed its investigation of Fertitta's connections with
16    USA's former management, it is apparent that the willingness of
17    USA's former management to pay elevated interest rates to
18    Fertitta was not based solely on the amount of funds direct
19    lenders invested in the loans."  What investigation is ongoing?
20    Can you explain that to us.
21    A.    There's been a close relationship between Mr. -- or what --
22    what Mr. Milanowski has reported to me is a close relationship
23    between him and Mr. Bullard.
24          As a matter of fact before -- before Mr. Bullard -- before
25    the -- the company filed for Chapter 11, Mr. --
```

1    MR. GORDON:  Move to strike that the answer is not

2    responsive, your Honor.  I asked him what investigation.

3    THE COURT:  Okay.  Sustained.

4    BY MR. GORDON:

5    Q.   What investigation again have you started?

6    A.   Discussions with previous -- with the previous management.

7    Q.   And do you have any declarations from previous management

8    with regard to that?

9    A.   No, I do not.

10   Q.   And when was the last time you had those discussions with

11   previous management?

12   A.   Over -- a week ago.

13   THE COURT:  Somebody must be in a submarine.  Please,

14   everybody put your phones on mute that's listening in.

15   THE CLERK:  Maybe they're taking a shower.

16   BY MR. GORDON:

17   Q.   Are there any documents that you have or you've discovered

18   which would indicate an apparent willingness to pay elevated

19   interest rates to Fertitta was not based solely on the amount

20   of funds that direct lenders invested in the loans?

21   A.   Outside of the relationship that Mr. Milanowski said he had

22   with Mr. Bullard, no.

23   Q.   The loan rate stated in the note for the Hasley loan was

24   18 percent, correct?

25   A.   Yes.

1    Q.    Fertitta Enterprises received 18 percent, correct?

2    A.    That's correct.

3    Q.    The other investors received 17 percent, correct?

4    A.    That's correct.

5    Q.    And USA Capital was entitled to one percent as a service

6    fee.

7    A.    Right.  There was a difference between 18 and 17.

8    Q.    Tapia, the interest rate was 13 percent in the note.

9    A.    That's correct.

10    Q.    The servicing fee was one point.

11    A.    The servicing fee was a half a point.

12    Q.    Half a point in Tapia.

13    A.    That's correct.

14    Q.    Okay.  The note applicable to all of the Tapia investors

15    stated 13 percent.

16    A.    13 percent less the servicing fee.  That's correct.  As a

17    matter of fact, the solicitation document, it said

18    12.5 percent.

19    Q.    Is there any document that you've discovered in the files

20    which would indicate why USA Capital paid 18 percent to

21    Fertitta with regard to Tapia and 13 percent to Hasley, instead

22    of the 17 and the 12.5?

23    A.    No.

24    Q.    So you have no evidence today to explain why.

25    A.    No.  Just the fact that it exists.

1    Q.    All right.  Now, let me put up what's been marked as

2    Exhibit 3, and this sets forth the five loan transactions in

3    which Fertitta is a direct lender; is that correct?

4    A.    Yes.

5    Q.    With regard to the Brookmere/Matteson, do you know what the

6    total outstanding loan, original loan balance, of that loan

7    was?

8    A.    I don't have the records on it at the moment.  I'm sorry,

9    Mr. Gordon.

10   Q.    Do you know if Fertitta was the largest investor in that

11   loan?

12   A.    I don't -- I can't say that --

13   Q.    Okay.

14   A.    -- off the top of my head, sir.

15   Q.    All right.  With regard to Colt Gateway, do you know what

16   the original loan balance or loan amount was?

17   A.    No, I don't, but I do know on Colt Gateway they were the

18   largest investor.

19   Q.    Okay.  Hasley, they're the largest investor.

20   A.    That's correct.

21   Q.    Marlton Square, were they the largest investor?

22   A.    I don't know that.

23   Q.    And Tapia?

24   A.    They were the largest investor.

25   Q.    Okay.  Now, over in the far right corner, it says amount

1    paid, and it says year-to-date interest 11,169.32, and then

2    below that it shows interest payments for 02/01, 2006, 02/28,

3    2006, of $3,363.69 and $81.61.

4        If you add those two numbers up, the total is just around

5    $3450, so what is represented by the difference between the

6    year-to-date interest of 11,169.32 and those two numbers?

7    A.   I'd have to go through the math and go through the math on

8    what the -- what the deductions are.

9    Q.   But it would be fair to assume, is it not, that what's

10   missing here since this is through February 28th, and this

11   appears to be a February statement that the difference was paid

12   as interest in January?

13   A.   From -- essentially, yes.

14   Q.   Okay.  Now, so if we go down to Hasley Canyon, we have a

15   year-to-date interest of 138,735, correct --

16   A.   Correct.

17   Q.   -- of which 43,162 was paid in February --

18   A.   February.

19   Q.   -- it appears?

20   A.   Correct.

21   Q.   Now, what would be the one-percent service charge on the

22   138,735?

23   A.   It would be -- it would be -- if it was one -- if it was a

24   one-percent service charge, it would be one-twelfth of

25   one percent charged each month.

1    Q.    That's right.  So, in essence, wouldn't it be 138,753

2    divided by 18?  Since it's 18 percent, it would be one percent,

3    so you divide the 138 by 18, and one-eighteenth of it would

4    represent the service charge.

5    A.    Or -- or -- or -- or one percent of the --

6    Q.    Right.

7    A.    -- of the balance which would be one -- one percent of

8    the --

9    Q.    Either way, what would approximately -- and I'm not trying

10   to test your math skills.  But just to give the Court a sense

11   for what we're talking about --

12   A.    Correct.

13   Q.    -- how much would that be?

14   A.    I think you are testing my math skills.  If -- if you just

15   take the -- take the principal balance of -- beginning

16   principal balance of $1,000,000, and one percent per annum

17   would be $100,000.  And if you divide $100,000 by twelfths,

18   that would be the amount of -- that would be the -- the amount

19   each month.

20   Q.    Okay.  About $8,000 or about --

21   A.    Right.

22   Q.    -- 16,000 total, 17,000.  And on Tapia, the 162, it would

23   be half-a-percent service fee, correct?

24   A.    Correct.

25   Q.    So it would be just around $5,000.

1    A.    Right.

2    Q.    Okay.  So were there any payments made after February on

3    any of these loans?

4    A.    No.

5    Q.    So we're talking about in 2006 somewhere around a

6    difference based on the service fee of about 17-, $18,000.

7    A.    Yes.

8    Q.    Okay.  I'm a little bit confused, and I appreciate your

9    explaining again.  Last week, the statement was made that the

10    Fertitta Enterprises was overpaid about 2.1 million.  And in

11    your declaration dated June 20, it states 588.

12        Now you said based on a further review --

13    A.    Sure.

14    Q.    -- it's 1.5.  Can you explain again for me the difference

15    between the 588 and the 1.5.

16    A.    Sure.  Mr. Gordon, it -- one of the things that we're doing

17    as -- as I share -- as -- as Ms. Jarvis shared with the Court

18    is we're going through and doing T-accounts on all of these

19    transactions.

20        And one of the things that we've done in terms of -- it --

21    it's been a recreation process because as payments were made on

22    -- on various loans they were styled as principal payments

23    wherein in the note the note basically said it just applied --

24    it should have been applied first to interest.

25        So what we've -- what essentially has happened is the

1    amount of interest has -- the amount of interest that would be

2    -- that was overpaid has gone down by the interest payments as

3    we've properly applied them according to the note, and the

4    balance of the principal of the note has gone up.

5         The difference in -- in the transactions whereas we were

6    going through and preparing for today the -- and going through

7    the -- going through the transactions, the $500,000 that we

8    reported earlier when we went back to 2003, we found a

9    $1,000,000 payment that we -- that should have been -- that was

10   -- that was styled as principal which should have been applied

11   to interest.

12        So that -- that's -- essentially, that's where we -- we --

13   we've gone through, and I could have to -- I'd walk you through

14   the math on all of the transactions --

15   Q.   No.  That's fine.

16   A.   -- to do it.

17   Q.   Let me just get the principal down.  So a payment was made

18   by the borrower of $1,000,000, correct?

19   A.   Right.

20   Q.   And on that borrower's ledger on that loan, it had a

21   principal balance say of $2,000,000 and an interest accrual of

22   1.2 --

23   A.   To --

24   Q.   -- million dollars.

25   A.   To -- to -- to be simple, let -- let's just take a

1    hypothetical transaction.  The borrower had made a payment.  He

2    had a $100 loan, made a $10 payment.  It -- it owed -- it -- it

3    owed on -- it owed $50 in interest, and it had $100 of

4    principal.  It made a $10 payment.

5         It put on it -- it's styled on its note that $10 -- this

6    is -- I'm -- I'm paying $20, $10 to interest and $10 to

7    principal.

8         Since he was owed 50 -- he owed $50 of interest, that

9    money should have been first applied to interest as opposed to

10   applying $10 to interest and $10 to principal.

11        And, unfortunately, with the -- what company -- company's

12   management did was not enforce the terms of the note and took

13   the -- took the payment instructions from the borrower at face

14   value and applied it $10 to interest and $10 to principal.

15   Q.   Applying the principal to a principal decreases the amount

16   of principal which increases the accrued interest going

17   forward.

18   A.   Correct.

19   Q.   Okay.  But what did not happen was in that instance the

20   money came from another borrower and was misapplied to a

21   different loan.  It's a calculation on the loan itself.

22   A.   That's correct.

23   Q.   It's a correction on the loan itself.

24   A.   That's correct.

25   Q.   So as of this time, that $1,000,000 is a loan adjustment

1    that needs to be made amongst that loan itself.

2    A.   That specific loan.  That's what we're doing --

3    Q.   Okay.

4    A.   -- on a loan-by-loan basis.

5    Q.   Okay.  That doesn't mean that Fertitta or any of the other

6    lenders on that loan that you're talking on those loans owe

7    money to someone else.

8    A.   There -- there were -- essentially, on each of the Fertitta

9    loans, they -- they were in a net -- they're in a position

10   where they have been paid more interest than we've collected.

11   Q.   But, ultimately, the balance due on the loan is the same --

12   A.   That's correct.

13   Q.   -- because it's principal and interest.

14   A.   That's correct.

15   Q.   Actually, they've been harmed, haven't they, because by

16   applying it to the principal -- and so has USA Capital been

17   harmed because by applying it to principal they've reduced what

18   would be the normal interest accrual on a going-forward basis.

19   A.   That's correct.

20   Q.   And that would relate to your servicing fees, too.

21   A.   That's correct.

22   Q.   There's no evidence that this was only done for the benefit

23   of Fertitta.  It was done as to the loan itself.

24   A.   It was done -- it was done systematically, and that's why

25   we're -- we're recreating the books to accurately reflect the

1    -- the due-tos and due-froms.

2    Q.   Okay.  So that's an adjustment that needs to be made.

3    A.   Yes.

4    Q.   So how do we get that Fertitta owes 1.5 million dollars?

5    A.   When we've gone through each of the -- when we've gone

6    through each of the notes, and we've -- and we looked at what

7    we paid out in interest versus what we've collected in interest

8    from the borrowers, Mr. -- the Fertitta net position is

9    1.5 million dollars in overpayment of -- in -- in being paid

10   interest that -- that USA Commercial Mortgage did not collect.

11   Q.   So when you adjust it, you're going to take their

12   principal, increase it by the 1.5, and decrease the amount of

13   interest paid, so their interest goes up.

14   A.   Correct.

15   Q.   So the borrower owes Fertitta -- I'm sorry.  Strike that --

16   owes Fertitta more principal and less interest.

17   A.   Correct.

18   Q.   You testified that of the 3600 direct lenders a substantial

19   number have been underpaid.

20   A.   That's correct.

21   Q.   How many of those lenders have been overpaid?

22   A.   A number have been overpaid on -- on the nonperforming

23   loans where the interest was continued to --

24   Q.   Oh, do you have --

25   A.   -- what --

1    Q.    Do you have an estimate of how many hundreds of direct
2    lenders have been overpaid?
3    A.    We're -- we're working through the final number on that.  I
4    gave Ms. Jarvis an estimate, and it's in the thousands, and I
5    -- I -- I would hold that as an estimate.
6    Q.    And to the extent that Fertitta owes service fees on its
7    18-percent interest and its 13-percent interest because those
8    were not deducted from it, that's money that's owed to
9    USA Capital Mortgage.
10   A.    That's correct.
11   Q.    And that could be adjusted as payments are received going
12   forward, can it not?
13   A.    Potentially, yes, it could.
14   Q.    Yeah.  Let me read paragraph 47 from your fifth
15   declaration, the one that was just filed.  "For the reasons
16   stated above, based on my business judgment as the
17   chief restructuring officer of these debtors and of USACM, in
18   particular, Fertitta does not adequately represent the interest
19   of the direct lenders who are the true creditors of USACM
20   because their principal repayments were diverted prepetition
21   and who have the most to lose or gain by the success of the
22   debtor's reorganization efforts."  Who are you referring to as
23   the true creditors of USACM?
24   A.    The individual -- Mr. Gordon, the individual investors
25   where their collateral has been diverted where the -- where the

1    -- they have -- the loan has been paid off, the collateral is

2    released, and they are a true unsecured creditor.

3    Q.    Okay.  We're talking about the sold-out, the ones who had

4    USA Capital Mortgage receive payments, released the deed of

5    trust, the note's paid off, and they never saw their money.

6    A.    That's correct.

7    Q.    Okay.  They have no collateral left.

8    A.    Their collateral was released.

9    Q.    They're purely unsecured.

10   A.    The borrower paid the --

11   Q.    Okay.

12   A.    The borrower repaid the loan.  He had a -- he had his liens

13   released, and the money was never paid back to those investors.

14   Q.    Okay.  Do you know who the U.S. Trustee composed the

15   Executory Contracts or I call the Official Committee of

16   Direct Lenders who it composed that committee of?

17   A.    A series of direct lenders.

18   Q.    Are any of those direct lenders true creditors?

19   A.    I believe that Terry is.

20   Q.    On one loan.

21   A.    Yes.

22   Q.    On the rest of the loans, he's a direct lender.

23   A.    Yes.

24   Q.    So isn't the statement that Fertitta does not adequately

25   represent the interests of direct lenders who are true

1    creditors of USACM also apply to everyone else on that

2    committee save except for Mr. Helms wearing one arm?

3    A.   It -- it does, but, Mr. Gordon, where I was going is that I

4    really feel that, you know, people that have a stake in the

5    reorganization of the company should be represented on that

6    committee.

7    Q.   And doesn't that really mean, Mr. Allison, that what you're

8    really asking the U.S. Trustee to do or the Court to do is to

9    address that issue because I agree with you.

10       Those people are not represented on any committee at this

11   time, and either expand this committee or add them to the

12   Unsecured Creditors Committee?

13   A.   Either solution.

14   Q.   Either solution.

15   A.   But I do think that they need to be -- they need to have a

16   voice.

17   Q.   I agree.  And how much are there?

18   A.   As I said, there -- there is about 50 -- if you do them in

19   dollar amounts, about $50,000,000 worth of dollars that need to

20   -- need to -- should have a voice.

21   Q.   The last number I heard was 35.

22   A.   Well --

23   Q.   So it's up --

24   A.   -- what's --

25   Q.   -- to 50?

1  A.   It -- there's $50,000,000 of collateral that's been

2  diverted in -- in total.

3            MR. GORDON:  Your Honor, I have no further questions.

4       I firmly agree --

5            THE COURT:  Okay.

6            MR. GORDON:  -- with you, Mr. Allison --

7            THE COURT:  All right.

8            MR. GORDON:  -- on that point.

9            THE COURT:  Mr. Landis.

10      (Colloquy not on the record.)

11           THE COURT:  Well, there he is bringing the code out

12  again.

13           MR. LANDIS:  Sometimes, it helps, Judge.  If you

14  wouldn't mind leaving them right there --

15      (Colloquy not on the record.)

16           MR. LANDIS:  -- that would be fine.

17      Good morning, Mr. Allison.

18           THE WITNESS:  Good morning, Mr. Landis.

19           MR. LANDIS:  It hasn't gotten to afternoon, yet, huh?

20           THE WITNESS:  We're getting close.

21           MR. LANDIS:  A lot of the stuff I would have covered,

22  Mr. Gordon has asked you.  I'm going to try to be brief.  Fair

23  enough?

24           THE WITNESS:  Thank you.

25                          CROSS-EXAMINATION

1    BY MR. LANDIS:

2    Q.   How many members are on the Direct Lenders Committee?

3    A.   I believe seven.

4    Q.   Okay.  Who are they?

5    A.   Oh, I can't give you all their names off the top of my

6    head.  Terry -- I -- I have spoken with -- with Terry on

7    several occasions.  I met with him last night.  I have

8    spoken to Ned Homfeld on -- on -- on a couple of

9    occasions.

10        There are other members I've met face to face, but,

11    frankly, I haven't spoken to them.  I -- I can't remember their

12    names off the top of my head, and, obviously, Mr. Bullard.

13        (Colloquy not on the record.)

14    BY MR. LANDIS:

15    Q.   Mr. Bullard is in the courtroom, isn't he?

16    A.   Yes, he is.

17            MR. LANDIS:  Mr. Bullard, will you stand up for me,

18    please.

19    BY MR. LANDIS:

20    Q.   You talked about Terry.  Who's Terry?

21    A.   Terry Helms.  He's No. 2 and No. 3.

22            MR. LANDIS:  And, Terry, is he here?

23            MR. HELMS:  Yes.

24            MR. LANDIS:  Can you stand up for me, too.

25    BY MR. LANDIS:

1  Q.   Homfeld, Inc., or Homfeld, LLC, --

2  A.   Ned --

3  Q.   -- Edward Homfeld, is that --

4  A.   Ned Homfeld, I believe he's in -- in Detroit today.

5  Q.   Okay.

6  A.   He called me yesterday with a 313 area code.

7  Q.   How about Arthur Polacheck (phonetic), have you talked to

8  him?

9  A.   No.  I try to return as many calls as I can in a day.

10       MR. LANDIS:  All right.  Is Mr. Polacheck out there?

11  Not so far.

12  BY MR. LANDIS:

13  Q.   How about Dennis Flier, Inc., Defined Benefits Trust?  Have

14  you met Dennis?

15  A.   I've met him at a committee meeting, sir.

16       MR. LANDIS:  Dennis, are you here?  I know the answer

17  to the last one, except for you can't see it.

18  BY MR. LANDIS:

19  Q.   Jim McCollum, do you know Mr. McCollum?

20  A.   No, not personally.

21       MR. LANDIS:  Mr. McCollum, I know you're here.  Are

22  you here?  Stand up for me.

23  BY MR. LANDIS:

24  Q.   You'd agree with me that these are pretty important folks

25  in connection with the administration of these cases, right?

1    A.    Absolutely.

2    Q.    It's good to meet them, isn't it?

3    A.    Yep.

4          MR. LANDIS:  Thank you.  You can have a seat.

5          (Interruption over the telephone line at 11:17:34 a.m.)

6    BY MR. LANDIS:

7    Q.    You indicated in response to some testimony from Mr. Gordon

8    that there were some folks that had been overpaid and some

9    folks that had been underpaid, right?

10          THE COURT:  I'm sorry.

11          Somebody's on the line talking to somebody else at the

12    same time.  Please mute your phones.

13          Go ahead.  Sorry.

14          MR. LANDIS:  That's all right, your Honor.

15    BY MR. LANDIS:

16    Q.    I just have a few questions with respect to the folks that

17    we just identified.

18          (Interruption over the telephone line at 11:17:57 a.m.)

19    BY MR. LANDIS:

20    Q.    In connection with today's hearing, you have prepared an

21    analysis with respect to the financial situation that

22    Fertitta Enterprises find itself in; is that right?

23    A.    That's correct.

24    Q.    Have you done a similar analysis with respect to

25    Helms Homes?

Cline Transcription Services, Inc.  (702)644-1123

1    A.    With Mr. Helms, we've have discussions.  I have not

2    finalized the analysis, but we've had discussions.

3    Q.    So you've had discussions, but you don't have anything here

4    before the Court in the form of a report; is that right?

5    A.    That's correct.

6    Q.    How about Terry Helms Living Trust?  Have you done a

7    similar analysis to what you did for Mr. Bullard in connection

8    with Terry Helms Living Trust?

9    A.    No, I have not.  But, again, as I said, I made --

10    Q.    That --

11    A.    I've been --

12    Q.    That's fine.

13    A.    -- in discussion with him.

14    Q.    You've answered my question.  How about Homfeld, LLC?

15    A.    No.

16    Q.    How about Arthur Polacheck?

17    A.    No.

18    Q.    How about Dennis Flier?

19    A.    No.

20    Q.    How about Jim McCollum?

21    A.    No.

22    Q.    Why haven't you done a status update for those folks who

23    are six-sevenths of this committee like you did for Fertitta?

24    A.    We have -- I've looked at Mr. Helms' position.  I know

25    that he's in a nonperforming loan -- or in a loan that was

