1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF NEVADA

3   LAS VEGAS, NEVADA

4   In re:  USA COMMERCIAL MORTGAGE      )  JUNE 21, 2006
         COMPANY,                       )  E-Filed:  10/21/10
5                                        )
                    Debtor.             )  Case No.
6   _____ )  BK-S-06-10725-LBR
                                         )  Chapter 11
7

8                   PARTIAL TRANSCRIPT OF PROCEEDINGS
                                OF
9                         STATUS HEARING
                      RE: MOTION FOR ORDER
10            UNDER 11, USC, SECTIONS 105(A), 345, AND 363
        APPROVING DEBTOR'S PROPOSED CASH MANAGEMENT PROCEDURES
11           AND INTERIM USE OF CASH IN ACCORDANCE
             WITH PROPOSED CASH BUDGET, NO. 8
12                              AND
        MOTION DIRECTING PAYMENTS TO DIRECT LENDERS, NO. 336
13                              AND
                    ORDER SHORTENING TIME
14   RE: MOTION TO USE CASH COLLATERAL THROUGH JULY 29, 2006,
           PURSUANT TO SECOND REVISED BUDGET, NO. 407
15                              AND
             MOTION TO RECONSIDER, NO. 609
16                              AND
                    ORDER SHORTENING TIME
17                  RE: MOTION FOR AUTHORITY
        TO FORBEAR AND TO PROVIDE FURTHER FUNDING
18       FOR CERTAIN OUTSTANDING LOANS, NO. 592
19                              AND
                    ORDER SHORTENING TIME
        RE: MOTION FOR EMERGENCY INTERIM AND PERMANENT ORDERS
20     AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING,
                          NO. 588
21                              AND
                    ORDER SHORTENING TIME
22           RE: MOTION FOR ORDER APPROVING AGREEMENT
             WITH INVESTMENT PARTNERS, NO. 575
23                              AND

24

25   Proceedings recorded by electronic sound recording;

2

```
 1                    ORDER SHORTENING TIME
              RE: APPLICATION FOR ADMINISTRATIVE ORDER
 2          ESTABLISHING PROCEDURES FOR INTERIM COMPENSATION
        AND REIMBURSEMENT OF EXPENSES OF PROFESSIONALS, NO. 570
 3                            AND
                      ORDER SHORTENING TIME
 4           RE: MOTION TO REMOVE FERTITTA ENTERPRISES, INC.,
              AS A MEMBER OF OFFICIAL COMMITTEE OF HOLDERS
 5                OF EXECUTORY CONTRACT RIGHTS, NO. 562
                              AND
 6                    ORDER SHORTENING TIME
                    RE: APPLICATION TO EMPLOY
 7              ORRICK, HERRINGTON & SUTCLIFFE, LLP,
                AS COUNSEL TO THE OFFICIAL COMMITTEE
 8                   OF EQUITY SECURITY HOLDERS
        OF USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, NO. 619
 9                            AND
                      ORDER SHORTENING TIME
10        RE: APPLICATION TO EMPLOY BECKLEY SINGLETON, CHTD.,
                  AS SPECIAL NEVADA BANKRUPTCY COUNSEL
11      TO THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS
        OF USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, NO. 622
12                            AND
                JOINT MOTION FOR NUNC PRO TUNC ORDER
13      CLARIFYING REQUIREMENT TO PROVIDE ACCESS TO INFORMATION,
                              NO. 521
14                            AND
                      ORDER SHORTENING TIME
15          RE: APPLICATION TO EMPLOY FTI CONSULTING, INC.,
        AS FINANCIAL ADVISORS NUNC PRO TUNC AS OF JUNE 9, 2006,
16                          NO. 659
                              AND
17                    ORDER SHORTENING TIME
            RE: APPLICATION TO EMPLOY ALVAREZ & MARSAL, LLC,
18                AS FINANCIAL AND REAL ESTATE ADVISOR
                NUNC PRO TUNC TO JUNE 1, 2006, NO. 633
19                          VOLUME 3
                          P.M. SESSION
20              BEFORE THE HONORABLE LINDA B. RIEGLE
                UNITED STATES BANKRUPTCY JUDGE
21                  Wednesday, June 21, 2006

22                        9:00 a.m.

23

24      Court Recorder:        Helen C. Smith

25      Proceedings recorded by electronic sound recording;
```

3

```
 1    APPEARANCES:

 2    For Diversified Trust      MARC A. LEVINSON, ESQ.
      Deed Fund Committee:       Orrick, Herrington & Sutcliffe
 3                               400 Capitol Mall
                                 Suite 300
 4                               Sacramento, California 95814

 5                               ANNE M. LORADITCH, ESQ.
                                 BRETT A. AXELROD, ESQ.
 6                               Beckley Singleton, Chtd.
                                 530 Las Vegas Boulevard South
 7                               Las Vegas, Nevada 89101

 8                               JEFFERY D. HERMANN, ESQ.
                                 Orrick, Herrington & Sutcliffe
 9                               777 South Figueroa Street
                                 Suite 3200
10                               Los Angeles, California 90017

11    For the Official           CANDACE C. CARLYON, ESQ.
      Committee of Equity        Shea & Carlyon, Ltd.
12    Security Holders           233 South Fourth Street
      of USA Capital             Suite 200
13    First Trust Deed Fund,     Las Vegas, Nevada 89101
      LLC:
14
      For Boise/Gowen, LLC,      SUSAN WILLIAMS SCANN, ESQ.
15    and Franklin Stratford,    Deaner, Deaner, Scann, Malan
      Investment, LLC:            & Larsen
16                               720 South Fourth Street
                                 Suite 300
17                               Las Vegas, Nevada 89101

18    For the First Trust        EVE H. KARASIK, ESQ.
      Deed Committee:            Stutman, Treister & Glatt, P.C.
19                               1901 Avenue of the Stars
                                 Twelfth Floor
20                               Los Angeles, California 90067

21    For the Jones Vargas       JANET L. CHUBB, ESQ.
      Direct Lenders:            Jones Vargas
22                               100 West Liberty
                                 Twelfth Floor
23                               Reno, Nevada 89501

24

25
```

4

```
1    APPEARANCES (Cont.):

2    For the Unsecured        ROB CHARLES, JR., ESQ.
     Creditors Committee      Lewis and Roca, LLP
3    of USA Commercial        3993 Howard Hughes Parkway
     Mortgage Company:        Suite 600
4                             Las Vegas, Nevada 89109

5    For the Canepa           LAUREL E. DAVIS, ESQ.
     Group:                   Lionel, Sawyer & Collins
6                             300 South Fourth Street
                              Suite 1700
7                             Las Vegas, Nevada 89101

8    For the Official         GERALD M. GORDON, ESQ.
     Committee of Executory   GREGORY E. GARMAN, ESQ.
9    Contract Holders of      Gordon & Silver, Ltd.
     USA Commercial           3960 Howard Hughes Parkway
10   Mortgage Company:        Ninth Floor
                              Las Vegas, Nevada 89109
11
     For Liberty Bank:        WADE B. GOCHNOUR, ESQ.
12                            Haney, Woloson & Mullins
                              1117 South Rancho Drive
13                            Las Vegas, Nevada 89102

14   For CapitalSource        DAVID A. COLVIN, ESQ.
     Finance, LLC:            Marquis & Aurbach
15                            10001 Park Run Drive
                              Las Vegas, Nevada 89145
16
                              KENNETH J. OTTAVIANO, ESQ.
17                            Katten Muchin Rosenman, LLP
                              525 West Monroe Street
18                            Suite 1600
                              Chicago, Illinois 60661
19
     For the United States    AUGUST B. LANDIS, ESQ.
20   Trustee:                 Office of the United States Trustee
                              300 Las Vegas Boulevard South
21                            Suite 4300
                              Las Vegas, Nevada 89101
22
     For the Debtor:          ANNETTE W. JARVIS, ESQ.
23                            Ray, Quinney & Nebeker, P.C.
                              36 South State 1400
24                            Salt Lake City, Utah 84145

25
```

5

1    APPEARANCES (Cont.):

2    For the Debtors:          LENARD E. SCHWARTZER, ESQ.
                               Schwartzer & McPherson Law Firm
3                              2850 South Jones Boulevard
                               Suite 1
4                              Las Vegas, Nevada 89146

5    For Richard McKnight,     THOMAS J. GILLOON, ESQ.
     Esq.:                     Law Office of Richard McKnight, P.C.
6                              330 South Third Street
                               Suite 900
7                              Las Vegas, Nevada 89101

8    Also Present:            ROBERT A. RUSSELL
                              Manager
9                             Boise/Gowen, LLC
                              Franklin Stratford Investment, LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        I   N   D   E   X

                                                           Voir
2      Witness           Direct      Cross      Red.      Rec.    Dire

3      THOMAS J. ALLISON
       (By Ms. Jarvis)     13                    70
4      (By Mr. Levinson)              48
       (By Ms. Davis)                 54
5      (By Mr. Gordon)                57,69
       (By Ms. Chubb)                 58
6      (By Mr. Landis)                61
       (By Mr. Charles)               65
7      (By Ms. Carlyon)                                    84

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Court reconvened at 03:08:49 p.m.)

2              THE CLERK:  Bankruptcy court is now in session.

3              THE COURT:  Be seated.  All right.

4          Sorry for the delay.  Okay.

5          Ms. Jarvis.

6          So really I think this testimony is kind of related to all

7      these motions.  So just for those purposes, we'll consider this

8      testimony in connection with all the remaining motions.

9          Go ahead.

10             MS. JARVIS:  Okay.  We did listen to your questions

11     and have had further discussions.

12         In addition, all four committees told me I forgot something

13     when I stated the revisions, so let me add a few more revisions

14     on the table so we understand what we're talking about.

15         The Executory Contracts Committee wanted me to confirm once

16     again that with respect to the direct-lenders' collections that

17     are in the collection account those are not part of the

18     collateral that is being pledged for the loan, so those are

19     excluded.

20         They also wanted me to -- or I guess it was the

21     Funds Committee wanted to make sure that I was clear that there

22     would be no new originations that would be requested or gone

23     forward with during this interim period.

24         Those, of course, would be subject to further approval by

25     the Court in any case.

1          THE COURT:  You mean new beyond the ones that are in

2     these motions here before us.

3          MS. JARVIS:  Well, meaning like not a current

4     borrower and not, you know, finishing out funding for a certain

5     project, but simply going out and starting --

6          THE COURT:  Oh.

7          MS. JARVIS:  -- a whole new project.

8          THE COURT:  Oh.  Well, that's --

9          MS. JARVIS:  Not yet.  That's --

10          THE COURT:  I assume that's a given, right?

11          MS. JARVIS:  Yeah.  That's not on the table.  That

12     is --

13          THE COURT:  Okay.

14          MS. JARVIS:  -- but I'm just clarifying to make sure

15     we're all on the same page here.

16          THE COURT:  Um-h'm.

17          MS. JARVIS:  We would go forward as I explained with

18     respect to the second part to review and file further motions

19     with the Court if the DIP is granted with respect to the

20     certain unfunded -- so-called unfunded commitments with respect

21     to projects that are currently, you know, subject to loans

22     originated by the debtors.

23          Also, there is a provision in the term sheet that deals

24      with a stalking-horse provision with respect to if the entire,

25      you know, portfolio is sold.  That is also not on the table

1    during this interim period.

2        The Court very astutely recognized there are a lot of

3    issues with respect to, for instance, the allocation issues,

4    issues with respect to charging certain loans for certain

5    foreclosure actions, et cetera.

6        All of those issues are -- I mean, part of what we did in

7    negotiating all these restrictions is to put those issues off

8    until the final hearing which is when all those issues will be

9    discussed as far as, you know, allocating the specific

10   foreclosure fees to the different loans and so it can be then

11   noticed out in a very comprehensive way prior to the July 25th

12   hearing.

13       So those issues we recognize are issues, are difficult

14   issues, and that is part of what we will be having further

15   discussions with both the committees and the lenders in the

16   interim in order to deal with those issues in the final

17   approval that we will seek.

18           THE COURT:  So I guess the question I have is with

19   all that in mind what moneys are needed in the interim and why

20   or are we just -- I guess that's what I'm --

21           MS. JARVIS:  Yeah, and I'm going to put Mr. Allison

22   on the --

23           THE COURT:  Okay.

24           MS. JARVIS:  -- stand to answer that.

25       Then there also has been some financial improvements as

1      well with respect to the fees.  The lender has agreed to cut

2      its origination fee from 150,000 to 75,000 with respect to the

3      due-diligence fees which is estimated to not -- be not more

4      than 200,000 of -- up to of costs.

5           With respect to the due diligence that is done, that will

6      be turned over to the debtors so that with respect to what is

7      done we can also use that with respect to dealing with our own

8      portfolio or in servicing these loans.

9           So, for instance, if UCC searches are done and that cost is

10     charged, those would then be given to us as well.

11          In addition, while the collateral management fee would stay

12     the same -- it's a fee of about 10,000 for the month because

13     it's a fixed cost -- the unused credit part of the fee would

14     actually be prorated down to -- since all we're asking for is

15     the $3,000,000 in the interim.  It would not be on the entire

16     amount.  It would only be on that part.

17               THE COURT:  Okay.

18               MS. JARVIS:  Let's see.  I think --

19               THE COURT:  Okay.

20               MS. JARVIS:  I think -- anything else?

21               UNIDENTIFIED SPEAKER:  That's it.

22               THE COURT:  Now, just so that I know, have these

23     modifications -- do I still have oppositions -- I'm hearing --

24               MS. JARVIS:  My -- yeah.

25               THE COURT:  -- seeing heads nod.  Okay.

1           MS. JARVIS:  My -- yeah.

2           UNIDENTIFIED SPEAKER:  Yes, your Honor.

3           MS. JARVIS:  My understanding, your Honor, is with

4     these modifications all the committees are on-board except that

5     the Funds committees, the two Funds committees, still have

6     issues with respect to the fees.

7           THE COURT:  Okay.

8           MS. JARVIS:  But with respect to everything else,

9     they're supportive of the deal, and their issues have been

10    resolved.

11          THE COURT:  Okay.  All right.

12          MS. JARVIS:  So may I call --

13          THE COURT:  You --

14          MS. JARVIS:  -- Mr. Allison --

15          THE COURT:  Yes.

16          MS. JARVIS:  -- to the stand?

17          THE COURT:  Uh-huh.

18          MR. LEVINSON:  Your Honor, Marc Levinson for the

19    Diversified Committee.

20        The Funds committees I believe are on-board.  We still have

21      significant documentation problems.  We'd need to see a revised

22      form of order, assuming the Court approves it, because there

23      are many devil-in-details issues that will have to be worked

24      out.  Hopefully, those will be clarified during Mr. Allison's

25      testimony and cross-examination.

1          THE COURT:  Okay.  Thank you.

2          MS. JARVIS:  And, your Honor, I have to apologize.

3    Mr. Levinson did ask me to tell the Court that, and I neglected

4    to put that on the list.

5          The loan documentation is not complete at this point.  It

6    is projected that this would close on June 30th.  As we said,

7    the loan documentation on our side, we would not agree to it

8    until we got the agreement of the Funds committees and the

9    Unsecured Creditors Committee as well.

10         So, internally, we will work on that, so that we can

11   present a united front or agreement with respect to the lender

12   in getting that loan documentation done.

13         We do anticipate that if the Court does grant this interim

14   order that we are willing -- and I know the lenders' counsel is

15   willing -- to stay tonight to -- we have circulated an order

16   which would be what we're seeking approval of -- not the term

17   sheet, but what's in the order -- and that we would be happy to

18   stay as long as possible to work with committee counsels to get

19   an agreed order tonight that we could submit.

20         THE COURT:  Okay.  All right.  Good.

21         THE CLERK:  I'm going to just remind you

22   (indiscernible) you're still under oath.

23         THE WITNESS:  Thank you.

24   Thereupon --

25                        THOMAS J. ALLISON

1    was recalled as a witness by the Debtor, and having been

2    previously duly sworn, testified as follows:

3                         DIRECT EXAMINATION

4    BY MS. JARVIS:

5    Q.   Mr. Allison, let me ask you about the status of the current

6    loans being serviced by the debtors, Commercial Mortgage.   What

7    is the current status of that loan portfolio?

8    A.    Approximately, 42 to 43 percent of it is performing where

9    they're paying interest on a current basis, and the reciprocal

10   is nonperforming where interest is not being paid on a current

11   basis.

12        The portfolio overall, though, I think that one of the

13   things I want to be clear on to people that are in the

14   audience, even -- because a loan is characterized as

15   nonperforming, it doesn't mean that it's not money good.

16        It means that -- it means that it's -- it's perhaps run out

17   of interest reserve or the project is mature and is -- and

18   potentially could be monetized.

19        We have had some luck.  I -- I think I will be modest and

20   say some luck thus far in collecting over $50,000,000 of

21   principal in the first month and $10,000,000 of -- of past-due

22   interest thus far.

23        I think we've been able this month -- this month being the

24   month of May and in June.  We have commitments to -- who are

25   identified.  We'll pay out another six to seven loans.

1      So we are working the portfolio to monetize it, and as

2   we're monetizing it, we're monetizing both performing and

3   nonperforming loans.

4      The problem with the loan portfolio as we go to monetize it

5   is that, you know, we're -- we're having a few factors come

6   into play.

7      Our loan-servicing fees are slowing down.  That's a

8   combination of paying -- of monetizing loans as well as

9   borrowers starting not to pay or slowing down payments.

10      So we have -- or what I look at is while we're trying to

11   enforce and collect the past-due loans -- as the debtor in

12   possession that's what I -- or one of my jobs -- and to

13   maximize the value of the loans that are outstanding that may

14   be -- may need -- where there is a series of loans that need

15   new money where the -- where USA Commercial Mortgage committed

16   to lend X amount of dollars and because of the bankruptcy they

17   -- there's no more access to public moneys to continue to fund

18   those loans.

19      So the portfolio continues -- we've been -- we've been able

20   to reduce it.  We've been able to collect past-due loans at

21   par, and we've been able to -- to look at potential enforcement

22   actions.

23      It's been a challenge to look at enforcement actions

24   without having a substantial amount of funds to foreclose on --

25   on delinquent properties or -- and use the threat of

1    foreclosure on delinquent properties to monetize them.

2        So if I can give you a state of the portfolio is we -- as

3    we continue to pay the portfolio down and -- and get loans that

4    are both performing or nonperforming monetized, this portfolio

5    is in a shrinking state right now.

6        There is a need in the portfolio to fund about -- I think

7    to fund 17 loans which represents about 41.5 million dollars

8    new money.

9    Q.   So --

10   A.   So if I can give -- or an overall characterization is that

11   we're working a strategy of collection.  We're working a

12   strategy to monetize and get loans paid down and bring as much

13   money back into the estate as possible.

14       And we're working a strategy to mitigate claims against the

15   estate on commitments that USA Commercial Mortgage made to

16   builders that have projects that are in -- in some percentage

17   of completion.

18   Q.   So you've developed a plan of action for all of the I would

19   call them problem loans that you are servicing; is --

20   A.   Yes.

21   Q.   Is that correct?

22   A.   The -- the problem loans that we -- we've gone through

23   various strategies, and each -- each loan has its own distinct

24   strategy to it.  Some of the strategies are (indiscernible) to

25   do.

1          For example, if we want to foreclose on a transaction where
2     we know that we may have to hold it for some period of time or
3     we -- or that we need to use the threat of foreclosure, we have
4     to show some liquidity in order to execute that plan.
5     Q.   So at current, are you testifying that you do not have
6     sufficient liquidity to carry forth all of the action plans
7     that you've --
8     A.   That's correct.  With the --
9     Q.   -- you've --
10    A.   With the budget the way we've constructed it, we have a
11    million-three of cash on hand.
12         And as we look at foreclosure actions that potentially we
13    would have to take just doing the foreclosure actions without
14    looking at the costs to carry, costs to handle, the insurance
15    and -- and remarketing the properties, it -- it will take some
16    -- it will take more funds than we have -- than we currently
17    have to execute the monetization strategies.
18    Q.   And so is it fair to say that as you collect more loans
19    that the loans that are remaining become the more problematic
20    loans?
21    A.   That's a fair statement.  That's a fair statement,
22    Ms. Jarvis.
23         As we collect loans down, what we're probably going to be
24    left with are the most problematic ones as we -- as we -- as we
25    try and monetize the portfolio.

1        Plus, what we will also be left with are the loans that

2    were newly -- that were originated in the first quarter of '06,

3    and a series of those loans need additional funds to -- to

4    monetize, and if we don't provide those funds, we'll be looking

5    at losses on both the -- both interest and principal in -- in

6    that part of the portfolio.

7    Q.    And the servicing fees on these loans that are remaining as

8    you pay off some of the better loans, you're not collecting

9    those servicing fees currently; is that --

10   A.    No.  We wouldn't collect those servicing fees until we

11   ultimately monetize the loan.  So --

12   Q.    So --

13   A.    -- essentially what we'd be -- what we're looking at as

14   liquidity is -- is -- is having some funding to fund our

15   operation during the carry period between when we foreclose and

16   take an asset into -- into -- into our possession and when it's

17   ultimately monetized, because when it's ultimately monetized,

18   we'll pick up our servicing fees and -- and the fees that are

19   tied to it, but we won't have the liquidity to -- to monetize

20   it during that period of time.

21        THE COURT:  Let me ask you to -- since this is an

22   interim motion --

23        UNIDENTIFIED SPEAKER:  Yeah.

24        THE COURT:  -- and maybe you are -- let me focus on

25   the needs for this very interim period rather than what you

1  anticipate -- I mean, I think it probably makes sense to do

2  both because the issue is if -- maybe there's a need for

3  interim -- maybe there shouldn't be any loan funded in which

4  case it doesn't make any difference whether it's now or later,

5  but let me -- because I wanted to get a sense of what's needed

6  in the interim period.

7          MS. JARVIS:  I'm going to tie that in because we're

8  going to go right now to the budget.

9          THE COURT:  Okay.

10          MS. JARVIS:  Okay?

11   BY MS. JARVIS:

12  Q.   Let me show you what has been --

13          MS. JARVIS:  Let me have this marked.  Actually, I'll

14  mark these both.

15      This is Exhibit 1 and Exhibit 2.

16          THE CLERK:  Okay.

17          MS. JARVIS:  Your Honor, I'd like to mark as

18  Exhibit 1 -- this is the budget that was attached to

19  Mr. Allison's declaration.  I think it's Exhibit A, the one

20  that was filed yesterday.

21          THE CLERK:  You can use that document

22  (indiscernible).

23          THE COURT:  Oh, I got the wrong one.

24          THE CLERK:  Is it on your screen?

25          THE WITNESS:  Yes, it is.  Thank you.

1          THE CLERK:  Is it on your screen, Judge?

2          THE COURT:  I got it.  I have the wrong one.

3      June 5th I can get rid of, right?

4          MS. JARVIS:  Yep.  I mean, June 5th -- we're going to

5  do a little bit of a comparison so you can just see -- explain

6  what has changed from that, but I'm not going to put that up

7  because then that's confusing.  We'll just simply -- I have a

8  comparison that we will use to demonstrate the differences.

9  Okay.

10  BY MS. JARVIS:

11  Q.   Can you generally describe how this budget that was

12  attached to your affidavit yesterday or your declaration

13  yesterday differs from the one that was attached to the

14  cash-management motion.

15  A.   Sure.

16  Q.   Which is I think the June 5th.

17  A.   It varies in -- in several ways.  Essentially, one of the

18  -- one of the more -- there's -- there's several material ways

19  it varies, and let me try and go through them.

20      The first of which is that we moved the interest -- the

21   interest that we collected from the borrowers that would have

22   been paid -- that would have been paid out out of the operating

23   cash line, and we reflect it down below into -- into the line

24   that's styled excess funds collected.  It's the second line --

25  Q.   And that's the --

1    A.    -- from the bottom.

2    Q.    That's the line I'm pointing to --

3    A.    Right.

4    Q.    -- right?

5    A.    Ms. Jarvis is pointing to it on -- on her machine.

6    Q.    Okay.

7    A.    It's the $10,000,000 number.

8          So we moved that out of our operating cash.  So I think

9    it's the first and it's an important part because instead of --

10   it -- it -- we'll -- we'll figure out with -- with the

11   committees, you know, whose property that is, but essentially

12   that's interest that was already paid to the investors which

13   we've collected back from nonperforming loans.

14         The -- the next part of the -- of the -- of the transaction

15   that I think is important is that there -- in the operating

16   line we show previously interest that was earned on the -- the

17   funds that we were holding, and we've moved that down to the --

18   moved that out of the operating line.

19         We have moved the -- the interest earned again down into --

20   down into one of the lower lines that --

21   Q.    So you're talking about moving this --

22   A.    Right.

23   Q.    -- again down --

24   A.    Right.

25   Q.    -- into this category --

1    A.    It's --

2    Q.    -- so it's no longer --

3    A.    That's correct --

4    Q.    -- available for --

5    A.    -- Ms. Jarvis.  That's --

6    Q.    -- operations.

7    A.    So it's no longer available for operations.

8    Q.    And was this done as a result of negotiations with the

9    committees?

10    A.    Yes.  It was -- we -- we listened to the committees'

11    concern and -- and their fears and -- and the indirect

12    investors' fears for that matter, and we moved it to -- we

13    moved it down as to decide at a later date, but clearly to move

14    it out of the -- out of the working capital so that we could

15    have a clear picture of what the estate looks like with those

16    moneys out of the -- out of the picture.

17    Q.    And so in moving that then what you're saying is that this

18    is not going to be used to fund any operations --

19    A.    No.

20    Q.    -- during this interim period.

21    A.    That's correct.  Neither the interest nor the -- nor the --

22    nor the amount of -- of past -- neither the interest earned on

23    the past-due interest that we've collected or the interest

24    itself would be used to fund the operation.

25              MS. JARVIS:  Let me mark, in fact, one other exhibit

1    which might be helpful.  This is the comparison.  I'm going to

2    have this marked as Exhibit 3.

3          (Colloquy not on the record.)

4                THE COURT:  Is this the June 5th one?  Is this the

5    June 5th one?

6                MS. JARVIS:  This is --

7                THE COURT:  Oh.

8                MS. JARVIS:  This is comparing the June 5th budget to

9    the budget that was filed yesterday, and I think it just might

10   be faster -- we prepared this --

11               THE COURT:  Yes.  That's fine.

12               MS. JARVIS:  -- just to --

13               THE WITNESS:  Just to move --

14               MS. JARVIS:  -- kind of --

15               THE WITNESS:  -- through it.

16               MS. JARVIS:  -- move things quickly.

17               THE WITNESS:  Several -- while we're setting it up,

18   I'll -- I'll start going through it.

19         One of the original -- one of the original beliefs that we

20    had was that through the credit -- the DIP facility that we

21    would be able to originate new loans.

22         I had mentioned previously in my testimony this morning

23    that we earned ten percent -- typically ten percent on any new

24    loan originated in terms of upfront fees.

25         So we took that -- the ability to continue in operation to

1    generate fees out of the equation.  We also took out other

2    collections that would be tied to new originations which is the

3    14.1 million dollars.

4        Going down the line, the $16,000,000 is the -- the

5    $16,000,000 in -- in this line, your Honor, ties to the

6    $10,000,000 that's in the budget plus the remaining $6,000,000

7    we're forecasting to collect over the period of time of

8    past-due interest.

9        The interest from the collection account we referred to

10   earlier is the $1,000,000 on our -- on our interest, and the

11   estimated service fees, while we looked at it being -- in our

12   original budget, we thought it to be 1.2 million dollars for --

13   our current line of sight has moved it down to $944,000 as --

14   BY MS. JARVIS:

15   Q.   And --

16   A.   -- we're collecting loans out.

17   Q.   And is that a demonstration of what you talked about as the

18   slowing down of --

19   A.   Yes.

20   Q.   -- the collection of servicing fees?

21   A.   Yes.  It's a combination of it slowing down and paying off

22   some of the loans, so we have a decreasing amount of loans to

23   -- to cover the cost of -- of administering the estate.

24       And loan -- and then the last part that we added to the

25    budget was $800,000 for foreclosures.  As we're -- as we're

1    looking at loans and looking at problems, you know, I -- I

2    think the faster we move to -- move to foreclose on the

3    nonperformers and move to monetize them the better -- the

4    better off we are for the estate.

5        So I did budget an incremental $800,000 to move into

6    foreclosure actions on some of the -- the more delinquent

7    nonperforming loans.

8        With respect to cash disbursements of professional fees, we

9    had originally baked that into our -- our plan, and, well,

10   we've pushed the professional-fee payment out, and essentially

11   the difference between the three-four and the two-five, we

12   assume that at some point in time the -- the Court would

13   authorize a -- a monthly payment and/or a payment that we -- of

14   our professional fees that were accrued at approximately 80

15   percent of face value.

16       So those are -- those are the key dynamics, and the lines

17   below this are the reciprocal of where they fall out.

18   Q.   Let me ask you then just to kind of go back to that last

19   point, and then I have one other question I want to ask you on

20   this.

21       When you talk about the professional fees, in the revised

22   budget, then, if you look at -- let's see.  Which line is it?

23   This line here.

24       Is that -- I mean, that's not in your cash forecast, but

25   what does that represent?

A.   Essentially, what I felt it was fair to depict for the
Court and for all of our committees as we're looking at this
case, what the cost of -- of -- of fee -- the -- the fee costs
of administering this case is, and while we continue to accrue
expenses, I felt it was fair for the -- for all of the -- all
the professionals and the estate to see what the cost of -- of
the burden is on this estate to continue to administer it.

