1

1          UNITED STATES BANKRUPTCY COURT

2                DISTRICT OF NEVADA

3               LAS VEGAS, NEVADA

4   In re:  USA COMMERCIAL MORTGAGE  )  E-Filed:  10/21/10
        COMPANY,                        )
5                                        )
              Debtor.                    )  Case No.
6                                        )  BK-S-06-10725-LBR
    _____)  Chapter 11
7

8

9

10

11            TRANSCRIPT OF PROCEEDINGS
                        OF
12             HEARING RE: MOTIONS
                    VOLUME 1
13         BEFORE THE HONORABLE LINDA B. RIEGLE
              UNITED STATES BANKRUPTCY JUDGE
14
              Friday, May 11, 2007
15
                    9:30 a.m.
16

17

18

19

20

21

22

23   Court Recorder:       Helen C. Smith and Larry Espinoza

24

      Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.

2

```
1    APPEARANCES:

2    For USA Investors VI, LLC:   GREGORY E. GARMAN, ESQ.
                                  Gordon & Silver, Ltd.
3                                 3960 Howard Hughes Parkway
                                  Ninth Floor
4                                 Las Vegas, Nevada 89109

5    For Vesta Hospitality:       BRIAN D. SHAPIRO, ESQ.
                                  Law Office of Brian D. Shapiro
6                                 411 East Bonneville Avenue
                                  Suite 300
7                                 Las Vegas, Nevada 89101

8    For United States            AUGUST B. LANDIS, ESQ.
     Trustee's Office:            Office of the United States Trustee
9                                 300 Las Vegas Boulevard South
                                  Suite 4300
10                                Las Vegas, Nevada 89191

11   For USACM                    ROBERT M. CHARLES, ESQ.
     Liquidating Trust:           Lewis and Roca, LLP.
12                                3993 Howard Hughes Parkway
                                  Suite 600
13                                Las Vegas, Nevada 89169
                                  (Telephonic)
14
     For Compass Partners,        GEORGE A. DAVIS, ESQ.
15   LLC:                         Cadwalader, Wickersham & Taft, LLP.
                                  One World Financial Center
16                                New York, NY 10281

17   For Vindrauga Corporation:   DEAN T. KIRBY, ESQ.
                                  Kirby & McGuinn, a Professional
18                                 Corporation
                                  600 B Street
19                                Suite 1950
                                  San Diego, California 92101
20
     For USA Capital Diversified  CYNTHIA J. LARSEN, ESQ.
21   Trust Deed Fund, LLC:        Orrick, Herrington & Sutcliffe, LLP
                                  400 Capitol Mall
22                                Suite 3000
                                  Sacramento, California 95814
23
                                  ANNE LORADITCH, ESQ.
24                                Beckley & Singleton, Chtd.
                                  530 South Las Vegas Boulevard South
25                                Las Vegas, Nevada 89101
```

3

```
 1    APPEARANCES (Cont.):

 2    For Salvatore J. Reale:      DOUGLAS D. GERRARD, ESQ.
                                   Gerrard, Cox & Larsen
 3                                 2450 St. Rose Parkway
                                   Suite 200
 4                                 Henderson, Nevada 89074

 5    For HMA Sales, LLC:          GERALD M. GORDON, ESQ.
      (Proposed Counsel)          GREGORY E. GARMAN, ESQ.
 6                                 Gordon & Silver, Ltd.
                                   3960 Howard Hughes Parkway
 7                                 Ninth Floor
                                   Las Vegas, Nevada 89109
 8
      For Great White:            JASON G. LANDESS, ESQ.
 9    Investments, NV,            Landess & Associates
      Inc.:                       7054 Big Springs Court
10                                 Las Vegas, Nevada 89113

11    For National               HOWARD S. NEVINS, ESQ.
      Real Estate Holdings:       Hefner, Stark & Marois, LLP
12                                 2150 River Plaza Drive
                                   Suite 450
13                                 Sacramento, California 95833
                                   (Telephonic)
14
      For Amanda Stevens:         ULRICH W. SMITH, ESQ.
15                                 Smith & Associates
                                   3990 Vegas Drive
16                                 Las Vegas, Nevada 89108

17

18

19

20

21

22

23

24

25
```

4

1          (Court convened at 09:37:01 a.m.)

2               THE COURT:  Okay.  I'd like to do USA Investors VI

3     first, so that those people who are involved in that can go,

4     and we'll do the others matters later.

5          So USA Investors VI starting with the matter on item

6     No. 3.

7          Appearances, please.

8          (Colloquy not on the record.)

9               MR. GARMAN:  Your Honor, Greg Garman with

10    Gordon & Silver, counsel -- post-counsel to USA Investors VI.

11              MR. SHAPIRO:  Good morning, your Honor.

12    Brian Shapiro on behalf of Vesta Hospitality.

13              MR. LANDIS:  Good morning, Judge.  Augie Landis,

14    Assistant United States Trustee.

15              THE CLERK:  We have parties on the phone,

16    Judge.

17              THE COURT:  Okay.  And on the telephone, anyone wish

18    to make an appearance to USA Investors VI?

19              MR. CHARLES:  Thank you, your Honor.  Rob Charles

20    from Lewis and Roca on behalf of the USACM Liquidating Trust

21    and servicer for the senior lien, and thank you for letting me

22    appear telephonically.

23              THE COURT:  Okay.

24              MR. GARMAN:  Your Honor, there are a few matters

25    before you that were trailed from the last hearing as well as

1  our motion to consolidate.

2  Let me give you a brief update in the USA Investors VI,

3  and I'm going to give you a brief update also in Tree Moss

4  because they're fairly related.

5  As you will hear --

6  THE COURT:  Yeah.  I don't see Tree Moss on the

7  calendar, but it's supposed to be on calendar, right, or am I

8  just missing it?

9  MR. GARMAN:  No.  There's actually nothing that has

10  been ordered to be on calendar for today --

11  THE COURT:  Oh, okay.

12  MR. GARMAN:  -- but both of these entities are

13  100-percent owned by USA Investment Partners or the IP case.

14  In both instances, IP is the member and manager.

15  They are two facilities in Palm Springs, California, the

16  Hotel Zoso being the primary asset in the Investors VI case

17  and next door the Marquis Villas being a condo facility that

18  has somewhere between 100 and 110 units.

19  The condo facility has only two owners of the units

20  inside, Tree Moss being the 60-some-odd unit owner, and

21  Sunterra, the big nationwide timeshare entity holding 30-some

22  of the units.

23  They are somewhat affiliated in that there is a minor bit

24  of infrastructure that the two facilities share.  But for all

25  practical purposes, they run independently of one another.

1    It's the trustee's intent to commence a sale proceeding for

2    both facilities.

3         And just to give the Court a heads-up as to where the

4    trustee is at the moment, we spent about a day down there going

5    through trying to get, among other things, statements and

6    schedules going but meeting with probably ten or more potential

7    buyers and one or more of the facilities.

8         Some potential buyers have shown an interest in having a

9    consolidated-sale proceeding in which they believe there might

10   be synergy to acquiring both assets as opposed to simply one,

11   obviously some buyers saying they just wanted the hotel or the

12   condos.  We're evaluating that, and we'll be back.

13        I'm sure by the time you take the bench again we will be

14   in a position to have teed up a sale process with the

15   stalking horse probably on both sides in timelines that you'll

16   hear.

17        Unfortunately, those two facilities are in fundamentally

18   different economic shape.  The hotel -- which is a beautiful

19   facility, by the way -- has a management company which is

20   Vesta, Mr. Shapiro's client, seems to be running on all

21   cylinders.

22        It seems to have sufficient cash reserves, and operations

23   seems to be tip-top at the moment.  Essentially, we have no

24   short-term concerns about the economic viability of that

25   debtor.

7

1        Tree Moss, on the other hand, is in an unfortunately

2    different set of circumstances.  And once we were able to get

3    our hands just Tuesday and Wednesday on the books and records

4    of what Tree Moss looked like, it's become apparent that next

5    week is going to be somewhat of a make-or-break week for us and

6    that it's going to run out of cash.

7        There is an interesting -- we don't need to go into it

8    this morning, but just so you're aware, there's a very

9    interesting dynamic between the way operations are funded

10   between our 60 units and Sunterra's 30 units which involves a

11   homeowners association to represent the two of us.  The

12   homeowners association has to pay all the bills, but there are

13   assessments made against the debtor and against Sunterra.

14       The debtor doesn't have the funds to pay its allocation of

15   what we anticipate the assessment will be based upon the next

16   homeowners association meeting, so we've had some preliminary

17   discussions with the Diversified Fund who has the primary

18   economic interest in the Tree Moss case.

19       And we've tentatively agreed that upon certain events

20   taking place, they will fund an emergency DIP in order to allow

21   us to work through the sale process.

22       We've prepared budgets for 13 weeks and 26 weeks for a

23   variety of reasons, but we will be coming back before the Court

24   with a DIP, and the reason I'm bringing this up now is I know

25   you're leaving for a couple of weeks.

1       We began those discussions late Wednesday.  We made a lot

2   of progress on them yesterday, and I think we are fundamentally

3   in agreement.  The wild card for us is what Sunterra's going to

4   do, and we should know that early today.

5       But while you're gone, I anticipate that we will need to

6   have one of the other judges deal with an emergency DIP on an

7   interim basis for only that amount of money that will be

8   necessary until you get back for our next omnibus date on the

9   31st.

10              THE COURT:  Well, I could be available

11  telephonically --

12              MR. GARMAN:  Okay.

13              THE COURT:  -- the 16th, 17th, or 18th.

14              MR. GARMAN:  Okay.

15              THE COURT:  Will --

16              MR. GARMAN:  And I anticipate --

17              THE COURT:  Sorry.  17th or 18th.

18              MR. GARMAN:  17th or 18th?

19      So I anticipate that come --

20              THE COURT:  Maybe the 21st, but 17th or 18th I'm

21  judging the ABI litigation seminar, so I can get to a phone or

22  get to --

23              MR. GARMAN:  There's no reason that by -- come Monday

24  we wouldn't have something on file --

25              THE COURT:  Okay.

1      MR. GARMAN:  -- because we'll know where we're at, so

2  I think that those two dates will work, and I'll work with your

3  courtroom deputy to make sure that it all gets put together.

4      So that's why we sort of deal with the breakup of the

5  cases Tree Moss and Investors VI as a single unit, despite the

6  fact they're two --

7      THE COURT:  Right.

8      MR. GARMAN:  -- independent cases, and we're not

9  planning at the moment on subsequently consolidating them.

10      THE COURT:  Now, I've forgotten.  Does Diversified

11  actually hold a deed of trust on Tree Moss and/or Zoso or is

12  this one they're relying on the constructive theory?

13      MR. GARMAN:  Zoso has a loan on which Mr. Charles and

14  his client, the Trust, are the servicer for a loan of -- I

15  don't remember what the amount is.

16      So on Investors VI we do have a loan, a secured loan, in

17  which the USA Commercial Mortgage Liquidating Trust is a loan

18  servicer as you recall pursuant to the plan.

19      THE COURT:  Right.  But who's the beneficiary?

20      MR. GARMAN:  The makers of the notes are a series of

21  direct lenders, and I do not recall --

22      THE COURT:  You mean beneficiaries of the note.

23      MR. GARMAN:  I'm sorry.  Yeah.  Direct lenders are on

24  that loan.  I do not recall whether or not at the moment

25  Diversified was a direct lender in that loan.

1    On the Tree Moss side, among other things, you recall that

2    when the note in favor of Investment Partners was made last

3    year, there were a series of equity interests that were pledged

4    as collateral to secure those note obligations.

5    Tree Moss falls in that category of equity interest of IP

6    whose benefit flows to one or more of the trusts or

7    Diversified.  As I stand here right now, I don't recall exactly

8    where it worked out.

9    But, among things, we're globally working towards a

10   resolution with the trust and --

11             THE COURT:  Well, I appreciate that, but --

12             MR. GARMAN:  -- with Diversified --

13             THE COURT:  But don't forget -- and this is aimed

14   more at the Diversified counsel.  You know, if you're going to

15   make DIP financing, you're going to have to show to me that

16   there's going to be some economic interest down at the end or I

17   guess, arguably, you can make DIP financing and get -- if

18   you're going to get repaid like any other lender, that's fine,

19   too, but --

20             MR. GARMAN:  Oh, rest assured.  We're covering all

21   those bases.  It'll be in there.

22             THE COURT:  Because the point is, you know, there may

23   not be any equity interest as opposed to if there really was

24   some -- the real --

25             MR. GARMAN:  Right.

1    THE COURT:  -- deeds of trust, some constructive

2    deeds of trust, et cetera.

3    MR. GARMAN:  What we're contemplating right now and

4    what's generally been agreed to in principle is that they would

5    simply make a more traditional DIP loan, and that they will be

6    the first dollars out upon the sale.

7    THE COURT:  Okay.

8    MR. GARMAN:  But, again, we will put that together

9    hopefully today and over the weekend to be in some fashion so

10    that all the information is before you.  But just given the

11    fact that you were leaving town, I wanted to make you aware of

12    where we were headed.

13    THE COURT:  Okay.

14    MR. GARMAN:  So, your Honor, the first motion you

15    have before you today is our motion to consolidate the

16    involuntary case in the Investors VI with that being the

17    voluntary that we subsequently filed.

18    If you will recall, the involuntary was filed in December,

19    and it was filed as an involuntary 7.  We came to court, and

20    the trustee was prepared in her capacity as member manager to

21    consent to the involuntary, but for a variety of reasons we

22    collectively decided that it was safer to avoid litigation and

23    some other issues if we filed a voluntary 11.

24    The impact of those two collateral cases is the avoidance

25    actions and the look-back period, and so what I proposed to you

1    at that hearing is what this motion requests which is that

2    customary in situations like this where an involuntary is filed

3    and subsequently converted to a voluntary case, we use the

4    involuntary case petition date for the purposes of a look-back

5    period and the order for relief date of the voluntary case and

6    consolidate the two.

7    So the request that we have is that you consolidate the

8    involuntary case with the voluntary case pursuant to Rule 1015

9    which specifically addresses this issue.

10    We file a copy of the order consolidating both in the

11    involuntary case and the voluntary case using the voluntary

12    case's docket for all purposes on a going-forward basis, the

13    involuntary case be held in abeyance while we proceed down the

14    voluntary case timeline.

15    We provide that the petition date of December 15th be the

16    petition date for the purposes of the consolidated cases.  We

17    use the consolidated case number of 12377 which is the

18    subsequent voluntary case.

19    We provide that all future filings be with respect to the

20    -- in the voluntary case, and that we use the caption for the

21    voluntary case.

22    The reason that this is all essential, in addition to

23    using the petition date of the involuntary for purposes of

24    look-back, is that we have substantial issues as to gap

25    creditors.

1      We were in the gap period for, what, 100 days or more
2   while our vendors at the hotel continued to operate on a
3   going-forward basis.
4      Many of those vendors were paid in the ordinary course,
5   but we have found that the timing of our filing of our
6   voluntary was specifically very unfortunate in that on April
7   30th, the last day -- business day of the month, the hotel ran
8   a payables, and we issued checks to all of our vendors for the
9   hotel.
10     It is my belief that those are creditors that the hotel
11  and the debtor are authorized to pay.  But to the extent it
12  ultimately becomes necessary, we may be coming back before you
13  with a motion to pay those priority claims.
14     But I think that the code provides that gap creditors are
15  specifically designed to be protected in situations like this
16  to ensure that the hotel operations continue on a going-forward
17  basis during that gap period.
18     So that's the relief we've requested.  We think that the
19  rules specifically provide for it, and that's where we're
20  headed in the Investors VI case.
21          THE COURT:  Okay.  So any objection?  All right.
22  That motion is granted.
23     And just to be clear, the motion you were talking about
24  you anticipate would be in Tree Moss, not in Investors VI.
25          MR. GARMAN:  That's correct.

1              THE COURT:  Okay.  Now, I also have the continuing

2    motion for permitting to honor hotel room deposits.  I only had

3    a concern at that time that I just wanted you to make double

4    sure that those were all legitimate, et cetera --

5              MR. GARMAN:  Yes, your Honor.

6              THE COURT:  -- and you've reviewed all that?

7              MR. GARMAN:  I have been to the hotel, and I have --

8    I've personally talked to management and their staff,

9    Mr. Shapiro's clients and the like.

10         The way this hotel operates is that we do have a

11   management company in place, Vesta.  The employees are not

12   employees of Vesta.

13         They're, in fact, the debtor's employees, and they simply

14   act as our agent, so the bank accounts are ours, and all

15   functions of the hotel are ours.  They are a reputable

16   management company who manages hotels across the country.

17         I have no concerns, and we've uncovered no evidence to

18   lead me to believe that any of the wage payments by way of the

19   next motion would go to insiders, and I have no reason to

20   believe that any of these room deposits or commissions that

21   would be paid to travel agents are in any way improper, and

22   these are just typical arm's-length transactions.

23              THE COURT:  All right.

24              MR. GARMAN:  So --

25              THE COURT:  So any opposition there?  All right.  So

1     that's granted.  All right.

2          Next, we have the continued motion to pay wages, salaries,

3     employee benefits.  I'd allowed the payment of wages and

4     salaries.  I wanted to hold off on the other benefits 'til you

5     had an opportunity to make sure there was nothing out of the

6     ordinary in that regard.

