# EXHIBIT

# B

# LOAN AGREEMENT



This Loan Agreement, dated as of November 28, 2005, is entered into by and among Palm Harbor One, LLC, a Florida limited liability company ("Borrower"), and those persons listed on **Exhibit "A"** attached hereto ("Lender").

## SECTION 1: DEFINITIONS AND ACCOUNTING TERMS.

1.1     Defined Terms.  As used in this Agreement, the following terms shall have the meanings set forth respectively after each:

"**Agreement**" means this Loan Agreement.

"**Assignment of Permits, Licenses, Franchises and Authorizations**" means the Assignment of Permits, Licenses, Franchises and Authorizations executed by Borrower.

"**Assignment of Rents**" means the Assignment of Rents contained in the Mortgage.

"**Business Day**" means any Monday, Tuesday, Wednesday, Thursday, or Friday on which banks in the State of Nevada are open for business.

"**Closing or Close of Escrow**" means when Borrower completes the purchase of the Real Property using the proceeds of the Loan, and Lender performs its obligation under Section 4.1 hereof.

"**Control Account Escrow Agreement**" means the Control Account Escrow Agreement and Security Agreement by and between Borrower, Lender and Escrow Agent of even date herewith.

"**Default Rate**" shall have the meaning set forth in the Note.

"**Disbursement Agent**" means Fidelity National Title - Construction Disbursement Department, which shall hold and disburse the Interest Reserve pursuant to Section 3.3 hereof.

"**Disbursement Schedule**" means the schedule on **Exhibit "B"** attached hereto.

"**Effective Date**" means the date the Mortgage is recorded in the Official Records of Pinellas, Florida.

"**Environmental Indemnity**" means the Environmental and Accessibility Indemnity Agreement executed by Borrower and the Guarantor.

by Borrower in favor of Lender with respect to the Personal Property.

"**Governmental Agency**" means any governmental or quasi-governmental agency, authority, board, bureau, commission, department, instrumentality or public body, court, administrative tribunal or public utility.

"**Guarantor**" means Joseph Lilly.

"**Guaranty**" means the Unconditional Guaranty executed by the Guarantor in favor of Lender, either as originally executed or as it may from time to time be supplemented, modified or amended.

"**Improvements**" means any and all improvements now existing or hereafter constructed on the Real Property.

"**Laws**" means, collectively, all federal, state and local laws, rules, regulations, ordinances and codes.

"**Lender**" means those persons listed on **Exhibit "A"** attached hereto, and any other persons or entities who may be added to that list pursuant to an amendment to the Note.

"**Loan**" means the loan to be made by Lender to Borrower pursuant to Section 3 hereof.

"**Loan Documents**" means, collectively, this Agreement, the Note, the Security Documents, the Environmental Indemnity, the Guaranties and the Project Assignments, in each case either as originally executed or as the same may from time to time be supplemented, modified or amended, together with any other documents or instruments which may at any time be executed by Borrower in connection with the Loan.

"**Maturity Date**" means the date which is twelve (12) months after the Mortgage is recorded.

"**Mortgage**" means the mortgage, security agreement and assignment of rents of even date herewith, executed by Borrower in favor of Lender with respect to the Property or portions thereof, either as originally executed or as it may from time to time be supplemented, modified or amended.

"**Note**" means the promissory note of even date herewith, in the original principal amount of Twenty-Nine Million Dollars ($29,000,000), executed by Borrower in favor of Lender to evidence the Loan, either as originally executed or as it may from time to time be supplemented, modified or amended.

"**NRS**" means the Nevada Revised Statutes, as amended from time to time.

2

"**Operation**" means the operation of Borrower's business on the Property, including the operation, sales, leasing, running and maintenance of the Property and the Improvements.

"**Permitted Exceptions**" means the matters identified in **Exhibit "C"** attached hereto and made part hereof.

"**Person**" means any entity, whether an individual, trustee, corporation, partnership, trust, unincorporated organization or otherwise.

"**Personal Property**" means all present and future personal property (including the Project Documents) of Borrower of every kind and nature, whether tangible or intangible, now or hereafter located at, upon or about the Property, or used or to be used in connection with or relating or arising with respect to the Property and/or the Project, including but not limited to the property described in the Mortgage.

"**Project**" means the project for the development of, and construction of improvements on, the Property, as such exists at any time.

"**Project Assignments**" means, collectively, the Assignment of Permits, Licenses, Franchises and Authorizations, and such other assignments as Lender shall require.

"**Project Documents**" means, collectively, all agreements, documents, instruments and materials of whatever kind or nature relating to the Project, including but not limited to: (a) the improvement plans and all other plans, specifications and drawings relating to the Project, (b) all approvals, consents, licenses and permits issued, or to be issued, by any Governmental Agency in connection with the Project, (c) the engineer's contract, architect's contract and any and all construction contracts, and all other agreements relating to the Project between Borrower and any contractor, subcontractor, independent project manager or supervisor, architect, engineer, laborer or supplier of materials, and (d) any take-out, refinancing or permanent loan commitment issued to Borrower with respect to the Property.

"**Property**" means, collectively, the Real Property, the Personal Property and any other buildings, structures, or improvements now or hereafter located on all or any portion of the Real Property.

"**Real Property**" means the real property and interests in real property described in **Exhibit "D"**.

"**Security Agreement**" means the Security Agreement contained herein and in the Mortgage.

"**Security Documents**" means the Mortgage, the Assignments, the Financing Statements and any other mortgage,, assignment of leases, security agreement or assignment executed to secure the Note, either as originally executed or as they may from time to time be supplemented, modified or amended.

3

"**Title Company**" means Fidelity National Title Insurance Company.

"**Title Policy**" means the Lender's policy of title insurance and endorsements thereto required by this Agreement as a condition of the first Disbursement.

"**USA**" means USA Commercial Mortgage Company, a Nevada corporation, the mortgage company which arranged the Loan.

"**Use**" means ownership, use, development, construction, maintenance, management, operation or occupancy.

1.2     Use of Defined Terms.  Any defined term used in the plural shall refer to all members of the relevant class, and any defined term used in the singular shall refer to any number of the members of the relevant class.  Any reference to the Loan Documents and other instruments, documents and agreements shall include such Loan Documents and other instruments, documents and agreements as originally executed or as the same may be supplemented, modified or amended.

1.3     Accounting Terms.  All accounting terms not specifically defined in this Agreement shall be construed in conformity with, and all financial data required to be submitted by this Agreement shall be prepared in conformity with, generally accepted accounting principles applied on a consistent basis.

1.4     Exhibits.  All exhibits to this Agreement, either as now existing or as the same may from time to time be supplemented, modified or amended, are incorporated herein by this reference.

## SECTION 2: RECITALS.

Borrower has applied to Lender for a Loan to acquire the Real Property.  Lender is willing to make the Loan to Borrower on the terms and conditions contained in this Agreement and the other Loan Documents.

## SECTION 3: THE LOAN.

3.1     Amount of the Loan.  Subject to the terms and conditions set forth in this Agreement, Lender agrees to make a loan ("Loan") to Borrower in a principal amount of up to Twenty-Six Million Two Hundred Thousand Dollars ($26,200,000) (the "Loan Amount"), the disbursement of which by Lender is subject to the terms and conditions of the Loan Documents. The Loan Amount shall be disbursed in accordance with Lender's instructions to the Title Company. From and after the Effective Date, the entire Loan Amount (whether paid to, or on behalf of, Borrower or held by the Disbursement Agent) shall bear interest at the rate set forth in the Note until fully repaid to Lender.

3.2     Increase in Loan Amount.  From the Effective Date through and including

4

August 31, 2006, Lender and USA shall have the exclusive right, but not the obligation, to increase the Loan Amount to an amount not to exceed Twenty-Nine Million Dollars ($29,000,000). All amounts added to the Loan Amount after the Effective Date shall be advanced by Lender as and for Interest Reserve. Upon each increase in the Loan Amount, Borrower shall execute amendments to the Note and the Mortgage which shall memorialize the increase in the Loan Amount, the change in the identity of persons and entities which comprise Lender and their respective undivided interests in the Loan. Upon the recordation of the amendment(s) to the Mortgage, the Title Company shall issue to Lender, at Borrower's expense, an endorsement or endorsements to the Title Policy which shall (i) insure the continued priority of the Mortgage, and that the additional advance is secured thereby, (ii) reflect the increase in the face amount of the policy corresponding to the increase in the Loan Amount, and (iii) set forth the change in the identity of the insured lenders and their respective undivided interests in the Loan. Nothing herein shall be deemed to be a commitment by Lender or USA to fund to Borrower any more than the initial Loan Amount.

3.3    Interest Reserve. Of the Loan Amount, $2,000,000, shall be disbursed by the Title Company to the Disbursement Agent to be held as interest reserve for the benefit of Lender (the "Interest Reserve"). Disbursement Agent's only function shall be to hold and disburse the Interest Reserve in accordance with the Control Account Escrow Agreement. Interest accrued on the Note Amount shall be paid from a portion of the Interest Reserve upon presentation of a monthly interest statement by Lender, without the necessity of any instruction or request from Borrower. Except as provided in this paragraph, the funds in the Interest Reserve shall never be used for any other purpose without the express written consent of Lender. Depletion of the Interest Reserve shall not release Borrower from any of Borrower's obligations under the Loan Documents, including but not limited to the obligation to pay interest accruing under the Note. After depletion of the Interest Reserve, or so long as any Event of Default has occurred and is continuing, all interest payments under the Note shall be made by Borrower using its own funds; provided that Lender, at its option and in its sole discretion, may obtain disbursements from the Interest Reserve notwithstanding such Event of Default. Upon the occurrence of an Event of Default, the entire balance of the Interest Reserve shall be paid to Lender upon demand and applied to the then outstanding balance of the Loan.

3.4    Prepayment. Borrower agrees that all loan fees and any prepaid finance charges are fully earned as of the date they are paid and will not be subject to refund upon any early payment hereof (whether voluntarily or as a result of default). Subject to the foregoing, Borrower may prepay the Loan, in full or in part, at any time provided, however, that if Borrower repays the Loan within the first three (3) months after the Effective Date (whether voluntarily or as a result of default), then Borrower shall pay to Lender a prepayment fee equal to all interest which would accrue on the full Loan Amount during said three (3) month period, less all interest previously paid. Notwithstanding anything to the contrary hereunder, Lender shall receive a minimum of three (3) months' interest on the full Loan Amount.

3.5    Security. The indebtedness evidenced by the Note, and all other indebtedness and obligations of Borrower under the Loan Documents, shall be secured by the Security Documents. The Environmental Indemnity and the Guaranty and the respective obligations of any of Borrowers and the Guarantor under each shall be unsecured.

3.6    Partial Release Provisions.        So long as no Event of Default has occurred and is continuing, Lender shall release an individual condominium unit ("Unit") from the lien of the Mortgage upon the occurrence of the following events: (i) Borrower shall pay to Lender a release price equal to 90% of the net proceeds from the sale ("Release Price"); provided, however that the net proceeds shall be based on the greater of the gross sale price or the following minimum sale prices:

| Square Footage of Unit | Minimum Sale Price |
|---|---|
| 630 | $104,400 |
| 650 | $108,000 |
| 775 | $117,000 |
| 860 | $122,400 |
| 900 | $135,900 |
| 930 | $134,100 |

(ii) Borrower shall pay all of costs and expenses in connection with such release; (d) the property being released and the remaining Property shall be legal parcels under Florida law.