```
1    diverted.
2        I've looked at each of the individuals that are in -- on
3    the committee with respect to what -- where their loans are at,
4    and they would be net -- if I were to do the analysis,
5    Mr. Landis, they would end --
6    Q.   And you haven't done it yet, right?
7    A.   Well, I had --
8    Q.   So --
9    A.   I have --
10   Q.   Well, let --
11   A.   I --
12   Q.   Let's stop because I don't want to argue with you, but I
13   want the record to be clear.  You haven't done that analysis
14   with respect to any entity other than Fertitta; is that right?
15   A.   Where I have it today to bring to court, I -- I have looked
16   at each --
17   Q.   Okay.
18   A.   -- of these loans.
19   Q.   But you've answered my question.
20       (Interruption over the telephone line at 11:19:39 a.m.)
21   BY MR. LANDIS:
22   Q.   You can't say that anybody else on this committee, the
23   other six members, are not representative of the constituents
24   they represent, can you?
25   A.   I don't believe any of the other outside of Mr. Helms that
```

1    they had their collateral diverted.

2    Q.   So six-sevenths of the committee is consistent with the

3    direct lenders, generally; is that right?

4    A.   Well, six-sevenths are direct lenders, and, well, I think

5    they're all direct lenders, Mr. Landis.

6        (Interruption over the telephone line at 11:20:06 a.m.)

7    BY MR. LANDIS:

8    Q.   Right.

9    A.   So seven-sevenths are direct lenders.  With respect to

10   collateral being in a loan where it's been paid off, Mr. Helms

11   is the one that has -- unfortunately, has a loan that's been

12   paid off, and --

13   Q.   We'll come back to that.  You have indicated I think in

14   your testimony, previously -- and I want to be clear -- that

15   while Fertitta Enterprises received interest overpayments

16   thousands of others in the investor body that covers these five

17   cases received similar payments; isn't that right?

18   A.   Yes.

19   Q.   I'm curious about something.  I have to ask you.  That's

20   Exhibit No. 3.  You testified in response to questions from

21   Ms. Jarvis earlier, right?

22   A.   That's correct.

23   Q.   What's the date on that document?

24   A.   February 28th, 2006.

25   Q.   Who prepared that document?

1    A.    It was prepared internally at USA Capital.

2    Q.    Before or after you got started?

3    A.    Before.

4    Q.    Okay.  And you used documents just like this one in a

5    series to come up with information to talk about whether or not

6    Fertitta is representative; is that right?

7    A.    That's correct.

8    Q.    As you sit here today, are you willing to tell Judge Riegle

9    under oath that the information that's contained in these

10    documents prepared by the predecessor to you at USA Capital are

11    true and accurate in all respects?

12    A.    No.  Because we've -- we've gone back and restated them.

13        (Interruption over the telephone line at 11:21:48 a.m.)

14    BY MR. LANDIS:

15    Q.    So they're not accurate; isn't that right?

16    A.    They -- they're not -- what we've done is gone back and

17    reflect -- restated every -- every loan.

18    Q.    Well, sure.  Because when you do that, you find out there

19    are problems with respect to the accuracy of those documents,

20    right?

21    A.    That's correct.

22    Q.    Okay.  Mr. Gordon touched on one of them.  You gave the

23    Court a declaration in support of removing

24    Fertitta Enterprises, right?

25    A.    Yes.

1    Q.    Looking at paragraph 46, "USACM's prepetition business

2    records and accounting systems indicate that Fertitta received

3    approximately 2.1 million dollars in interest payments from USA

4    that had not been collected from the borrowers," right?

5    A.    That's correct.

6    Q.    That's what USA Commercial Mortgage's records --

7    A.    Showed.

8    Q.    -- just like that indicated, right?

9    A.    Yes.

10    Q.    But you reconstructed them because you didn't believe in

11    the accuracy of them; isn't that right?

12    A.    That's correct.

13    Q.    And you were smart not to, weren't you?

14    A.    Yep.  At least, I believe I was.

15    Q.    Well, then, yesterday, it was 588,000 after you had done

16    your work up to that time, right?

17    A.    That's correct.

18    Q.    Okay.  And, today, it's a million--five?

19    A.    That's correct.

20    Q.    Are you --

21    A.    And that's --

22    Q.    Are you willing to testify under oath in response to this

23    direct question that that is the exact amount, 1.5 million

24    dollars, that was overpaid to Fertitta Enterprises in

25    connection with this interest?

1    A.    Yes.

2    Q.    We talked about interest rates in connection with the loans

3    that Fertitta Enterprises participated in when you were talking

4    to Ms. Jarvis and when you were talking to Mr. Gordon, right?

5    A.    That's correct.

6    Q.    When were those interest rates negotiated?

7    A.    It looked like at the inception of the loan.

8    Q.    Okay.  When were the exit fees negotiated?

9    A.    At the inception of the loans.

10   Q.    Were you present for any of those negotiations?

11   A.    No.

12   Q.    But if the borrower was there, they might have some

13   recollection of what was discussed, right?

14   A.    Yes.

15   Q.    And they'd have better information of that conversation

16   than anything that you would have based on your review of the

17   business records; isn't that true?

18   A.    Yes.

19   Q.    Okay.  I want to talk about the exit fees because, boy,

20   that just seems pernicious.  You talked about it as a success

21   fee, right?

22   A.    Yes.

23   Q.    That means if the loan succeeds in paying off, and the

24   borrower gives all the money back the investors receive their

25   rate of interest.  And at that point in time, they're paid in

1   full, right?

2   A.   That's correct.

3   Q.   Okay.  And it doesn't happen until the loans pay off.

4   A.   That's correct.

5   Q.   And the borrowers get paid in full.

6   A.   Yes.

7   Q.   And then USA Commercial Mortgage after that gets its fee --

8   A.   Yes.

9   Q.   -- and then in this particular instance split a portion of

10  that fee by virtue of an agreement with Fertitta Enterprises at

11  the time of the loans; isn't that right?

12  A.   At the time the loan is paid back.

13       (Interruption over the telephone line at 11:25:07 a.m.)

14  BY MR. LANDIS:

15  Q.   You aren't suggesting, are you, that Fertitta Enterprises

16  after they found out there were problems came back in and

17  strong-armed anybody, are you?

18  A.   No.

19  Q.   Oh, okay.  So to the extent that exit fees were earned, the

20  underlying investors got made whole and earned the rate of

21  return they expected, right?

22  A.   That's correct.

23       (Interruption over the telephone line at 11:25:26 a.m.)

24   BY MR. LANDIS:

25  Q.   We talked a little bit about who makes up the investor

1    body, and we talked a little bit, too, about who was selected

2    to comprise this committee.  Did you do some work in advance of

3    the filing of these cases?

4        (Interruption over the telephone line at 11:25:44 a.m.)

5            THE COURT:  Excuse me.

6        On the phone, please, mute your phone.

7        (Interruption over the telephone line at 11:25:46 a.m.)

8            THE COURT:  Mute the phone, please.

9            MR. LANDIS:  Honest, I'll quit talking faster.

10           THE COURT:  It could be a crossed wire on top of

11   everything else.  It's NSA.

12       (Colloquy not on the record.)

13           MR. LANDIS:  Say when, Judge.

14           THE COURT:  I'm just concerned of the record.

15       Are you okay, Helen?  Is that --

16           THE COURT RECORDER:  Yes.

17           THE COURT:  All right.

18           THE COURT RECORDER:  (Indiscernible).

19       Thank you.

20           THE COURT:  It's a little --

21       (Interruption over the telephone line at 11:26:15 a.m.)

22           THE COURT:  It's annoying, but --

23           THE COURT RECORDER:  Yes, it is.

24           THE COURT:  Okay.

25       (Interruption over the telephone line at 11:26:20 a.m.)

```
 1              THE COURT:  I'm not going to say anything.

 2              MR. LANDIS:  Thank you.

 3              UNIDENTIFIED SPEAKER:  Your Honor, we could ask the

 4     operator and find out which line is talking and then have that

 5     line disconnected.

 6              THE COURT:  Can somebody do that?

 7         (Colloquy not on the record.)

 8              UNIDENTIFIED SPEAKER:  Let me try it.

 9              THE COURT:  All right.  Thank you.

10         (Interruption over the telephone line at 11:26:35 a.m.)

11              MR. LANDIS:  While they're doing that, Judge, may I

12     approach and have --

13              THE COURT:  Yes.

14              MR. LANDIS:  -- an exhibit marked?

15         (Trustee's Exhibit A was marked

16         for identification.)

17              MR. GORDON:  Your Honor, I guess that means we're not

18     going to have the NSA on the list of the people we're going to

19     inquire of.

20              THE COURT:  Yeah.

21         (Colloquy not on the record.)

22              UNIDENTIFIED SPEAKER:  Please mute your phone using

23     star 6, star 6.

24         (Colloquy not on the record.)