Q.   So to give just a -- basically, an overall more accurate --

A.   Picture.

Q.   -- picture of eventually --

A.   Rather --

Q.   -- what it looks like.

A.   Exactly, Ms. Jarvis.

   Rather than using cash accounting and saying, gee, it's not
-- professional fees aren't due to their -- they're approved.
There is an -- there is an amount of fees that are being
incurred each week, and I felt it was fair to depict for the
Court even if it's an estimate, you know, of what the cost of
administration is on a weekly basis.

Q.   And does this amount include all of the committees?

A.   I believe that it -- yeah.  It doesn't include all the
committees, but it does give an -- an idea of -- of fees.  I
think we can go to a separate chart that --

Q.   It's this one.

A.   On page 3 I believe it is.

1          MS. CARLYON:  Your Honor, I would just object because

2     of the timing.  None of --

3          THE COURT RECORDER:  Counsel, I'm sorry.  Could you

4     move where the microphone is closer to you.

5          MS. CARLYON:  I'm sorry.

6          THE COURT RECORDER:  Thank you.

7          MS. CARLYON:  Candace Carlyon for the First Trust

8     Deed Fund.

9          There are no professional fees contemplated to be paid from

10     the interim draws, and I think it would -- you know, although

11     it's arguably relevant to the final motion, I think just to

12     expedite matters I would object to it being presented at this

13     time.

14          THE COURT:  Okay.

15          MS. JARVIS:  Your Honor, we're just trying to give an

16     accurate picture --

17          THE COURT:  Well, we do have very short time, and I

18     appreciate --

19          MS. JARVIS:  Okay.

20          THE COURT:  -- the fact that, you know, your

21     presentation is kind of put out of whack by taking all morning

22     on the other matter, and that was my fault, but, you know,

23     we've got another I don't know how many hours, so let's make it

24     shorter rather than longer.

25          MS. JARVIS:  Let me move through it.

1    BY MS. JARVIS:

2    Q.   Let me ask you then going back to this page.

3         When you reduced the servicing fees, was this done in order

4    to give again kind of a more realistic picture of what kind of

5    the --

6    A.   It's our line of sight of what we think --

7    Q.   Yeah.

8    A.   -- we can collect over the period, Ms. Jarvis.

9    Q.   So the difference is -- I mean, it doesn't necessarily mean

10   that you -- if all goes perfect, you might not meet the higher

11   budget, but this is basically giving a more realistic picture

12   of --

13   A.   This is a --

14   Q.   -- the downside.

15   A.   This is a line -- a line of sight of what we believe we can

16   collect.  The 1.2 is a bit more optimistic.

17   Q.   Okay.  In fact, could this -- depending on how these

18   collections come in, could it be -- the number be actually

19   below that amount?

20   A.   Yes.

21   Q.   Why don't you then just go through the changes on the --

22   A.   Collections account?

23   Q.   -- expense side.

24   A.   Okay.

25              MS. CARLYON:  Again, your Honor, my objection would

1    be to the extent that they are the 13-week period and not the

2    four-week period, I object to introducing that testimony at

3    this time because it's not relevant, and I apologize for doing

4    so.  If it wasn't for the short time frame, I would let it go.

5             MS. JARVIS:  The question I just asked him with

6    respect to the servicing fees does go to the four-week period,

7    your Honor, because this again -- the collection amount is

8    lowered, but there also is a possibility that it would be below

9    that as well, and that --

10             THE COURT:  Okay.

11             MS. JARVIS:  -- factors --

12             MS. CARLYON:  I'm sorry.  I apologize.  I thought

13    counsel was asking about the 13-week total document.

14        Apparently, we're just asking about something for the next

15     four weeks?

16             MS. JARVIS:  Yes.  Well, it goes across the whole

17    board, but it also --

18             THE COURT:  Okay.  Well, let's just move on.

19        Again, focus --

20             MS. JARVIS:  Yeah.

21             THE COURT:  -- on the three-week period because I --

22    let me note -- maybe this is one of the questions.

23        Is there -- I guess -- is there still opposition to

24     borrowing anything at all?  I gather there is.

25             MS. CARLYON:  Your Honor, because of the fees that

1    are impacted by this request, we are currently opposing the

2    interim request, and because we are opposing the interim

3    request, we're opposing it both on the grounds that the fees

4    are totally disproportionate, but also on the grounds that the

5    request disproportionately affects our clients and that there

6    is no demonstrated need in this interim period for the

7    financing at all.

8              THE COURT:  Okay.

9    BY MS. JARVIS:

10   Q.   Let me just cut to the chase and ask you.  This budget

11   still -- it's more a conservative budget.  It does show that if

12   this budget is met that you would not need financing.

13        Is this -- I mean, is there reason to believe that, in

14    fact, you would need financing during this four-week period?

15   A.   If we're going to be credible to go out and -- and -- and

16   collect problem loans, Ms. Jarvis, we're going to need some

17   liquidity to do that, liquidity greater than we currently have

18   on our balance sheet in terms of cash.

19        Our business is -- the business is being impacted.  I'm

20    losing an employee a week because of concerns over viability of

21    the business.

22        I am losing the -- I've -- I've been chasing loans and

23    monetizing them with a threat of foreclosure without having --

24    you know, telling people that I would have a DIP in place, and

25    without having the ability to -- for -- to have a credible

1    belief to the borrowers that are in my delinquent pile which is

2    over 60 percent of the portfolio that I actually can foreclose

3    on them and move -- and move to hold the assets, I don't have a

4    -- I -- I'm -- I'm in a weakened position to monetize assets.

5         And then, finally, there's a small loan that needs to be

6    monetized for Boise/Gowen of $125,000.  That $125,000 --

7    Mr. Bice's estate was very clear with me -- could not be used

8    -- we could not use funds within the company to -- to monetize

9    -- to make that -- to make that loan to finish off that project

10   and -- and -- and enhance the value of the Boise/Gowen project.

11        So there's a series of needs from -- from looking at how to

12   enforce and how to, you know, monetize and bring money back

13   into this estate to -- to looking at potentially working

14   through -- working through losing -- continuing to lose people

15   and losing the belief within the -- the investor -- the -- the

16   borrower body that we can go out and -- and fully enforce

17   collections and take the next steps along the path, because if

18   we look at this budget as it stands, our cash balance decreases

19   each week.

20        The borrowers are smart.  They're going to look at a

21   waiting game that there -- that as we continue to -- we

22   continue to -- to burn cash each week, it's not -- it's not

23   outside the realm of reason that we'll run out of cash within a

24   period of time, that if our borrowers wait they don't have to

25   worry about paying us back.

```
1        So I think that those -- those issues are in front of us,
2    and -- and while it shows that I don't need to borrow to make
3    payroll tomorrow -- you know, we're not making widgets in this
4    business.
5        What we're doing is trying to enforce and collect a -- a
6    series of problematic loans and enforce them to the best of my
7    ability to get those -- get this money paid back so I can get
8    the investors paid back.
9    Q.   So let me just -- to move this along, let me just summarize
10   what I think you've just said which is this money is needed now
11   in order to have liquidity behind you in order to be able --
12            MS. CARLYON:   Objection --
13   BY MS. JARVIS:
14   Q.   -- to collect loans.
15            MS. CARLYON:   -- your Honor.  It's leading and
16   inappropriate.
17            MS. JARVIS:   Okay.  I've just --
18            THE COURT:   Sustained.
19        If you want to ask him to summarize it in one sentence,
20   that's fine, but --
21            MS. JARVIS:   Okay.
22   BY MS. JARVIS:
23   Q.   I think you expressed three issues.  What is it going to be
24   used for with respect to collecting loans from borrowers?  Why
25   is it important to have it now?
```

A.   To -- to -- to show the borrowers have the ability to stay

-- stay in place, that the USA Commercial Mortgage can stay

intact and enforce the loans and monetize them.

     The second part is that the service fees are continuing to

decline, and, you know, if -- if -- if we continue to stay the

course, the -- the estate will run out of cash.

Q.   And is it possible during this four-week period that the

servicing fees will not be sufficient, that you could run out

of cash?

A.   It -- it's -- we're dependent upon -- we're dependent upon

collections in order for those servicing fees to be received.

Q.   So --

A.   So the answer is -- the answer is most likely.  I -- I'm

just telling you that I'm -- I try to be very realistic in the

944 number and say, gee, I think I can get that, but we're

seeing the -- we're seeing slowdowns in collections each month.

     Each -- each week we have a collection meeting.  We look at

what our interest has collected for -- for the month to date

and service fees being collected month to date so we have

enough money to run the estate, and -- and as -- as we continue

to -- to push these loans and push hard to collect these loans

down, we're -- we're running with less and less money in the

estate to do it.

Q.   And then will you draw down the 125,000 for the Boise/Gowen

loan --

1    A.    Yes.

2    Q.    -- if the Court approves that funding today?

3    A.    If the Court approves it, I would draw it down and fund it.

4    I think that it's a commercially-reasonable transaction to do,

5    and I do think if I -- when I do that, it will enhance my

6    ability to collect the loan at its maturity.

7         The Boise/Gowen loan matures in the last part of August,

8    and I think that it's the last part of the engineering that's

9    needed to do to -- to monetize -- to put the -- put that

10   particular project in a way it can be marketed.

11   Q.    And have you done due diligence on that project?

12   A.    Yes, I have.  I have -- I have and I've worked with

13   Mr. Russell, the principal, on it.  There's -- Mr. Russell is

14   -- I -- I've pushed Mr. Russell a variety of different ways to

15   see if we could refinance or find different financing sources

16   for this transaction, and -- and they're not available.

17   Q.    And by financing this transaction, what are you

18   accomplishing with respect to the current lenders in the loan?

19   A.    Well, I think we will improve their position.

20        The $125,000 is structured to go in in a way that would not

21   impair the existing lenders, and it would -- I think without it

22   I'm not sure I'll get the loan out at par.  With the money in I

23   think I can get the loan out at par plus all the accrued

24   interest on it.

25   Q.    And what do you believe that you're accomplishing for

1    Commercial Mortgage in funding this last piece of this loan?

2    A.   I -- I think -- what I'm trying to do is get for

3    Commercial Mortgage, you know -- besides honoring a commitment

4    to -- to put money out that we can bring back and not -- not

5    trigger any losses for Commercial Mortgage on top of what --

6    what some of the borrowers may -- what some of the investors

7    may already have incurred.

8    Q.   So the first piece of this that you're talking about is

9    this operating capital, but also dealing with Boise/Gowen loan.

10   Is this tied, then, to a second piece of this loan?

11   A.   Yes, Ms. Jarvis, and that's -- that's really the most

12   important part is there's -- when -- when I took over and I met

13   with management, I was -- I was told there was $65,000,000 of

14   unfunded commitments that existed at USA Commercial Mortgage,

15   and after meeting with management that number grew to about

16   $74,000,000 of unfunded commitments.

17       What we've been -- what we've been doing during our period

18    of time in addition to try and collect loans down, we're

19    looking at loans that had been originated and need -- and where

20    -- where there was a commitment to lend additional moneys.

21    Those moneys -- the access to those moneys ceased when we filed

22    the Chapter 11.

23   Q.   Let me just stop you just for a minute.  You're not saying

24   when you say commitment -- it's not your position that the

25   company is required to fund it, is it?

1    A.    The -- the company -- the -- USA Commercial Mortgage on

2    several of the transactions entered into commitments to -- to

3    lend more than what -- what was in the original funding

4    transaction.

5              MS. CARLYON:  Your Honor, I object again.  This is

6    not --

7              UNIDENTIFIED SPEAKER NO. 1:  Will the person --

8              MS. CARLYON:  -- part of what's proposed --

9              UNIDENTIFIED SPEAKER NO. 1:  -- breathing into the

10    phone --

11              MS. CARLYON:  -- for the interim funding.

12              UNIDENTIFIED SPEAKER NO. 1:  -- please stop

13    breathing --

14              MS. JARVIS:  This is tied --

15              UNIDENTIFIED SPEAKER NO. 1:  -- into the phone.

16              MS. JARVIS:  -- to the interim funding, and if you --

17              UNIDENTIFIED SPEAKER NO. 1:  Mute the phone.

18              MS. JARVIS:  If we could just get through --

19              UNIDENTIFIED SPEAKER NO. 1:  Star six.

20              MS. JARVIS:  -- an explanation of this --

21              UNIDENTIFIED SPEAKER NO. 1:  Star six.

22              MS. JARVIS:  -- I'll have him tie it back --

23              THE COURT:  Okay.

24              UNIDENTIFIED SPEAKER NO. 1:  Mute the phone.

25              MS. JARVIS:  -- as to why this is important.

1          UNIDENTIFIED SPEAKER NO. 2:  Thanks, Michael.

2          THE COURT:  All right.

3          THE WITNESS:  The -- if I can keep going.  The -- the

4    key part of these -- the transactions that we're looking at

5    funding are -- are basically cut across most of the -- most of

6    the -- most of the various committees.

7          There are -- there's steel out of the ground.  My concern

8    is that if we don't continue to fund these -- if we don't round

9    out the funding on these loans, we -- we run the risk of being

10   sued by the borrowers and also that someone else is going to

11   come in and finish them and while I think that if we continue

12   to -- to fund these loans, we could recoup them at par plus

13   accrued interest.

14         If we don't, my concern is that we're going to lose -- lose

15   all -- some or all of the principal and accrued interest on

16   these transactions and we're locking in some losses.

17         So, essentially, what I've been looking at is putting

18   together a -- a -- a funding source that will fund these deals

19   and fund them to completion so that I can maximize the value of

20   getting the -- getting the money back to the investors at the

21   end of the day.

22         The other part that I have negotiated with CapitalSource is

23   -- and if I look at my (indiscernible) cost of funds on -- on

24   this $41,000,000, it's -- it's a little bit -- it's around nine

25   percent.  My -- my average lending rate is 12 percent, so

1    essentially what I've locked in as a positive spread of 300

2    basis points on these transactions.

3        So not only does -- not only do I -- will I be able to

4    maximize the value of these loans in terms of building them to

5    completion, but also generate some positive spread income which

6    enures to the benefit of this estate.

7    BY MS. JARVIS:

8    Q.   And have borrowers actually threatened to sue

9    Commercial Mortgage with respect to these so-called unfunded

10   commitments?

11   A.   Yes.  There's actually a lawyer in the -- in the courtroom

12   today that's told me that he's got a lawsuit on -- on -- on his

13   desk.

14   Q.   Are these -- let me refer to --

15           MS. CARLYON:  Objection.  Hearsay.

16           THE COURT:  Sustained.

17   BY MS. JARVIS:

18   Q.   Let me refer to what has been marked as I think Exhibit 2

19   that was attached to your declaration.  Was this prepared by

20   your staff under your direction?

21   A.   It was prepared by my staff under my direction.

22   Q.   And can you explain what this sets forth.

23   A.   This is a summary of --

24           THE COURT:  Again, I really want you to focus on just

25   this interim period.  I know what you're talking about because

1    -- but if we're getting ahead to the plan purposes --

2              MS. JARVIS:  Okay.

3              THE COURT:  -- we're way ahead of ourselves.

4              MS. JARVIS:  All right.  I will move over then.

5     BY MS. JARVIS:

6    Q.   Just let me ask you with respect to these unfunded

7    commitments, are they time sensitive?

8    A.   Yes.

9    Q.   And can you give an example of that.

10   A.   There is --

11             MS. CARLYON:  Objection unless it's within the

12   interim period.

13             THE COURT:  That's sustained.

14             MS. JARVIS:  Let me go back and just ask.

15    BY MS. JARVIS:

16   Q.   Do you intend to -- if this DIP financing is accepted

17   today, do you intend to during this interim period go forward

18   to negotiate for funding these -- or for getting a commitment

19   to fund these unfunded commitments?

20   A.   Yes.  That was what was contemplated not only just the 15

21   -- the -- the money that was contemplated for the first part of

22   the transaction, but going through these transactions and

23   getting them committed for funding so that we could preserve

24   and protect these -- these projects that are -- that are --

25   where there's progress in place, where there's potential

1   mechanic's liens, potential of workers walking off the job.  I

2   want to try and project the values -- the value of the estate.

3   Q.   And without having the first piece of the interim DIP

4   financing approved, is this opportunity available to you with

5   respect to getting a commitment from CapitalSource on these

6   unfunded commitments?

7   A.   No.

8   Q.   So in your business judgment, is this an important reason

9   for obtaining the DIP financing?

10            MS. CARLYON:  Objection.  Leading.

11            THE WITNESS:  Yes.  It's an --

12            THE COURT:  Sustained.

13            THE WITNESS:  It's --

14            THE COURT:  Sustained.

15            THE WITNESS:  It's -- it --

16            THE COURT:  There was an objection --

17            MS. JARVIS:  Yeah.

18            THE COURT:  -- and I sustained it, so you need to --

19            MS. JARVIS:  Yeah.  Why don't --

20            THE COURT:  The question --

21            THE WITNESS:  I'm sorry, your Honor.

22            THE COURT:  -- is withdrawn.

23   BY MS. JARVIS:

24   Q.   Mr. Allison, why don't you explain -- connect up -- or why

25   don't you explain why -- with respect to the approval you're

1    seeking for today, why that is important with respect to these

2    unfunded commitments.

3                MS. CARLYON:  Objection.  Leading.

4                THE COURT:  No, she said explain why.  That -- you

5    know, I want to get through it.  You're right.  It's still

6    leading, but, you know, let's get through it.

7                MS. CARLYON:  I appreciate that, your Honor.

8                THE COURT:  And please don't ask leading questions.

9                MS. JARVIS:  Okay.

10               THE COURT:  All right.  This witness can certainly

11   testify if you just ask him what's your rationale and be done

12   with it.

13               THE WITNESS:  My -- my rationale, your Honor, to do

14   these deals is that I want to protect this estate.

15       I know that -- I -- I've diligenced (sic) these loans, and

16   I've -- as I said, your Honor, I took them down from many more

17   loans than this and many more dollars than this to what I think

18   are -- are transactions that are money good, that could be

19   monetized and brought in at par for this estate.

20       They need funding to do that.  I don't believe that the

21   funding is available through third parties outside of --

22   outside of what's committed here at -- what we've gone through

23   with CapitalSource and doing each of these transactions, and

24   funding them help -- will help us monetize -- will help us

25   maximize the recovery to all the creditors in this estate.

1    BY MS. JARVIS:

2    Q.   And let me ask you a question that was asked before, but

3    you didn't have a chance to answer.  Are these time sensitive?

4    A.   Yes.  They're very -- they're -- they're time sensitive.

5    These -- these are projects that are --

6              MS. CARLYON:  Again, I object.

7              THE WITNESS:  They have steel in the air.

8              MS. CARLYON:  Wait.

9        I object except as to projects which are going to be funded

10     from the interim request.

11             THE COURT:  I'll sustain that.

12   BY MS. JARVIS:

13   Q.   If the DIP financing is allowed today, what, if any, of

14   these projects are you going to discuss with the DIP financier

15   for future financing under the second part?

16   A.   All of the projects --

17             MS. CARLYON:  Same objection, your Honor.

18   BY MS. JARVIS:

19   Q.   Within this interim period.  Within this next month.

20   A.   Within the next month --

21             MS. CARLYON:  Wait, wait, wait.

22       Same objection, and the question what are you going to

23    discuss with the lender if this is accrued is just so outside

24    of relevant to the issues here that we're just wasting our

25    time.

1           MS. JARVIS:  Then let me ask -- your Honor, I think

2    this is an important part of the DIP financing.  If he

3    cannot --

4           THE COURT:  Well, let's not have a --

5           MS. JARVIS:  But this --

6           THE COURT:  Let's not have you testify.

7           MS. JARVIS:  No.  I know, but what I'm -- okay.

8           THE COURT:  So just --

9           MS. JARVIS:  Let me just ask him.

10          THE COURT:  -- ask a question.

11          MS. JARVIS:  Okay.

12   BY MS. JARVIS:

13   Q.   What of these unfunded commitments do you intend to get a

14   motion on file before the July 25th hearing?

15   A.   All of the -- all the transactions that are -- that are on

16   these sheets, the 17 transactions, I plan to have a motion on

17   file to fund them.  I'm hoping to have that -- that put on our

18   August 4th hearing date that they would be up for final

19   approval.

20        I've already started a discussion with financial advisors

21   for one of the committees to explain to them the rationale

22   behind each of the transactions of why those fundings make

23   sense.

24        Again, I'm trying to -- these fundings are an integral part

25   of preserving the value of this estate.  They are linked to the

1    first part of the funding because during the intervening period

2    we're going to be working with CapitalSource and the

3    committees, committees' financial advisors, to -- to go through

4    each of these transactions and allow them to be fully vetted.

5    Q.   And will each of these transactions be separately noticed?

6    A.   Yes.

7    Q.   Will they be noticed to all of the lenders in each loan?

8    A.   Yes.

9    Q.   And will they be -- is it your intention to notice them on

10   the full 25-day period?

11   A.   Yes.

12   Q.   Let me ask you, then, just I guess the third piece.  Is the

13   third piece -- what is the third piece of this DIP financing?

14   A.   The third piece of the DIP financing is the ability to --

15   and to creating a warehouse facility within a defined parameter

16   to originate new transactions.  If this debtor is to

17   rehabilitate itself and exit bankruptcy as a -- as a lender

18   that -- it will need a warehouse facility to do so.

19       We are -- the company itself is receiving -- is receiving

20   loan proposals each day that -- that could potentially be

21   funded.

22       There are transactions out there -- USA Capital is -- it

23   has been a highly-regarded hard-money lender even though it's

24   lost its way.  There are -- there are a lot of -- there are a

25   lot of borrowers that want to continue to do business with it.

1    Q.    And is this third piece related to the interim financing

2    you're seeking approval for today?

3    A.    It's not, but it's -- it's a -- it's a part of how, you

4    know -- it's a part of how we renew the company.

5    Q.    Have you negotiated the DIP financing that is currently as

6    modified with all of the committees?

7    A.    Yes.

8    Q.    Let me ask how each of the -- as you negotiate this on

9    behalf of the estate, how are -- in your opinion as the CEO of

10   this company, how are the funds benefitted by this interim

11   financing?

12       In fact, let me take them one at a time.  What about the

13    Diversified Trust Deed Fund?

14   A.    Diversified Trust Deed Fund is -- is going to need the

15   majority of the enforcement.  They have the -- a disparate

16   number of -- of unperforming -- of nonperforming loans which --

17   several of which will need to be foreclosed upon.

18       So to the extent that I'm going to take into foreclosure

19    actions, the Diversified Trust Deed Fund will be benefitted by

20    the foreclosures.

21   Q.    And would you anticipate that some of this money would be

22   used during this interim period or could be used during this

23   interim period for those enforcement actions?

24   A.    Yes.

25   Q.    In your opinion as the CEO of this company, how does this

1    financing benefit the First Trust Deed Fund?

2    A.    On the First Trust Deed Fund, going to the transactions

3    which potentially could be losses on -- on this loan summary,

4    the 17 loans, the First Trust Deed Fund is in the majority of

5    them.  I think they're in 11 of them in various -- various

6    forms of percentages of ownership.

7         And, again, I think that by going forward on this and going

8     to the next step which is finishing out these projects, it will

9     benefit First Trust Deed Fund rather than triggering losses on

10    -- on part of its portfolio.

11        It would -- it would in turn allow that portfolio to -- to

12    monetize and -- and return a greater return than if -- if these

13    projects aren't completed.

14   Q.    In your opinion as the CEO of this company, how will this

15   benefit the direct-lender group?

16   A.    For -- on the direct-lender group, the -- they are all --

17   they are in the vast majority of these loans as well that need

18   funding, and this preserves from both an enforcement action

19   against nonperforming loans that are in the direct-lender pool

20   -- pool as well as with respect to the -- these 17 transactions

21   which the direct lenders are in the majority of them.  It will

22   -- it will, indeed, enhance the value they'll recover.

23   Q.    And in your opinion as the CEO of this company, how does

24   this benefit the unsecured-creditors group?

25   A.    By -- by finishing out these projects and avoiding -- and

1    limiting the amount of claims against the estate, we should be

2    able to convey a greater return to the unsecured creditors.

3    Q.    How many -- or did you negotiate with other potential

4    debtor-in-possession lenders prior to entering into this term

5    sheet?

6    A.    Yes, I did, nine of them.

7    Q.    About how many other lenders did you negotiate with?

8    A.    I'm sorry.  I -- I -- I went into significant negotiations

9    with nine other credit facility -- with nine other lending

10    groups.

11    Q.    And are the terms of this -- what are the -- comparing the

12    terms that you received here, how did it compare with the other

13    negotiations you (indiscernible)?

14    A.    They're superior to all the other terms that we've

15    received.

16    Q.    And based on your negotiations with these nine other

17    lenders, is it your opinion that this is the best deal that --

18    or this is a good deal for the estate and the best deal that

19    you have received with respect to these negotiations?

20    A.    This is the best deal I have received.  This is the best

21    deal I've received, and I've been in extreme -- been in very

22    tough negotiations.

23        It's a -- this is a hard portfolio to understand with the

24    -- with the way the loans -- the way the business has been

25    structured, and CapSource has come through with a very

1   reasonable proposal for us.

2   Q.   And I think you testified before that you have a background

3   as a banker; is that correct?

4   A.   Yes, Ms. Jarvis.

5   Q.   From your banking background, what is your view of this

6   term sheet that you've negotiated?

7   A.   It's -- it's -- it's very favorable.  I -- I negotiate DIP

8   financing every year for major corporations, Ms. Jarvis, and

9   getting this down to a LIBOR plus 300 basis points with a --

10  with a relatively small fee is really at the -- at the low end

11  of market.

12  Q.   And did you try to get an unsecured loan to cover these

13  needs?

14  A.   I have tried.

15  Q.   Was that available?

16  A.   No.

17  Q.   Did you try to get a loan based on an administrative

18  expense claim, the granting of that administrative expense

19  claim?

20  A.   Yes, and that was not available either.

21  Q.   There is a reference to loans being primed.  Are you aware

22  of any loans that would be primed as part of this interim

23  financing?

24  A.   No.

25  Q.   In fact, there were some potential equipment liens.  Is

1    that equipment going to be the subject of the collateral for

2    this loan?

3    A.   I don't believe it is.

4    Q.   Okay.  And in your business judgment, is this a reasonable

5    and necessary step in operating this business?

6    A.   Yes.

7              MS. JARVIS:  Okay.  That's all I have, your Honor.

8              THE COURT:  All right.  Cross.

9         (Thereupon, the portion requested to be transcribed

10        was concluded at 03:57:55 p.m.)

11        (Thereupon, the portion requested to be transcribed

12        commenced at 04:38:27 p.m.)

13             THE COURT:  Okay.  Who wants to go next or do you

14   want to take a five-minute recess now or --

15        (Colloquy not on the record.)

16             MR. LEVINSON:  Marc Levinson for the

17   Diversified Trust Fund.  I just have a few questions.

18             THE COURT:  All right.

19        (Colloquy not on the record.)

20             MR. LEVINSON:  Ms. Carlyon graciously said she

21   represented the Funds, and a lot of her questions were my

22   questions, but we are different as Mr. Allison knows.

23             THE WITNESS:  Yeah.

24                       CROSS-EXAMINATION

25    BY MR. LEVINSON:

1    Q.    First off, in terms of the 17 loans that would be funded

2    the next time perhaps, my client only has an interest in one;

3    isn't that right?

4    A.    That's correct.

5    Q.    Okay.  The Diversified Trust Fund is in a different

6    position, is it not, than the First Trust Fund because of the

7    nature of its collateral?

8    A.    Most assuredly, sir.

9    Q.    Our loans as best as I can tell are at the nature of about

10   $108,000,000 according to the schedules?

11   A.    That's correct.

12   Q.    And, yet, our biggest loans, 10-90, $55,000,000, is

13   unsecured, is it not?

14   A.    That's correct.

15   Q.    And our second biggest loan, Epic Resorts, at about

16   $19,000,000 is unsecured, is it not?

17   A.    That's correct.

18   Q.    And our third biggest loan, the Sheraton Hotel, $7,000,000,

19   is unsecured, is it not?

20   A.    That's correct.

21   Q.    Okay.  So if you do the simple math on that, that's 74 --

22   $81,000,000 out of our 108 is unsecured.

23         So the lien that would be put on the assets of the

24    Diversified Trust Fund, the few remaining assets, would tie up

25    all of our few assets out of $110,000,000 to perhaps fund this

1      one loan in which we have an interest of 19 percent?

2    A.    Yes.

3    Q.    Okay.  Let me ask the question of if assuming the Court

4    were to say no today as to interim financing because the fees

5    were too high or because you really don't need the money and

6    the debtor-in-possession loan were teed up for the end of July,

7    it would include all three parts -- the warehousing part, the

8    17 loans part, and the operations part.

9          Would that really prejudice your operation over the next

10    four weeks if you could tell creditors that -- and vendors and

11    employees that the motion were teed up, that you had warm and

12    fuzzy feelings perhaps from the committees that it would be

13    approved at that time?

14    A.    I think that the -- there's been an expectation of funding

15    for some period of time here and that I think that the -- the

16    -- my first -- my first reaction would be that I would be

17    losing employees during that period of time which would require

18    Mesirow to continue to add employees or -- or to hire temps to

19    -- to continue to do operations.

20          We -- we've already incurred that, so I think from an

21    employee standpoint there's -- there's that aspect to it.

22          The second aspect of -- of funding that I believe is

23    necessary ties in to credibility in terms of enforcement

24    actions.

25          We've been negotiating under the ability that, you know,

1    we're -- we'll go after foreclosure, and we've had some --

2    we've had some success.

3         (Colloquy not on the record.)