7               MR. GARMAN:  Your Honor, same representations as last

8     time.  We have 160, give or take, full-time employees that had

9     accrued $137,000 in wages.

10              THE COURT:  And these are hotel employees.

11              MR. GARMAN:  These are hotel employees, but, again,

12    under the direction of Vesta in their capacity as management.

13    We've uncovered nothing, and we've looked, to lead us to

14    believe that any of these payments are going to insiders,

15    nothing improper about them.

16         We looked at the vacation accrual and the expense

17    reimbursements.  And the expense reimbursements, by the way, we

18    believe altogether are $1,000.

19         And, again, these are hard-working folks at the hotel who

20    we believe should be paid and should be protected.  They are a

21    valuable asset to us on a going-forward basis.

22              THE COURT:  Okay.  Any objection?  All right.

23         So that's granted.

24              MR. GARMAN:  And then, finally, your Honor, there is

25    a motion to extend the time to file statements and schedules.

1      You indicated at your last hearing that you would grant

2  that motion on an ex parte basis provided that the U.S. Trustee

3  approved.  They do approve; however, the order stated that all

4  of these motions would be continued --

5            THE COURT:  That's fine.

6            MR. GARMAN:  -- until today, so --

7            THE COURT:  Okay.  So that's granted.

8            MR. GARMAN:  -- because that's on file.  Yes.

9      There was one Tree Moss matter that you may have been

10  referring to earlier that we did seek an OST on that an order

11  has not been entered.  I think we can deal with that on the

12  31st.

13            THE COURT:  Okay.

14            MR. GARMAN:  But it is a motion to extend a potential

15  deadline to file the statements and schedules in Tree Moss to

16  the extent it's necessary when you convert from a 7 to an 11.

17            THE COURT:  Okay.

18            MR. GARMAN:  There's case law that says when you go

19  the other direction, you've got to file new statements and

20  schedules.  Ms. Gray (phonetic) in my office is the one who

21  errs on the side of caution which is always useful, so it's

22  nothing more than a protective request to make sure that we

23  don't get in trouble to the extent that --

24            THE COURT:  It seems to me that's something the U.S.

25  Trustee could stipulate to.  And --

1          MR. GARMAN:  Um-h'm.

2          THE COURT:  -- of course, if they don't want to

3    stipulate, I would be glad to have argument.  But if they do

4    stipulate, that could take that matter off calendar.

5          MR. LANDIS:  Your Honor, that makes perfect sense.

6    We would stipulate to that sort of an order at this time.

7          THE COURT:  Okay.  All right.

8          MR. GARMAN:  So --

9          THE COURT:  So we won't need that, then.

10          MR. GARMAN:  Thank you, your Honor.

11          THE COURT:  Okay.  Thank you.  Okay.

12      Next, let's do -- and even this is a USA -- well, these

13    are two USA Commercial versus HMA.  Let me deal with these

14    next.  All right.

15      In the USA versus HMA -- oh.

16      Mr. Gordon?

17          MR. GORDON:  Yes, your Honor.

18      May I suggest that given the Court is not aware we did

19    file HMA into chapter yesterday evening.  That really those

20    matters are going to be more important now in the HMA matter.

21      It makes sense to deal with both of those together, and I

22    would suggest that you hear the DACA, the true USACM matter,

23    the Compass/DACA matter.  That may make more sense, and then

24    we'll deal with both of those -- well, the first matter and the

25    last matter --

1          THE COURT:  Okay.

2          MR. GORDON:  -- together.

3          THE COURT:  (Indiscernible) matters who could go

4    first.  All right.

5        The next, then, we'll go ahead and do the matter No. 2,

6    motion to enforce confirmation order.

7        And appearances in the USA Commercial Mortgage.

8        (Colloquy not on the record.)

9          MR. DAVIS:  Good morning, your Honor.  George Davis

10    of Cadwalader, Wickersham & Taft on behalf of Compass Partners.

11        (Colloquy not on the record.)

12          MR. KIRBY:  Good morning, your Honor.  Dean Kirby,

13    Kirby & McGuinn for Vindrauga Corporation.

14          MR. LANDIS:  Good morning, again, Judge.

15    Augie Landis, Assistant United States Trustee.

16          THE COURT:  Okay.  Let me ask Mr. Kirby first.

17        In light of Mr. Blatt's last supplemental affidavit which

18    purports to suggest that you don't have 51 percent anymore,

19    what's your response to that?  Because that to me is the whole

20    key.  I don't go any farther if there's not 51 percent.

21          MR. KIRBY:  Well, your Honor, I think that what

22    they've done here or what they say they're going to do, more

23    accurately, is a violation of the plan, and I do want the

24    opportunity to explain that.

25          THE COURT:  Well, I just want to know whether or not

1   you've got 51 percent or not.  You may have some other motion

2   you're going to bring before me, but this motion is a motion to

3   enforce rights.  If you don't have 51 percent, you could see

4   that that ends the issue --

5           MR. KIRBY:  Well, your Honor --

6           THE COURT:  -- as to this particular group.

7           MR. KIRBY:  We made the showing in our opposition

8   that we have 75 percent, roughly.  Right?  Now, 75 percent have

9   designated our client as the loan servicer.

10      The question is do they have 51 percent now.  That's the

11  question.

12          THE COURT:  You still claim you have 51 percent, at

13  least.

14          MR. KIRBY:  Well --

15          THE COURT:  Do I have to have an evidentiary hearing

16  on this?

17          MR. KIRBY:  You don't have to have an evidentiary

18  hearing, but there is an important, very important issue of

19  interpretation of the plan, the Section 3 right --

20          THE COURT:  No.

21          MR. KIRBY:  -- on --

22          THE COURT:  I only --

23          MR. KIRBY:  -- the 51 --

24          THE COURT:  -- have that issue if I have a case in

25  controversy.

```
 1              MR. KIRBY:  I understand that.

 2              THE COURT:  Do I have a case in controversy?

 3              MR. KIRBY:  Absolutely, you do.

 4              THE COURT:  So you have 51 percent.

 5              MR. KIRBY:  Well, okay.  I'll answer that question

 6    yes.

 7              THE COURT:  Okay.

 8              MR. KIRBY:  I want to be heard on this specific issue

 9    of the 51 percent, and it is not a simple yes-or-no question.

10              THE COURT:  All right.

11              MR. KIRBY:  It is an important question --

12              THE COURT:  Okay.

13              MR. KIRBY:  -- of interpretation of the plan.

14         Would your Honor wish me to proceed or Mr. Davis to

15    proceed first?

16              THE COURT:  I'll let Mr. Davis go ahead first.  I

17    just wanted to see what your position was as to what percentage

18    you held.

19              MR. KIRBY:  Thank you, your Honor.

20              MR. DAVIS:  Good morning, your Honor.

21         I think the simple answer to your Honor's question is they

22    don't have 50 percent, but we'll let that play out.

23         We're here today on Compass' motion for an order enforcing

24    the confirmation order and determining that no surviving

25    Section 3 right exists with respect to the Fiesta Oak Valley
```

1    loan.

2         Your Honor, on February 18th of this year, Compass paid

3    these estates approximately $16,000,000 pursuant to the

4    debtor's confirmed Chapter 11 plan in order to purchase the

5    servicing rights and accrued servicing fees and loan

6    participation interests owned by the debtors.

7         As your Honor will recall, DACA was one of the parties

8    objecting to the sale and confirmation of the plan, although it

9    had never participated in the auction process established by

10   the debtors and approved by the Court.

11        DACA is a self-described distressed investor that, quote,

12   "purchases" -- this is its own description of itself -- "claims

13   at a discount in anticipation of receiving a favorable return

14   from the debtor upon its emergence from bankruptcy."  That's

15   important for the reasons that I will get to, your Honor.

16        Your Honor, six months --

17             THE COURT:  Well, there's been a lot going back and

18   forth.  Neither of you are exactly (indiscernible)

19   institutions, so --

20             MR. DAVIS:  But, your Honor, one of us paid these

21   estates $60,000,000.

22             THE COURT:  I know, but there's a contract clause

23   here, so I just want to know how you fit within this contract

24   clause and whether or not --

25             MR. DAVIS:  Well, it's very --

1            THE COURT:  -- under the contract.

2            MR. DAVIS:  Okay.  If your Honor -- I think it's

3    important for your Honor to have some backdrop as to what has

4    been going on here because --

5            THE COURT:  I mean, I'll take as a given --

6            MR. DAVIS:  -- we're going to --

7            THE COURT:  -- they're evil incarnate --

8            MR. DAVIS:  No, but --

9            THE COURT:  -- but the point is that's not relevant.

10            MR. DAVIS:  I understand, but I think -- and I'm

11    happy to skip forward and go exactly to the substance if that

12    would --

13            THE COURT:  Okay.

14            MR. DAVIS:  -- please your Honor --

15            THE COURT:  Please.

16            MR. DAVIS:  -- but I think there is some important

17    background.  Okay.

18        Your Honor, in terms of -- to exercise -- well, basically,

19    when Compass purchased the servicing rights, it purchased those

20    servicing rights and agreements and, you know, free and clear

21    of all liens, claims, and encumbrances, including monetary and

22    nonmonetary defaults other than what has been described as a

23    surviving Section 3 right.

24        Under Section 3 of the loan-servicing agreement, it

25    requires two things.  One, it requires that there be a borrower

1    default.  Two, it requires that there be a servicer default.

2        And your Honor's order and the way that it was structured

3    poses yet another requirement.  That those defaults shall have

4    existed and been matured and fully exercisable at the time of

5    the USACM Chapter 11 petition date.

6        I think, your Honor, you don't need to deal today I don't

7    believe with whether there was a borrower default, whether

8    there was a servicer default as of the USACM petition date,

9    whether those defaults were matured and exercisable, whether

10   Compass had cured those defaults post closing.

11       I don't think your Honor has to deal with any of that

12   today for one simple reason, and that is that Compass exercised

13   its rights under Section 6 -- under Section 2(c)(3) of the

14   loan-servicing agreements to purchase approximately 48 percent

15   of the total outstanding loan participations leaving DACA with

16   under 30 percent of the loan participations.

17           THE COURT:  Well, my math isn't very good.  But if

18   you purchase 48 percent, why couldn't they have 52 percent?

19           MR. DAVIS:  It's --

20           THE COURT:  I mean, if they got everybody.

21           MR. DAVIS:  It's 48 percent of the 75 -- 48 percent

22   are 100 percent -- well, 100 percent of the 48 percent make up

23   the 75 percent that support them, so that brings them from 78

24   percent -- or 75 percent less 48 percent.  You wind up with

25   less than 30 percent.

1        I agree that --

2              THE COURT:  Oh, I see what you're saying.

3              MR. DAVIS:  Okay.

4              THE COURT:  Okay.

5              MR. DAVIS:  That's how it gets down to that.

6              THE COURT:  So you say they don't have the 51

7    percent.

8              MR. DAVIS:  Absolutely not.

9              THE COURT:  Okay.

10             MR. DAVIS:  Absolutely not.

11       Your Honor, in Section 6 point -- I'm sorry, Section

12   2(c)(3).  Compass' rights under Section 2(c)(3) were expressly

13   preserved in paragraph 14 of your Honor's confirmation order

14   which provides, "The post-closing survival of a surviving

15   Section 3 right shall not impair in any respect any rights or

16   interests of Compass under the loan-servicing agreements,

17   including, without limitation, its rights under Section 2(c)(3)

18   of the loan-servicing agreement, i.e., the right to buy out the

19   interest."

20       You know, as your Honor mentioned in the supplemental

21   declaration of David Blatt which was filed on May 7th, on

22   April 24th, 2007, Compass wired approximately 12.4 million

23   dollars to Orange Coast Title Company representing the total

24   outstanding principle and accrued interest through April 30,

25   2007, on account of the 47.36 percent of the beneficial

1   interest in the Fiesta Oak Valley loan together with certain

2   assignment processing fees.

3            THE COURT:  So how did that work?

4            MR. DAVIS:  The --

5            THE COURT:  An individual had to put a call on that?

6   In other words, it wasn't paid out pro rata?  It was just

7   whoever put their request in got paid?

8            MR. DAVIS:  Well, under --

9            THE COURT:  I'm not sure it makes a difference.  I'm

10  just curious --

11           MR. DAVIS:  Under the --

12           THE COURT:  -- and want to understand this.

13           MR. DAVIS:  -- loan-servicing agreement, you know,

14  Compass has the absolute right to purchase the interest, and

15  the direct lenders have the obligation to transfer them.

16       So rather than just send people checks and hope that

17  they'll sign an assignment agreement, Compass put the money

18  into an escrow account.

19       The escrow agent then -- and sent letters to all of the

20  parties whose right -- whose participation interest it was

21  purchasing.  Now, remember, it was purchasing them at the full

22  amount of the principle outstanding.

23           THE COURT:  Was this offer made to everybody?

24           MR. DAVIS:  I'm not sure.  I'm not sure, your Honor.

25  I don't think so.  I think it was made to the substantial

1    majority of them.

2        This is a loan, your Honor, that -- I don't know how much

3    background you have on it, but this is a loan where the amount

4    of the loan originally made was about $20,000,000.  Now with

5    accrued interest and related charges it's probably about

6    $30,000,000.

7        The value of the property -- the borrower received a

8    letter of intent from a major real estate purchaser, a

9    developer in California, to purchase the property a year ago

10   for $215,000,000.  There's no doubt that these people are going

11   to get paid and get paid in full.

12               THE COURT:  And what does -- and, again --

13               MR. DAVIS:  Compass has been --

14               THE COURT:  -- this is not relevant, but --

15               MR. DAVIS:  It's not relevant --

16               THE COURT:  -- status wise --

17               MR. DAVIS:  Compass has been --

18               THE COURT:  -- what's happening with the loan?

19               MR. DAVIS:  -- actively involved in negotiating with

20   the borrower.  Part of the issue, the borrower is owned in part

21   by USAIP which is now I believe a Chapter 11 debtor before your

22   Honor which had previously commenced a receivership proceeding

23   in California.

24        There was concern over the breadth of the injunction that

25   was entered in that receivership proceeding, and Compass had

1     hired California counsel and was advised that it couldn't and

2     shouldn't begin foreclosure proceedings because it would --

3     could run afoul of that injunction order.

4          It was then talking to the committees here and the trust

5     who are going to seek to file an involuntary Chapter 11 case

6     against USAIP.  And they were advised that if that were to

7     occur and the involuntary became a voluntary, the California

8     receivership proceeding would be dismissed.

9          And, therefore, it's quite clear that if USAIP is a

10    Chapter 11 debtor, its interests in the borrower are property

11    of its estate, but the assets of the borrower are not property

12    of its estate.  It was unclear in the California proceeding

13    just because of the breadth of the order.

14         So it has been actively negotiating with the borrower and

15    for a full payment plan to the direct lenders.  It has been

16    discussing with various developers the possibility of either

17    purchasing from the borrower directly or purchasing from the

18    direct lenders directly their claims, again, either purchasing

19    the property from the borrower or purchasing from the direct

20    lenders their claims for full principle plus interest.

21         Either way, no matter what happens, they haven't -- and

22    just recently they have hired counsel just to, you know, ensure

23    that all angles and all possibilities are covered, even though

24    they think that this ultimately will prove to be unnecessary.

25    They have retained counsel to commence a foreclosure

1    proceeding.

2             THE COURT:  And let me make it clear, I recognize

3    that these questions I've asked you and your responses are not

4    relevant to this particular discussion.  I just neglected to

5    sort of ask for a status report, and I really don't have the

6    right to --

7             MR. DAVIS:  No.  That's okay.

8             THE COURT:  -- afterwards.

9        So just to make it clear, I recognize that these questions

10   -- it's not relevant what they're doing now.  What's relevant

11   is what were the surviving rights and who has the right --

12            MR. DAVIS:  Sure.

13            THE COURT:  -- to exercise those.

14            MR. DAVIS:  Your Honor, paragraph 14 of the

15   confirmation order expressly grants Compass the right to

16   challenge the attempted exercise of a surviving Section 3 right

17   by filing a motion with your Honor, and provides that, "This

18   Court retains jurisdiction to adjudicate any such dispute, and

19   most importantly for this purpose also provides that the

20   effectiveness of the attempted exercise of such surviving

21   Section 3 right shall be stayed pending this Court's

22   adjudication of the Compass motion."

23       So all of these things were put in motion, the action to

24   purchase, the demand for parties to sign the assignment and

25   receive 100 percent of what they were legally entitled to.  All

1    principle plus accrued and unpaid interest was made during this

2    period, and the money was funded into escrow.

3        It was done in this manner so as to ensure -- rather than

4    just mailing people their checks to their home and then hoping

5    that they will send back the assignment, it was done in this

6    manner.

7        I have an affidavit.  This was not supposed to be an

8    evidentiary hearing, but I have an affidavit from someone at

9    Orange Coast Title which I, you know, could provide to

10   your Honor today which would describe that.

11       Again, Compass had tendered for 40-some-odd percent.  At

12   this date, already Orange Coast Title has received the signed

13   assignment forms back from 30 percent in the aggregate of the

14   total amount of the loan.

15       So the 45 percent was the amount tendered for 47 percent.

16   30 percent already of the total -- not 30 percent of the 47

17   percent, 30 percent of the total leaving only 17 percent have

18   as of today already tendered the assignments.

19               THE COURT:  So --

20               MR. DAVIS:  At --

21               THE COURT:  -- by that math they can't hold 51

22   percent?