For the purpose of this section, the term "net proceeds" means the gross sale price less customary closing costs and escrow fees; provided, however, that if a real estate commission is payable to Borrower or an affiliate of Borrower, then no more than 2% of the gross sale price (or, in the case of co-brokerage with a buyer's broker, 1% on account of the Borrower or its affiliate) shall be deducted to determine the net proceeds, regardless of the actual commission payable to Borrower or its affiliate.

## SECTION 4: CONDITIONS TO DISBURSEMENTS.

4.1    Initial Advance Conditions. The obligation of Lender to initially close the Loan is subject to the following conditions precedent:

(a)    Borrower shall, at its sole expense, deliver or cause to be delivered to Lender, in form and substance satisfactory to Lender:

      (i)    the original Note;

      (ii)    the original Mortgage;

6

(iii)    the original Financing Statement;

(iv)    the original Guaranty;

(v)    the original Environmental Indemnity;

(vi)    the original Control Account Escrow Agreement, executed by Borrower, Lender and Disbursement Agent;

(vii)    the original Assignment of Permits, Licenses, Franchises and Authorizations executed by Borrower;

(viii)    a certificate of consent of Borrower, authorizing the execution, delivery and performance of the Loan Documents to be executed by a specified authorized officer on behalf of Borrower;

(ix)    an ALTA form of extended coverage of lender's policy of title insurance, or evidence of a commitment therefor, issued by an insurer satisfactory to Lender, together with such endorsements and binders thereto as may be required by Lender pursuant to Section 6.6 hereof, in a policy amount of not less than the face amount of the Note, insuring the Mortgage to be a valid lien upon the Property, and showing the Property to be subject only to the Permitted Exceptions;

(x)    an appraisal of the Real Property certified to Lender, performed by an appraiser acceptable to Lender;

(xi)    certified copies of, or certificate evidencing, all insurance policies required to be delivered pursuant to this Agreement;

(xii)    copies of all permits and approvals by Governmental Agencies necessary to construct the Improvements (if available);

(xiii)    current Financial Statements of Borrower and the Guarantor;

(xiv)    evidence, in form and substance acceptable to Lender, of the availability and sufficiency of all utilities to the Project, although Lender acknowledges that the water and sewer will be provided by wells and septic tanks;

(xv)    copies of any proposed, or approved final Covenants, Conditions and Restrictions recorded or to be recorded on the Project;

(xvi)    a Phase I Hazardous Waste Survey, prepared by an entity approved by Lender, in form and substance acceptable to, and approved by,

7

Lender;

(xvii) such additional agreements, certificates, reports, approvals, instruments, documents, financing statements, consents and opinions as Lender may reasonably request; including, without limitation, a soils report for the Real Property (including, without limitation, all determinations required by Lender with respect to hazardous waste [as such term is defined in the Environmental Indemnity] and water located on the Real Property).

(b) Lender shall have reviewed and approved the Permitted Exceptions;

(c) Borrower has acquired fee title to all of Property;

(d) The Mortgage shall have been recorded in the Official Records of the County in which the Property is located as a first priority lien;

(e) The Financing Statement shall have been filed for record with the Florida Secretary of State, and recorded in Pinellas County, Florida.

4.2  Future Advance Conditions. The obligation of Lender to make any additional advances pursuant to Section 3.2 above is subject to following conditions:

(a) The representations and warranties of Borrower contained in all of the Loan Documents shall be correct on and as of the date of the advance as though made on and as of that date and no Event of Default (or event which, with the giving of notice and/or the passage of time, would become an Event of Default) shall have occurred and be continuing;

(b) Borrower shall, at its sole expense, deliver or cause to be delivered to Lender, in form and substance satisfactory to Lender:

(i) from the title insurer who has issued the Title Policy, such endorsements, binders or modifications thereto as Lender may require; and

(ii) such additional agreements, certificates, reports, approvals, instruments, documents, consents or opinions as Lender may reasonably request.

# SECTION 5: REPRESENTATIONS AND WARRANTIES BY BORROWER.

5.1  Formation, Qualification and Powers of Borrower. Borrower is a limited liability company duly formed and validly existing under the laws of the State of Florida and has all requisite power and authority to conduct its business, to own its properties, and to execute, deliver and perform all of its obligations under the Loan Documents.

8

5.2    <u>Authority and Compliance with Instruments and Government Regulations</u>. The execution, delivery and performance by Borrower of all of its obligations under each Loan Document have been duly authorized by all necessary action and do not and will not:

(a)    require any consent or approval not heretofore obtained of any Person holding any security or interest or entitled to receive any security or interest in Borrower;

(b)    violate any provision of any organizational document or certificate of Borrower;

(c)    result in or require the creation or imposition of any mortgage, pledge, lien, security interest, claim, charge, right of others or other encumbrance of any nature, other than under the Loan Documents, upon or with respect to any property now owned or leased or hereafter acquired by Borrower;

(d)    violate any provision of any Law, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to Borrower or the Property, which violation would have a material, adverse impact thereon;

(e)    result in a breach of or constitute a default under, cause or permit the acceleration of any obligation owed under, or require any consent under, any indenture or loan or credit agreement or any other agreement, lease or instrument to which Borrower is a party or by which Borrower or any property of Borrower, is bound or affected; and Borrower is not in default in any respect that is materially adverse to the interest of Lender or that would have any material adverse effect on the financial condition of Borrower or the conduct of its business under any Law, order, writ, judgment, injunction, decree, determination, award, indenture, agreement, lease or instrument described in Sections 5.2(d) and 5.2(e).

5.3    <u>Execution of the Guaranty by the Guarantor</u>. The execution and delivery of the Guaranty:

(a)    have been duly authorized by all necessary action;

(b)    do not require the consent, authorization or approval of any Governmental Agency or Person;

(c)    will not result in the creation of any lien or other claim of any nature upon or with respect to the property of the Guarantor, other than as may be set forth in the Guaranty; and

(d)    will not violate any provision of any Law having applicability to the Guarantor, in a manner which would have a material, adverse impact on any Guarantor; and, when executed and delivered, the Guaranty will constitute the legal, valid and binding obligation of the Guarantor enforceable against the Guarantor in accordance with its terms.

9

5.4    No Governmental Approvals Required. No authorization, consent, approval, order, license, exemption from, or filing, registration or qualification with, any Governmental Agency is or will be required to authorize, or is otherwise required in connection with:

(a)    the execution, delivery and performance by Borrower and the Guarantor of the Loan Documents; or

(b)    the creation of the liens, security interests or other charges or encumbrances described in the Security Documents; except that filing and/or recording may be required to perfect Lender's interest under the Security Documents.

5.5    Binding Obligations. The Loan Documents, when executed and delivered, will constitute the legal, valid and binding obligations of Borrower and the Guarantor, as the case may be, enforceable against them in accordance with their respective terms.

5.6    Financial Statements. Borrower and the Guarantor have furnished to Lender a copy of recent financial statements relating to Borrower's and the Guarantor's financial conditions and Borrower represents and warrants to Lender that such financial statements present fairly the financial position of Borrower and the Guarantor as at the date thereof.

5.7    No Material Adverse Change. Borrower represents and warrants to Lender that there has been no material adverse change in the condition, financial or otherwise, of Borrower or the Guarantor since the date of the financial statements described in Section 5.6; since that date, neither Borrower nor the Guarantor have entered into any material transaction not disclosed in such financial statements; neither Borrower nor the Guarantor have any material liabilities or contingent liabilities not reflected or disclosed in such financial statements; and there are no material mortgages, deeds of trust, pledges, liens, security interests, claims, charges, right of others or encumbrances (including liens or retained security titles of conditional vendors) of any nature whatsoever on any property of Borrower or the Guarantor, and no material indebtedness, not disclosed in such financial statements.

5.8    Tax Liability. Borrower and the Guarantor have filed all tax returns (federal, state and local) required to be filed and have paid all taxes shown thereon to be due and all property taxes due, including interest and penalties, if any. Borrower and the Guarantor have established and are maintaining necessary reserves for tax liabilities, if any.

5.9    Compliance with Law. Borrower and the Guarantor are in compliance in all material respects with all Laws and other requirements applicable to their business and have obtained all authorizations, consents, approvals, orders, licenses and exemptions from, and have accomplished all filings, registrations or qualifications with, any Governmental Agency that is necessary for the transaction of their business.

5.10    Compliance with Requirements. Throughout the term of the Loan, Borrower

shall comply with all applicable covenants, conditions and restrictions, Laws and other requirements, and all necessary approvals, consents, licenses and permits of any Governmental Agency have been regularly and finally received with respect thereto, including without limitation each of the following as applicable:

> (a)    all zoning, land use and planning requirements;

> (b)    subdivision and/or parcel map requirements, including without limitation Requirements of applicable Law regarding subdivisions, parcel maps and the division of land into lots or parcels;

> (c)    environmental requirements and preparation and approval of any necessary environmental impact statements or reports;

> (d)    all requirements regarding the provision of all necessary utilities to the Real Property including the irrevocable allocation to the Property of sufficient domestic and fire protection water service to the Property;

> (e)    all requirements imposed by any public utility in connection with the supply of utilities to the Property; and

> (f)    all requirements imposed in connection with any approval, consent, license or permit issued or required by any Governmental Agency in connection with the Project.

> 5.11    <u>Litigation</u>.  There are no actions, suits or proceedings pending or, to the best of Borrower's or any Guarantor's knowledge, threatened against or affecting Borrower or the Guarantor or any property of Borrower or the Guarantor before any court or Governmental Agency that would have a material adverse affect on the Property, except as shown on the Title Policy, or Borrower's or the Guarantor's ability to perform their respective obligations under the Loan Documents.

> 5.12    <u>Title to Property</u>.  Borrower has good, marketable and merchantable title to all of its property and assets as disclosed in the financial information provided Lender and at the time of the recordation of the Security Documents shall have good and merchantable title to the Property, and there shall be no mortgages, liens, pledges or other encumbrances of any character on the Property, other than the Security Documents and Permitted Exceptions, without prior consent of Lenders.

## SECTION 6: <u>AFFIRMATIVE AND NEGATIVE COVENANTS</u>.

> Until payment of the Note in full and performance of all obligations of Borrower under the Loan Documents, unless Lender otherwise consents in writing:

> 6.1    <u>Compliance with Requirements</u>.  Borrower shall comply with all conditions, covenants, restrictions, leases, easements, reservations, rights and rights-of-way and all

applicable Laws and other requirements relating to the Property and the Project, and obtain all necessary approvals, consents, licenses and permits of any Governmental Agency, including without limitation those set forth in Section 5.10.

6.2    <u>Sale or Other Encumbrances</u>.  Borrower specifically agrees that:

(a)    In order to induce Lender to make the Loan, Borrower agrees that if the Property or any part thereof or any interest therein, shall be sold, assigned, transferred, conveyed, pledged, mortgaged or encumbered with financing other than that secured hereby or otherwise alienated by Borrower whether voluntarily or involuntarily or by operation of law, except as shall be specifically hereinafter permitted or without the prior written consent of Lender, then Lender, at its option, may declare the Note, including the prepayment fee, if applicable, secured hereby and all other obligations hereunder, to be forthwith due and payable. Except as shall be otherwise specifically provided herein, (a) a change in the legal or equitable ownership of the Property whether or not of record, or (b) a change in the form of entity or ownership (including the hypothecation or encumbrance thereof) of the stock or any other ownership interest in Borrower shall be deemed a transfer of an interest in the Property; provided, however, that any transfer of the Property or any interest therein to an entity which controls, is controlled by or is under common control with Borrower shall not be considered a transfer hereunder. In connection herewith, the financial stability and managerial and operational ability of Borrower is a substantial and material consideration to Lender in its agreement to make the loan to Borrower secured hereby. The transfer of an interest in the Property may materially alter and reduce Lender's security for the indebtedness secured hereby. Moreover, Lender has agreed to make its loan based upon the presumed value of the Property and the Rents and Profits (as such are defined in the Mortgage) thereof.  Therefore, it will be a diminution of Lender's security if junior financing, except as shall be permitted by Lender, or if other liens or encumbrances should attach to the Property.