25              MR. LANDIS:  I was just looking out there to see if
```

1   anybody was pointing their phones at me, yet.

2       (Interruption over the telephone line at 11:27:00 a.m.)

3           MR. LANDIS:  Do you want to go the --

4           THE WITNESS:  Well, it is lunchtime someplace.

5           MR. LANDIS:  Yeah.  Do you want to go to the

6   Weiners Circle and have some hot dogs?

7       (Colloquy not on the record.)

8           MR. LANDIS:  I've been doing this almost 18 years.

9   I've never done this.

10          THE COURT:  Okay.

11          MR. LANDIS:  All right.

12          UNIDENTIFIED SPEAKER:  Your Honor, I just spoke to

13  the operator, and she is going to listen in to see who it is

14  that's talking over the proceedings and, hopefully, mute them

15  or disconnect them.

16          THE COURT:  All right.  Thank you so much.  All

17  right.

18          MR. LANDIS:  I'm --

19          THE COURT:  Go ahead.  I'm so sorry.

20          MR. LANDIS:  No worries, your Honor.  We're about

21  done, anyway.

22   BY MR. LANDIS:

23  Q.   Mr. Allison, when I left thinking about hot dogs, I asked

24  you if you'd done some work in advance of the filing of these

25  cases.  Had you done some of that work?

1    A.    Yes, I did, and I met with you prepetition as well.

2    Q.    Right.   And in connection with that conversation, did you

3    provide me with some information regarding the top-20 investors

4    in USA Commercial Mortgage?

5    A.    Yes, I did.

6    Q.    I put up what's now been marked for purposes of

7    identification as Exhibit A, Mr. Allison.   Do you recognize

8    that document?

9    A.    Yes.

10    Q.    And what is it?

11    A.    It's what I provided you, Mr. Landis.

12    Q.    Okay.   And I know what it is.   You know what it is.   Tell

13    the folks that don't.

14    A.    Sure.   It's essentially a list of -- a list of the top

15    creditors which has USA Diversified Trust Deed Fund with a

16    current balance of -- a current balance of $80,000,000,

17    First Capital with a balance of 65,000,000, and then

18    Fertitta Enterprises with a balance of $12,000,000 -- and --

19    and I could go down the list -- Terry Helms with a balance of

20    5.7 million.

21    Q.    All right.   Fair enough.   I don't need you to go through

22    everybody because the list is self-explanatory, Mr. Allison,

23    but did you prepare this document in anticipation of the filing

24    of these cases?

25    A.    I had one of my staff prepare it under my direction.

1    Q.   All right.  And to the best of your knowledge, is it a true

2    and accurate representation of the information as to the

3    20-largest investors in USA Commercial Mortgage?

4    A.   Yes.  And --

5            MR. LANDIS:  All right.  Your Honor, it's been marked

6    for purposes of identification as Exhibit A.  I'd move to admit

7    it into evidence.

8            THE COURT:  All right.  I assume there's no

9    objection.

10       It's admitted.

11       (Trustee's Exhibit A was admitted

12       into evidence.)

13            MR. LANDIS:  Thank you.

14            THE COURT:  And with respect to the other exhibits --

15            MS. JARVIS:  Yeah.  I --

16            THE COURT:  -- nobody formally moved --

17            MS. JARVIS:  I would ask.  I was going to ask --

18            THE COURT:  Okay.

19            MS. JARVIS:  -- when I got up again that

20    (indiscernible) because I neglected --

21            THE COURT:  All right.

22            MS. JARVIS:  -- to ask --

23            THE COURT:  Any objection?

24            MS. JARVIS:  -- that they be admitted.

25            MR. LANDIS:  I have objection to several of them.

1    They're hearsay, and several of them aren't relevant.

2              THE COURT:  Oh --

3              MR. LANDIS:  They haven't been offered --

4              THE COURT:  -- all right.

5              MR. LANDIS:  -- or admitted, and so --

6              THE COURT:  Okay.  So we'll go back through those

7    later.

8              MR. LANDIS:  Yeah.

9     BY MR. LANDIS:

10   Q.   The bottom line, Mr. Allison, is tell the Judge who the

11   single-largest nondebtor investor is in USA Commercial

12   Mortgage.

13   A.   Yeah.  At the time of that report, it was

14   Fertitta Enterprises.

15   Q.   Has that changed?

16   A.   In understanding some of the trusts out -- out there,

17   actually, I think Mr. Helms may have a larger amount when I add

18   up all of his bits and pieces.

19   Q.   Okay.  By the way, what -- I almost forgot.  How many votes

20   per person on the committee?

21   A.   I believe Mr. Helms has two.

22   Q.   Everybody else?

23   A.   One.

24   Q.   Thank you.  So Fertitta Enterprises for all we've talked

25   about has one vote out of seven; is that right?

105

A.    Yes.

Q.    And, in fact, Mr. Helms commands more votes?

A.    Two.

      (Colloquy not on the record.)

BY MR. LANDIS:

Q.    We talked about true unsecured creditors.  I want to visit

with you a little about that, see what you know.  In order for

the people that you said you're concerned about not having

representation, the loan that they invested in had to pay off

before the bankruptcy cases were filed, right?

A.    Yes.  Or -- or have their collateral diverted.

Q.    And that had to happen prepetition no matter what, right?

A.    Yes.

Q.    Because if it happened after the fact, you're the new

sheriff in town, and you got the money, and you're holding it

for the investors; isn't that right?

A.    I'm holding all the money I've collected which is both --

-- both -- which was some of the loans that we're -- that we --

we've collected postpetition that has prepetition money in it.

Q.    All right.  How many loans are there where the borrower

paid off and the borrower payments were diverted to the extent

that there's no money in your Collection Account as you sit

here today?

A.    Four.

Q.    What are those loans?

1   A.   I'm going -- I'd have to go through my list of them to go

2   -- to give you each of them.  And in addition to that, there's

3   other loans that were carried on the books that actually the

4   collateral was released --

5   Q.   Okay.

6   A.   -- as we've continued to go through the investigation.

7        For example, Sheraton Hotel, the loan was foreclosed on

8   two years ago, guarantee released.  The loan still stayed on

9   the books.

10  Q.   So, in other words, you're sure that there are

11  four loans --

12  A.   And --

13  Q.   -- that were --

14  A.   And it's growing.

15  Q.   Okay.  Does Beastar, LLC, strike you as being --

16  A.   It's one --

17  Q.   -- one of those?

18  A.   -- of them.

19  Q.   How about Beau Rivage Homes?

20  A.   Yes.

21  Q.   Freeway 101?

22  A.   Yes.

23  Q.   How about Universal Hawaii?

24  A.   Yes.

25  Q.   Those are the four, right?

1    A.    Right.

2    Q.    Okay.  And there might be others where there were partial

3    diversions of borrower payments or collateral, too, and you're

4    looking into that, right?

5    A.    Yeah.  There -- there are -- there were partial diversions.

6    But as I said, the Sheraton is another transaction where --

7    where there appeared to be a loan on the books, and there

8    really wasn't.

9    Q.    The idea of this whole exercise is that when you're done

10   with your forensic accounting we'll be able to identify in

11   addition to these four loans the ones where partial borrower

12   payments were misappropriated.

13   A.    Correct.

14   Q.    So that's being addressed as I'm talking to you, right?

15   A.    Yes.

16   Q.    You know, it's interesting.  In each of those four loans on

17   your loan summary that you filed on May 31st of this year, the

18   amount of the loan was not shown in any of them.  Do you have

19   any information as to how much those loans were actually for?

20   A.    I can't -- I think that the total loan value on -- I -- I

21   -- I'd have to go through each of the loans.  I don't want to

22   give you a guess today.

23   Q.    Okay.  Well, let me just ask you and see if these numbers

24   sound about right.  In Beastar, LLC, does it sound like maybe

25   3,124,999.81?  Sound about right?

1    A.    It sounds about right.

2    Q.    Yeah.  How about Beau Rivage at $432,349?  Does that sound

3    about right?

4    A.    Yeah.  And that's one we're -- we continue to look into

5    to --

6    Q.    Okay.

7    A.    -- to get to the right number.

8    Q.    Yeah.  It --

9    A.    The total amount that's -- that you would get to to go

10    through all your -- the four loans is about $15,000,000.

11    Q.    Sure.  Freeway 101, how does $3,750,000 strike you?

12    A.    Yes.

13    Q.    And Universal Hawaii at $5,166,412.53, does that sound

14    about right?

15    A.    Yes.

16    Q.    Would it surprise you if I got those numbers from your

17    loans by -- or let's try again -- investors-by-loan summary

18    that you gave me in connection with this case at the inception

19    of it?

20    A.    No.

21    Q.    Well, why wasn't it in your loan summary?

22    A.    When we went through the loan summary that we're going

23    through is to do a due-to and due-from.  As I said, we're

24    trying to investigate each of the pieces of those loans that

25    come through.  That's why as we've continued to work on them

1    they've been under the to-be-determined category.

2          MR. LANDIS:  Okay.  See, because now I've got to make

3    some more exhibits, and I apologize for that.

4        May I approach, your Honor?

5          THE COURT:  Um-h'm.

6        (Colloquy not on the record.)

7        (Trustee's Exhibit B was marked

8        for identification.)

9     BY MR. LANDIS:

10   Q.   Mr. Allison, I'm going to put up on the overhead here a

11   document.  I'm going to tell the Court and the parties here

12   it's been identified for purposes of identification as

13   Exhibit B.

14        And I will also tell you that the markings at the top are

15   markings that I made, and they were not on the original

16   exhibit; is that fair?

17   A.   Fine.

18   Q.   Do you recognize this document?

19   A.   It's the Beastar loan-origination document.

20   Q.   Prepared by?

21   A.   Prepared by our -- prepared by our group.

22   Q.   Oh, okay.  When is it as of?

23   A.   I don't -- I'd have to just look at the date of it to -- to

24   do it, but I'm sure it was probably done --

25   Q.   The lower --

1    A.    -- as --

2    Q.    -- left-hand corner.

3    A.    That's not visible to me.

4          MR. LANDIS:  May I approach?

5          THE COURT:  Yes.

6       (Colloquy not on the record.)

7          THE COURT:  Did we lose, Chuck?

8       Eileen --

9          MR. LANDIS:  (Indiscernible) read (indiscernible).

10         THE COURT:  -- did we lose Chuck?

11         THE WITNESS:  Well, that's the way you -- and -- and

12   we just went -- we had it --

13         THE COURT:  We need to get him --

14         THE WITNESS:  -- put together.

15         THE COURT:  -- to put this stuff on the monitors.

16         THE WITNESS:  I don't have any list.

17         THE COURT:  Where did he go?

18         THE CLERK:  (Indiscernible).

19         THE WITNESS:  I'll --

20         MR. LANDIS:  (Indiscernible).

21         THE WITNESS:  I'll submit to you the date.

22         MR. LANDIS:  Okay.  Are you (indiscernible)?

23         THE WITNESS:  Yeah.  Okay.

24    BY MR. LANDIS:

25    Q.   Mr. Allison, I approached you and showed you Exhibit B, and

1  we discussed it.  Would you agree with me that Exhibit B is the

2  preliminary analysis for Beastar, LLC, as of April 19th of

3  2006?

4  A.   Yes.

5            THE COURT:  Wrong way, Eileen.

6            MR. LANDIS:  What is it with me?

7            THE COURT:  No.

8            MR. LANDIS:  That's twice I've been --

9            THE CLERK:  Well --

10           THE COURT:  It --

11           MR. LANDIS:  -- in your --

12           THE COURT:  You know, it's us.

13           THE CLERK:  -- (indiscernible) --

14           THE COURT:  We keep meaning --

15           THE CLERK:  -- (indiscernible).

16           THE COURT:  We keep meaning to have remedial

17  audiovisual.

18           THE CLERK:  (Indiscernible).

19           THE COURT:  And we never quite do it, so --

20           THE CLERK:  Well, let me get that --

21           THE COURT:  We need a --

22           THE CLERK:  -- (indiscernible).

23           THE COURT:  Has anybody got a ten-year-old here that

24  could run this for us?

25           THE CLERK:  No.  What did I do?

1          MR. LANDIS:  Your Honor, I'm afraid to start pushing

2    buttons for fear that it won't come back on.

3          THE COURT:  And I didn't touch anything.

4          MR. LANDIS:  I didn't, either.

5          THE CLERK:  I --

6          THE COURT:  So I didn't hit --

7          THE CLERK:  I did.

8          THE COURT:  -- the Judge override.

9          MR. LANDIS:  Oh, okay.

10          THE CLERK:  I was trying to get this monitor up, and

11    it took it right (indiscernible).

12      (Colloquy not on the record.)

13          MR. LANDIS:  I --

14          THE WITNESS:  My monitor's on, too.

15          MR. LANDIS:  Good.

16          THE COURT:  Oh, there's nothing on the screen, is

17    there?

18          MR. LANDIS:  There wasn't then.

19          THE COURT:  Oh, okay.

20          MR. LANDIS:  There is now.

21      (Colloquy not on the record.)

22          THE CLERK:  Oh.

23          THE COURT:  Oh, okay.

24          THE CLERK:  Is your screen working now?

25          THE WITNESS:  Yes.

```
 1              THE CLERK:  Good.
 2     BY MR. LANDIS:
 3     Q.   Can you see better now, Mr. Allison?
 4     A.   Yes.
 5              MR. LANDIS:  All right.
 6              THE COURT:  Is your monitor working?
 7              THE WITNESS:  Yes.
 8              THE COURT:  Oh, good.  Okay.
 9     BY MR. LANDIS:
10     Q.   And can you see that April 19th --
11     A.   April 19th --
12     Q.   -- date?
13     A.   -- 2006.
14     Q.   And prepared by your group?
15     A.   Yes.
16          (Colloquy not on the record.)
17     BY MR. LANDIS:
18     Q.   I'm going to turn to the last page of Exhibit B.  What's
19     the total funded amount?  Can you read it?
20     A.   3.1 million dollars.
21     Q.   It's 3,124,999.81, right?
22     A.   Yes.
23              MR. LANDIS:  Okay.  We'd offer Exhibit B, your Honor.
24              THE COURT:  All right.  Any objection?  No?  All
25     right.
```

1        That's admitted.

2        (Trustee's Exhibit B was admitted

3        into evidence.)

4            MS. JARVIS:  And I would just note, your Honor, that

5     there is no foundation with the handwriting on there, so we're

6     just talking about --

7            THE COURT:  No.  He said that --

8            MS. JARVIS:  -- the document --

9            THE COURT:  -- he done --

10           MS. JARVIS:  -- (indiscernible).

11           THE COURT:  -- that.

12           MS. JARVIS:  Okay.

13           THE COURT:  And he concedes that.

14        (Colloquy not on the record.)

15           THE COURT:  I think we got it.  We were having

16     trouble getting the monitor on, and I think it's on now.

17        Are we all right, Eileen, on the AV?

18           THE CLERK:  Uh-huh.

19           THE COURT:  Eileen --

20           THE CLERK:  Yeah.

21           THE COURT:  -- we're okay now, right?

22           THE CLERK:  We're fine.

23           THE COURT:  Okay.  Sorry, Chuck.

24        Thank you.

25           CHUCK:  That's fine.

1    BY MR. LANDIS:

2    Q.   Mr. Allison, I'm going to put what's been marked for

3    purposes of identification as Exhibit C on the board.  Do you

4    recognize that document?

5    A.   Beau Rivage.  It's the Beau Rivage loan-origination

6    document --

7    Q.   Okay.  And looking down in the bottom left-hand corner,

8    can --

9    A.   -- prepared April 19th by our group.

10   Q.   Okay.  And the last page of Exhibit C, are you able to tell

11   the total funded amount in connection with the

12   Beau Rivage Homes loan?

13   A.   $432,349.21.

14           MR. LANDIS:  I'll move to admit Exhibit C,

15   your Honor.

16           THE COURT:  All right.  That's admitted.

17       (Trustee's Exhibit C was admitted

18       into evidence.)

19           THE COURT:  Now, he's already agreed with you as to

20   these amounts.  Can we just admit them --

21           MR. LANDIS:  I --

22           THE COURT:  -- or --

23           MR. LANDIS:  I --

24           THE COURT:  You've only got two more, but --

25           MR. LANDIS:  That's it.  I'll go quickly --

```
 1              THE COURT:  Okay.

 2              MR. LANDIS:  -- your Honor.

 3              THE COURT:  Thank you.

 4    BY MR. LANDIS:

 5    Q.   Exhibit D, Mr. Allison?

 6    A.   Freeway 101.

 7    Q.   As of when?

 8    A.   April 19th.

 9    Q.   Who prepared it?

10    A.   Some -- our -- our group prepared it.

11    Q.   And on the last page, funded amount?

12    A.   3 -- three-million-seven-fifty.

13              MR. LANDIS:  I move to admit Exhibit D --

14              THE COURT:  All right.  It --

15              MR. LANDIS:  -- your Honor.

16              THE COURT:  It's admitted and hearing no objection.

17         (Trustee's Exhibit D was admitted

18         into evidence.)

19    BY MR. LANDIS:

20    Q.   Exhibit E, Mr. Allison?

21    A.   Universal Hawaii.

22    Q.   The lower left-hand corner --

23    A.   April 19th --

24    Q.   -- of the first page?

25    A.   -- 2006 --
```

```
1    Q.    We've got this one --

2    A.    -- by Mesirow.

3    Q.    -- marked as Exhibit E.  Do you see that?

4    A.    Yes.

5    Q.    The last page of Exhibit E shows what funded amount?

6    A.    $5,166,412.53.

7    Q.    All right.  Do you know who the largest investors --

8          MR. LANDIS:  Oh, before I forget, your Honor, I'd

9    move to admit Exhibit E.

10          THE COURT:  All right.  That's admitted.

11         (Trustee's Exhibit E was admitted

12         into evidence.)

13    BY MR. LANDIS:

14    Q.    Mr. Allison, do you know who the three-largest investors in

15    Beastar are?

16    A.    Not off the top of my head, Mr. Landis.

17    Q.    Do you know Dwayne Deverell (phonetic)?

18    A.    No.

19    Q.    Do you know USA National Fund (phonetic)?

20    A.    No.

21    Q.    You don't know anything --

22    A.    USA National Fund, yes, it's one of our -- one of our

23    debtor entities.