4              THE WITNESS:  We've had -- I hesitate talking about

5    it because we're in very sensitive negotiations on a loan that

6    we thought we would have a substantial loss on that we think

7    that we're -- that we're a day or two away from monetizing.

8         (Colloquy not on the record.)

9              THE WITNESS:  So to the extent that there could be

10   damage to the estate by not having funding in place, the answer

11   is, yeah.  I -- I'm very concerned about not having enough

12   liquidity in place.  That's why I put the motion on -- on hand.

13        And, frankly, from the time that I came in here, I started

14   negotiating with lenders to -- to find -- to find a lending

15   source to provide the incremental funding necessary to -- to

16   fund this business to protect the portfolio.

17        I -- I look at my duty as to protect the portfolio of all

18   the loans here, and, you know, part of the way the structure

19   works is that -- unfortunately, is that there's a -- this is a

20   very complex -- a very complex organization as you're well

21   aware, sir, and where we need to -- the two funds are -- are

22   the source of collateral along -- and, you know, what this

23   works towards is protecting the monetization of all the assets.

24        And so I think there needs to be a sorting out of how the

25   -- the -- the charges go at the end of the day, but what I've

1    been looking at putting a DIP in place to do is to protect the

2    value of this estate.

3        (Colloquy not on the record.)

4    BY MR. LEVINSON:

5    Q.    Well, we've already established, right, that you would have

6    to employ ordinary-course professionals which you haven't yet

7    done.

8    A.    That's true.

9    Q.    And so if you needed an enforcement action let's say

10   against one of my Funds' few collateralized assets, don't you

11   feel you could call on my firm to do that because we already

12   know we're not getting paid until the end of July or longer?

13   A.    Understood.

14   Q.    I would hope that.

15       And in terms of the foreclosure costs, I guess you've

16    answered the question that you had enough to pay the

17    foreclosure costs in the meantime or the option to go to

18    another judge and ask for emergency financing if that was

19    necessary.

20   A.    Yes, but I didn't think that going to another judge would

21   be part of the equation.

22   Q.    Well, and obviously we'd all like to avoid that, but,

23   again, it is an option if it were necessary.

24       The final question is that when the Debtor filed its

25    emergency financing motion on Friday the 9th, had you spoken to

1    members of my committee about that DIP-financing request before

2     the motion was heard?

3    A.   I'm -- I'm not quite sure.  I spoke to so many different

4    people, I'm not quite sure who I spoke to.

5    Q.   And --

6    A.   And I'm not trying to be evasive, sir.  I just -- I -- I

7    did -- I have had a number of direct -- a number of investors

8    call me, and I -- and I haven't identified them as to which

9    fund they're on.

10        (Colloquy not on the record.)

11    BY MR. LEVINSON:

12   Q.   But when you said before that you had negotiated this with

13   the committee, that was really negotiations that started last

14   week, wasn't it?

15   A.   Yes.

16   Q.   And our goal -- if the motion were denied, we would

17   continue to negotiate with you and actually have a real

18   negotiation this time on a final DIP financing.

19            MR. LEVINSON:  Thank you, your Honor.

20            THE COURT:  Okay.  Mr. Landis, you have just a few --

21   oh, Ms. Davis.

22            MS. DAVIS:  I just have a couple.

23        (Colloquy not on the record.)

24            MS. DAVIS:  I won't go over ground that other counsel

25   has gone over, but I do have some specific questions regarding

1    the Boise/Gowen loan.

2         Good afternoon, Mr. Allison.

3                         CROSS-EXAMINATION

4     BY MS. DAVIS:

5     Q.    You remember me as Laurel Davis, counsel for Scott Canepa

6     who is the --

7     A.    Correct.

8     Q.    -- largest single direct lender in the Boise/Gowen loan.

9     A.    That's correct.

10    Q.    And of that $2,425,000 loan, Mr. Canepa holds $1,250,000 of

11    the unpaid principal; is that correct?

12    A.    Yes.

13    Q.    I just have a couple of follow-up questions with respect to

14    some of your examination by Ms. Carlyon.  I want to get back

15    into this question about priming liens and how the loans would

16    be secured, but I want to focus on it from the perspective of

17    Boise/Gowen.

18         So if her Honor grants your request to fund the $125,000 on

19     the Boise/Gowen loan, how would that loan be documented?

20    A.    It would be documented as a participation in -- in the --

21    it would be a pari passu participation with your client,

22    Mr. Canepa.

23    Q.    So it would be a deed of trust with the same level of

24    priority as the existing deed of trust.

25    A.    Yes.

1    Q.    Now, I may be wrong, but I thought I reviewed something in

2    the proposed term sheet with a lender that required priming

3    liens as a condition of any funds advanced by the lender.

4    A.    On this particular transaction what we've discussed is

5    having it on a pari passu basis.

6    Q.    So just to be clear, the information that was provided in

7    your supplemental declaration --

8    A.    That was with respect to the 17 loans on -- on the -- in --

9    Q.    Right.

10    A.    The 17 loans we're talking about.

11    Q.    And if I could just finish my question, then.  There was no

12    specific discussion of a difference regarding Boise/Gowen, but

13    there is, in fact, now a difference regarding Boise/Gowen?

14    A.    What I understand it -- what we're -- what I understand our

15    intent would be is a pari passu, that we would come in on a --

16    on an equal basis with the existing lenders.

17    Q.    And you've confirmed that with the DIP financier.

18    A.    That's what our discussions have been.

19    Q.    And do you have a modified term sheet that reflects that?

20    A.    No, I -- we didn't -- the term sheet was contemplating the

21    17 loans, and -- and, frankly, we didn't -- I didn't -- under

22    the press of time, I didn't carve out that specific

23    transaction.

24    Q.    Okay.  Now, with respect to the Boise/Gowen project, that

25    was a one-year loan obtained in August of 2005, and it matures

1  in --

2  A.   Yes.

3  Q.   -- August of 2006; isn't that correct?

4  A.   That's correct.

5  Q.   Okay.  And you previously testified that that was a project

6  under construction.  What --

7  A.   It was a project needing engineering for -- to finish it

8  out.

9  Q.   Correct, and if I could just finish my question.  It was

10  actually a land takedown loan, wasn't it?

11  A.   Yes.

12  Q.   Okay.  So it's really not currently under construction as

13  we would normally consider construction, correct?

14  A.   No, but it's -- in terms of building stuff, no, but it's --

15  it's getting it ready and getting it -- getting it to a

16  position where it can be -- be -- the land can be harvested.

17       MS. DAVIS:  Okay.  And one more area of questioning,

18  your Honor, and then I'll be finished.

19   BY MS. DAVIS:

20  Q.   You testified during cross-examination by Ms. Carlyon that

21  in conjunction with the proposed advance on the Boise/Gowen

22  loan that you had not had any discussions with any of the

23  direct lenders regarding this?

24  A.   I haven't had a discussion with -- I haven't had a

25  discussion with your client, no.

1    Q.   Have you had a discussion with any of the 17 direct

2    lenders?

3    A.   No, I have not, personally.  I have not, personally.

4    Q.   Not even Ms. Cangelosi.

5    A.   I have with Ms. Cangelosi.

6    Q.   Okay.  Have you made any communication directly to the 17

7    direct lenders as required under paragraph 2-E of the

8    loan-servicing agreement?

9    A.   No, I haven't yet.

10   Q.   So what is your proposed course of action here?  You're

11   going to get the DIP loan approved, then you're going to get

12   your business judgment for this loan approved, and then you're

13   going to communicate with the direct lenders?

14   A.   Yes.

15            MS. DAVIS:  Okay.  No further questions, your Honor.

16            THE COURT:  Okay.

17            MR. GORDON:  Just one question, your Honor.

18            THE COURT:  Um-h'm.

19        (Colloquy not on the record.)

20                         CROSS-EXAMINATION

21    BY MR. GORDON:

22   Q.   Is this pari passu deed of trust on the Boise/Gowen loan to

23   secure solely the 125 or is it to secure the entire interim DIP

24   loan?

25   A.   The 125, Mr. Gordon.

1    Q.   So it will be limited to the 125.

2    A.   Yeah.

3              MR. GORDON:  Thank you.

4              MS. CHUBB:  Thank you, Mr. Allison.  I represent a

5    group of --

6              THE COURT:  Can you put one of the microphones --

7              THE COURT RECORDER:  Thank you.

8              THE COURT:  -- there.  Thank you.

9              MS. CHUBB:  Sorry.

10             THE WITNESS:  Hi, Ms. Chubb.  How are you?

11             MS. CHUBB:  Good morning -- afternoon.  Long

12   afternoon.

13                        CROSS-EXAMINATION

14    BY MS. CHUBB:

15   Q.   I was listening really carefully, and I understand that the

16   notes and deeds of trust will not be pledged as collateral.

17        I didn't understand whether the loan-servicing contracts of

18    the direct lenders would be pledged or whether just the fees

19    that you get out of those loans would be pledged.

20   A.   It would be the assets of -- the assets of Commercial

21   Mortgage would -- would be the fees.

22   Q.   Just the fees, not the contracts themselves.

23   A.   The contracts would be pledged as well, but that's -- those

24   are the assets of Commercial Mortgage.

25   Q.   So the contracts once they were pledged would be somebody

1    else's collateral, so it would be very difficult for those

2    loan-servicing contracts to be moved somewhere else.

3    A.    I hadn't thought through that part.

4    Q.    Do you think that would be the case?

5    A.    Probably.

6    Q.    Are you willing to pledge only the fees?

7    A.    I'd have to talk to my lenders to see where they're at.

8    Q.    Okay.  And with respect to your strategy on each one of

9    these loans that's nonperforming, is the value that you're

10   going to find out about when you get the appraisals back

11   relevant to the strategy on each one of those loans?

12   A.    Are we talking about the DIP financing or are we talking

13   about my workout strategy on -- on each of the loans?

14   Q.    Either.

15   A.    Well, I think that the workout strategy is going to vary on

16   each of the loans.  I -- we've -- we've -- we've worked a

17   variety of different methods to monetize -- help monetize

18   transactions and negotiate a variety of different ways.

19   Q.    But my question was is the value that you obtain from the

20   appraisal relevant to that?

21   A.    Yes.

22   Q.    And is there some reason why those values and the

23   information on the strategy isn't going to be available to the

24   direct lenders?

25   A.    I think that the strategy of monetizing the loans when I'm

1    negotiating with a borrower is -- is something that I should

2    keep with -- with -- under my hat until we monetize them.

3    Q.   Okay.  Is there some reason why the appraisals wouldn't be

4    made available?

5              MS. JARVIS:  Your Honor, I would object on --

6              MS. CHUBB:  Well --

7              MS. JARVIS:  -- relevancy grounds.

8              THE COURT:  Well, I understand it may be an issue on

9    other grounds, but in this particular motion since we've got --

10             MS. CHUBB:  Well, I thought you said --

11             THE COURT:  -- to deal with these things --

12             MS. CHUBB:  -- we were talking about all the motions

13   in the --

14             THE COURT:  No.  You're right.

15             MS. CHUBB:  -- (indiscernible) motion.

16             THE COURT:  We did talk about that.  You're right,

17   but we've been -- what I meant by that was the motions that

18   relate to the monetary aspects as opposed to --

19             MS. CHUBB:  Okay.  I'm sorry.

20             THE COURT:  And you're -- no, you're right, but

21   let's --

22             MS. CHUBB:  I misunderstood.

23             THE COURT:  -- focus on the monetary kind of motions.

24             MS. CHUBB:  Okay.  That's all I have on the monetary.

25             THE COURT:  Okay.

1        MS. CHUBB:  I just wanted to know --

2        THE COURT:  And thank you for reminding me we have

3    that other issue pending before us --

4        MS. CHUBB:  Okay.

5        THE COURT:  -- which I don't know --

6        MS. CHUBB:  Thank you.

7        THE COURT:  -- when we'll get to.

8        MS. CHUBB:  Okay.  Thank you.

9        THE COURT:  All right.  Thank you.

10       MR. LANDIS:  Good afternoon, Mr. Allison.

11       THE WITNESS:  Good afternoon, Mr. Landis.

12                     CROSS-EXAMINATION

13    BY MR. LANDIS:

14   Q.   You prepared a loan summary, right?

15   A.   Yes.

16   Q.   And whenever there's a footnote No. 1 --

17   A.   That's correct.  That's --

18   Q.   What does it mean?

19   A.   Oh, I'm sorry.  The -- the borrower is -- what I've tried

20   to flag and identify for -- for the world to see is which

21   transactions that we're looking to fund the borrower has some

22   sort of joint venture with Investment Partners.

23   Q.   Who is Investment Partners, so the record's real clear?

24   A.   The Investment Partners is the -- the principals in

25   Investment Partners are Mr. Hantges and Milanowski.

1   Q.   So if these transactions are funded, there is a benefit

2   that would derive to Mr. Hantges and Milanowski in connection

3   with any of the loans where there's a footnote No. 1, right?

4   A.   Potentially, yes.

5   Q.   Potentially?  Certainly, right?

6   A.   Well, the first benefit I'm looking to do is to get the

7   loans paid off.

8   Q.   Okay.

9   A.   And they'll -- getting the loans paid off, the joint

10  venture is on USA -- on Investment Partners owning the equity

11  underneath the loan, not the loan itself.

12  Q.   All right.  Well, let me just give you an example real

13  fast.  Boise/Gowen, you need $125,000 to pay it off so it can

14  go to the next level, right?

15  A.   Yes.

16  Q.   That's a third-party takeout lender?

17  A.   Yes.

18  Q.   And so that Boise/Gowen loan is going to pay off, right?

19  A.   Hopefully.

20  Q.   And how much of the payoff goes to Mr. Hantges and

21  Milanowski through Investment Partners?

22  A.   I believe -- well, it would be -- you would characterize it

23  hearsay, but I believe Mr. -- Mr. Bob Russell who's the owner

24  of the property has already bought out Mr. Hantges and

25  Milanowski --

Q.   When --

A.   -- in the Boise/Gowen transaction.

Q.   When did that happen?

A.   I've been -- I was just advised of it today.

Q.   How much did they pay?

A.   I think they -- he hasn't told me the -- I don't know the
number, but I -- he told me today that he was buying
Mr. Hantges and Milanowski out.

Q.   So they're going to get their money out of this pretty
quick, huh?  Is that right?

A.   Yeah.  They -- I -- again, I don't know what the number
would be.

Q.   So anytime that there is money that goes into footnote 1
loan under this arrangement, USA Investment Partners is going
to get roughly half of the value of that project when it
monetizes, right?

A.   Yes.

Q.   Now, you say monetize.  You mean liquidate, don't you?  I
mean, the money -- it just turns into money instead of whatever
it is.

A.   Well, what I'm looking at is monetizing the loan --

Q.   Right.

A.   -- that's here.

Q.   And I'm asking what you mean when you say monetizing.

A.   When the -- when the loan is paid off.

1    Q.    So of the 17 loans, would it surprise you if $6,967,372

2    worth of the proceeds are going to go into projects that

3    benefit Mr. Milanowski and Mr. Hantges?

4    A.    Where they have 50 percent of the equity.

5    Q.    On up to 75 percent, right?

6    A.    My footnote actually says --

7    Q.    Looking on the last page of your loan summary

8    (indiscernible).

9    A.    Okay.  Okay.  That's on -- on one transaction.  The

10   footnote -- the transactions that are footnoted on page 1 are

11   50 percent.  There's no transactions footnoted on page 2, and

12   there's one transaction on page 3 that they have 75 percent of

13   the equity.

14   Q.    So if you borrow money after having pledged the assets of

15   the funds in order to finance the 17 loans on your funding

16   summary so that they can be monetized, about 7,000,000 bucks

17   goes to Mr. Hantges and Milanowski; is that right?

18          MS. JARVIS:  Your Honor, lack of foundation.  We

19   don't have the -- I mean, the documents that determine

20   distribution are not in evidence, and this is pure speculation.

21          THE WITNESS:  What I did was on --

22          THE COURT:  I'll sustain the objection to the -- of

23   course, if you want to ask him what personal knowledge he has

24   of what he's reviewed.

25          MR. LANDIS:  Well, that's exactly what I'll do.

1    BY MR. LANDIS:

2    Q.    Why don't you tell the Court how much of that money you

3    understand would go to USA Investment Partners if they are in a

4    joint venture with the borrower at a rate of 50 percent.

5    A.    That -- well, I'll -- I'll answer the question

6    specifically, and -- and it -- and it -- I can't answer your

7    question as you've addressed it, Mr. Landis.

8         What I can tell you is that in each of the transactions

9    when I've looked at them what's flagged in -- on my records at

10   the company is that Investment Partners owns an equity

11   interest.

12        What this doesn't say is how that equity interest is split

13   between -- how -- or how proceeds are split up amongst the --

14   the partners and the equity interest.

15   Q.    Is that in any of the papers in any of the motions that are

16   pending before the Court right now (indiscernible)?

17   A.    No.

18             MR. LANDIS:  No more questions.

19             MR. CHARLES:  I thought a benefit to Investment

20   Partners was a good thing.  Let me see if I'm right.

21                          CROSS-EXAMINATION

22   BY MR. CHARLES:

23   Q.    Investment Partners also owes money to USA Commercial.

24   A.    That's correct.

25   Q.    One of the topics hopefully of today is to turn that into a

1   promissory note.

2   A.   That's correct.

3   Q.   For about?

4   A.   $57,000,000.

5   Q.   Secured by?

6   A.   Secured by the assets of Investment Partners.

7   Q.   So if value flows through those transactions into

8   Investment Partners, do Hantges and Milanowski get it?

9   A.   The -- what we've taken is the liens on several of these

10  projects to bring the money back into the estate of

11  Commercial Mortgage.

12          MR. CHARLES:  Thanks.

13          THE COURT:  You know, foreclosure is always a game of

14  chicken anyway, but let me understand, for example, about

15  Boise/Gowen.

16      If the 125,000 isn't lent or advanced -- whatever word you

17   may use -- then what happens vis a vis the project?  The

18   project was just to buy land, right?

19          THE WITNESS:  Yes, ma'am.

20          THE COURT:  And that's -- the land has been bought.

21          THE WITNESS:  That's correct, your Honor.

22          THE COURT:  And why can't they get refinancing based

23  upon that now from somebody else?

24          THE WITNESS:  Well, actually that's what I've

25  encouraged Mr. Russell to do is to find a third-party financier

1   to -- to make the 125,000.

2       Actually, I -- I asked Mr. Russell to make it himself, to

3    fund it.  He's funding actually other projects at the moment

4    that we had -- that USA Commercial had committed to -- to fund

5    where -- where he's got mechanic's liens, and Mr. Russell has

6    indicated to me he's essentially out of cash, so --

7           THE COURT:  So -- sorry.

8           THE WITNESS:  So -- and -- and as Mr. Landis pointed

9    out, there's a taint in projects where USA Capital is out

10   there, and I think that Mr. Russell has looked pretty hard to

11   find other third-party financing to cover this hole, and he's

12   represented to me that he hasn't been able to do so.

13          THE COURT:  So what --

14          MR. GORDON:  Your Honor --

15          THE COURT:  -- good would the --

16          MR. GORDON:  Your Honor, I'm going to move to strike

17   any parts of that as hearsay.  Mr. Russell is here.

18          THE COURT:  Okay.

19          MR. GORDON:  He could testify as to his ability of

20   refi'ing the property or the chances of it going --

21          THE COURT:  All right.

22          MR. GORDON:  -- to foreclosure.

23          THE COURT:  So that's sustained.

24       So what is the 125,000?  What is that going -- you said

25    it's going to be used for engineering.  What does that

1    accomplish that makes the financing from some third party more

2    likely rather than less likely?

3                THE WITNESS:  From what I've been told, it -- it's

4    the last part of the funds that are necessary to get the

5    project into a position where a third party potentially could

6    take it out.

7                THE COURT:  Have you done any investigation to

8    understand whether or not a third party could take it out now

9    and just do a reduction in the price by 125,000?

10               THE WITNESS:  What I've been told is that the

11   reduction in price would be greater than 125,000, your Honor.

12   It's --

13               THE COURT:  So you haven't done any independent

14   investigation.

15               THE WITNESS:  No.

16               THE COURT:  Okay.  Now, if we assume that the loan is

17   not made of 125,000, and August is two months from now, assume

18   they don't pay, you would start foreclosure, right?

19               THE WITNESS:  Or I would be -- I would try to find --

20   I would encourage Mr. Russell to refinance the project as

21   opposed to foreclose upon it.

22               THE COURT:  But if you foreclose, the point is they

23   would lose their equity, correct?

24               THE WITNESS:  Yes.  If I foreclosed, they would lose

25   their equity.

1            THE COURT:  Okay.  All right.  Any questions in

2     response to mine?

3            MS. SCANN:  Just one --

4            MR. GORDON:  Yeah.  Your Honor --

5            MS. SCANN:  -- further response.

6            MR. GORDON:  -- I had some questions based on what

7     the Court asked.

8            THE COURT:  Okay.  All right.  Do you want to ask

9     your questions first or --

10           MS. SCANN:  It's not really a question.  On behalf of

11    Boise/Gowen, Mr. Russell is here.  He's available to answer any

12    questions, but he's also willing to look for financing

13    elsewhere to fund this in another way.

14           THE COURT:  Okay.

15           MS. SCANN:  So --

16           MR. GORDON:  And these were generated by the Court's

17    questions.

18           THE COURT:  Yes.

19                          CROSS-EXAMINATION

20     BY MR. GORDON:

21     Q.   Mr. Allison, does USA Capital Mortgage get any fees from

22     the 125,000 originating (indiscernible)?

23     A.   The 125, I don't believe we get -- we earn -- I think if we

24     earn anything it's just the incremental fee on -- from getting

25     this transaction to closure.

1    Q.    So you don't get an origination fee.

2    A.    No.

3    Q.    Thank you.

4        And No. 2 is the Court asked you about foreclosure, but

5     there will be now two deeds of trust on this property, correct?

6    A.    Yes.

7    Q.    And --

8            THE COURT:  No, I said if the loan wasn't given.

9            MR. GORDON:  If the loan -- okay.  That's fine.

10   Thank you, your Honor.  I missed that.

11           THE COURT:  All right.  Okay.  Redirect.

12                        REDIRECT EXAMINATION

13    BY MS. JARVIS:

14   Q.    Mr. Allison, is Commercial Mortgage currently receiving any

15   servicing fees from First Trust Deed Fund?

16   A.    No.

17   Q.    Is Commercial Mortgage currently receiving any management

18   fee from First Trust Deed Fund?

19   A.    No.

20   Q.    And why is that?

21   A.    Because they're out of cash.

22   Q.    In fact, let me just refer you to I think Exhibit 1.  This

23   is the budget.  Does this represent on the budget the current

24   cash situation of First Trust Deed Fund?

25   A.    That's correct.

1    Q.    So is the Debtor currently taking enforcement actions on

2    behalf of First Trust Deed Fund?

3    A.    Yes.

4    Q.    Is the Debtor currently expending other -- both time and

5    effort in expenditures on behalf of First Trust Deed Fund?

6    A.    Yes, most assuredly.

7    Q.    And how are those being paid for?

8    A.    They're -- they're being absorbed by the professionals.

9    Q.    Are they also being paid for by servicing fees from other

10    lenders?

11    A.    Yes.

12    Q.    And is this an example of the situation we described before

13    where servicing fees are not currently being collected but for

14    which you are seeking upfront ability to fund them pending

15    collection?

16    A.    Yes.

17    Q.    Do you currently have any proposal on the 17 unfunded

18    commitments to take to lenders?

19    A.    I'm sorry, Ms. Jarvis.  I --

20    Q.    Do you currently have a firm commitment to take to the

21    lenders on any of these 17 --

22    A.    No, I do not.

23    Q.    -- unfunded commitments?

24         If this, the interim financing, is not approved, will you

25     be able to get a commitment from CapSource to take to lenders?

1    A.    No.

2    Q.    When you had described your intent in the process dealing

3    with these unfunded commitments, do you intend to wait until

4    you have a proposal before you take that to the lenders?

5    A.    Yes.

6    Q.    And, in fact, you would do further due diligence before you

7    did that.

8    A.    That's correct.

9    Q.    Okay.  You talked about hiring ordinary-course

10   professionals.  Do you feel it is necessary to go forward with

11   doing this at this point in time?

12   A.    Yes, I do, and -- and, frankly, one of the things I wanted

13   to be able to do is show them through the DIP that they have

14   the ability to get paid.

15        You know, as we look at, you know, the estate having a cash

16    burn, I wanted to make sure that if we hired professionals to

17    do things that this estate had the ability to pay them.

18   Q.    So do you believe it will be difficult then to hire

19   ordinary-course professionals without a DIP, at least an

20   interim DIP in place?

21   A.    Yes.

22   Q.    Without an interim DIP and the ability to go forward to try

23   to fund these unfunded commitments, will there be delay in

24   trying to deal with these unfunded commitments?

25   A.    Yes.

73

1    Q.    And what will be the cost of that delay in your opinion?

2    A.    I believe that we'll be triggering litigation and

3    continuing damages from the builders that are out there that

4    are -- that are -- that were relying on US -- that -- that took

5    a loan down relying upon USA Commercial Mortgage to -- to fund

6    the commitments that they have outstanding.

7    Q.    And even if you prevail in this litigation, will there be a

8    cost to the estate?

9    A.    Yes.

10    Q.    And what will that be?

11    A.    I think that we'll continue to -- we'll have -- we'll --

12    we'll have loans that are out there that won't pay out at par.

13    We'll have lost interest and lost principal.

14    Q.    The term sheet, was it attached to the motion that you sent

15    out of this hearing?

16    A.    I believe it was, yes.

17    Q.    Let me refer you to page -- let's see.  What is it?  Page 4

18    of the term sheet.

19             MS. CARLYON:  I'm sorry.  Is that an insert to the

20    motion?

21             MS. JARVIS:  Yes, it is.

22    BY MS. JARVIS:

23    Q.    You were asked whether you gave notice in the motion of the

24    potential lien, priming lien, and superpriority claim.  Was

25    this attached to the motion to give notice of that --

1    A.    Yes.

2    Q.    -- issue?

3         Let me go back to the funding summary that everyone has

4     been referring to which we've marked as Exhibit 2.  There are

5     17 loans that you discussed that you would seek funding for.

6     Of these 17 loans, how many of them would you seek funding for

7     within this next month?

8    A.    I would be walking through the funding needs with all --

9    for all of them with our lenders and with -- with the

10   committees.

11   Q.    Right.  And would you seek the approval -- is part of your

12   agreement with the committees that you would not seek funding

13   for this to go forward unless they had given you your approval?

14   A.    That's what I already agreed -- that's what I discussed

15   with the committees last week.

16   Q.    Maybe just to give an example of one of the issues with

17   respect to the funding and the importance of this, maybe you

18   could walk me through the Rio Rancho Executive Plaza, LLC.

19   A.    Sure.  Rio Rancho is a project in -- in New Mexico, and

20   Rio Rancho is very -- is under construction at the moment.

21   Construction would -- the risk to not funding include

22   construction stopping.

23        Rio Rancho has already leased out Phase One and Phase Two,

24    and it has real -- it has tenants in it that if this

25    construction stops they would -- the -- the -- the builder --

1    and I think it's Mr. Russell again -- would potentially lose

2    his tenants.

3        So I think that there's -- there's -- if construction stops

4    here, it's not --

5            MS. CARLYON:  Objection.  Hearsay.

6            THE COURT:  What was basing your knowledge?  Did you

7    visit this?

8            THE WITNESS:  I have not visited the site, but

9    I've --

10            THE COURT:  Okay.

11            THE WITNESS:  -- interviewed --

12            MS. JARVIS:  Your Honor, he's --

13            THE WITNESS:  -- Mr. Russell.

14            THE COURT:  Okay.

15            MS. JARVIS:  Yeah.  He's explaining his rationale as

16    to why he wants to move forward immediately.

17            THE WITNESS:  And in my --

18            MS. CARLYON:  Wait.  Just --

19            THE COURT:  I'll sustain the objection.

20            MS. CARLYON:  Thank you.

21            MS. SCANN:  Your Honor, Mr. Russell is present in the

22    courtroom.

23            THE COURT RECORDER:  I'm sorry, Counsel.

24            THE COURT:  Okay.

25            UNIDENTIFIED SPEAKER:  Yeah.

1            THE COURT RECORDER:  I'm not able to pick you up from

2    back there.

3        (Colloquy not on the record.)

4     BY MS. JARVIS:

5    Q.   Do you believe a --

6            MS. SCANN:  Susan Scann on behalf of Boise/Gowen.  I

7    just made the comment that Mr. Russell is present in the

8    courtroom and available for questions.

9     BY MS. JARVIS:

10   Q.   Do you believe a 30-day delay on funding this project would

11   cause potential damage to the collateral that is currently

12   securing the loan brokered by Commercial Mortgage --

13   A.   Yes.

14   Q.   -- and serviced?

15   A.   These are construction loans that are typically 12 month in

16   -- in length, and essentially by delaying it -- you know, this

17   loan has been delayed substantially already, and I think that

18   further delay in doing this could have disastrous effects on --

19   on the -- on -- on what Mr. Russell has done to lease out this

20   facility.

21   Q.   And have you tried to obtain funding outside of the DIP

22   financing for these projects or -- yeah, for these projects?

23   A.   Yes.

24   Q.   And is that available?

25   A.   It isn't.

1   Q.   You were asked about what you thought from the budget was

2   necessary to meet immediate and irreparable injury to the

3   estate with respect to asking for this interim financing.

4        Would you explain what there would be outside the budget

5    that you believe would demonstrate immediate and irreparable

6    injury to the estate if this interim financing is not granted.