23               MR. DAVIS:  By my math they can't because they were

24   only at 75, and already 30 have already tendered.

25               THE COURT:  Okay.

1          MR. DAVIS:  So that leaves them today -- even though

2    I don't think it's relevant because I think the exercise would

3    have been effective when the demand was made and the money was

4    sent into escrow, even today they're under 50 percent.

5          THE COURT:  Okay.

6          MR. DAVIS:  So if your Honor has any questions, I'm

7    happy to answer them.  But, you know, I think it's important --

8    I'll just say this.

9          And I know this is not what's before your Honor today, but

10   this action to try to replace Compass was something that was in

11   the works literally for six months before the closing date.

12         DACA began purchasing at a discount direct-lender

13   interests even before the closing in early January of this

14   year.  They started soliciting these designations to replace

15   Compass.

16         They sent the replacement on behalf of 51 percent of the

17   owners 12 days after we closed.  Their pleadings are replete

18   with references to, well, if Compass would only get off of --

19   you know, would only get moving and actually do something, the

20   lenders wouldn't want to replace them.

21         Well, the fact is, your Honor, 12 days after the closing

22   we were sent a letter that is the subject of the motion today.

23         THE COURT:  Okay.  All right.

24   Mr. Kirby?

25         MR. KIRBY:  Your Honor, the Court's made it very

1    clear, and I understand that what is on the Court's mind are

2    not the various issues about Nevada law and when this right is

3    exercisable.

4          What's on the Court's mind is this issue of the 51

5    percent, and I want to go right to that, and I want to talk

6    only about that.  And if I accidentally don't talk about it,

7    let me know.

8          Compass is trying here to take a shortcut that avoids the

9    proper operation of this Section 3 right.

10         And understand, please, your Honor, Mr. Blatt's

11   declaration, the one that the Court referred to when I was up

12   here the first time, does not say that anyone has changed their

13   vote, and it doesn't say that Compass has purchased enough of

14   the interests in this loan to give them 51 percent.

15         Now, you know, if Compass gets 51 percent, they can

16   vote --

17              THE COURT:  Well --

18              MR. KIRBY:  -- 51 percent.

19              THE COURT:  -- conversely, you have to have 51

20   percent to terminate.

21              MR. KIRBY:  We did.  We did.

22              THE COURT:  You --

23              MR. KIRBY:  We -- we (indiscernible) --

24              THE COURT:  Do you now have 51 --

25              MR. KIRBY:  Well --

```
1              THE COURT:  -- percent --

2              MR. KIRBY:  And --

3              THE COURT:  -- to terminate?

4              MR. KIRBY:  And, your Honor, that's the crux of the

5    issue, and, please, it's not as straightforward as that, and

6    there are important reasons to think about how this is being

7    done.

8         Now, your Honor --

9              THE COURT:  Well, look.  You bought all this debt at

10   a discount, so don't give me this crying on the shoulder.

11   Right?  How much --

12             MR. KIRBY:  I'm not --

13             THE COURT:  -- did you pay for people's debt?  You

14   didn't pay them 100 percent, did you?

15             MR. KIRBY:  In many cases, yes.

16             THE COURT:  How many cases --

17             MR. KIRBY:  51 percent --

18             THE COURT:  -- did you not pay 100 percent?

19             MR. KIRBY:  Many.

20             THE COURT:  Right.  You didn't pay people 100

21   percent.

22             MR. KIRBY:  Well, your Honor, if I was crying, I've

23   already dried my tears.  All right?

24             THE COURT:  Okay.  But you --

25             MR. KIRBY:  I'm not --
```

1          THE COURT:  -- didn't pay --

2          MR. KIRBY:  I'm not crying --

3          THE COURT:  You didn't pay --

4          MR. KIRBY:  -- and I'm not --

5          THE COURT:  -- the individuals 100 percent for the

6    assignment of their interest.  Right?

7          MR. KIRBY:  I think we did in some cases, but

8    certainly --

9          THE COURT:  But not all the cases.

10         MR. KIRBY:  -- not in all.

11         THE COURT:  Right?

12         MR. KIRBY:  Yes.  Uh-huh.

13         THE COURT:  And you bought them knowing they were in

14   default.  Right?

15         MR. KIRBY:  Right.

16         THE COURT:  Right.  And you didn't pay the estate

17   anything for this right to do that, right?

18         MR. KIRBY:  The right to buy loan interests at --

19         THE COURT:  Right.

20         MR. KIRBY:  -- a discount?  No.

21         THE COURT:  Okay.

22         MR. KIRBY:  All right.  Your Honor, look what went

23   down here exactly.

24      Vindrauga, my client, gets 51 percent and ultimately 75

25   percent of these direct lenders to designate them as the loan

1    servicer.  Right?

2        The plan says that Compass has 30 days from the date that

3    they receive that notification to file a motion in this court

4    showing that that action was invalid for whatever reason.

5        They go 30 days, the full 30 days, and they use -- and

6    they file, as your Honor knows, this three-and-a-half page

7    motion that really doesn't challenge anything.  It doesn't

8    contest that we have 51 percent.  It doesn't really say that

9    USACM didn't violate the loan-service agreement.

10       What they do during the 30 days is they send out a letter

11   to all of these investors offering on behalf of a third party,

12   on behalf of a third, to buy their interests at 91 percent of

13   principle.

14               THE COURT:  Well, isn't that how you got your

15   interest?  You send out a letter --

16               MR. KIRBY:  Well --

17               THE COURT:  -- about saying let me buy your interest?

18               MR. KIRBY:  I do understand, your Honor.  This isn't

19   a question --

20               THE COURT:  That's how you did it, too.  Right?

21               MR. KIRBY:  I'm not trying to heap blame --

22               THE COURT:  Okay.

23               MR. KIRBY:  -- on them --

24               THE COURT:  But --

25               MR. KIRBY:  -- or praise on us.  I'm trying to

1   explain --

2           THE COURT:  But there's nothing unusual about that

3   because you do it every day in your business.  Right?

4           MR. KIRBY:  I didn't claim that there was anything

5   unusual about it.  I mean, please let me -- please let me --

6           THE COURT:  Okay.

7           MR. KIRBY:  -- get my point across if I could.  They

8   send out this letter offering to buy these interests.

9       Now, what they want to accomplish here, and what Mr. Davis

10  is arguing, and what Mr. Blatt's declaration is all about, they

11  say, well, if we buy two percent of these interests at a

12  discount and take you from 51 to 49, then the action of 51

13  percent of the lenders --

14          THE COURT:  Well, now, did --

15          MR. KIRBY:  -- in designating a new loan-servicing

16  agent was invalid.  Right?

17          THE COURT:  Didn't they get --

18          MR. KIRBY:  That's what --

19          THE COURT:  Why is it a discount?  This is payment of

20  principle and interest?

21          MR. KIRBY:  No.  No, no, no.  The letter from Compass

22  that went to these direct lenders during that first month which

23  is attached as an exhibit to Mr. Justice's (phonetic)

24  declaration offers on behalf of a third party to buy these

25  interests at 91 percent of principle only.

1          THE COURT:  Okay.

2          MR. KIRBY:  And that copy -- they don't deny it.

3          THE COURT:  Um-h'm.

4          MR. KIRBY:  And that's a copy of the letter that's

5    attached both to Mr. Justice's declaration and to Mr. Specker's

6    (phonetic) declaration.

7        Now think.  I mean, let's ignore -- let's say there's no

8    bankruptcy at all, and 51 percent of a group of lenders who are

9    dissatisfied with their loan servicer designate a new servicing

10   agent.

11       Is it how Nevada law works that after that action is

12   taken, two percent can void it?  I don't think so.

13         THE COURT:  Well, what about the --

14         MR. KIRBY:  And I think --

15         THE COURT:  -- contract right that they have the

16   absolute right to pay and get the assignment of the rights?

17         MR. KIRBY:  And we absolutely agree that if they

18   actually purchase 51 percent, then they can --

19         THE COURT:  Why do they have to purchase 51 percent?

20         MR. KIRBY:  Because Nevada law does not say that 51

21   percent can change loan servicers and 2 percent can change it

22   back.

23       And look at the way this went down, your Honor, is we get

24   51 percent.  They go out and they try to purchase a few

25   interests at a very substantial discount.  Vindrauga, at the

1   meantime, or DACA, its affiliate, goes and buys another 20, so

2   now we've thwarted that.

3        I mean, is that the way these motions are going to go in

4   this court?  I mean, this --

5           THE COURT:  Well, if the party whose true interest is

6   paid in full or at least they've taken that amount, then --

7           MR. KIRBY:  Well, they haven't taken, yet, not yet.

8        I mean, Compass has said we've exercised our right.

9   Compass has put some money into an escrow.

10       30 percent of the total loan according to them have

11  actually closed, although that's not before your Honor, yet.

12  That's just the latest breaking news from Mr. Davis.  That's

13  not 51 percent.

14       See, these motions -- and, your Honor, there are going to

15  be a bunch of them, and maybe in some of these motions in the

16  future we're not going to be able to ignore or avoid deciding

17  some of the other issues.  Right?

18       But these motions should be simple.  It should be, No. 1,

19  did Vindrauga or the proposed new loan servicing agent get 51

20  percent, and, second, did 51 percent of the direct lenders as

21  of the petition date have the right to change servicers.

22          THE COURT:  Well --

23          MR. KIRBY:  And if the answer to those two simple

24  questions is yes --

25          THE COURT:  We don't get to the one question we don't

1    have 51 percent, right?

2              MR. KIRBY:  We have 51 percent, and they don't.

3              THE COURT:  You had --

4              MR. KIRBY:  Now --

5              THE COURT:  -- maybe.  You don't --

6              MR. KIRBY:  No one's changed --

7              THE COURT:  -- have now.

8              MR. KIRBY:  No one's changed their vote.  No one's

9    changed their vote.  All they're saying is that we're in the

10   process of buying these interests.  And when we actually

11   succeed in buying 51 percent, then of course we can designate

12   our servicer.

13       But if your Honor doesn't rule this way -- well, think.

14   If your Honor rules as I'm suggesting, then 51 percent of these

15   direct lenders actually do have to get their money, principle

16   and interest.

17       If your Honor lets them play games with this up and down

18   tally as we go, oh, I have 51, now you only have 49, well, now

19   I have 70, well, we bought more, and now you're only down to --

20   if your Honor lets them do that, then what it means is that

21   only 2 percent of these people are going to get their money, or

22   10, or 20, or whatever the amount is to, quote, unquote, "bring

23   us down from 75 to 49 percent."

24       That's not what the plan had in mind here.  I mean, and

25   that's certainly not what the Nevada statute is all about.  51

1   percent of these direct lenders have spoken.

2       Now, if they close their --

3           THE COURT:  But once --

4           MR. KIRBY:  -- escrows --

5           THE COURT:  But under your theory, I guess all those

6   people will have to -- all that money will be refunded then to

7   those people.  They can't keep that money anymore.

8           MR. KIRBY:  No.  They're going to go ahead and sell.

9   I mean, I would.  Anybody would.

10          THE COURT:  No.  How can they?  If they've changed

11  their servicer, part of the contract was under signing they get

12  their --

13          MR. KIRBY:  Oh.  There's --

14          THE COURT:  -- designation rights.

15          MR. KIRBY:  There's no question --

16          THE COURT:  Those people have to pay their money

17  back, right?

18          MR. KIRBY:  There's no question that under the plan

19  Compass kept their right to buy their interest.  And before --

20          THE COURT:  Right.

21          MR. KIRBY:  -- the Court ruled on this motion,

22  Compass --

23          THE COURT:  Bought their interest.

24          MR. KIRBY:  -- did what they -- well, no.  Exercised

25  their call right and said you're now obligated to sell us your

1    interest --

2              THE COURT:  Right.

3              MR. KIRBY:  -- and we're putting some money into

4    escrow, and presumably at that go ahead --

5              THE COURT:  And the people got their money.  Right?

6              MR. KIRBY:  Yes.  But the question is --

7              THE COURT:  So if they got their money --

8              MR. KIRBY:  But the question --

9              THE COURT:  -- what more will they get by changing

10   servicer?

11             MR. KIRBY:  Your Honor, if Compass buys 51 percent --

12             THE COURT:  Right.

13             MR. KIRBY:  -- for principle and interest, Vindrauga

14   isn't going to be the servicing agent anymore.  We understand

15   that.

16             THE COURT:  Um-h'm.

17             MR. KIRBY:  And we don't contest that the plan says

18   that they can exercise their right to buy the loan, buy the

19   loan interest, even though the 51 percent have spoken.  Right?

20        But what's at stake here -- and that's why -- and I was so

21   anxious to be able to explain this to you.  It's all been

22   raised in replies or supplemental declarations.

23             THE COURT:  I think I'd feel a little better if I

24   knew this was just individuals who had loans.  You bought these

25   loans knowing they're in default.  You bought many of them at

1  discounts.  You did it, arguably, with a purpose so you could

2  control these loans.

3          MR. KIRBY:  Well --

4          THE COURT:  This is not 51 people who have gotten

5  together and says, you know, we need to change servicers.

6  You're out there to make a profit just like Compass is.

7          MR. KIRBY:  But -- but --

8          THE COURT:  And don't tell me you're not.

9          MR. KIRBY:  This process --

10          THE COURT:  You're not out there just to get your

11  money back, right?  You're out there to make a profit.

12          MR. KIRBY:  Of course.  I mean, I --

13          THE COURT:  Okay.

14          MR. KIRBY:  I'm not denying that, and I'm not

15  certainly feeling sorry for my client.

16      But if this procedure is followed a particular way, then

17  when 51 percent of these people speak, then they're either

18  going to get a new loan servicer or 51 percent of the people

19  are going to get their money, principle and interest.

20      But if you allow Compass to act according to a different

21  interpretation of this plan --

22          THE COURT:  Now, why is it different?

23          MR. KIRBY:  They're saying that when 51 percent

24  speak, all they have to go out and do is to go out and buy 2

25  percent, and then we're in some kind of race where Vindrauga or

1  DACA, its affiliate, is out there buying --

2          THE COURT:  And where is that precluded by the plan

3  or the contracts?

4          MR. KIRBY:  It's precluded by Nevada law and the plan

5  because the plan preserves the lender's right to designate a

6  servicing agent.  And once 51 percent designate, it takes 51

7  percent to designate another one.

8      And if your Honor interprets the plan in that way, then

9  either the servicing agent is going to change or 51 percent of

10  these people are actually going to get their money.  If your --

11          THE COURT:  So you're telling me that outside

12  bankruptcy -- let's assume 51 percent designate.  And then

13  before they actually do a new broker -- because there's no new

14  broker selected yet.  Right?

15          MR. KIRBY:  Well, if 51 percent designate a

16  particular agency --

17          THE COURT:  Oh, that's right.  Your --

18          MR. KIRBY:  -- to be their servicer --

19          THE COURT:  I forgot, your client's agency.

20          MR. KIRBY:  Any agency.

21          THE COURT:  It was your client's agency.  Right?

22          MR. KIRBY:  Well, I'm here representing a client.

23  There's no doubt about it.

24          THE COURT:  It was your client's agency.  Right?

25          MR. KIRBY:  Yes.

```
 1              THE COURT:  Okay.  It wasn't some third party
 2    unrelated to you.
 3              MR. KIRBY:  Unrelated to me?
 4              THE COURT:  It wasn't like Countrywide.  It wasn't
 5    like Ditech.
 6              MR. KIRBY:  Compass --
 7              THE COURT:  It was your client's company that,
 8    coincidentally, got designated the servicing agent.
 9              MR. KIRBY:  Well, I absolutely think that your remark
10    in the beginning of this was true is that Compass and DACA are
11    in the same business.
12              THE COURT:  That's right.
13              MR. KIRBY:  All right?
14              THE COURT:  You're both out to make a profit.
15              MR. KIRBY:  Nobody's morally superior to anybody
16    else.
17              THE COURT:  That's right.
18              MR. KIRBY:  And, gosh, if I ever argue that by
19    accident, I'm sure you're going to correct me.
20         But the issue is here the procedure we're following.  Are
21    we in a race that only ends when the Court finally issues an
22    order?
23              THE COURT:  Now, did you --
24              MR. KIRBY:  You've got 51.  No, you don't.  Now you
25    have 49.  Now I've got 20 more or --
```

1            THE COURT:  Did you advise these entities that

2       Vindrauga was an agency of DACA?

3            MR. KIRBY:  Absolutely.  That is in the designation

4       form.  And, yes, we did, and I have personal of that fact.

5            THE COURT:  Okay.

6            MR. KIRBY:  I mean, the fact is -- and I don't want

7       to get into who's the better loan servicer.  But the fact is

8       if --

9            THE COURT:  And I don't care because that's beside

10      the point.

11           MR. KIRBY:  Your Honor --

12           THE COURT:  The issue was totally --

13           MR. KIRBY:  Your Honor can look --

14           THE COURT:  Yeah.

15           MR. KIRBY:  -- at the loan-servicing agreement that

16      they're willing to serve under, the one that creates the

17      conflict of interest, the one that says three percent, the one

18      that has the illegal power of attorney provisions --

19           THE COURT:  Well, the --

20           MR. KIRBY:  -- the one --

21           THE COURT:  Wait.  Wait, wait, wait, wait.

22           MR. KIRBY:  All that stuff --

23           THE COURT:  Wait, wait.  That was the --

24           MR. KIRBY:  -- we amended --

25           THE COURT:  Wait.

1           MR. KIRBY:  -- all of that.

2           THE COURT:  That was the contract that was in

3    existence that these people signed to begin with.