(b)    Borrower may request Lender to approve a sale or transfer of the Property to a party who would become the legal and equitable owner of the Property and would assume any and all obligations of Borrower under the Loan Documents (the "Purchaser").  Lender shall not be obligated to consider or approve any such sale, transfer or assumption or request for the same.  However, upon such request, Lender may impose limiting conditions and requirements to its consent to an assumption.

(c)    In the event ownership of the Property, or any part thereof, becomes vested in a person or persons other than Borrower, the Lender may deal with such successor or successors in interest with reference to the Note or the Mortgage in the same manner as with Borrower, without in any way releasing, discharging or otherwise affecting the liability of Borrower under the Note, the Mortgage or the other Loan Documents.  No sale of Borrower's interest in the Property, no forbearance on the part of Lender, no extension of the time for the payment of the Mortgage indebtedness or any change in the terms thereof consented to by Lender shall in any way whatsoever operate to release, discharge, modify, change or affect the original liability of the Borrower herein, either in whole or in part. Any

deed conveying the Property, or any part thereof, shall provide that the grantee thereunder assume all of Borrower's obligations under the Note, the Mortgage and all other Loan Documents. In the event such deed shall not contain such assumption, Lender shall have all rights reserved to it hereunder in the event of a default or if Lender shall not elect to exercise such rights and remedies, the grantee under such deed shall nevertheless be deemed to have assumed such obligations by acquiring the Property or such portion thereof subject to the Mortgage. Nothing contained in this section shall be construed to waive the restrictions against the transfer of the Property contained in Section 6.2(a).

    6.3   <u>Removal of Personalty</u>. Borrower shall not:

    (a)   install in or otherwise use in connection with the Project any materials, equipment or fixtures under any security agreements or similar agreements however denominated whereby the right is reserved or accrues to anyone to remove or repossess any such items or whereby any Person other than Lender reserves or acquires a lien upon such items; or

    (b)   remove or permit the removal of any fixtures or personalty located on the Property or used in connection with the Project, except for tools and construction equipment intended for use in connection with the construction of other improvements, unless actually replaced by an article of equal suitability and value, owned by Borrower free and clear of any lien or security interest other than the Security Documents.

    6.4   <u>Payment of Taxes, Assessments and Charges</u>. Borrower shall pay, prior to delinquency, all taxes, assessments, charges and levies imposed by any Governmental Agency which are or may become a lien affecting the Property or any part thereof, including without limitation assessments on any appurtenant water stock; except that Borrower shall not be required to pay and discharge any tax, assessment, charge or levy that is being actively contested in good faith by appropriate proceedings, as long as Borrower has established and maintains reserves adequate to pay any liabilities contested pursuant to this Section in accordance with generally accepted accounting principles and, by reason of nonpayment, none of the property covered by the Security Documents or the lien or security interest of Lender is in danger of being lost or forfeited.

    6.5   <u>Insurance</u>. The Borrower shall at all times maintain the following policies of insurance:

    (a)   prior to completion of the Improvements, builder's "all risk" insurance ("completed value" form), including "course of construction" coverage, covering the Improvements and any Personal Property;

    (b)   from and after completion of the Improvements, property "all risk" insurance covering the Improvements and any Personal Property;

    (c)   commercial general liability insurance in favor of the Borrower (and naming

the Lender as an additional insured) in an aggregate amount not less than $2,000,000 (or such greater amount as may be specified by the Lender from time to time) combined single limit; and

(d)    such other insurance as may be required by applicable Laws (including worker's compensation and employer's liability insurance) or as the Lender may reasonably require from time to time (including "all risk" insurance with respect to any other improvements now or in the future located on the Real Property and comprehensive form boiler and machinery insurance, if applicable, rental loss insurance and business interruption insurance).

The Borrower shall also cause any contractor and each subcontractor employed on the Property to maintain a policy of commercial general liability insurance and, upon request by the Lender, shall cause the Architect and any engineer engaged in connection with the Project to maintain a policy of professional liability insurance, in each case for such periods and in such amounts as the Lender may reasonably require from time to time.

Each policy of builder's-risk and all-risk insurance required by this Section 6.5 shall be in an amount not less than the full replacement cost of the property covered by such policy, shall contain a "waiver of coinsurance" provision, a "full replacement cost" endorsement, a "Mortgagee Loss Payable" clause, and a "Betterments" or "Building Ordinance" endorsement, and shall insure the Property against flood loss risk to the maximum available policy amount if the Real Property is located in a "Flood Hazard Area" (as determined by the Federal Emergency Management Agency).    Each policy of commercial general liability insurance required by this Section shall cover personal injury, property liability, and contractual liability, including coverage for Borrower's indemnity obligations under the Loan Documents, and shall name Lender as an "additional insured". The commercial general liability insurance shall also cover completed operations, and such insurance shall be primary and non-contributing with any other insurance available to the Lender.    All insurance policies shall be in form and substance and issued by insurers reasonably satisfactory to the Lender, and shall contain such deductible and such endorsements as the Lender may reasonably require.    Each policy shall require thirty (30) day written notice to Lender prior to any cancellation thereof.    As a condition to funding the Loan, Borrower shall provide to Lender an ACORD 27 form certificate evidencing such policies.    Upon request by the Lender from time to time, the Borrower shall deliver to the Lender originals or copies of all such insurance policies.

6.6    Title Insurance.  Borrower shall deliver or cause to be delivered to Lender, in form and substance satisfactory to Lender, an ALTA Title Policy which does not contain an exception for mechanic's liens, and such endorsements and binders as Lender may from time to time reasonably require.

6.7    Books and Records.  Borrower shall: (a) maintain full and complete books of account and other records reflecting the results of its operations (in conjunction with any other business as well as specifically with respect to the Project) in accordance with

14

generally accepted accounting principles applied on a consistent basis; and (b) permit Lender and its agents, at any time and from time to time, upon twenty-four (24) hours telephonic notice to Borrower, to inspect and copy all of such books and records, including without limitation any books and records pertaining to the Project or the Project Documents.

      6.8     <u>Entry and Inspection</u>. Lender and its agents shall, at all time, upon twenty-four (24) hours telephonic notice to Borrower, have the right of entry and free access to the Project and the right to inspect all work done, labor performed, and materials furnished in and about the Project. If, at any time, Lender determines, in its sole discretion, that regular inspections of the Project are required, the Borrower shall allow free access to such inspector. Such inspection shall be performed at Borrower's expense, with the actual cost thereof, reasonably incurred, to be paid by Borrower upon seventy-two (72) hours notice from Lender.

      6.9     <u>Physical Security of Project</u>. Borrower shall take appropriate measures to protect the physical security of the Project and the Property.

      6.10    <u>Reporting and Requirements</u>. Borrower shall cause to be delivered to Lender, in form and detail satisfactory to Lender:

      (a)     promptly upon Borrower's learning thereof, notice of:

          (i)     any litigation affecting or relating to Borrower, and/or the Guarantor, and the Property or the Project;

          (ii)    any dispute between Borrower and any Governmental Agency relating to the Property or the Project, the adverse determination of which would adversely affect the Property or the Project;

          (iii)   any threat or commencement of proceedings in condemnation or eminent domain relating to the Property;

          (iv)   any Event of Default or event which, with the giving of notice and/or the passage of time, could become and Event of Default; and

          (v)    any change in the Officers of Borrower.

      (b)     as soon as available, and in any event within thirty (30) calendar days after the end of each month during the term of the Loan, a status report for the Project, if and when any exists, for the month most recently ended (which status report shall contain an itemized breakdown of the progress of construction, sales of units, the gross revenues and all costs and expenses with respect to the Project for such month), in reasonable detail and prepared in accordance with generally accepted accounting principles applied on a consistent basis, and certified as accurate by an officer of Borrower;

(c)    (Intentionally Omitted)

(d)    as soon as available, and in any event within ninety (90) calendar days after the close of each fiscal year of Borrower, annual financial statements applicable to Borrower, all in reasonable detail and prepared in accordance with generally accepted accounting principles applied on a consistent basis;

(e)    as soon as available, and in any event within ninety (90) calendar days after the close of each fiscal year of each of the Guarantor, annual financial statements applicable to the Guarantor, all in reasonable detail and prepared in accordance with generally accepted accounting principles applied on a consistent basis;

(f)    promptly upon receipt thereof, any audited financial information applicable to Borrower or the Guarantor; and

(g)    such other information relating to Borrower, the Guarantor, the Property and/or the Project as Lender may reasonably request from time to time, including without limitation (i) tax returns, to be provided concurrently with the filing thereof with the relevant government authority or (ii) if Borrower or the Guarantor receive an extension from the relevant governmental authority for filing a tax return, satisfactory evidence of such extension.

6.11    Surveys. Borrower agrees to furnish Lender all of the following:

(a)    a perimeter survey of the Property (a copy of the Proposed Subdivision Map of the Property shall satisfy this requirement); and

(b)    upon request by Lender, immediately upon completion of the foundations of any of the Improvements, a survey made and certified by a licensed engineer or surveyor showing the locations of the Improvements located on the Property and showing that the Improvements are located entirely within the Property lines and do not encroach upon any easement, or breach or violate any Law or any covenant, condition or restriction of record, or any building or zoning ordinance.

6.12    Management of Property and Project. Borrower shall not enter into any agreement providing for the management, leasing or operation of the Property or the Project without the prior written consent of the Lender.

6.13    Defense of Vested Right, Modification of Vested Rights. Borrower shall at all times, at its own cost and expense take, pursue and assert all such actions and defenses as are necessary to perfect, maintain and protect its vested development rights with respect to the Property. Should Borrower fail to do so, Lender may do so either in its own name or the name of the Borrower, and all unrecovered fees, costs and expenses incurred by Lender in connection therewith shall be payable by Borrower to Lender on demand, shall bear interest at the Default Rate specified in the Note, and shall be secured by the Mortgage.

Borrower shall not modify, amend, cancel, terminate or otherwise alter any development rights or entitlements with respect to the Property, without Lender's prior written consent, which consent shall not be unreasonably withheld.