24    Q.    Okay.  One of your debtor entities?

25    A.    USA National Fund?
```

Cline Transcription Services, Inc.  (702)644-1123

1    Q.    Yes.

2    A.    I'm sorry.  I don't have it in front of me.

3    Q.    Fair enough.  How about Robert J. Verchota?

4    A.    No.  I'm sorry.  I don't know him.

5    Q.    If I told you that those were the three-largest investors

6    based on your preliminary summary, would you have any reason to

7    argue with me?

8    A.    No.

9    Q.    And in connection with Beau Rivage, if I said that

10   Maria Enamorado (phonetic), Pompei Lombardi (phonetic), and

11   Morris E. Mansell look to have the largest interest, would you

12   disagree with me?

13   A.    No.  And I don't know any of them as well.

14   Q.    Fair enough.  In connection with Freeway 101, do you know

15   Robert J. Kehl, K-e-h-l?

16   A.    No.

17   Q.    Would it surprise you that there are several investors who

18   have about 4.44-percent interest in that loan?

19   A.    No.

20   Q.    And in Universal Hawaii, do you know Larry Rieger

21   (phonetic)?

22   A.    I've heard the name, but I don't know him.

23   Q.    Okay.  He's got about a 2.94-percent interest in that loan.

24   Do you know Eugene Kady (phonetic)?

25   A.    No.

1  Q.   Would it surprise you if there are several investors at

2  1.14 percent?

3  A.   No.

4  Q.   Let me ask you this.  If these investors were solicited,

5  and they were individuals that were willing to serve, and they

6  were appointed to the Unsecured Creditors Committee, would that

7  address your concerns as you've identified them for the Court?

8  A.   Yes, Mr. Landis.

9  Q.   And that doesn't mean that we have to reconvene or

10  reallocate or appoint new folks in connection with the

11  Executory Contracts Committee, right?

12  A.   No.  I'm -- I'm -- what I'm trying to find is giving --

13  give the people a voice that have had their total collateral

14  diverted, I mean, where --

15  Q.   And --

16  A.   -- where they have been -- where they're -- they're --

17  they're truly out money, and they're a true creditor of the

18  estate.

19  Q.   And it would be right, wouldn't it, to try to select the

20  people who have the largest financial stake from among those

21  loans?

22  A.   Yes.

23        MR. LANDIS:  That's all I have, your Honor.

24        THE COURT:  All right.  Thank you.  All right.

25     (Colloquy not on the record.)

1              THE COURT:  Redirect.

2         Any other cross?

3              UNIDENTIFIED SPEAKER:  No, your Honor.

4              THE COURT:  Okay.  Thank you.

5         Redirect.

6              MR. LANDIS:  I bought it, and I didn't use it.

7                        REDIRECT EXAMINATION

8     BY MS. JARVIS:

9     Q.   Mr. Allison, you've been asked a lot of questions about

10    your objection based on the fact that Fertitta is not a

11    creditor of this estate, but that's only one of your

12    objections, isn't it, that is the basis for your motion to

13    remove?

14    A.   That's correct.

15         (Interruption over the telephone line at 11:43:11 a.m.)

16    BY MS. JARVIS:

17    Q.   And what is the other basis?

18    A.   Basically, that Fertitta Enterprises is a co-lender.  I

19    mean, their -- their -- their transaction has been structured

20    to be a co-lender with USA Commercial Mortgage in -- in these

21    transactions as opposed to an investor.  Their -- their loan

22    structure is -- is -- is pari passu and equal to USA Commercial

23    Mortgage as a co-lender.

24         (Interruption over the telephone line at 11:43:36 a.m.)

25    BY MS. JARVIS:

1    Q.   In that way, you believe they are not like any of the other

2    investors, direct investors, in this case.

3    A.   Yes.

4            MR. GORDON:  Your Honor, I'm going to object.  It's

5    leading questions.  And during the opening --

6            THE COURT:  Sustained.

7            MR. GORDON:  -- I let it go.

8            MS. JARVIS:  Okay.

9            MR. GORDON:  But this is redirect.

10    BY MS. JARVIS:

11    Q.   So do you believe that makes them different?

12    A.   Yes.  The --

13        (Interruption over the telephone line at 11:43:58 a.m.)

14    BY MS. JARVIS:

15    Q.   And --

16    A.   The interest rate and the -- and sharing in fees are both

17    different than any -- all the other investors.

18        (Interruption over the telephone line at 11:44:02 a.m.)

19            THE COURT:  Excuse me.

20        Whoever's on the phone, mute.

21        Thank you.

22    BY MS. JARVIS:

23    Q.   You were shown by Mr. -- let me deal first with the issue

24    of the creditor issue.  You were showed by Mr. Landis the

25    various schedules where the four loans that were paid off

1    showed various investors and how much their principal was

2    diverted in each of those loans.  Do you recall that?

3    A.   Yes.

4    Q.   Are there other schedules or are there other amounts which

5    were diverted by the debtor of principal beyond just those four

6    schedules?

7    A.   Yes.

8    Q.   So how would you determine -- could you determine the four

9    -- the largest creditors with principals diverted only from

10   those four loan payoffs?

11   A.   No.  There are others, and that's what we've been

12   continuing to work on, Ms. Jarvis.

13   Q.   And how would you have to go about determining that?

14   A.   As we go through a loan -- on a -- on a loan-by-loan basis

15   to understanding where each of the net positions are on -- on

16   loans that have had, you know, partial releases or in the case

17   of the Sheraton where it was foreclosure action, and the loan

18   still stayed on the books.

19   Q.   And I believe you have -- you stated that you have

20   preliminarily looked at the members of the committee.  You

21   mentioned that Mr. Helms is in a loan that paid off and

22   therefore would be a creditor of this estate.  What about

23   Mr. Ned Homfeld?

24   A.   I don't believe so.

25   Q.   And with respect to the direct lenders that had principal

1   paid off and diverted that are creditors of this estate, are

2   there to your knowledge any of those investors that aren't also

3   still investors in this estate, direct lenders?

4   A.   I'm sorry.  It --

5   Q.   So with respect when you look at those direct lenders who

6   have had principal paid off and diverted, so that they're

7   creditors of this estate, are you aware of any of that group

8   that aren't also still invested or direct lenders in other

9   loans in this estate?

10  A.   No.

11  Q.   So in most cases, the lenders are involved in multiple

12  loans?

13  A.   Yes.

14  Q.   Okay.  You were also shown a schedule that demonstrated

15  that Fertitta was actually paid the higher interest rates.  Do

16  you recall that it came from -- it was a February statement

17  that came from --

18  A.   Yes.

19  Q.   -- the debtor's records, and you testified that you --

20      (Interruption over the telephone line at 11:46:55 a.m.)

21          MR. GORDON:  Your Honor, I'm going to object to the

22  form of the question.  There is no evidence that Fertitta was

23  paid a higher interest rate.  The evidence is Fertitta was paid

24  the interest rate, and these are the leading questions.

25          THE COURT:  All right.  I'll sustain on the grounds

1   of a leading question.

2           MS. JARVIS:  Okay.

3           THE COURT:  And, please, don't go over things we've

4   already gone over --

5           MS. JARVIS:  Okay.

6           THE COURT:  -- because our time --

7           MS. JARVIS:  It --

8           THE COURT:  -- is getting short.

9           MS. JARVIS:  Yeah.  Yeah.  And all I was getting to,

10  your Honor, is that he testified that that --

11          THE COURT:  Well, just ask a question.

12          MS. JARVIS:  Okay.

13   BY MS. JARVIS:

14  Q.   Have you independently gone back and verified whether the

15  interest rate, the 18 percent on Hasley Canyon and the

16  13 percent on Tapia Ranch, was actually paid to Fertitta?

17  A.   Yes.

18  Q.   With respect to your concern that the higher interest rate

19  paid than other --

20          MR. GORDON:  Your Honor, I'm going to object to the

21  use of the word "concern", and she's characterizing his

22  testimony.  If she has a question, ask the question.

23       (Interruption over the telephone line at 11:47:54 a.m.)

24          THE COURT:  Okay.

25          MR. GORDON:  Let's not editorialize or add

1     additional --

2              THE COURT:  Please just ask questions.

3              MS. JARVIS:  Okay.

4      BY MS. JARVIS:

5     Q.   Have you interviewed Mr. Milanowski with respect to his

6     relationship with Fertitta and Mr. Bullard?

7     A.   Yes.

8     Q.   Have you interviewed other staff members at the debtor with

9     respect to their relationship to Mr. Bullard?

10    A.   Yes.

11    Q.   Do those interviews form the basis for your motion today?

12    A.   Yes.

13             MR. LANDIS:  Objection.  Hearsay.

14             MR. GORDON:  Your Honor, objection.  That is

15    absolutely hearsay.  You can't get it in the back door.  You

16    can't get it in the front door.

17             THE COURT:  Sustained.

18             MR. GORDON:  Counsel knows that.  Move to strike the

19    answer.

20             MR. LANDIS:  Hearsay.

21             MS. JARVIS:  Your Honor, he --

22             THE COURT:  Sustained.

23             MS. JARVIS:  He was asked whether there were

24    documents on which he based that opinion.  All I'm asking is if

25    there weren't documents were there interviews upon which that

1   opinion was based.

2          MR. LANDIS:  So there were interviews, your Honor.

3   Anything that was said is hearsay.  The same objection.

4          MS. JARVIS:  What --

5          THE COURT:  I'll sustain --

6          MS. JARVIS:  I'm not --

7          THE COURT:  -- the objection.

8          MS. JARVIS:  I'm not asking for the hearsay, but I'm

9   just asking to clarify the basis on which -- he was asked of

10  the basis on which he formed --

11         MR. LANDIS:  Well, let the witness --

12         MS. JARVIS:  -- his opinion.

13         MR. LANDIS:  -- testify, then --

14         THE COURT:  Well, more importantly --

15         MR. LANDIS:  -- Judge.

16         THE COURT:  -- it goes beyond cross-examination, so

17  I'll sustain the objection.

18         MS. JARVIS:  Okay.  Let me ask one last --

19         THE COURT:  Oh, I'm sorry.  That was a question on

20  cross.  I apologize.

21         MS. JARVIS:  It was a question on cross.

22         THE COURT:  All right.

23         MS. JARVIS:  And I was just clarifying.  They asked

24  him whether it was formed based on documents.  He said no.  I'm

25  asking him was it formed based on interviews.

1          MR. GORDON:  Actually, your Honor, he never testified

2    to that either in his deposition or -- and I'm sorry -- in his

3    declaration.  What I asked him about was counsel's statement in

4    the pleading as to any basis, so he's never testified --

5          THE COURT:  Okay.

6          MR. GORDON:  -- to that position.

7          THE COURT:  All right.  So I'll sustain the

8    objection.

9    BY MS. JARVIS:

10   Q.  With respect to the difference between the 2.1 amount that

11   was in the debtor's records that Fertitta would owe the estate

12   and the 1.5 million which is higher than what's in your

13   declaration, the restatement that you explained about the

14   borrowers, is that the reason for the lowering of the amount?

15   A.  Yes.

16         MS. JARVIS:  That's all I have, your Honor.

17         THE COURT:  Okay.  This is a basic question I think I

18   certainly thought I knew the answer to.  Isn't it true that the

19   company was run such that when money would come in from loans

20   and then be paid out of USA Commercial to all the lenders

21   regardless of whether or not the particular loan the lender had

22   an interest in had made that payment?

23         THE WITNESS:  That's correct, your Honor.

24         THE COURT:  Okay.  So to the extent that the

25   Fertittas received any money, they received money in the same

1    process everybody else did, right?

2              THE WITNESS:  That's correct, your Honor.

3              THE COURT:  Okay.  Now, when you say the Fertittas

4    were overpaid, were they in any nonperforming loans?

5              THE WITNESS:  They were in nonperforming loans that

6    were -- that the company continued to pay interest on.

7              THE COURT:  Okay.  Are they still owed their

8    principal?

9              THE WITNESS:  Yes.

10             THE COURT:  So to the extent they were, quote,

11   "overpaid," that's interest payments they may have received

12   before they should have received the interest payments.

13             THE WITNESS:  They were interest payments that were

14   paid by USA Commercial Mortgage when USA Commercial Mortgage

15   did not receive the interest from the -- from the ultimate

16   borrower.

17             THE COURT:  Okay.  Any questions in response to mine

18   just limited --

19             MR. GORDON:  Yes, your Honor.

20             THE COURT:  -- to my questions?

21             MS. JARVIS:  Your Honor, also, we need to go back and

22   do the housekeeping of it, and we'd ask that --

23             THE COURT:  Okay.

24             MS. JARVIS:  -- the exhibits be admitted.

25             THE COURT:  All right.

1    MS. JARVIS:  And Mr. Landis wanted that addressed.

2    RECROSS-EXAMINATION

3    BY MR. GORDON:

4    Q.   Mr. Allison, not all the funds that were received by

5    USA Capital as the servicing agent were misapplied to loans, is

6    that correct, were paid --

7    A.   I'm sorry?

8    Q.   If money came in on loan A, it was not automatically paid

9    out to loan B, C, or D.  Some of the money that came in on

10   loan A was actually paid on loan A.

11   A.   That's correct.

12   Q.   Okay.  Your task is to determine which moneys that came in

13   on loan A or loan B was used to pay loan C or D, correct?

14   A.   That's correct.

15   Q.   Okay.  So when the Court said isn't it true that money

16   which came in from loans and then was paid out, it was paid

17   out -- that is correct -- but it was not necessarily paid out

18   to the wrong lenders.

19   A.   I'm sorry.  Mr. Gordon, if you're -- you're on -- to be

20   clear, USA Commercial Mortgage kept the -- kept the company

21   alive by paying interest to all the investors at -- every month

22   up until April.

23   Q.   Right.  But not all the money that came in up until the

24   petition date was misapplied.  Part of it was.

25   A.   Yeah.  Because about 60 percent of the loans were not

1    paying interest at the time as of April.

2    Q.    Right.

3    A.    But they -- the company was paying 100 percent of --

4    Q.    I agree.

5    A.    -- the loans' interest.

6    Q.    But that may not have been the situation in December of

7    2005 or January 2006.  Moneys were still coming in and were

8    being applied correctly.

9    A.    Moneys were coming in, and we've -- we've gone back to --

10   and -- and I would -- as we're going through our exercise,

11   Mr. Gordon, I would -- I would -- I wouldn't go in to testify

12   today that moneys were being applied correctly.

13   Q.    Well, would you testify that all the moneys that came in

14   were being applied --

15   A.    Paid out?

16   Q.    -- incorrectly?

17   A.    Well, I would be -- I would testify that the moneys that

18   were -- that were collected were paid out, and, you know, what

19   it was doing -- whether they were paid out in term -- within

20   the terms of each -- of each of the notes is something that

21   we've gone back and restated.

22   Q.    Okay.  And this is not only applicable to

23   Fertitta Enterprises.  This would be applicable, then, to

24   across the board the direct lenders.

25   A.    Yes.

1    Q.    So singling out Fertitta is simply putting one example on

2    the board.

3    A.    You know, the reason Fertitta's singled was because that

4    they -- they look more like a co-lender than a direct investor.

5    Q.    Because they participated in the exit fee.

6    A.    And -- and -- and the -- in the -- in the -- in the top --

7    in the top-rate interest coming in as well, Mr. Gordon.

8    Q.    Right.  They didn't get charged a service fee.

9    A.    Right.

10    Q.    Okay.  The 1.5 million that you claim, is that money that

11    the Fertittas received in payments on other loans?

12    A.    That's the total -- the 1.5 is the total of their portfolio

13    that was received in excess of what was collected from the

14    borrowers.

15    Q.    As principal or interest?

16    A.    Interest.

17    Q.    That may have been received as principal, but it was

18    applied to interest.

19    A.    There -- in some instances, there were transactions where

20    there -- where a collection was made, and it was styled as a

21    principal payment.  The payment was applied to principal.

22    Q.    And that applied to Fertitta, and it probably applies to --

23    A.    Others.

24    Q.    And thousands of others, hundreds of others?

25    A.    We're going through each of these transactions.

1    Q.   I think you testified -- well, did you testify hundreds or

2    thousands?  I can't remember.

3    A.   Probably, thousands.

4              MR. GORDON:  Thank you.

5              THE COURT:  Thank you.

6        Any questions in response to mine?  All right.

7        Thank you.  You're excused.

8              THE WITNESS:  Thank you.

9              THE COURT:  Just to shorten this up, I'm just going

10   to admit the exhibits just so we don't have to argue about

11   them.

12       I understand your objections, but we've taken a lot of

13   time, and I as I'll indicate later I think rightfully so.  Just

14   five minutes of argument on each side.

15             MR. GORDON:  Your Honor, before we go to argument, I

16   have Mr. Bullard here because --

17             THE COURT:  Oh.

18             MR. GORDON:  I can put him on the stand.  I'm not

19   asking the Court to -- but I can put him on the stand to

20   clarify a couple of points if that would be of any help to the

21   Court if there's any questions in the Court's mind.  He's

22   pretty much answered in his declaration what I think --

23             THE COURT:  I think we'll just rely --

24             MR. GORDON:  -- he needs to answer.

25             THE COURT:  -- on the declaration.

1          MR. GORDON:  Okay.  Thank you, your Honor.

2          THE COURT:  All right.  Go ahead.