7   A.   There are things that are -- that are -- obviously, this

8   case has been one of unforeseen issues, Ms. Jarvis, and -- and

9   one of the things I've been trying to protect in this case is

10  the appearance of having enough funding to -- having enough

11  funding to make sure that the -- the debtor stays in

12  operations, that the debtor is able to -- to take enforcement

13  actions as I said to collect loans, to keep employees in place,

14  and to -- and to sort out the -- this estate, and -- and one of

15  the things that's unknown at this time is if there could be a

16  dramatic slowdown in payments to this estate in terms of

17  loan-servicing fees by -- by the -- by the borrowers.

18  Q.   And if there is a slowdown, a more substantial slowdown

19  because of the lack of DIP financing, will that then affect the

20  budget as far as a need for financing within the next 30 days?

21  A.   Yes.

22  Q.   Do you believe that you have negotiated a very favorable

23  deal with --

24        MS. CARLYON:  Objection.  Leading.

25   BY MS. JARVIS:

1    Q.    -- CapitalSource?

2            THE COURT:  Please, don't lead.

3            MS. JARVIS:  Okay.

4            THE WITNESS:  I believe I -- I have shopped this

5    financing --

6            THE COURT:  Oh, well.

7            THE WITNESS:  -- from the -- I'm sorry.

8            MS. JARVIS:  Sorry.

9            MS. CARLYON:  Duplicative.

10           THE WITNESS:  I'm sorry, your Honor.

11           MS. CARLYON:  Exceeds the scope of redirect.

12           MS. JARVIS:  Yeah.

13           THE WITNESS:  Trying --

14           THE COURT:  Let's just go on.

15           THE WITNESS:  -- to be responsive, I've shopped this

16   transaction from the time I've come onboard prior to -- prior

17   to filing a bankruptcy in terms of looking at lenders and

18   looking at the loan structures that -- that make sense to -- to

19   finance this company.

20       I believe that this is the -- from an economic standpoint

21    of fees and costs, this is the lowest-cost transaction that I

22    have a hard proposal on.

23    BY MS. JARVIS:

24    Q.   Has CapitalSource done due diligence to date?

25    A.   Yes.  They've done it on their own nickel.

```
 1    Q.    And have they done in your view substantial due diligence?
 2    A.    Yes.  Our team has worked with them.  We provided them
 3    substantial information.  I believe that they're in a position
 4    where they could have this loan approved and can close it.
 5    Q.    If this interim financing is not granted today, do you
 6    believe that CapitalSource will continue to move forward on
 7    this transaction?
 8    A.    I don't believe --
 9              MS. CARLYON:  Objection.
10              THE WITNESS:  -- that they --
11              MS. CARLYON:  Calls for speculation --
12              THE COURT:  Sustained.
13              MS. CARLYON:  -- or hearsay.
14     BY MS. JARVIS:
15    Q.    Will the lack of DIP financing affect your decisions with
16    respect to enforcement actions that you will take within the --
17              MS. CARLYON:  Objection.
18     BY MS. JARVIS:
19    Q.    -- next 30 days?
20              MS. CARLYON:  Leading.
21              THE COURT:  Let's just --
22              MS. JARVIS:  All right.  Yeah.
23              THE COURT:  Please don't ask --
24              MS. JARVIS:  Okay.
25              THE COURT:  -- leading questions, but, you know, come
```

80

1    on.

2              MS. JARVIS:  All right.

3              THE COURT:  Try not to do that again.

4              MS. JARVIS:  All right.

5     BY MS. JARVIS:

6     Q.   How will this affect enforcement actions taken within the

7     next 30 days if the DIP financing is not allowed?

8     A.   I'm only going to spend money that I know that I have --

9     Q.   Okay.

10    A.   -- Ms. Jarvis, and I'll be making decisions on enforcement

11    actions based upon what liquidity I have in the budget.

12              MS. JARVIS:  That's all the questions I have.

13              THE COURT:  Don't every one of the trust deeds

14    provide that cost of foreclosure are taken first from the

15    property?

16              THE WITNESS:  Sure.  Yes, they do, your Honor.  The

17    problem is is that you don't get the money until you -- until

18    you've monetized the assets.  So between the time I foreclose,

19    the cost to carry it, and then I get my money when I -- when I

20    sell it.

21         So when I'm trying to finance this, the money necessary to

22     go from the first step to when I monetize it because that's

23     when I get my -- that's when I get my money out of the deal.

24              THE COURT:  But the costs will ultimately come from

25    the property, correct?

1          THE WITNESS:  Correct.

2          THE COURT:  Okay.  You said you're losing employees.

3   What kind of employees are you talking about?

4          THE WITNESS:  So far I've lost the -- the -- the most

5   senior person I've lost is the -- the person in charge of loan

6   servicing which I have then had to put one of my people in to

7   fill in the gap for him.

8          THE COURT:  So you're still going to have the same

9   costs regardless, right?

10          THE WITNESS:  Well, having one of my people do the

11   loan-servicing cost at his rates is a bit more expensive than

12   having --

13          THE COURT:  Have you attempted to hire anybody in the

14   local economy?

15          THE WITNESS:  Not in the past week I haven't.  He

16   resigned last week.

17          THE COURT:  Okay.  And why would you not seek -- oh,

18   I'm sorry.  For example, let's look at Gerrans Corporation

19   (phonetic).  It's a $275,000 loan.  You have your appraisal

20   back.  Is the property in the condition it's in worth less than

21   $275,000?

22          THE WITNESS:  I'm sorry.  Which loan, your Honor?

23          THE COURT:  J. Gerran's Corporation (phonetic).

24          THE WITNESS:  Yes.

25          THE COURT:  Third.  You have the appraisal back,

1   obviously.

2              THE WITNESS:  Right.

3              THE COURT:  Is the property worth less than 275,000

4   as it stands?

5              THE WITNESS:  No.  I think it's worth a bit more than

6   that.

7              THE COURT:  So why do you want to put more money in

8   if you've got enough to pay the lenders on this loan?

9              THE WITNESS:  Again, what I'm trying to look at on

10  each of these loans is the -- this one in engineering rezoning

11  which would if it's not completed would have a negative impact

12  on the property.

13     All I'm trying to do is take each of these transactions and

14   look at what the values come out at.

15             THE COURT:  But if the property is now worth more

16  than what you made the loan for, you're going to come out whole

17  on that loan, right?

18             THE WITNESS:  Right.

19             THE COURT:  Well, the lenders will.

20             THE WITNESS:  The lenders hopefully will.  Yes.

21             THE COURT:  Yeah.  Now, with respect to each of these

22  properties, do you believe that the values as is are worth

23  significantly less, about the same, or more than the loan?

24             THE WITNESS:  Less.

25             THE COURT:  Significantly less or just less, some

1   less?

2           THE WITNESS:  It depends on each transaction, but

3   less than what the loan is.

4           THE COURT:  Now, for example, on the Boise/Gowen.  Do

5   you believe -- and I maybe asked this, and I apologize.  Do you

6   believe the property as is is worth less than the loan even

7   without the engineering?

8           THE WITNESS:  Yes.

9           THE COURT:  How much less?

10          THE WITNESS:  Oh.  It --

11          THE COURT:  About.

12          THE WITNESS:  I -- I would think it's probably about

13  $250,000 less 10 percent of the loan balance.

14          THE COURT:  Okay.  All right.  Any questions in

15  response to mine?

16      Oh, I'm sorry.  One more question I forgot.  Why would you

17   not seek -- if you're making a loan on a specific project, for

18   example, Boise/Gowen, why would you not seek to have the lien

19   be a senior lien on the property?

20      (Colloquy not on the record.)

21          THE COURT:  If it's only benefitting that group, why

22  not?  Why have you chosen to make it pari passu since you

23  haven't even talked to them anyway as opposed to a priming

24  lien?

25          THE WITNESS:  Your Honor, on this transaction what I

1    was trying to do for speed was to do it on a -- on a pari passu

2    basis --

3              THE COURT:  Okay.

4              THE WITNESS:  -- in order to move it forward.

5              THE COURT:  Now, with respect to the other loans, for

6    example, Gateway Stone.  I'm just picking loans out of the air.

7    Why -- and I don't even know who the -- is that a direct lender

8    or is that a fund loan?

9              THE WITNESS:  Gateway is 92 percent held by the

10   direct lenders.

11             THE COURT:  Okay.  So, in any case, there are direct

12   lenders.  So why would that loan not be made available with at

13   least a pari passu or a priming loan?

14             THE WITNESS:  I think what we have to do in each --

15   each of these loans is -- what we've looked at as a priming

16   basis on each of the loans, we need to go back and talk -- once

17   -- first of all, we need to go through each of these loans to

18   get to a consensus with the committees to go ahead and fund

19   them, and then -- after we get that consensus put in place, to

20   go and talk about the loan structure.

21             THE COURT:  Okay.

22                          RECROSS-EXAMINATION

23    BY MS. CARLYON:

24   Q.   Now, with regard to your efforts to obtain this funding

25   elsewhere --

1          THE COURT RECORDER:  Counsel, could you move the

2     microphone back down towards you.  Thank you.

3          MS. JARVIS:  Your Honor --

4          MS. CARLYON:  I'm sorry.

5          MS. JARVIS:  Your Honor, I mean, I think if she wants

6     to cross-examine with respect to your questions, that's okay,

7     but if we're going to go back --

8          THE COURT:  No.  This is --

9          MS. JARVIS:  -- to my questions --

10          THE COURT:  I assume this is --

11          MS. JARVIS:  -- we're now doing a re-re- --

12          THE COURT:  -- with respect my questions.

13          MS. CARLYON:  But he --

14          MS. JARVIS:  -- re-recross.

15          MS. CARLYON:  -- testified about this issue in

16     response to the Court's question.

17       I do have one question I would like to ask in recross in

18      response to an issue raised by Ms. Jarvis.  When I ask it, if

19      there's an objection, we'll deal with it.

20     BY MS. CARLYON:

21     Q.  With regard to your efforts to shop these new loans or

22     these additional loans out, do you recall prior to filing this

23     motion we had a committee meeting, and I suggested to you that

24     you package up all of the related loans, the existing loans,

25     and the new financing, and you present them to the debtor's

1    local competitors such as Vista Group or Vestin to see if they

2    would just take out the loans and that you then go to the

3    investors and ask them if they would rather do that?

4    A.   I -- I remember your comment.

5    Q.   Okay.  And is it accurate to say you haven't done that?

6    A.   No, I haven't.

7    Q.   Okay.  You told me that the Funds -- you told Ms. Jarvis

8    the Funds are not currently paying the servicing fees --

9             MS. JARVIS:  Your Honor, now we're --

10   BY MS. CARLYON:

11   Q.   -- because they are --

12            MS. JARVIS:  Your --

13   BY MS. CARLYON:

14   Q.   -- out of cash --

15            MS. JARVIS:  Your Honor, I would object because now

16   we're going back to take my redirect --

17            MS. CARLYON:  It's --

18            MS. JARVIS:  -- and doing recross.  She's --

19            MS. CARLYON:  It's one question --

20            MS. JARVIS:  -- referring to one of my comments about

21   it.  I think this is improper.

22            THE COURT:  I'll allow it.

23   BY MS. CARLYON:

24   Q.   And because the Funds were out of cash.

25            Is it accurate to say that the Funds would have cash if you

1    had brought today the motion to distribute the interest and

2    principal you've received to the investors instead of this

3    financing motion?

4    A.    The -- there -- there -- what we've collected in cash today

5    would be distributed.  I -- what we're working on is making --

6    Q.    And --

7    A.    -- sure that we have an agreement with all the committees

8    including yours as to how those funds are distributed.

9    Q.    And if those funds were let go of, you would be able to pay

10   from those funds the servicing fees, right?

11   A.    I'm sorry.  You're -- you're --

12   Q.    You've collected principal and interest on account of

13   First Trust Deed being a lender in some loans, right?

14   A.    And others.

15   Q.    Right.  And you're holding that, right?

16   A.    Yes.

17   Q.    And if you ask this Court for permission to release that,

18   one of the things that would be released is the servicing fees,

19   right?

20   A.    What would be released would be the -- the principal and

21   interest that we've collected.

22   Q.    And when you collect the interest, are you taking the

23   servicing fees out before you put it in the separate account?

24   A.    When I collect interest on current accounts, I'm taking out

25   the servicing fee.  Yes.

1    Q.    Okay.  So the Funds have been paying --

2    A.    My loan --

3    Q.    -- the servicing fees.

4    A.    My -- my loan-servicing fee.  There's a -- there's a

5    servicing fee that's due from -- from First Trust Deed Fund.

6    First Trust Deed Fund has no cash to pay that.

7    Q.    You're saying the separate management fee.

8    A.    That's correct.

9    Q.    And the reason that there's no money to pay the management

10   fee is that you haven't released to First Trust Deed Fund that

11   principal and interest that you've collected.

12   A.    That's right.  I have not released it to any of the

13   funds -- any --

14   Q.    Filing --

15   A.    -- any of the --

16   Q.    -- that motion --

17   A.    -- any of the investors.

18            THE COURT:  We got the point.

19            MS. CARLYON:  Thank you.

20            THE COURT:  All right.  Let's take a recess.  We'll

21   have very brief argument.

22       We asked GSA to keep the air conditioning on.  They

23    listened to us like they always do.  I believe it's turned off,

24    so we're not going to last --

25            THE CLERK:  No, I think it's still on.

```
 1              THE COURT:  I think they turned it off, don't you?
 2         (Colloquy not on the record.)
 3              THE CLERK:  No.  They --
 4              THE COURT:  No?
 5              THE CLERK:  They called earlier (indiscernible).
 6              THE COURT:  I know, but we did what we're supposed to
 7    do.
 8              THE CLERK:  (Indiscernible) --
 9              THE COURT:  I know nobody wants to come back
10    tomorrow.  We'll finish this.  We'll do the motion to forbear.
11    I mean, we'll do the motion on the Canepa aspect --
12              UNIDENTIFIED SPEAKER:  Well --
13              MS. DAVIS:  Your Honor, before we go any further, in
14    communication with Mr. Russell and his counsel, Mr. Russell
15    wanted me to communicate to the Court and counsel that he is no
16    longer interested in the $125,000 advance, and he would ask
17    that that be taken off calendar.
18              THE COURT:  Oh.
19              MS. SCANN:  That's small enough that that's something
20    that could be managed, but we have the Franklin Stratford one
21    that's in.  That's absolutely essential.
22              MS. JARVIS:  And that needs to go forward today.
23              MS. SCANN:  Right.
24              THE COURT:  Okay.
25              MS. SCANN:  And it's brief because --
```

1          THE COURT:  Well --

2          MS. SCANN:  -- we've already vetted everybody with

3     that.

4          THE COURT:  Oh.  Okay.  All right.

5       So we'll take about a five-minute break, and what I can do

6      just to the extent we don't finish, unfortunately, I maybe have

7      two hours tomorrow between 10:30 and 2:00, so I hope we'll

8      finish.  I think I'd kind of like to quit at 6:00.

9          MS. SCANN:  Your Honor, may we start when we come

10    back --

11         THE COURT:  Yes.

12         MS. SCANN:  -- with the Franklin Stratford because it

13    doesn't depend on the DIP financing, so --

14       (Colloquy not on the record.)

15         THE COURT:  Well, the only thing is I was going to

16    make a ruling (indiscernible) have argument on it --

17       (Colloquy not on the record.)

18         MS. SCANN:  You were going to --

19         THE COURT:  -- but --

20         MS. SCANN:  Oh, just have --

21         THE COURT:  Oh.  Franklin Stratford everybody's happy

22    about.

23       (Colloquy not on the record.)

24         MS. SCANN:  Yeah.

25         THE COURT:  Okay.

1          MS. SCANN:  Everybody is --

2      (Colloquy not on the record.)

3          THE COURT:  All right.

4          MS. SCANN:  The people who --

5          THE COURT:  So we'll take it --

6          MS. SCANN:  -- are involved --

7          THE COURT:  -- when we come back.

8          MS. SCANN:  Yeah.

9          MR. GOCHNOUR:  I'm sorry, your Honor.  Wade Gochnour

10   on behalf of Liberty Bank.

11      Before we go, I was only here for the Investment Partners

12    motion.

13      (Colloquy not on the record.)

14          THE COURT RECORDER:  I'm sorry.  We're still on the

15   record, and we're getting --

16          MR. GOCHNOUR:  Yeah.

17          THE COURT RECORDER:  -- all the conversation.

18          MR. GOCHNOUR:  I'm sorry.  For the Investment

19   Partners motion.  I'm trying to figure out is that going to be

20   heard today?  Do I need to come back another day?

21          THE COURT:  Well --

22          MR. GOCHNOUR:  I'm just trying to figure out where

23   things are going, your Honor.

24          THE COURT:  And I can't tell you what is left to go.

25   Talk to counsel.  I'd like to try and leave at 6:00 and come

1    back tomorrow, but those people who can't, can't, so --

2              MS. CARLYON:  We'll discuss it during the break.

3              THE COURT:  Just talk among yourselves for a couple

4    of minutes.

5              UNIDENTIFIED SPEAKER:  Yeah.

6              THE COURT:  I don't think we'll have any air

7    conditioning.  I think they've shut it off on us, so it's going

8    to get awful in here in about five minutes.

9              THE CLERK:  All rise.

10       (Court recessed at 05:23:17 p.m.)

11       (Court reconvened at 05:31:11 p.m.)

12             THE CLERK:  Bankruptcy court is now in session.

13             THE COURT:  Be seated.

14       Gayle (phonetic) said that GSA's supposed to get it fixed.

15    Okay.

16       Let's go ahead then and -- do we need any additional

17    testimony in those other motions or can we just argue those

18    motions together, the forbear, the --

19             MS. CARLYON:  The forbearance I think we've resolved

20    most of it.

21             MR. SCHWARTZER:  Your Honor, with regard to the

22    forbear, I think everybody has withdrawn -- this is

23    Lenard Schwartzer on behalf of the debtor.

24       There are several things.  Boise/Gowen was the first one.

25    That's been withdrawn because Mr. Russell understands this is

1    more trouble than it's worth I guess.

2         The next one is the Stratford.  In Stratford, the debtor is

3    in a construction project.  There's an additional

4    two-and-a-half acres that's subject to the deed of trust that

5    is up for sale, and there's a sales contract to sell it.

6         And rather than loaning additional money to this lender,

7    what we're proposing is that the sale be completed and that the

8    lender use the proceeds from the sale, this additional

9    collateral, to fund the completion of the project.

10        This makes sense, obviously, from a financial point of view

11   because, otherwise, we wind up in the situation of a project

12   that's incomplete, unfunded.  This way we'll have a project

13   that the building will be completed, and there won't be

14   mechanic's liens on it.

15              THE COURT:  Now, were all the lenders on that loan

16   noticed --

17              MR. SCHWARTZER:  They all -- my --

18              THE COURT:  -- of that motion?

19              MR. SCHWARTZER:  They all received the notice that

20   was mailed out on the 14th notifying them of the hearing of the

21   motion to forbear.

22              THE COURT:  Okay.

23        (Colloquy not on the record.)

24              MR. SCHWARTZER:  And we've confirmed with some

25   counsel here that they received seven or eight copies because

1    my understanding the BMC Group sent it out to the lenders

2    involved in these specific loans.  It was a total of something

3    like 790 people.  Right at this point in time, there are no

4    objections to the Franklin Stratford deal.

5         The other thing, the other matter that there is is called

6    the Amesbury project.  Amesbury is a multiple-building

7    project.

8         On one of the buildings which is completed there are three

9    condominiums that are going to be sold for what appears to be

10   the full fair-market value, and the net proceeds of the sale

11   will be paid -- the entire net proceeds of the sale will be

12   paid to USA Commercial Mortgage on behalf of the individual

13   direct lenders.

14        So we're getting all the net proceeds.  What's not being

15   paid when the sale comes out is I guess the broker's fee and

16   the escrow closing costs.

17        And we need authority to sign a release because this loan

18   is in default, but we're still better off -- the business

19   judgment of the debtor is that we're still better off getting

20   the full net proceeds from the sale on these three condominiums

21   than keeping them together and --

22             THE COURT:  And the same question.

23             MR. SCHWARTZER:  -- foreclosing them.

24             THE COURT:  The direct lenders on this loan have also

25   been noticed.

1          MR. SCHWARTZER:  Yes, your Honor.

2          THE COURT:  Okay.

3          MR. SCHWARTZER:  They were also part of that notice.

4      The last matter, your Honor, is with regard to HFA.  HFA

5      paid off four loans, and as part of the deal they -- not a

6      condition.  They paid off three or four loans completely that

7      were in default.

8          They have additional loans that the debtor agreed that they

9      would not seek foreclosure before December 31st, at the end of

10     the year; in other words, basically, an extension of the loans.

11         We still have objection to that.  What we suggest with

12     regard to that is that part of the motion be continued to

13     July 25th.

14          THE COURT:  Okay.

15          MR. SCHWARTZER:  So, basically, the two parts there

16     are there's no objection, so we would like granted.  One part's

17     withdrawn, and one part is continued to July 25th.

18          THE COURT:  All right.  Comments?

19          MS. SCANN:  Your Honor, on behalf of Franklin

20     Stratford, Susan Williams Scann.

21         I just wanted to add this is urgent for this project

22     because the general contractor has only been paid the $100,000

23     that my client paid him since the last loan draw was submitted

24     in -- well, I guess it's been since March.  The April draw

25     wasn't on it.  He's threatened to walk off.

1          My client does have -- is in the process of selling one of

2     the warehouses, so if this thing doesn't get complete, it's not

3     only a disaster for my client but for the investors, too, and

4     we need it tonight because the escrow is just waiting for the

5     Court's --

6               THE COURT:  Okay.

7               MS. SCANN:  -- approval.

8               MR. GORDON:  Your Honor, the direct lenders take no

9     position with regard to the Franklin Stratford.  That's not our

10    loan.  That's the Funds' loans.

11         With regard to Boise/Gowen, obviously, that one now goes

12    away.  With regard to HFAH loans, we're fine with deferring

13    that to the 25th.  We do have problems with that.

14         With regard to the release of the three condominiums, I

15    appreciate the fact that notice was sent out.  Our opposition

16    to that --

17              THE COURT:  These are the Amesbury.

18              MR. GORDON:  Amesbury.  Sorry.

19         Our opposition to that was softer than obviously the HFAH

20    because we did have very clear objections.  I appreciate what

21    the debtor is saying.  We'd like to cooperate in that regard,

22    but we don't want to get down the slippery slope.

23         The notice says release three condominiums in exchange for

24    the net sales price for sales that are full-value sales.  It

25    doesn't say this is the last three elements of collateral, as a

1    result of their being released, there will be a deficiency for

2    which there is no further collateral available.  I have a

3    problem with that.

4         What I would suggest is we do the following, and that is --

5    is that the notice went out.  I appreciate it, but

6    (indiscernible) like to have a negative notice going out that,

7    you know, this order was approved subject to an additional

8    notice going out to the 398.

9         I just don't want to get into the position where this type

10   of notice binds them, and they come back in and say we didn't

11   know all the particulars.

12        I appreciate where the debtor is.  Again, our problems with

13   that was basically factual in addition to the notice problem,

14   and we did not have the access to this notice or had been told

15   it was served on all 3700 or all the interested parties.

16        So we sympathize with the debtor, but we don't want to

17   establish a precedent here that these type of short-end notices

18   all of a sudden comply with the loan-servicing agreement which

19   says, you know, we must hear from you.

20             UNIDENTIFIED SPEAKER:  Hello?

21             THE COURT:  Okay.

22             MR. LANDIS:  And, Judge, the United States Trustee

23   generally doesn't have a problem with what's been outlined just

24   walking through it right quickly so that we're all clear.

25        The request for release of excess collateral for the

1    Franklin Stratford loan as I understand it's a carve-out sale

2    and reapplying the sales proceeds into the project.

3        With respect to the additional 125,000 from Boise/Gowen, as

4    I understand it it's off the table.  That's fine.

5        We're going to -- with respect to the three Amesbury loan

6    condominium units, as long as the order provides for how the

7    proceeds are going to be addressed if there is an order we

8    might be comfortable there, and we would reserve all rights

9    obviously as we've discussed with respect to the HFA loans.

10        There's only one thing left, and that is we don't even need

11    an order.  I would suggest that the Court doesn't enter an

12    order.

13        The debtors have suggested to you that this stuff is

14    supposed to be ordinary course.  Mr. Allison has a $500,000

15    insurance policy premium that's already been paid.  If these

16    stand up, great.  If they don't, tough.  I don't think you need

17    to enter an order if you agree that they're ordinary course.

18        That's our two-cents' worth on these issues, your Honor.

19            THE COURT:  Okay.  On Amesbury --

20            MR. SCHWARTZER:  Your --

21            THE COURT:  -- so are you -- I'm sorry.

22            MR. SCHWARTZER:  Your Honor, can I just correct one

23    thing?

24            THE COURT:  Um-h'm.

25            MR. SCHWARTZER:  It's not the last collateral.  This

1  is the last units in Phase One.  There apparently is a

2  Phase Two.  I just want to make clear that --

3       THE COURT:  Okay.  So this is not the last collateral

4  because it does say issue partial releases.

5       MR. SCHWARTZER:  Yes.

6    (Colloquy not on the record.)

7       THE COURT:  And these indeed is partial releases.

8  This would not release --

9       MR. SCHWARTZER:  And my --

10      THE COURT:  -- all the collateral.

11      MR. SCHWARTZER:  And my understanding -- and it's

12  basically from reading what was filed, your Honor -- is that

13  this is the last three units in Phase One, but we do agree that

14  the remaining collateral appears to be insufficient to pay the

15  balance of the loan.

16      THE COURT:  Why didn't you say that?

17      MR. SCHWARTZER:  Because based upon the appraisals

18  that we had which are a year old, the remaining condominiums in

19  Phase -- this is a multiple-building condominium project, and

20  they have outstanding at this point in time $18,000,000, and

21  they're approximately $5,000,000 behind in interest payments.

22    This is a bad project.  We're not saying this is a good

23   deal.  What we're saying, this is a good deal under the

24   circumstances that we're better off with getting the full

25   fair-market value for these last three remaining condos in

1    Phase One than having to foreclose on three more pieces of

2    property and not having the --

3            THE COURT:  Do --

4            MR. SCHWARTZER:  -- million-and-a-half-dollar --

5            THE COURT:  Do we --

6            MR. SCHWARTZER:  -- net proceeds.

7            THE COURT:  -- know if Phase Two that we -- do we

8    already have Phase Two as our collateral or is Phase Two is a

9    new loan to be funded for which we'll get collateral?

10           MR. GORDON:  Your Honor, I stand corrected.  If you

11   look at paragraph 33 --

12           THE COURT RECORDER:  I'm sorry, Counsel.  Could you

13   move the microphone closer --

14           MR. GORDON:  Yes.

15           THE COURT RECORDER:  -- to you.

16           MR. GORDON:  If you look --

17           THE COURT RECORDER:  Thank you.

18           MR. GORDON:  -- at paragraph 33 --

19           THE COURT:  Oh.

20           MR. GORDON:  -- it says --

21           THE COURT:  It does say it's less the remaining

22   value.

23           MR. GORDON:  Right.

24           MR. SCHWARTZER:  Yes.

25           MR. GORDON:  That's why I was --

1           MR. SCHWARTZER:  I mean, we're --

2           THE COURT:  Okay.

3           MR. SCHWARTZER:  We want to make sure that --

4           THE COURT:  So it was disclosed.

5           MR. SCHWARTZER:  And, yes, we -- yes.

6           THE COURT:  Okay.  All right.  So let's do the easy

7    things first then so at least Ms. Scann is --

8           MS. SCANN:  And we --

9           THE COURT:  -- freed from her --

10          MS. SCANN:  Thank you, your Honor.

11       And we do need a written order.  We're dealing with a title

12    company, so --

13          THE COURT:  Okay.  You'll have to upload that order,

14    so --

15          MS. SCANN:  Right.

16          THE COURT:  -- on yours.  All right.

17       So on the motion to forbear, I'll grant the motion for

18     release of excess collateral for Franklin Stratford.

19       Do counsel waive signature on that?

20          MR. SCHWARTZER:  Your Honor, the only thing I want to

21    make sure is because the condition -- the idea of this

22    agreement is that the net proceeds from the sale of the real

23    property will go to the general contractor.

24       We want to make sure that the net proceeds go to the

25     general contractor or anything that's not paid to the general

1    contractor will be paid over to USA Commercial Mortgage.

2         MS. SCANN:  The general contractor is Petra, Inc.,

3    and we've proposed --

4         THE COURT RECORDER:  I'm sorry, Counsel.

5         MS. SCANN:  -- to put right in the order --

6         THE COURT RECORDER:  Could you move the microphone

7    closer to you.

8         MS. SCANN:  We would propose --

9         THE COURT RECORDER:  My apologies.

10        MS. SCANN:  -- to put it right in the order that the

11   net proceeds go to Petra, Inc., and --

12        MR. SCHWARTZER:  Okay.  That will be fine.

13        THE COURT:  So just have Mr. Schwartzer sign off on

14   the order and everybody else waives signature?

15        MR. SCHWARTZER:  That will be --

16        MS. CARLYON:  Ms. Karasik would like just to have a

17   couple hours to review the order.

18        THE COURT:  Okay.  So make sure you upload -- or give

19   it to them in the morning.  Upload it to me.  Friday morning's

20   fine.

21        MS. SCANN:  Okay.

22        THE COURT:  I mean, if you --

23      (Colloquy not on the record.)