4           MR. KIRBY:  That doesn't mean that the --

5           THE COURT:  That was the --

6           MR. KIRBY:  -- contract is legal.

7           THE COURT:  I am tired of these blogs that probably

8    you're sending around that make the representation that this

9    Court changed the contract.

10          MR. KIRBY:  We didn't know.

11          THE COURT:  This Court did not change the servicing

12   contract.

13          MR. KIRBY:  When have I --

14          THE COURT:  The servicing contracts are the servicing

15   contracts that each of these people have entered into.

16   Correct?

17          MR. KIRBY:  True.

18          THE COURT:  Okay.

19          MR. KIRBY:  They're illegal in some cases.

20          THE COURT:  But the point was --

21          MR. KIRBY:  I mean, they're --

22          THE COURT:  -- they are the servicing contracts that

23   each of these individuals have entered into.

24          MR. KIRBY:  No doubt about it.

25          THE COURT:  Okay.  I don't want you to suggest that

1        this Court somehow changed the contract at confirmation.

2                    MR. KIRBY:  Did I?

3                    THE COURT:  I thought you just said that.

4                    MR. KIRBY:  No.  No, ma'am.  No, ma'am.

5            The loan servicing agreement that they have with Compass

6        that will stay the way it is if they stay with Compass --

7                    THE COURT:  Is the exact contract that everybody

8        signed before.

9                    MR. KIRBY:  Yes.  And --

10                   THE COURT:  Warts and all.

11                   MR. KIRBY:  Yes.  Absolutely.  And the one --

12                   THE COURT:  And probably good parts and all.  There

13       may be something --

14                   MR. KIRBY:  That's right.

15                   THE COURT:  -- there to their advantage.

16                   MR. KIRBY:  And the designation form that they signed

17       with Vindrauga eliminates many of the illegal provisions and

18       takes the loan-servicing fee from three to one percent and

19       contains Vindrauga's promise that if the loan isn't paid off

20       and they have to foreclose, Vindrauga will buy them out in full

21       within 30 days after the foreclosure.

22                   THE COURT:  Okay.

23                   MR. KIRBY:  All important reasons why they might want

24       to change servicing agents.

25                   THE COURT:  Now, I sure don't see this designation of

1   servicing agent where it indicates that Vindrauga is a

2   subsidiary of DACA.

3            MR. KIRBY:  Does your Honor want me to file a

4   supplemental declaration with copies of the solicitations that

5   went out?

6            THE COURT:  That may be relevant.  We'll wait and see

7   what happens.

8            MR. KIRBY:  All right.

9            THE COURT:  Okay?

10            MR. KIRBY:  Because we certainly can.  And I know

11   because I, of course, reviewed those solicitations before they

12   went out, and I can represent to the Court personally that that

13   was done.

14            THE COURT:  Okay.

15            MR. KIRBY:  The point here -- and I'm trying to focus

16   as laser-like as I can on this issue that the Court's

17   identified, the 51 percent.

18       Are we going to have a process here where it's 51 percent,

19   no, we bought 2, now you've only got 49?  Oh, well, we bought

20   another 20.  Well, now we've got 73.  And this process

21   continues all the way down the line until a final hearing on

22   this motion?

23       Or does it instead work like this?  If 51 percent vote to

24   change the servicer, 2 percent can't undo that.  51 percent

25   have to undo that which means that Compass has to go out and

1   buy 51 percent.

2        Now, if Compass exercises its right to buy the 51 percent

3   and closes, then Godspeed to them.  All right?

4        But anything short of that what they're trying to do is do

5   an end run around that requirement.  They're trying to get away

6   with not paying 51 percent of the direct lenders their

7   principle and interest.

8        So do it the way that my client says it should be done --

9            THE COURT:  Now, but your clients bought some.  How

10  much do your clients hold?

11           MR. KIRBY:  My client holds I believe about 24

12  percent of the loan.

13           THE COURT:  24 percent.  You bought it full and

14  probably discount.

15           MR. KIRBY:  Absolutely, your Honor.

16           THE COURT:  Okay.  And then the rest of these people

17  you got designations for weren't paid anything.

18           MR. KIRBY:  That's right.

19           THE COURT:  Okay.

20           MR. KIRBY:  That's correct.

21       So do it the way and the procedure that we're suggesting,

22  and the motions are simple.  Did you have a right on the

23  petition date to change loan servicers, and did 51 percent

24  vote.  All right?  If those two things are true, and Compass

25  has the right to contest either one of them, then motion

1    denied, Compass.

2        But you say to Compass -- Compass doesn't need to be

3    reminded, but you can say, anyway, close 51 percent, purchase

4    51 percent, and then you're the loan servicer again.

5        And, your Honor, if you deny it because this is unclear

6    and because this issue was raised in a -- not even in a reply,

7    but a supplement to a reply.  If your Honor wants to stay the

8    effectiveness of her order denying this motion for a period of

9    30 days to let them close, then fine.

10       We recognize absolutely their right to buy up 51 percent

11   of this loan and designate themselves back as servicer, but

12   what we think is unfair and not beneficial to the direct

13   lenders who aren't my clients, but, nevertheless, the Court's

14   looking out for them, is that they can go in and cherry pick 2

15   percent, 10 percent, 30 percent like Mr. Blatt has and retain

16   control of the loan when 51 percent have voted to remove them

17   as servicer.

18       And that's all I'm saying, and that's what I wanted to

19   have a chance to say.

20           THE COURT:  Okay.  All right.

21       Response?

22       (Colloquy not on the record.)

23           MR. DAVIS:  Your Honor, I just want to remind you the

24   -- I don't know if -- well, I'm sure you do remember the hours

25   and hours and days of confirmation hearing that we had before

1    your Honor trying to deal with all of the objections to the

2    sale and the plan.

3        And I specifically recall Mr. Merola standing before your

4    Honor at the confirmation hearing and said, your Honor, guess

5    what?  Compass made a huge concession which will help

6    facilitate getting this plan confirmed.

7        They're still going to pay us the same amount of money,

8    the 67-some-odd million dollars that they agreed to pay, but

9    rather than require that they take these interests, that they

10   take the agreements free and clear of all monetary and

11   nonmonetary defaults, period, they have agreed to this concept

12   of a surviving Section 3 right.  Huge concession, Mr. Merola

13   described to your Honor.

14       The reason we did it is for this very reason, so that --

15   well, we did it because we didn't could get the plan confirmed,

16   but we did it in a context of the protections that were built

17   into the order surrounding the survival of that right, namely,

18   that it had to be on notice to us.  There had to be 30 days

19   notice.

20       The confirmation order expressly preserves our right to

21   purchase direct-lender interests, notwithstanding the exercise

22   of a surviving Section 3 right pursuant to Section 2(c)(3) of

23   the loan-servicing agreement.  And, most importantly, it also

24   provides that any attempted exercise is stayed until your Honor

25   enters an order finding that there is a subsequent servicer and

1    that it has been and is effective.

2         The fact is we purposely with complete input from the

3    creditors committees and with the debtor designed this process

4    for exactly the reason why we're here today.

5         Compass has gone out of pocket and purchased for over

6    $12,000,000 the interests of these parties.  The reason they

7    did it is because it wants to complete the process that it has

8    embarked upon in terms of resolving this loan, a loan for which

9    it purchased the right from these estates to be the servicer

10   for and the accrued servicing fees for which it has purchased

11   and paid real dollars to this estate.

12        Remember, these are loans that, you know, have been

13   serviced by a servicing company that has been accused of

14   significant wrongdoing and for which significant defaults were

15   alleged to have occurred.

16        We paid $67,000,000 to become the subsequent servicer so

17   that we could then service the loans, recover the amounts that

18   were accrued in terms of fees and, you know, and ultimately,

19   yes, make a profit.

20        But, importantly, the process that's in here was designed

21   to protect us against allowing a surviving Section 3 right.  It

22   was very, very carefully crafted.  It was negotiated for a long

23   period of time with the debtors and the committee, and it was

24   done for this very purpose.

25        We let it happen.  We let that right survive because we

1   knew that if someone attempted to exercise it, we had the right

2   to purchase enough interests from the lenders that wanted to

3   change servicer to stop it from happening to protect our

4   investment which is the $67,000,000 we paid to the estate.

5       That's exactly why the order is crafted the way it is, and

6   that's exactly why we have the right to do what we're doing,

7   and we will continue to come back to your Honor and do this for

8   every single time DACA tries to replace us as loan servicer.

9   We'll be back before your Honor with this very same point.

10      We're protecting our investment.  We've paid these people

11  dollars today, every dollar that they are due, 100 percent of

12  the principle, 100 percent of the interest, and they have the

13  money today.

14      DACA wants you to undo that and basically have these

15  people go back, let them be the loan servicer.  These people

16  will presumably have to forfeit their -- or return the money.

17      I'm not sure what would happen in that scenario.  I

18  haven't, frankly, given it much thought because I never thought

19  that -- I never conceived that it would be a possibility that

20  people would have to return the money that Compass has paid to

21  them.

22      But suffice it to say, this is -- that the process for

23  dealing with what DACA has been attempting to do for six months

24  prior to the closing date which is to replace us, again, by

25  purchasing interest at a discount and then promising to buy --

1    the interesting thing is if you look at their loan-servicing

2    agreement and the designation, they only agree to actually pay

3    and buy the interest of these people if the liens are bid in at

4    the foreclosure.

5        The reason is, your Honor, if the liens are bid in at the

6    foreclosure, they get a $215,000,000 property for the amount of

7    the debt.  Of course, that's the end game.

8        And when they say, you know, Compass has a three percent,

9    well, we -- or one percent or whatever it is, it is whatever

10   the contracts were that USACM and the direct lenders entered

11   into.  We haven't changed them.

12       And Vindrauga also as part of their solicitation has, you

13   know, given the option of lenders to pay them six percent

14   interest -- six percent servicing fee on the loan, and then

15   allowing the direct lenders I guess at that point to keep any

16   default interest and late charges that might be collected.

17       Your Honor, they have orchestrated this in a way --

18   there's another point that I want to bring to your Honor's

19   attention.

20       Your Honor will recall that in the confirmation order

21   there was another protection that we had, you know, asked for

22   and your Honor gave us which is any subsequent servicer can't

23   compromise, waive, or subordinate any of the fees that are due

24   to Compass and for which it purchased from the estate.

25       Essentially, the way this has been structured is to buy

1    these participation interests upon a successful foreclosure at

2    the principle plus the accrued nondefault interest, so that

3    they're structured in a way that effectively -- they will never

4    have to pay the default interest and late charges that would

5    come to Compass, anyway.

6        So, essentially, they've subordinated our -- attempted to

7    subordinate our right to default interest and late charges

8    through the contract that they're having these people sign.

9        It's wrong.  It violates your Honor's confirmation order.

10   You know, it is completely unfair considering the consideration

11   that's been paid by Compass, and we are fully within our rights

12   under the confirmation order in buying a sufficient number of

13   interests to prevent this very injustice from happening.

14       Thank you, your Honor.

15            THE COURT:  Okay.

16            MR. KIRBY:  Your Honor, just one minute.

17            THE COURT:  No.  I don't think so.  I won't consider

18   that last point about whether or not the -- what the new

19   contracts do, so you don't need your --

20            MR. KIRBY:  I had omitted one thing that --

21            THE COURT:  All right.

22            MR. KIRBY:  Thank you for your indulgence.  I'm not

23   going to respond to those remarks.

24       There's another issue which I neglected to mention because

25   I was so wrapped up in putting this 51-percent point across,

1    and that is there's a licensing issue now.

2        Mr. Davis will have to tell you that within the last --

3            THE COURT:  I don't see that in your opposition

4    anyplace, Counsel.

5            MR. KIRBY:  Licensing is briefed in the opposition,

6    your Honor, and this --

7            THE COURT:  I don't think you raised that as a --

8            MR. KIRBY:  Well, your Honor, within the last two

9    days, right, Compass has been served with a cease and desist

10   order by the Nevada -- state of Nevada.

11           THE COURT:  Where is that in your opposition?

12           MR. KIRBY:  My opposition wasn't filed less than two

13   days ago.

14           THE COURT:  So where's your supplement?

15           MR. KIRBY:  If your Honor isn't interested in whether

16   they're licensed, that's fine.

17           THE COURT:  Counsel --

18           MR. KIRBY:  The cease --

19           THE COURT:  -- I just don't appreciate let's come up

20   here -- oh, I forgot something, and you throw out these issues

21   at the last minute.

22       What are we supposed to do now?  I let counsel have

23   another half hour to respond to this?

24           MR. KIRBY:  Well --

25           THE COURT:  I then figure out what the legal issue

56

1    is?

2            MR. KIRBY:  Well, would your Honor enforce then her

3    policy about raising new issues in replies and supplements to

4    replies?  Because if so, we don't have anything to argue about

5    here.  Right?

6            THE COURT:  But what is --

7            MR. KIRBY:  They intentionally --

8            THE COURT:  I mean, I understand the like --

9            MR. KIRBY:  They intentionally sandbagged us on the

10   reply, and your Honor knows that.  So if there are two -- if

11   there's a double standard here, fine.

12       I'm saying -- and Mr. Davis can get up here and deny it.

13   Right?  I'm saying that within the last two days -- and I found

14   out about this yesterday afternoon.

15           THE COURT:  But they have the right to use an

16   out-of-state licenser.

17           MR. KIRBY:  Their out of -- their -- how does

18   your Honor know that?  I'm just saying they've been served with

19   a --

20           THE COURT:  Because they've told me that at a --

21           MR. KIRBY:  -- cease and desist order by the state of

22   Nevada --

23           THE COURT:  -- hearing that you probably weren't at.

24   That was at confirmation.

25           MR. KIRBY:  Apparently, the state of Nevada feels

1    differently, so I'm raising this.  If it's a matter of

2    indifference to the Court about whether they have a license --

3         THE COURT:  Counsel, I disapprove of that kind of

4    comment.  What do you mean indifference?

5    I'm trying to deal with the legal issues.  You've raised a

6    legal issue that you did not raise before.  If you want to

7    bring a motion, if it's relevant to something, then bring it.

8         MR. KIRBY:  All right.

9         THE COURT:  Don't tell me I'm indifferent.

10         MR. KIRBY:  Then what I'll do -- then what I'll do

11    since this is a matter that came up completely too late to

12    raise in any papers -- I found out about it yesterday afternoon

13    while I was -- an hour before I got on the airplane to come

14    here -- is I'll file a motion for reconsideration based on this

15    new matter, and we'll consider it.

16    And I was informing the Court of what I learned yesterday.

17    I sat there for five minutes while Mr. Davis testified about

18    all kinds of facts.  All right?

19    If that's the way that we need to do it, that's the way

20    we'll do it.

21    Thank you.

22         THE COURT:  All right.  I appreciate Mr. Kirby's

23    frustration about not understanding the process, and I think

24    what we need to do is clarify the order of confirmation.

25    From the order of confirmation and all that happened at

1  confirmation, it is apparent that we need to go back.  The

2  issue is whether or not these were executory contracts.  I've

3  found they weren't executory contracts.

4      The question was how, then, the assets were sold free and

5  clear of liens.  The question at confirmation became what does

6  that mean.

7      Arguably, selling free and clear of liens and claims could

8  mean that notwithstanding the severe default of USA Commercial

9  prepetition, the direct lenders would not have any rights to

10  change servicers postpetition.  None.  Period.

11      And when DACA bought its interest, it knew that that was

12  indeed possible.  However, at confirmation issues were raised,

13  is that appropriate, is it not.

14      And Compass agreed to a compromise.  It agreed to the

15  compromise that, all right, we will take subject to prepetition

16  defaults insofar as they relate to the servicing.

17      And I need to read that language because that's important.

18  Which pleading is that?  Oh, Compass is not -- there it is.

19      There was a surviving right, and that provided that "it

20  was free of all claims and interests and liens except "any

21  right that existed and was matured and exercisable as of the

22  petition date to effect a substitution to USACM as a loan

23  servicer under Section 3 as well as any defenses of the loan

24  servicer."

25      And then there was a procedure to determine this, and the

1    procedure expressly gave them the right to challenge that and

2    suggested there be a hearing to oppose it.

3        I think reading all this together and conceding that the

4    right to the contract includes the rights to buy loans on

5    behalf of the servicer, I believe the appropriate way to read

6    the plan is to hold that the one who effects to change the

7    service must have 51 percent approval of those who are loan

8    holders who are direct lenders as of the date of the hearing.

9    In essence, that becomes the record date.

10        Now, to make things easier in the future -- and this

11    hearing had a tortured history because of calender problems,

12    trying to get to the calendar -- I think the record date would

13    be, if you will, 30 days after the motion is filed.

14        That way you know if you think you have 50 percent,

15    they're going to go out and they know what the deadline is, and

16    you can go out and acquire some more as well.

17        But I think that establishes a procedure that takes into

18    account the compromise that was made but recognizes the right

19    of the servicers to change based upon this compromise.

20        It makes no sense to me to suggest that even if somebody

21    said, okay, I want to change servicer and they're now bought

22    out, what interests do they have anymore.  That's the anomaly.