## SECTION 7: <u>EVENTS OF DEFAULT AND REMEDIES UPON DEFAULT</u>.

7.1    <u>Events of Default</u>. The occurrence of any one or more of the following, whatever the reason therefor, shall constitute an Event of Default hereunder:

(a)    Borrower shall fail to pay when due any installment of principal or interest on the Note; provided, however, that this default shall be cured by payment no later than five days after the due date; or

(b)    Borrower or Guarantor shall fail to perform or observe any term, covenant or agreement contained in any of the Loan Documents on its part to be performed or observed, other than the failure to make a payment covered by Section 7.1(a), and such failure shall continue uncured as of ten (10) calendar days after written notice by Lender of the occurrence of such failure; provided, however, that if Borrower has commenced to cure the default within said 10-day period and is diligently pursuing such cure, but the default is of such a nature that it cannot be cured within 10 days, then the cure period shall be extended for the number of days necessary to complete the cure, but in no event shall the total cure period be longer than 60 days (the cure period set forth in this Section 7.1(b) shall not apply to any other Events of Default); or

(c)    any representation or warranty in any of the Loan Documents or in any certificate, agreement, instrument or other document made or delivered pursuant to or in connection with any of the Loan Documents proves to have been incorrect in any material respect when made; or

(d)    Borrower (which term shall include any entity comprising Borrower) is dissolved or liquidated, or otherwise ceases to exist, or all or substantially all of the assets of Borrower or any Guarantor are sold or otherwise transferred without Lender's written consent; or

(e)    Borrower or any Guarantor is the subject of an order for relief by the bankruptcy court, or is unable or admits in writing its inability to pay its debts as they mature, or makes an assignment for the benefit of creditors; or Borrower or any Guarantor applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer (the "Receiver"); or a Receiver is appointed without the application or consent of Borrower or any Guarantor, as the case may be, and the appointment continues undischarged or unstayed for sixty (60) calendar days; or Borrower or any Guarantor institutes or consents to any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, custodianship, conservatorship, liquidation, rehabilitation or similar proceedings relating to it or to all or any part of its property under the laws of any jurisdiction; or any similar proceeding is

instituted without the consent of Borrower or any Guarantor, as the case may be, and continues undismissed or unstayed for sixty (60) calendar days; or any judgment, writ, attachment, execution or similar process is issued or levied against all or any part of the Property of Borrower or any Guarantor, and is not released, vacated or fully bonded within sixty (60) calendar days after such issue or levy; or

(f)    there shall occur a material adverse change in the financial condition of Borrower or any Guarantor from their respective financial conditions as of the date of the Note, as determined by Lender in its reasonable discretion, and Lender reasonably believes that such adverse change shall jeopardize (i) Lender's ability to collect the amounts due under the Note, as they become due, or (ii) Lender's ability to foreclose on the Mortgaged Property; or

(g)    any Loan Document, at any time after its execution and delivery and for any reason other than the agreement of Lender or the satisfaction in full of all indebtedness and obligations of Borrower under the Loan Documents, ceases to be in full force and effect or is declared to be null and void by a court of competent jurisdiction; or Borrower or any trustee, officer, director, shareholder or partner of any entity comprising Borrower or any Guarantor claims that any Loan Document is ineffective or unenforceable, in whole or in part, or denies any or further liability or obligation under any Loan Document unless all indebtedness and obligations of Borrower thereunder have been fully paid and performed; or

(h)    all or a substantial portion of the Property is condemned, seized or appropriated by any Governmental Agency; or

(i)    Borrower is dissolved or liquidated, or otherwise ceases to exist, or all or substantially all of the assets of Borrower or the Guarantor are sold or otherwise transferred without Lender's written consent; or

(j)    any lien or security interest created by any Security Document, at any time after the execution and delivery of that Security Document and for any reason other than the agreement of Lender or the satisfaction in full of all indebtedness and obligations of Borrower under the Loan Documents, ceases or fails to constitute a valid, perfected and subsisting lien of the priority required by this Agreement or security interest in and to the Property purported to be covered thereby, subject only to the Permitted Exceptions; or

(k)    any default occurs in any loan document or other agreement by and between Borrower and Lender or by Borrower in favor of Lender with reference to the Loan or otherwise, or any default occurs in any loan document regarding any loan or other obligation secured by the Property or any portion thereof.

7.2    <u>Remedies Upon Default</u>.  Upon the occurrence of any Event of Default, Lender may, at its option, do any or all of the following:

(a)     declare the principal of all amounts owing under the Note, this Agreement and the other Loan Documents and other obligations secured by the Security Documents, together with interest thereon, and any other obligations of Borrower to Lender, to be forthwith due and payable, regardless of any other specified maturity or due date, without notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor, or other notices or demands of any kind or character, and without the necessity of prior recourse to any security;

(b)     take possession of the Property and, at Lender's option, let contracts for, or otherwise proceed with finishing the Improvements and paying the cost thereof; and if Lender advances its own funds for such purposes, such funds shall be considered advanced under the Note and shall be secured by the Security Documents, notwithstanding that such advances may cause the total amount advanced under the Note to exceed the face amount of the Note or the amount committed to be advanced pursuant to this Agreement, and Borrower shall immediately upon demand reimburse Lender therefor, together with interest thereon as if such advances were advances under the Note, from the date of such advance until the date of reimbursement (nothing contained in this Section 7.2(b) or elsewhere in this Loan Agreement shall be construed to make Lender a "mortgagee in possession" unless and until Lender actually takes possession of the Property either in person or through an agent or receiver);

(c)     terminate any right of Borrower to receive any additional advance;

(d)     terminate all rights of Borrower and obligations of Lender under the Loan Documents;

(e)     exercise its right and power to sell, or otherwise dispose of, the Personal Property, or any part thereof, and for that purpose may take immediate and exclusive possession of the Personal Property, or any part thereof, and with or without judicial process to the extent permitted by law, enter upon any premises on which the Personal Property or any part thereof may be situated and remove the same therefrom without being deemed guilty of trespass and without liability for damages thereby occasioned, or at Lender's option Borrower shall assemble the Personal Property and make it available to the Lender at the place and the time designated in the demand; and

(f)     exercise any and all of its rights under the Loan Documents, including but not limited to the right to take possession of and foreclose on any security, and exercise any other rights with respect to any security, whether under the Security Documents or any other agreement or as provided by Law, all in such order and in such manner as Lender in its sole discretion may determine.

7.3     Cumulative Remedies; No Waiver.  All remedies of Lender provided for herein are cumulative and shall be in addition to any and all other rights and remedies provided in the other Loan Documents or provided by Law from time to time. The exercise of any right or remedy by Lender hereunder shall not in any way constitute a cure or waiver

19

of any default hereunder or under any of the other Loan Documents, nor invalidate any notice of default or any act done pursuant to any such notice, nor prejudice Lender in the exercise of any rights hereunder or under the Loan Documents. No waiver by Lender of any default by Borrower hereunder shall be implied from any omission by Lender to take action on account of such default if such default persists or is repeated, and no express waiver shall affect any default other than the default expressly made the subject of the waiver. Any such express waiver shall be operative only for the time and to the extent therein stated. Any waiver of any covenant, term or condition contained herein shall not be construed as a waiver of any subsequent breach of the same covenant, term or condition. The consent or approval by Lender to or of any act by Borrower requiring further consent or approval shall not be deemed to waive or render unnecessary consent or approval to or of any subsequent act.

## SECTION 8: <u>MISCELLANEOUS</u>.

8.1    <u>Performance by Lender</u>. In the event that Borrower shall default in or fail to perform any of its obligations under the Loan documents, Lender shall have the right, but not the duty, without limitation upon any of Lender's rights pursuant thereto, to perform the same, and Borrower agrees to pay to Lender, within seventy-two (72) hours after demand therefor, all costs and expenses incurred by Lender in connection therewith, including without limitation actual attorneys' fees reasonably incurred, together with interest thereon from the date of expenditure at the Default Rate.

8.2    <u>Actions</u>. Provided Borrower has not promptly so acted, Lender shall have the right to commence, appear in, and defend any action or proceeding purporting to affect the rights or duties of the parties hereunder or the payment of any funds, and in connection therewith Lender may pay necessary expenses, employ counsel, and pay reasonable attorneys' fees. Borrower agrees to pay to Lender within seventy-two (72) hours after demand therefor, all costs and expenses incurred by Lender in connection therewith, including without limitation actual attorneys' fees reasonably incurred, together with interest thereon from the date of expenditure at the Default Rate.

8.3    <u>Advances Obligatory</u>. Anything herein to the contrary notwithstanding, it is specifically understood and agreed that any advances made by Lender pursuant to this Agreement, including but not limited to all funds advanced by Lender, shall be deemed advanced by Lender under an obligation to do so, regardless of the person or entity to whom such advance is made. Advances made in the reasonable exercise of Lender's judgment that such are necessary to complete the Improvements or to protect its security are to be deemed obligatory advances hereunder and are to be secured by the Note and Mortgage, and such security shall relate back to the original recording of the Mortgage.

8.4    <u>Nonliability of Lender</u>. Borrower acknowledges and agrees that:

(a)    any inspections of the Property or the construction of the Improvements made by or through Lender are for purposes of administration of the Loan only and Borrower is

not entitled to rely upon the same with respect to the quality, adequacy or suitability of materials or workmanship, conformity to the plans therefor, state of completion or otherwise; Borrower shall make its own inspections of such construction to determine that the quality of the Improvements and all other requirements of such construction are being performed in a manner satisfactory to Borrower and in conformity with the Improvement Plans and all applicable Laws; and Borrower shall immediately notify Lender, in writing, should the same not be in conformity with the plans therefor and all applicable laws;

(b)    by accepting or approving anything required to be observed, performed, fulfilled or given to Lender pursuant to the Loan Documents, including any certificate, statement of profit and loss or other financial statement, survey, appraisal, lease or insurance policy, Lender shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof, and such acceptance or approval thereof shall not constitute a warranty or representation to anyone with respect thereto by Lender;

(c)    Lender neither undertakes nor assumes any responsibility or duty to Borrower to select, review, inspect, supervise, pass judgment upon or inform Borrower of any matter in connection with the Project, including without limitation matters relating to the quality, adequacy or suitability of: (i) any plans or specifications, (ii) architects, contractors, subcontractors and materialmen employed or utilized in connection with the construction of the Improvements, or the workmanship of or the materials used by any of them, or (iii) the progress or course of any construction and its conformity or nonconformity with the plans therefor; and Borrower shall rely entirely upon its own judgment with respect to such matters, and any review, inspection, supervision, exercise of judgment or information supplied to Borrower by Lender in connection with such matters is for the protection of Lender only and neither Borrower nor any third party is entitled to rely thereon;

(d)    Lender owes no duty of care to protect Borrower against negligent, faulty, inadequate or defective building or construction;

(e)    the relationship of Borrower and Lender under the Loan Documents is, and shall at all times remain, solely that of borrower and lender, and Lender neither undertakes nor assumes any responsibility or duty to Borrower or to any other Person with respect to the Property or Loan, except as expressly provided in the Loan Documents; and notwithstanding any other provision of the Loan Documents: (i) Lender is not, and shall not be construed as, a partner, joint venturer, alter-ego, manager, controlling person or an insider or other business associate or participant of any kind of Borrower, and Lender does not intend to ever assume such status; (ii) Lender's activities in connection with the Loan Documents shall not be "outside the scope of the activities of a lender of money" under Nevada law, as amended or recodified from time to time, and Lender does not intend to ever assume any responsibility to any Person for the quality, suitability, safety or condition of the Property or Improvements; and (iii) Lender shall not be deemed responsible for or a participant in any acts, omissions or decisions of Borrower; and

21

(f)    Lender shall not be directly or indirectly liable or responsible for any loss, claim, cause of action, liability, indebtedness, damage or injury of any kind or character to any Person or property arising from any construction on, or occupancy or use of, any of the Property, whether caused by, or arising from: (i) any defect in any building, structure, soil condition, grading, fill, landscaping, or other improvements thereon or in any on-site or off-site improvement or other facility therein or thereon; (ii) any act or omission of Borrower or any of Borrower's agents, employees, independent contractors, licensees or invitees; (iii) any accident in or on any of the Property or any fire, flood or other casualty or hazard thereon; (iv) the failure of Borrower, any of Borrower's licensees, employees, invitees, agents, independent contractors or other representatives to maintain any of the Property in a safe condition; and (v) any nuisance made or suffered on any part of the Property.