3          MS. JARVIS:  Your Honor, Section 1102(a)(2) does

4    allow the Court to change the membership of a committee

5    appointed by the U.S. Trustee if the Court determines that a

6    change is necessary to ensure adequate representations to

7    creditors.

8          And it's on this basis that the debtor is arguing that

9    Fertitta be removed from the committee, and it is for the

10   following reasons:

11         First, Fertitta had a higher interest rate paid to them

12   than any other investors on the same loans.  It may have

13   special solicitations offered to them that were not offered to

14   any other investors and the solicitations that, indeed, do not

15   appear to exist in the business records of the company.

16         Unlike every other direct investor in the case, it was

17   charged no servicing fees by the debtor prepetition.  In that

18   way as testified by Mr. Allison, they were treated as a

19   co-lender, not as the rest of the investors were treated that

20   where loans were brokered and serviced by this company.

21         Further, that loan-servicing payment was not paid even

22   though they were contractually -- or not collected even though

23   they were contractually obligated to do so.

24         In this way, it is different and has special treatment

25   that is not representative of the group of investors as a

134

1    whole.

2        It was given being able to again participate in the exit

3    fees again indicating that it is more like a co-lender, being

4    treated more like a co-lender, than the direct lenders or

5    investors that were otherwise serviced by this company.

6        This makes it an independent lender in substance and not

7    an investor in loans through this company as was everyone

8    else.

9        Further, between the past-due service fees that were not

10   collected and the overpayment of interest, Fertitta owes the

11   debtor almost 1 point -- or around 1.5 million dollars.

12       And Mr. Fertitta in the actions taken by his counsel last

13   week has taken the decision that these overpayments cannot be

14   collected from Fertitta by any other way than suing them.

15       And that Fertitta is entitled, in fact, to be double paid

16   its interest when collections of the already-paid interest is

17   finally made by the borrowers.

18       That position again is not representative and is, in fact,

19   adverse to the hundreds of direct lenders, actually, thousands

20   of direct lenders whose principal was diverted and who were

21   underpaid in this estate.

22       As these are the true creditors in this group of lenders

23   and as 1102 -- if you look 1102, it only allows for

24   appointments of committees of creditors or equity security

25   holders.

1        So it is creditors that ought to be on this committee by

2    statute, and he does not fit into this category both because he

3    is not a creditor and because he's not representative of this

4    group.

5        The code's limitations to committees of unsecured

6    creditors and equity holders is understandable as is the

7    limitation that they adequately represent the entire

8    constituency that they serve.  These are the constituencies in

9    the case that are forced to stay in the case to get paid.

10        For instance, secured creditors don't have statutory

11    committees appointed to represent them because they do not have

12    to stay in the case.

13        They can seek to have their collateral released from the

14    estate, and they can take it out of the estate and seek

15    remedies outside of the case.

16        Fertitta in that way is like a secured creditor.  It's not

17    an appropriate member of the committee because Fertitta has

18    already taken the position that these loans are not property of

19    the estate.

20        That they should be released from the bankruptcy and

21    without regard to the many thousands of direct lenders that are

22    in this case who cannot get out of this case who are owed money

23    by this estate because of the diversions of principal

24    prepetition.

25        And I might add that when he does -- if Fertitta seeks to

1    take these loans out of the estate that it will be very

2    difficult as this Court has recognized for the other lenders

3    for these amounts to be collected and then paid to the other

4    lenders and the unsecured creditors who are entitled to this

5    amount of money.

6         And, therefore, both because Fertitta is like a co-lender

7    is not the same.  It is not representative of the position that

8    the other direct lenders find themselves in.

9         And because he is not a creditor of this estate and, in

10   fact, is not an appropriate member of a committee under the

11   statute, we would ask that Fertitta be removed from the

12   committee.

13             THE COURT:  Okay.  All right.

14        (Colloquy not on the record.)

15             MR. GORDON:  Your Honor, I'll keep it very short.

16   1102(a)(4) now provides to the Court a new provision which

17   allows it, "On request of a party in interest and after notice

18   and a hearing, the Court may order the United States Trustee to

19   change the membership of the committee appointed if the Court

20   determines that change is necessary to ensure adequate

21   representation of creditors or equity security holders."

22        What they're asking for is that Mr. Bullard be removed,

23   Fertitta be removed, despite the fact it is the largest

24   independent direct lender because they don't like Mr. Fertitta

25   or Mr. Bullard.

1        Also, as candidly admitted by Mr. Allison -- and I --

2             MS. JARVIS:  And, your Honor, I would --

3             MR. GORDON:  -- appreciate it --

4             MS. JARVIS:  I would object.  There's no evidence

5    that we don't like him, and that's why we're not asking for him

6    to be removed, so I would ask that to be stricken.

7             THE COURT:  Oh, all right.  And I didn't -- I mean, I

8    guess we could Mr. Bullard on the stand, so --

9             MR. GORDON:  Your Honor, I appreciate what

10   Mr. Allison said.  What his real frustration is is that these

11   sold-out -- let's call them sold out -- direct lenders who are

12   pure creditors are not represented.  That can be dealt with.

13        The U.S. Trustee has already said that can be dealt with

14   by adding them to the Unsecured Creditors Committee.  That

15   doesn't mean that you remove Mr. Bullard unless he meets the

16   standards as set forth in the case law.

17        The case law is very clear, and we have cited it, and the

18   only response to our case law is the response in a footnote

19   from counsel to the effect of, oh, now with 1102(a)(4) none of

20   the case law applies because it was all prior to the amendment

21   of 1102(a)(4) in October of 2005, six months ago.  That's not

22   true.  That's not so.  The case law is still the same.

23        And it is best set forth in our points and authorities in

24   which we cite at page 6 a whole series of cases beginning with

25   in re Hill Stores Company (phonetic) where it states the

1  bankruptcy code requires, quote, "That conflicting groups of

2  creditors have a voice through adequate representation on a

3  committee.

4      Adequate representation exists for a single committee so

5  long as a diverse interest in the various creditor groups are

6  represented on and have participated in the committee."

7      And, finally, in in re Lakleta Cab Company (phonetic), a

8  1992 decision by the Bankruptcy Court in the Eastern District

9  of Missouri, quote, "Courts should not remove a member from a

10  creditors committee in the absence of specific evidence which

11  support a finding that the member has breached or is likely to

12  breach a fiduciary duty to or has an actual impermissible

13  conflict of interest with the class of creditors represented by

14  that member."

15      Your Honor, here's the basis.  One, well, clearly, we

16  believe and we suspect there's some purported relationship with

17  Mr. Hantges and Milanowski.

18      There's no evidence of that other than Mr. Bullard's

19  declaration in which he says I have no interest.  Fertittas

20  have no interest.

21      What we did is we negotiated a deal because we're the

22  largest investors.  And by having us do this deal, they avoided

23  a brokerage fee, so we got an exit fee which gets us to the

24  exit fee.  Gee, that's a terrible thing because they're a

25  co-participant.

1        The exit fee is a success fee.  If everyone gets paid,

2   then it's shared with Fertitta.  That is not in conflict with

3   the interests of the direct lenders.

4        In fact, that is directly in their best benefit because if

5   they get paid and only if they get paid does Fertitta then get

6   a portion of the exit fee, in this case, and I guess an

7   unsecured claim for it.

8        Third, well, Fertitta got a different interest rate.  No.

9   It's the same interest rate.  For some reason that's

10  unexplained, that's not documented.

11       And as Mr. Bullard stated, I don't know why.  They took

12  out the service fee from all the other investors and didn't

13  take it out from Fertitta.

14       That doesn't mean it's still not due.  That doesn't

15  mean that, ultimately, they won't recover it.  That's simply

16  it.

17       As far as the 1.5, I am completely confused because the

18  witness testified at one point it was simply an adjustment on

19  the loans, and then he says it's money due because it was

20  diverted to other loans and paid over.

21       If it was diverted, that's something that's applicable to

22  thousands.  Every other direct investor, direct lender,

23  apparently may have that problem.

24       If anything, having people on the committee who have that

25  problem is most indicative of the interest of the direct

1    lenders.

2        As far as Mr. -- as Fertitta Enterprises participating

3    through Ms. Chubb in a motion, I would also remind the Court as

4    to the position taken last week by the committee of which

5    Mr. Bullard is a chairperson.

6        Our position was very clearly that we believe that any

7    direct-lender group which has 51 percent is entitled to

8    terminate the service agreement.

9        But on the other hand, the committee took the position

10   last week that that should not be done and should be deferred

11   until July 25th for further consideration -- now August 4 -- to

12   see what the motion says to release funds.

13       The committee from the very beginning and I have taken the

14   position that there are certain benefits received by the direct

15   lenders by participating in these proceedings and by having the

16   debtor fund it, and that will come up later on this afternoon.

17       Clearly, accountings are for the benefit of the direct

18   lenders.  H Central (phonetic), the Court had an interplay with

19   me last week about where is the best forum, and I said the

20   committee's belief is possibly this Court is the best forum to

21   resolve due-to/due-froms.

22       So Mr. Bullard is one of seven members of this committee.

23   There is no showing of actual conflict.

24             THE COURT:  Let me ask an obvious question.

25             MR. GORDON:  Sure.

1          THE COURT:  But I'd just like you to affirm it for

2    the record.  I assume since you are up here arguing on behalf

3    of his not being removed that the committee voting as a whole

4    and/or without Mr. -- is it Bullard or Ballard (sic) --

5          MR. GORDON:  Bullard.

6          THE COURT:  -- Bullard voting that the committee has

7    directed you to take this position.

8          MR. GORDON:  Yes, it has.

9          THE COURT:  Okay.

10         MS. JARVIS:  Your Honor, there --

11         MR. GORDON:  And Mr. --

12         MR. JARVIS:  There are --

13         MR. GORDON:  Mr. Homfeld is here to say that -- and

14   as Mr. Bullard testified in his declaration -- this was

15   disclosed to the committee early on.

16      I believe that there may be a difference in terms of

17   Mr. Helms maybe taking a slightly different position on that.

18   I don't know.  I have had -- and I'll represent to the Court.

19      But as far as I know from everything we've seen, from

20   submitting our briefs, from talking to the members of the

21   committee, the committee supports Mr. Bullard --

22         THE COURT:  Did the committee --

23         MR. GORDON:  -- remaining.

24         THE COURT:  -- take a vote?

25         MR. GORDON:  My understanding, the vote is positive.

1          THE COURT:  Okay.

2          MS. JARVIS:  Your Honor, I would just say there are

3    two.  I mean, there are two committee members in the courtroom,

4    and I think that if the Court, you know, wants the answer to

5    that question they could answer that themselves.

6          MR. GORDON:  Yeah.

7          THE COURT:  Okay.  Well, I --

8          MR. GORDON:  The Court can.

9          THE COURT:  Again, I'm just assuming since you're

10    making the argument, and you're representing the -- you know,

11    the same token could be said for any attorney who argues a

12    position.

13        I never ask the question did your client really tell you

14    to say that or allow you to say it, but here it's a little

15    important because --

16          MR. GORDON:  Well, it --

17          THE COURT:  -- we've got --

18          MR. GORDON:  And not only is it --

19          THE COURT:  -- got the committee.

20          MR. GORDON:  Not only is it important.  But when you

21    deal with committees, it's a far different world than when

22    you're representing debtors.

23        And in that case, we are very careful in terms of

24    inquiring and getting a consensus because you have to in the

25    committee process.

1        I will tell you that I've had no indication from anyone

2    since this motion was filed last week in talking to any of the

3    members that there was any problem with this --

4               THE COURT:  Okay.

5               MR. GORDON:  -- or at least the majority.  Okay.

6    And, again, I'll be very candid to the Court.  I have been

7    informed second- or third-hand that Mr. Helms may have some

8    slight hesitations or hesitancy.

9        I will also tell the Court that -- and Mr. Bullard wanted

10   to address the Court after the motion's over, and he can.  He's

11   very unhappy with the fact that we are spending the time and

12   money on this.

13       And he has offered -- and I've said I don't know how you

14   do it, but he's offered to reimburse for the expense of this.

15   That came up in the Court comment last week.  I think it is our

16   obligation to defend it, no question about it.

17       He's a member of the committee, and it goes to the

18   integrity of the committee, but he has stated to me and he

19   asked to state that to the Court afterwards despite whatever

20   the outcome is that he was prepared to reimburse.

21       The final item is that they said that Mr. Bullard looks

22   for a double recovery.  I will tell the Court that's

23   categorically not so.  It is what it is.  If he owes a service

24   fee (indiscernible), they'll pay it.  They're not looking for

25   double recovery.

1       And I think the most clear, the clearest indication, of

2  the way in which he has divided his position as Fertitta as a

3  direct lender and his obligations as a member and the chairman

4  of the committee is the fact that he has taken and the

5  committee has taken positions that are not directly in line

6  with the other direct lenders who have filed motions in this

7  court.  We did not necessarily support their positions last

8  week, and that was a committee decision.

9       So, your Honor, I don't believe that they've established

10  the standards of the case law, 1104.  It is clear what they

11  wish.

12       And that is their real objective is to get representations

13  for the sold-out direct lenders, and they should be

14  represented.  I absolutely firmly agree with that.

15            THE COURT:  Okay.  Mr. Landis, do you wish to add

16  anything?

17       (Colloquy not on the record.)

18            THE COURT:  It's all your fault.  You appointed the

19  committee.

20            MR. LANDIS:  Every single time, Judge, there's not

21  much that isn't.  Just ask my wife.  A couple of things, Judge.

22  This is about the committee of direct lenders.  Yeah.  I know I

23  gave it a longer name than that, but you and I both know what

24  it is.

25       It's not about just Fertitta Enterprises because the code

1    says -- and I know -- that you get to change when the change is

2    necessary to ensure adequate representation of creditors or

3    equity security holders.  That's when you change the

4    membership.

5         I think the evidence that's before you is that, in fact,

6    Mr. Bullard and the committee as a whole does, in fact,

7    represent the interests of direct lenders across the board in

8    this case.

9         Second, how did this whole thing happen?  You're right.

10   It's my fault.  I appointed them.  Well, I tried to lay it out

11   for you as best I could in our opposition papers, Judge.

12        We are required to appoint persons willing to serve that

13   hold the seven largest claims against the debtor of the kind

14   represented on the committee.  That's in that code thing, too,

15   down there under 1104(b)(1), so that's where I came up with

16   this whole idea.

17        And, mind you, I'm doing this on the git-go without a

18   whole lot of information because schedules weren't filed with

19   the petition, and they weren't filed in 15 days.  They weren't

20   filed until long after the fact, so I'm doing the best I can,

21   and we solicited heavily.

22        Where did we start the solicitation?  Well, we had to rely

23   on the debtors to give us the information, and they were kind

24   enough to do that, and I will credit them for being

25   professional in their approach.

1          They met with our office in advance of the filing of these

2     cases to give us a heads-up and let us know what was happening.

3     And in that meeting, they gave us that list right there.  It's

4     in the evidence before you know.  Okay?

5          The members of this committee are all in that top-20 list,

6     so I didn't just come up with them.  They were the folks that

7     were identified by the debtors.

8          Solicitations were sent, and they said that they were