24        THE COURT:  The sooner the better, but you --

25        MS. SCANN:  Yeah.

```
1              THE COURT:  -- can still --

2              MS. SCANN:  I'll do it.

3              THE COURT:  -- upload it Friday.

4              MS. SCANN:  I'll do it as soon as I can get it done.

5              THE COURT:  Okay.  All right.  And the Boise/Gowen is

6     off.

7              MR. SCHWARTZER:  Right.

8              THE COURT:  And the Amesbury I'll grant.  I make no

9     opinion as to whether or not an order is required.

10             MR. SCHWARTZER:  Okay.

11             THE COURT:  And then HFA, that's continued 'til --

12             MR. SCHWARTZER:  July 25th.

13             THE COURT:  -- July 25th or do you want --

14             MR. SCHWARTZER:  That makes more --

15             THE COURT:  -- August 4th?

16             MR. SCHWARTZER:  -- sense on July 25th because I

17    think August 4th is going to be worse, your Honor.

18             THE COURT:  Okay.  It's impossible.

19        (Colloquy not on the record.)

20             THE COURT:  All right.  Now, so the only other

21    financing motion is our motion to borrow, correct?

22             MS. CARLYON:  Oh, your Honor --

23             THE COURT:  I'm sorry.

24             MS. CARLYON:  Was Amesbury approved?

25             THE COURT:  Yes.
```

1          MS. SCANN:  One more point on the Franklin Stratford.

2    There was a -- the order requested that the ten-day stay be

3    waived, and I would request that be part of the order.

4          THE COURT:  Oh.  Does anybody have any objection to

5    waiving the stay on that?

6       There's nobody in opposition --

7          MS. SCANN:  No?

8          THE COURT:  -- so that's granted.  Okay.

9       Now -- all right.  Let's hear argument on -- I need my

10    calendar again -- the financing motion.

11          THE CLERK:  What page is that, Judge?

12          THE COURT:  This is the motion for interim permanent

13    orders authorizing postpetition financing.

14       (Colloquy not on the record.)

15          THE CLERK:  Okay.

16          MS. CARLYON:  Page 4 of the Court's calendar.

17          MS. JARVIS:  Your Honor, we are at a critical stage

18    of this case.  We have essentially finished the first piece or

19    the first phase of the forensic accounting and restoring

20    reliable books and records and are ready to begin reinstating

21    disbursements to investors from money now held in the

22    collection account and moneys collected in the future, and

23    that's to be heard on August 4th.

24       We will begin discussing the outlines of a plan of

25    reorganization with the four committees next week and plan to

1    get that plan on file in July prior to the next hearing.

2         However, despite what we believe is a process which we have

3    quickly moved this case forward, we no longer have time to wait

4    to arrange for DIP financing, and we need this for several

5    reasons.

6         First, we must make sure that we have sufficient operating

7    capital not only to perform services under the valuable

8    servicing agreements with lenders and to take actions to

9    preserve and protect collateral securing such loans, but to

10   protect the assets of the Fund's estates in pursuing collection

11   of other actions on behalf of this estate to preserve value for

12   the lenders in these funds as well.

13        Each month that goes by without the funding ability to

14   adequately deal with enforcement actions or to pursue money

15   that needs to be recovered back into these estates decreases

16   the likelihood of success for the estate in taking advantage of

17   the immediate opportunities to collect some amounts and to

18   aggressively pursue those that owe money to this estate or to

19   the lenders serviced by this estate.

20        Our focus is on collecting these loans to rehabilitate

21   loans and pay off investors and in bringing money into the

22   estate now from third parties to hopefully increase the pot

23   that needs to be divided among the unpaid investors and

24   creditors of this case who will not be paid by the mere

25   collection of the loans.

1    That would be enhanced with adequate financing, and that

2    would hopefully then minimize the disputes that we may have

3    over the ultimate distribution of the assets of these estates

4    since these estates can ill-afford protracted disputes among

5    claimants.

6        But in order to do this, this estate must be adequately

7    capitalized, and the DIP financing as proposed is the first

8    step and is a very important step in doing that immediately.

9        Without this adequate capital, it will be difficult for us

10    to proceed to protect the valuable servicing contracts of this

11    estate because we have certain functions we need to perform,

12    and we need additional capital to make sure that we can do

13    that.

14        Secondly, we must begin immediately to deal with these

15    funding issues on the construction projects that both serve as

16    collateral for direct lenders and for the Fund lenders.

17        We cannot wait any longer because many of these projects

18    are at a critical stage and must receive funding immediately to

19    preserve the value in the project and to prevent mechanic's

20    liens.

21        THE COURT:  But you haven't even talked to the

22    lenders yet, and I don't understand timing wise --

23        MS. JARVIS:  But we have --

24        THE COURT:  He said he was going to talk to the

25    lenders first.  The motion would have to be filed by July 7th.

1    This is June 21st.  How is that even possible?

2          MS. JARVIS:  But because as he testified, he can't

3    talk to the lenders first unless he has a proposal.

4        For instance, you need to look at the proposal.  You need

5     to figure out what the interest rate is going to be, you know,

6     what the terms are going to be --

7          THE COURT:  Well, why couldn't --

8          MS. JARVIS:  -- to make sure --

9          THE COURT:  -- he say --

10         MS. JARVIS:  -- that makes sense.

11         THE COURT:  Why couldn't he say, look, here's this

12   company that will give us a loan, and would you be willing to

13   do it if?  Why does he have to pay the money first?  Shouldn't

14   he first see if there are loans (indiscernible)?

15         MS. JARVIS:  Well, it depends on -- part of the

16   reason why we got the appraisals, your Honor, was to make sure

17   we understood the value of the property not only in its current

18   state but also as it would be with increased funding.

19       Now, you know, looking at that as an important piece

20    because looking at the terms of that you've got to make sure --

21    before we make a proposal to the lenders in this, we want to

22    make sure that it works for them, that it doesn't make the

23    situation worse for them, it makes it better.

24       But in order to do that, we need to have, you know, the

25    terms tied down.  We need to have something to propose where we

1    then can look at it in terms of the value that will be added by

2    adding on this piece versus the cost of that piece, and we

3    can't do that until we get a proposal, and we can't get a

4    proposal until we get this first piece of the financing

5    approved.

6            THE COURT:  Okay.

7            MS. JARVIS:  To wait even a month to start on this is

8    too late to present -- I think to prevent the losses that now

9    loom over these loans.

10       In addition, it will put us in a situation where we will

11   begin to see litigation arising out of the situation which

12   again will impose additional costs on this estate, real costs

13   in defending that, and even if we would prevail on that, we

14   still have to deal with the litigation costs in defending.

15       This will, therefore, avoid litigation costs and protect

16   the value of the collateral for the lenders.

17       Further, since the borrowers as we've previously stated and

18   as we've seen today with Mr. Russell are borrowers on multiple

19   loans, there's a domino effect.  If one loan of a borrower fits

20   into this category, it can affect not only this loan but other

21   loans that also affect other investors.

22       As we've previously demonstrated to the Court, there is a

23   tremendous amount of overlap in this estate, and, therefore,

24   it's very difficult to prevent a ripple effect, you know, when

25   there is one loan because of the overlap in investors and the

1    overlap of borrowers.  So when one loan is affected, it does

2    affect other loans as well.  We can't wait even 60 days because

3    these issues are critical and need to be focused on

4    immediately.

5        Third, we need to know that we have multiple options for

6    reorganization going forward that having a DIP provides.  These

7    debtors are slowly being starved to death by the lack of cash

8    as more and more of the difficult loans are left as the sole

9    group to service while unsecured creditors and numerous

10   innocent investors harmed by principal diversions that are of

11   no fault of their own look to the debtor for a solution to

12   their claims that cannot be adequately explored without

13   sufficient cash on which to operate and deal with the other

14   funding problems of this estate.

15       If maximum options to reorganize or even to liquidate in an

16   orderly manner are to remain available to these debtors, they

17   must have sufficient operating cash or these options will not

18   be available.

19       We must know that we have sufficient capital for our

20   servicing contracts including carrying any defaults under that

21   in order to maintain the value of those contracts as well, and

22   as we plan to file a plan again within the next few weeks,

23   knowing that we have this funding is critical.

24       Fourth, we need to know whether these estates are on the

25   brink of administrative insolvency with the weight of the

1   committees and the professionals being added to the debtor's

2   professionals.

3       Now, while that is not an issue until a week after

4   July 25th, it is coming up immediately, and it needs to be

5   dealt with because decisions need to be made now in order to

6   try to minimize that effect, and if we do not have financing

7   available, we have to consider that.  The debtor has to

8   consider that as Mr. Allison testified in going forward.

9       That will force -- if we're in that situation, that will

10  force the debtor on a very different course of action, and we

11  just cannot ignore this pending reality if the financing --

12  because essentially we're asking to finance this on the backs

13  of the professionals who have to be paid at some time or the

14  other.

15      We need to make sure that we have an endgame in sight, that

16  we have adequate funding to be able to take the actions we need

17  to take, and to feel like we can move this business forward in

18  an appropriate way, and the interim financing is critical to

19  that.

20      Further, while the funding is critical both in the short

21  and the long term, the interim relief we seek at this hearing

22  is reasonable and is in the debtor's best business judgment.

23      We have spent tremendous amount of time dealing with the

24  committees' objections, and, frankly, at the beginning of the

25  hearing, I think your Honor heard that with all the amendments

1    that we made to the term sheet that but for the fees issue that

2    the committees were onboard with this financing understood that

3    it needed to go forward and had agreed to it.

4         And so while we've spent a lot of time talking about the

5    fees issue with respect to the testimony of Mr. Allison, I

6    think that point should not be lost that other than that issue

7    there is an agreement that the DIP financing needs to go

8    forward.

9         We have proven a lot of protection, so we're asking only

10   for a use of up to 3,000,000 pending the final hearing.  We've

11   agreed that the Funds committees and the creditors committee

12   can dictate essentially whether they are in agreement that

13   advances need to be made.  So we've put in protections to

14   protect the creditor groups from any advances that they may

15   think are not appropriate.

16        We have provided that -- so we've given them the discretion

17   to oversee, monitor, and control any actual advances used by

18   the debtor in the interim period as well as the ability to

19   dictate to the debtor whether those unfunded commitments --

20   which of those unfunded commitments we move forward to get

21   noticed up immediate for funding.

22        So we've put in a lot of protections to protect the

23   creditors of this estate.  We've negotiated for no exit fee for

24   the repayment of this interim financing if permanent financing

25   is not approved.

1        We've eliminated the first right of refusal on the loans on

2    the construction needs so all options can be looked to for

3    those, but we don't want to lose the option we have here to be

4    able to get that financed through the DIP financing.

5        We've eliminated mandatory prepayments for the interim

6    financing, eliminated avoidance actions and intercompany

7    receivables for the interim financing as collateral.

8        We have not sought to use investor funds, and part of our

9    agreement in going forward on this DIP financing was our

10   agreement to set aside those investor funds which we have

11   collected on prepaid interest and also the interest on the

12   funds held in the collection account because we understand that

13   there are issues with respect to those funds and feel like it's

14   more appropriate to preserve those and to deal with that at a

15   later time in a global context where we're dealing with how do

16   we get these investors who -- or these lenders whose principal

17   has diverted paid in a plan of reorganization along with the

18   unsecured creditors.

19       We've agreed to weekly reports showing the budget to

20   actual, and, thus, with all of these protections that we have

21   negotiated we have reduced substantially the risk to the estate

22   so that the risk is really small comparatively for this interim

23   financing.

24       But the downside without it can be devastating to this

25   estate.  It can be a turning point for this estate, and if this

1    case has any hope of a successful reorganization the debtors

2    have met the standard for this interim financing.

3        We are only going to pull down what is necessary for

4    irreparable -- to prevent irreparable harm, but that

5    irreparable harm is looming, and in the debtor's best business

6    judgment this is necessary to prevent this going forward.

7        We need to deal with this in a controlled fashion which

8    this DIP financing allows us to do while there still exists the

9    possibility of a healthy future.

10       Waiting any longer to grant this relief may irreparably

11   damage the debtor and its ability to reorganize and to pay all

12   of the creditors of this estate, and we, therefore, would ask

13   that the Court grant this interim financing with the various

14   amendments that we have negotiated and the protections that we

15   have put in place on an interim basis for 30 days pending a

16   final hearing on July 25th.

17            THE COURT:  Okay.  All right.  Opposition.

18       (Colloquy not on the record.)

19            MR. LEVINSON:  I want to clarify one problem first.

20       This is the first page of Exhibit -- it's either 1 or A.

21   My fund actually has cash.  If you look at this line here, we

22   have 500-and-something thousand -- my eyes can't read it from

23   here -- and we will continue to have that.

24       And then the week of July 9th we will be tagged for

25   $125,000 to fund the other debtor, and toward the end of August

1    we will be tagged again, so the total we will be paying is

2    $250,000.  We'll be paying 125 here, 125 here, 250.  So we do

3    have cash, and we are funding this debtor in addition to the

4    collateralization that's being sought.

5        The Diversified Trust view is that there is no need for

6    cash within the next 30 days.  The evidence I think is clear

7    because the debtor has the funds to pay it.

8        So what we're doing here is we're paying $300,000 for an

9    insurance policy so people will know that cash will be

10   available if it has to be drawn down, but it doesn't have to be

11   drawn down because there's no need for it.

12       We do agree, my committee agrees, that we do not want the

13   debtor to shut down tomorrow, that we are interested in

14   negotiating a DIP financing agreement, and we would be willing

15   to do that so a full, complete agreement could be heard by the

16   Court on July 25th.

17       Look at where we are.  First off, this motion was filed

18   without any notice to my committee at all.  We started talking

19   after it was filed.  We've been negotiating on and off ever

20   since.

21       We learned this morning that the term sheet that's attached

22   to the motion is out the window, that there's been so many

23   changes.

24       We received last night in time for us to be able to read it

25   for the first time this morning a new and revised version of

1    the order which we went through this morning in part during a

2    meeting that started at 7:30 that was set at 11:00 o'clock last

3    night and in part while you were hearing testimony about

4    kicking Fertitta of the committee as we were trying to learn

5    just what this order provided.

6        If the Court were to grant the motion today, we would have

7    to spend the rest of tonight and tomorrow negotiating the form

8    of order because what we have in front of us, what you have, is

9    nothing like what it will end up looking like.

10       What we would suggest is that the Court deny the motion

11   now, give us a chance to negotiate a real DIP, perhaps even

12   look at the DIP loan agreement.

13       I know that's an unusual concept to have before we come in

14   for a DIP motion, but to see the DIP agreement, to see all the

15   little bells and whistles that lenders put in, and that debtors

16   and committees fight, and that judges generally don't like to

17   give us a chance to look at that and vet it completely before

18   the next motion is filed so when we come here on July 25th

19   you'll actually have something to really consider instead of an

20   order that was marked up and E-mailed last night at 11:00

21   o'clock at night.

22            THE COURT:  Okay.  All right.  Objections?  Comments?

23            MS. KARASIK:  Your Honor, Eve Karasik, Stutman,

24   Treister & Glatt on behalf of the First Trust Deed Fund.

25            THE COURT RECORDER:  I'm sorry, Counsel.  Could you

1    move the microphone closer to you.

2             MS. KARASIK:  Yes.

3             THE COURT RECORDER:  Thank you.

4             MS. KARASIK:  We echo the comments by Diversified

5    Trust Fund, and we will not repeat those.

6        I just want to state on the record that it's really our

7    fund whose ox is going to get gored in this case.  I mean, we

8    have the best loans.  We have the best portfolio.

9        They're asking our fund to really carry these cases, and we

10    really did try to work with them on this.  We gave them a lot

11    of proposed changes to the term sheet.

12        They were very responsive.  We just couldn't get past the

13    fees on a $3,000,000 loan to pay nearly over -- and we don't

14    even know, maybe 300,000, maybe more.  They won't cap their

15    fees.  We just can't do that.

16             THE COURT:  And how many -- I've forgotten.  There's

17    like 1600 investors?

18             MS. KARASIK:  I believe that's right, your Honor.

19             THE COURT:  And --

20             MS. KARASIK:  I'm not sure.

21             THE COURT:  Between the two funds.

22             MS. KARASIK:  And maybe with some sort of different

23    pricing it could have worked, but we just didn't get there

24    today, and the need doesn't demonstrate it.  There's just no

25    need here for this.

1        There is one issue I wanted to raise.  In their term sheet

2    that they signed which who knows if it's really binding because

3    the Court didn't approve it, and it's not ordinary course,

4    there's a negotiation exclusivity provision in it so the debtor

5    is not permitted to talk to any other lenders because they

6    signed that term sheet.  That's problematic.

7        We need to open the doors.  We need to make sure that these

8    are the best terms that they can get especially because it's

9    our fund's assets.

10       So we would ask that the Court hold that that is not --

11   that the debtor is not bound by that provision or at a minimum

12   that we can go out and talk to folks and that if we find people

13   we want them to talk to that they must be directed to provide

14   information and communicate with those lenders.

15            THE COURT:  Okay.

16            MS. KARASIK:  Thank you.

17            MS. CHUBB:  Your Honor, only with respect to the

18   collateral that might be pledged on behalf of my direct

19   lenders, I would just ask the Court to restrict that collateral

20   to the fees that might be received pursuant to the servicing

21   contracts.

22       The contracts have not been accepted or rejected.  They

23   can't be treated as property of the estate yet, so the

24   contracts themselves should not be included as collateral.

25       (Colloquy not on the record.)

1          THE COURT:  Okay.

2          MR. LEVINSON:  Your Honor, while we're waiting,

3     Marc Levinson for the Diversified Trust.

4        We actually have 1900 investors in the Diversified Trust

5      Fund.  I believe anecdotally there's like 1300 in the First

6      Trust Deed Fund.

7        (Colloquy not on the record.)

8          THE COURT:  And I recognize there's a lot of overlap

9     between the direct lenders --

10          MR. LEVINSON:  There is.

11          THE COURT:  -- and whatever.

12          MR. LEVINSON:  There is.

13          THE COURT:  I understand that, but I just kind of

14    want to remind everybody that since it's not just like some

15    group that's owned by a bunch of insiders, these are all

16    investors just like the direct lenders were.

17        (Colloquy not on the record.)

18          MS. KARASIK:  That's correct, your Honor.

19          MR. LEVINSON:  That's correct.

20          MR. LANDIS:  Judge, all we did was respond to the

21    debtor-in-possession financing motion, and I have these

22    observations.

23        Prepaid interest equals stolen borrower payments.  Monetize

24      the loan means liquidation of existing loans, and Investment

25      Partners equals Hantges and Milanowski.

1          The United States Trustee is concerned that borrowed moneys

2     secured by fund assets to benefit Hantges and Milanowski in any

3     way who were running USA Commercial Mortgage when the borrower

4     payments were taken doesn't make a lot of sense.

5          That having been said, the committees are well represented.

6     They understand the issues.  They are willing to discuss this

7     matter with the borrowers.  We're willing to stand back and

8     simply review the form of order if an agreement can be reached.

9               THE COURT:  Okay.  Mr. Charles.

10              MR. CHARLES:  Your Honor, the Unsecured Creditors

11    Committee had filed a response that was generally not

12    supportive.  We are generally supportive of the changes that

13    have been proposed, although, also they've agreed to consult

14    with us.

15         Really, only three points.  One is I hope they're right

16    that their assets are at risk, but I looked at the schedules

17    and saw it, and we looked at the schedules as a committee and

18    saw $80,000,000 of assets at USA Commercial Mortgage.  Maybe

19    the question's of timing and liquidity, but there are

20    significant assets here.

21         Our committee are unsecured creditors.  They're not lenders

22    yet -- they may be soon -- and they looked at the numbers and

23    the amounts and thought -- and listened to Mr. Allison and

24    thought if you starve this thing, if you, you know, kind of

25    kill it up with little cuts you end up with -- and no one used

120

1    this example except me -- the RTC.  I mean, what was it like

2    when the RTC was collecting loans?

3         When I was representing borrowers, we got away with a lot

4    because they weren't in a position to --

5              THE COURT:  That's because you represented them.

6              MR. CHARLES:  Also true, but they weren't -- when

7    lenders can't be aggressive, when the only option -- and to

8    answer one of your questions, when the only option is you have

9    to foreclose and take your lumps with however long that takes

10   or how much time it takes or how much cost that involves, that

11   doesn't work in terms of maximizing the dollars that you get

12   out of this mess.

13        And if you don't maximize the dollars you get out of this

14   mess, all of the lumps fall on the unsecured creditors because

15   people will say USA Commercial Mortgage brokers violated this

16   contract and that contract, here are bigger claims, and the

17   pool as it shrinks the claims rise.  We are hurt.

18        And so we supported this even on an interim basis hoping

19   they don't need the money but believing that that will make it

20   more likely to succeed.

21        Last, on USA Investment Partners and Mr. Landis' point, we

22   still think -- I still think that's a good thing.  The biggest

23   asset unfortunately in USA Commercial Mortgage if it's

24   approved -- and I sure hope it is -- is that $56,000,000 note

25   from USA Investment Partners that is secured hopefully by

1    everything that's useful.

2         So if you prop up their projects, it's not like they have

3    gold or coins or land you can go take.  They've got projects

4    and deals, and you need to make their deals work to turn that

5    into money.  If their deals go to hell, their note isn't worth

6    much.

7              THE COURT:  Okay.  Let me just go ahead.  We're all

8    sick of each other.

9              MS. JARVIS:  Your Honor, if I could just make just

10   one point, one --

11             THE COURT:  One.  One minute.  That's it.

12             MS. JARVIS:  All I'm going to say is just this.  You

13   know, the Funds argue it's their collaterals at risk and,

14   therefore -- and these fees are too much, and they don't want

15   to pay these fees.

16        But if you really look at where the fees are being paid

17   from, and if we're right and we happen to be -- and we don't

18   need to pull down anything on this loan in the interim period,

19   the fees are coming from the unsecured assets of this estate.

20        So it's the unsecured creditors that are actually paying

21   for this, and they'd support this because they understand that

22   this is important for maintaining the value of this estate.  So

23   those fees are coming out of their assets.

24        Thank you, your Honor.

25             THE COURT:  Okay.  I think unfortunately in a sense I

122

1    think this motion is a motion based on paranoia of the fact

2    that Mom's going to be gone for a little bit, and the reality

3    is things will be fine, kids.  Dad's still here.

4        I don't want another judge to have to deal with any of

5    these things, but if there was a true emergency there's a

6    visiting judge here for two weeks.  Judge Markell is here for

7    two weeks -- Judge Markell's here.  They're all only gone -- in

8    fact, Judge King is here the week that they're at the

9    Ninth Circuit conference.

10        But, more importantly, in the real world -- it's like I

11    said last week.  You know, a 30-day notice is what you would

12    normally give in this kind of a context.  This was just sort of

13    a reaction because I guess you were afraid somebody wasn't

14    going to hear it because -- and the reality is there is no need

15    for emergency money right now.

16        The good news is Mr. Allison is doing a terrific job

17    managing the money, collecting what he has.  There is

18    sufficient funds to fund this the next 30 to 45 days.

19        Secondly, the 125 has gone away, and, more importantly, I

20    was very skeptical about that anyway.  I'm really concerned

21    about the slippery slope of making these loans especially

22    without the direct-lenders' consent.

23        Thirdly, foreclosure.  I think you're going to be able to

24    find attorneys to start the foreclosure process, and I'll get

25    to it in a moment.  I don't think there's any doubt that at

1    some point lending will be approved either in the context of a

2    plan for purposes of going after foreclosures or any of these

3    kind of things.

4         But the problem now is there are too many unknowns.  We

5    would never get an agreed upon order.  I mean, collateral -- I

6    have a big issue about collateral.

7         As I've sort of intimated -- and I'm sure many direct

8    lenders don't want to hear this or are afraid to hear this -- I

9    seriously question whether or not you can when you make a loan

10   on a current loan to try and get value for that loan, why in

11   the world you could give a lien on all the other assets as

12   opposed to the loan, a senior loan, on that very project.  It

13   is those people who are benefitting.

14        Perhaps even more importantly is -- and the reason this is

15   premature is I think that it's imperative that you get -- at

16   least advise the direct lenders on any of these loans before

17   you attempt to loan more money to get you out of the hole on

18   the current loan.

19        Having said all that, just so that Mr. Allison doesn't feel

20   like the rug has been taken from under him, I think it's safe

21   to say that DIP loan financing would be approved for loans that

22   direct lenders have all agreed that that's what should be done

23   and/or we have a hearing and you convince me that under the

24   bankruptcy code notwithstanding 100-percent consent that's the

25   right thing to do.

124

1       I guess what I'm saying is this is not to suggest that some

2    loan couldn't be approved once we get all these issues -- in

3    fact, the lenders committee -- the Fund committees have

4    intimated as much.

5       So it's not that we're saying there can't be a loan.  It's

6    just it's premature in my mind.  It doesn't meet the

7    requirements of the 15 days, first of all, nor can I say, okay,

8    fine, go let somebody else hear it, it's got to be done in the

9    next 30 days.  I just don't see the need, and there's too many

10    concerns.

11       I think -- and Ms. Chubb had this question last week in

12    relation to what do you do first.  Do you first find out if you

13    can lift stay, I'm going to lift stay, or do you go to your

14    clients -- do you go and get your 51 percent?  I understand

15    it's a chicken and egg.

16       The same thing is true here.  I think the first thing to do

17    is to have those conversations with the lenders on these new

18    monetizings, if you wish, to see if that's what they want to

19    do.

20       And I think, Ms. Jarvis, you'd probably concede you're not

21    in a position to actually say at this time that that's the

22    right thing to do because, for example, if this one loan -- the

23    property is worth as much now as the debt, then why do you want

24    to put more money into that loan with the attendant risk that

25    you won't get that money back.

1    I mean, I recognize there's a lot of mortgage companies,

2    and I'm sure USA Capital did.  I know Lemon (phonetic)

3    certainly did.  That the answer to paying off a loan was you

4    just get a new loan and pay off that loan.

5        Now, the fact that the property may not appreciate in

6    enough value to take care of that was kind of beside the point.

7    So that's what we've got to be careful of.

8        So I'm going to deny the motion, but will keep the motion

9    on for the July 25th hearing.  It's just on an interim basis

10    I'll deny it.

11        I do think you've made out a case for financing in general.

12    The question is what kind of collateral, the question is the

13    fees, and the question is for what kind of things that you draw

14    down on, and you've already conceded you will not draw down to

15    fund new loans without consent.  So, again, that all works

16    together.

17        I do think it appropriate that the term sheet not be

18    approved insofar as I think you should be able to negotiate

19    with other lenders.  That's not to say -- I don't think anybody

20    necessarily disagreed with the terms of the loan, and I think

21    -- I gather the fees -- it was just a question of what fees

22    were paid upfront.

23        Was that the issue as opposed to --

24        MS. KARASIK:  Your Honor, after this morning's

25    conversation when we understood that they had agreed to take

1    out the laundry list of objectionable provisions, that

2    satisfied that issue on an interim basis.

3         Those are going to come back to haunt us and will still

4     come back to haunt us on the final basis, and we're going to

5     need to work through --

6              THE COURT:  Okay.  Okay.

7              MS. KARASIK:  -- many of those issues --

8              THE COURT:  Okay.

9              MS. KARASIK:  -- but the fees were what we couldn't

10    get past today.

11             THE COURT:  Okay.  So, again, those are the reasons

12    why I'll deny it on an interim basis.

13        Now, let me indicate that if you modify the motion, you've

14     got to file your modification -- let's get some dates here, and

15     we're going to go into housekeeping for one moment before we

16     get to the other matters.

17        You're going to have to file a modification by July 14th.

18    Any new budgets will have to be given by July 19th.

19        I don't see, quite frankly, how you can put on motions -- I

20    have no objection if you put on motions to fund at the same

21    time in anticipation of getting a loan or outlining in the

22    motion what you intend to fund, but keep in mind the Catch-22

23    that you admit it.  I don't see how you get time to at least

24    discuss intelligently the transaction with the direct lenders

25     before that.

1        Now, I understand.  Some of these loans have 900 people.

2   You can't, quote, discuss it with them, but I think they

3   deserve a letter which explains what you want to do and work

4   out the procedure from there.

5        And I will -- I'm not deciding at this stage what happens

6   if -- let's assume we've got a smaller group.  Let's assume it

7   was Ms. Davis' loan that we were talking about where we had to

8   define 15 people.

9        I'm not deciding at this time.  I don't know what the

10  answer is.  I don't know if, for example, that you have pushed

11  the 125 issue and they had said no, what the answer to that

12  question is.

13       It may well be if they said no, that's it because it's

14  their money they're risking and not anybody else's.  It may

15  well be that what if you had -- the majority said no, and the

16  minority said yes, so how do we balance that.  I don't know the

17  answer to that.

18       But I do think that the direct lenders have to be at least

19  advised of the fact and giving all the information especially

20  since you are, in essence, making new loans which I think

21  Ms. Davis' might be -- you know, there's a concern about, okay,

22  you're saying it's not really your money, it's coming from a

23  lender.  Well, I'm not sure what the distinction is there.  All

24  right.  So on that issue.

25       Now, what do you want to do about Investment Partners?  Do

1    you want to come back tomorrow on Investment Partners or --

2         (Colloquy not on the record.)

3              MS. JARVIS:  Your Honor, let me just clarify one

4    thing.

5         You know, our term sheet with CapSource which we

6    substantially, you know, renegotiated, and they were very good

7    about that, does have a drop-dead date basically of at least

8    closing on an interim financing by June 30.

9         So all I'm saying is I don't know -- I think we should not

10   automatically continue this because I don't know that that is

11   going to be available.