23        I appreciate your frustration, Mr. Kirby.  You say, well,

24    I got my 51 percent.  But on the other hand, you now have the

25    loan controlled by people who didn't really have 50 percent as

60

1    of the day the change was made because they didn't own the loan

2    anymore.

3        And I think that's probably the way the law would work

4    under the state law.  That is, you would look at right before

5    the loan -- the new contract was signed with the new company.

6    Here we have this anomaly because we have this 30-day hold.

7        So the record date, if you will, will be 30 days after

8    Compass would file its motion regardless of when they hold the

9    hearing.  The hearing will be sometime after the 30 days, but

10   that will be the record date, if you will, and that solves that

11   issue.

12       I make no comments that may be a very legitimate concern

13   about whether or not they're not licensed.  My point is that's

14   not before me today.

15       If it's a valid concern, file your motion.  That is if

16   it's -- you know, I don't know what the effect is.  I don't

17   know what the Nevada licensing requirements are.  I don't know.

18   I have heard at one of these hearings that the servicers intend

19   to use a non-Nevada servicing agency.

20       I know the U.S. Supreme Court has certainly restricted

21   state regulatory actions as it relates to certain institutions.

22   Whether or not this would apply to these institutions I don't

23   know.  Those are all issues that are brand-new.

24       So that's the issue.  It seems to me that they have

25   conceded that, yes, there was a default such that if

1    Mr. Kirby's clients did have 51 percent as of today, then the

2    contract can be changed.  If --

3              MR. KIRBY:  Only one point of clarification, please.

4              THE COURT:  And I'll let you go investigate that.

5              MR. KIRBY:  I understand.

6        Does that mean that they have closed and have obtained the

7    assignments to take us under --

8              THE COURT:  Yes.  I think it means -- and then you --

9    maybe you can argue what the contract means, but my

10   understanding right now would be they have to have the

11   assignment.

12       If they have an argument that, well, the contract says

13   they've got to turn it over, that may be an issue, but that's

14   something you probably should look at and brief together first.

15             MR. KIRBY:  Thank you, your Honor.

16             THE COURT:  So that's my initial reaction.

17             MR. KIRBY:  Thank you.

18             MR. DAVIS:  Okay.  But there's no ruling --

19             THE COURT:  My initial reaction is it's --

20             MR. DAVIS:  No ruling today as to --

21             THE COURT:  -- actually have the assignments.

22       I'm willing to listen to their arguments based upon the

23   contract and what they have, but that's something that, you

24   know, is legal issues that you reserve the right -- you deserve

25   the right to respond to.

```
1            MR. KIRBY:  Thank you, your Honor.

2            THE COURT:  Okay.  Thank you.

3            MR. DAVIS:  Thank you, your Honor.

4            THE COURT:  All right.  So let's go next to

5    USA Commercial in the Reale and HMA matter.

6        (Colloquy not on the record.)

7            THE COURT:  Well, I'll tell you what.  Let's take a

8    two-minutes break so those of you that want to leave certainly

9    may.

10           MR. DAVIS:  Thank you, your Honor.

11           THE COURT:  You can change positions.

12           THE CLERK:  All rise.

13       (Court recessed at 10:42:45 a.m.)

14       (Court reconvened at 10:51:55 a.m.)

15           THE CLERK:  Bankruptcy court is now in session.

16           THE COURT:  Be seated.  Okay.

17       In the HMA Sales matter.

18           MS. LARSEN:  Cynthia Larsen representing Diversified

19   Trust Deed Fund.

20           MS. LORADITCH:  Good morning, your Honor.

21   Anne Loraditch of Beckley & Singleton, Chartered, Nevada

22   counsel for Diversified Fund.

23           MR. GERRARD:  Douglas Gerrard, Gerrard, Cox & Larsen,

24   on behalf of Mr. Reale.

25           MR. GORDON:  Gerald Gordon of Gordon & Silver,
```

1   proposed counsel to HMA Sales, LLC, a Chapter 11 debtor before

2   this Court.

3           MR. LANDESS:  Good morning, your Honor.

4   Jason Landess representing Great White.

5           MR. LANDIS:  Good morning, Judge.  Augie Landis,

6   Assistant United States Trustee.

7           THE COURT:  Okay.  And, Mr. Gordon, would you let

8   Mr. Garman know on that matter.  He wanted an emergency

9   hearing.

10          MR. GARMAN:  I'm right here, your Honor.

11          THE COURT:  Oh.

12          MR. GARMAN:  Hiding.

13          THE COURT:  Hiding behind the computer.

14          MR. GARMAN:  Excuse me, your Honor.

15          THE COURT:  Friday's not going to work.  Friday I'm

16  in sessions all day.  Maybe Thursday.  Maybe Monday.  I'd

17  prefer you avoid it if at all possible, but Friday will not

18  work, so I'll let you -- I'm waiting to hear back what my

19  responsibilities are on the 17th.  Maybe the 21st.

20          THE CLERK:  Did you want that telephonic, Judge?

21          THE COURT:  It's going to have to be.  I mean, I'm

22  not here.

23          THE CLERK:  (Indiscernible) --

24          THE COURT:  You know what?  Let's just do it the 21st

25  at -- can you do it at 8:30?

```
 1              MR. GARMAN:  Sure.

 2              THE COURT:  Is that a problem for here, Eileen?

 3              THE CLERK:  I don't think so.

 4              THE COURT:  Okay.  I mean, I know you're not here,

 5    so --

 6              THE CLERK:  On the 21st?

 7              THE COURT:  -- no, it's no problem at all.

 8              THE CLERK:  The 21st, right?

 9         (Colloquy not on the record.)

10              THE COURT:  Oh, you are.  Okay.  So does 8:30 work

11    okay?

12              THE CLERK:  That's fine.

13              THE COURT:  Okay.  So we'll do it the 21st at 8:30.

14              MR. GARMAN:  Okay.  Thank you, your Honor.

15              THE COURT:  And I'll let you know.  I might be able

16    to use somebody's chambers.  All right.  Okay.

17         Go ahead.

18              MR. NEVINS:  Excuse me, your Honor.

19              THE COURT:  Uh-huh.

20              MR. NEVINS:  This is Howard Nevins.

21              THE COURT:  Sorry.  Appearances on the telephone.

22    I'm so sorry.

23              MR. NEVINS:  Howard Nevins of Hefner, Stark & Marois,

24    Sacramento, California, appearing for defendant National Real

25    Estate Holdings.
```

1          THE COURT:  Okay.

2          MR. NEVINS:  Thank you.

3          THE COURT:  Part of the reason of one of these

4    matters is because I was unclear.  When the injunction came, I

5    had disapprovals, but I had no objections actually filed by

6    anybody.

7      I understand from my clerk that Mr. Gerrard was willing to

8    go along with the injunction, but I'm just trying to understand

9    what -- on the injunction order where we are and if there are

10   disapprovals and if there's a formal order we can agree to in

11   the interim.

12         MS. LARSEN:  Your Honor, just one point of

13   clarification.  Mr. Sylvester is willing to go along with the

14   writ-of-attachment order against USREG (phonetic).  He was not

15   affected by the -- his client was not affected by the

16   preliminary-injunction order.

17         THE COURT:  Okay.  So you can resubmit that one,

18   then, if it's --

19         MS. LARSEN:  Yes.  It has been --

20         THE COURT:  -- not there.

21         MS. LARSEN:  -- uploaded already.

22         THE COURT:  Okay.  Thank you.

23         MR. GERRARD:  Your Honor, let me just address that.

24   What I had indicated to your deputy court clerk is that we had

25   no problem with the writ-of-attachment order.  Ms. Larsen made

1    the changes that we felt were appropriate to it.

2        We continued to have disagreement over the language of the

3    preliminary-injunction order, the reason being that there were

4    really -- there was this outstanding issue that your Honor had

5    raised at the last hearing with respect to, you know, the

6    overreaching nature of going out and serving this on

7    nonparties, and then the language that followed therefrom which

8    your Honor indicated you had a problem with and wanted to see

9    some subsequent legal authority, and some was provided by

10   Mr. Larsen and Ms. Loraditch.

11            THE COURT:  But it wasn't filed.

12            MR. GERRARD:  I don't know if they filed it or not.

13   I'm just saying I know I saw something.

14            THE COURT:  Okay.

15            MR. GERRARD:  I can't speak to whether they submitted

16   it to the Court.

17            MS. LORADITCH:  (Indiscernible).

18            MS. LARSEN:  Your Honor, it was filed with the Court.

19            THE COURT:  Was it filed in the Reale case or --

20            MS. LORADITCH:  It was electronically filed

21   April 25th.

22            THE COURT:  In which case?

23            MS. LORADITCH:  The adversary 01256.  It's entitled

24   Plaintiff's Memorandum of Authorities Regarding Application of

25   Federal Rule of Civil Procedure 65(d) to Nonparty --

1          THE COURT:  I just looked yesterday and didn't see

2    it.  I might have just overlooked it.  I apologize because I

3    looked, and I didn't see it.  All right.

4          Go ahead, in the meantime.

5          MR. GERRARD:  Well, your Honor, I did see what they

6    submitted.

7          THE COURT:  Okay.

8          MR. GERRARD:  And I did read the couple of cases that

9    they cited.  And although in those cases it was permitted that

10   there be some service on outside financial institutions, there

11   was nothing in the language of those cases that allowed what

12   they have proposed to do in this case.

13         And I told Ms. Larsen that, you know, in some E-mails that

14   I sent back and forth to her and some conversations that I had

15   with her that because your Honor was willing to give us that

16   expedited trial setting and you made that one of the conditions

17   to, you know, the minimal amount of the bond that was required

18   and to granting the injunctive relief to begin with.

19         Because your Honor had done that, I told Ms. Larsen we

20   will not object to your going out and serving the third-party

21   financial institutions because we're only talking about a

22   matter of a few weeks now before our trial date.

23         However, the second part of what she put into her language

24   of the order as your Honor may recall, and I'm sure you have it

25   in front of you, it also says that once this is served, that

1    each of these financial institutions is authorized and ordered

2    to confirm in writing to Cynthia Larsen at her fax number and

3    her address the identity and balance of any deposit accounts

4    and the description and estimated value of any other assets of

5    an enjoined defendant held by it.

6        And I just explained to Ms. Larsen, I said that is so

7    overreaching.  What you're essentially doing --

8            THE COURT:  Now, is this one I actually then signed

9    or is it -- I had understood that you had no objection, so I

10    did sign one order, but the injunction --

11            MR. GERRARD:  No.  You --

12            THE COURT:  -- has not been signed.  Right?

13            MR. GERRARD:  No.

14            THE COURT:  Right.

15            MR. GERRARD:  This order you did not sign.

16            THE COURT:  Okay.

17            MR. GERRARD:  This is the one we marked as

18    disapproved.

19            THE COURT:  Okay.

20            MR. GERRARD:  The other one you entered, the

21    writ-of-attachment order, was entered.

22            THE COURT:  Okay.

23            MR. GERRARD:  And, your Honor, what I explained to

24    Ms. Larsen is the same thing I'm telling your Honor now.  Even

25    if your Honor was willing to allow them to go well beyond what

1     I think is normally allowed in serving third parties, to

2     suggest that they can circumvent all the discovery rules and to

3     simply serve this thing upon any financial institution they

4     want, and then that financial institution is supposed to report

5     back to them any personal information on any accounts that my

6     client might have had at that institution without my client

7     even having notice of it is just ridiculously overreaching.

8         And I explained to Ms. Larsen there's no basis for that.

9     The Court never ordered that, and, in fact, your original

10    motion never even requested that.  It's just what you put in

11    the order.

12        And so I said I cannot agree to that.  I said even if I'm

13    willing to overlook this serving on the third-party banks

14    because of our short time before the trial, I cannot overlook

15    this.

16        They could take that and serve it on anybody anywhere and

17    have that person report back to them financial information or

18    personal information to my client, and we would never even

19    know.

20        I mean, it completely circumvents all the discovery rules

21    and all the rules with respect to writs of attachment even, you

22    know, prejudgment or postjudgment, and I just said it's so

23    overreaching I just cannot allow that to go forward.

24        So that's the reason I asked her to mark disapproved from

25    me on the preliminary-injunction order because I just couldn't

1    go that far.

2        The other thing that we did work out, your Honor, that I

3    just want to make note of is that -- and this related to the

4    injunction and the attachment.

5        The attachment order they were saying they could attach up

6    to 9.9 million dollars of property because that's the amount my

7    client received from the sale of the Royal Hotel.

8        And what we said is the injunction is already enjoining,

9    you know.  At least we know of one bank account that has

10    six-and-a-half-million dollars in it.

11        So in that writ of attachment you need to reduce that

12    amount from 9.9 million to the difference between the

13    six-and-a-half million that's in the bank account, right, and

14    the 9.9 million because you can't go above that.  That's the

15    maximum amount of your claim against my client.

16        And we were able to work something out on that, so I don't

17    want to make it sound like they are totally unresponsive to the

18    things that we had requested, but I still think this is so

19    overreaching.

20            THE COURT:  Okay.  Mr. Landess, any additional --

21            MR. LANDESS:  I'll just --

22            THE COURT:  -- comments?

23            MR. LANDESS:  I'll just --

24            THE COURT:  Because you disapproved as well.

25            MR. LANDESS:  I'll just add a footnote to what

1    Mr. Gerrard had to say.  I join in exactly his point with

2    respect to the information that she's seeking, and there's a

3    very good reason why, and I'll leave this to Mr. Gordon, and

4    he'll amplify on this.

5         The parties haven't had a 26(f) conference in this.  And

6    so when you're trying to seek information from anyone, as you

7    know under 26(d), it says that a party is prohibited from

8    seeking discovery from any source, this is just a disguised

9    subpoena, if you will.

10        And they can't until we've -- at least until we've had a

11   26(f) conference seek information from any source, and they're

12   prohibited by 26(d) until that occurs.

13        Thank you.

14             THE COURT:  Okay.  Mr. Gordon, I guess you had a

15   comment first?

16             MR. GORDON:  Your Honor, and I don't mean to throw a

17   wrench in all this, but --

18             THE COURT:  Well, let me deal with this order first,

19   and then --

20             MR. GORDON:  But --

21             THE COURT:  -- let's deal --

22             MR. GORDON:  But the order --

23             THE COURT:  -- with the other issue.

24             MR. GORDON:  But, first, let me raise it in this

25   context.

1    THE COURT:  Well, you didn't even respond.

2    MR. GORDON:  No.  But let me raise it in this

3  context, and don't yell because we're going to try to have a

4  solution to this.

5    HMA filed bankruptcy yesterday evening.  HMA has filed an

6  answer and cross-claims to the second amended complaint.  We

7  filed that also after we filed the petition last night.

8    I will tell the Court, as the Court is aware, given that

9  HMA is a defendant in this action -- and I'm just going to

10  throw this out -- part of our concern is is that there is an

11  automatic stay now in place with regard to all matters

12  involving HMA.

13    We filed our answer knowing that because it's not our

14  intention --

15    THE COURT:  Well --

16    MR. GORDON:  -- (indiscernible) --

17    THE COURT:  -- I wanted to deal with this after I got

18  this order satisfied.

19    MR. GORDON:  I just want that issue in place.  That

20  there is a concern by us, though we support the motion -- the

21  position taken by Diversified with regard to the discovery, but

22  we need then to address the more important issue of the

23  overarching issues.

24    THE COURT:  I understand that.

25    MR. GORDON:  Thank you.

1    MS. LARSEN:  And, your Honor, first, I'd like to

2   point out that there were no formal objections filed to our

3   proposed order as required --

4        THE COURT:  But why are you putting things that

5   weren't discussed at the hearing in orders?  You were warned

6   against that the last time.

7        MS. LARSEN:  Well, your Honor, you're mistaken about

8   this.  Can I just -- can I explain?

9      At the last hearing, your Honor indicated that you wanted

10  us to provide authority for the provisions that were in the

11  order with respect to service of the preliminary injunction on

12  banks within 48 hours which we did.

13     Those authorities make it quite clear, and I believe

14  that's why we are not hearing any objection this morning to the

15  service on banks, that what we had proposed was completely

16  permissible and, in fact, what Rule 65 envisions.

17       THE COURT:  But you never ask in your motion to go

18  farther about the identity and balance of deposit accounts.

19       MS. LARSEN:  Your Honor, that's what this proposed

20  order has said all along.  That's what it said the last time.

21       THE COURT:  You didn't say it --

22       MS. LARSEN:  There was no objection.

23       THE COURT:  -- in the motion.

24       MS. LARSEN:  Your Honor, there was no objection to

25  that specific provision of it --

1          THE COURT:  Where was that --

2          MS. LARSEN:  -- when the written objections --

3          THE COURT:  -- in your original motion?

4          MS. LARSEN:  That was in the TRO.  That goes way

5     back, your Honor.  When you entered the TRO that was way back

6     in January --

7          THE COURT:  That the banks had to identify the

8     balance of deposit accounts, the description and estimated

9     value of other assets?

10         MS. LARSEN:  That's been in the TRO.  That has been

11    in place from the very beginning, and the reason that that's

12    important, your Honor -- well, it's obvious that you can't

13    enforce a preliminary injunction without knowing.

14      Moreover, there's case law.  And since this wasn't a basis

15    for any written objection or any objection at all until after

16    the last hearing --

17         THE COURT:  But they --

18         MS. LARSEN:  -- on the 23rd --

19         THE COURT:  But they talked to you about it.

20         MS. LARSEN:  They did, and that's -- and here I am

21    with authority as to why that specific language requiring the

22    banks to indicate what they're holding if they do, in fact,

23    have an account or assets of the enjoined defendants is

24    permissible.