8.5    No Third Parties Benefitted.  This agreement is made for the purpose of defining and setting forth certain obligations, rights and duties of Borrower, Lender and USA in connection with the Loan.  It shall be deemed a supplement to the Note and the Security Documents, and shall not be construed as a modification of the Note or the Security Documents, except as provided herein.  It is made for the sole protection of Borrower, Lender, and USA and their successors and assigns.  No other Person shall have any rights of any nature hereunder of by reason hereof.

8.6    Indemnity.  Borrower indemnifies Lender against, and holds Lender harmless from, any and all losses, damages (whether general, punitive or otherwise), liabilities, claims, cause of action (whether legal, equitable or administrative), judgments, court costs and legal or other expenses, including attorneys' fees, which Lender may suffer or incur as a direct or indirect consequence of: (a) Lender's performance of this Agreement or any of the Loan Documents, including, without limitation, Lender's exercise or failure to exercise any rights, remedies or powers in connection with this Agreement or any of the Loan Documents but excluding charges and assessments by Governmental Agencies imposed upon the Lender in the normal course of the Lender's business such as taxes and regulatory fees; (b) Borrower's failure to perform any of Borrower's obligations as and when required by this Agreement or any of the other Loan Documents, including without limitation any failure, at any time, of any representation or warranty of Borrower to be true and correct and any failure by Borrower to satisfy any condition; (c) any claim or cause of action of any kind by any Person to the effect that Lender is in any way responsible or liable for any act or omission by Borrower, whether on account of any theory or derivative liability or otherwise, including but not limited to any claim or cause of action for fraud, misrepresentation, tort or willful misconduct; (d) any act or omission by Borrower, any contractor, subcontractor or material supplier, engineer, architect, or any other Person with respect to any of the Property or Improvements; or (e) any claim or cause of action of any kind by any Person which would have the effect of denying Lender the full benefit or protection of any provision of this Agreement or the Loan Documents but excluding charges and assessments by Governmental Agencies imposed upon Lender in the normal course of Lender's business such as taxes and regulatory fees.  Lender's rights of indemnity shall not be directly or indirectly limited, prejudiced, impaired or eliminated in any way by any finding or allegation that Lender's conduct is active, passive or subject to any other classification or that Lender

22

is directly or indirectly responsible under any theory of any kind, character or nature for any act or omission by Borrower or any other Person. Notwithstanding the foregoing, Borrower shall not be obligated to indemnify Lender with respect to any intentional tort or act of negligence which Lender is personally determined by the judgment or a court of competent jurisdiction (sustained on appeal, if any) to have committed. Borrower shall pay any indebtedness arising under this indemnity to Lender immediately within seventy-two (72) hours after demand therefor by Lender together with interest thereon from the date such indebtedness arises until paid at the Default Rate. Borrower's duty to defend and indemnify Lender shall survive the release and cancellation of the Note and the release and reconveyance or partial release and reconveyance of the Mortgage.

8.7     Commissions.  Borrower hereby indemnifies Lender from the claim of any Person for a commission or fee in connection with the Loan.

8.8     Lenders' Representative.  The persons and entities which comprise Lender hereby collectively appoint USA Commercial Mortgage Company ("USA") to administer the Loan on their behalf, to make all necessary demands on Borrower and to execute and deliver all approvals and notices to be given by Lender hereunder.

8.9     Binding Effect; Assignment.  This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns, except that, as provided herein, Borrower may not assign its rights or interest or delegate any of its duties under this Agreement or any of the other Loan Documents without prior written consent of Lender.

8.10    Amendments; Consents.   No amendment, modification, supplement, termination or waiver of any provision of this Agreement or any of the other Loan Documents, and no consent to any departure by Borrower therefrom, may in any event be effective unless in writing signed by Lender, and then only in the specific instance and for the specific purpose given.

8.11    Costs, Expenses and Taxes.  Borrower shall pay to Lender, within seventy-two (72) hours after demand therefor:

(a)     the actual attorneys' fees and out-of-pocket expenses incurred by Lender in connection with the negotiation, preparation, execution, delivery and administration of this Agreement and any other Loan Documents and any matter related thereto;

(b)     the actual costs and expenses of Lender in connection with any modification of any Loan Document or in connection with the enforcement of this Agreement and any other Loan Document and any matter related thereto, including the actual fees and out-of-pocket expenses, reasonably incurred, of any legal counsel, independent public accountants and other outside experts retained by Lender; and

(c)     all costs, expenses, fees, premiums and other charges relating or arising with

23

respect to the Loan Documents or any transactions contemplated thereby or the compliance with any of the terms and conditions thereof, including without limitation the Disbursement Agent's fee, appraisal fees, inspection fees, cost review fees, recording fees, filing fees, release or reconveyance fees, title insurance premiums, and the cost of realty tax service for the term of the Loan.

All sums paid or expended by Lender under the terms of this Agreement and the other Loan Documents shall be considered to be a part of the Loan. Except as otherwise specifically stated herein, all such sums shall be secured by the Security Documents, shall bear interest from the date of expenditure as if such sums were advances under the Note, and shall be immediately due and payable by Borrower within seventy-two (72) hours after demand therefor.

8.12    <u>Survival of Representations and Warranties</u>.    All representations and warranties of Borrower and the Guarantor contained herein or in any other Loan Document shall survive the making of the Loan and execution and delivery of the Note, and are material and have been or will be relied upon by Lender, notwithstanding any investigation made by Lender or on behalf of Lender. For the purpose of the foregoing, all statements contained in any certificate, agreement, financial statement, or other writing delivered by or on behalf of Borrower or the Guarantor pursuant hereto or to any other Loan Document or in connection with the transactions contemplated hereby or thereby shall be deemed to be representations and warranties of Borrower or the Guarantor contained herein or in the other Loan Documents, as the case may be.

8.13    <u>Notices</u>. All notices to be given pursuant to this Agreement shall be sufficient if given by personal services, by guaranteed overnight delivery services, by telex, telecopy or telegram or by being mailed postage prepaid, certified or registered mail, return receipt requested, to the described addresses of the parties hereto as set forth below, or to such other address as a party may request in writing. Any time period provided in the giving of any notice hereunder shall commence upon the date of personal service, the date after delivery to the guaranteed overnight delivery service, the date of sending the telex, telecopy or telegram or two (2) days after mailing certified or registered mail.

**BORROWER'S ADDRESS:**         Palm Harbor One, LLC
153 Andover Street, Suite 104
Danvers, Massachusetts 01923
Attn. Joseph Lilly

**LENDER'S ADDRESS:**         USA Commercial Mortgage Company
4484 South Pecos Road
Las Vegas, Nevada 89121
Attn: Joe Milanowski

8.14    <u>Further Assurances</u>. Borrower shall, at its sole expense and without expense to Lender, do such further acts and execute and deliver such further documents as Lender

from time to time may require for the purpose of assuring and confirming unto Lender the rights hereby created or intended now or hereafter so to be, or for carrying out the intention or facilitating the performance of the terms of any Loan Document, or for assuring the validity of any security interest or lien under any Security Document.

8.15    Governing Law. The Loan Documents shall be governed by, and construed and enforced in accordance with, the laws of the State of Nevada, or, at Lender's election, the laws of the State of Florida, without regard to choice of law provisions.

8.16    Severability of Provisions. Any provision in any Loan Document that is held to be inoperative, unenforceable or invalid shall be inoperative, unenforceable or invalid without affecting the remaining provisions, and to this end the provisions of all Loan Documents are declared to be severable.

8.17    Assignment or Sale of Participation by Lender; Advertising. Lender may, at any time, sell, transfer, assign or grant participation in the Loan and in the Loan Documents and Lender may forward to its Partners or to such participant and prospective participant all documents and information relating to the Loan and to Borrower, whether furnished by Borrower or otherwise, as Lender determines necessary or desirable. Lender and USA may also reasonably divulge and advertise the making of the Loan and the amount thereof.

8.18    Headings. Section headings in this Agreement are included for convenience of reference only and are not part of this Agreement for any other purpose.

8.19    Time of the Essence. Time is of the essence with respect to all duties and obligations of Borrower under any Loan Document..

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**BORROWER:**    Palm Harbor One, LLC

By: _____
Joseph Lilly, Manager

**LENDER:**

_____    _____

25

# EXHIBIT "A"

## LENDER

| | NAMES | AMOUNT |
|---|---|---|
| 1 | Liberty Resource Management Corp. a Pennsylvania company | $200,000 |
| 2 | Celso Acosta a divorced man | $50,000 |
| 3 | Gloria Weiner Adams Trustee of the Gloria Weiner Adams Revocable Trust dated 6-8-2005 | $50,000 |
| 4 | First Savings Bank Custodian For Kenneth Addes IRA | $50,000 |
| 5 | Michel F. Aiello and Patricia A. Aiello Trustees of the Michel F. Aiello and Patricia A. Aiello Trust Agreement dated 10/4/94 | $50,000 |
| 6 | Steven C. Altman a married man dealing with his sole and separate property | $100,000 |
| 7 | AIG Limited a Nevada Limited Partnership | $50,000 |
| 8 | August J. Amaral Inc. a Nevada corporation | $100,000 |
| 9 | Pensco Trust Company Inc. Custodian for Robert S. Angel IRA | $70,000 |
| 10 | Patrick J. Anglin an unmarried man | $100,000 |
| 11 | Toni Antonacci Family Trust dated 6/26/98 | $100,000 |
| 12 | John P. Aquino and Lisa Aquino husband and wife as joint tenants with the right of survivorship | $100,000 |
| 13 | Rod Arbogast & Donna Arbogast Trustees of the Arbogast Family Trust | $250,000 |
| 14 | Richard Armijo & Sanayha Armijo Trustees for the Armijo Family Trust dated 8/19/1999 | $50,000 |
| 15 | Bert E. Arnlund Trustee of the Bert E. Arnlund Charitable Remainder Unitrust dated 12/31/01 | $100,000 |
| 16 | Darlene Ashdown & Vincent N. Greene husband & wife as joint tenants with right of survivorship | $50,000 |
| 17 | Robert J. Asselin & Mary E. Asselin Trustees of the 1994 Robert Asselin & Mary Asselin Family Trust | $50,000 |
| 18 | Dr. H. C. Ayoub a married man as his sole & separate property | $75,000 |
| 19 | Paul P. Backes & Loretta D. Backes Co-Trustees of the Backes Family Trust dated 8/8/88 | $50,000 |
| 20 | Simmtex Inc. a Nevada corporation | $50,000 |
| 21 | Gary R. Barton & Mavis J. Barton husband & wife as joint tenants with right of survivorship | $50,000 |
| 22 | Beatrice Baskin Trustee of the Beatrice Baskin Family Trust Dtd 6/1/91 | $50,000 |
| 23 | Alan B. Bennett A Married Man Dealing With His Sole & Separate Property | $50,000 |
| 24 | David P. Betteridge a single man | $100,000 |
| 25 | Jerry L. Blackman Sr. and Carolyn N. Blackman Living Trust dated 11/26/01 | $50,000 |
| 26 | Donald W. Brehm a married man dealing with his sole & separate property | $50,000 |