9     willing to serve.  Mr. Bullard and everyone else on the

10    committee did exactly that.

11         So from a procedural standpoint, Judge, we relied on

12    information that the very debtors that now object to the

13    individual being on the committee provided to us.  They all

14    indicated to the extent that they're appointed on the committee

15    that they're willing to serve.

16         Everybody that's involved in this case as a direct lender

17    has contract rights that run between them and other parties.

18    That's why they're Executory Contracts Committee members, and

19    there's issues back and forth between them.

20         And there's going to be issues with respect to whether or

21    not they got claims as a result of what USA Commercial Mortgage

22    did before Mr. Allison took over as the new sheriff in town and

23    has done a credible job of trying to put Humpty Dumpty back

24    together again.

25         Members of the Executory Contracts Committee probably have

1    claims, Judge.  It's a defined term under the code,

2    Section 101, and I believe it's (a)(5).  It's right there on

3    the board for you.  You can find it.  "A right to payment

4    whether or not such right is reduced to judgment, liquidated,

5    unliquidated," and so forth.

6         To the extent that people got overpaid, and they're being

7    asked to pay money back, well, hopefully, the accounting will

8    take care of it.

9         But if it doesn't, don't you think that they might think

10    that they have a breach-of-contract claim or two against

11    USA Commercial Mortgage for what they did?  Isn't that an

12    unliquidated claim?

13        And if they hold a claim because a claim is defined, too,

14    somewhere in there, then I think that makes -- or that doesn't

15    make them a creditor?

16        "An entity that has a claim against the debtor that arose

17    at the time of or before the order for relief concerning the

18    debtor."

19        Heck, Mr. Allison told you that to the extent that all

20    this stuff that was bad that's resulted in injury to everybody

21    that's sitting out here and is an interested party happened

22    before he was appointed and happened before these cases were

23    filed.

24        The idea, a suggestion, that these people aren't creditors

25    is absolutely on the border of being specious.  It is just

1   crazy.

2       Everybody that is an investor in connection with these

3   cases has claims that have to be addressed, and they're being

4   addressed.

5       Apparently, what the debtor wants to do is make it so that

6   they can get the committees to do whatever they want, and

7   Mr. Bullard seems to be in the way.

8       We cited you the Ruff-Co (phonetic) case, Judge.  It

9   doesn't have to be happy in Storybook Land as between the

10  debtor and the committees in all regards.

11      "The creditors committee is not merely a conduit through

12  whom the debtor speaks" notwithstanding their protestations

13  from counsel bench earlier in connection with what went on in

14  the creditor-committee meetings "and negotiates with creditors,

15  generally.

16      On the contrary, it's purposely intended to present

17  necessarily different interests and concerns of the creditors

18  it represents."  It must be adversarial in a sense.  The

19  debtors don't like it.  Tough.  That's not the law.

20      We agree that when it's appropriate this Court could say

21  to the Office of the United States Trustee you haven't done the

22  job.  That's not the situation that's before you in this case,

23  Judge.  We have done our job.

24      Now, there is one issue that isn't pled, but it has been

25  the theme that underpins all of this discussion.  That there

1    are some people who got their loans sold out from under them

2    that aren't represented on the committees.

3        You touched on this in a comment from the bench that I

4    thought was real quick on the uptake which was to the extent

5    that that happened before the cases were filed aren't they

6    unsecured creditors.  Yes, they are.

7        Is there anybody on the Unsecured Creditors Committee that

8    stands in that situation?  No, not yet.  Why?  Because up until

9    May 31st we couldn't figure out who.

10        Well, we know now because we got the loan summary from

11    Mr. Allison.  We got the information as to who the debtors are

12    in each one of those loans.  I've been through it.

13        I touched in the testimony with Mr. Allison as to who I

14    identified at least quickly as the top-three investors in each

15    of the four loans that were at issue in this case.

16        And I will tell the Court that it is our intention to

17    solicit and to recompromise the Unsecured Creditors Committee

18    by adding creditors who are in that position.  Now that we have

19    the information, and we're able to do it, I will tell you we

20    will do that.

21        That will allow those folks to have a voice on the

22    Unsecured Creditors Committee and be properly represented in

23    connection with the administration of these cases, but that

24    doesn't mean the following:

25        It doesn't mean that Mr. Bullard isn't the right guy to be

1     the chair of the Executory Contracts Committee.  He's got some

2     pretty good credentials if you look at his declaration.  And by

3     the way, he was appointed the chair after he disclosed

4     everything about all the interest that he held.

5           And, second, it sure doesn't mean that the

6     Executory Contracts Committee as a whole is not representative

7     of the interests of its constituents.  That's just not true.

8           We're asking you to deny the motion.  We're asking you to

9     enter an order.  And if you want to tell me by when we will

10    have the solicitations completed with respect to adding the

11    additional members to the Unsecured Creditors Committee, that's

12    fine.

13          Thank you, your Honor.

14              THE COURT:  Okay.  All right.  I don't need any

15    reply.  I'm going to deny the debtor's motion.  Just some

16    preliminary comments.

17          We've spent a lot of time on this today, and I know it's

18    been expensive in the sense of the time spent that we've all

19    been here, but I think it's a very important issue and a very

20    important process.

21          It is very important to know that committees are fairly

22    chosen and adequately represent their constituency, and it's

23    important to understand the fiduciary duties that those

24    committee members owe to the constituency that they represent.

25          Having said that, I find there's no reason to change the

1    membership.  First, a comment about the notion that Enterprises

2    was not a creditor and hence didn't belong on the committee,

3    well, first, Mr. Landis pointed out absolutely correctly the

4    error in that legal analysis in that where they arguably aren't

5    owed money by USA Capital as the servicer because they may have

6    been in the position that they received their interest payments

7    all along the way and aren't owed any interest payments or

8    principal payments the point is as Mr. Landis correctly pointed

9    out everybody in this case is going to have a claim against the

10   debtor for breach of contract or right to equitable

11   performance, for all those things that were violations of the

12   servicing agreement.  The servicing agreements provided that

13   payments were going to be properly made.

14       Certainly, Fertitta Enterprises is now in a position by

15   which someone can challenge the money they've been paid because

16   they just received moneys in the course of everything else.

17       Secondly, Fertitta did nothing during the course of

18   receiving those moneys -- and I'll go back to the inceptions of

19   the loan in a minute -- that everybody else got.

20       The problem in this case -- yes, it was a problem -- was

21   that everybody sat there fat, dumb, and happy collecting their

22   checks every month.

23       In essence, as I have said before, it emanates the classic

24   Ponzi scheme.  As long as the money keeps coming in, nobody

25   questions, nobody challenges, and the money just comes from

152

1    either new investors or it comes from loans that weren't

2    supposed to be paid.

3        So they like everybody else received their money all

4    along.  This is not a situation in which they received money,

5    and nobody else did.

6        Now, vis-a-vis the interest and the exit fees, as to both

7    those fees, I see nothing that would preclude them from still

8    adequately representing the committee.

9        The fact they may have been treated differently along the

10   way in the initial loan transactions or servicing transactions

11   is to me of no moment.

12       For example, if we had a casino bankruptcy, and the top-20

13   creditors included Michelin (phonetic), (indiscernible), and it

14   included some gaming company that forgot to get their

15   collateral secured, and it included some wine store, each of

16   those entities may well have been paid in accordance with

17   different terms and conditions.

18       Some of them may have paid on the 90 days.  Some may have

19   been paid on a 30-day.  Some may have been paid with no

20   (indiscernible).

21       But the point is they can all adequately represent the

22   committee because they are creditors, and they owe their duty

23   to the constituency as a whole.

24       The exit fees, now, if Fertitta received exit fees to the

25   exclusion of USA Commercial, I would see a distinction, but

1      that's not the case.  They share in the exit fees.

2           And, indeed, as Mr. Gordon pointed out, their motivation

3      will be to see that the loans gets paid because at least they

4      have a claim or some right, arguably, to receive a portion of

5      those fees.

6           And, again, you don't get those fees until the loans are

7      paid in full, so that's not something that says that they're

8      biased.  That works the other way.

9           I do question -- I think there may be some evidence that

10     the debtor's motivations were not so much adequate

11     representation, but a concern about the way -- they didn't like

12     what was happening from the committee because there was no

13     analysis done on the other noteholders.

14          And while it's true there's no exit financing, there's no

15     interest, but as to the loans.  It doesn't make any difference

16     what the motivations are.

17          You know, I'm sure that the debtor in their belief was

18     concerned, and I'm not impugning any bad motives.  I'm just

19     saying there was a lot of emphasis put on Fertitta and not the

20     other entities on the committee which makes me wonder.

21          I think I've touched all the points.  Again, I

22     emphasize -- and I know Mr. Bullard knows.  I know Mr. Gordon

23     knows.  I know the committee members know, but the committee

24     members owe a fiduciary duty to their constituency.

25          And in some cases, it may well be Mr. Fertitta finds --

154

1    excuse me -- Mr. Bullard finds himself, well, arguing with

2    himself.

3        On one hand, something may be better for his client.  But

4    as committee chair and committee member, something else may be

5    better, and it's a tough position to be in, but I think it's

6    important that he's accepted.

7        The U.S. Trustee's Office did exactly what they were

8    supposed to do in the manner they were supposed to do it, and I

9    was kidding Mr. Landis by saying it was his fault.

10        My only point being it's the U.S. Trustee's Office that

11    appoints committees.  The Court does not appoint.  The debtors

12    do not appoint.  The committee appoints, but it's appointed

13    through a process.

14        Appointed through the process is normally the

15    seven-largest creditors unless they're insiders or some other

16    problem.

17        There's no evidence to suggest that these enterprises are,

18    indeed, insiders, any untoward influence, or connections.  The

19    fact that somebody may know somebody, you know, notwithstanding

20    what the L.A. Times think, everybody does know everybody in

21    Las Vegas, so, you know, I don't see that as a concern.

22        So with that, I'll deny the motion.  We'll take a short

23    break.  This is how I see things proceeding from here.  I'd

24    like to take next after this Mr. Benincasa's motion just

25    briefly, and then from there we'll go to as you suggested -- I

1   think you suggested DIP next --

2           MS. JARVIS:  Yes.

3           THE COURT:  -- DIP financing next?

4           MS. JARVIS:  Yes, your Honor.

5           THE COURT:  And then we'll take a break from about

6   1:30 to 2:30.  I have a 2:00 o'clock scheduling conference.

7   Well, if we're done by 1:30, but I can't imagine that.

8       But I need to take a break at 2:00 for a scheduling

9   conference that's going to talk a half hour.  My staff

10  certainly needs some time for lunch, so we'll take our break

11  from 1:30 to 2:30.

12      We'll take now, though, about a 15-, 20-minute break, so

13  that everybody can (indiscernible) or my staff can grab

14  something, and then we'll start back up.

15      (Colloquy not on the record.)

16          THE CLERK:  All rise.

17      (Recess at 12:25:56 p.m.)

18      (Court reconvened at 12:58:43 p.m.)

19          THE CLERK:  Bankruptcy court is now in session.

20      (Colloquy not on the record.)

21          THE COURT:  Be seated.

22      (Colloquy not on the record.)

23          THE COURT:  Just one final point on the committee

24  situation.  Yes.  I think it does make sense to add those

25  people who have no collateral left to a committee.

1     And when we were speculating about this the last time, the

2  question was, well, on one hand, they've got contracts.  But on

3  the other hand, they're unsecured.

4     The U.S. Trustee's Office is in the best position I think

5  to at least just -- you know, it's your decision to decide how

6  those committees work.

7     And I would appreciate if you could -- they do need

8  representation.  If you could add them to a committee such that

9  they'd be represented and on-board before the next hearing, I'd

10  appreciate that.

11          MR. LANDIS:  If the next hearing isn't until July --

12          THE COURT:  That's right.

13          MR. LANDIS:  -- that should be plenty of time,

14  your Honor.

15          THE COURT:  Okay.  Great.  All right.

16     So on the Benincasa matter.

17          THE CLERK:  Page 3.

18          THE COURT:  Will you state your name, please.

19          MR. BENINCASA:  Jasper Benincasa.

20          THE COURT:  Okay.  I'm not sure if you understood

21  what was happening in this matter.  The problem is with your

22  loan or with your request for funds there were a number of

23  people as I understand from what Mr. Schwartzer said at the

24  prior hearing and the basis which I ruled had put money in the

25  account to buy loans, and there were certain money.  People put

1    money in an account to get their money out because the loans

2    had been bought.

3        Unfortunately, there were more claimants to the fund than

4    there are funds.  Mr. Schwartzer's indicated the debtor is not

5    claiming any interest in any of those moneys.

6        But the point is all those people will have to fight among

7    yourselves.  You'll have to fight among yourselves as to who

8    has the right to the money, so the way it was left was he was

9    going to file what's called an interpleader action to determine

10    that.

11        Was that done or has that been done yet, Mr. Schwartzer?

12    Have we filed the interpleader?  Have you filed the

13    interpleader action, yet?

14            MR. SCHWARTZER:  No, your Honor.  On analysis, what

15    we -- and I think we mentioned it on June 21st.  We mentioned

16    that it would be inappropriate for my firm to represent

17    USA Commercial Mortgage Corporation (sic) bringing an

18    interpleader action because one of the defendants would be

19    USA Capital First Trust Deed Fund.

20        So there will be an ex parte application to employ

21    Mr. Huston as special counsel for USA Commercial Mortgage

22    Corporation (sic) to file that interpleader action.

23        And we're also going to request authority for the equity

24    security holders of USA First Trust Deed Fund's counsel to

25    represent USA First Trust Deed Fund as a defendant in that

1    interpleader action, so my firm won't be on either side of

2    that.

3              THE COURT:  Okay.

4              MR. SCHWARTZER:  The complaint has been prepared.

5    It's been drafted.  It's been sent to Mr. Huston.  The

6    application has actually been prepared.

7              THE COURT:  Can we get that done by Friday, please.

8    I mean, I'd like to get this started because these people are

9    waiting for it.  You know, the longer we go --

10             MR. SCHWARTZER:  I understand.  What we're doing is I

11   guess Mr. -- one of Mr. Allison's E-mails that he probably

12   hasn't looked at today has the application for his signature --

13             THE COURT:  Okay.

14             MR. SCHWARTZER:  -- to employ Mr. Huston as special

15   counsel.  Mr. Huston is not in a position to file the complaint

16   until the order appointing him is issued.

17             THE COURT:  Okay.

18             MR. SCHWARTZER:  And so, hopefully, we'll get that

19   uploaded --

20             THE COURT:  Okay.

21             MR. SCHWARTZER:  -- to you today, your Honor.

22             MS. CARLYON:  Is there any appetite --

23             MR. SCHWARTZER:  What --

24             MS. CARLYON:  -- to just employ him on an interim

25   basis, and we can deal --

1    MR. SCHWARTZER:  If the Court will do --

2    MS. CARLYON:  -- with the application --

3    MR. SCHWARTZER:  -- a speaking order --

4    MS. CARLYON:  -- in August?

5    MR. SCHWARTZER:  -- to do that --

6    THE COURT:  Does the U.S. Trustee -- do you all have

7    an objection with that?

8    MR. LANDIS:  I haven't even seen the application,

9    your Honor.  I have no earthly clue.

10    THE COURT:  Okay.  Well, what I can do is if the

11    U.S. Trustee's Office signs off on that I can certainly

12    authorize that order to be signed next week if it's necessary.

13    MR. SCHWARTZER:  Okay.  Your Honor, with regard to

14    that order appointing Mr. Huston, could the Court direct me