12        So I think --

13             THE COURT:  Well, we can --

14             MS. JARVIS:  -- either --

15             THE COURT:  It's easy --

16             MS. JARVIS:  -- either by the --

17             THE COURT:  -- to take things --

18             MS. JARVIS:  -- either by --

19             THE COURT:  -- off calendar.

20             MS. JARVIS:  -- the 14th if they, you know, decide

21   they are still interested, we could do a renewed motion, you

22   know, or --

23             THE COURT:  I think it's easier to keep it on

24   calendar because then you're not asking for an order shortening

25   time.

1          MS. JARVIS:  Okay.

2          THE COURT:  And if there's no funding there --

3          MS. JARVIS:  Then we'll just pull it off calendar.

4          THE COURT:  -- the motion's off calendar.

5          MS. JARVIS:  Okay.  That's fine.

6          THE COURT:  The motion's off calendar.

7     And I appreciate that, and I appreciate the good faith in

8     CapitalSource negotiating, but it's just -- it was just too

9     soon, and we certainly don't have consensus nor am I in a

10    position to rule what the collateral will be.

11    Quite frankly, if you pushed me to rule today I would say

12    that while I might approve a loan, I wouldn't approve the

13    collateral on the basis you've suggested because it seems to me

14    the collateral has to come from the loans that are advanced.

15         MS. JARVIS:  And I think, by the way, there was some

16    misunderstanding on that.

17    With respect to the loans that were advanced on the

18    particular projects, (indiscernible) project, there never was

19    any proposal that it be secured other than simply by that

20    project itself.  So that was never being proposed except with

21    respect to Boise/Gowen which has been taken off the table.

22    With respect to all --

23         THE COURT:  Okay.

24         MS. JARVIS:  -- other loans, solely secured by the

25    property that is being lent on, so --

1                    THE COURT:  Okay.

2                    MS. JARVIS:  I think, your Honor, with respect to the

3          Investment Partners, I don't know -- we have presented a

4          declaration of Mr. Allison and a reply brief that kind of goes

5          through the various factors for approving the settlements.

6              We've clarified that this settlement is not a settlement of

7          any amount.  It's only a settlement of terms.  So rather than

8          going and suing them on this, we have, you know, a note with an

9          interest rate and with terms.

10             And I would think if there aren't any -- I mean, if people

11         want to ask Mr. Allison questions, you know, we obviously could

12         put him on the stand.

13             However, I think to kind of shortcut this, we ought to just

14         ask whether anyone feels that testimony is necessary --

15                   THE COURT:  Right.

16                   MS. JARVIS:  -- or whether we can simply go forward.

17                   THE COURT:  Okay.

18                   MR. LEVINSON:  The two trust funds if the Court

19         doesn't mind would prefer to go forward.  We don't need

20         Mr. Allison on the stand.

21                   UNIDENTIFIED SPEAKER:  (Indiscernible).

22                   THE COURT:  All right.

23                   MS. CARLYON:  And we have -- I'm sorry.  We have that

24         motion, and we have the --

25                   THE COURT RECORDER:  Counsel, could you move the

1    microphone closer to you, please.  Thank you.

2          MS. CARLYON:  We have that motion left and the

3    information protocol motion left on the second one.  I don't

4    know if that's something we want to just --

5          THE COURT:  Can we do --

6          MS. CARLYON:  -- set before a --

7          THE COURT:  -- the protocol motion --

8          MS. CARLYON:  -- visiting judge.

9          THE COURT:  -- tomorrow?  We could do it by phone

10   even for those counsel that need to leave.

11       (Colloquy not on the record.)

12         MS. CARLYON:  That would be fantastic.

13       (Colloquy not on the record.)

14         MR. GOCHNOUR:  And again --

15         THE COURT:  And that just involves counsel, really.

16   It doesn't involve other people?  Okay.

17         UNIDENTIFIED SPEAKER:  Yeah.

18         MR. GOCHNOUR:  On behalf --

19         MS. CARLYON:  Thank you.

20         MR. GOCHNOUR:  -- of the Investment Partners motion,

21   your Honor, for Liberty Bank, I have absolutely no problem not

22   taking testimony and just moving forward without it.

23         THE COURT:  Okay.  Thank you.  All right.

24       So on the Investment Partner motion, why don't you go ahead

25    with -- let's go ahead and I guess opposition first.

1           MS. DAVIS:  Excuse me, your Honor.  For those of us

2       who are not participating --

3               THE COURT RECORDER:  I'm sorry --

4               THE COURT:  Yes.

5           MS. DAVIS:  -- may we be excused?

6               THE COURT RECORDER:  -- Counsel.  (Indiscernible) --

7               THE COURT:  You may escape.

8               THE COURT RECORDER:  -- (indiscernible).

9       (Colloquy not on the record.)

10          MS. CARLYON:  Ms. Davis asked for permission to be

11      excused.

12      (Colloquy not on the record.)

13          MS. DAVIS:  I can't get to a microphone.

14              THE COURT RECORDER:  Sorry.

15      (Colloquy not on the record.)

16          MR. LEVINSON:  Your Honor, Mr. Hermann from my firm

17      is going to cover this one.

18              THE COURT:  All right.  Thank you.

19      (Colloquy not on the record.)

20          MR. HERMANN:  Good evening, your Honor.

21      Jeff Hermann, Orrick, Herrington & Sutcliffe.

22          Ms. Jarvis has been up here all day --

23              THE COURT RECORDER:  Can you move the microphone

24      directly in front of you.  Thank you.

25              MR. HERMANN:  -- so I volunteered to take a little

1    bit of weight off of her shoulders.

2         I want to address this motion in terms of two sets of

3    issues.  One set of issues is whether or not the debtor should

4    do the deal.

5              THE COURT:  I need to back up.  Who do you represent?

6              MR. HERMANN:  Diversified Trust Fund Committee.

7              THE COURT:  Oh, okay.  So you represent the Funds.

8    Okay.

9              MR. HERMANN:  That's right, your Honor.

10        And there have been some objections on the first set of

11   issues about whether the debtor should do the deal.  Our

12   objection really is assuming the debtor does the deal, which of

13   the various estates should benefit?

14        I'm sorry.  I'm a little bit out of breath here.

15        Your Honor, the debtor filed the motion on shortened time.

16   The debtor didn't really provide much of a basis for an

17   understanding of whether it's a good deal or not.

18        And I would short-circuit all of that in the interest of

19   time by saying they got a 58.3-million-dollar promissory note.

20   Maybe it should have been 60,000,000.

21        (Colloquy not on the record.)

22             MR. HERMANN:  But if that's the only issue we have,

23   that's a high-level problem because, frankly, we don't have any

24   evidence for this, but I think if these debtors could collect

25   $58,000,000 for Investment Partners that would be a great

134

1    victory.

2         So it would be a high-level problem if we thought that

3    maybe there should have been a $60,000,000 settlement, or a

4    $61,000,000 settlement, or a $62,000,000 settlement.  So I

5    think we've got to deal with real -- excuse me -- real issues.

6         The second is that there's some forbearance built in here.

7    The debtors have agreed on this 58.3-million-dollar note, that

8    they will not proceed to collect the note for one year, and, in

9    fact, if the Investment Partners can pay $20,000,000 in the

10   next year, the debtors would give them, in fact, an additional

11   year, so they get two years of forbearance.

12        And some people have objected saying, you know, that's not

13   a good deal for these debtors.  We shouldn't be doing that.

14             THE COURT:  Now, there's only one of those loans

15   that's yours, your client's, the 10-90, right?

16        (Colloquy not on the record.)

17             MR. HERMANN:  Well, there's a lot of uncertainty in

18   all aspects of this, your Honor.  We think that putting the 58

19   -- well, I'm now getting into the issues of between the estates

20   who should benefit from the deal.

21        It's been structured such that -- excuse me -- the

22   promissory note is made payable solely to USA Commercial

23   Mortgage for the 58.3-million-dollar promissory note.

24        And we, of course, reacted to that saying you're just going

25   off the books and records of the debtor.  You don't know if

135

1    Commercial Mortgage advanced that money or Diversified Fund or

2    First Trust Deed advanced the money.

3        That should be an open book, and that shouldn't be decided,

4    but that's really not the issues as between the debtor's

5    estates and Investment Partners, the first set of issues.

6    That's really the second set of issues of if we do the deal,

7    who should benefit.

8        And so we do have a lot of issues over here, but on the

9    first set of issues, there have been a lot of stones thrown at

10   the debtor saying this may not be the best deal; they should go

11   back and try to cut a better deal; you know, we shouldn't give

12   them a year's forbearance; we don't know anything about how

13   they came up with the $58,000,000.

14       And our take on all of that is it seems like a good deal in

15   terms of what would happen if this estate is able to collect

16   58.3 million dollars from Investment Partners.

17       Again, you know, maybe we'd all be kicking ourselves

18   saying, you know, it should have been a $61,000,000 note

19   instead of a $58,000,000 note.  I think the probability of that

20   occurring is infinitesimal.

21       So in terms of whether it's the right amount on the note, I

22   think it's a high-level problem that we should skip over today

23   and get the deal approved.

24       If it's an issue about whether we give them forbearance,

25   the answer really is, you know, as a practical matter,

1    Investment Partners is really not getting any forbearance out

2    of this.

3         And I hope they're not here to hear this, but on the

4    58.3-million-dollar note, yes, they're getting forbearance.

5    The documents say we won't pursue you, but my client, the

6    Diversified Trust Fund, has, you know, the 10-90 loan which is

7    where the borrower is Investment Partners.  It's $55,000,000.

8         One of the things we wanted to clarify is that no one's

9    agreed to any forbearance on the $55,000,000 loan, so those --

10              THE COURT:  On the separate note, the 10-90 note.

11              MR. HERMANN:  That's exactly right, your Honor.

12              THE COURT:  Okay.

13              MR. HERMANN:  So to the extent that people complain

14   that, gee, we have to wait a year before going after

15   Investments Partners, well, no, we don't really have to do

16   that.  We can proceed directly on the 10-90 note.

17        So I don't really find there to be any legitimate criticism

18   of the debtors.  Even though they teed it up quickly and didn't

19   support it the way they should have, there shouldn't be any

20   legitimate criticism of whether or not the deal should be done.

21        There's one other objection I think that was filed by the

22   Executory Contract Committee, the direct lenders, and that

23   objection basically says, you know, if you give this to the

24   debtors we have claims against Investment Partners we think.

25   We know we have claims against Milanowski and Hantges, and if

1    you do the deal, Judge, you're giving the debtors a leg up.

2        And I don't think there's any principle of law that would

3    say that you disable a debtor from doing a good deal because it

4    may put them in a better position than some other competing

5    creditor.  That's what Mr. Allison is getting paid to do.  He's

6    trying to better the position of these debtors.

7        So on that set of issues there are objections, but I think

8    that the easy decision is let's let them go ahead and do the

9    deal.

10        The second set of issues really relates to, as I said

11    before, it seems to be done for the benefit of one estate to

12    the exclusion of the other estates, and we have a problem with

13    that, and I think we have an agreement -- and I think everyone

14    raised that objection, the U.S. Trustee, our fund, the First

15    Trust Deed Fund.

16        And I think we have what is, in essence, an agreement in

17    principle with the debtor that they will agree that even though

18    the note's made payable to Commercial Mortgage, it's really for

19    the benefit of all the debtors.

20        Not necessarily on a pro rata basis, but time will tell

21    where these moneys came from that were transferred down to

22    Investment Partners, the moneys that have been, you know,

23    reduced to a note for 58.3 million dollars, and we think that's

24    okay, but we just don't want to have to fight with somebody

25    later saying, well, Judge Riegle approved this on June 21st,

1    and Commercial Mortgage is the only debtor that gets to benefit

2    from this deal.

3        If that's going to be the result, then we have very serious

4    information gaps that would allow us to even look at this

5    motion to decide whether or not it's a good deal or not.

6        But that shouldn't be an issue because the debtor has

7    agreed that they aren't taking a position as between the

8    different estates who should benefit.  That will be sorted out

9    later.

10            THE COURT:  So is the note going to make payable --

11    this microphone's working all of sudden.  Is the --

12            MR. HERMANN:  It's made payable to only one debtor.

13            THE COURT:  Why shouldn't it be made payable to all

14    five debtors?

15            MR. HERMANN:  Well, we suspect, for instance, that a

16    lot of the money that showed up on Commercial Mortgage's books

17    that went down to Investment Partners came from our fund.  So

18    why shouldn't --

19            THE COURT:  Well, yeah, maybe paid to your fund, but

20    why not make it payable to all five notes so that it saves that

21    issue later?  I mean, at least so we preserve the fact that --

22            MR. HERMANN:  Right.  If we had it to do over again,

23    your Honor, the promissory note would have been payable from IP

24    as maker to all five estates as lenders.

25            THE COURT:  Well, why can't you do that?

1        MR. HERMANN:  I think that Mr. Allison's concern is

2    that if he has to go back to Mr. Milanowski and redo the deal

3    that he will slip away, and so Mr. Allison is looking for a way

4    to keep the documentation we already have, yet meet the

5    concerns of the different estates saying, well, you know, it

6    should be for our benefit also.

7        And so we were looking for an order that says this really

8    is going to be for the benefit of whichever estate really put

9    the money into Investment Partners, and we personally think,

10   the Diversified Trust Fund, we think that the lion's share of

11   the money came from us, but we may be wrong.  We don't know.

12       Now, because Diversified Trust Fund has this outstanding

13   loan to 10-90, we know that $55,000,000 of our money went to

14   10-90, and 10-90 loaned all of that money the best we can tell,

15   every penny, to Investment Partners.

16       In fact, in January of 2005, for whatever reason, everyone

17   got together and said, you know, 10-90's in the middle here.

18   We don't really need that.  Let's collapse the deal, take 10-90

19   out, and from now on, Diversified Trust Fund, you're going to

20   be the direct lender, and, Investment Partners, you are the

21   borrower.  Mr. Milanowski and Mr. Hantges were also personal

22   guarantors, and they agreed to that.

23       So the current structure is that there's a $55,000,000 loan

24   owing from Investment Partners directly to Diversified Trust

25   Fund.

1        So another set of issues that we raise being early in the

2    process and not really having perfect information is, well,

3    maybe the same collateral that's being given for all the

4    debtors in this security agreement, maybe that was Diversified

5    Trust Fund's collateral.  It should have been ours to begin

6    with, and not only should we share in that collateral, but we

7    should have a first shot at that collateral.

8        And we've asked that that issue be deferred also in the

9    interest of getting the deal done and not letting

10   Mr. Milanowski slip off the hook on the promissory note and the

11   security agreement.

12       So as between the second set of issues is which of the

13   debtor estates benefit, I think it's fair to say that everyone

14   agrees that all of those issues should be put on hold for later

15   determination and that whatever the Court does today is without

16   prejudice to any of those issues either as to the entitlement

17   to the promissory note, the principal under the promissory

18   note, how do you carve that up, and, secondly, on the security

19   agreement and the liens that are being created, who's first,

20   who's second as between -- well, I missed a step.

21       And that is the security agreement supports three

22   obligations; the 58.3-million-dollar promissory note, the

23   $55,000,000 loan, the 10-90 loan, and three it's a catchall.

24   All other obligations that we may later find that IP owes to

25   any of the -- Investment Partners owes to any of these debtors.

1        So there's a second set of issues as between the estates

2   about who's entitled to the liens and what priority, and,

3   again, I think we've all agreed that will be determined at some

4   point in the future, and the debtor is so agreeable.

5        THE COURT:  Well, isn't there a question if you enter

6   into this security agreement and you define obligations as

7   meaning everything else that's owed that you couldn't then sue

8   them for breaches of contract, breaches of fiduciary duty,

9   other loans that you don't yet know about?

10       MR. HERMANN:  That's correct.

11       THE COURT:  So why doesn't this agreement mean that

12  there would be a forbearance against them on anything for a

13  year?

14       MR. HERMANN:  Well, there would be a forbearance --

15  well, I'm sorry.  I'm sorry, your Honor.  I'm absolutely wrong

16  about that.

17       There's a forbearance only with respect to the

18  58.3-million-dollar promissory note.  As to the other two

19  categories of obligations secured, the 10-90 loan and the

20  catchall, there is absolutely no forbearance whatsoever.

21       So if there is a cause of action discovered by Mr. Allison

22  tomorrow that was not encompassed in the accounts -- the book

23  entries which form the compromise for the 58.3-million-dollar

24  promissory note, if this Court approves the deal today, he

25  could sue on the other obligation tomorrow just the same --

1      just like he could sue on the 10-90 loan tomorrow.

2          So there is no forbearance in the security agreement.  The

3      only forbearance in the deal is in the promissory note.

4              THE COURT:  And is there an acknowledgement in here

5      that by doing this does not release him from other claims or

6      constitute a merger, a waiver?

7              MR. HERMANN:  Well, there is language in the

8      promissory note that says you understand, Investment Partners,

9      that when we're liquidating this amount into 58.3 million

10     dollars, it's not part of the 10-90 loan.  You owe that

11     separately.

12         Now, I don't know if that language goes on further to say

13      and it's only a compromise of the receivables reflected on the

14      books and records of Commercial Mortgage.

15             THE COURT:  I mean, there's the standard no-waiver

16     language in the note, but, you know, that could be read to mean

17     waiver with collection of that particular note.

18         I guess it's because we're dealing with a compromise.  As

19      we know, the Ninth Circuit and the Supreme Court have ruled

20      that when you have a compromise that the initial transactions

21      go away, and then what you have to sue on is the compromise

22      notwithstanding the fraud in the initial transaction.

23             MR. HERMANN:  And I think that --

24             THE COURT:  So do we have anything that -- unless you

25     specifically reserve your rights to sue on the initial

143

1    transaction.

2            MR. HERMANN:  Well, I --

3            THE COURT:  And I'm --

4            MR. HERMANN:  I think they may --

5            THE COURT:  -- remembering this from the top of my

6    head --

7            MR. HERMANN:  Right.  Right.

8            THE COURT:  -- and it's the Platters (phonetic) case,

9    so I might be wrong, but I think that's the case.

10       (Colloquy not on the record.)

11            MR. HERMANN:  I think the debtor has made it clear

12   that all that's being compromised are the amounts that are

13   reflected in the promissory notes that previously were accounts

14   payable on the books of Commercial Mortgage.

15       So there is no general release in favor of Investment

16    Partners, in favor of the note.  Certainly, there was the

17    intent that anything that shows up on the books as an account

18    payable has been liquidated into a 58.3-million-dollar note.

19       Therefore, if the debtors were to attempt to sue on any

20    kind of entry on the books and records as an account payable,

21    then Investment Partners would legitimately be able to say you

22    can't sue me on that, it's in the 58.3- --

23            THE COURT:  Okay.  So if we --

24            MR. HERMANN:  -- million-dollar note.

25            THE COURT:  -- find out tomorrow there was an

1    additional $60,000,000 that was lent, the estate is stuck.

2              MR. HERMANN:  I'll have to defer to the debtor on

3    that because I don't know what was reflected on the books and

4    what is not reflected on the books.

5         I think we're talking about anything that is reflected on

6     the books has been compromised at 58.3, but if we discover for

7     whatever reason that money went out the back door and never

8     made it to the books, that's fair game, and Investment Partners

9     can come in and say you can't sue me on that, it's in the

10    58.3-million-dollar promissory note, and the proper response

11    would be, no, because it's not an account payable on the books

12    and records of the debtors.  It's an entirely separate

13    obligation.

14              THE COURT:  Okay.

15              MR. HERMANN:  And, again, your Honor, the 10-90 loan

16    can be --

17              THE COURT:  We should --

18              MR. HERMANN:  -- pursued --

19              THE COURT:  -- probably have Mr. Charles look at this

20    since he's the wily person that represented all those ROC

21    entities.

22         (Colloquy not on the record.)

23              MR. HERMANN:  Anyway, so our position, your Honor, is

24    that we think that the agreement should be approved.  We think

25    that all the issues relating to how both the promissory note as

1    well as the liens are carved up among the different debtors

2    should be deferred.  We think that the objection saying don't

3    give the estate a leg up should be overruled.

4          Thank you, your Honor.

5          THE COURT:  Okay.  All right.  Other opposition,

6    comments in favor?

7          MS. JARVIS:  Do you want me just to -- I think there

8    are some questions I can --

9          THE COURT:  Sure.

10         MS. JARVIS:  -- clarify.

11         THE COURT:  That's fine.  I would appreciate that.

12         MS. JARVIS:  Your Honor, there is no compromise being

13   sought of the amount that is owed by Investment Partners.  The

14   only compromise is on the terms of an amount that was derived

15   from the accounting records of Commercial Mortgage.

16        And Mr. Hermann is correct in the sense that the debtors

17    have no objections to and, in fact, intended to trace through

18    forensic accounting as to where funds originally came from, and

19    so this is not intended to impair the rights of any of the

20    debtors as far as where it may be determined that this money

21    ultimately should reside.

22         THE COURT:  So maybe compromise is the wrong word to

23   use in this context?

24         MS. JARVIS:  Yeah.  It's --

25         THE COURT:  This is not a compromise.

1          MS. JARVIS:  Well, it's just a compromise of terms.

2    It's not a compromise of amount, and that is, you know, clear

3    in the note.  It's clear in the --

4          THE COURT:  Well, do we have an agreement?  Do we

5    have a compromise agreement that says those things?  We have a

6    note and security agreement, but where do we have anything that

7    tells us that, indeed, that's the deal?

8          MS. JARVIS:  If you'd give me a couple of minutes,

9    I'll find the exact language, but it was negotiated in order to

10   allow for anything else we find that is owing by Investment

11   Partners we can and will pursue.

12        The reference in the note to 10-90 was merely because

13    that's a separate transaction, $55,000,000, similar amount,

14    that it actually -- when Mr. Allison took over and we began

15    doing a review of the loan files, that was a loan that we found

16    that had no UCC filing that had been done on it, so we

17    immediately filed a UCC filing.

18        So that actually was filed before this agreement was

19    entered into, and there's only one overlapping property between

20    the two which is the Royal Hotel.  The rest of the collateral

21    on the two is separate.

22        But let me find this for you because it is clear that there

23    is no compromise in the amount.  It's only just the

24    forbearance, the terms, so -- and that was intended to --

25          THE COURT:  But forbearance --

147

1          MS. JARVIS:  -- benefit the estate.

2          THE COURT:  -- on this particular amount or as to

3     everything?

4          MS. JARVIS:  Only on this particular amount.  Only on

5     this particular transaction which was derived from the

6     accounting records of Commercial Mortgage showing money going

7     out to Investment Partners that had never been documented in

8     any way.

9          THE COURT:  Okay.

10       (Colloquy not on the record.)

11         MR. SCHWARTZER:  Your Honor, if you look at the

12    security agreement which is Exhibit B, paragraph 1.1, it has a

13    provision that says the security agreement is securing the

14    note, which is No. 1-A; then, B, any obligations owed

15    separately under the 10-90 loan; and then, C, any and all other

16    obligations owed -- obligations, liabilities, and claims now or

17    hereafter owed or payable by the debtor to the secured party in

18    addition to the note.

19        So we're leaving outstanding is if there's anything we find

20     it can be secured and covered by the security agreement.  So I

21     think that makes it clear that we're not saying the note is the

22     only obligation.

23        In addition to what Mr. Hermann said about the 10-90 note,

24     you should be aware that the 10-90 note is secured by its own

25     security agreement that was filed and recorded in January of

1    2005.  That's a prior agreement.  That note is still in effect,

2    and that 10-90 note doesn't disappear.

3         So what we're doing here by this security agreement is

4    we're giving the people who have the 10-90 note and the

5    security agreement additional security.

6         Now, there's about six things that secure the 10-90 note.

7    Now they're also going to have a security interest in all the

8    things that secured this note as well.

9         So that sort of solves the problem I think with the

10   committee.  We're not saying that their prior note is not good.

11   We're saying the 10-90 note and security agreement is still

12   valid, and now they're getting additional security because

13   they're covered by this security agreement.

14             THE COURT:  Okay.

15             MS. JARVIS:  Your Honor, actually, I think the 10-90

16   loan was -- the financing statement was filed after Mr. Allison

17   was appointed as part of his review and cleanup of

18   documentation, but it was filed prior to this.

19        Mr. Schwartzer is right that the reason why the security

20   agreement extends to all debtors but the note is only to

21   Commercial Mortgage is simply for the purpose in case something

22   else is discovered, then, you know, it's basically dragging

23   into the security agreement the ability to get those amounts

24   also secured as well, but it does not, you know, affect any

25   compromise of any claims that may be owed by Investment

1    Partners.

2            THE COURT:  Okay.

3            MR. WALKER:  Your Honor, Russell Walker of

4    Woodbury & Kesler in Salt Lake City representing

5    Mr. Milanowski, Mr. Hantges, and USA Investment Partners.

6        I came here today with some degree of trepidation.  I'm

7    glad this hearing has gone on long enough to lose some of our

8    spectators, but I do want to make a statement on behalf of

9    Mr. Milanowski.

10       I believe he is here in this case and has hired us to

11   represent him because he wants to do all that he can to help

12   this company reorganize and help the investors and the

13   creditors receive payment in full.

14       This $58,000,000, in essence, the bulk of it represents

15   earnings on the investment that USA Commercial Mortgage

16   obtained through Investment Partner's investments.

17       The money didn't come from investors.  It didn't come from

18   any other source, and I believe, you know, the course of

19   Mr. Allison's investigation will bear that out.

20       The 58,000 (sic) I think is a figure that we've looked at

21   and decided is a reasonable figure to represent that debt owing

22   back from Investment Partners to the company.

23       I think Mr. Milanowski is working hard to turn these

24   investments into money that can be paid into the estate.  We're

25   not certain exactly how that will be divided up.  I think that

1    will be up to the Court and the parties to decide how the best

2    way is to use that.  Our hope is that it will go to investors

3    to pay claims and to pay unsecured-creditors' claims.

4        I think we are very concerned about today the number of

5    committees and the number of attorneys, and I can't imagine the

6    staggering cost of today's hearing and how quickly that eats up

7    money for unsecured creditors or investors.

8        It makes sense for the parties to try and get together and

9    use that to work together to solve the problem.  That's what we

10   believe Mr. Milanowski's entire purpose is in being here.

11       So with respect to -- there was some discussion -- I

12   appreciate the Court giving us a good argument in case we do

13   get sued.  I think Mr. Milanowski is sitting out there with a

14   lot of people angry and wanting to bring actions.

15       Our hope is that this is a first step and is good evidence

16   in his -- or evidence of his good faith and his willingness to

17   try and make this thing work and putting $58,000,000 on the

18   table and trying to turn that into cash.

19       And we anticipate within a fairly short period of time

20   coming before the Court with a motion to approve payment of

21   that money into the estate and possibly some motion as to

22   designate how that money should be paid.

23       So in short, I think there is a forbearance.  We're hoping

24   that good faith of the parties will come into play here and

25   that we're working together to solve the problem.

1      Today I've seen in the course of the hearing some

2    substantial disagreement between particularly the committees

3    and Mr. Allison.  Our hope would be that we could work together

4    and stop the fighting and get it resolved, and I think that's

5    Mr. Milanowski's point, and we're all in favor of having the

6    Court approve this proposed stipulation.

7           THE COURT:  All right.  So that that's clear and

8    since you're here representing him, I assume then that you

9    acknowledge that this agreement would not release any claims

10   any of the debtors would have against him.

11          MR. WALKER:  We had substantial negotiations

12   regarding release language, and the parties did not agree upon

13   any.

14      To the credit of Mr. Allison, my client made a business

15    judgment that he signed this document as written.  There was

16    substantial discussion.  I think his hope is that by stepping

17    up and paying the $58,000,000, turning it into cash, getting it

18    paid to the estate will show people that that's the best way

19    for them to get paid.

20          THE COURT:  So you agree, though, there is no

21   release --

22          MR. WALKER:  I don't -- yeah.

23          THE COURT:  -- nor merger, nor waiver.

24          MR. WALKER:  But there also is no release in there,

25   no affirmative release, that there is no waiver, so I guess at

1    this point it is what it is.  The document is its best

2    evidence, and --

3              THE COURT:  So if, for example, tomorrow Mr. Allison

4    finds $20,000 that Mr. Milanowski received from Diversified

5    Trust Funds for no disclosed purpose -- in other words -- or

6    contrary to a contract.  Let's say that the contract said it

7    was to go to A and he took it.

8        Would you argue that they could not -- if they brought

9    suit, would you argue release or forbearance?

10             MR. WALKER:  Well, my understanding is this

11   stipulation deals with Investment Partners and the money that

12   went in there.  I don't --

13             THE COURT:  All right.  Let me rephrase the question

14   then.  That's fair.

15             MR. WALKER:  And so it was not Mr. Milanowski.

16             THE COURT:  So Investment Partners.  So if Investment

17   Partners -- if he found money that Investment Partners received

18   that was previously not disclosed, would you assert forbearance

19   as a defense or a waiver of release?

20             MR. WALKER:  I believe Mr. Milanowski has agreed that

21   if there's any legitimate amounts that Mr. Allison finds that

22   were owing from Investment Partners that he will stand up and

23   acknowledge that debt.  So I do not believe --

24             UNIDENTIFIED SPEAKER:  Is that no?

25             MR. WALKER:  -- that this would be a forbearance or a

1    waiver of any additional claims.

2              THE COURT:  Now -- okay.  Thank you.

3              MR. WALKER:  Thank you.

4              THE COURT:  Other --

5         (Colloquy not on the record.)