25      Reebok versus Marnatech, 737 F. Supp. 1521, as part of the

1    preliminary-injunction order, statements were to be provided to

2    the --

3              THE COURT:  Did you ask --

4              MS. LARSEN:  -- moving entity.

5              THE COURT:  -- for that in your motion for

6    preliminary injunction?

7              MS. LARSEN:  Yes, we did.

8              THE COURT:  Okay.  So show me where motion for a writ

9    of -- approval of procedures.  I don't know why you're calling

10   it a motion for approval of procedures.  Writ of attachment,

11   partial summary judgment -- which docket number is it?  Do you

12   know?

13             MS. LARSEN:  No, I don't, your Honor.

14             THE COURT:  I mean, I -- you may not know offhand.

15             MS. LARSEN:  No, I don't.

16             THE COURT:  Does anyone know?

17             MS. LARSEN:  Your Honor, at the last hearing, you

18   specifically indicated we could leave that frivolous provisions

19   in the order, and I can cite you the transcript on that, and

20   I'd be happy to do that.

21             THE COURT:  All right.  Show me the transcript.

22             MS. LARSEN:  Okay.  Your Honor, you said on page 87

23   of the transcript of the hearing on April 23rd, 2007 --

24   Mr. Gerrard said, "We would request that your Honor strike the

25   language" -- this was the language about service on the

1    banks -- "the whole paragraph, and they can submit a subsequent

2    order later on."

3        The Court said, "Let's do this.  This order is already in

4    effect.  There aren't major changes in this -- in the

5    injunction.  We'll leave it in place.  But unless they supply

6    me with -- excuse me -- cases within two business days that

7    show that the paragraph is appropriate, that will be stricken.

8    And in the meantime, they're ordered not to serve that

9    injunction on any banks," and we did that.

10        THE COURT:  But show me in the prior injunction where

11    the order is about the identity that each institution is

12    ordered to confirm in writing by a facsimile the identity and

13    balance of any deposit account.

14        MS. LARSEN:  Are --

15        THE COURT:  Show me the part --

16        MS. LARSEN:  Are --

17        THE COURT:  -- where it says that.

18        MS. LARSEN:  Are you talking about in the initial TRO

19    or in the --

20        THE COURT:  In any of the orders.

21        MS. LARSEN:  It is clearly in there, your Honor.  I

22    didn't believe that this was going to be at issue, so I don't

23    have a copy of the TRO at hand --

24        THE COURT:  Do you --

25        MS. LARSEN:  -- but I do happen to --

1          THE COURT:  Was it in there, Mr. Gerrard?

2          MR. GERRARD:  No, your Honor.  It --

3          THE COURT:  I sure as heck don't remember --

4          MR. GERRARD:  What --

5          THE COURT:  -- seeing this.

6          MR. GERRARD:  What was in the order that we

7   stipulated to -- because you remember this was a stipulation

8   where we agreed to keep this in place for a period of time to

9   allow an evidentiary hearing to take place and some discovery

10  be done before that.

11     And what we did is we identified a specific account --

12          THE COURT:  Right.

13          MR. GERRARD:  -- the one that the 6.7 million dollars

14  was it, and we said they could confirm that specific account.

15  That's what we agreed to.  That's all that we agreed to.

16     And with respect to what happened at the last hearing, you

17  just heard Ms. Larsen read what actually happened.  Your Honor

18  had a problem with that entire paragraph.

19     And they were to provide some legal authority that

20  supported their position within 48 hours.  What they provided

21  within 48 hours said nothing about the right to ask banks to

22  provide information back to them about what was contained in

23  the accounts.

24     What they provided was a couple of cases that said that in

25  those cases the Court thought that it was appropriate to allow

1   them to serve the injunction on some banks.

2           THE COURT:  Yeah.  And the problem here is you didn't

3   give me a courtesy copy, so I didn't realize you had even filed

4   it.

5           MS. LARSEN:  No.  We did provide a courtesy copy.

6           THE COURT:  I never got it.

7           MS. LARSEN:  Ms. Loraditch provided it.

8           MS. LORADITCH:  Your Honor, we did send it over.  I

9   don't have the run slip.  I'm happy to send that over later

10  today, but we did send a courtesy copy because we were aware of

11  the time deadline and your Honor's concern that we get that

12  over within the two business days.

13          MR. LANDESS:  And, your Honor, you might recall the

14  original temporary restraining order --

15          THE COURT RECORDER:  I'm sorry, Counsel.  I need you

16  to --

17          MR. LANDESS:  -- that you (indiscernible) --

18          THE COURT RECORDER:  -- speak into a microphone --

19          THE COURT:  You need to -- wait, wait, wait.

20          THE COURT RECORDER:  -- please.

21          THE COURT:  You need to be at a microphone,

22  Mr. Landess.

23          MR. LANDESS:  Your Honor, you might recall the

24  original temporary restraining order.  The reason that I

25  believe your Honor took umbrage with this whole thing was

1    because in the original temporary restraining order that was in

2    effect, it was explicitly crossed out, the paragraph with

3    respect to service upon the financial institution.

4              THE COURT:  Oh, that's right.

5              MR. LANDESS:  And so I can't imagine how they can

6    stand here and say that that language was in the original order

7    when that was explicitly crossed out.

8              MS. LARSEN:  Your Honor, it was in the original order

9    that was --

10             THE COURT:  Somebody give me a copy of the order

11   you're talking about.

12             MS. LARSEN:  Your Honor, I did not bring that order

13   with me today.

14             THE COURT:  All right.  Well, then, we'll take a

15   recess --

16             MS. LARSEN:  We'll --

17             THE COURT:  -- and go --

18             MS. LARSEN:  We'll be happy to provide it.

19             THE COURT:  -- pull it off.

20             MS. LARSEN:  Okay.

21             THE COURT:  Tell me what docket number it is and pull

22   it off.

23        We'll take a recess.

24             THE CLERK:  All rise.

25        (Court recessed at 11:09:14 a.m.)

1          (Court reconvened at 11:21:09 a.m.)

2               THE CLERK:  Bankruptcy court is now in session.

3          (Colloquy not on the record.)

4               THE COURT:  All right.  Be seated.

5          (Colloquy not on the record.)

6               THE COURT:  All right.  I see the temporary

7     injunction that I issued, and it did have the provision that

8     each institution was authorized to confirm the identity and

9     balance of any account.

10              MR. GARMAN:  Is that the one, your Honor, that was

11    entered without notice at the very beginning of the case?

12              THE COURT:  No.  This is the one entered April 17th.

13              MR. GARMAN:  Oh, okay.  So that's the one that you

14    entered --

15              THE COURT:  That --

16              MR. GARMAN:  -- just the interim without us ever

17    having an opportunity to -- that was just their order that --

18              THE COURT:  Right.  And then we argued about it.

19              MR. GARMAN:  Right.  That's the order they just

20    submitted through.

21              THE COURT:  And I guess Ms. Larsen's claiming you

22    didn't specifically object to that aspect of the order.

23         Is that what you're claiming?

24              MS. LARSEN:  That's correct, and I can give you the

25    citations as to where he did not object and what the issue was.

```
1              THE COURT:  But you're not claiming it wasn't in the
2    -- you're not claiming it was in the prior order.
3              MS. LARSEN:  Me?  I'm claiming it was in the
4    temporary restraining order, and that's the stipulated one, and
5    that's what's going to be coming in --
6              MR. GERRARD:  No.
7              MS. LARSEN:  -- here momentarily.
8              MS. LORADITCH:  (Indiscernible).
9              THE COURT:  So which docket number is he -- so you
10   claim it was in the temporary restraining order.
11             MS. LARSEN:  Yes.  (Indiscernible).
12             MS. LORADITCH:  The stipulated order is Docket
13   No. 19.  Mr. Landess just went up to run off a copy, and then I
14   have my runner coming over with copies for your Honor if you
15   need one as well.
16             THE COURT:  Okay.  There's a stipulated that says,
17   "The institution shall confirm the amount on deposit."
18             MR. GERRARD:  And we talked about a specific
19   identified account.  It's even I think a defined term, and you
20   have the advantage because I don't have it in front of me, but
21   that's my recollection, your Honor.
22             THE COURT:  Yes.  The identified account --
23             MS. LARSEN:  And --
24             THE COURT:  -- and that was a defined term.
25             MS. LARSEN:  And it was identified by the banks.
```

1          THE COURT:  Okay.  So now you've expanded it to say

2     any deposit account.

3          MS. LARSEN:  Well, where there is an account.  If

4     they have --

5          THE COURT:  But where did you ask that it be any

6     account as opposed to the identified account?

7          MS. LARSEN:  Well, it's the same thing.  If you

8     look --

9          THE COURT:  Where in your motion did you ask for the

10    identified account?

11         MS. LARSEN:  Oh, your Honor, that is -- the accounts

12    that they would be giving us information about would be the

13    accounts identified as that account holder's account.

14         THE COURT:  Well, where -- all right.

15         MS. LARSEN:  It can't work any other way.

16         THE COURT:  Let's skip whether or not you added this

17    or not.  Where do you have the authority to circumvent the

18    discovery orders as opposed to them just confirming they've got

19    an account?  But you're asking them to go beyond.  You're

20    asking them to go on and identify any other deposit accounts.

21         MS. LARSEN:  Yeah, any accounts they're holding

22    subject to the preliminary injunction.  That's correct.

23         And that would be one authorized pursuant to the

24    preliminary powers of this Court to enforce its preliminary

25    injunctions.  It's also authorized pursuant to the case that I

1    just gave you.

2        And in addition to that, your Honor, when there were

3    objections raised -- and I can read you the portions of the

4    transcript by your Honor, not by Mr. Gerrard -- as to that

5    provision of the order, your point was does Rule 65 permit the

6    order to be served on banks, and I'll read you the portions of

7    this transcript --

8            THE COURT:  Right.  I never --

9            MS. LARSEN:  -- because I just looked them up.

10           THE COURT:  -- looked at the -- I never thought about

11   the discovery aspect you were doing in the second part of the

12   order.

13           MS. LARSEN:  And --

14           THE COURT:  I --

15           MS. LARSEN:  And --

16           THE COURT:  -- was not focused on that.

17           MS. LARSEN:  And neither was it raised by

18   Mr. Gerrard, and neither to this time has it been raised in any

19   written --

20           THE COURT:  All right.

21           MS. LARSEN:  -- objection.

22           THE COURT:  I'll take the matter under submission.

23   I'm sincerely suspect about it.

24       Would you respond to her points and authorities,

25   Mr. Gerrard.

1          MR. GERRARD:  Your Honor, I will if you'd like me to.

2     There's really no points and authorities that I would submit

3     because it's based upon what happened at the hearing.  It's not

4     based upon any authorities, per se.

5          What she's saying is, in essence, we believe we have the

6     right to put this in the order because it wasn't objected to at

7     the last hearing, and that's simply not the case.

8          She read you the part of the transcript where your Honor

9     said that whole paragraph was a problem, and we agree that it

10    was a problem.  It was discussed at the last hearing, and so

11    they were supposed to provide some legal authority within 48

12    hours.

13         They did provide some legal authority.  It didn't go to

14    this issue, within 48 hours.  There's nothing that --

15         THE COURT:  Okay.

16         MR. GERRARD:  -- allowed them to do this.

17         And in the prior order which your Honor has now looked at,

18    we did give them permission to get confirmation about that one

19    specific account, and that's all we agreed to.

20         And so I can supplement if you'd like me to.  I don't

21    really find it necessary.

22         THE COURT:  You know, you're right.  On second

23    thought, this clearly goes beyond -- you know, you -- assuming

24    for the moment -- and I apparently missed the authorities that

25    came in.  When I looked the other day, they were filed earlier,

1    and I guess I thought they were, and I missed them, and I don't

2    recall ever seeing a courtesy copy, but that's -- I'll take the

3    blame for that.  I'll look at that.

4         But in any case, I'm not going to order a preliminary

5    injunction that they confirm any other accounts.  You do that

6    through discovery.

7         You've cut so many corners.  I can't get you to follow

8    procedures.  You know, you've got to follow procedures.  It

9    doesn't belong in the injunction.  Enough.

10             MS. LARSEN:  Well, your Honor --

11             THE COURT:  It doesn't belong in an injunction.

12             MS. LARSEN:  I --

13             THE COURT:  You --

14             MS. LARSEN:  You haven't seen any authority --

15             THE COURT RECORDER:  I'm sorry, Counsel.

16    (Indiscernible) --

17             THE COURT:  It doesn't --

18             THE COURT RECORDER:  -- please.

19             THE COURT:  -- belong in an injunction.

20             MS. LARSEN:  Well, would you look at the case that I

21    cited you, your Honor?  At least look at that before you

22    (indiscernible).

23             THE COURT:  I will.

24             MS. LARSEN:  Thank you.

25             THE COURT:  And it better deal with that

1    specifically.  All right.

2         Now, on the trial schedule issues.

3         Oh, I assume there's no use for a settlement conference?

4    I mean, you're still not prepared, Mr. Gordon, for a settlement

5    conference?

6              MR. GORDON:  Oh, no, no.  We talked to Mr. Gerrard.

7    We think that is now appropriate.

8              THE COURT:  Oh, you do.  Okay.

9              MR. GORDON:  Yes, yes.  And may I explain --

10              THE COURT:  Um-h'm.

11              MR. GORDON:  -- where we are in -- again, your Honor,

12    I am going to try to lay something out to the Court as what we

13    think where we would suggest this goes, and I'm not being

14    confronting with anyone or adversarial.  We just need to

15    represent the interest of HMA.

16         As I stated before, at this moment technically, and I use

17    the word "technically", there is an automatic stay in place.

18              THE COURT:  Right.

19              MR. GORDON:  One of the reasons we filed the HMA

20    bankruptcy was in looking at our trial which is set to go on

21    June 4th, we have Diversified as a plaintiff seeking

22    constructive trust against all the proceeds that HMA received

23    from the sale of the Royal Hotel, and that would include all

24    the moneys that have already been distributed and whatever else

25    we have that would come into the estate.

1        Prior to the bankruptcy, we were able to conclude the

2    payoff of Liberty Bank.  We stayed within the terms of the

3    stipulated order that was entered in this adversary which

4    allowed us to conclude that transaction.

5        We attempted to also conclude the sale of the Liberty

6    accounts receivable to the buyer of the Royal Hotel.  But given

7    unsecured creditors and other issues, it just was not possible

8    to conclude that.  We hope that we will be able to conclude it

9    in the bankruptcy and what I, as I said to the counsel for the

10   buyer, and not deal with some of the clutter.  We're waiting

11   for a response now.

12       But we put it in into Chapter (indiscernible) both to deal

13   with that issue and also primarily, again, the trial.

14       In addition to the constructive trust, Diversified has a

15   claim against HMA for 13,670,000 for conversion.  In addition

16   to that, they are pursuing various fraudulent transfer actions

17   both under state law NRS 112 and also under Sections 548 and

18   550.  Obviously, with the filing by HMA, we take those rights.

19       Mr. Reale a couple days ago filed an extensive answer,

20   counterclaim, and cross-claim.  Without going into all the

21   various causes of action, in the fourth cause of action

22   Mr. Reale is seeking constructive trust against HMA, and in the

23   sixth cause of action he is seeking what, in essence, is a

24   declaration that HMA, Diversified, USAIP, USAIP Investor IV,

25   USACM, and Mr. Hantges, and Mr. Milanowski are all alter egos

1    of each other, and, therefore, HMA is liable to Mr. Reale for

2    all claims he may have against any of them.

3         On top of that, we have a jury demand which was filed by

4    Mr. Reale back on January 29, '07, which has not been dealt

5    with, and we have -- from Great White we have a motion to

6    withdraw the reference which is now apparently processing or is

7    pending before the district court, and we have as alluded to or

8    stated by Mr. Landess an objection to any discovery going

9    forward on the basis there has not been a Rule 26 meeting.

10        We filed an answer and certain cross-claims, and we've

11   asserted fraudulent transfer.  For instance, we've asserted

12   unjust enrichment, those various items against Mr. Reale,

13   Great White, the media transferees from Great White,

14   USA Commercial Real Estate, not all the parties, just those

15   that we felt whoever was appropriate.

16        And bottom line is no discovery has been really conducted,

17   and we have a trial date of June 4.  We're just simply not

18   prepared nor do I think anyone is, in essence, prepared to go

19   to trial on June 4 given that no discovery basically has been

20   done.  We have all these issues.

21        In fact, we will be filing an answer, a response to

22   Mr. Reale answer, and I think is scheduled for the 24th.

23   Answers to our cross-claims aren't due until the 25th or 26th,

24   so we have a -- we're in a quagmire.

25        And I appreciate what the Court said previously to me in

1    terms of where she was in terms of her sensitivity with regard

2    to that trial date.

3          THE COURT:  And my concern is this.  And, look, I

4    recognize -- and everybody did, too -- that these are

5    complicated issues, and it's an aggressive trial schedule.

6        But the problem is that Diversified is being so very

7    aggressive in the amount it seeks to an injunction attachment,

8    and it is not -- based upon the case it has at this stage --

9    fair to continue that, and Mr. Gerrard wanted the trial early.