26

| | | |
|---|---|---|
| 27 | June F. Brehm a unmarried woman | $50,000 |
| 28 | Charles R. Brice and Jayneta L. Brice husband and wife as joint tenants with the right of survivorship | $50,000 |
| 29 | Donald E. Briney Trustee of the Briney Family Exemption Trust dated 11/5/82 | $65,000 |
| 30 | Charles R. Brooks and Wendy S. Brooks husband and wife as joint tenants with right of survivorship | $50,000 |
| 31 | Sunrise Mini-Storage a Nevada General Partnership | $100,000 |
| 32 | First Savings Bank Custodian For Edward Burgess IRA | $50,000 |
| 33 | June Y. Burlingame & David B. Burlingame husband & wife as joint tenants with right of survivorship | $70,000 |
| 34 | PLB Enterprises LLC | $65,000 |
| 35 | Richard L. Cadieux & Clara M. Cadieux husband & wife as joint tenants with right of survivorship | $100,000 |
| 36 | David S. Cadwallader & Alyce E. Cadwallader Trustees of the Cadwallader 2001 Trust | $50,000 |
| 37 | Doris Mae Campbell Trustee of the Doris Mae Campbell Revocable Trust of 1999 dated 3/30/99 | $70,000 |
| 38 | Linda F. Carsten an unmarried woman | $80,000 |
| 39 | A. William Ceglia a married man dealing with his sole & separate property | $50,000 |
| 40 | Robert J. Centanni Sr. & Susan R. Centanni husband & wife as joint tenants with right of survivorship | $50,000 |
| 41 | Eunice O. Chapman an unmarried woman payable on death to Barbara Heffner and Elizabeth Tomlin | $50,000 |
| 42 | Jack R. Clark & Linda C. Reid husband & wife as joint tenants with right of survivorship | $100,000 |
| 43 | Ray L. Coffin a married man dealing with his sole & separate property | $50,000 |
| 44 | George S. Cohan Trustee of the George S. Cohan & Natalie H. Cohan Family Trust dated 4/1/03 | $100,000 |
| 45 | Irwin Cohen & Marilyn T. Cohen Trustees of the Cohen Living Trust dated 3/6/90 | $50,000 |
| 46 | Bernard Cohen and Elaine Cohen Trustees of the Bernard Cohen Trust dated 3/24/88 | $50,000 |
| 47 | Gerald E. Colligan an unmarried man | $50,000 |
| 48 | Shirley M. Collins Trustee as her sole & separate property under the Collins Family Trust dated 1/29/93 | $50,000 |
| 49 | Thomas Raymond Conway & Victoria C. E. Conway husband & wife as joint tenants with right of survivorship | $50,000 |
| 50 | Iris G. Corley Trustee of the Iris G. Corley Trust dated 9/19/84 | $50,000 |
| 51 | Billy James Corley Trustee of the Billy James Corley Revocable Living Trust dated 9/13/04 | $50,000 |
| 52 | April M.Corley Trustee of the April Corley Trust dated 4/25/05 | $50,000 |
| 53 | Bruce H. Corum Trustee of the Credit Shelter Trust | $50,000 |

| | | |
|---|---|---|
| 54 | Sam Costanza Trustee of the Costanza 1987 Survivor's Trust dated 3/12/87 | $100,000 |
| 55 | Gareth A. R. Craner Trustee of the Craner Family Trust Under Agreement dated 2/23/99 | $50,000 |
| 56 | Charles D. Cunningham & Susan M. Cunningham husband & wife as joint tenants with right of survivorship | $80,000 |
| 57 | Richard N. Dahlke a married man dealing with his sole & separate property | $50,000 |
| 58 | Deborah A. Daniel A single woman | $50,000 |
| 59 | Michael Dashosh & Elizabeth Dashosh husband & wife as joint tenants with rights of survivorship | $100,000 |
| 60 | Andrew Dauscher & Ellen Dauscher husband & wife as joint tenants with right of survivorship | $150,000 |
| 61 | Davis Investments a Nevada partnership | $300,000 |
| 62 | Marrice L. Davis and Nanci E. Davis husband and wife as joint tenants with the right of survivorship | $100,000 |
| 63 | DeHart/Hooks LP a Nevada limited partnership | $100,000 |
| 64 | Gary Deppe A single man | $50,000 |
| 65 | Ann R. Dery and James D. Dery husband and wife as Tenants in Common | $100,000 |
| 66 | Dwayne H. Deutscher and Michelle T. Deutscher husband and wife as joint tenants with the right of survivorship | $50,000 |
| 67 | Dennis A. DeVito a married man | $100,000 |
| 68 | Thomas Di Jorio & Antonette Di Jorio husband & wife | $50,000 |
| 69 | Helmut R. Dobeck & Eloise A. Dobeck husband and wife as joint tenants with the right of survivorship | $50,000 |
| 70 | Linda Patrucco Doerr Trustee of the Doerr Family Trust dated 9/12/02 | $85,000 |
| 71 | Mark A. Dolginoff Trustee of the Mark A. Dolginoff Separate Property Trust dated 11/21/97 amended/restated on 5/10/00 | $50,000 |
| 72 | Daniel Drubin & Laura Drubin husband & wife as joint tenants with right of survivorship | $100,000 |
| 73 | First Savings Bank Custodian For Daniel Drubin IRA | $25,000 |
| 74 | First Savings Bank Custodian For Daniel Drubin Sep IRA | $40,000 |
| 75 | James J. Duffy Jr. Trustee of the Duffy 1986 Trust dated 6/18/86 | $150,000 |
| 76 | Donald C. Dunbar and Wanda Dunbar Trustees of the Dunbar Revocable Living Trust dated 11/21/1998 | $300,000 |
| 77 | Wayne A. Dutt & Cynthia Deann Dutt Trustees of the Wayne A. Dutt Trust | $150,000 |
| 78 | Edward D. Earl a married man dealing with his sole and separate property | $75,000 |
| 79 | First Savings Bank Custodian For Mary H. Earp IRA | $75,000 |
| 80 | Schwartz & Earp Joint Venture | $57,000 |
| 81 | Pioneer Accounting & Investments LLC a Colorado LLC  Christian Elbert Manager | $50,000 |

28

| | | |
|---|---|---|
| 82 | Ellis L. Elgart and Sivia V. Elgart Trustees of the Ellis L. Elgart Revocable Living Trust dated 7/8/02 | $50,000 |
| 83 | Frank E. Ensign a single man | $75,000 |
| 84 | Melinda Estevez & Richard David Estevez wife & husband as joint tenants with right of survivorship Acct. #2 | $50,000 |
| 85 | Daniel L. Everett & Sandra M. Everett husband & wife as joint tenants with right of survivorship | $50,000 |
| 86 | Marguerite Falkenborg Trustee of the Marguerite Falkenborg 2000 Trust dated 6/20/00 | $100,000 |
| 87 | John J. & Gina A. Fanelli Husband and Wife as joint tenants with rights of survivorship | $500,000 |
| 88 | John Fanelli & Jodi Fanelli husband & wife as joint tenants with right of survivorship | $150,000 |
| 89 | Patricia Ferguson Trustee of the Ferguson Living Trust dated 6/28/00 | $50,000 |
| 90 | Dennis Flier Trustee of the Dennis Flier Inc. Defined Benefit Trust dated 6/29/87 | $40,000 |
| 91 | Donald T. Flood & Betty R. Flood Trustees of the Flood Family Trust dated 12/24/85 | $50,000 |
| 92 | Sarah A Foley & Bernadette Foley as joint tenants with right of survivorship | $150,000 |
| 93 | Allen K. Forbes a single man | $50,000 |
| 94 | Seymour Frank a married man dealing with his sole and separate property | $50,000 |
| 95 | Robert G. Fuller Trustee of the RGF Revocable Trust | $50,000 |
| 96 | Theodore J. Fuller and Joan L. Fuller Trustee of the Fuller Family Trust dated 5/29/97 | $100,000 |
| 97 | Susan F. Gackenbach Trustee of the Susan F. Stein Trust Dated 2/12/00 | $100,000 |
| 98 | Jerry L. Gage & Darlene C. Gage Trustees of the Dakota Trust dated 9/16/96 | $50,000 |
| 99 | Frederick D. Garth and Blair F. Garth husband and wife as joint tenants with the right of survivorship | $50,000 |
| 100 | Thornton Garth and Sharon R. Garth husband and wife as joint tenants with the right of survivorship | $50,000 |
| 101 | Walter L. Gasper Jr. an unmarried man | $50,000 |
| 102 | Christian Geisser & Hildegard Geisser husband & wife as joint tenants with right of survivorship | $50,000 |
| 103 | Caroline M. Gerwin Trustee of the Caroline Gerwin Family Trust dated 11/2/95 | $330,000 |
| 104 | William L. Ghidossi an unmarried man | $55,000 |
| 105 | First Savings Bank custodian for Nancy R. Gilmour IRA | $50,000 |
| 106 | Gonska Foundation LLC a Nevada limited liability company | $50,000 |
| 107 | Karen Gordon Trustee of the KGG Living Trust dated 7/29/96 | $50,000 |
| 108 | Horizon Investment Management LLC | $100,000 |
| 109 | William Harrison Goulding and Elizabeth R. Goulding husband & wife as joint tenants with right of survivorship | $50,000 |

29

| | |
|---|---|
| 110 Glenn Greenberg and Denise M. Greenberg husband and wife as joint tenants with the right of survivorship | $50,000 |
| 111 David M. Greenblatt an unmarried man transfer on death to Karl Greenblatt | $50,000 |
| 112 Clifford Hagberg & Claire F. Hagberg husband & wife as joint tenants with right of survivorship | $100,000 |
| 113 First Savings Bank Custodian For Gary Haider IRA | $50,000 |
| 114 Stanley Halfter a married man dealing with his sole & separate property | $50,000 |
| 115 Daniel R. Halseth & Sandra K Halseth Trustees of the Halseth Family Trust restated 4/21/00 | $100,000 |
| 116 Larry E. Hanan Trustee of the Larry E. Hanan Revocable Trust dated 5/20/02 | $50,000 |
| 117 T. Claire Harper Trustee of the Harper Family Trust dated 2/28/84 | $50,000 |
| 118 Marisa Deville Harvey a married woman dealing with her sole and separate property payable on death to Liana De Ville Paul De Ville and Christina De Ville | $100,000 |
| 119 Kevin J. Haselhorst A Single Man | $50,000 |
| 120 Roger N. Havekost a married man dealing with his sole & separate property | $50,000 |
| 121 Brooke Ann Hawley an unmarried woman & Stephen Hawley a married man dealing with his sole & separate property as joint tenants with right of survivorship | $100,000 |
| 122 Rose O. Hecker a single woman & Anita Rosenfield a single woman as joint tenants with right of survivorship | $50,000 |
| 123 Michael T. Heffner & Barbara C. Heffner Trustees of the Heffner Family Trust dated 9/10/02 | $100,000 |
| 124 Richard M. Heinen a married man as his sole & separate property | $100,000 |
| 125 Helms Homes LLC a Nevada limited liability company | $2,000,000 |
| 126 Walter F. Henningsen Trustee of the Walter F. Henningsen Revocable Trust dated 2/18/03 | $50,000 |
| 127 Brian K. Herndon and Sharon L. Herndon Trustees of the Herndon Family Trust dated 05/29/1997 | $300,000 |
| 128 Donald A. Herrmann & Nancy E. Herrmann husband & wife as joint tenants with right of survivorship | $50,000 |
| 129 Edward O. High an unmarried man | $50,000 |
| 130 Ruby M. Hill Trustee of The Ruby M. Hill Family Trust dated December 12 1992 | $60,000 |
| 131 Ralph C. Holder & Naomi S. Holder Trustees of the Holder Revocable Trust dated 10/21/91 | $75,000 |
| 132 Jason L. Holt a married man dealing with his sole & separate property | $50,000 |
| 133 Edward W. Homfeld an unmarried man | $100,000 |
| 134 Susan N. Houston & William H. Houston  Trustees of the William H. Houston and Susan N. Houston Revocable Family Trust dated 12/20/85 | $100,000 |