15    that the only signature I need is from the Office of the

16    U.S. Trustee, rather than --

17    THE COURT:  Yes.

18    MR. SCHWARTZER:  -- all four committees?

19    THE COURT:  That's acceptable to everyone, isn't it?

20    MR. LANDIS:  It is.

21    MS. CARLYON:  Yes, your Honor.

22    THE COURT:  Okay.

23    MR. LANDIS:  It is by our standards, your Honor.

24    We'll turn it around quickly with the debtor.

25    THE COURT:  Okay.

1          MR. SCHWARTZER:  Okay.

2          THE COURT:  So does that answer -- does that explain

3    what's happening in your case?

4          MR. BENINCASA:  Yes.  It does.  One of the loans,

5    Del Valle, has been since repaid postpetition.  I don't see

6    where there would be a conflict --

7          MR. SCHWARTZER:  Okay.

8          MR. BENINCASA:  -- on that loan.

9          MR. SCHWARTZER:  With regard to that, that's going to

10   be included in the motion that's going to be heard on

11   August 4th that we're required to file by July 7th because

12   Mr. Benincasa is in the situation that's similar to hundreds of

13   other investors in this company.

14         THE COURT:  Okay.  So that motion will be dealt with

15   at that time on that issue.

16         MR. BENINCASA:  Okay.

17         THE COURT:  All right.  Thank you.

18         MR. BENINCASA:  Thank you, your Honor.

19         THE COURT:  Um-h'm.  So I'm going to deny the motion

20   for reconsideration without prejudice to the interpleader

21   action.

22         MR. SCHWARTZER:  Thank you.

23         THE COURT:  All right.  Now, on I guess the loan.

24         MS. JARVIS:  If I may, your Honor, I think we'd like

25   to address No. 2, the motion for order on the cash-management

1    procedure --

2              THE COURT:  All right.

3              MS. JARVIS:  -- because I think we've resolved that.

4    And, in fact, this is part of the reason why we're -- you know,

5    we resolved it in favor of going forward on the DIP financing.

6              THE COURT:  Oh, all right.

7              MS. JARVIS:  It simply makes --

8              THE COURT:  Uh-huh.

9              MS. JARVIS:  -- the DIP financing more necessary.

10             THE COURT:  Okay.  On page 2, then.

11             MS. JARVIS:  Yeah.  The objections that were filed on

12   that dealt with -- because, originally, we had put the -- the

13   money that is collected that has already been paid out in

14   interest, the money collected from the borrowers that

15   Commercial Mortgage has already paid to investors on that loan

16   as interest, it is, you know, our contention that under, you

17   know, the doctrine of equitable subrogation that that becomes,

18   you know, the estate's money when that is paid, however.

19       And we had originally put it in the budget to be put in

20   the operating account.  We also had taken the interest which

21   has been accruing on the funds in the Collection Account and

22   put it into the budget.

23       However, there were objections lodged to both of those

24   issues.  And rather than resolve them at this point in time

25   which we would like to hopefully resolve in a negotiated way

1   with the four committees through probably a plan of

2   reorganization, we have set those aside.

3        So if you'd look at the budget that was filed attached to

4   Mr. Allison's declaration yesterday --

5        (Colloquy not on the record.)

6              THE COURT:  Yesterday.  Okay.

7              MS. JARVIS:  If you see on the next to bottom line,

8   it said estate funds in Collections Account, and --

9              THE COURT:  This is not the June 5th one, right?  Oh,

10  that would be June.

11             MS. JARVIS:  Yeah.  This is the one that was filed

12  yesterday --

13             THE COURT:  So it would be --

14             MS. JARVIS:  -- morning.

15             THE COURT:  -- June 20th.

16             MS. JARVIS:  Yes.

17             THE COURT:  It's too small to read.

18             MS. JARVIS:  I have that same problem.

19             THE COURT:  Do you have an extra copy?

20             MS. CARLYON:  I do, your Honor.

21             THE COURT:  All right.  Thank you.

22        (Colloquy not on the record.)

23             THE COURT:  Well, it's first and third.

24        (Colloquy not on the record.)

25             THE COURT:  Thank you.

1        MS. JARVIS:  And to resolve the objections that were

2    filed to the cash-management motion, we have taken all those

3    funds --

4        THE COURT:  And I found that in the meantime.  It was

5    attached to --

6        MS. JARVIS:  Okay.

7        THE COURT:  -- the fifth supplemental, right?

8        MS. JARVIS:  And --

9        THE COURT:  Okay.

10       MS. JARVIS:  And we've put them in the -- it's in the

11   second to last line -- estate funds in Collections Account.

12   That would include both the interest component and the amounts

13   that the estate has collected from borrowers on interest that

14   they've already paid to the lenders in that loan.

15       That currently stands at approximately $10,000,000.  That

16   will remain in that account.  We're not seeking to use that at

17   this point in time.  As I've said, that will be a subject of

18   further negotiations with the four committees.

19       THE COURT:  Okay.

20       MS. JARVIS:  So I believe with that modification we

21   would ask that the cash management be approved, and I think

22   with that modification there aren't --

23       THE COURT:  Okay.

24       MS. JARVIS:  -- any objections to it.

25       THE COURT:  And I take it there are no --

1    Ms. Karasik, comments, objection?

2          MS. KARASIK:  Eve Karasik, Stutman, Treister & Glatt,

3    on behalf of the First Trust Deed Committee.  Your Honor, just,

4    first of all, this was the third budget filed in support of

5    this motion filed on the eve last night.  We did get an interim

6    last week that was different.

7          And I just ask that we can try to stop running this case

8    like this.  It just gets very, very difficult to really

9    represent your clients when things are filed on the eve, Friday

10   nights, and nights before the hearing, and I just ask that the

11   debtors try to organize their practice a little bit better to

12   the extent that they can.

13         THE COURT:  Okay.

14         MS. KARASIK:  On the subrogation issue, we clearly

15   disagree with that.  We reserve all rights that characterize

16   the funds as estate funds in the Collection Account.  We

17   disagree with that characterization.

18         They can leave it in there if the Court approves the

19   cash-management motion, but we reserve all rights with respect

20   to that characterization.

21         We just note that I believe this motion requests use of

22   funds only through the 25th of July.  There are expenses beyond

23   the 25th of July in this budget.

24         And we request, you know, that it be clear that that is

25   the time period through which this motion follows because there

1    are additional expenses after that period in the budget that we

2    need to understand better.

3              THE COURT:  All right.

4              MS. KARASIK:  Lastly, your Honor, the budget has

5    professional fees for the debtors and for other folks in there.

6    We have not made it through our first bill.

7         We have to figure out what our budget should be for our

8    firm and for our financial adviser, and we need to reserve the

9    right in the next budget --

10             THE COURT:  Well, I'm unclear.

11             MS. KARASIK:  -- to have that --

12             THE COURT:  And someone addressed this before.

13   Professional fees, see schedule.  All these fees are apparently

14   coming out --

15             MS. KARASIK:  I think they have --

16             THE COURT:  -- of USA Commercial, but the point is

17   the fees, for example, for you wouldn't come out of

18   USA Commercial.

19             MS. KARASIK:  No.  I think ours are broken down by

20   the First Trust Deed.  There's a separate spreadsheet.

21             THE COURT:  The --

22             MS. KARASIK:  The debtors do need to allocate, and

23   they have not yet allocated.

24             THE COURT:  Okay.

25             MS. KARASIK:  And that's something we're going to

1    talk with them about in the next month before the interim-fee

2    procedure.

3              THE COURT:  I mean, what happens is it wouldn't --

4    you know, the professional fees from USA Commercial would only

5    be those for the Secured Creditors Committee -- excuse me --

6    Mr. Gordon's committee, the unsecured committee, the debtor.

7        And then moneys would flow to your clients and your -- the

8    budget then would go for there, but it wouldn't come out of

9    USA Commercial, and you agree with that.

10             MS. KARASIK:  Correct, your Honor.

11             THE COURT:  Okay.

12             MS. KARASIK:  And then I guess just a reservation of

13   rights on the amount of the fees they've budgeted for the

14   debtor's professional fees.

15             THE COURT:  Sure.

16             MS. KARASIK:  And thank you, your Honor.

17             MS. JARVIS:  Okay.  Let me just further respond,

18   your Honor.  We agree.  When we labeled these for purposes of

19   the budget as estate funds, we are not asking the Court to make

20   any determination on that.

21        Like I said, we're just holding that.  We'll either

22   negotiate that out or seek a further determination by this

23   Court at a later time, so that is without prejudice to

24   everyone's rights, and that is actually true of this budget as

25   a whole.

1    And as you recall, we had filed a motion for procedures

2    dealing with professionals, and we continued that until the

3    25th.

4    And the reason why we had filed it is because of exactly

5    what Ms. Karasik is saying which is we don't have adequate

6    figures for the committees as to their professional fees and

7    what they are.

8    So this is not meant to be determinative of how much they

9    will, you know, eventually be requesting from this estate.

10    It's just simply doing the best we have with the information

11    that we have.

12    And as we will get into in Mr. Allison's testimony in the

13    next motion, the fees at the bottom of this -- and let me just

14    show you again.

15    You can see there's a line that says incurred and unpaid

16    professional fees.  That is merely for tracking.  It's not for

17    payment.  That's why it's not up in the budget above which is a

18    cash forecast.

19    It is simply for tracking purposes again based on an

20    estimation just so we have some way of keeping track of things

21    that we believe are accruing, you know, and will eventually

22    become payable because it's important to manage and understand

23    that.

24    That is, you know, again, not determinative of anything,

25    and the Court has not allowed that.  It's simply for

1    informational purposes only.

2        We are only asking for this to be approved through the

3    25th when we would ask if we -- if the Court grants our interim

4    DIP financing, that's when it would end as well.

5        So the fact that it goes out, it's just a typical

6    13-week cash, you know, cash flow, but it's not meant to ask

7    for approval beyond that.

8            THE COURT:  Okay.  Is there any objection by the

9    committees if we make this through the 4th because the 4th is

10   when we're having the motion for direct pay?

11       Things will change based upon that because then we have

12   checks going out, so it will be extra budgets, and/or we won't

13   have checks going out.

14       So is there any problem if we make that budget through the

15   4th?  We'll discuss it on the 25th, but the budget should go

16   through the 4th.

17           MS. JARVIS:  Let me just explain.  That would be

18   easier.  And, in fact, we haven't both -- if you'll look down

19   both at -- the professional fees to be paid don't come in until

20   after the 4th.

21       And the distributions from the Collection Account also

22   don't come in until after the 4th, so neither of those issues

23   which would be new issues are going to be addressed until after

24   the 4th.

25           (Interruption over the telephone line at 01:13:09 p.m.)

1           THE COURT:  Okay.

2           MS. CARLYON:  Your Honor, there are some issues if

3    you extend it past the 25th.  For example, the $400,000 in

4    loan-servicing expenses, it's on that list of things we need to

5    more fully understand.

6           THE COURT:  Okay.

7           MS. CARLYON:  With regard to the operational

8    expenses, I don't think there's any objection, but we need to

9    have the same understanding that other expenses aren't being

10   approved by approving the budget.

11      That being said, we don't have a problem with the uses of

12   funds through the 4th, but we're not consenting to, for

13   example, the payment of the $350,000 in lender fees or the

14   $400,000 in loan-servicing expenses via this motion.

15          THE COURT:  Okay.

16          MS. JARVIS:  And --

17      (Interruption over the telephone line at 01:13:51 p.m.)

18          MS. JARVIS:  And this was prepared for the DIP

19   financing, and we intend to go through that.  That would only

20   apply if, you know, the DIP financing is approved in the form

21   that we presented it.

22          THE COURT:  Okay.  All right.  Well, let's just make

23   it through the 6th, then, just for purposes of cutoff

24   understanding full well that to the extent that any fees

25   require Court approval that this, of course, cash-management

1    budget doesn't approve those.  This is just budgeting for them.

2             MS. JARVIS:  And, your Honor, I would also, you know,

3    respond we -- the debtor has -- we have four committees to deal

4    with.

5         We get four separate, you know, requests every day, and we

6    are doing our best to provide everyone with, you know, as much

7    information as possible.

8         It's just a very difficult situation for us, and we

9    certainly -- or we've instituted weekly telephonic meetings

10   with them.  We also have meetings during the week with counsel

11   and with committees.  We are doing our best to provide the

12   information as quickly and rapidly as we can.

13        It's just, you know -- and where we're dealing with the

14   records on top of it, you know, that we've had reconstruct.

15   It's simply difficult for us to deal with this.

16        I mean, your Honor made a comment about, you know, we want

17   friends in the committee.  We don't have any friends in the

18   sense that -- we understand all the committees have their own

19   issues, and they have different issues, and we're dealing with

20   all four of those at the same time.

21        We expect that they each have their own issues that are

22   different and adverse to us, and we are doing our best to

23   address those timely.

24             THE COURT:  All right.  So just for purposes of

25   clarification, we'll continue this motion to use cash

1    collateral which was No. 3.  The first one is resolved because

2    we've taken it through today.  I'm just trying to clarify the

3    calendar.

4        So No. 407 is continued, and then I assume you'll be

5    filing a separate motion --

6            MS. JARVIS:  To continue it.

7            THE COURT:  -- to continue it?

8            MS. JARVIS:  Yes.

9            THE COURT:  Okay.

10           MS. JARVIS:  With a new budget.

11           THE COURT:  All right.  All right.  So that's

12   approved.

13           THE CLERK:  So that's August 4th, Judge?

14           THE COURT:  Yes.  No.  We'll do that July 25th.

15           THE CLERK:  Oh, July 25th.

16           THE COURT:  Oh.

17           MS. JARVIS:  To address the July 25th, but the --

18           THE COURT:  The budget is continued --

19           MS. JARVIS:  The budget --

20           THE COURT:  -- to August 4th.

21           MS. JARVIS:  -- continues until August 4th.

22           THE COURT:  Correct.

23           MS. JARVIS:  Okay.

24           THE COURT:  Okay.  Next, you said you want to do the

25   lending motion.

1          MS. JARVIS:  Yes.  The DIP financing, and I think to

2     start out we're going to go straight into again testimony from

3     Mr. Allison to answer these questions if the Court will allow

4     us to do that.

5          THE COURT:  Ooh, I guess we can -- we only have

6     15 minutes before I have to take a recess.

7          MS. JARVIS:  Yeah.  But let me first go through -- in

8     fact, this might be helpful.  Maybe we can deal with that

9     afterwards, but let me go through and just explain.

10     We have been in intense negotiations with all four

11     committees.  And as a result -- and with the DIP lender.  And

12     as a result of that, there are some changes that I would just

13     like to address before we --

14          THE COURT:  All right.

15          MS. JARVIS:  -- take a break.

16          THE COURT:  Let's do that, yes.

17          MS. JARVIS:  Okay.  We have agreed and the DIP lender

18     has agreed that this will be -- what we're requesting today is

19     interim financing between now and July 25th.

20     And that will be limited by $3,000,000 only to be used as

21     necessary and, you know, appropriate to prevent irreparable

22     injury, so the amount we're asking for today will be limited to

23     that $3,000,000.  We also have negotiated with the lenders --

24          THE COURT:  And the fees will be based upon that

25     3,000,000 and not the 15,000,000.

1          MS. JARVIS:  Well, there will be no exit fee that is

2     going to be charged, for instance, if the Court does not grant

3     the permanent financing on the 25th.

4          However, the fees as far as the origination fee which is I

5     think $150,000 and the other fees involved in there would

6     still, you know, remain in effect --

7          THE COURT:  But not the fee --

8          MS. JARVIS:  -- during that period.

9          THE COURT:  -- based upon the maximum authorized.  In

10    other words, there's a fee in there that is also -- there's a

11    fee on the basis of how much you actually took.  There's a fee

12    based upon which you have the right to take.  That's based upon

13    the 3 as opposed to the 15.

14         Of course, for one-month's difference or two-months'

15    difference, it probably doesn't make much difference, but --