6              THE COURT:  Wait.  Mr. Gordon and --

7              MS. JARVIS:  Well, I just want to clarify this.

8         There is -- as he stated, there was a release requested.

9    It was refused.  There is no release in this agreement, and as

10   Mr. Schwartzer pointed out, in the security agreement it

11   clearly identifies there could be other amounts owed that are

12   not subject to this promissory note, and if, you know,

13   Mr. Milanowski is now saying that somehow that it wasn't

14   clearly agreed that there is no release of any other claims and

15   that this is, you know, confined to this amount and is not, you

16   know, a compromise of any amounts, then, you know, we'll pull

17   it off the table because we are not seeking for, you know, any

18   agreement other than what we had negotiated for what is -- we

19   believe is in these documents which is no release and an

20   acknowledgement that there may be other amounts owed.

21             THE COURT:  Okay.

22             MR. GORDON:  Maybe we should short-circuit this

23   because counsel for Mr. Milanowski was very careful in talking

24   about the document speaks for itself.

25        If we go to the promissory note and we go to the very first

1    line, it says, "For value received in an attempt to compromise

2    a disputed claim, USA Investment Partners promises to pay to

3    the order."

4        I agree there's no release language, but I'm looking at

5    that language and saying in an attempt to compromise a disputed

6    claim, I think this is, and I think that's exactly what counsel

7    was talking about, and I think that's what counsel was focused

8    on, that very first line.

9        My problem with this -- and in some ways it doesn't really

10   involve the direct lenders, but it does because our opposition

11   to this was very limited.

12       It basically said, look, we're somewhat offended by the

13   fact this is a 9019 compromise in one form or the other because

14   there's a forbearance here, and it is an agreement to take a

15   security interest, but there's no evidence for it.

16       We didn't meet the A&C Property standard.  We're once again

17   rushing in on a week's notice with woefully inadequate

18   declarations, et cetera.

19       But our opposition was limited, and we basically say, look,

20   we as direct lenders, we may have -- some of the direct lenders

21   have their own guarantees.  We just want to know that if you're

22   locking up these assets that there's no court order, there's no

23   court decision -- and I think Mr. Hermann commented on this and

24   really kind of addressed it -- that impairs our right to

25   basically claim at some future date that this is an avoidance,

1      that this is subject to an avoidance action against US Partners

2      (sic) or is a fraudulent transfer if US Partners (sic) goes

3      into a bankruptcy, whatever.

4          It's simply a decision --

5              THE COURT:  You mean Investment Partners.

6              MR. GORDON:  Investment Partners.  It is simply

7      between --

8              THE COURT:  Oh, it is USA Investment Partners.

9              MR. GORDON:  Yes.  It is --

10             THE COURT:  I apologize (indiscernible).

11             MR. GORDON:  -- USA Investment Partners.

12         This is simply between these parties arriving at a deal.

13         But last night -- maybe no one's talked about it -- I

14     looked at the Liberty Bank opposition that was filed, and I'm

15     looking at it going what is this.  Who is Liberty Bank?

16         And what Liberty Bank says is --

17             THE COURT:  Who shot Liberty Bank?  Oh.

18             MR. GORDON:  But, you know, also one thing going

19     through my mind, Judge, is that when you see our fee

20     applications in several months, that for today when you see

21     that entry for nine, ten hours, you're going to remember this,

22     please.

23         But going back, Liberty says that Debtor USA Commercial

24     Mortgage and Nondebtor USA Partners each guaranteed as sureties

25     a $10,000,000 receivable loan from Liberty to HMA made on or

1    about November 15th, 2004, and HMA is one of the entities

2    that's membership interest is going to be collateralized.

3        The Liberty loan provided financing for HMA Sale a

4    timeshare interest at the Royal Resort & Hotel located at

5    99 Convention Center Drive, and that apparently is a pot of

6    assets we've heard about.

7        And then it goes on in connection with this guarantee of

8    the Liberty loan, USA Partners (sic) agreed to subordinate its

9    claims and rights against HMA until the Liberty loan was paid

10   in full pursuant to section 9 of the USA Investment Partner's

11   guarantee in a separate subordination agreement.

12       USA agreed to subordinate its claims and rights against

13   HMA.  That sounds like a lien of some sort or claim against

14   membership interest for $10,000,000.

15       And when I look at the security agreement -- and this is a

16   well-drafted security agreement -- and you go to the security

17   agreement, we have in there reps and warrants, and one of the

18   reps and warrants is clearly "Debtor" -- USA -- "further

19   represents" -- this is paragraph 8 on page 4 -- "represents

20   warrants secured by the following:  Debtor is the owner and has

21   all rights empowered to transfer the collateral free from any

22   rights or claims of any person.  The security is created by

23   this agreement and other liens permitted by secure party in

24   writing and the provisions" -- it goes on.

25       And what it basically says is we have full rights to our

1    membership interest in HMA.  We haven't granted any other

2    security interests other than you know about, and we're not

3    going to.

4        Well, it comes down to this.  There's an agreement to

5    forbear.  Do I believe a lockup is a good thing?  Yes, but I

6    really get to the forbear.  We're going to forbear for a year.

7        First of all, we're compromising apparently.  We're

8    agreeing to forbear for a year with the expectation that we're

9    going to collect all these moneys.  From what?  We don't know.

10   Is it from the Royal?  If it is, we have this claim for

11   $10,000,000 which apparently no one knew about.  It's not

12   listed.

13       First of all, it's a guarantee by USA Capital Mortgage.

14   That's a pretty big unsecured claim that I don't think is on

15   the schedules and clearly could be a member of the Unsecured

16   Creditors Committee given the size.

17       I'm just saying I don't know what we're doing here.  Why

18   are we here on such short notice agreeing to documents that I'm

19   not sure the debtor truly appreciates what they're agreeing to.

20   I just think that this is premature.  It may be the appropriate

21   thing to do, but at this moment it's premature.

22           THE COURT:  Okay.

23           MS. KARASIK:  Well, I guess it's good evening,

24   your Honor.  Eve Karasik, Stutman, Treister & Glatt on behalf

25   of the First Trust Deed Committee.

158

1       I'll keep it short.  I actually came in here today

2   thinking, okay, our big issue here was to make sure that USA

3   Commercial Mortgage as the payee on the note would hold it in

4   trust for everybody.  Let's deal with it that way.

5       Let's make sure there's no allocation.  Let's make sure

6   there's no disposition until we know who really should get this

7   collateral because not only is there an issue as to the

8   $58,000,000 transfer, it could be limited collateral that

9   Investment Partners has and Milanowski and others, and even

10  Investment Partners may have guaranteed.

11      Actually, we know Milanowski did guarantee a whole host of

12  loans.  So why should all the collateral be used for this

13  particular transaction?

14      But having listened to the argument today, I don't even

15  know if I could just support this at all on that basis.  I just

16  don't think we know enough about it.  It doesn't sound like

17  it's been well thought through.

18      And even though I would love to tie these people up the

19  best that we can, this entity up and Milanowski up, I don't

20  know if we can do that today based on what we've heard in

21  court, especially based on what Mr. Milanowski and Hantges'

22  lawyer said in court today.

23           THE COURT:  Okay.

24           MS. KARASIK:  Thank you, your Honor.

25           THE COURT:  Mr. Landis.  Oh, sorry.

1          MR. GOCHNOUR:  It's okay.

2      Good evening, your Honor.  Wade Gochnour of Haney,

3  Woloson & Mullins on behalf of Liberty Bank.

4      I think Mr. Gordon hit pretty much on the topics that we

5  were most concerned about was the fact that what happened here

6  is Liberty Bank has a loan to HMA Sales.  HMA Sales is -- the

7  sole member of HMA Sales, LLC, is USA Investment Partners, LLC.

8          THE COURT:  So the sole member of HMAC (sic) is

9  Investment Partners.

10          MR. GOCHNOUR:  It's HMA Sales, LLC, your Honor --

11          THE COURT:  Okay.

12          MR. GOCHNOUR:  -- is the entity, and the sole member

13  of that entity is USA Investment Partners, LLC, which is owned

14  by Mr. Milanowski and the other gentleman's name.  I'm sorry.

15      USA Investment Partners as well as USA Commercial Mortgage

16  were both guarantors on that loan.  So we kind of are in a

17  strange position of, yes, we're a creditor in one respect, but

18  that's really not why we're here.

19      Why we're here is because we're a little more concerned

20  with the fact that -- and I'll tell you the exact date,

21  your Honor, as we attached to our objection.

22      On July 6th of 2005, USA Investment Partners executed a

23  subordination agreement where they agreed that they would

24  subordinate any rights they have to receive any moneys from

25  HMA Sales until and in such time as Liberty Bank was fully paid

1    on the loan that it had made to HMA Sales.

2        It's very clear, your Honor, and what we are terribly

3    afraid of is the way that this is set up, your Honor.  It is an

4    impairment of our right to that subordination.

5        It's very clear, your Honor, and, in fact, I'd even point

6    to the debtor's reply brief, paragraph 12, where it talks

7    about, "The promissory note and security agreement provide an

8    avenue for the debtors to claim the benefits of creditors to

9    the funds that would be owed to Investment Partners from the

10   sales of those real estate developments."  That would naturally

11   include the loan that we've made to HMA Sales.

12       So, your Honor, we have a real problem with this just from

13   that respect.  We're a little bit different.  Honestly, you

14   know, I don't think that Liberty Bank necessarily has a problem

15   with the transaction that's stated just as long as it's

16   conditioned upon the fact that our subordination is superior to

17   any rights of the security agreement given to the debtors.

18       With that said, you know, I think --

19           THE COURT:  How much is the collateral worth at the

20   -- assuming -- in your position?  How much is your position

21   worth?

22           MR. GOCHNOUR:  Your Honor, I'm not sure because I'm

23   just local counsel, and I just got involved yesterday.

24           THE COURT:  Okay.

25           MR. GOCHNOUR:  So I'm honestly not -- and I'd hate to

161

1    misrepresent --

2           THE COURT:  Okay.

3           MR. GOCHNOUR:  -- what it actually is.

4        But, again, going back, I think we had some of the same

5     general issues about the timing of this and how it happened,

6     but, honestly, our big concern is just the impairment of our

7     security interest.

8        So thank you --

9           THE COURT:  Okay.

10          MR. GOCHNOUR:  -- your Honor.

11          THE COURT:  Mr. Landis.

12          MR. LANDIS:  I can think of about 10,000,000 reasons

13    why Mr. Milanowski would like for the $58,000,000 paid on these

14    deals, but that's not the issue here.

15       It is interesting that all the time he's been saying that,

16     he never did ink the deal with the Division of Mortgage Lending

17     that we read about in the paper regarding the Palace Hotel or

18     the Royal Hotel, but that's an aside.

19       The easy decision in this case, Judge, and you heard it

20     from the initial argument from the Diversified Trust Deed is,

21     oh, let's just do the deal.  Let's just get it done now, and

22     then we'll worry about the problems later.  The difficulty is

23     you can't really do that.

24       A couple of things.  Nobody --

25          THE COURT:  There you are with the law --

1           MR. LANDIS:  I know.

2           THE COURT:  -- again.

3           MR. LANDIS:  I'm going to be fast.  It's late, and I

4    don't want to bore you, but there's a couple of things you need

5    to be aware of.

6        First of all, we don't dispute that there was hard-fought

7    negotiations.  I think Mr. Allison has done that.  I think he

8    has done the best he can, but there's got to be more than that

9    that you're aware of in order for you to affirm the compromise.

10       You've got to look at the fairness of the deal, and the

11   trustee has the burden on that issue, and that's A&C

12   Properties, and that is Ninth Circuit law.

13       The Court, you know, here has to look at a number of

14   issues.  You've got to look at the probability of success if

15   there was litigation with respect to the underlying claims that

16   are supposed to be documented through this promissory note, and

17   nobody's really explained why you need that if you have an

18   immediately-collectible account receivable, but --

19           THE COURT:  That was my question which I forgot to

20   ask.  Thank you.

21           MR. LANDIS:  The second one is the difficulties to be

22   encountered in the matter of collection -- and we don't know

23   about that really -- the complexity of the litigation involved,

24   the expense, inconvenience, and delay necessarily attending it

25   -- if we're talking about true collection work, it's not all

1    that complicated -- and the paramount interest of the creditors

2    and a proper deference to their reasonable views in the

3    premises.  We've laid all that stuff out in our objection.

4        Basically, what it boils down to, Judge, is what you're

5    being asked to do is that you're asked to just approve this

6    thing right now because they say it's important, and they got

7    to do it fast, and I think you really ought not do that.

8        You can't just accept the word that it's a good deal.

9    There's some collateral here.  You ought to go forward and just

10   approve this deal.  You shouldn't do it.

11       A bankruptcy judge needs to apprise him or herself of all

12   facts necessary to evaluate the settlement and make an informed

13   and independent judgment.  There is no way on this record you

14   can do it.

15       Here's some things you don't know.  What's the

16   collateral worth?  Who's involved in these LLCs?  Why is it

17   that of the LLCs that are the collateral one of them -- and I

18   use collateral in the very loosest of sense.

19       Why is it that HMA Sales, LLC, is subject to other

20   people's claims and nobody bothered to tell you about that in

21   connection with the settlement agreement?

22       How much money is the collateral worth over existing

23   liens?  Are you really getting a nickel's worth of collateral

24   for all this stuff or are you just giving up the opportunity to

25   pursue $58,000,000 for a year without there being a dollar that

164

1    goes to the investors who haven't got any money in connection

2    with these estates?

3        You don't have an evidentiary record before you,

4    notwithstanding Mr. Allison's declaration, that gets anywhere

5    near enough to allow you to make an informed and independent

6    judgment about whether or not this is a good deal.

7        You got to talk about well-reasoned conclusions arrived

8    after comprehensive consideration of the factors and mere

9    boilerplate approval unsupported by evaluation of the facts

10   (indiscernible).  That's what you're being asked to do is the

11   latter.

12       What we have suggested is that this ought not be approved

13   simply because you don't have enough information.  And at a

14   very minimum, if you are interested in considering this further

15   -- and we would suggest that -- we'd understand if you decided

16   that you didn't want to waste anymore time with it, you

17   certainly ought to let parties in interest conduct enough

18   discovery to figure out whether or not this makes any sense at

19   all.

20       I have more I could talk about, but my paper is laid out

21   for you, Judge.  It's late, and I'm tired, so are you.

22       Thank you for your time.

23          THE COURT:  Thank you.

24          MR. CHARLES:  I hear a very good lawyer say things in

25   a conclusory way, and I just don't get it.  Today, you know you

1    have some debt that is acknowledged by a writing in the amount

2    of 58,000,000 and change.

3        Today, you know that debt is unsecured with respect to USA

4    Commercial Mortgage, and, apparently, the financing statement

5    with respect to some of the collateral was only just filed as

6    to 10-90.

7        So today you know that unless this is approved and the

8    debtor proceeds, we have some debt.  It's at least 58,000,000

9    which apparently the suggestion is, well, go sue on it and see

10    if you can turn that into a judgment that you can get into --

11    an execution lien that you can get into a position of priority

12    when you know there are guarantee claims coming from the

13    lenders, when you know Liberty Bank says the loan's in default,

14    and they're coming for their $10,000,000.

15        I do not understand why it is a -- what the risk is of

16    saying we will take this collateral.  The only risk is one that

17    I think with respect you made up, and it's the merger or waiver

18    argument.

19        And, largely, that's the intent of the parties.  And the

20    way this was explained and presented in the court, the debtor

21    has clearly said that's not their intent.

22        And when you asked the lawyer for Investment Partners to

23    give you his blanket assurance, he would not.  But for that

24    dialogue, there isn't waiver or merger here, and it's

25    disclaimed in the debtor's papers.

1        So with respect from the unsecured-creditors' perspective,

2    we would very much like to see the debt liquidated and get what

3    security there is here.

4            THE COURT:  But what if the collateral is worth minus

5    $15 and --

6            MR. CHARLES:  If --

7            THE COURT:  But the point --

8            MR. CHARLES:  Go ahead.

9            THE COURT:  But the collateral is worth minus $15.

10   And let's assume that the day after it's signed they realize

11   it's worth minus 15, so it's not worth anything.  Is not the

12   debtor precluded from suing on that $58,000,000 for --

13           MR. CHARLES:  A year.

14           THE COURT:  -- a year?

15           MR. CHARLES:  Yes.

16           THE COURT:  So isn't that information we need to

17   know?  For example, if the collateral is worth $20, maybe the

18   risk of forbearing for a year is worth it.  But if we don't

19   know what the collateral is worth at all, how can I make that

20   informed judgment?

21           MR. CHARLES:  The only marginal question I think that

22   your question presumes is is there anything you left on the

23   table, Mr. Allison.  Because if they took everything that he

24   thought had any value and the collateral is worth nothing, then

25   there's nothing to be gained from suing them.

1       So the question to Mr. Allison is as part of this, did you

2   leave anything on the table that we ought to be suing about to

3   get a judgment lien or some other kind of interest.  If the

4   answer is no, then you don't care what the collateral is worth.

5       We sure hope it's worth something, but we got what we

6   could, and I hope we got a leg up on everybody else.

7           THE COURT:  We don't have in here any real property

8   owned by the debtor.

9       (Colloquy not on the record.)

10          MR. CHARLES:  And that's the question.  Did you leave

11  anything --

12          THE COURT:  Correct.

13          MR. CHARLES:  -- on the table, Mr. Allison?

14          THE COURT:  Now it may well be that this debtor --

15  well, the allegation is the debtor doesn't own, debtor meaning

16  Investment Partners, doesn't own any real property but only

17  owns membership interest, but we don't know that, correct?

18          MR. CHARLES:  Ask him.  Ask Mr. Allison.

19          THE COURT:  Okay.

20          MR. CHARLES:  It's a one-line question.  Is there

21  anything that you know about that you left on the table.

22          THE COURT:  Okay.  Thank you.

23          MR. CHARLES:  Thank you.

24          MS. JARVIS:  Your Honor, Mr. Allison would be glad to

25  answer that question.  We didn't, you know, proffer his

1    testimony because it's late, and I thought we could rely on the

2    declaration.  I didn't think there were a lot of objections to

3    it because I think the creditors --

4                    THE COURT:  Sure.  No.  I appreciate that.

5                    MS. JARVIS:  -- agreed, you know, but that question,

6    you know, can certainly be answered by him.

7        I also have assurance from Mr. Walker that he will

8    represent on the record that he agrees with my statement that

9    this is not a release of any claims.

10       There is no, you know, compromise of any additional

11   claims, and it's without, you know, a waiver of any rights to

12   go after any other claims we may find, and, in fact, we can put

13   that in the order to make certain.

14       But he can confirm our representation that this was not a

15   compromise of any claims that we didn't know about.  It was

16   simply a documentation of the receivable that we determined on

17   the books.

18                    THE COURT:  Okay.

19                    MS. JARVIS:  And so I would ask him to make that

20   representation.  Then I would be glad to have Mr. Allison

21   answer the one question.

22                    THE COURT:  All right.

23                    THE WITNESS:  Do you want me to come back up on

24   the --

25                    THE COURT:  We'll you're still under oath, so I'll

169

1      let you stay there.

2            THE WITNESS:  Thank you, your Honor.  Perhaps just to

3      make a quick statement.

4            When I looked at the receivable at -- on Commercial

5      Mortgage when I came into the company, I saw it was about a

6      $48,000,000 receivable.  We did a substantial amount of work on

7      it, and that's where got the number up to 58.3 million.

8            When I saw the issues that existed at -- with Mr. Hantges

9      and Milanowski, I thought it was in the best interest of the

10     estate to take what was an unsecured receivable at

11     Investment Partners and secure it.

12           Unfortunately, Investment Partners has to the best of my

13     knowledge and the best of my investigation only equity

14     interests in various -- various equity shares in -- in various

15     projects.

16           We took the projects that were available including the

17     Royal Hotel, Oak Valley, Stoneridge, Rapar Ranch (phonetic),

18     and Placer Vineyards.

19           All those projects are land projects -- most of them are

20     in southern California -- and took their equity interests and

21     put a secured lien behind it.

22           We know that Mr. Hantges and Milanowski have issues, and I

23     wanted to get these debtor entities in first position.

24           THE COURT:  You know, I forgot to ask an important

25     question, and this has to be asked of one of the counsel, and I

1    don't mean to interrupt, but, you know, this late.  I'll forget

2    it.

3         By getting these membership interests, do we know from

4    looking at the LLCs whether you get the voting rights as well?

5    Are the voting rights assignable as a security or not?  And if

6    you don't get the voting rights, then if you're not the full

7    member, how do you exercise the right to foreclose on the

8    collateral?

9         (Colloquy not on the record.)

10         THE WITNESS:  They aren't the majority member in most

11    of these cases, your Honor.

12         (Colloquy not on the record.)

13         THE WITNESS:  Again, what I was trying to do is take

14    a position that where I could try and improve our position,

15    improve the estate's -- my -- my intent was to improve the

16    estate's position from the outset.

17         THE COURT:  Of course.

18         THE WITNESS:  And to -- and -- and when I look at in

19    going through the questions that are asked here, my intent was

20    to -- was to improve the position vis-à-vis anybody else that

21    could be coming against -- against Mr. Hantges and Milanowski

22    and get our -- get our estate in first position.

23         The -- I think those are -- giving those as my intent, and

24    I want to share with the Court, when I -- when I look at the --

25    I'm the responsible -- responsible party for the debtor

171

1    entities.

2        And what I wanted to do is bring these assets into the

3    debtor entities, and we've been very clear with the committees

4    that we can figure out what to do with them, but I wanted to be

5    in first place and be in a position to at least have them in a

6    place to be monetized.

7        You know, I -- I -- I can't speak to appraisals.  I have

8    spoken to the equity partner in -- in one of the projects, Oak

9    Valley.  That project has -- the equity value between the two

10   parties is -- is estimated to be $50,000,000.

11           THE COURT:  But the problem is if you don't have the

12   right to vote because you're only assigned the interest,

13   whether or not you're a minority or majority, how do you ever

14   realize in the collateral?

15           MS. JARVIS:  Your Honor, what he has is a right to

16   the distributions in essence on the ownership interests --

17           THE COURT:  But what --

18           MS. JARVIS:  -- or to --

19           THE COURT:  -- if the --

20           MS. JARVIS:  -- or to --

21           THE COURT:  -- managers --

22           MS. JARVIS:  -- foreclose on those.

23           THE COURT:  -- decide not to do any distributions?

24           THE WITNESS:  The -- and -- and, your Honor, just to

25   maybe go --

1          THE COURT:  Trust me.  I've seen this happen in a

2     nasty case I had involved in this court, and it created quite a

3     conundrum.

4          I'd already ruled, but I think I published an opinion that

5     said that based upon the agreement, if you got assignment of

6     the rights, you didn't necessarily -- oh, I know.  It was a

7     foreclosure.

8          So that's the concern.

9          THE WITNESS:  Okay.  And, your Honor, I -- I -- I

10    have been in discussions on a couple of the projects that are

11    in the line of sight going to be -- that are -- that are in

12    process to be monetized.  Both partners are -- have the project

13    up for the sale, and I wanted to get -- I wanted to be in a

14    position to bring that cash back into the estate as quickly as

15    possible.

16         And if we're ready to go through what was on my mind, my

17    mind was to -- to get first in line to get the cash and bring

18    it back in the estate when it got the for-sale sign on the

19    property.

20         THE COURT:  Okay.  But you don't have any idea, do

21    you, how much that collateral is worth?

22         THE WITNESS:  The -- there's certain pieces I can

23    give --

24         THE COURT:  I mean --

25         THE WITNESS:  -- an idea.

1          THE COURT:  -- the debtors -- I'm sorry.  The

2     collateral that we have that the debtor would have.

3          THE WITNESS:  I can give you -- I can --

4          THE COURT:  This debtor.

5          THE WITNESS:  -- go through pieces of it, your Honor,

6     and pieces of it I'm waiting for appraisal on.

7        On the Oak Valley transaction, Oak Valley they're -- they

8     -- we have -- Investment Partners has a 50-percent equity

9     interest in a -- in a parcel of land.  That parcel of land has

10    a value of $75,000,000.  USA Commercial Mortgage --

11         THE COURT:  But what's the debt?

12         THE WITNESS:  Let -- let me -- I was just going

13    there.

14         THE COURT:  Oh, I'm sorry.

15         THE WITNESS:  USA Commercial Mortgage has a

16    20,000,000 -- 20.9-million-dollar loan on the property, and it

17    is in arrears of interest about $4,000,000, so in round

18    numbers, there's $25,000,000 today of debt on the property, and

19    that -- that's controlled by USA Commercial Mortgage or -- and

20    the debt lenders.

21         THE COURT:  So you're going to be foreclosing on

22    yourself.

23         THE WITNESS:  Well, the -- moving forward on that,

24    that's -- well, that's part of why I wanted to try and get a

25    DIP in place, so I didn't mean to say it that way, but what I

1   was trying to do is making sure I have the ability to go

2   forward.

3        Investment Partners, the value of the property that's

4   underneath or the equity value in the land underneath it, is

5   approximately $50,000,000, so the value of the entire project

6   is $75,000,000, so -- and I know that there's a for-sale sign

7   on the property.  I wanted to be first in line to -- to -- to

8   have 50 percent of the proceeds brought into the estate.

9        With respect to the Royal Hotel, the Royal Hotel is under

10  -- is under a negotiation for sale.  I've talked to the

11  financial advisors last week that are -- that are -- that are

12  working with the -- the -- the buyer of the hotel.  The Royal

13  Hotel purchase price is $29,000,000, so I have an idea of what

14  the value of the Royal Hotel is from a purchaser or from a --

15  from a sale price.

16            THE COURT:  But you're subordinated to Liberty.

17            THE WITNESS:  I -- I understand that.  I -- I think

18  there may be other -- there may be other problems as well that

19  we're working on.

20        But the -- the point is that we know the property is up

21  for sale, and, again, what I wanted to do and my intent was to

22  be, you know, in line to get some of that money and have a lien

23  in place to do it, so my intent was to put ourselves in a

24  position to get money back into the estate.

25            THE COURT:  Okay.

1          THE WITNESS:  Okay.  And so if I can share with you

2     the -- the strategy on the other transactions, Placer,

3     Rapar Ranch.  Rapar Ranch should be money good as well, and we

4     have a minority interest in that.

5          But what I've been told -- and, again, I haven't an

6     appraisal to bear it out, your Honor, but Rapar Ranch has a

7     value of between 150- and $200,000,000 when it's closed and

8     Investment Partners has a third of that, so somewhere in the

9     area of $50,000,000 of value.

10         Again, what I'm trying to do -- what I was trying to is

11    get in line to that Rapar Ranch.  It probably won't monetize

12    during the -- during the next 12 months, but it's -- it's --

13    it's a project that's close to completion, and I wanted to have

14    this debtor in line to get money back into the estate.  So by

15    line of sight and looking at various transactions that I've

16    looked at over on the Investment Partner's side where we don't

17    have -- where the -- not we, but Milanowski and Hantges don't

18    have control but negotiated an equity participation in some

19    way, shape, or form, I wanted that brought back into this

20    estate.

21         THE COURT:  And when you talk about, quote,

22    compromising this particular 58,000,000 in debt, could you

23    articulate exactly what that kind of debt was so that we can

24    articulate it's that number we're dealing with and not some

25    other larger unknown number?

1          THE WITNESS:  The -- the --

2          THE COURT:  Is there a way --

3          THE WITNESS:  -- number --

4          THE COURT:  -- to articulate that?

5          THE WITNESS:  The $58,000,000, your Honor, was after

6     I did some thorough look at that receivable as I -- as I shared

7     with your Honor when we came in.  The books and records had it

8     in the 40s.

9          We worked and what -- we looked very carefully as to what

10    should have been in that receivable, and, unfortunately, we

11    looked at a receivable that was sitting there for some period

12    of time with -- where there was no repayment.

13         And so I looked at this receivable that went over to

14    Investment Partners that had no interest rate, had no, you

15    know, that there was nothing coming back to the estate other

16    than a receivable that had been sitting out there for some

17    years.

18         THE COURT:  But we have the ability to define exactly

19    what number it is --

20         THE WITNESS:  Yes, your Honor.

21         THE COURT:  -- that is being --

22         THE WITNESS:  There --

23         THE COURT:  -- quantified.

24         THE WITNESS:  What we -- what we looked at was --

25    what we quantified was what we could find that was owing to --

1   to Commercial Mortgage from Investment Partners, and that's the

2   -- that's where we came to the round number of --

3          THE COURT:  Okay.

4          THE WITNESS:  -- 58.3 million dollars.

5      And by doing that, that's -- you know, and we did that

6   with some work on our part to take a number and actually

7   increased it.

8      And then what I wanted to do, the other parts to it for my

9   intent, was is to put some incentive on Milanowski and Hantges

10  by creating an interest rate on a -- on a receivable that had

11  no interest rate and had no maturity to -- to incent him to get

12  it paid down and have a paydown incentive or it doesn't -- or,

13  you know, to -- to move forward where we foreclose on

14  everything.

15         THE COURT:  Okay.

16         THE WITNESS:  So I was trying to create a -- a

17  vehicle that we could bring moneys back into the estate and

18  take a receivable that was there and -- and put it into a

19  document that had a bit more teeth to it.

20         THE COURT:  Okay.  Thank you.

21         THE WITNESS:  Thank you, your Honor.

22         THE COURT:  Did you want to add anything --

23         MS. JARVIS:  Yeah.

24         THE COURT:  -- else?

25         MS. JARVIS:  So I think the answer to that question

1    is there, you know, there is.  They've gotten what they can get

2    out of here.

3         And he did some due diligence in, you know, that there is,

4    you know, a reason for the compromise.  He carefully looked at

5    it in that this does benefit the estate and does meet the

6    standards of TMT (phonetic).  I would ask Mr. Walker just to

7    confirm --

8              THE COURT:  Okay.

9              MS. JARVIS:  -- you know, our understanding.

10             MR. WALKER:  Your Honor, just briefly on a couple of

11   points.  Our position is Liberty Bank is in first position, but

12   this stipulation doesn't affect that subordination agreement.