10          MR. GORDON:  May I --

11          THE COURT:  That's where --

12          MR. GORDON:  May I --

13          THE COURT:  -- we are and why we are.

14          MR. GORDON:  May I propose what I think is the

15    solution, and that is -- may I approach the bench?  We filed --

16          THE COURT:  Well --

17          MR. GORDON:  -- this this morning.

18          THE COURT:  -- you could propose all day you want,

19    but I want to know what everybody else thinks.

20          MR. GORDON:  Well --

21          THE COURT:  If everybody else doesn't agree to it --

22          MR. GORDON:  -- let me put a proposal out, and then

23    everyone can --

24          THE COURT:  Not on my time you're not.  Talk to

25    everybody else first.

1           MR. GORDON:  Well, I've spoken to Great White, and

2    they don't have a problem with continuing the trial date.

3           THE COURT:  Okay.  But Mr. Gerrard is kind of the

4    big --

5           MR. GORDON:  And --

6           THE COURT:  -- (indiscernible).

7           MR. GORDON:  And that's where my solution, my

8    proposal is --

9           THE COURT:  Okay.

10          MR. GORDON:  -- if I could have -- okay.

11       May I approach the bench?

12          THE COURT:  All right.  Is this what you just filed

13   yesterday --

14          MR. GORDON:  No.  This was --

15          THE COURT:  -- or just now?

16          MR. GORDON:  -- filed this morning.  It was intended

17   to be --

18          THE COURT:  Yeah.  I have a copy of that.

19          MR. GORDON:  -- filed yesterday, but I did not get

20   it.

21          THE COURT:  We downloaded that.  Thanks.

22          MR. GORDON:  Okay.

23          THE CLERK:  We have it.

24          MR. GORDON:  Okay.  Your Honor, one of the causes of

25   action we've also sought in our answer and cross-claim is

1   injunctive relief against Mr. Reale releasing his funds, and we

2   feel that we have a better cause of action to cause Mr. Reale

3   to enjoin.

4        And our belief is -- and I won't go into the merits of it.

5   We believe that just simply based on his answer that he's filed

6   and his statements that we have we can establish a prima facie

7   case and meet the standards for preliminary injunction.

8        What I would propose is that the Court adopt -- set off

9   the trial by 90 days.  There's no way that we can see where it

10  can be bifurcated, allow Diversified to try its claim against

11  Mr. Reale without -- it just can't be because it's basically a

12  constructive-trust theory that they're establishing against

13  Mr. Reale.  And if they win, then we have no assets in this

14  estate, so it goes to the very merits of what HMA's estate is.

15       On the other hand, we are prepared, your Honor, to file

16  our own motion for preliminary injunction late this afternoon

17  or Monday, and what we would propose is is that what the Court

18  do hear since it has time on June 4th and 5th is the

19  preliminary-injunction hearing.

20       And if the Court finds that there's prima facie standards

21  to continue to enjoin Mr. Reale's money, that it do so, but

22  that the trial on the merits be put off.

23       What the Court has done is is entered a TRO.  It's made

24  certain findings to continue the TRO, but it really hasn't

25  conducted a trial and evidentiary hearings with regard to the

preliminary injunction, and that's what we would propose.

As long as you have the time, we're prepared to go forward on that day. We appreciate what the Court said, and that does not affect Mr. Reale at all because he's already going to trial on -- he already knows his money is enjoined until June 4th or 5th.

And we understand the standards for a preliminary injunction. We believe that we can meet it. If we can't, then the Court releases the injunction for the funds and we go to trial on a normal trial schedule, though, what we have proposed is a very aggressive one through the first week of September with various dates.

Now, obviously, these dates we proposed we can play with them a couple days here or there, but what we're trying to do is say, look, everyone, we're prepared to go forward very quickly, get discovery done, disclose experts, do all those things as required under the federal rules to get prepared to go to trial and go to trial.

In the meantime, we're prepared -- and we've told Mr. Gerrard. We feel now we have a pretty good handle on Mr. Reale's overall issues involving USAIP and the other entities where he's claimed a security interest involved with USAIP, and we feel that while you're gone and before June 4th we can go to a settlement conference before Judge Markell.

We feel comfortable enough now that we understand where he

1    lies, where Diversified.  We're not comfortable enough to go --

2    to start doing evidentiary proofs at a trial, but we feel

3    comfortable --

4                THE COURT:  Okay.

5                MR. GORDON:  -- we can participate.

6                THE COURT:  Now --

7                MR. GORDON:  That's our suggestion, and we hope

8    that --

9                THE COURT:  Okay.

10               MR. GORDON:  -- everyone is okay with that and we can

11   simply try to get this into a normal course.

12               THE COURT:  Okay.  Though I recognize that there is a

13   stay against HMA, I was just prepared to hear an emergency

14   motion to lift stay.

15               MR. GORDON:  I know that.  And, your Honor, as I

16   said, we filed our answer, so it's kind of like we're being

17   practical here.

18               THE COURT:  Right.  Right.

19        Mr. Landess.

20               MR. LANDESS:  Your Honor, let me just kind of broad

21   brush it.  It makes sense to do something along that Mr. Gordon

22   has suggested because we're presently in a real morass with

23   respect to discovery.

24        The plaintiffs have failed to comply with some of the

25   local rules, for example.  We've never had a 26(f) conference.

1    We haven't met and conferred.  There haven't been the voluntary

2    disclosures that are required.

3        And so that came to a point here just a week or two ago

4    they decided they wanted to engage in a whole battery of

5    discovery.  They had sent out requests for production,

6    interrogatories, noticed up a bunch of depositions, mine

7    included.

8        I notified them that you can't do this under our local

9    rules unless we have a meet-and-confer conference.  Ms. Larsen

10   tried to rectify that by getting everybody on the telephone a

11   few days ago.

12       I informed her that doesn't cut muster.  Here in our

13   jurisdiction we've got to meet face to face.  We've got to talk

14   about these issues.  We have to exchange documents, a witness

15   list, and maybe we can streamline discovery if we do that.

16       And because that hasn't been done, Rule 26(d) comes into

17   play, but she's not engaged to and she's not entitled to

18   proceed with any of this discovery, and what attempts that she

19   has made are ineffectual, therefore, highlighting the necessity

20   to do what counsel has just pointed out.

21       Let's get some orderliness.  Let's have a 26(f)

22   conference.  Let's get a discovery plan.  Let's know what our

23   cutoff deadlines are as to taking discovery, disclosure of

24   expert witnesses, dispositive motions.  None of those things

25   are before us, and here we are tracking for a trial date two

1   weeks from now.

2       So I think in the spirit of cooperativeness and trying to

3   help the Court that it would behoove all of us to get some

4   orderliness underneath our belts here.

5           THE COURT:  Okay.  Mr. Gerrard, any comments?

6           MR. GERRARD:  It's probably not surprising to

7   your Honor we disagree with this.

8       My client was sued at the end of December of 2006.  His

9   money has been tied up continuously from that time until the

10  present time, the period that is in excess of five months now,

11  and by the time the trial arrives it would have been

12  approximately six months.

13      And your Honor understandably being concerned about that

14  fact and in balancing the equities set a trial date, and

15  everyone was aware of it, and we were here at a hearing back in

16  mid March, and I don't -- I was just looking to see if I could

17  see the date, and I believe it was actually March 22nd, but I

18  don't --

19          THE COURT:  Well, we do have a new player in the

20  sense that HMA was previously represented by the very same

21  people who everybody seems to have alleged defrauded them.

22          MR. GERRARD:  Agreed.

23          THE COURT:  So that is a big --

24          MR. GERRARD:  And --

25          THE COURT:  -- distinction because we now have a

1    player who is the person who was maybe both -- and he was both

2    harmed and the one that caused the harm as well, so --

3                MR. GERRARD:  I understand that --

4                THE COURT:  Um-h'm.

5                MR. GERRARD:  -- and that's why I brought up that

6    hearing.

7                THE COURT:  Um-h'm.

8                MR. GERRARD:  It was at that hearing back in mid

9    March when we came in for a preliminary-injunction hearing, and

10   essentially we had a settlement conference that was set up as

11   well as your Honor may recall.

12         And USA Investment Partners had been placed into

13   bankruptcy, and Mr. Gordon appeared and said, you know, we

14   can't do a settlement conference and we're a new party in this

15   case.

16         As Mr. Gordon just acknowledged, he was advised at that

17   time by your Honor that we had a trial date scheduled for the

18   beginning of June.

19         There has been, contrary to what was said, a lot of

20   discovery that's been done.  To suggest that there's no

21   discovery that's been done is I think misleading.

22         We have conducted depositions of numerous people.  I have

23   a large stack of deposition transcripts back at my office, and

24   we have had, you know, 6- or 7,000 pages of documents that have

25   been produced, and we are ready to go to trial.

1    We have an expert witness whose report will be prepared by

2    -- and to be produced by agreement between us and Diversified

3    by Wednesday of next week.  Diversified's expert was to have

4    provided the same information.

5    I acknowledge, readily acknowledge the problem that this

6    presents to your Honor with the new party, and I'm not trying

7    to discount that.  What I'm trying to show your Honor is that

8    my client has really been put in a difficult bind, and I have

9    told you this many times.

10    THE COURT:  So what is the problem, then, I mean,

11    with -- and I think you're the one that said you would like

12    another settlement conference.

13    MR. GERRARD:  I think that the last settlement

14    conference would have been beneficial if HMA's new counsel --

15    THE COURT:  So you don't want to handle it?

16    MR. GERRARD:  -- had been involved long enough at

17    that point, so I fully agree that we do need a new --

18    THE COURT:  Okay.

19    MR. GERRARD:  -- settlement --

20    THE COURT:  Okay.

21    MR. GERRARD:  -- conference.

22    THE COURT:  Okay.

23    MR. GERRARD:  I wish that it could have happened

24    sooner is what I'm saying.

25    THE COURT:  I don't disagree.  I don't disagree.

1          MR. GERRARD:  So --

2          THE COURT:  So let me --

3          MR. GERRARD:  But pushing --

4          THE COURT:  It might make some sense.  I'm inclined

5     to take Mr. Gordon's suggestion, but the point is the trial --

6     and we could make it the fifth and sixth.

7          (Indiscernible) a preliminary-junction hearing, and, you

8     know, I recognize that I've granted a preliminary injunction at

9     this stage, but that was sort of a -- I guess we all sort of

10    agree sort of an extended TRO.

11         And the injunction -- they're going to have higher

12    standards in the fifth and sixth.  They're going to have to

13    like -- well, you've got your evidence.  If they can't meet

14    your evidence, then I think they'll lose because you're right.

15    We're enjoining your client.

16         MR. GERRARD:  It --

17         THE COURT:  If they want to forego the injunction --

18         MR. GERRARD:  The problem that I have and that I've

19    presented to your Honor before is this has been enormously

20    expensive to my client, and all of his money is tied up except

21    for what your Honor released when you were trying to balance

22    the equities and set the bond amount.

23         And the result of that is that we need to get this matter

24    to trial --

25         THE COURT:  Right.

1          MR. GERRARD:  -- as quickly as we can.  I understand

2     what you're saying --

3          THE COURT:  So on the 4th or 5th if we have the

4     injunction hearing --

5          MR. GERRARD:  But, again --

6          THE COURT:  -- and they've got to show substantial

7     likelihood --

8          MR. GERRARD:  But that is not going to dispose of the

9     case.

10          THE COURT:  Well, what do you propose?

11          MR. GERRARD:  So then we're going to have to come

12     back.

13          THE COURT:  When do you propose we go to trial?

14          MR. GERRARD:  Well, I would say let's push the trial

15     date back 30 days.  I mean, there should be enough time in a

16     30-day extension for them to conduct whatever discovery they

17     want to do.  It's not like this is a --

18          THE COURT:  So you're just saying 30 days.

19          MR. GERRARD:  Yes.

20          THE COURT:  Okay.

21          MR. GERRARD:  I mean, because that would give them 45

22     days from now before we could go into trial, and these are

23     straightforward issues.  I mean, HMA's insolvency is not a

24     great mystery.

25          You know, other assets essentially were sold the 22nd of

1    December.  You have a liquidated amount that tells you what the

2    asset's value was and offers for the remaining assets.

3        And as far as the debts go, they're very straightforward

4    as well.  The main question's going to be whether the money

5    that was contributed to HMA by USA Investment Partners, one of

6    its members, is treated as capital or whether it's treated as a

7    loan.

8            THE COURT:  All right.  But this is the question.

9    Are you available the 2nd and 3rd and 5th and 6th of July

10   because that's Fourth of July week.

11           MR. GERRARD:  How about give me just one second to

12   check that.  I could be available the following week.  That

13   week I'm not available because I have to actually go pick up my

14   wife out of town, so --

15           THE COURT:  I'm not available the next week --

16           MR. GERRARD:  Okay.

17           THE COURT:  -- so if the first --

18           MR. GERRARD:  What about the week after that?  I --

19           THE COURT:  No.  Ninth Circuit conference.

20           MR. GERRARD:  Is there --

21           THE COURT:  So you --

22           MR. GERRARD:  Is there a time in July when we could

23   do it?

24           THE COURT:  You can't get 'til -- I'd have to move

25   everybody.

1           MR. GERRARD:  I could do it the week before that.

2           THE COURT:  But the week of July 23rd is the first

3    that I could get you in July.

4           MR. GERRARD:  What about the last week of June,

5    your Honor?

6           THE COURT:  No.  I have entire week of trials that

7    week.

8           THE CLERK:  (Indiscernible).

9           THE COURT:  But that was only a half day.

10          THE CLERK:  (Indiscernible).

11          THE COURT:  But that's not even a month away.

12      I mean, you haven't even moved to lift stay, yet, so,

13   arguably, you do --

14          MR. GERRARD:  No, and we can.  But as counsel has

15   already stated, they filed an answer and counterclaims in this

16   case which, you know, there's case law which suggests that

17   that's a waiver as well.

18          THE COURT:  I just can't because one thing I have is

19   the USA Commercial fees.  And I suspect that even after the

20   hearing, I'll be working my way through those.

21      So I just can't the last week.  I have a trial or motions

22   all day every day in June.  There's not one day free.  Of

23   course if this trial goes off, that's four days that's freed

24   up, so that helps a little bit.

25          MR. GERRARD:  So the earliest you --

1          THE COURT:  So the first I can get to you is

2   July 23rd.

3          MR. GERRARD:  Well, then we would request -- then we

4   would request that we go that week.

5          THE COURT:  All right.  I'll do that.

6          MR. GORDON:  Your Honor --

7          THE COURT:  Uh-huh.

8          MR. GORDON:  -- a couple clarifications.

9          THE COURT:  So the injunction would stay in place

10  other than the bank issue which I'll reserve looking at the

11  legal issue on that.

12         MR. GORDON:  Well, a couple clarifications --

13         MR. GERRARD:  Was that --

14         MR. GORDON:  -- with regard to that date.

15         THE COURT:  Um-h'm.

16         MR. GERRARD:  Let me respond to what the Judge said

17  first.

18     That's extending us out approximately -- well, it's almost

19  two months.  It's, you know, a month and 23 days.

20         THE COURT:  I appreciate that.  That's why I'm --

21         MR. GERRARD:  And --

22         THE COURT:  -- clarifying this.

23         MR. GERRARD:  Yeah.  I understand.  And what I'm

24  asking is is the Court willing to modify that injunction to

25  again release some additional money to my client for having

1    extended it out for another approximately two months so that he

2    can continue to pay his legal fees and be able to proceed

3    forward in balancing the equities that you have been trying to

4    do up to this point in time.

5         THE COURT:  Um-h'm.  Mr. Gordon?

6         MR. GORDON:  Well, a couple things, your Honor, and

7    I'll get to that point.  There's still a jury trial demand out

8    there.  Are we trying this as a jury trial?

9         THE COURT:  Oh.  Whose jury trial?  Is this Mr. --

10        MR. GORDON:  Mr. Gerrard's.

11        THE COURT:  Well, then you cannot have a jury trial

12   July 23rd.

13        MR. GERRARD:  Well, your Honor, I don't think that

14   we're going to be -- here's the way I see it, and you can

15   correct me if you think that I'm wrong.

16    The claims that were brought originally are state court

17   claims for fraudulent transfer, and those are legal claims.

18   Notwithstanding what's been filed, those are legal claims.

19    Those legal claims, Diversified's no longer going to have

20   standing to bring.  They can bring their constructive trust and

21   their unjust enrichment --

22        THE COURT:  Just tell me what you want to do with the

23   jury trial.

24        MR. GERRARD:  What --

25        THE COURT:  I don't want to hear about whether or not

1    you have a right to it.  I understand your positions, but --

2         MR. GERRARD:  Yeah.  I'm just trying to explain to

3    you where I see this, because I haven't had a chance to analyze

4    it.

5      But given that the fraudulent transfer claims are going to

6    be brought by HMA are core matters, there's not going to be a

7    right to a jury trial on those issues.

8         THE COURT:  So as long as you concede that issue on

9    -- and we just go to trial.  So we would only go to trial on

10   the fraudulent-conveyance issues brought by HMA.  Is that --

11        MR. GERRARD:  Well, and whatever other claims

12   Diversified still is bringing.  I mean, we want to dispose of

13   it all at once, obviously.

14        MR. GORDON:  My second point, the counterclaim or the

15   cross-claim brought by -- filed yesterday and the day before

16   includes -- put aside the constructive trust, includes having

17   to try the issue of that HMA, USAIP, USAIP Investors VI --

18   Investor VI or Hantges -- Mr. Hantges, Mr. Milanowski, USACM,

19   and Diversified are all alter egos of each other.