| | | |
|---|---|---|
| 135 | Earl Howsley Jr. a married man dealing with his sole & separate property | $90,000 |
| 136 | George W. Hubbard and Carol N. Hubbard Trustees of the Hubbard trust dated 7/29/1998 | $100,000 |
| 137 | Richard Ianni an unmarried man | $50,000 |
| 138 | Jonathan R. Iger A married man as his sole & separate property | $50,000 |
| 139 | Donald E. James an unmarried man transfer on death to Betty A. Roe sister | $60,000 |
| 140 | Mary Jean Jellison a married woman dealing with her sole & separate property | $50,000 |
| 141 | First Savings Bank Custodian For Mary Jellison IRA | $60,000 |
| 142 | Alicia Jenkins a single woman | $50,000 |
| 143 | Ronald Johnson Trustee of the C. I. B. B. Inc. Pension Plan | $50,000 |
| 144 | Delbert T. Johnston Jr. & Rebecca J. Johnston Trustees of the Johnston Estate Revocable Trust dated 5/17/94 | $100,000 |
| 145 | Rodney L. Johnston and Diane E. Johnston Trustees of the Johnston Trust dated 9/7/85 | $50,000 |
| 146 | Jack L. Jones a married man dealing with his sole and separate property | $50,000 |
| 147 | K. Ken Kaneda & Brigitte Arend-Kaneda Trustees of the Kaneda Living Trust dated 5/30/02 | $50,000 |
| 148 | Arthur E. Kebble & Thelma M. Kebble Trustees of the Arthur E. Kebble & Thelma M. Kebble Family Trust dated 5/19/95 | $50,000 |
| 149 | Christina M. Kehl an unmarried woman | $50,000 |
| 150 | Robert J. Kehl & Ruth Ann Kehl husband & wife as joint tenants with right of survivorship | $500,000 |
| 151 | Dr. Dana D. Keith DDS a married man dealing with his sole and separate property | $150,000 |
| 152 | Tally-Ho Fund a Pennsylvania company | $50,000 |
| 153 | Norman Kiven a married man dealing with his sole & separate property | $50,000 |
| 154 | Othmar Klay and Christine Klay Trustees of the Klay Living Trust dated 7/11/90 | $100,000 |
| 155 | Walter Klevay & Gail Klevay husband & wife | $50,000 |
| 156 | Bernard A. Kloenne Trustee of the Bernard Kloenne Living Trust dated 10/10/86 | $75,000 |
| 157 | G. Robert Knoles and Christina G. Knoles husband and wife as joint tenants with the rights of survivorship | $50,000 |
| 158 | Guenther A. Kohler & Elfriede Kohler Trustees of the 1989 Kohler Living Trust dated 6/13/89 | $75,000 |
| 159 | Stephen V. Kowalski & Maria T. Sutherland husband and wife as joint tenants with the right of survivorship | $50,000 |
| 160 | Ronald Kreykes & Linda Kreykes husband & wife as tenants in common | $50,000 |
| 161 | Donald H. Kwiatkowski & Sandra L. Kwiatkowski husband & wife as joint tenants with right of survivorship | $50,000 |

31

| | | |
|---|---|---|
| 162 | Paul L. Kwiatkowski and Colita Jo Kwiatkowski Trustees of the Kwiatkowski Revocable Trust dated 12/17/04 | $50,000 |
| 163 | Dina Ladd a single woman | $50,000 |
| 164 | Teresa H. Lee Trustee of the William W. Lee & Teresa H. Lee 2003 Family Trust Agreement dated 6/26/03 | $100,000 |
| 165 | Ron Lifton & Leonora Lifton Trustees of the Lifton Trust dated 2/9/99 | $50,000 |
| 166 | Stephen Lincoln & Patricia Lincoln Trustees of the Stephen & Patricia Lincoln Trust dated 8/21/03 | $50,000 |
| 167 | Douglas Littrell & Joani Littrell husband & wife as joint tenants with right of survivorship | $50,000 |
| 168 | Ivan Loebs a married man dealing with his sole & separate property | $70,000 |
| 169 | Area 2 L.L.C. a Nevada limited liability company | $50,000 |
| 170 | Leona Lubliner Trustee of the Leona Lubliner Living Trust U/A dated 7/16/96 | $50,000 |
| 171 | Erika G. Lynn an unmarried woman | $50,000 |
| 172 | Christopher A. Marando and Noreen E. Marando husband and wife as joint tenants with the right of survivorship | $50,000 |
| 173 | Michele L. Marson-Ruiz & Phillip J. Ruiz husband & wife as joint tenants with right of survivorship | $50,000 |
| 174 | Norman Martineau & Kathryn J. Martineau husband & wife as joint tenants with right of survivorship | $50,000 |
| 175 | Pamela Jean Marton an unmarried woman transfer on death to James Dickinson | $50,000 |
| 176 | Gerald Marts & Linda R. Marts husband & wife as joint tenants with right of survivorship | $50,000 |
| 177 | Morris Massry a married man dealing with his sole & separate property | $100,000 |
| 178 | Monroe Mayo & Louise Mayo Trustees of the Mayo Family Trust | $50,000 |
| 179 | Alicia McBride & Marlon McBride husband & wife as joint tenants with right of survivorship | $50,000 |
| 180 | Dale J. McMullan Trustee of the McMullan Living Trust dated 8/19/94 | $50,000 |
| 181 | Joseph J. Melz and Linda M. Melz husband and wife as joint tenants with the right of survivorship | $50,000 |
| 182 | Brian J. Miller and Penny Miller husband and wife as joint tenants with right of survivorship | $50,000 |
| 183 | Albert J. Mineconzo Trustee of the Albert J. Mineconzo Living Trust dated 11/4/97 | $50,000 |
| 184 | Douglas Minter & Elizabeth F. Minter Trustees of the Minter Family 1994 Trust | $50,000 |
| 185 | Equity Trust Company Custodian FBO Gary Moberly IRA | $150,000 |
| 186 | First Trust Co. Of Onaga Custodian For Karen S. Moberly IRA | $84,000 |
| 187 | Felix N. Moccia Trustee of the Felix N. Moccia Trust dated 4/11/94 | $50,000 |
| 188 | Monighetti Inc. a Nevada corporation | $50,000 |
| 189 | First Savings Bank custodian for Robert T. Monsen IRA | $50,000 |
| 190 | Paula A. Morgan Trustee of the P. Morgan Trust dated 7/1/88 | $50,000 |

| | | |
|---|---|---|
| 191 | William H. Morgan and Donna R. Morgan Trustees of the William H. and Donna R. Morgan Living Trust dated 6/7/04 | $50,000 |
| 192 | Adelaide L. Moschogianis & Christine Moschogianis Trustees of the Al Moschogianis Revocable Trust dated 11/30/04 | $50,000 |
| 193 | Frank J. Murphy and Margaret F. Murphy husband and wife as joint tenants with the right of survivorship | $50,000 |
| 194 | Dr. James & Tracy Murphy Trustees of The Murphy Family Trust | $75,000 |
| 195 | Walter Musso & Barbara Musso Trustees of the Musso Living Trust dated 11/30/92 | $50,000 |
| 196 | Larry J. Newman & Elsie D. Newman Trustees of the Newman Family Trust dated 9/30/97 | $50,000 |
| 197 | First Savings Bank Custodian For Marvin Nicola IRA | $75,000 |
| 198 | Frank T. Novak & Patricia A. Novak Trustees of the Novak Living Trust dtd 10/21/97 | $50,000 |
| 199 | Dennis J. O'Hare & Irene R. O'Hare Trustees of the Irene R. O'Hare Trust dated 7/28/88 | $50,000 |
| 200 | John E. O'Riordan & Sonhild A. O'Riordan husband & wife as joint tenants with the right of survivorship | $100,000 |
| 201 | Henry J. Obermuller & Mengia K. Obermuller Trustees of the Henry & Mengia Obermuller Trust dated 9/14/90 | $50,000 |
| 202 | Robert L. Ogren Trustee of the Robert L. Ogren Trust dated 6/30/92 (Acct#2) | $60,000 |
| 203 | Diana A. Oldham a married woman dealing with her sole & separate property | $50,000 |
| 204 | David M. Olds & Sally W. Olds husband & wife as joint tenants with right of survivorship | $50,000 |
| 205 | Franklin D. Ott and Kathryn R. Ott Trustees of the Ott Family Revocable Trust dated 4/29/98 | $50,000 |
| 206 | Shirley Payne an unmarried woman | $50,000 |
| 207 | Lealand T. Pearce & Isabelle J. Pearce husband & wife as joint tenants with right of survivorship | $50,000 |
| 208 | First Savings Bank Custodian for Robert L. Pech IRA | $50,000 |
| 209 | Larry Peschke & Susan Peschke husband & wife as joint tenants with right of survivorship | $50,000 |
| 210 | Ronald C. Phelps Trustee of the Ronald C. Phelps Trust dated 10/19/01 | $50,000 |
| 211 | Betty J. Phenix a married woman dealing with her sole & separate property | $50,000 |
| 212 | Mary P. Phillips Trustee of the Mary P. Phillips Trust dated 7/26/01 | $50,000 |
| 213 | Michael E. Pile a single man | $50,000 |
| 214 | William Platt and Sondra B. Platt husband and wife as joint tenants with the right of survivorship | $50,000 |
| 215 | Jack Polen Trustee of the Jack & Gladys Polen Family Trust dated 6/28/88 | $100,000 |
| 216 | Martha W. Potter Trustee of the Martha W. Potter Revocable Trust | $50,000 |

| | | |
|---|---|---|
| 217 | Hans J. Prakelt an unmarried man | $50,000 |
| 218 | Evelyn E. Pulley Trustee of the Pulley Revocable Trust dated 12/20/00 | $50,000 |
| 219 | Michael J. Pulley & Deborah A. Pulley Trustees of the Pulley Living Trust dated 4/30/01 | $50,000 |
| 220 | Justin D. Rafferty & Patricia L. Lewis Trustees of the The Lewis/Rafferty Family Trust dated 6/25/97 | $80,000 |
| 221 | Laverne F. Rafferty Trustee of the Harry J. Rafferty & Laverne F. Rafferty Trust dated 4/15/90 | $50,000 |
| 222 | Richard M. Raker Trustee of the Richard M. Raker Living Trust dated 3/18/98 | $50,000 |
| 223 | Ray Properties LLC a Nevada limited liability company | $50,000 |
| 224 | Jean G. Richards Trustee of the Jean G. Richards Trust dated 9/30/1999 | $60,000 |
| 225 | Larry L. Rieger & Patsy R. Rieger Trustees of the Larry L. Rieger & Patsy R. Rieger Revocable Trust dated 8/14/91 | $50,000 |
| 226 | Brooks H. & Dee Dee Robinson Husband and wife joint tenants with right of survivorship | $50,000 |
| 227 | Robert R. Rodriguez an unmarried man | $50,000 |
| 228 | Arnold Rosenthal a single man | $50,000 |
| 229 | John Ross Enterprises Inc. a California corporation | $50,000 |
| 230 | Sheila Rothberg a married woman dealing with her sole & separate property | $50,000 |
| 231 | Thalia Nicholas Routsis Trustee of the Thalia Routsis Family Trust dated 7/24/90 | $50,000 |
| 232 | Ingrid A. Rutherford Trustee of the Ingrid A. Rutherford Family Trust dated 7/8/99 | $50,000 |
| 233 | Ronald F. Ryan and Mary A. Ryan husband and wife as joint tenants with the right of survivorship | $50,000 |
| 234 | Mark A. Sauceda an unmarried man | $200,000 |
| 235 | Irwin Schneider & Ursula Schneider husband & wife as joint tenants with right of survivorship | $50,000 |
| 236 | Robert H. Schultz & Sharon L. Schultz Trustees of the Robert H. Schultz & Sharon L. Schultz Living Trust dated 2/25/97 | $50,000 |
| 237 | Jacqueline L. Scott a married woman dealing with her sole & separate property | $50,000 |
| 238 | Abraham Serouya a married man | $100,000 |
| 239 | Ronald C. Shackelford Trustee of the Shackelford Family Trust dated 9/21/04 | $50,000 |
| 240 | Ryan S. Shane a single man and Tracy Benson a single woman | $50,000 |
| 241 | First Savings Bank Custodian For Gary O. Sharp IRA | $50,000 |
| 242 | Gerald A. Sherwin Transfer on Death to Pamela J. Sherwin | $50,000 |
| 243 | Andrew Shier & Peri Chickering husband & wife as joint tenants with right of survivorship | $50,000 |
| 244 | Donald E. Shoup & Sharon K. Shoup husband & wife as joint tenants with right of survivorship | $100,000 |