16         MS. JARVIS:  Yeah.  Let me have further

17    discussions --

18         THE COURT:  Okay.

19         MS. JARVIS:  -- to clarify that --

20         THE COURT:  Um-h'm.

21         MS. JARVIS:  -- over the lunch period, but I think

22    that is in there, actually, that that fee would still be in

23    there.

24         There are also the fees -- no fees are paid until the deal

25    actually closes until -- and this is just a clarification.  So

1    until the funding actually closes, no fees of any kind would be

2    paid.

3         The debtor will give the Fund committees who are, you

4    know, of course, a part of -- I mean, it's the Funds' loans

5    that are part of the collateral that's being pledged for the

6    DIP financing.

7         And because of that, then the debtor will agree to give

8    the Fund committees the right or I guess the debtor will not

9    enter into loan documents until the Fund committees have agreed

10   to the form of the loan documents.  So as between the debtors

11   and the Fund committees, that agreement will be in there.

12        Further, the debtors will not draw down on the DIP lending

13   loan unless, again, the debtors get written approval from the

14   Fund committees for that drawdown.

15        During this interim period, there also would be no first

16   right of refusal on the second tranche or the second piece of

17   the funding which is with respect to the individual loans that

18   have unfunded, you know, requirements.  That there would be no

19   first right of refusal during that interim period with respect

20   to those.

21        Although, we do intend to go forward and continue to

22   negotiate in hopes that if we can get the DIP financing

23   approved today, then we can go forward and try to tee those up

24   for approval on the 25th because there are several projects as

25   we will demonstrate that are in pretty dire straits with

1   respect to preserving the collateral of lenders and of the Fund

2   debtors, so that would not apply.

3       But we would not -- they would only look at those loans if

4   we, if the debtors, request them to do that, and the debtors

5   would only request them to do that if they had agreement with

6   the two Fund committees.

7              THE COURT:  Well, but what if a loan is held by

8   direct investors, for example, the Canepa --

9              MS. JARVIS:  Um-h'm.

10             THE COURT:  -- Canepa loan?

11             MS. JARVIS:  Canepa.  Then yeah.  And in that

12  instance, what would happen is we can go forward if the

13  committees can --

14             THE COURT:  Can or cannot?

15             MS. JARVIS:  -- can --

16             THE COURT:  Um-h'm.

17             MS. JARVIS:  -- go forward if the committees, the two

18  committees, agree to request a funding proposal to be made by

19  the lender in the interim and to notice that up.

20             THE COURT:  Well, why would the -- assuming neither

21  of the Funds were investors in any particular loan, why should

22  they have a say?

23             MS. JARVIS:  Because this would require some

24  due-diligence fees that would then be part of the DIP lending,

25  and the Funds have collateral.  They have 19 loans between them

1    that would be pledged as collateral for the DIP financing.

2              THE COURT:  Okay.

3              MS. JARVIS:  And in the interim, you know, between

4    the initial financing and the permanent financing, this issue

5    of allocation with respect to individual loans -- and those

6    individual loans by the way would be secured, not

7    cross-collateralized.  But when granted, they would be secured

8    solely by the project on which they are funding.

9              THE COURT:  But they would prime --

10             MS. JARVIS:  They --

11             THE COURT:  -- the present loan.

12             MS. JARVIS:  That would be the proposal.  It would be

13   noticed up separately and basically noticed up, so the direct,

14   you know, lenders or Fund lenders that are in that would have

15   the opportunity, you know, to decide that, you know, in

16   accordance with their contractual rights whether or not they

17   want this to go forward.

18             THE COURT:  Okay.  So this is sort of the cart before

19   the horse, and it all meshes together.  None of these funds are

20   sought to be borrowed on the interim basis for anything but

21   advancements on current loans; is that correct?

22             MS. JARVIS:  No.  Well, the 3,000,000 that we're

23   talking about now is for, you know, operational enforcement,

24   you know, purposes to, you know, just move generally --

25             THE COURT:  So it would go to USA --

1           MS. JARVIS:  -- the estate.

2           THE COURT:  -- directly.

3           MS. JARVIS:  Yes.  Yes.  And the way the second piece

4    ties in which is the piece where you're doing the loans on

5    individual projects that have unfunded requirements is that the

6    DIP lender will not give us, basically, a good deal or, you

7    know, the commitments on the second piece unless we have the

8    first piece in place, so they're tied together.

9         And it's been negotiated, so that there can be a lower

10   interest rate overall.  And, in fact, that interest rate enures

11   to the benefit of the entire debtors because if we can get a

12   loan at a lower interest rate to fund this unfunded

13   requirement, you know, at a higher interest rate, then, of

14   course, the difference between it would be property of the

15   estate, and it would benefit everyone in the estate.

16          THE COURT:  So I guess what you're saying -- so under

17   this -- since we're not having professional fees disbursed, I

18   guess I don't understand in this cash budget why we need to

19   borrow money during this month for operations and enforcement

20   according to this cash-management budget we just approved.

21          MS. JARVIS:  Yeah.  I will go through that with

22   Mr. Allison, if you would --

23          THE COURT:  Okay.

24          MS. JARVIS:  -- you know, bear with me and because

25   this is -- and explain this budget as to what has done.  Those

1    professional fees are put on there just so that it's clear kind

2    of what's accruing --

3            THE COURT:  Sure.  They're going to ultimately

4    accrue.

5            MS. JARVIS:  -- because --

6            THE COURT:  But --

7            MS. JARVIS:  -- otherwise you're financing --

8            THE COURT:  I agree.

9            MS. JARVIS:  -- on the backs of professionals, and it

10   doesn't make any sense to put yourself in an

11   administratively-insolvent --

12           THE COURT:  No.

13           MS. JARVIS:  -- situation.

14           THE COURT:  I agree, but I guess what I'm saying is

15   you're showing -- isn't there a showing that there are funds

16   available for operations without a loan?  Isn't that what this

17   budget shows?

18           MS. JARVIS:  And if you can hold that thought --

19           THE COURT:  Okay.

20           MS. JARVIS:  -- 'til we get through describing this,

21   I will have Mr. Allison explain kind of how the budgeting --

22           THE COURT:  Okay.

23           MS. JARVIS:  -- and the deeds --

24           THE COURT:  All right.  And since we're going to be

25   having to take a break, let me tell you a real concern, and,

1    perhaps --

2            MS. JARVIS:  Okay.

3            THE COURT:  -- your changes deal with that.

4        But I am very concerned about management acting as if the

5    loans that the direct lenders have are loans in which he is not

6    merely the servicer, but managing a fund.

7        In other words, many of these motions talk about we've got

8    to make these loans, and we've got to do all these things to,

9    in essence, balance it all out, make all the money come back,

10   not just balance it out inter se, but to get more money into

11   the estate, so then we can pay other people.

12       The problem is that these are all direct -- at least

13   vis-a-vis Commercial Mortgage and the direct lenders, each

14   person has their own interest in a deed of trust which is going

15   to rise or fall on where that deed of trust is.

16       Now, there's going to have to be truing up as between the

17   people who receive money, and it seems to me that the debtor,

18   the debtor's management, Mr. Allison, is not in a position to

19   say we've got to give a new advance on this loan if the lenders

20   in that loan don't agree with that analysis, and that's what

21   troubles me.

22           MS. JARVIS:  And the --

23           THE COURT:  And I'll let you argue it, but that --

24           MS. JARVIS:  Yeah.  I --

25           THE COURT:  Just come out right now.

1          MS. JARVIS:  No.  I understand that issue.

2          THE COURT:  I mean, it's --

3          MS. JARVIS:  And that is --

4          THE COURT:  For example, I --

5          MS. JARVIS:  -- an issue we --

6          THE COURT:  I telegraphed to Ms. Davis last week --

7     not telegraphed.  I guess I shouted to Ms. Davis and Ms. Chubb

8     last week my concerns in the sense of the colloquy we had.

9          I want you to have the advantage of that thinking right

10    now such that during this hour break you could, A, either have

11    a chance to explain that to me or if all those oppositions have

12    gone away maybe that makes a difference.

13         And I gather there's still oppositions to the direct

14    lending.  Is that --

15         MS. JARVIS:  And that --

16         THE COURT:  -- a fair --

17         MS. JARVIS:  That issue actually is not being

18    approved today.  We're just explaining how it ties, you know,

19    to what we're asking for to be approved for today.

20         And this is an issue we have thought about.  It is an

21    issue that I will have Mr. Allison address in his

22    testimony --

23         THE COURT:  Okay.

24         MS. JARVIS:  -- as well.

25         MS. DAVIS:  I don't mean to interrupt, but my client

181

1    is very concerned about me staying at these proceedings any

2    longer than I need to.

3         Based upon counsel's presentation, are we still going to

4    go forward with the forbearance and funding motion this

5    afternoon?

6              MS. JARVIS:  Yeah.

7              THE COURT:  And I have no problem if we go through

8    with that first.  I mean, I understand.  I --

9              MS. JARVIS:  Yeah.  And as long as --

10             THE COURT:  Because I --

11             MS. JARVIS:  As long as --

12             THE COURT:  And on one hand, I think the forbearance

13   motions need to go first -- not the forbearance, but the loan

14   motions need to go first --

15             MS. DAVIS:  I agree.

16             THE COURT:  -- because if there is no need for a loan

17   there's no need for DIP financing.

18             MS. DAVIS:  I agree, your Honor.  I just wanted to

19   make sure I needed to come back.

20             THE COURT:  Yeah.

21             MS. DAVIS:  Thank you.  Sorry.

22             MS. JARVIS:  Yeah.

23             THE COURT:  I mean, I assume --

24             MS. JARVIS:  And you --

25             THE COURT:  -- you would not resolve --

1           MS. JARVIS:  Yeah.

2           THE COURT:  -- your problems.

3           MS. JARVIS:  And, you know, your Honor, we can go --

4    I mean, we can do the forbearance motion first.  We just need

5    to make sure we have time to get the DIP-financing motion --

6           THE COURT:  Oh --

7           MS. JARVIS:  -- heard.

8           THE COURT:  -- we're going to stay until we get

9    everything done today.

10          MS. JARVIS:  Okay.  Okay.  Because that's just, you

11   know, that -- that's why we asked to get it done because we

12   didn't know how much time --

13          THE COURT:  No.

14          MS. JARVIS:  -- your Honor had.

15          THE COURT:  No.  I --

16          MS. JARVIS:  And --

17          THE COURT:  My problem went away, and we can stay

18   'til we get it done.

19          MS. JARVIS:  Okay.

20          THE COURT:  And like I said, the only reason I have

21   to break is I've got -- I haven't had a break, and then I have

22   2:00 o'clock scheduling conferences, and I've got like

23   40 matters on that I have to deal with.

24          MS. JARVIS:  Okay.

25          THE COURT:  So --

1          MS. JARVIS:  Let me just go down through a few other

2    clarifications.  The Direct Lenders Committee or the

3    Executory Contracts Committee were concerned that there was a

4    lien being granted on their funds in the Collection Account.

5    That's not the case.  That, you know, can be clarified.  That

6    was never intended.

7          There also is with respect to an automatic prepayment

8    provision.  During the interim, that also will not be in

9    effect.

10          And, of course, it really can't be in effect because any

11    loans that are collected are going to be going in the

12    Collection Accounts.

13          We don't have -- we're not distributing anything until

14    August -- we request the Court to allow us to do it on

15    August 4th, anyway.

16          Those, you know, proceeds of the loans of the funds that

17    would be collateral would, of course, be subject to, you know,

18    the lien, but there would be no automatic prepayment of that.

19          There would be no lien on avoidance actions in this

20    interim period or on any inter-debtor receivable, so that also

21    is an improvement that we've negotiated with the lender and

22    with the assistance of the committees or input of the

23    committees.

24          We have the payoff amount.  If it's not granted on a

25    permanent basis on the 25th, we have also bargained for it not

1    becoming due that day, but to give us five business days to go

2    ahead and pay back whatever the advances were up to that point

3    in time.

4         They have agreed, the DIP lender has agreed, that part of

5    this money can be used to fund the $125,000 Boise/Gowen loan

6    which is the subject of the other motion that's on today if the

7    Court grants that as well.

8         The debtor has agreed also to give the committees, all

9    four of the committees, weekly reporting comparing budgeted

10   amounts to actual use of cash.  I think that addresses --

11              THE COURT:  Okay.  Let --

12   (Colloquy not on the record.)

13              THE COURT:  Let me kind of also clarify my concerns I

14   want you to focus on and procedures.  The two questions I had

15   were why do we need the money which --

16              MS. JARVIS:  Yeah.

17              THE COURT:  -- I've sort of intimated and then,

18   secondly, what exactly would the liens attach to, and that's

19   kind of the ambiguity because of -- and you may well have

20   addressed it in your clarifications.

21        And when I say why do we need the money, let me indicate

22   -- and I certainly don't mean to substitute my business

23   judgment because that's not my role.

24        But I certainly see the idea of having a funding source

25   out there, but it seems to me that the funding source -- there

1    should be a procedure by which you ask the entities that have

2    the particular loan this is what's happening.  We have a loan.

3    Do you consent?

4         And if so, the loan can be immediately paid.  I'm sorry.

5    The transaction can immediately be consummated whether or not

6    -- maybe with or without a hearing.

7         But what I'm not hearing is that intermediate step of the

8    procedure.  It's sort of a reverse procedure.  In other words,

9    what do the particular lenders on this loan want to do.

10        And if they want to do it, it's great because you have now

11   provided with them for the ability to do that and for which

12   they can be charged against their loan to the extent that their

13   loan, their money, benefitted, the same way if you go to

14   foreclose.

15        If you go to foreclose, the documents make it quite clear

16   that they are ultimately liable for the expenses in collection

17   which can be done through an offset between what you finally

18   collect.

19        And so what I'm concerned about is -- you know, the

20   original thing was there's certainly the idea of collectivism.

21   I think that the parties need to work together to do it.

22        But we can't shift over into, in essence, a communism.  We

23   can't shift over to say just because you have it and I should

24   have it because it's right and good doesn't mean that's going

25   to happen.  Each entity has their own rights, and that's the

1    thing that I'm concerned that's been lost focus.

2         Again, if this was nothing more than the funds that we

3    have, this approach would work perfectly because the funds --

4    people are members in the funds.

5         They don't have any direct interests or if you're an

6    indenture trustee, but that's not the case for 3600 of these, a

7    number of these loans, so that's my concerns.

8         We'll come back at 2:30.  What I'd want to do first when

9    we come back at 2:30 is -- well, let's just take the Canepa

10   motion.  It's only 125,000, and then that way Ms. Davis will be

11   free, and then the money is lent or it's not lent.

12             MS. DAVIS:  No, your Honor.  I have to sit through

13   the DIP motion, anyway.

14             THE COURT:  Oh, okay.

15             MS. DAVIS:  So I don't want to --

16             THE COURT:  It doesn't make any difference?

17             MS. DAVIS:  It doesn't make any difference.  I just

18   wanted to make sure I had to stay.

19             THE COURT:  Okay.

20             MS. DAVIS:  Thank you.

21             THE COURT:  All right.  Great.  I've helped

22   everybody's billable time out today, so --

23             MS. DAVIS:  I appreciate that.

24        Thank you.

25             THE COURT:  Okay.  All right.

187

1         (Colloquy not on the record.)

2              THE COURT:  So we'll be back at 2:30.

3         Thank you.

4              MS. JARVIS:  Thank you, your Honor.

5              THE CLERK:  All rise.

6         (Recess at 01:32:11 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    I certify that the foregoing is a correct transcript

2    from the electronic sound recording of the proceedings in

3    the above-entitled matter.

4

5

6    /s/ Lisa L. Cline                            10/21/10

7    _____              _____
     Lisa L. Cline, Transcriptionist              Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25