13             THE COURT:  Well, isn't your warranty then wrong on

14   your security agreement?

15             MR. WALKER:  I don't believe so.

16             THE COURT:  Or am I misreading it?

17             MR. WALKER:  If --

18             THE COURT:  Maybe --

19             MR. WALKER:  If --

20             THE COURT:  -- not.

21             MR. WALKER:  Yeah.  I think it's all right.  We can

22   certainly clarify that in the order.

23        Secondly, I do agree with what Ms. Jarvis said with

24   respect to the language.  It said this amount was a specific

25   amount as Mr. Allison testified was on the books, and he

1    increased that amount.

2         And so it's our agreement that we agree to repay that

3    amount, and this stipulation does say -- when I said we were

4    bound by the terms of the stipulation, it says and any other

5    amounts that Mr. Allison determines, so we're not intending it

6    to be a blanket waiver release of those claims.

7         And the final point is that our representation was that

8    the value of the assets that we are pledging far exceeds the

9    amount of the debt in the promissory note, so that's consistent

10   with what we've said.

11             THE COURT:  Okay.

12             MR. WALKER:  In that regard, we ask the Court to

13   approve it.

14             THE COURT:  All right.  Any other comments?

15             MR. LANDIS:  One other thing expressly from the

16   security agreement.  You've indicated already you don't know if

17   you've got the voting rights.

18        You also need to be aware of the fact that under Section 8

19   of the agreement, page 4, paragraph 8-A two little I's,

20   "Subject to the provisions of the operating agreements of the

21   LLCs."

22        It very well may be that there is a limitation on the

23   ability to alienate these provisions.  We don't know, and

24   nobody's come up with any of the operating agreements, Judge.

25        You're being asked to take this on faith that there's

1   value to these assets, that there aren't competing claims, that

2   the operating agreements don't get in the way.

3       I've already given you the law.  I won't do it twice, but

4   I've been accused of being sparse.  I'm going to continue being

5   that way.

6       The only other thing we ask, Judge, and we've asked for it

7   in our prayer -- and I want to be very clear on the record --

8   is that in the event that you believe that you have enough

9   information before you, notwithstanding the fact you haven't

10  seen an operating agreement, notwithstanding the fact that

11  nobody can tell you if the voting rights are part of this deal,

12  notwithstanding the fact that you don't know whether or not

13  there are restraints on alienation of the membership

14  agreements, notwithstanding you don't know what claims are

15  being compromised, what the nature of those claims were, if you

16  decide that you've got a sufficient record here, please, if the

17  order comes through, make it so that it's not binding on

18  successors in interest to this estate.

19      Thank you, your Honor.

20          THE COURT:  Okay.  Did --

21          Mr. HERMANN:  Your Honor, I've done a lot of lending

22  work, and I'm sure that there are other people in the courtroom

23  that have, also.  And when you're confronted with a situation

24  like this, you know that it's going to be a race to the assets.

25      You have a borrower that has assets that are currently

1    unpledged, and there's going to be a race, and there are going

2    to competing creditors.

3        And so you've got some constituency standing up today --

4    certainly not the U.S. Trustee's Office -- but you've got other

5    standing up today who are probably competing creditors, and

6    they're saying don't approve this, don't approve it, we don't

7    have enough information.

8        We could work this by drilling down to values, drilling

9    down to operating agreements, drilling down to alienation

10    provisions in the operating agreements, and we could come up

11    with perfect information.  But in all likelihood, it's going to

12    be too late because someone will have beat us in line.

13        And so I think that what you have to do is say as the

14    counsel for the Unsecured Creditors Committee said, if there's

15    nothing left on the table, and you've got a debtor who is

16    willing to in effect confess a judgment, who is even willing to

17    secure the judgment without having to go sue on it, it's a good

18    deal, and we could take the time to get more perfect

19    information.

20        I'm guessing that the operating agreements do have

21    restrictions upon transfer.

22        There's a provision of the security agreement that

23    obligates Investment Partners to use their best efforts to go

24    out and get all this blessed by the LLCs.  They have a majority

25    interest in many of the limited liability companies.  They may

1    get that done, they may not get it done, but the alternative is

2    letting someone else jump in line to these assets or having the

3    estate go out and sue for a year.

4         Now, I looked at the Liberty Bank documents.  There's no

5    security interest there.  I looked for a negative pledge.

6    There's no negative pledge there.

7         And so I don't know what the analysis is under state law

8    if I as a creditor of Investment Partners perfect a lien

9    against Investment Partner's membership interest in HMA Sales,

10   and Liberty Bank has a guarantee outstanding and a

11   subordination of distributions, but that should just -- the

12   chips should fall where they may on that.

13        THE COURT:  I think my new judge would love to hear

14   that case.

15        (Colloquy not on the record.)

16        Mr. HERMANN:  In any event, if I'm a creditor, I'm

17   not going to turn it down because I say, you know, I'm getting

18   collateral, but I don't know if Liberty Bank has a prior lien

19   or not.

20        If I look at what I'm giving up, what am I giving up?  I'm

21   giving up a year's forbearance.  It's going to take me a year

22   to sue the borrower and try to get a liquidated amount by way

23   of a judgment.  I'm getting that on day one under this deal.

24        So I think even though the law cited by the U.S. Trustee

25   is correct, what you have to balance off is what is the estate

1    giving up?  It's not giving a release, it's not compromising

2    the amount of the debt, apparently, and all it's giving up is a

3    one-year forbearance.

4        It's going to take a year to get the estate into a

5    position where the estate can get a nonconsensual lien against

6    these assets.  We're getting it right now.  It's a no-brainer

7    in my opinion.

8        Thank you, your Honor.

9            THE COURT:  Okay.  All right.  I'm going to approve

10   the motion on the following conditions, and then I'll give you

11   my findings and conclusions.  The following conditions are in

12   no particular order.

13       That the particular LLCs permit the alienation of the

14   membership interest at least insofar as distribution.  Now,

15   it's my understanding that under the uniform law that even if

16   the members don't consent, that the assigning members -- what

17   happens is you get the distribution rights, although you

18   wouldn't have the voting rights, so that shouldn't be an issue.

19       But we don't know what states we're talking about.  We

20   don't know if they've got the uniform laws.  We don't know if

21   they're really LLCs.

22       So one of the conditions is the assumption that the

23   assignment will at least be permitted and (indiscernible) the

24   estate would receive the distributions.

25       Secondly, that this agreement does not constitute a

184

1    release of any causes of action against Investment Partners.

2    And that in that regard, all that is, quote, "compromised is

3    the setting of the sum of those particular receivables," and I

4    think you should define exactly what receivables you're talking

5    about.

6        Also, that there's no waiver of any rights by entering

7    into this agreement on behalf of the estate or any of the

8    debtors or any of the other lenders or -- any other lenders.

9        Now, I can approve this, and I very much appreciate

10   Mr. Landis bringing us down to what the law is and the facts

11   that we need to find.

12       Clearly, I cannot rubber-stamp something a trustee says.

13   We know it's hard fought, and, in that regard, I think I very

14   much respect the business judgment of Mr. Allison.

15       Here we have an issue of we have moneys that were

16   apparently clearly owed to the debtor but which was not

17   secured, and my reaction was first much like Mr. Landis'.  So

18   what?  Go sue on it.

19       But the problem with that is in order -- what we want to

20   secure is the assets, in the meantime.  So if you were to go

21   sue on it -- and I have no reason to believe you couldn't file

22   a contract action tomorrow -- you would have to get a

23   prejudgment writ of attachment.  Prejudgement writ of

24   attachments are often difficult to get and depends upon a whole

25   series of factual findings.

1          So it seems to me as long as this collateral is worth more

2     than a dollar even, you're better off than you were if you

3     didn't have it as long as the conditions that I've indicated

4     are the case, and those conditions will be because it's only

5     approved on those conditions.

6          So the estate has lost nothing because it would -- in

7     forbearing for a year it would take you a year and/or you'd

8     have the uncertainly about whether or not you could get a

9     prejudgment writ of attachment.  Certainly, you couldn't even

10    if you'd come to this Court.

11         You, you know, arguably could go to trial in two months on

12    a contract action, but then you'd have to go chase the assets.

13    It's what everybody who practices bankruptcy understands and

14    state court litigators don't.  You might as well be in

15    bankruptcy where you've got someplace where they are as opposed

16    to going to chase assets.

17         So for those reasons, I can approve the agreement on those

18    conditions.

19         All right.  We have one more.  We have the --

20              MS. KARASIK:  Your Honor, I have one --

21              THE COURT:  Oh, sorry.

22              MS. KARASIK:  -- one issue on the order --

23              THE COURT:  Um-h'm.

24              MS. KARASIK:  -- I just want to make.  Excuse me.

25         (Colloquy not on the record.)

1          MS. KARASIK:  I just want to make sure that with

2     respect to the payee being USA Commercial Mortgage, they hold

3     it in trust.

4        With respect to the allocation distribution of proceeds

5     under the security agreement, that they're all held in escrow

6     or in some manner such that nobody's rights are prejudiced with

7     respect to distribution at a future date.  If we can have --

8          THE COURT:  You know, I have a note which I couldn't

9     read which I now realize says also that the note may be

10    assigned to the other debtors without a breach of the

11    agreement.

12         MS. JARVIS:  Your Honor, we've already agreed to

13    that, and I think --

14         THE COURT:  Okay.

15         MS. JARVIS:  -- probably it would be best if we just,

16    you know, in the order work out a language.  We all understand

17    the concept, and we'll work --

18         MS. KARASIK:  That's fine --

19         MS. JARVIS:  -- with the committees --

20         MS. KARASIK:  -- your Honor.

21         MS. JARVIS:  -- to reach an agreement on some

22    language in it.

23         THE COURT:  Um-h'm.

24         MS. JARVIS:  Thank you.

25         MR. GOCHNOUR:  Your Honor, I'm sorry.  I just want to

1    clarify.

2         With regard to the Liberty Bank, the particular LLCs

3    allowing alienation of the distributions, is that in order to

4    cover what we see and I thought what I heard was admitted by

5    Mr. Milanowski's and USAIP's attorney as a first position?

6              THE COURT:  What I mean by that was and my only

7    concern was that, fine, you assign the membership interest, but

8    LLCs generally require that you can't assign a membership

9    interest without the consent of the other members.

10        That's probably obviated with the specific state law which

11   says, okay, fine, it's ineffective to give them voting rights,

12   but it will give you the rights to distribution.

13        But I want to sew up any kind of problem in that regard or

14   defense by the LLCs to which the debtor is receiving the

15   assignment from IP.

16             MR. GOCHNOUR:  Okay.

17             THE COURT:  So I am not touching in any regards the

18   rights as between Liberty.  Liberty -- you know, the parties

19   are whatever they have, they have.  I mean, this certainly

20   doesn't affect anybody's priority.

21             MR. GOCHNOUR:  Just so I'm clear then, the order that

22   you're making tonight is without prejudice for Liberty to

23   pursue whatever stay --

24             THE COURT:  Oh, of course.

25             MR. GOCHNOUR:  -- or federal court rights --

1           THE COURT:  Of course.

2           MR. GOCHNOUR:  -- that it has elsewhere.  Okay.

3           MR. LANDIS:  And, Judge, just so the record is real

4    clear on the order, also, you indicated no waiver by the

5    estate's debtors or other lenders.  That also goes to

6    successors in interest --

7           THE COURT:  Yes.

8           MR. LANDIS:  -- to the estates and the debtors?

9           THE COURT:  Yes.

10          MR. LANDIS:  Thank you.

11          MR. CHARLES:  I apologize for being difficult.  When

12   you say condition, and I'm trying to resist enforcement of

13   this, and I don't even know how to prove what you just said --

14          THE COURT:  No.  I'm saying this order is approved,

15   if the order is signed, and that means that is the terms of the

16   deal.

17          MR. CHARLES:  And so they will -- it will be

18   enforceable.  They've said they'll use their best efforts to

19   get that consent.  But on behalf of the estate's unsecured

20   creditors, I would rather have an assignment.  That is you've

21   approved it.  It's effective.

22       We may have to go fight with LLCs about how much I can get

23   for that.  But if they can say if I don't consent, it's not

24   effective, oh, good, good-bye, so the notion of condition

25   really concerns me.

1          THE COURT:  Oh, I see what you're saying.

2          MR. CHARLES:  The agreement says they're going to use

3     their best efforts to obtain consent and get what the -- you

4     know, turn this into a distribution of proceeds.

5          THE COURT:  Oh, I guess on the other side what I'm

6     saying is I want to make sure what they're giving is the right

7     to distribution.

8          So it's not a defense as to the LLCs.  What I'm saying is

9     -- this is easily resolved by just people looking at their

10    agreements and/or the particular limited-liability law.

11         MR. CHARLES:  Just as long as you don't say there was

12    some condition to the effectiveness of the agreement that

13    someone could say it wasn't met and therefore now I don't -- we

14    really don't have lien or security interest.

15         THE COURT:  Right.  They can't use it as a defense.

16    My condition was just you have told me, Mr. Investment

17    Partners, that you will assign the interest, and you have told

18    me that that means we get a distribution of the proceeds.

19         MR. CHARLES:  Understood.  Thank you.

20         THE COURT:  And thank you for clarifying that.

21    You're right.  All right.

22    I guess GSA, we told them 6:00, and they believed us, so

23    it's cut off again.

24    Why don't we come back on -- the only thing left is the

25    committee protocol issues.  Do we really need to deal with

1    those?  Are those issues still pressing?  I guess so.

2        Or have the committees more or less decided among

3    themselves?  Do you really need my advice of what is -- how you

4    deal with your committees and what's confidential on 1106?

5            MS. KARASIK:  Your Honor, I believe there's two

6    issues of confidentiality here.  One is the issue of

7    information from the debtors to the committees and how we

8    protect that.

9        And the debtors have provided us with and have filed with

10    the Court I believe a much more limited definition which is

11    acceptable to First Trust Deed Fund, and I believe the

12    Diversified Fund, too?

13        There's a second part, too, which are committee

14    deliberations and --

15            THE COURT:  Okay.  I think --

16            MS. KARASIK:  -- those issues.

17            THE COURT:  -- we're all too tired to do it today.  I

18    can offer -- we could squeeze it in tomorrow.  You promise this

19    would not take more than an hour, right?

20            MS. KARASIK:  Oh, I promise, your Honor.

21            THE COURT:  So we could do it tomorrow --

22            MS. KARASIK:  Does Greg promise?

23            MR. GARMAN:  I think we can do this in five minutes.

24            THE COURT:  You lie.

25        (Colloquy off the record.)

1          THE COURT:  If you're not all agreed, how is it

2    possible to do any of this stuff in five minutes?

3          MR. GARMAN:  Because I think we could put off the

4    issue --

5          THE COURT RECORDER:  Counsel, could you --

6          MR. GARMAN:  -- we don't agree on --

7          THE COURT RECORDER: -- come to a --

8          MR. GOCHNOUR:  -- until a later day.

9          THE COURT RECORDER:  -- microphone, please.

10          THE COURT:  Okay.  You get five minutes and that's

11    it.

12          MR. GARMAN:  I'll do better than that.

13          THE COURT RECORDER:  And your appearance also,

14    please, Counsel.

15          MR. GARMAN:  Greg Garman of Gordon & Silver,

16    committee for -- the Official Committee of Direct Lenders.

17       Your Honor, I think we're in 99-percent agreement that the

18    protocol motion and the 15 procedures we set out to deal with

19    the two issues of solicitation and information provided to our

20    various constituents we agree to.

21       The only issue we have is the new language which was

22    proposed by the debtor last night concerning trade secrets,

23    things of that nature.  I believe that's properly addressed in

24    the confidentiality agreement.

25       We have one dispute.  I think I can come back to this

1   Court at a later date and get your impressions, but you might

2   just want to deal with it now, and that is we agree with

3   everything they said except for the fact that our committee

4   members won't be provided copies of the Hilco appraisals.

5        I can tee this up by way of a subpoena, and we can do it

6   with a protective order.  You can give us some guidance now.

7        But I think that the language to the protocol motion and

8   what it is we're supposed to give to our constituents and get

9   back from constituents we're all in agreement upon tonight.

10       THE COURT:  Well, shouldn't they get the appraisals?

11  Why shouldn't direct lenders get appraisals?  Because how in

12  the world -- especially those people in these new loans you're

13  talking about.

14       MS. JARVIS:  Your Honor, obviously, if there is an

15  issue that comes by before the Court and the appraisals are

16  going to be part of the testimony, those will be made available

17  publically.

18       The issue that came up, and what we've agreed to with the

19  other committees, and my conversations with Mr. Garman this

20  morning is that maybe we can work out something that works.

21       Because those appraisals are primarily used at this point

22  in time for negotiating, for repayments from borrowers, or

23  making decisions, credit decisions on how to proceed forward,

24  they're very sensitive because, obviously, you don't want

25  borrowers knowing what you think the value of this property is

1    while you're trying to work out a workout plan form.

2                THE COURT:  So a confidentiality --

3                MS. JARVIS:  That's what it's --

4                THE COURT:  -- agreement --

5                MS. JARVIS:  -- being used for.

6                THE COURT:  -- would work for that.

7                MS. JARVIS:  Yeah.  Right.  And that's what I

8    understand.

9         I mean, this list of confidential information that we set

10   out is what we're saying.  I think last week the Court said,

11   you know, everything can't be confidential, can you work out

12   something that, you know, really is confidential.

13        So we sat down, thought about it and said here's the

14   things that we think really are sensitive and need to be held

15   as confidential, and that's why those are appraisals are in

16   there.

17        However, there is an exception.  What we agreed to -- what

18   the other committees have agreed to, the Executory Contract

19   Committee hasn't yet, but we agree that we would allow those to

20   be for attorneys' eyes, professional eyes only, so that, you

21   know, attorneys and financial advisors can make decisions but

22   they don't become public.

23                THE COURT:  Well, appraisals only?  I mean, the

24   appraisals --

25                MS. JARVIS:  The appraisals --

1          THE COURT:  -- will be --

2          MS. JARVIS:  -- that deal with their -- yeah, with --

3          THE COURT:  But how can you do that when you got

4   these direct lenders, and you're asking them to make these new

5   loans?  How can you do that?

6          MS. JARVIS:  Alternatively -- well, with the new

7   loans, obviously, those things -- if we are asking for new

8   loans, and we've got -- you know, we're going to base it on

9   appraisal information, that's going to become public

10  information.

11         THE COURT:  And why couldn't these individual lenders

12  sign confidentiality agreements?

13         MS. JARVIS:  I mean, we could sign confidentiality,

14  you know, agreements.  There are issues, too.  There's claim

15  (indiscernible) going on.  There's a lot of stuff out in the

16  market.

17      So we're just trying to make sure that with respect to the

18  value of, you know, these properties where we're in either

19  sensitive negotiations or we feel like it would harm, you know,

20  the investors to have, you know, information floating around to

21  some but not others, that's it.

22      I mean, that's the issue, and we certainly can discuss

23  that further and see if we can --

24         THE COURT:  Okay.

25         MS. JARVIS:  -- reach an agreement on the language.

195

1    We've reached agreement with the other committees.

2         MS. CHUBB:  Your Honor, we oppose the appraisals, and

3    you said it was fine for them to get the appraisals.  We're

4    paying for the appraisals.  We should get to see the

5    appraisals.

6       This whole thing would be a lot simpler if there were a

7    little if not transparency, translucency.  We need to see

8    those, and I don't want to have to wait a month now that the

9    appraisals are there.  My people cannot make decisions

10   without --

11        THE COURT:  Right.

12        MS. CHUBB:  -- that --

13        THE COURT:  Right.

14        MS. CHUBB:  -- information.

15        MR. CHARLES:  Your Honor, we have no interest in

16   giving away the family jewels such that the borrowers are going

17   to have an increased bargaining position but --

18        THE COURT:  So you would agree that the direct

19   lenders would also sign the confidentiality agreement?

20        MR. CHARLES:  I think --

21        THE COURT:  You have no problem --

22        MR. CHARLES:  -- we can but --

23        THE COURT:  -- with that.

24        MR. CHARLES:  But 645(b) as well as the loan service

25   agreement obligates the company to give these appraisals to

1    their direct lenders.

2         So I have no -- I, in theory, have no objection to them

3    individually signing confidentiality agreements, but we have to

4    make this information available --

5              THE COURT:  Okay.

6              MR. CHARLES:  -- to our constituents.

7              MS. JARVIS:  Your Honor, one --

8              THE COURT:  Uh-huh.

9              MS. JARVIS:  One issue that's relevant on this is --

10   I mean, are the direct lenders agreeing they could be

11   surcharged for these?  Because remember that was an issue we

12   left --

13             THE COURT:  I think we said that --

14             MS. JARVIS:  -- later on.

15             THE COURT:  -- they're getting it.  That's what I

16   certainly thought.

17             MS. JARVIS:  Well, I thought you said -- I understood

18   that there was a limitation and that it was, what, $3500 for

19   any appraisal, and I didn't have a lot of heartburn with that.

20             THE COURT:  Great.

21             MS. JARVIS:  But --

22             THE COURT:  It certainly seems to me that as to each

23   loan, that loan could be surcharged that appraisal.  Maybe that

24   can be decided another day, but that just seems -- that's the

25   way the deal was, and I --

1           MS. JARVIS:  Well, I can --

2           THE COURT:  I agree.

3           MS. JARVIS:  -- sure tell you that we're not going to

4    pay for it.  We're going to fight about it if we don't get to

5    see it.

6           THE COURT:  Exactly.  Yeah.

7           MS. JARVIS:  Yeah.

8           THE COURT:  So I'm going to -- I don't think they

9    should remain confidential.  I have no problem if you just sign

10   a very limited confidentiality agreement, you know, just to

11   make -- if nothing else, make them aware, please do not -- and

12   make it simple.

13       Don't make it, you know, too legalese, just simple.  This

14   is given for your use, please do not disseminate this to

15   anybody else, you can talk it about it with your attorney, you

16   can talk about it with other direct lenders, but please do not,

17   you know, disclose this beyond that group.  Simple, right.

18           MS. JARVIS:  Yeah.  And, your Honor, that's fine.

19       We would simply ask -- because in some instances like I

20   said there are sensitive negotiations going on -- if those are,

21   you know, particular issues where we don't feel like we can,

22   you know, release them, we'll come in for, you know, a motion

23   for protection order, or whatever we need to do, or we'll reach

24   agreement.

25       But in principle, you know, as long as it's subject to a

1    confidentiality agreement, we can -- you know, we can deal with

2    that.

3            THE COURT:  Okay.  Ms. Karasik.  No.  That's just --

4    we also lost all the computer power, so -- oh, Helen, do you

5    still have a computer because mine they told me --

6            THE COURT RECORDER:  (Indiscernible).

7            THE COURT:  -- I had to log off.

8            THE CLERK:  She's on (indiscernible).

9            THE COURT RECORDER:  I keep getting network messages,

10   though.

11           THE COURT:  Oh, okay.

12       (Colloquy not on the record.)

13           MS. CARLYON:  It's all unofficial now.

14           THE COURT:  Okay.

15           MR. LEVINSON:  I just wanted to address -- this is

16   Marc Levinson for the Diversified Trust Committee -- a point

17   Ms. Karasik raised before that does impact our two committees.

18       We are fine with the new language proposed by the debtor

19   defining confidentiality.  Hopefully, your Honor is as well.

20       We would like an add-on to that -- we can worry about the

21   language -- that says whatever is discussed among the members

22   of the committee with their lawyers also is confidential, so we

23   don't have to post that on our Web site, and that would still

24   be confidential.

25           THE COURT:  All right.  Did you --

1          MS. JARVIS:  And, your Honor, just to --

2          THE COURT:  -- do that?

3          MS. JARVIS:  -- just to clarify.  The confidentiality

4    agreement we will workout -- work with the Executory Contracts

5    Committee and see if we can't --

6          THE COURT:  Okay.

7          MS. JARVIS:  -- reach agreement --

8          THE COURT:  But, again --

9          MS. JARVIS:  -- on language.

10         THE COURT:  -- for the ones that go to the direct

11   lenders, keep it simple.  Don't make the standard, you know,

12   don't it make it that lengthy -- just make it a simple one.

13         MS. JARVIS:  We will work on an order --

14         THE COURT:  Yeah.

15         MS. JARVIS:  -- and submit it to you, your Honor.

16         THE COURT:  All right.  That's it.  Now just a few

17   housekeeping, and then I guess we don't have to come back,

18   right?

19         MS. JARVIS:  Yeah.

20         UNIDENTIFIED SPEAKER:  We're done.

21         THE COURT:  Anyone can leave if you want.  The

22   attorneys I'd like to stay.

23      Let me say this.  All right.  I've already given you the

24   July 7th deadline for filing anything on July 25th.  If you

25   believe you truly have to have something heard on the 25th or

1   some date prior to that, I'm going to require that all

2   committee counsel -- in other words -- let me back up.  I'm too

3   tired.  Sorry.  Let me back up.

4        July 7th, anything filed by July 7th will be put on the

5   July 25th calendar without the specific need for an order

6   shortening time.  All right.

7        What happens if you want something after July 7th that you

8   want heard on the 25th?  You can only ask for an order

9   shortening time if all counsel agree to it, you know, the

10  committee counsel, just like the standard that we have.

11       If it is truly an emergency, and you can't get all counsel

12  to agree, you can still submit it, but you're going to have to

13  have some very good reasons why.

14       And Judge Markell will be reviewing the orders.  He, you

15  know, frankly, doesn't want to get involved in the middle of a

16  case that requires, you know, a lot of a learning curve.

17       But there is -- or if you think that there's something

18  that has be heard before the 20 -- or really the 20 -- the

19  hearing is the 25th -- I'm available from the 21st on -- you

20  can attempt to file it, but, boy, you better have good reasons

21  and, you know, better be prepared for questioning about why you

22  had to have it.

23       I've already giving you deadlines for filing that budget

24  in advance of that hearing.  The August 4th deadline for

25  hearing is on 4th will be August (sic) 14th?

201

1           THE CLERK:  July?

2           THE COURT:  Excuse me.  July.  Thank you.

3           THE CLERK:  July 14th.

4           THE COURT:  So if you file anything by July 14th,

5    that will go on the August 4th calendar without a need for an

6    order shortening time, and then the rest of the rules just kind

7    of govern.

8        Any kind of other housekeeping that we probably need to do

9    that I've forgotten?  I guess not.

10        Oh, yeah.  I guess on August 4th, that's only a half day.

11    That's going to be just as bad as today probably, right?

12        What does Judge Markell have on the 4th?  Do you think he

13    could take my Chapter --

14           THE CLERK:  (Indiscernible).

15           THE COURT:  Can I move my Chapter 11s maybe to the

16    3rd --

17           THE CLERK:  No.

18           THE COURT:  -- since they wouldn't have been filed

19    yet.

20           THE CLERK:  No.  Why don't they come in all day on

21    the 11th?  We have the 11th open.

22           THE COURT:  You don't want to move the 4th to the

23    11th, do you?  No?

24           MS. CHUBB:  Your Honor -- yeah.

25           THE COURT:  (Indiscernible) we can't.

1          MS. CHUBB:  I won't be available on the 11th.

2          THE COURT:  All right.  So why can't we -- the

3    Chapter 11s on the 4th is what I'm saying.

4          THE CLERK:  Okay.  You also have a jury

5    (indiscernible).

6          THE COURT:  I can move that.  That's an argument.

7          THE CLERK:  Okay.

8          THE COURT:  But can we move the Chapter 11 calendar?

9          THE CLERK:  Yeah.  Yeah.  I can -- I can -- we can

10   move it.

11         THE COURT:  Move it to the 3rd.  All right.

12      We'll give you all day on the 4th.

13         MS. CHUBB:  And 9:30, your Honor?

14         THE COURT:  Right.  And we'll probably need all day

15   the 16th, won't we?  Hopefully not.

16      Can we move the 16th motion calendar to the 17th, perhaps?

17         THE CLERK:  Uh-huh.  Yeah, I could do that, but you

18   have Chapter 13s in the afternoon.

19         THE COURT:  Right.  But why can't we move it to the

20   morning?

21         THE CLERK:  Well, we can't -- you're going to do a

22   whole motion calendar all morning?

23         THE COURT:  Yeah.  Maybe I can get Judge Markell to

24   do the Chapter 7s.  Well, that's all right.

25      I can give you all day the 16th.  I'll take a break at

203

1    11:00 o'clock for my Chapter 7s, and then we'll do the rest of

2    the day, so I'll give you all day on the 16th, too.

3         So move my motion calendar on the 16th to the 17th.  Okay.

4              MS. CHUBB:  At 9:30?

5              THE COURT:  Yeah.  Um-h'm.  All right.  Thank you.

6              UNIDENTIFIED SPEAKER:  Thank you, your Honor.

7              UNIDENTIFIED SPEAKER:  Thank you, your Honor.

8              UNIDENTIFIED SPEAKER:  Thank you, your Honor.

9              THE COURT:  Been the best five days of my life.

10             UNIDENTIFIED SPEAKER:  Enjoy Africa.

11             UNIDENTIFIED SPEAKER:  Enjoy (indiscernible) for us.

12             THE COURT:  Thank you.

13        (Court concluded at 07:43:14 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

204

1        I certify that the foregoing is a correct transcript from

2    the electronic sound recording of the proceedings in the

3    above-entitled matter.

4

5

6        /s/ Biljana Dokic                    10/21/10

7        _____          _____
        Biljana Dokic, Transcriptionist          Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25