20        THE COURT:  So I assume you're willing to waive that

21   defense for an early trial and bifurcate it.  In other words,

22   the bifurcation would be trial in conveyance first?

23        MR. GERRARD:  Yes.  We can do the fraudulent transfer

24   of claims first.  Yes.

25        MR. GORDON:  So what we're trying is the fraudulent

1   transfer claims.  With that --

2           MR. GERRARD:  And the other claims --

3           THE COURT:  It would be bifurcated.

4           MR. GERRARD:  And the other claims that have already

5   been asserted by Diversified, their constructive-trust claim,

6   their unjust-enrichment claim --

7           MR. GORDON:  All right.

8           MR. GERRARD:  Yeah.

9           MR. GORDON:  No. 3, we have now both filed answers

10  with counterclaims -- with cross-claims and in Mr. Reale's case

11  with counterclaims.

12      I assume that we're going to be at issue in terms of

13  answers to those.  We're prepared to simply file an answer and

14  not a motion to dismiss and not go through that process.

15      If we do that, our answers are due near the end of the

16  month, and we're going to be well into June, and I understand

17  what the Court's saying with regard to the USACM fee hearings.

18      We're never going to get at issue for this, so I'm --

19          THE COURT:  Well, and can't we just bifurcate on the

20  fraudulent conveyance?

21          MR. GORDON:  I'm happy to do that.

22          MR. GERRARD:  And, your Honor, there's nothing to

23  prevent us from starting discovery now and waiving the Rule 26

24  requirements --

25          MR. GORDON:  Your Honor, look --

1          MR. GERRARD:  -- for that.

2          MR. GORDON:  -- I'd rather hold a Rule 26 conference

3    next week --

4          THE COURT:  Yes.  Exactly.

5          MR. GORDON:  -- and just do it --

6          THE COURT:  Exactly.

7          MR. GORDON:  -- and take those times, shorten it

8    down.

9       If the Court wishes to go to trial July 23rd, that's fine.

10   Mr. Kistler is going to be trying the case for us.  I

11   checked with him, and he's available the first week of

12   August --

13         THE COURT:  All right.

14         MR. GORDON:  -- if that makes some more sense.

15         THE COURT:  So let's do this.  The 25th

16   Judge Markell's available for a settlement conference.

17         MR. GERRARD:  Perfect.

18         THE COURT:  Do I understand everybody's available for

19   a settlement conference?

20         MR. GERRARD:  That would be the 25th --

21         THE COURT:  Okay.

22         MR. GERRARD:  -- of June or the 25th of May?

23         THE COURT:  May.

24         MR. GERRARD:  Okay.  Yeah.  Yes.

25         THE COURT:  Then let's have a scheduling conference

1    on May 31st at 2:30.  In the meantime, you'll work out your

2    discovery plans, how we intend to bifurcate, et cetera.

3         I will reserve back the 5th and 6th of June.  I won't give

4    it away.  I'll save it in case it turns out we have to have a

5    hearing on the preliminary injunction so that the trial is then

6    postponed to some later date.

7                   MR. GERRARD:  Okay.  It --

8                   THE COURT:  So that gives you the option when you're

9    discussing things what we're going to do.

10                  MR. GORDON:  Well, to have that on the 5th and 6th of

11   June, that we will file -- if it makes sense, we can file a

12   motion for preliminary junction, have it pending.

13                  THE COURT:  Okay.

14                  MR. GORDON:  Okay.  Because we can't go unless we're

15   at issue and let Mr. Gerrard know what our position is --

16                  THE COURT:  Right.  Right.

17                  MR. GORDON:  -- and have the Court be able to review

18   it.

19                  THE COURT:  So I'll just save --

20                  MR. GORDON:  Okay.

21                  THE COURT:  -- the 5th and 6th back --

22                  THE CLERK:  Now, they --

23                  THE COURT:  -- such if we need those days --

24                  THE CLERK:  Judge, (indiscernible) --

25                  THE COURT:  -- for a hearing --

1          THE CLERK:  -- the 4th and 5th.

2          THE COURT:  No.  I want to keep the 4th free.  Oh,

3     you say -- I understand what you're saying.

4          THE CLERK:  Yeah.

5          THE COURT:  The 6th is a motion day.

6          MR. GORDON:  Yeah.

7          THE CLERK:  Right.

8          MR. GERRARD:  Yeah.  You had a Wednesday on --

9          MR. GORDON:  Yeah.

10          MR. GERRARD:  -- or something like that.

11          THE COURT:  But let's do Tuesday and -- I don't want

12     to do a Monday/Tuesday because Monday you're going to need --

13     that's too soon.

14          THE CLERK:  Okay.

15          THE COURT:  How about --

16          THE CLERK:  The 7th and 8th?

17          THE COURT:  -- 7th and 8th, then?

18          MR. GORDON:  So the 7th and 8th of June is held back,

19     and we will file the preliminary injunction.  We'll set it for

20     those days, and then we'll work with Mr. Gerrard --

21          THE COURT:  Right.

22          MR. GORDON:  -- in terms of going forth.

23          MR. GERRARD:  And --

24          MR. GORDON:  That's fine.

25          MR. GERRARD:  And --

```
 1              MR. GORDON:  As far as the -- okay.  Go ahead.  I'm
 2     sorry.
 3              MR. GERRARD:  I'm sorry.  That's okay.
 4              MR. GORDON:  Yeah.
 5              MR. GERRARD:  If you're done.  Two --
 6              MR. GORDON:  No.  I was going to deal with the
 7     release of funds.
 8              MR. GERRARD:  Well, I was going to ask about that,
 9     but one question before that.
10          With respect to these dates, are we -- am I hearing
11     Mr. Gordon say that he's willing to stipulate to having the
12     stay lifted for this matter to go forward or do we need to file
13     that emergency motion?
14              MR. GORDON:  No.  I'm stipulating to let it go
15     forward.
16              THE COURT:  Okay.  Good.  All right.
17          Why don't you discuss the release of funds, and we'll deal
18     with it on the 31st if you haven't come to an agreement.
19              MR. GORDON:  That's fine.
20              THE COURT:  It would be my inclination since he has
21     to wait 45 more days to allow it, but I'll certainly hear
22     argument and you can discuss it in the meantime.
23              MR. GERRARD:  The 30 -- did you say --
24              THE COURT:  And I absolutely agree --
25              MR. GERRARD:  -- the 31st?
```

1          UNIDENTIFIED SPEAKER:  31st.

2          THE COURT:  Yeah.

3          MR. GERRARD:  Oh.

4          THE COURT:  Um-h'm.

5          THE CLERK:  (Indiscernible).

6          THE COURT:  May.

7          MR. GERRARD:  Oh, May 31st.  The scheduling

8    conference.  Okay.

9          THE COURT:  Correct.

10          MR. GERRARD:  I got you.

11          UNIDENTIFIED SPEAKER:  Okay.

12          THE CLERK:  At 2:30.

13          THE COURT:  And I absolutely agree.  We need some

14    order in this case.

15      (Colloquy off the record.)

16          THE COURT:  It was my fault for forgetting to mention

17    to everybody -- maybe I just didn't need to -- the -- you know,

18    you've got to follow Local Rule 26, but it sounds like you've

19    informally waived it anyway, so --

20          MR. GORDON:  Okay.  So let me just go back.  With

21    regard to the May 25th settlement conference, is there a time

22    on that, and is the Court going to enter an order --

23          THE COURT:  Yes.  We will enter an order.

24          MR. GORDON:  Thank you.

25          THE COURT:  But, in the meantime, everybody knows the

1    standard settlement conference order.  The representative must

2    be present as well.

3          MR. GERRARD:  And your Honor ordered last time that

4    this time the parties actually participate in good faith --

5          THE COURT:  Yes.

6          MR. GERRARD:  -- and with an effort to try and

7    resolving that.

8          THE COURT:  And I want to know that now.  If you

9    think you're not ready for this conference, I want to know now.

10   I don't want to waste Judge Markell's time.

11         MR. GORDON:  No.  Your Honor, from the standpoint of

12   HMA -- and I can speak for USAIP -- we will be at issue on all

13   issues so that if it's going to -- the settlement with

14   Mr. Gerrard and Mr. Reale will go beyond simply HMA.  That's

15   our --

16         THE COURT:  Well, that's kind --

17         MR. GORDON:  That's our concern.

18         THE COURT:  -- of the whole point because --

19         MR. GORDON:  And that's perfect.

20         THE COURT:  That's right.

21         MR. GORDON:  That's where we want to be, too.

22         THE COURT:  Yeah.

23         MR. GORDON:  Okay?  No, we're fine.  We feel

24   comfortable with that.

25         THE COURT:  Okay.  I understand Mr. Orrick is ill

1    today, but he'll be available on the 25th?

2              MR. LANDESS:  He will, and would it be all right --

3              THE COURT RECORDER:  Counsel, I'm sorry.  Could you

4    speak into --

5              MR. LANDESS:  -- if some --

6              THE COURT RECORDER: -- a microphone, please.

7              MR. LANDESS:  Would it be all right, your Honor, as

8    far as Great White at the settlement conference if we had a

9    representative there rather than the --

10             THE COURT:  Yes.

11             MR. LANDESS:  -- 20 old people from all over --

12             THE COURT:  Yes.

13             MR. LANDESS:  -- the country --

14             THE COURT:  You're --

15             MR. LANDESS:  -- traveling here?

16             THE COURT:  You're right.  Thank you about that for

17   clarifying that.

18             MR. LANDESS:  Okay.  And I just want to just for the

19   record say, you know, that Great White and myself since I've

20   been named as a party has filed a request for a jury trial in

21   this matter, too, so I don't know how that shapes out in --

22             THE COURT:  Well, the point -- we'll have to discuss

23   that the 31st.

24             MR. LANDESS:  Okay.

25             THE COURT:  In other words, it would be my intent

1    that if we do an early trial in July, that it be a bifurcated

2    trial, and that would obviate any jury trial issues --

3              MR. GORDON:  That's correct.

4              THE COURT:  -- so we don't have to deal with whether

5    or not there's a right, just --

6              MR. GORDON:  Yeah.

7              THE COURT:  -- bifurcate.

8              MR. GORDON:  Our issues against Great White are two,

9    unjust enrichment, but primarily the fraudulent-transfer

10   issues, and against immediates.  Obviously it's under 550,

11   so --

12             THE COURT:  Right.

13             MR. GORDON:  So it's a core matter --

14             THE COURT:  Right.

15             MR. GORDON:  -- from that standpoint.

16             THE COURT:  And so we do have -- everything has

17   changed because we now have a debtor.

18             MR. LANDESS:  Okay.  Thank you, your Honor.

19             MR. GORDON:  Yeah.  I appreciate that, your Honor.  I

20   appreciate the Court's indulgence and counsel's indulgence.

21             THE COURT:  Okay.

22             MR. GERRARD:  I didn't hear the time for the

23   settlement conference.

24             THE COURT:  2:30.  Oh --

25             MR. GERRARD:  Settlement --

1          THE COURT:  -- settlement conference.

2          MR. GERRARD:  Settlement conference.

3          THE COURT:  Excuse me.

4          MR. GERRARD:  Do you know --

5          THE COURT:  9:30, correct?

6          MR. GERRARD:  -- what that was, Eileen?

7          THE CLERK:  9:30.

8          MR. GERRARD:  9:30?  Okay.

9          MR. LANDESS:  What day?

10         THE COURT:  25th, the settlement conference.

11         MR. LANDESS:  25th.

12         THE COURT:  In Judge Markell's chambers.

13         MR. LANDESS:  9:30.

14         MS. LARSEN:  I think I'd be remised if I did not

15    mention that the jury-trial issue, we have filed a motion to

16    strike the jury demand --

17         THE COURT:  I understand that.

18         MS. LARSEN:  -- even as to all of those --

19         THE COURT:  Sure.  And I understand --

20         MS. LARSEN:  -- other appearance as well.

21         THE COURT:  -- that's an issue we'll save past the

22    scheduling conferences because, you know, if we need to get to

23    it for the July date, but it sounds like everybody says let's

24    just do the nonjury trial.  Even if there's a right, let's just

25    deal with what we -- everybody agrees it's a nonjury trial and

1    bifurcate that first.  If not, then obviously the trial gets

2    postponed later.

3            MS. LARSEN:  Thank you.

4            THE COURT:  So, all right.  Good.  Thank you.

5        One final motion is the (indiscernible) motion, is that

6    right, the --

7            MR. NEVINS:  Excuse me, your Honor.

8            THE COURT:  I'm sorry.

9            MR. NEVINS:  I'm sorry.  This is Howard Nevins

10   appearing for defendant National Real Estate Holdings.

11       The dates that you had previously just mentioned for the

12   scheduling conference and the settlement conference, that

13   applies to all parties in the action?

14           THE COURT:  Yes.  Is National Realty (sic) a party as

15   well in this one?

16           MR. NEVINS:  National Real Estate Holding --

17           THE COURT:  Yes.

18           MR. NEVINS:  -- is a defendant.

19       And the scheduling conference, did you say May 21st or

20   31st?

21           THE COURT:  The scheduling conference is the 31st.

22   25th is the settlement conference.

23           MR. NEVINS:  All right.

24           THE COURT:  Thank you.

25           MR. NEVINS:  Thank you.

1          MR. GORDON:  Yes, your Honor.  They are a defendant

2     in the main action, and we did not sue National Real Estate on

3     a cross-claim.

4          THE COURT:  You did not.  Okay.

5          MR. GORDON:  We did not.

6          MR. NEVINS:  And, your Honor, I just wish to point

7     out that National Real Estate Holding was just named in the

8     second amended complaint by the plaintiff in this action and

9     just filed an answer.

10          THE COURT:  All right.  Thank you.

11          MR. NEVINS:  Thank you.

12          MS. LORADITCH:  Your Honor, if I may on one

13     housekeeping note.

14          The motion to strike that Ms. Larsen mentioned, that was

15     filed with an OST request, and so does it make sense to just

16     hold that in abeyance and not --

17          THE COURT:  Let's just set it for the 31st for status

18     only.

19          MS. LORADITCH:  Okay.  So we'll prepare the notice of

20     hearing on that day.

21          THE COURT:  Okay.  Just status only for that day.

22     That way you don't lose track of it.  Thank you.

23          MR. LANDESS:  What time?

24          THE COURT:  Again, 2:30 on the 31st.  All of these

25     matters will be at 2:30.  All right.

1          Now, finally, we have the motion to compel against

2    Ms. Stevens?  Anyone here on behalf of Ms. Stevens?

3              MR. SMITH:  Yes.  Good morning, your Honor.

4    Ulrich Smith --

5              THE COURT RECORDER:  I'm sorry.  I need to have you

6    speak into a microphone, please.

7              MR. SMITH:  Oh, I apologize.

8        Good morning, your Honor.  Ulrich Smith, Bar No. 2274, for

9    Ms. Stevens who is also present, your Honor.

10             THE COURT:  Now, I don't see a written response.

11             MR. SMITH:  No, Judge.  It was on an order shortening

12    time.  We did not have sufficient time.  We'd like to make a

13    few oral representations.  I think we --

14             THE COURT:  No.  I'm not going to do any oral

15    representations.  You've got to respond in writing.

16             MR. SMITH:  Can I have --

17             THE COURT:  Well, I'll continue it to the 31st --

18             MR. SMITH:  Thank you.

19             THE COURT:  -- and I want a written response.

20             MR. SMITH:  Thank you, Judge.

21             THE COURT:  Because these issues are too complicated

22    to just do in oral representations.

23             MS. LARSEN:  Well --

24             THE COURT:  And --

25             MS. LARSEN:  Well --

118

1          THE COURT:  -- you deserve the right to see what

2    their contentions are.

3          MS. LARSEN:  Right.  And we just needed the OST

4    because of the June 4th trial date, and now that's off, so --

5          THE COURT:  Okay.  Good.

6          MS. LARSEN:  -- that's fine.

7          MR. SMITH:  So it's on the 31st at 2:30.

8          THE COURT:  Yes.

9          MR. SMITH:  Thank you, Judge.

10         THE COURT:  Okay.

11         MR. GORDON:  Your Honor, just one follow up --

12         THE COURT:  Um-h'm.

13         MR. GORDON:  -- just so we're -- as all counsel here

14   including Mr. Nevins is on the phone, we would propose that

15   Mr. Kistler from our office will make communication with

16   everyone and try to conduct a Rule 26 conference next week and

17   try to get all the dates down and work up a clear scheduling

18   order.

19         THE COURT:  Yes.

20         MR. GORDON:  So I would just ask that everyone

21   attempt to have their schedules available, their calendar, so

22   we can have that early next week.

23         THE COURT:  Okay.  And I will indeed order -- I don't

24   need to order, but I'm going to order a Rule 26 meeting.

25         MR. GORDON:  Okay.

119

1          THE COURT:  So --

2          MR. GORDON:  Thank you, your Honor.

3          THE COURT:  All right.  Thank you very much.

4          THE CLERK:  All rise.

5     (Court concluded at 11:56:26 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        I certify that the foregoing is a correct transcript from

2    the electronic sound recording of the proceedings in the

3    above-entitled matter.

4

5

6    /s/ Michele Phelps                          10/21/10

7    Michele Phelps, Transcriptionist                Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25