| | | |
|---|---|---|
| 245 | Alan R. Simmons & Judith B. Simmons husband & wife as joint tenants with right of survivorship | $50,000 |
| 246 | Herbert Slovis a single man  & Julie B. Slovis a single woman as joint tenants with right of survivorship | $50,000 |
| 247 | Oliver F. Smith Trustee of the Oliver F. Smith Incorporated Profit Sharing Plan | $50,000 |
| 248 | The Soldo Family Limited Partnership | $100,000 |
| 249 | Robert S. Speckert Trustee of the Robert S. Speckert Rev. Living Trust dated 6/11/92 | $100,000 |
| 250 | Charles A. Spencer a single man | $60,000 |
| 251 | Brett W. Sperry an unmarried man | $300,000 |
| 252 | Peter E. Sprock Trustee of the Peter E. Sprock 2001 Trust | $60,000 |
| 253 | Stater Family Ltd Partnership | $300,000 |
| 254 | Naomi F. Stearns Trustee of the Naomi F. Stearns Trust Dated 8/9/1985 | $50,000 |
| 255 | Jay S. Stein Trustee of the Jay S. Stein Charitable Remainder Unitrust dated 7/15/02 | $200,000 |
| 256 | Michael D. Stewart & Mary Jude Stewart Trustees of the Stewart Family Trust dated 1/15/98 | $100,000 |
| 257 | Lesley Stricker a widow | $50,000 |
| 258 | Hans - Ueli Surber a married man dealing with his sole and separate property | $50,000 |
| 259 | Marcia Sweany-Volpe a married woman dealing with her sole & separate property transfer on death to Linda St. Pierre | $175,000 |
| 260 | Nicholas Randazzo Linda Tabas Stempel & Robert Tabas Executors for the Estate of Daniel Tabas | $250,000 |
| 261 | Sovereign Capital Advisors LLC a Nevada limited liability company | $50,000 |
| 262 | KTaylorGO Investments LTD a Texas company | $100,000 |
| 263 | Kerry S. Taylor & Joyce L. Taylor Trustees of the Taylor Living Trust dated 2/27/98 | $50,000 |
| 264 | Annabelle E. TaylorTTEE of the Annabelle E. Taylor Family Trust dated 5/12/95 | $50,000 |
| 265 | William Taylor & Lyla Taylor Trustees of the Taylor Family Trust dated 12/23/86 | $50,000 |
| 266 | Gregory R. Thompson an unmarried man | $50,000 |
| 267 | Ronda L. Threlfall a married woman dealing with her sole & seperate property | $100,000 |
| 268 | Lynnette S. Thurman and John H. Thurman husband and wife as joint tenants with right of surviviorship | $50,000 |
| 269 | Sigmund L. Tomczak & Diana Tomczak Trustees of the Tomczak Family Trust dated 4/25/83 | $85,000 |
| 270 | Robert C. Toombes and Patsy G. Toombes husband and wife as joint tenants with the right of survivorship | $100,000 |
| 271 | Stephanie Trager & Lawrence B. Trager a husband & wife as joint tenants with rights of survivorship | $100,000 |

| | | |
|---|---|---:|
| 272 | T-2 Enterprises LLC. Manager  Warren W. Tripp | $50,000 |
| 273 | T-3 Enterprises LLC. Manager Warren W. Tripp | $50,000 |
| 274 | Gary E. Tucker & Linda L. Tucker husband & wife as joint tenants with right of survivorship | $50,000 |
| 275 | Mark Tysseling & Sharon Vey-Tysseling husband & wife as joint tenants with right of survivorship | $100,000 |
| 276 | USA Capital First Trust Deed Fund | $1,174,000 |
| 277 | USA Commercial Mortgage Company | $3,670,000 |
| 278 | Peggy Ann Valley Trustee as her sole & separate property under the McLaughlin-Valley Trust dated 2/24/97 | $95,000 |
| 279 | Julie A. Virga an unmarried woman | $50,000 |
| 280 | Marietta Voglis a married woman dealing with her sole & separate property | $50,000 |
| 281 | Darren E. Watson A single man transfer on death to Linda L. Watson | $50,000 |
| 282 | Dean F. Weible & Ardis Weible Co-TTEEs of the Weible 1981 Trust dated 6/30/81 | $50,000 |
| 283 | Diana F. Weiland Trustee for the benefit of Gerald R. Weiland & Diana F. Weiland Trust | $100,000 |
| 284 | George S. Willett and Laurene Willett husband and wife as joint tenants with right of survivorship | $50,000 |
| 285 | Frederick P. Windisch Trustee of the Windisch 1998 Living Trust | $75,000 |
| 286 | Frederick Paul Windisch a widower | $50,000 |
| 287 | Jerry Woldorsky a married man dealing with his sole & separate property | $50,000 |
| 288 | Richard G. Worthen and La Rue S. Worthen Trustees of the Richard G. Worthen Family Trust | $500,000 |
| 289 | Gregory D. Yonai Trustee of the Gregory D. Yonai Family Trust | $75,000 |
| 290 | Terry Thomas Young a single man | $50,000 |
| 291 | Erin Belle Zenor Trustee of the Erin Belle Zenor 1994 Trust dated 4/13/94 | $50,000 |
| 292 | Osvaldo Zunino Trustee of the Osvaldo Zunino Living Trust dated 12/18/98 | $100,000 |
| | TOTAL | $29,000,000 |

**EXHIBIT "B"**

DISBURSEMENT SCHEDULE

All disbursements after the closing are subject to Section 3.2, above. Month "X" means x months after closing. The exact amount and date of each advance are subject to amendment by mutual agreement of the Borrower and USA. The Interest Reserve amount is the portion of the figure in the column labeled "Amount" that is designated for Interest Reserve.

| MONTH | AMOUNT | INTEREST RESERVE |
|---|---|---|
| Closing | $26,200,000 | $350,545 |
| Month 1 | $    255,000 | $220,000 |
| Month 2 | $ 1,145,000 | $300,000 |
| Month 3 | $    375,000 | $300,000 |
| Month 4 | $    505,000 | $310,000 |
| Month 5 | $    260,000 | $260,000 |
| Month 6 | $    260,000 | $260,000 |
| TOTAL: | $29,000,000 | $2,000,000 |

## EXHIBIT "C"

### PERMITTED EXCEPTIONS

Items 2(e, f and g) (with all taxes paid current), 5 through 8, and 10 through 13, as shown on that A.L.T.A. Commitment issued by Chicago Title Insurance Company under Commitment No. 630501248 with an effective date of November 23, 2005.

## EXHIBIT "D"

## DESCRIPTION OF REAL PROPERTY

**Parcel 1**

A portion of Lots 18, 19, 58, 59 and 64, TAMPA AND TARPON SPRINGS LAND COMPANY, as recorded in Plat Book 1, page 116, of the public records of Hillsborough County, Florida, of which Pinellas County was formerly a part, situated in the Northwest 1/4 of Section 30, Township 27 South, Range 16 East and also being in the Southwest 1/4 of Section 19, Township 27 South, Range 16 East, Pinellas County, Florida, being more particularly described as follows:

From the Northeast corner of the Northwest 1/4 of said Section 30; thence along the North line of said Section 30, North 86° 04'07" West, 652.04 feet to the Point of Beginning; thence along the boundary of property described in Official Records Book 5309, page 2031, by the following 7 courses: (1) thence continue North 86° 04'07" West, 50.94 feet; (2) thence leaving said line North 65° 02'55" West, 63.86 feet; (3) thence South 00° 03'51" East, 266.72 feet; (4) thence South 89 ° 56'09" West, 83.54 feet; (5) thence South 00° 03'51" East, 455.95 feet; (6) thence North 89° 56'09" East, 69.67 feet; (7) thence South 00° 03'51" East, 265.88 feet; thence North 87° 07'35" West, 536.13 feet to the Easterly right-of-way of Belcher Road Corridor (a 110 foot right-of-way); thence North 00° 02'46" West, along said right-of-way, 1031.73 feet to a point of curve; thence along the arc of a curve to the left, radius 1200.92 feet, delta 04° 33'28", arc 95.53 feet, chord bearing North 02° 19'29" West, 95.51 feet; thence leaving said right-of-way South 81° 32'09" East, 667.87 feet; thence South 00° 36'33" East, 97.60 feet to the Point of Beginning.

LESS AND EXCEPT land conveyed to Pinellas County for CYPRESS POND ROAD by Quitclaim Deed recorded in Official Records Book 6647, page 146, of the public records of Pinellas County, Florida.

ALSO LESS AND EXCEPT land conveyed to Pinellas County for CYPRESS POND ROAD by Quit-Claim Deed recorded in Official Records Book 14642, Page 1104, public records of Pinellas County, Florida.

**Parcel 2**

A portion of Lots 18 and 59, TAMPA AND TARPON SPRINGS LAND COMPANY, as recorded in Plat Book 1, Page 116, public records of Hillsborough County, Florida, of which Pinellas County was formerly a part situated in the Northwest 1/4 of Section 30, Township 27 South, Range 16 East and also being in the Southwest 1/4 of Section 19, Township 27 South, Range 16 East, Pinellas County, Florida, being more particularly described as follows:  From the Northeast corner of the Northwest 1/4 of said Section 30; thence along the North line of said Section 30, North 86° 04'07" West,

437.33 feet to the Point of Beginning; thence leaving said line South 00° 03'51" East, 960.32 feet; thence North 87° 07'35" West, 337.11 feet; thence North 00° 03'51" West, 265.88 feet; thence South 89° 56'09" West, 69.67 feet; thence North 00° 03'51" West, 455.95 feet; thence North 89° 56'09" East, 83.54 feet; thence North 00° 03'51" West, 266.72 feet; thence South 65° 02'55" East, 63.86 feet to a point on the aforedescribed North line of Section 30, thence along said line South 86° 04'07" East, 50.94 feet; thence leaving said line South 00° 36'33" East, 26.60 feet to a point on a curve; thence along the arc of a curve to the right concaved to the Southeast, radius 860.00 delta 14 ° 15'57", arc 214.13 feet, chord bearing North 86° 47'54" East, 213.58 feet to a point of tangency on the aforementioned North section line; thence along said line South 86° 04'07" East, 0.61 feet to the aforedescribed Point of Beginning.